## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| RFR HOLDING LLC and | ) | |
| CENTURY 21 CHICAGO, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | No. 08 CV 1555 |
| | ) | |
| v. | ) | Judge Wayne R. Andersen |
| | ) | |
| PONTE GADEA FLORIDA, INC. and | ) | Magistrate Judge Jeffrey Cole |
| CHICAGO MICHIGAN, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' 12(b)(6) MOTION TO DISMISS PLAINTIFFS' COMPLAINT

### INTRODUCTION[1]

Under Century 21 Chicago's contract to purchase the Property at 730 North Michigan Avenue, Plaintiffs had no ability to share confidential information about the Property with anyone, let alone market the Property to another prospective purchaser. Nonetheless, RFR Holding had Ponte Gadea sign a Confidentiality Agreement to share that information with, and market the Property to, Ponte Gadea, and to stop Ponte Gadea, and its affiliates, from talking directly with the Seller . . . *forever.* Under Plaintiffs' view of the Confidentiality Agreement, *even after Century 21 Chicago no longer had a contractual right to purchase the Property,* Plaintiffs still could stop Ponte Gadea from talking with the Seller. Plaintiffs' position fails as a matter of logic, equity, and, most importantly for this Motion, law.

---

[1] As in Defendants' 12(b)(6) Motion to Dismiss Plaintiffs' Complaint ("Motion"), "Century 21 Chicago" herein refers to Plaintiff Century 21 Chicago, LLC; "RFR Holding" refers to Plaintiff RFR Holding LLC; "Ponte Gadea" refers to Defendant Ponte Gadea Florida, Inc.; "Chicago Michigan" refers to Defendant Chicago Michigan, LLC; "Seller" refers to 730 North Michigan Avenue, LLC; "Property" refers to the land and improvements at issue located at 730 North Michigan Avenue, Chicago, Illinois; and "Confidentiality Agreement" refers to the letter agreement, dated November 9, 2007, executed by Ponte Gadea at RFR Holding's request, referred to in paragraphs 13-19, 31, 34, 35, 37, 39, and 44 of Plaintiffs' Complaint.

## PLAINTIFFS' TWO-COUNT COMPLAINT

### Count I – Breach of the Confidentiality Agreement

Plaintiffs allege that, by contract of sale dated October 12, 2007 ("Original Contract of Sale"), Century 21 Chicago contracted with Seller to purchase the Property at 730 North Michigan Avenue for $350 million. (Compl., ¶ 11). Under that Original Contract of Sale:

> Purchaser [Century 21 Chicago] agrees that neither Purchaser nor Purchaser's Representatives [RFR Holding] shall, at any time or in any manner either directly or indirectly, divulge, disclose or communicate to any person, entity or association the Information [including, *inter alia*, "all information and documents in any way relating to the Property, the operation thereof or the sale thereof"], or any other knowledge or information acquired by Purchaser or Purchaser's Representative from Seller, any Seller Related Party or by Purchaser's own inspections and investigations, other than matters that were in the public domain at the time of receipt by Purchaser or Purchaser's Representatives. Without Seller's prior written consent, Purchaser shall not disclose and Purchaser shall direct Purchaser's Representatives not to disclose to any person, entity or association or [sic] any of the terms, conditions or other facts with respect to this Agreement, including, without limitation, the status hereof, and ***shall not market or offer the Property for sale***.

(*See* Original Contract of Sale, § 4.2.1(b) and (e), attached hereto as Exhibit A) (emphasis added).[2]

Despite the restrictions in the Original Contract of Sale, Century 21 Chicago and RFR Holding almost immediately began to market the Property to Ponte Gadea. (Compl., ¶¶ 11, 14, 29). "In furtherance of such efforts," Plaintiffs had Ponte Gadea enter into a Confidentiality Agreement on November 9, 2007, which purported to prevent Ponte Gadea and its affiliates from disclosing to any third party any Confidential Information that they received on the Property, and

---

[2] Although Plaintiffs do not attach to their Complaint the Original Contract of Sale with the Seller, the Court is required to consider the Original Contract of Sale not only because is it referred to in Plaintiffs' Complaint (¶¶ 1, 11, 21, 22, and 23), but also because it is part and parcel of Plaintiffs' claim. *See, e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). It is not surprising that Plaintiffs did not attach the Original Contract of Sale given that contract prohibited Plaintiffs from entering into the very Confidentiality Agreement that they now are trying to enforce.

from discussing the Property with the Seller. (Compl., ¶¶ 13-19; Confidentiality Agreement, ¶ 4, attached hereto as Exhibit B).[3] Eleven days later, however, on November 20, 2007, Century 21 Chicago terminated its Original Contract of Sale with the Seller. (Compl., ¶ 23). Plaintiffs allege that *after* that termination – "between November 28, 2007 and December 5, 2007" – Defendants "discussed the Property with Seller." (Compl., ¶ 31). Plaintiffs claim that these discussions, held after its termination of the Original Contract of Sale, were in breach of the Confidentiality Agreement. (Compl., ¶¶ 31, 35, 39).

### Count II – Tortious Interference with Prospective Economic Advantage

To make out its tortious interference claim, Plaintiffs allege that, notwithstanding Century 21 Chicago's termination of the Original Contract of Sale, Century 21 Chicago continued discussions with the Seller and separately continued discussions with Ponte Gadea. (Compl., ¶¶ 24, 25). Plaintiffs then allege that on or after November 28, 2007, "Century 21 Chicago and the Seller confirmed to one another that they were each confident the sale of the Property to Century 21 Chicago could now be finalized." (Compl., ¶¶ 26 and 27). There is no allegation that Defendants' discussions with Seller were what caused Seller not to sell the Property to Century 21 Chicago. Plaintiffs just repeat their same allegation that "between November 28, 2007 and December 5, 2007, in breach of its obligations under the Confidentiality Agreement and in a purposeful attempt to interfere with Century 21 Chicago's prospective economic advantage and contractual relationship, [Defendants] discussed the Property with Seller," and that, on the latter date, Seller terminated its discussions with Century 21 Chicago. (Compl., ¶¶ 30-31, 40, and 41).

---

[3] Plaintiffs do not attach the Confidentiality Agreement to their Complaint either, despite bringing a claim for its purported breach. The Court is required to consider this letter agreement as well. *Venture Assocs.*, 987 F.2d at 431.

3

## APPLICABLE LEGAL STANDARDS

As this Court recently noted, "[a]ddressing a motion to dismiss involves two considerations. First, under the notice pleading requirement of Fed. R. Civ. P. 8(a), this Court must determine whether the Complaint sufficiently provides the defendants with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Alvarado v. Battaglia*, No. 06 C 4663, 2008 WL 410639, *1 (N.D. Ill. Feb. 13, 2008) (Andersen, J., presiding) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). A complaint cannot consist merely of conclusory allegations unsupported by factual assertions and, therefore, "[c]ourts are likewise not required to accept legal conclusions alleged or inferred from the facts pled in the complaint." *Hillman v. City of Chicago*, No. 04 C 6671, 2007 WL 2827797, at *1 (N.D. Ill. Sept. 25, 2007) (Andersen, J., presiding).

Second, "[i]f the complaint sufficiently provides notice of a claim, the Court must then determine if the allegations therein 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level."'" *Alvarado*, 2008 WL 410639, at *1 (quoting *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007) (citing *Bell Atlantic*, 127 S. Ct. at 1965, 1973)). "Although this does 'not require heightened fact pleading of specifics,' it does require the complaint to contain 'enough facts to state a claim to relief that is plausible on its face.'" *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Bell Atlantic*, 127 S. Ct. at 1974). The mere recitation of the elements of a cause of action is not sufficient. *Gavin v. AT&T Corp.*, No. 07 C 3078, 2008 WL 400697, at *4 (N.D. Ill. Feb. 12, 2008) (citing *Bell Atlantic*, 127 S. Ct. at 1964-65).

Moreover, the Court must consider documents attached to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to [the] claim." *Venture Assocs.*, 987 F.2d at 431; *see also Meer v. Graham*, 524 F. Supp. 2d 1044, 1048 (N.D. Ill. 2007). And,

4

importantly, "if the plaintiff pleads facts that demonstrate that he has no claim, he may plead himself out of court." *Alvarado*, 2008 WL 410639, at *1 (citing *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006)).

## ARGUMENT

### I.    Count I (Breach Of The Confidentiality Agreement) Fails To State A Claim Upon Which Relief Can Be Granted.

The Confidentiality Agreement contains a choice of law provision selecting New York law. (Ex. B, Confidentiality Agreement, ¶ 9). Under New York law, "[a] plaintiff seeking to recover for breach of contract . . . must prove (1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages." *Cohen v. Elephant Wireless, Inc.*, No. 03 Civ. 4058(CBM), 2004 WL 1872421, at *3 (S.D.N.Y. Aug. 19, 2004). Even if the elements of the claim are made out, however, a Court will dismiss a contract claim, pursuant to Rule 12(b)(6), if the contract is void, unenforceable, or expired, or a party's performance is excused. *See e.g., Trump v. Trump*, Nos. 96 CIV. 2995(SAS), 96 CIV. 6927(SAS), 1997 WL 277375, at *5 (S.D.N.Y. May 27, 1997) (void contracts); *Kimball Assocs., P.A. v. Homer Central Sch. Dist.*, No. 00-CV-897(HGM)(GJD), 2000 WL 1720751, at *3-5 (N.D.N.Y. Nov. 9, 2000) (expired contract).

### A.    The Prohibition Against Defendants Discussing the Property with the Seller Is Void as a Matter of Law.

Although New York law permits certain competitive restrictions in agreements, "contracts to restrain competition are generally against public policy, illegal and void." *Atkin v. Union Processing Corp.*, 77 A.D.2d 791 (N.Y. App. Div. 1980) (citations omitted). In cases involving competition–restrictive covenants, the court assesses the reasonableness of such covenants by "a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." *Spherenomics Global Contact Centers v. vCustomer*

*Corp.*, 427 F. Supp. 2d 236, 249 (E.D.N.Y. 2006) (citation omitted). "At issue under such an analysis are the legitimate business interests to be served by the covenant, the reasonableness of the geographic scope and *temporal duration of the restriction*, and the hardship enforcement would impose." *Id.* (emphasis added).

Here, the restriction against Defendants "discuss[ing] the Property" with the Seller is void for two reasons. First, it is simply too sweeping. *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 612-613 (S.D.N.Y. 2001) (applying the "simple rule of reason" test to find unenforceable a restriction that barred a party from "speak[ing] to or correspond[ing] or hav[ing] any contact whatsoever with" certain persons and entities that had business dealings with the other party). Second, the unlimited duration of the restriction is per se unreasonable and void. *Spherenomics*, 427 F. Supp. 2d at 249 (the restriction must have a "reasonable[] . . . temporal duration").

## B.    The Prohibition Was Expired.

Even if the Court were to allow such a sweeping prohibition and try to assist Plaintiffs by implying some time limit on the restriction,[4] the *only* possible reasonable time limit for restraining Defendants from talking with the Seller would have been for as long as Century 21 Chicago was under contract to buy the Property. The Confidentiality Agreement clearly states that it was executed "[i]n connection with a proposed transaction (the 'Proposed Transaction') involving the purchase of, the lease of, or an acquisition of an interest or investment in, the land and improvements commonly known as 730 North Michigan Avenue, Chicago, IL…" (Ex. B, Confidentiality Agreement, at 1). Plaintiffs concede that they terminated their Original Contract of Sale to buy the Property on November 20, 2007. (Compl., ¶ 23). Any possible "Proposed Transaction," and any prohibition on Defendants from talking to Seller, were premised on the

---

[4] *Austin v. Trybus*, 524 N.Y.S.2d 895, 896 (N.Y. App. Div. 1988) ("[W]here no time is expressed in the agreement for the performance of conditions, there is an implied duty to perform within a reasonable time").

obvious condition that Century 21 Chicago had a contractual right to own the Property. Once the Original Contract of Sale was terminated, any obligation of Defendants, if enforceable at all, expired. *See Kimball Assocs.*, 2000 WL 172051, at *3-5 (deciding the "temporal limit" of a contract from its other terms and granting Rule 12(b)(6) dismissal when said contract, accordingly, was terminated).

## C. Defendants' Compliance with the Prohibition Was Excused Once Plaintiffs No Longer Had a Contractual Right to Buy the Property.

Finally, for the same reasons that the prohibition against Defendants speaking with the Seller was expired, Defendants' compliance with it was excused. Any possible "Proposed Transaction" was premised on the obvious condition that Century 21 Chicago had a contract to own the Property. When a change in the situation undermines the purposes of a contract, and, given the "altered circumstances, it is clear that reasonable men would not have made the subject contract, and that the contract has been rendered worthless to [a party]," that party's performance "is excused." *City of New York v. Long Island Airports Limousine Serv. Corp.*, 476 N.Y.S.2d 93, 94 (N.Y. App. Div. 1983) (internal citation omitted); *cf. Septembertide Publishing, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (quoting *Callanan v. Powers*, 92 N.E. 747 (N.Y. 1910)) (holding it is a "classic expression of [New York] law" that rescission of a contract is warranted when there is a breach "'so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract'"); *Clanton v. Smith*, 567 N.Y.S.2d 67, 68 (N.Y. App. Div. 1991) (finding defendant's "failure to perform was so fundamental that it defeated the object of the parties in making the contract").

## II.    Count II (Tortious Interference) Fails As A Matter Of Law.

### A.    The Tort-Based Claim Is Duplicative of the Breach of Contract Claim.

Plaintiffs' second claim, for tortious interference with prospective economic advantage, is merely their breach of contract claim dressed up in tort clothing.  Both New York and Illinois law bar such a duplicative tort-based claim.[5]

Under New York law, "a tort cause of action does not lie where it is duplicative of a claim sounding in contract:  the plaintiff must assert that the defendant breached a duty independent of the claimed contract."  *Maxus Leasing Group, Inc. v. Kobelco Am., Inc.*, No. 5:04-CV-518(FJS/DEP), 2007 WL 655779, at *4 (N.D.N.Y. Feb. 26, 2007) (citation omitted); *Allerand, LLC v. 233 East 18th St. Co.*, 798 N.Y.S.2d 399, 402 (N.Y. App. Div. 2005) (citation omitted) ("The parties' rights and obligations respecting the matter in dispute are governed by their contract and the purported claim for tortious interference with contract does no more than restate plaintiffs' claim for the contract's breach.").

Likewise under Illinois law, Courts bar tort claims when they are intertwined with or duplicative of contract claims.  *Chicago Messenger Serv., Inc. v. Nextel Comms., Inc.*, No. 01 C 8820, 2003 WL 22225619, at *10 (N.D. Ill. Sept. 24, 2003) ("Illinois law is true to the distinction between contract claims and tort claims.  To the extent that [Plaintiffs'] allegations are, at their core, a claim for breach of contract, then relief is not warranted when simply

---

[5] While the Confidentiality Agreement has a New York choice of law selection, that is not determinative of the law governing Plaintiffs' tortious interference claim. *Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 863 (N.D. Ill. 2002) (citation omitted) ("[T]ortious interference with prospective economic advantage is a tort that is independent of choice-of-law clauses and subject to the forum's choice-of-law rules."). "'The law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and the parties.'" *Id.* at 864 (quoting *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 504 (7th Cir. 1998) (quoting *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996)). Because Plaintiffs' members all are New York citizens, and Plaintiff RFR Holding was formed there (Compl., ¶¶ 2 and 4), that is where "the economic impact of [any] tortious interference will be felt," making New York the "place of injury" whose law should govern. *See id.* Here, however, the result is the same either way. As shown in this Memorandum of Law, both Illinois and New York law support dismissal of this count.

repackaged as fraud-based claims."); *Hi-Grade Cleaners, Inc. v. Am. Permac, Inc.*, 561 F. Supp. 643, 644 (N.D. Ill. 1982) ("Basically, we believe that when a defendant is already contractually bound to the plaintiff, his assurance that he will perform in accordance with the contract is simply a reiteration of his original promise. It creates no additional liability in contract, let alone in tort.").

Such duplicative claims are to be dismissed. *See e.g., Baguer v. Spanish Broadcasting Sys., Inc.*, No. 04-CV-8393(KMK), 2007 WL 2780390, at *3-4 (S.D.N.Y. Sept. 20, 2007) (dismissing tortious breach of contract claim because "[u]nder New York law, absent a breach of a legal duty independent of the contract itself, a plaintiff has no cause of action in tort for a breach of contract" and because plaintiff failed to establish that defendant owed a duty to plaintiff in tort "separate and apart from its failure to fulfill its contractual obligations"); *U.S. Network Servs., Inc. v. Frontier Comms. of the West, Inc.*, 115 F. Supp. 2d 353, 356 (W.D.N.Y. 2000) (dismissing a misrepresentation claim because "the claim [was] duplicative of plaintiff's contract and warranty claims, and seeks the same compensatory damages as those claims"); *Daredia v. Gold & Diamond Merch. Group, Inc.*, No. 97 C 8149, 1999 WL 965591, at *4 (N.D. Ill. Sept. 30, 1999) ("These claims must be dismissed because they are either impermissible tort claims or claims which are duplicative of the breach of the contract claim."); *Hi-Grade Cleaners*, 561 F. Supp. at 644 (dismissing misrepresentation claim as duplicative of contract claim).

That Plaintiffs' tortious interference claim is premised on the same purported breach of the Confidentiality Agreement as Plaintiffs' contract claim is manifestly clear from the face of the Complaint:

- "Specifically, Defendants ***took the confidential information*** provided by Plaintiffs and ***used that information*** to interfere with Plaintiffs' proposed acquisition of the property. In other words, Defendants ***breached the confidentiality agreement***, went behind Plaintiffs' back, and stole the opportunity from Plaintiffs." (Compl., ¶ 1) (emphasis added).

- "Upon information and belief, between November 28, 2007 and December 5, 2007, *in breach of its obligations under the Confidentiality Agreement* and *in a purposeful attempt to interfere with Century 21 Chicago's prospective economic advantage and contractual relationship*, [Ponte Gadea] and its affiliate CM discussed the property with Seller." (Compl., ¶ 31) (emphasis added).

The specific allegations within each Count also are intertwined:

| **Count I (Breach of Contract)** | **Count II (Tortious Interference)** |
|---|---|
| "In express violation of the Confidentiality Agreement, Defendant engaged in discussions concerning the Property with Seller." (Compl., ¶ 35). | "Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 32 [breach of contract allegations] of the complaint with the same force and effect as if fully set forth herein." (Compl., ¶ 40). |
| "In fact, Defendants intentionally sought to purchase, and in fact did purchase, the Property directly from Seller." (Compl., ¶ 36). "Such actions on the part of Defendants constituted a breach of their obligations under the Confidentiality Agreement." (Compl., ¶ 37). "But for Defendants' wrongful actions, Plaintiff would have purchased the Property from Seller." (Compl., ¶ 38). | "Defendants' interference was done in a wrongful manner and was in *deliberate disregard of the confidential relationship* which existed with Plaintiffs, which specifically precluded Defendants from entering into discussions with Seller respecting Defendants' purchase of Property." (Compl., ¶ 41) (emphasis added). |

And, for both counts, Plaintiffs seek the identical, albeit unsupported, damages "in excess of twenty-five million dollars ($25,000,000)." (Compl., ¶¶ 39, 45). *See In re WorldCom, Inc.*, 361 B.R. 697, 719 (Bankr. S.D.N.Y. 2007) (finding that the tortious interference claims were duplicative of Debtors' claims for breach of contract that prevented party from soliciting customers and finding that "even if claims for tortious interference were allowable, recovery for claims under the theory of tortious interference would be duplicative of damages already awarded for breach of contract"); *Rockefeller Univ. v. Tishman Constr. Corp. of N.Y.*, 240 A.D. 2d 341, 342-43 (N.Y. App. Div. 1997) (when "the identical contractual benefit of the bargain recovery is sought," the tort action is barred as duplicative).

Plaintiffs' tortious interference claim merely restates their breach of contract claim.[6]  As stated by this Court in *Alvarado,* "if the plaintiff[s] plead[] facts that demonstrate that [they have] no claim, [they] may plead [themselves] out of court." 2008 WL 410639, at *1.  Such indisputably is the case here.  Plaintiffs' tortious interference claim must be dismissed.

**B.    Defendants Could Not Have Interfered with
Plaintiffs' Prospective Economic Advantage.**

"Only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." *Widewaters Prop. Dev. Co. v. Katz*, 836 N.Y.S.2d 746, 749 (N.Y. App. Div. 2007) (quotation omitted).  Similarly, under Illinois law, "in order to maintain a cause of action for tortious interference with a contract or prospective contractual relationship, the tortfeasor must be a third party to the contractual relationship." *Quist v. Bd. of Trustees of Comm. College Dist. No. 525*, 629 N.E.2d 807, 811 (Ill. App. Ct. 1994) (citing *IK Corp. v. One Fin. Place Partner*, 558 N.E.2d 161, 172 (Ill. App. Ct. 1990)).

The "stranger" analysis extends to third-party beneficiaries to the relationship, whether or not intended by the contracting parties. *See* 1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th ed. Dec. 2007):

> It has also been held that an intended third-party beneficiary of a contract may not be liable for interference therewith.  Moreover, the exclusion of third-party beneficiaries has been expanded to cover those who benefit from the contract of others *without regard to whether the beneficiary was intended by the contracting parties to be a third-party beneficiary.*

(emphasis added). *See e.g., Sea Crest Constr. Corp. v. City of New York*, 730 N.Y.S.2d 332, 333 (N.Y. App. Div. 2001) (city was intended third party beneficiary of subcontractor's contract); *Disaster Servs., Inc. v. ERC P'ship*, 492 S.E.2d 526, 529 (Ga. Ct. App. 1997) ("Where . . . a

---

[6] The ultimate proof that Plaintiffs' tortious interference claim merely duplicates Plaintiffs' contract claim is to ask what – other than the Confidentiality Agreement's prohibition – would have made it improper for Defendants (or any other prospective purchaser) to discuss the Property with the Seller?  Clearly, Plaintiffs' tortious interference claim is founded solely upon the Confidentiality Agreement.  As such, it is duplicative and must be dismissed.

defendant had a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract, although the defendant is a 'non-signer of a particular contract[, it is not] a stranger to the contract itself or to the business relationship giving rise thereto and underpinning [the contract.]"); *Lake Tightsqueeze, Inc. v. Chrysler First Fin. Servs. Corp.*, 435 S.E.2d 486, 489 (Ga. Ct. App. 1993) ("Inasmuch as the [defendant] was not a stranger and would benefit from any contracts entered into between the [plaintiffs] and residential purchaser, the [defendant] could not have tortiously interfered with any purchase contracts.")

Defendants are not strangers to the contractual relationship that once existed between Century 21 Chicago and Seller, or to the alleged prospective contractual relationship between Plaintiffs and Seller that purportedly arose thereafter.  Plaintiffs made Defendants third party beneficiaries of the Original Contract of Sale by marketing the Property to them and having Ponte Gadea enter into the Confidentiality Agreement on behalf of itself and its affiliates. (Compl., ¶¶ 12-13).  Any resulting sale to Defendants was conditioned on a sale between the Seller and Plaintiffs.  Therefore, Defendants were third-party beneficiaries to the underlying contractual or prospective contractual relationship between Plaintiffs and the Seller.  Defendants were not strangers, as required, for a tortious interference claim as a matter of law.

### C.    Plaintiffs Fail to Properly Allege Any Tortious Interference Claim.

The basic elements of a tortious interference claim are the same under New York and Illinois law.  *Republic Tobacco, L.P. v. N. Atlantic Trading Co.*, 254 F. Supp. 1007, 1011 (N.D. Ill. 2003) (finding that the basic elements of a tortious interference with prospective economic advantage claim are the same in New York and Illinois, although they may be worded slightly differently).  Thus, to state a cause of action for intentional interference with prospective economic advantage, Plaintiffs must allege and prove:  (1) a business relationship between Plaintiffs and the Seller; (2) Defendants' knowledge of that relationship and intentional

interference with it; (3) Defendants acted with the sole purpose of harming Plaintiffs or used dishonest, unfair or improper means; and (4) injury to the relationship. *Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428, 433 (S.D.N.Y. 2003) (citing *Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108-109 (2d Cir. 1997)); *see also Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) (quoting *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877-78 (Ill. 1991)) ("To succeed in an action for tortious interference with prospective economic advantage under Illinois law, the plaintiff must prove:  (1) the plaintiff's reasonable expectation of a future business relationship; (2) the defendant's knowledge of that expectation; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectations from ripening; and (4) damages.").

Plaintiffs have failed to properly allege a number of the necessary elements to maintain a tortious interference claim, including:  (1) a reasonable expectation of a business relationship; and (2) intentional interference that induced a breach.

### 1.    *Plaintiffs Fail to Allege a Reasonable Expectancy of a  Business Relationship.*

Plaintiffs have not alleged a real expectancy of entering into a future business relationship.  To assess this, courts look at the degree of specificity of the proposed agreement between the plaintiff and the third party. *See Corroon & Black Inc. v. Magner*, 494 N.E.2d 785, 794 (Ill. App. Ct. 1986) ("As the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases."). For example, in *Kemmerer v. John D. & Catherine T. MacArthur Foundation*, the defendant showed that a real estate transaction upon which the plaintiff's expectation of the payment of a commission depended never proceeded beyond an offer to negotiate. 594 F. Supp. 121, 122 (N.D. Ill. 1984).  Ruling that the plaintiff could not make out a reasonable expectation of the alleged business relationship

under Rule 12(b)(6), the court found that the plaintiff did not have any reasonable expectancy of economic gain because there was no firm agreement for the sale of the property, but rather there were "contemplated further negotiations on key provisions." *Id. See also Union Carbide Corp. v. Montell, N.V.,* 944 F. Supp. 1119, 1142 (S.D.N.Y. 1996) (dismissing tortious interference with prospective contractual relationship claim because plaintiff failed to allege a reasonable expectation of a prospective contract).

Here, Plaintiffs allege that, after they terminated the Contract with Seller, they believed the deal was back on track and could be finalized when one particular tenant's lease was improved. (Compl., ¶ 27). This type of wishful thinking or anticipation of agreeing on a contract is not sufficient. *See Hoopla Sports and Ent., Inc. v. Nike, Inc.*, 947 F. Supp. 347, 358 (N.D. Ill. 1996) (quoting *Anderson v. Vander Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)) ("[M]ere allegations that the plaintiff was involved in the process of negotiations with a third party were insufficient to state a claim. 'The hope of receiving a[n] . . . offer is not a sufficient expectancy.'"). Plaintiffs fail to allege a reasonable expectancy of entering into a business relationship for the purchase of Property when Seller already had terminated its Contract.

### 2.    *Plaintiffs Fail to Allege Intentional and Unjustified Interference that Induced a Breach or Termination of the Expectancy.*

Plaintiffs claim that Defendants talked to Seller (Compl., ¶ 31) and that Seller terminated its discussions with Plaintiffs (Compl., ¶ 30), but nowhere do Plaintiffs allege that Defendants' discussions with Seller (as opposed to Plaintiffs' termination of the Original Contract of Sale or other actions) *induced or caused* Seller to terminate its discussions with Plaintiffs for the sale of the Property. In fact, Plaintiffs allege that Chicago Michigan purchased the Property from Seller not for more money, but for the *exact same purchase price* ($350 million) as Plaintiffs were to pay under their Original Contract of Sale. (Compl., ¶¶ 11 and 32). Thus, on Plaintiffs' own

allegations, Defendants did not cause Plaintiffs' Original Contract of Sale to be terminated. Century 21 Chicago did that itself for a reason wholly unrelated to Defendants (having to do with one of the building leases). (Compl., ¶¶ 22-23). And Defendants did not out bid Plaintiffs to cause Plaintiffs' purported later business expectancy to be terminated either. (Compl., ¶¶ 11 and 32). Plaintiffs fail to allege this necessary "inducement" element. Count II fails for this reason as well.

## CONCLUSION

WHEREFORE, for the reasons set forth above and set forth in the Motion, Defendants Ponte Gadea Florida, Inc. and Chicago Michigan, LLC respectfully request that this Court enter an Order: (a) dismissing Plaintiffs' Complaint in its entirety with prejudice; and (b) awarding Defendants all such other and further relief as this Court deems just and proper.

Dated: May 7, 2008

PONTE GADEA FLORIDA, INC. and
CHICAGO MICHIGAN, LLC


By:___/s/ Rita M. Alliss Powers_____
        One of Their Attorneys

Rita M. Alliss Powers, Esq.
Howard K. Jeruchimowitz, Esq.
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
(312) 456-8400

Hillarie Bass, Esq. (admitted *pro hac vice*)
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131

*CHI 57,140,787*

# EXHIBIT A

# CONTRACT OF SALE

THIS CONTRACT OF SALE (this "Agreement") is made and entered into as of the 12th day of October, 2007, by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Seller") and Century 21 Chicago, LLC, a Delaware limited liability company, having an address at 140 Fulton Street, New York, New York 10038 ("Purchaser").

## WITNESSETH:

A. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement, (x) that certain parcel of land more particularly described on Exhibit A attached hereto and made a part hereof (the "Fee Interest"), which together with the Leasehold Interest (as hereinafter defined) is commonly known as 730 North Michigan Avenue, Chicago, Illinois, (b) all right, title and interest of Seller in, to and under the Ground Lease (as hereinafter defined) (the "Leasehold Interest," and together with the Fee Interest, the "Land"), (b) the buildings, improvements, and structures located upon the Land (collectively, the "Improvements"), the "Appurtenant Rights"), (c) all right, title and interest of Seller in, to and under the Leases (as hereinafter defined) and the Contracts (as hereinafter defined), and (d) (A) other personal property owned by Seller and attached or appurtenant to the Property (collectively, the "Personal Property"; the Land, the Appurtenant Rights, the Improvements, the Leases, the Contracts and the Personal Property, collectively, the "Property").

B. Purchaser acknowledges that the Property is being sold on an "as is," "where is" and "with all faults" basis on the terms and conditions hereinafter set forth.

NOW, THEREFORE, for $10.00 in hand paid and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. Purchase and Sale. Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Property.

2. Purchase Price. The purchase price (the "Purchase Price") for the Property shall be the sum of ▮▮▮▮▮▮▮.

3. Payment of Purchase Price. The Purchase Price shall be paid to Seller by Purchaser as follows:

3.1 Deposit. Purchaser shall (a) within two (2) Business Days (as hereinafter defined) after the date this Agreement is executed by Seller and Purchaser, deposit with First American Title Insurance Company of New York ("Escrowee"), by wire transfer of immediately available federal funds to an account designated by Escrowee, the sum of ▮▮▮▮▮▮▮ (together with all interest thereon, the "Deposit"), which Deposit shall ▮▮▮ or hold by Escrowee pursuant to the escrow agreement (the

SSL-DOCS1 1842269/6

"Escrow Agreement") attached hereto as Exhibit Q and hereby made a part hereof. If Purchaser shall fail to deposit the Deposit with Escrowee within two (2) Business Days after the date this Agreement shall be executed by Seller and Purchaser, at Seller's election, this Agreement shall be null, void ab initio and of no force or effect. At Closing, interest accrued on the Deposit as of the Closing Date shall be applied to payment of the Purchase Price.

3.2 Closing Payment. The Purchase Price, as adjusted by the application of the Deposit and by the prorations and credits specified herein, shall be paid by Purchaser, by wire transfer of immediately available federal funds to an account or accounts designated in writing by Seller.

4. Title Matters; Due Diligence Review; Estoppel Certificates; Conditions Precedent.

4.1 Title Matters.

4.1.1 Title to the Property.

(a) As a condition to the Closing, First American Title Insurance Company of New York (the "Title Company") shall have committed to insure Purchaser's ownership of the Fee Interest and the Leasehold Interest in the amount of the Purchase Price by issuance of an ALTA owner's title insurance policy (the "Owner's Policy") and in the standard form issued by the Title Company in the State of Illinois, subject only to the Permitted Exceptions (as hereinafter defined); providing, however, that Purchaser may obtain co-insurance (pursuant to a "me-too" endorsement), as to not more than fifty percent (50%) of such Owner's Policy, from Madison Title Agency.

(b) Purchaser shall order, at its sole cost and expense, within ▮▮▮▮▮▮ following the date hereof, a commitment for an owner's fee title insurance policy or policies with respect to the Property (the "Title Commitment") from the Title Company, and shall cause the Title Company to deliver a copy of the Title Commitment, together with true, legible and complete copies of all instruments giving rise to any defects or exceptions to title to the Property, to Seller's attorneys concurrently with delivery of the Title Commitment to Purchaser or Purchaser's attorneys. If any exception(s) to title to the Property should appear in the Title Commitment other than the Permitted Exceptions (such exception(s) being herein called, collectively, the "Unpermitted Exceptions"), subject to which Purchaser is unwilling to accept title, and Purchaser shall provide Seller with written notice (the "Title Objection Notice") thereof within ten (10) Business Days after receipt of the Title Commitment by Purchaser's attorneys, Seller, in its sole and absolute discretion, subject to the terms and conditions of this Section 4.1, may undertake to eliminate the same. Purchaser hereby waives any right Purchaser may have to advance, as objections to title or as grounds for Purchaser's refusal to close this transaction, any Unpermitted Exception of which Purchaser does not notify Seller within such ten (10) Business Day period pursuant to this Title Objection Notice unless (i) such Unpermitted Exception was first raised by the Title Company subsequent to the date of the Title Commitment, and (ii) Purchaser shall notify Seller of the same within five (5) days after the Title Company shall notify Purchaser of such Unpermitted Exception (failure to so notify Seller shall be deemed

2

SSL-DOCS1 1842269/6

to be a waiver by Purchaser of its right to raise such Unpermitted Exception as an objection to title or as a ground for Purchaser's refusal to close the transaction contemplated by this Agreement). Notwithstanding anything to the contrary contained in this Agreement, Seller, in its sole discretion, shall have the right to adjourn the Closing for the purpose of curing any Unpermitted Exception noted in the Title Objection Notice for a period not to exceed sixty (60) days (such period of time being herein called the "Extension Period"), provided that Seller shall notify Purchaser, in writing, within ten (10) days after receipt by Seller of the Title Objection Notice, whether or not it will endeavor to eliminate such Unpermitted Exceptions. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, Seller shall not under any circumstance be required or obligated to cause the cure or removal of any Unpermitted Exception including, without limitation, to bring any action or proceeding, to make any payments or otherwise to incur any expense in order to eliminate any Unpermitted Exception or to arrange for title insurance insuring against enforcement of such Unpermitted Exception against, or collection of the same out of, the Property, notwithstanding that Seller may have attempted to do so, or may have obtained an adjournment of the Scheduled Closing Date for such purpose provided, however, Seller shall (x) satisfy any mortgage or deed of trust placed on the Property by Seller, and (y) in addition to Seller's compliance with Section 72.5, cause the removal (by bonding or otherwise) of other monetary liens encumbering the Property in an amount not to exceed One Million Dollars ($1,000,000) in the aggregate.

(c) In the event that Seller is unable, or elects not, to eliminate all Unpermitted Exceptions in accordance with the provisions of this Section 4.1.1, or to arrange for title insurance, without special premium to Purchaser, insuring against enforcement of such Unpermitted Exceptions against, or collection of the same out of, the Property, and to convey title to the Property in accordance with the terms of this Agreement on or before the Closing Date (whether or not the Closing is adjourned as provided in Section 4.1.1(b)), Seller shall notify Purchaser that it elects not to remove the same, in which event Purchaser shall have the right, as its sole remedy, upon election of Seller, by delivery of written notice to Seller within five (5) Business Days following receipt of notice from Seller of its election not to remove such Unpermitted Exceptions, to either (i) terminate this Agreement by written notice delivered to Seller (in which event Escrowee shall return the Deposit to Purchaser and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement), or (ii) accept title to the Property subject to such Unpermitted Exception(s) without an abatement in or credit against the Purchase Price. The failure of Purchaser to deliver timely any written notice of election under this Section 4.1.1(c) shall be conclusively deemed to be an election under clause (ii) above.

(d) If, on the Closing Date, there are any liens or encumbrances that Seller is obligated to discharge under this Agreement, Seller shall have the right (but not the obligation) to either (i) arrange, at Seller's cost and expense, for affirmative title insurance or special endorsements insuring against enforcement of such liens or encumbrances against, or collection of the same out of, the Property, or (ii) use any portion of the Purchase Price to pay and discharge the same, either by way of payment or by alternative manner reasonably satisfactory to the Title Company, and the same shall not be deemed to be Unpermitted Exceptions.

3

---

4.1.2 Permitted Exceptions to Title. The Property shall be sold and conveyed subject to the following exceptions to title (the "Permitted Exceptions"):

(a) any state of facts shown by that certain survey made by National Survey Service, Inc. dated August 24, 2004 (the "Existing Survey") and any other state of facts that a current survey would show prior to the Closing Date, provided that such other facts do not materially adversely affect Purchaser's use of the Property for retail use;

(b) those matters specifically set forth on Exhibit B attached hereto and made a part hereof;

(c) all laws, ordinances, rules and regulations of the United States, the State of Illinois, or any agency, department, commission, bureau or instrumentality of any of the foregoing having jurisdiction over the Property (each, a "Governmental Authority"), as the same may now exist or may be hereafter modified, supplemented or promulgated;

(d) all presently existing and future liens of real estate taxes or assessments and water rates, water meter charges, water frontage charges and sewer taxes, rents and charges, if any, provided that such items are not yet due and payable and are apportioned as provided in this Agreement;

(e) any other matter or thing affecting title to the Property which Purchaser shall have agreed or be deemed to have agreed to waive as an Unpermitted Exception;

(f) all violations of laws, ordinances, orders, requirements or regulations of any Governmental Authority applicable to the Property and existing on the Closing Date (collectively, the "Violations"), whether or not noted in the records of or issued by any Governmental Authority, provided that at Closing, Seller shall provide Purchaser with a credit against the Purchase Price in the amount of any unpaid penalties or fines that have been assessed against the Property as a result of such Violations, which credit shall in no event exceed Two Hundred Thousand Dollars ($200,000); and

(g) all utility easements of record which do not interfere with the present use of the Property;



4.2 Due Diligence Reviews. Except for title and survey matters (which shall be governed by the provisions of Section 4.1 above), Purchaser shall have until 5:00 p.m. (Eastern time) on November 2, 2007, TIME BEING OF THE ESSENCE (the period of time

4

commencing upon the date hereof and continuing through and including such time on such date being herein called the "Due Diligence Period") within which to perform and complete all of Purchaser's due diligence examinations, reviews and inspections of all matters pertaining to the purchase of the Property, including all leases and service contracts, and all physical, environmental and compliance matters and conditions respecting the Property (collectively, the "Investigations"), which Investigations shall at all times be subject to Purchaser's compliance with the provisions of this Section 4.2. During the Due Diligence Period, Seller shall provide Purchaser with reasonable access to the Property upon reasonable advance notice and shall also make available to Purchaser, at the offices of Seller and/or the property manager of the Property (or, upon Purchaser's request, by copies delivered by e-mail, facsimile or overnight courier, to the extent reasonably practicable), access to such leases, service contracts, and other contracts and agreements with respect to the Property in Seller's possession as Purchaser shall reasonably request, all upon reasonable advance written notice; provided, however, in no event shall Seller be obligated to make available (1) any document or correspondence which would be subject to the attorney-client privilege; (2) any document or item which Seller is contractually or otherwise bound to keep confidential; (3) any documents pertaining to the marketing of the Property for sale to prospective purchasers; (4) any internal memoranda, reports or assessments of Seller or Seller's affiliates relating to Seller's valuation of the Property; (5) appraisals of the Property whether prepared internally by Seller or Seller's affiliates or externally; or (6) any documents which Seller considers confidential or proprietary, in its reasonable discretion. Any entry upon the Property and all Investigations shall be made or performed during Seller's normal business hours and at the sole risk and expense of Purchaser, and shall not interfere with the activities on or about the Property of Seller, its tenants and their employees and invitees. Purchaser shall:

(a)    promptly repair any damage to the Property resulting from any such Investigations and replace, refill and regrade any holes made in, or excavations of, any portion of the Property used for such Investigations so that the Property shall be in the same condition that it existed in prior to such Investigations;

(b)    fully comply with all laws applicable to the Investigations and all other activities undertaken in connection therewith;

(c)    permit Seller to have a representative present during all Investigations undertaken hereunder at the Property;

(d)    take all actions and implement all precautions necessary to ensure that the Investigations and the equipment, materials, and substances generated, used or brought onto the Property in connection with the Investigations, pose no threat to the safety or health of persons or the environment, and cause no damage to the Property or other property of Seller or other persons;

(e)    furnish to Seller, at no cost or expense to Seller, copies of all surveys, soil test results, engineering, asbestos, environmental and other studies and reports (other than internal analysis and proprietary information of the Purchaser, Purchaser's lender and/or Purchaser's Representatives) relating to the Investigations which Purchaser shall obtain with respect to the Property promptly after Purchaser's receipt of same;

5

(f)    maintain or cause to be maintained, at Purchaser's expense, a policy of commercial general liability insurance, with a broad form contractual liability endorsement and with a combined single limit of not less than $1,000,000 per occurrence for bodily injury and property damage, automobile liability coverage including owned and hired vehicles with a combined single limit of $1,000,000 per occurrence for bodily injury and property damage, and an excess umbrella liability policy for bodily injury and property damage in the amount of $5,000,000, insuring Purchaser, Seller, 730 NMA Holding Inc., J.P. Morgan Investment Management Inc., and JPMorgan Chase Bank, N.A., as additional insureds, against any injuries or damages to persons or property that may result from or are related to (i) Purchaser's and/or Purchaser's Representatives' (as hereinafter defined) entry upon the Property, (ii) any Investigations or other activities conducted thereon, and/or (iii) any and all other activities undertaken by Purchaser and/or Purchaser's Representatives, all of which insurance shall be on an "occurrence form" and otherwise in such forms acceptable to Seller and with an insurance company acceptable to Seller, and deliver a copy of such insurance policy to Seller prior to the first entry on the Property;

(g)    not permit the Investigations or any other activities undertaken by Purchaser or Purchaser's Representatives to result in any liens, judgments or other encumbrances being filed or recorded against the Property, and Purchaser shall, at its sole cost and expense, immediately discharge of record any such liens or encumbrances that are so filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

(h)    indemnify Seller and any agent, advisory, representative, affiliate, employee, director, partner, member, beneficiary, investor, servant, shareholder, trustee or other person or entity acting on Seller's behalf or otherwise related to or affiliated with Seller (collectively, "Seller Related Parties") and hold harmless Seller and Seller Related Parties from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements), suffered or incurred by Seller or any Seller Related Party and arising out of or in connection with (i) Purchaser's and/or Purchaser's Representatives' entry upon the Property in connection with the Investigations, (ii) any Investigations or other activities conducted thereon by Purchaser or Purchaser's Representatives, (iii) any liens or encumbrances filed or recorded against the Property as a consequence of the Investigations and/or (iv) any and all other activities undertaken by Purchaser or Purchaser's Representatives with respect to the Investigations. The foregoing indemnity shall not include any claims, demands, causes of action, losses, damages, liabilities, costs or expenses (including, without limitation, attorneys' fees and disbursements) that result solely from the mere discovery, by Purchaser or Purchaser's Representatives, of existing conditions on the Property during Investigations conducted pursuant to, and in accordance with, the terms of this Agreement or any gross negligence or willful misconduct of Seller or Seller Related Parties.

Without limiting the foregoing, in no event shall Purchaser or Purchaser's Representatives, without the prior written consent of Seller: (x) make any intrusive physical testing (environmental, structural or otherwise) at the Property (such as soil borings, water samplings or the like), and/or (y) contact any tenant of the Property, except for confirmatory

6

tenant interviews; provided, however, that Purchaser shall notify Seller of those tenants which Purchaser desires to interview, Seller or Seller's agent(s) shall schedule such confirmatory tenant interviews, and Seller or Seller's agent(s) shall have the right to be present at the confirmatory tenant interview (Purchaser acknowledges that Purchaser shall have no right to directly notify any tenant of an interview request, and that such interview requests shall be directed to Seller, who shall, or shall direct its agent(s) to, schedule such confirmatory tenant interviews).

The foregoing obligations shall survive the Closing or a termination of this Agreement.

4.2.1 Property Information and Confidentiality. All Information (as hereinafter defined) provided to Purchaser shall be subject to the following terms and conditions:

(a) Neither Seller nor any Seller Related Party makes any representation or warranty as to the truth, accuracy or completeness of the Information, or any other studies, documents, reports or other information provided to Purchaser hereunder and expressly disclaims any implied representations as to any matter disclosed or omitted.

(b) Purchaser agrees that neither Purchaser nor Purchaser's Representatives shall, at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, entity or association the Information, or any other knowledge or information acquired by Purchaser, or Purchaser's Representatives from Seller, any Seller Related Party or by Purchaser's own inspections and investigations, other than matters that were in the public domain at the time of receipt by Purchaser or Purchaser's Representatives. Without Seller's prior written consent, Purchaser shall not disclose and Purchaser shall direct Purchaser's Representatives not to disclose to any person, entity or association or any of the terms, conditions or other facts with respect to this Agreement, including, without limitation, the status hereof, and shall not market or offer the Property for sale. Notwithstanding the foregoing, Purchaser may disclose such of the Information and its other reports, studies, documents and other matters generated by it and the terms of this Agreement (i) as required by law or court order (provided prior written notice of such disclosure shall be provided to Seller) and (ii) as Purchaser deems necessary or desirable to Purchaser's Representatives in connection with Purchaser's Investigation and the transaction contemplated hereby, provided that those to whom such Information is disclosed are informed of the confidential nature thereof and agree(s) to keep the same confidential in accordance with the terms and conditions hereof.

(c) Purchaser shall indemnify and hold harmless Seller and all Seller Related Parties from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by Seller or any Seller Related Party and arising out of or in connection with a breach by Purchaser or Purchaser's Representatives of the provisions of this Section 4.2.1.

(d) Purchaser and Purchaser's Representatives shall use reasonable care to maintain in good condition all of the Information furnished or made available to Purchaser and/or Purchaser's Representatives in accordance with this Section 4.2. In the event

7

SSL-DOCS1 1842356v16

this Agreement is terminated, Purchaser and Purchaser's Representatives shall promptly deliver to Seller all originals and copies of the Information in the possession of Purchaser and Purchaser's Representatives.

(e) As used in this Agreement, the term "Information" shall mean any of the following: (i) all information and documents in any way relating to the Property, the operation thereof or the sale thereof, including, without limitation, all leases and contracts furnished to, or otherwise made available for review by, Purchaser or its directors, officers, employees, affiliates, partners, members, brokers, agents or other representatives, including, without limitation, attorneys, accountants, contractors, consultants, engineers and financial advisors (collectively, "Purchaser's Representatives"), by Seller or any Seller Related Party or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, and (ii) all analyses, compilations, data, studies, reports or other information or documents prepared or obtained by Purchaser or Purchaser's Representatives containing or based on, in whole or in part, the information or documents described in the preceding clause (i), the Investigations, or otherwise reflecting their review or investigation of the Property.

(f) In addition to any other remedies available to Seller, Seller shall have the right to seek equitable relief, including, without limitation, injunctive relief or specific performance, against Purchaser or Purchaser's Representatives in order to enforce the provisions of this Section 4.2.1.

(g) Notwithstanding any terms or conditions in this Agreement to the contrary, no conditions of confidentiality within the meaning of IRC §6111(d) or the Treasury Regulations promulgated under IRC Sec. 6011 are intended, and the parties hereto are expressly authorized to disclose every U.S. federal income tax aspect of any transaction covered by this Agreement with any and all persons, without limitation of any kind.

(h) The provisions of this Section 4.2.1 shall survive the Closing or a termination of this Agreement.

4.2.2 Termination Right. If, on or before the expiration of the Due Diligence Period, Purchaser shall determine that it no longer intends to acquire the Property for any reason or no reason, then Purchaser shall promptly notify Seller of such determination in writing on or before 5:00 p.m. (Eastern time) on the date that the Due Diligence Period shall expire (such notice being herein called the "Termination Notice"), whereupon the Deposit shall be promptly returned to Purchaser, and this Agreement and the obligations of the parties hereunder shall terminate (and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement). In the event that Purchaser shall fail to deliver the Termination Notice to Seller on or before 5:00 p.m. (Eastern time) on the date that the Due Diligence Period shall expire, TIME BEING OF THE ESSENCE, Purchaser shall be deemed to have agreed that it intends to proceed with the acquisition of the Property without a reduction in, or an abatement in or credit against, the Purchase Price (and, thereafter, Purchaser shall have no further right to terminate this Agreement pursuant to this Section 4.2.2).

8

SSL-DOCS1 1842356v16

4.3     Tenant Estoppel Certificates. (a) Receipt of estoppel certificates (each, a "Tenant Estoppel Certificate," and collectively, the "Tenant Estoppel Certificates") dated not sooner than the date hereof from the tenants identified on Exhibit C attached hereto and made a part hereof (collectively, the "Required Tenants"), shall be a condition precedent to Purchaser's obligation to purchase the Property hereunder. Seller shall use commercially reasonable efforts (and, as used in this Agreement, commercially reasonable efforts shall not be deemed to include any obligation to institute legal proceedings, deliver notices of default or to expend any monies in excess of the de minimis amounts customarily expended by landlords in connection with obtaining tenant estoppel certificates) to obtain such Tenant Estoppel Certificates, which certificates shall be substantially in the form attached hereto and made a part hereof as Exhibit D (or if Seller, after attempting to obtain certificates in such form, is unable to obtain the same, then in the form, if any, prescribed in the applicable lease or other operative document).

(b)     Seller agrees to use commercially reasonable efforts to obtain Tenant Estoppel Certificates from all tenants at the Property other than the Required Tenants (the "Remaining Tenants"). Purchaser acknowledges that receipt of Tenant Estoppels from one or all of the Remaining Estoppels shall not be a condition precedent to Purchaser's obligation to close hereunder.

4.4     Ground Lease Estoppel. Receipt of an estoppel certificate substantially in the form of Exhibit F annexed hereto and made a part hereof (the "Ground Lease Estoppel Certificate"), executed by the Ground Lessor (as hereinafter defined), shall be a condition precedent to Purchaser's obligation to close hereunder. Seller shall use commercially reasonable efforts (and, as used in this Section, commercially reasonable efforts shall not be deemed to include any obligation to institute legal proceedings, deliver notices of default or to expend any monies) to obtain such Ground Lease Estoppel Certificate.

4.5     EOA Estoppel Certificate. Receipt of an estoppel certificate substantially in the form of Exhibit G annexed hereto and made a part hereof (the "EOA Estoppel Certificate"), executed by Peninsula Chicago LLC, shall be a condition precedent to Purchaser's obligation to close hereunder. Seller shall use commercially reasonable efforts to obtain such EOA Estoppel Certificate.

4.6     Peninsula Sublease Estoppel Certificate. Receipt of an estoppel certificate substantially in the form of Exhibit H annexed hereto and made a part hereof (the "Sublease Estoppel Certificate"), executed by Peninsula Chicago LLC, shall be a condition precedent to Purchaser's obligation to close hereunder. Seller shall use commercially reasonable efforts to obtain such Sublease Estoppel Certificate.

4.7     Conditions Regarding Estoppel Certificates. Seller shall deliver to Purchaser estoppel certificates required to be delivered pursuant to this Article 4 (collectively, "Estoppel Certificates") promptly upon Seller's receipt thereof, and it shall be a condition to Purchaser's obligation to close hereunder that each Estoppel Certificate with regard to the Required Tenants, the Ground Lease Estoppel Certificate, the EOA Estoppel Certificate and the Sublease Estoppel Certificate be delivered "clean" (the "Estoppel Condition"). For the purposes of this Agreement, an Estoppel Certificate shall be deemed "clean" if it (x) complies with the

9

requirements set forth in this Article 4 with respect to the date and form thereof, and (y) does not allege any material default or material claim under the document pursuant to which such Estoppel Certificate was delivered and (z) does not materially contradict the terms set forth in such subject document. Seller shall have the right to adjourn the Closing Date one or more times in order to satisfy the Estoppel Condition.

4.8     Pottery Barn Termination; Comp USA Termination; Victoria's Secret Lease. (a) Purchaser acknowledges that Seller has entered into a termination agreement with Pottery Barn (the "Pottery Barn Termination") terminating the Pottery Barn lease and providing for a lease termination date of June 30, 2008. A true and correct copy of the Pottery Barn Termination is annexed hereto as Exhibit X.

(b)     As a condition to Purchaser's obligation to close hereunder, Seller shall have entered into a termination agreement with Comp USA (the "Comp USA Termination") terminating the Comp USA lease and providing for (i) a termination date prior to Closing, and (ii) monthly payments by Comp USA in the amount of $190,000 covering a period commencing on the month after the lease termination date and terminating in December, 2008.

(c)     ██████████████████ Seller shall have entered into a new lease with Victoria's Secret ███████████████████ its affiliate (the "Victoria's Secret Lease"), substantially in accordance with the terms of that certain Letter of Intent dated August 20, 2007, a copy of which is annexed as Exhibit L ██████████ made a part hereof as Exhibit L ████████████ covering space currently leased to Pottery Barn. ████████████ Seller shall ████████████ commercially reasonable provisions substantially consistent with the leases with the retail tenants currently at the Property. Seller shall promptly submit to Purchaser copies of any markup or comments to the draft lease that it receives from Victoria's Secret. Seller shall deliver to Purchaser any redrafts of the Victoria's Secret Lease (marked to show changes from the prior draft delivered to Purchaser) promptly following distribution of such redrafts to Victoria's Secret. Seller shall have the right, in its sole and absolute discretion ██████████████████████████████

4.9     SNDAs; Financing. Promptly following Purchaser's request, Seller shall deliver subordination, non-disturbance and attornment agreements (each, an "SNDA") to Tenants as requested by Purchaser, provided that Seller shall have no obligation to obtain the execution of same by any Tenant. Purchaser shall have the right to communicate directly with Tenants with respect to the negotiation of such SNDAs. Purchaser acknowledges and agrees that neither the execution of an SNDA by any Tenant nor Purchaser's receipt of financing for the purchase contemplated pursuant to this Agreement is a condition to Purchaser's obligation to close hereunder.

4.10     Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the performance and observance by Seller of all covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date and the

10

fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any or all of which may be waived by Purchaser in its sole discretion.

4.11 Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the performance and observance by Purchaser of all covenants and agreements of this Agreement to be performed or observed by Purchaser prior to or on the Closing Date and the fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

5. Closing. The closing (the "Closing") of the sale and purchase contemplated herein shall occur at 10:00 a.m. on or before December 17, 2007 (the "Scheduled Closing Date"), TIME BEING OF THE ESSENCE with respect to Purchaser's obligation to close on such date, at the offices of Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, or at the offices of Purchaser's lender, if located in New York County, or, if agreed to by all parties hereto, through escrow with the Title Company (the date on which the Closing shall occur being herein referred to as the "Closing Date"). The Closing shall constitute approval by each party of all matters to which such party has a right of approval and a waiver of all conditions precedent.

5.1 Seller Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate:

(a) a deed (the "Deed") in the form attached hereto and made a part hereof as Exhibit I.

(b) an assignment (the "Assignment and Assumption of Leases") of all right, title and interest of Seller under the Leases (to the extent assignable) which are in effect on the Closing Date, without recourse, representation or warranty, in the form attached hereto and made a part hereof as Exhibit J, which shall include Purchaser's assumption of Seller's obligations under the Leases accruing from and after the Closing Date.

(c) a bill of sale (the "Bill of Sale") in the form attached hereto and made a part hereof as Exhibit K.

(d) a certification of non-foreign status in the form attached hereto and made a part hereof as Exhibit L.

(e) an assignment (the "Assignment and Assumption of Contracts") of all right, title and interest of Seller under the Contracts (to the extent assignable) which are in effect on the Closing Date and to which Seller is a party, without recourse, representation or warranty, in the form attached hereto and made a part hereof as Exhibit M, which shall include Purchaser's assumption of Seller's obligations under the Contracts accruing from and after the Closing Date.

SSL-DOCS1 1842336v16

11

Lease") of all right, title and interest of Seller under the Ground Lease, without recourse, representation or warranty, in the form attached hereto and made a part hereof as Exhibit N, which shall include Purchaser's assumption of Seller's obligations under the Ground Lease accruing from and after the Closing Date.

(g) all existing surveys, blueprints, drawings, plans and specifications for or with respect to the Property or any part thereof, to the extent the same are in Seller's possession.

(h) all keys to the Improvements, to the extent the same are in Seller's possession.

(i) Original counterparts of all Leases in effect on the Closing Date, together with files containing the documentation relating to such Leases, to the extent the same are in Seller's possession, and if such original Leases are not in Seller's possession, then copies of the Leases.

(j) all Contracts that shall remain in effect after the Closing, to the extent the same are in Seller's possession.

(k) all applicable transfer tax forms, if any.

(l) such further instruments as may be necessary to record the Deed.

(m) notices to each of the tenants under the Leases (each, a "Tenant Notice", and collectively, the "Tenant Notices") in the form attached hereto and made a part hereof as Exhibit P, advising such tenants of the sale of the Property to Purchaser and directing them to make all payments to Purchaser or its designee, which Tenant Notices Purchaser shall, at Purchaser's sole cost and expense, either mail by certified mail return receipt requested or hand-deliver to each applicable tenant.

(n) evidence reasonably satisfactory to the Title Company respecting the due organization of Seller and the authorization and execution by Seller of this Agreement and the documents required to be delivered hereunder.

(o) a certificate (the "Update") of Seller dated as of the Closing Date certifying that the representations and warranties of Seller set forth in Section 7.1.1 of this Agreement (collectively, the "Closing Date Representations") remain true and correct in all material respects as of the Closing Date, it being agreed that if any Closing Date Representation shall no longer be true and correct in any material respect due to a change in the facts or circumstances which do not otherwise constitute a default of Seller pursuant to the express terms of this Agreement and Seller is unable to deliver the Update, the failure of Seller to deliver the Update shall constitute a failure of a condition to Closing and shall not constitute a default by Seller under this Agreement, and Purchaser's sole remedy in connection therewith shall be to terminate this Agreement by written notice to Seller (in which event the Deposit shall be

SSL-DOCS1 1842336v16

12

returned to Purchaser and neither party hereto shall have any further obligations under this Agreement except under those provisions of this Agreement that expressly survive a termination of this Agreement.

(p)    an Owner's affidavit, substantially in the form of Exhibit W annexed hereto and made a part hereof.

(q)    original counterparts of all Estoppel Certificates received by Seller.

(r)    originals or, if originals are unavailable, copies of any permits and licenses relating to the ownership, use or operation of the Premises, to the extent same are in Seller's possession.

5.2    Purchaser Deliveries.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following items executed and acknowledged by Purchaser, as appropriate:

(a)    payment of the Purchase Price to be made in accordance with Section 3 above.

(b)    the Assignment and Assumption of Leases.

(c)    the Assignment and Assumption of Contracts.

(d)    all applicable transfer tax forms, if any.

(e)    such further instruments as may be necessary to record the Deed.

(f)    the Tenant Notices.

(g)    evidence reasonably satisfactory to Seller and the Title Company respecting the due organization of Purchaser and the due authorization and execution by Purchaser of this Agreement and the documents required to be delivered hereunder.

(h)    subject to Section 10.21, the Replacement Ground Lease Guaranty (as hereinafter defined).

(i)    subject to Section 10.21, the Release of Guaranty (as hereinafter defined).

5.3    Closing Costs.  Seller shall pay (x) all transfer taxes, including transaction taxes of the State of Illinois and of Cook County, payable in connection with the transaction contemplated herein, (y) all recording charges payable in connection with Seller's cure of any Unpermitted Exceptions pursuant to Section 4.11 hereof, and (z) one-half (1/2) of the costs of any Escrows. Purchaser shall pay (a) the title insurance premium for the Owner's Policy, (b) the cost of any title endorsements and affirmative insurance required by Purchaser, (c) the costs of any survey (or an update thereto), (d) all recording charges payable in connection with the

13

recording of the Deed, (e) the one-half of the costs of Escrows, (f) the City of Chicago transfer tax applicable to the transaction contemplated herein, and (g) all fees, costs or expenses in connection with Purchaser's due diligence reviews hereunder. Any other closing costs shall be allocated in accordance with local custom. Except as expressly provided in the indemnities set forth in this Agreement, Seller and Purchaser shall pay their respective legal, consulting and other professional fees and expenses incurred in connection with this Agreement and the transaction contemplated hereby and their respective shares of prorations as hereinafter provided. The provisions of this Section 5.3 shall survive the Closing or a termination of this Agreement.

5.4    Prorations.

5.4.1    The following shall be prorated between Seller and Purchaser as of 11:59 of the day immediately preceding the Closing Date (on the basis of the actual number of days elapsed over the applicable period):

(a)    All real estate taxes, water charges, sewer rents, vault charges and assessments on the Property on the basis of the tax bill for fiscal year 2006 (payable in 2007). In no event shall Seller be charged with or be responsible for any increase in the taxes on the Property resulting from the sale of the Property or from any improvements made or leases entered into on or after the Closing Date. If any assessments on the Property are payable in installments, then the installment for the current period shall be prorated (with Purchaser assuming the obligation to pay any installments due after the Closing Date).

(b)    Subject to this Section 5.4.1(b), all fixed rent and regularly scheduled items of additional rent under the Leases, and other tenant charges, including without limitation any payment received from Comp USA pursuant to the Comp USA Termination, if, as and when received. Seller shall deliver or provide a credit in an amount equal to all prepaid rentals for periods after the Closing Date and all refundable cash security deposits (to the extent the foregoing were made by tenants under the Leases and are not applied or forfeited prior to the Closing Date, in accordance with the provisions of the applicable Lease) to Purchaser on the Closing Date. Seller shall deliver to Purchaser any security deposits which are held in the form of letters of credit.  Rents which are delinquent as of the Closing Date shall not be prorated on the Closing Date.  Purchaser shall include such delinquents in its normal billing and shall diligently pursue the collection thereof in good faith after the Closing Date (but Purchaser shall not be required to litigate or declare a default in any Lease). To the extent Purchaser receives rents on or after the Closing Date, such payments shall be applied first toward the rents for the month in which the Closing occurs, second to the rents for the month preceding the month in which the Closing occurs, third to the rents that shall then be due and payable to Purchaser, and fourth to any delinquent rents owed to Seller, with Seller's share thereof being held by Purchaser in trust for Seller and promptly delivered to Seller by Purchaser. Purchaser may not waive any delinquent rents nor modify a Lease so as to reduce or otherwise affect amounts owed thereunder for any period in which Seller is entitled to receive a share of charges or amounts without first obtaining Seller's written consent, which consent may be given or withheld in Seller's sole and absolute discretion. Seller hereby reserves the right to pursue any remedy against any tenant owing delinquent rents and any other amounts to Seller (but shall not be entitled to terminate any lease or any tenant's right to possession), which right shall include

14

known as the AHS Trust (collectively, the "Ground Lessor") and Property Owner (the Ground Lease").

(m)   Such other items as are customarily apportioned between sellers and purchasers of real properties of a type similar to the Property and located in the State of Illinois subject to Section 7.2.3(o) hereof.

5.4.2

(a)   If any of the items described in Section 5.4.1 hereof cannot be apportioned at the Closing because of the unavailability of information as to the amounts which are to be apportioned at the Closing, or are incorrectly apportioned at Closing or subsequent thereto, such items shall be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing Date or the date such error is discovered, as applicable; provided that (i) with the exception of any item required to be apportioned pursuant to Section 5.4.1(e), (b), (c) or (g), neither party shall have the right to request apportionment or reapportionment of any such item at any time following the one hundred eightieth (180th) day after the Closing Date, (ii) with respect to any item required to be apportioned pursuant to Section 5.4.1(a), neither party shall have the right to request reapportionment of any such item at any time following the Closing Date, and (iii) with respect to the items required to be apportioned pursuant to Section 5.4.1(e), (e), or (g), neither party shall have the right to request apportionment or reapportionment of any such item at any time following the one (1) year anniversary of the Closing Date.

(b)   In the event that the Leases require the reconciliation of additional rent "pass-through" to the landlord for common area maintenance charges, real estate taxes or other operating expenses, Purchaser shall perform all of the obligations of the landlord under the Leases with respect to such reconciliations for the year of Closing as and when required by the terms of the Leases and provide Seller with the results of such reconciliations simultaneously with Purchaser's delivery thereof to the appropriate tenants no later than March 31st of the calendar year succeeding the Closing Date. If such results reflect the underpayment of additional rent by tenants of the Property for the year of Closing, Purchaser shall bill the appropriate amounts to such tenants in accordance with the terms of their Leases and remit to Seller its prorata share of the amount collected from the tenants within thirty (30) days of Purchaser's collection of the same. If such results reflect the overpayment of additional rent by tenants of the Property for the year of Closing, Purchaser shall deliver to Seller an invoice from Purchaser together with evidence reasonably satisfactory to Seller indicating that such sums are due to such tenants. Seller shall pay Purchaser Seller's prorata share of the amounts due to such tenants within thirty (30) days of Purchaser's demand, provided that Seller shall have no obligation to reimburse Purchaser for any sums not invoiced on or before December 31st of the calendar year succeeding the Closing Date. The provisions of this Section 5.4.2(a) shall survive the Closing.

5.4.3   Items to be prorated at the Closing shall include a credit to Seller for costs and expenses incurred by Seller in connection with any new Leases or modifications to any existing Leases entered into after the date hereof and for which Seller is permitted to enter into in accordance with the terms and conditions set forth in Section 7.2.3(o) of this Agreement.

16

the right to continue or commence legal actions or proceedings against any tenant. Delivery of the Assignment and Assumption of Leases shall not constitute a waiver by Seller of such right, and such right shall survive the Closing. Purchaser shall reasonably cooperate with Seller in any collection efforts hereunder (but shall not be required to litigate or declare a default under any Lease). With respect to delinquent rents and any other amounts or other rights of any kind respecting tenants who are no longer tenants of the Property as of the Closing Date, Seller shall retain all rights relating thereto.

(c)   All operating expenses.

(d)   Value of building supplies stored at the Property, at Seller's cost, including any taxes, on the basis of a statement from Seller's supplier.

(e)   Charges and payments under Contracts or permitted renewals or replacements thereof assigned to Purchaser pursuant to the Assignment and Assumption of Contracts.

(f)   Any prepaid items, including, without limitation, fees for licenses which are transferred to Purchaser at the Closing and annual permit and inspection fees.

(g)   Utilities, including without limitation, telephone, steam, electricity and gas, on the basis of the most recently issued bills therefor, subject to adjustment after the Closing when the next bills are available, or if current meter readings are available, on the basis of such readings.

(h)   Deposits with telephone and other utility companies, and any other persons or entities who supply goods or services in connection with the Property if the same are assigned to Purchaser at the Closing, which shall be credited in their entirety to Seller.

(i)   Personal property taxes, if any, on the basis of the fiscal year for which assessed.

(j)   Permitted administrative charges, if any, on those tenants' security deposits transferred by Seller pursuant to the Assignment and Assumption of Leases.

(k)   Taxes payable by Seller relating to operations of the Property, including, without limitation, business and occupancy taxes and sales taxes, if any.

(l)   Rent under that certain Agreement of Lease dated May 10, 1994 by and between Robert L. Stern, as the original lessor, and American National Bank and Trust Company, as trustee under Trust Agreement dated April 20, 1994 and known as Trust No. 118119-01, as the original lessee, as amended by that certain First Amendment to Agreement to Lease by and among Adele Hillman Stern, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, Chicago and Rush Joint Venture, and Adele Hillman Stern, as Successor Trustee of Trust dated April 29, 1999 and

15

...urchaser shall be given a credit at Closing in the amount of Two Million Eighty-Seven Thousand Five Hundred Dollars ($2,087,500), representing a portion of the Purchaser's brokerage fees in connection with this Agreement. Purchaser acknowledges and agrees that (a) this sum is the sole credit Purchaser shall receive in connection with brokerage fees and (b) no third party, including, without limitation, Purchaser's Broker (as hereinafter defined), shall have any claim against Seller in connection with this credit or be a third party beneficiary of this credit.

5.4.7    The provisions of this Section 5.4 shall survive the Closing.

6.    Condemnation or Destruction of Property. In the event that, after the date hereof but prior to the Closing Date, either any portion of the Property is taken pursuant to eminent domain proceedings (or Seller receives written notice that eminent domain proceedings have been commenced) or condemnation or any of the improvements on the Property are damaged or destroyed by fire or other casualty, Seller shall promptly deliver, or cause to be delivered, to Purchaser, notice of any such eminent domain proceedings or casualty. Except as otherwise expressly provided herein, Seller shall have no obligation to restore, repair or replace any portion of the Property or any such damage or destruction by fire or other casualty, provided that Seller shall exercise reasonable efforts to commence the repair and restoration of any fire or other casualty damage to the Property which Seller is required to maintain insurance against hereunder not entitling Purchaser to terminate this Agreement. In no event shall Seller be obligated to commence such repair or restoration (other than temporary repair) typically made by a prudent real estate investor) until settlement of all insurance claims. Seller shall, at the Closing, assign to Purchaser all of Seller's interest in all awards or other proceeds for such taking by eminent domain or condemnation or the proceeds of any insurance collected by Seller for such damage or destruction (unless Seller shall have repaired such damage or destruction prior to the Closing and except to the extent any such awards, proceeds or insurance are attributable to lost rents or items applicable to any period prior to the Closing), less the amount of all reasonable costs incurred by Seller in connection with the repair of such damage or destruction or collection costs of Seller respecting any awards or other proceeds for such taking by eminent domain or condemnation or any uncollected insurance proceeds which Seller may be entitled to receive from such damage or destruction, as applicable. In connection with any assignment of awards, proceeds or insurance hereunder, Seller shall credit Purchaser with an amount equal to the applicable deductible amount under Seller's insurance (but not more than the amount by which the cost, as of the Closing Date, to repair the damage is greater than the amount of insurance proceeds assigned to Purchaser) and Seller shall not compromise or settle any claims with respect to such proceeds without Purchaser's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned, provided, however, if either (i) the amount of the damage (as determined by an independent third party contractor or engineer) selected by Seller and reasonably approved by Purchaser) or the amount of condemnation award shall exceed the sum of Twenty Million Dollars ($20,000,000) or (ii) such casualty or condemnation is of a character which permits any of Banana Republic, LLC, Polo Illinois, LLC, Tiffany and Company or Victoria's Secret to terminate its Lease, then in either case, Purchaser shall have the right to terminate this Agreement by notice to Seller given within ten (10) days after notification to Purchaser of the estimated amount of damages or the determination of the amount of any

18

---

Seller shall be responsible for all brokerage and leasing commissions and tenant improvement costs for the initial term of all Leases entered into prior to the date of this Agreement and for any extension, renewal or expansion of any such Lease exercised prior to the date of this Agreement, provided in all such instances, the term of such Lease, extension, renewal or expansion and the regularly scheduled payment of rent commences prior to the date of this Agreement (collectively, the "Seller Leasing Costs"). Purchaser shall be responsible for and expressly assumes the obligation to pay all brokerage and leasing commissions payable to third parties unaffiliated to Seller, provided the same are at commercially reasonable rates, and to pay tenant improvement costs and other costs and expenses including attorney's fees for any new leases entered into from and after the date of this Agreement and any extension, renewal or expansion of any existing Lease exercised or entered into from and after the date of this Agreement (other than the Seller's Leasing Fee in connection with the Victoria's Secret Lease and any expenses incurred by Seller in connection with the Pottery Barn Termination and the Comp USA Termination) including, without limitation, amounts owed under the Brokerage Agreements, provided in all such instances, that (i) Seller is permitted under this Agreement to enter into such new lease or such extension, renewal or expansion of such existing Lease, and (ii) the term of such Lease, extension, or expansion or the regularly scheduled payment of rent commences from and after the date of this Agreement (collectively, "Purchaser Leasing Costs"). If at the Closing Seller has paid any Purchaser Leasing Costs, the prorations at the Closing shall include an appropriate credit to Seller. If at the Closing there remain unpaid Seller Leasing Costs, Purchaser shall expressly assume the responsibility to pay such unpaid Seller Leasing Costs, and the prorations at the Closing shall include an appropriate credit to Purchaser.

5.4.4    Purchaser shall be given a credit at the Closing in the amount of Sixteen Million Dollars ($16,000,000), representing the cost of acquisition of the Ground Lessor's interest in the Ground Lease or the right of first refusal, as set forth in Sections 22 and 23 of the Ground Lease would be exercised. This amount shall be the sole credit Purchaser receives in connection with said option or any other right to purchase the Ground Lessor's interest in the Ground Lease, whether or not such option or rights are exercised.

5.4.5    [portion redacted] ... Seventy-Two Dollars ($3,5__,___) representing a portion of the leasing brokerage fee, a tenant improvement allowance and a rent credit in connection with the Victoria's Secret Lease. Prior to the Closing, Seller shall pay 50% of the leasing brokerage fee payable in connection with the Victoria's Secret Lease ("Seller's Leasing Fee"). Purchaser expressly assumes the responsibility to pay all leasing brokerage and tenant improvement allowances in connection with the Victoria's Secret Lease other than Seller's Leasing Fee, and shall indemnify, defend, and hold Seller and the Seller-Related Parties harmless from and against any and all claim, losses and liabilities (including, without limitation, reasonable attorneys' fees) arising from, or in connection with any and all leasing brokerage fees and tenant improvement allowances in connection with said lease other than Seller's Leasing Fee. Purchaser acknowledges and agrees that the sum set forth in this Section 5.4.5 shall be the sole credit Purchaser receives in connection with said lease.

17

condemnation award whereupon the Deposit, shall be promptly returned to Purchaser, and this Agreement and the obligations of the parties hereunder shall terminate (and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement). The parties hereby waive the provisions of any statute which provides for a different outcome or treatment in the event of a casualty or a condemnation or eminent domain proceeding.

7. **Representations, Warranties and Covenants.**

7.1 **Representations, Warranties and Covenants of Seller.** Subject to the provisions of this Section 7.1.1, Seller hereby represents to Purchaser that, as of the date of this Agreement:

(a) **Leases.** Seller has no knowledge of any leases, licenses or other occupancy agreements to which Seller is a party or is bound affecting any portion of the Property which will be in force on the Closing Date other than the Leases. As used herein, "Leases" shall be deemed to mean, collectively, (i) the leases described on Exhibit Q attached hereto and made a part hereof (the "Lease Exhibit"), and (ii) the leases entered into in accordance with this Agreement. To the best of Seller's knowledge, as of the date of this Agreement (x) the Leases are in full force and effect and have not been amended except as set forth in the Lease Exhibit, and (y) the Lease Exhibit is true and correct in all material respects. With respect to the Leases: (1) Seller has not sent, and from and after December 7, 2004, Seller has not received, any written notice of default which is continuing or remains uncured with respect to any Lease; (2) Schedule 1 is a true, correct and complete (in all material respects) list of the security deposits currently held by Seller under the Leases in effect as of the date set forth thereon; and (3) Schedule 2 is a tenant arrearage schedule which, to the best of Seller's knowledge, is true, correct and complete in all material respects as of the date set forth thereon.

(b) **Litigation.** To the best of Seller's knowledge, there is no material pending or threatened litigation or condemnation action against the Property or against Seller with respect to the Property which pending or threatened litigation or condemnation action would have a material adverse effect on the use or operation of the Property.

(c) **No Insolvency.** Seller is not a debtor in any state or federal insolvency, bankruptcy, receivership proceeding.

(d) **Non-Foreign Person.** Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code, as amended (the "Code").

(e) **Contracts.** Seller has not entered into any service or equipment leasing contracts relating to the Property which will be in force after the Closing, except for the Contracts. As used in this Agreement, the "Contracts" shall be deemed to mean, collectively, (i) the contracts described on Exhibit R attached hereto and made a part hereof, (ii) contracts which are cancelable on thirty (30) days or less notice without premium or penalty, and (iii) contracts

19

entered into by Seller which Seller is permitted to enter into in accordance with this Agreement. Seller has not sent, or to the best of Seller's knowledge, received any written notices of default under any Contract from and after December 7, 2004.

(f) **Lease Brokerage Agreements. Leasing Commission Agreements.** As of the date hereof, Seller has not entered into any lease brokerage agreements or lease commission agreements other than as described on Exhibit S attached hereto and made a part hereof (the "Brokerage Agreements") or in the Leases that shall be binding upon Purchaser following Closing.

(g) **Due Authority.** This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller are, or on the Closing Date will be, duly authorized, executed and delivered by and are binding upon Seller. Seller is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Delaware, and is duly authorized and qualified to do all things required of it under this Agreement.

(h) **Personal Property.** To the best of Seller's knowledge, the Personal Property has not been assigned or conveyed to any other party (other than (i) as security for any financing which shall be, with respect to the Property, released at Closing and (ii) to Purchaser at Closing pursuant to the terms of this Agreement).

(i) **Environmental Matters.** To the best of Seller's knowledge, as of the date of this Agreement, Seller has not received written notice from any governmental authority of any material violation at the Property of laws relating to Hazardous Materials (as hereinafter defined) which material violation occurred since December 7, 2004 and remains uncured in any material respect. For purposes of this Agreement, the term Hazardous Materials shall mean (a) any toxic substance or hazardous waste, hazardous substance or related hazardous material; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of presently existing federal, state or local safety guidelines, whichever are more stringent; and (c) any substance, material or chemical which is defined as or included in the definition of "hazardous substances", "toxic substances", "hazardous materials", "hazardous wastes" or words of similar import under any federal, state or local statute, law, code, or ordinance or under the regulations adopted or guidelines promulgated pursuant thereto, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801 et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; and the Federal Water Pollution Control Act, as amended, 33 U.S.C. §1251, et seq.)

(j) **Ground Lease.** To the best of Seller's knowledge, (i) the Ground Lease is in full force and effect, (ii) the Ground Lease has not been amended, and (iii) there are no defaults by Seller thereunder.

20

force and effect, and (ii) there are no defaults by Seller thereunder.

(k) _____ EOA. To the best of Seller's knowledge, (i) the EOA is in full force and effect, and (ii) there are no defaults by Seller thereunder.

(l) _____ Peninsula Sublease. To the best of Seller's knowledge, (i) the Peninsula Sublease is in full force and effect, (ii) the Peninsula Sublease has not been amended, and (iii) there are no defaults by Seller thereunder.

(m) _____ Employees. Seller employs no persons at the Property.

Notwithstanding and without limiting the foregoing, (i) if any of the representations or warranties of Seller that survive Closing contained in this Agreement or in any document or instrument delivered in connection herewith are materially false or inaccurate, or Seller is in material breach or default of any of its obligations under this Agreement, and Purchaser nonetheless closes the transactions hereunder and purchases the Property, then Seller shall have no liability or obligation respecting such false or inaccurate representations or warranties or other breach or default (and any cause of action resulting therefrom shall terminate upon the Closing) in the event that either (x) on or prior to Closing, Purchaser shall have had knowledge of the false or inaccurate representations or warranties or other breach or default, or (y) the accurate state of facts pertinent to such false or inaccurate representations or warranties or other breach or default was contained in any of the Information furnished or made available to or otherwise obtained by Purchaser, and (ii) to the extent the copies of the Lease, the Contracts or any other Information furnished or made available to or otherwise obtained by Purchaser prior to the expiration of the Due Diligence Period contain provisions or information that are inconsistent with the foregoing representations and warranties, Seller shall have no liability or obligation respecting such inconsistent representations or warranties (and Purchaser shall have no cause of action or right to terminate this Agreement with respect thereto), and such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to such Leases, Contracts and other Information.

References to the "knowledge," "best knowledge" and/or "actual knowledge" of Seller or words of similar import shall refer only to the current actual (as opposed to implied or constructive) knowledge of May Ann Cate and Sheryl Crosland and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller or any parent, subsidiary or affiliate of Seller or to any other officer, agent, manager, representative or employee of Seller or to impose upon Mary Ann Cate or Sheryl Crosland any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains. Notwithstanding anything to the contrary contained in this Agreement, neither May Ann Cate nor Sheryl Crosland shall have no personal liability hereunder. The provisions of this Section 7.1.1 shall survive the Closing for a period of one hundred eighty (180) days.

7.1.2 General Disclaimer. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR OTHERWISE, INCLUDING ANY REPRESENTATION OR WARRANTY CONCERNING TITLE TO THE PROPERTY, THE PHYSICAL CONDITION

21

OF THE PROPERTY (INCLUDING THE CONDITION OF THE SOIL OR THE IMPROVEMENTS), THE ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES ON OR AFFECTING THE PROPERTY), THE COMPLIANCE OF THE PROPERTY WITH APPLICABLE LAWS AND REGULATIONS (INCLUDING ZONING AND BUILDING CODES OR THE STATUS OF DEVELOPMENT OR USE RIGHTS RESPECTING THE PROPERTY), THE FINANCIAL CONDITION OF THE PROPERTY OR ANY OTHER REPRESENTATION OR WARRANTY RESPECTING ANY INCOME, EXPENSES, CHARGES, LIENS OR ENCUMBRANCES, RIGHTS OR CLAIMS ON, AFFECTING OR PERTAINING TO THE PROPERTY OR ANY PART THEREOF. PURCHASER ACKNOWLEDGES THAT, DURING THE DUE DILIGENCE PERIOD, PURCHASER WILL EXAMINE, REVIEW AND INSPECT ALL MATTERS WHICH IN PURCHASER'S JUDGMENT BEAR UPON THE PROPERTY AND ITS VALUE AND SUITABILITY FOR PURCHASER'S PURPOSES. EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS AGREEMENT: (A) PURCHASER WILL ACQUIRE THE PROPERTY SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS AND THE TITLE INSURANCE PROTECTION AFFORDED BY THE OWNER'S POLICY, AND (B) WITHOUT LIMITING THE FOREGOING, PURCHASER WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO SEEK DAMAGES FROM SELLER IN CONNECTION WITH THE ENVIRONMENTAL CONDITION OF THE PROPERTY, INCLUDING ANY RIGHT OF CONTRIBUTION UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT.

7.2 Interim Covenants of Seller. Until the Closing Date or the sooner termination of this Agreement in accordance with the terms and conditions of this Agreement:

7.2.1 Seller shall maintain the Property in substantially the same manner as prior hereto pursuant to Seller's normal course of business (such as maintenance obligations but not including extraordinary capital expenditures or expenditures not incurred in such normal course of business), subject to reasonable wear and tear subject to destruction by casualty or other events beyond the control of Seller.

7.2.2 Subject to the terms set forth in this Section 7.2.2, Seller may cancel, modify, extend, renew or permit the expiration of Contracts or enter into any new service contract without Purchaser's consent. After the expiration of the Due Diligence Period, Seller shall not modify, extend, renew or cancel (except as a result of a default by the other party thereunder) any Contract or enter into any additional service contracts or other similar agreements without the prior consent of Purchaser, which consent shall not be unreasonably withheld or delayed; provided, however, Purchaser's consent shall not be required if such contract is cancelable upon not more than thirty (30) days notice.

7.2.3 (a) Seller shall have the right to continue to offer the Property for lease in the same manner as prior hereto pursuant to its normal course of business and, upon request, shall keep Purchaser reasonably informed as to the status of leasing prior to the Closing

22

Date. Seller shall not during the term of this Agreement enter into any new leases or, unless required by the term of existing Leases, material modifications of existing Leases without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, (x) Purchaser agrees that Seller may enter into (i) the Victoria's Secret Lease, and (ii) the Comp USA Termination, (y) Purchaser's failure to disapprove any request for consent by Seller under this Section 7.2.3 within five (5) Business Days following Seller's request therefor shall be deemed to constitute Purchaser's consent thereto, provided that Seller's request for consent contains a copy of the proposed lease, together with financial and background information regarding the proposed tenant and guarantor and detailed information regarding any Purchaser Leasing Costs, and (z) Purchaser shall bear all Purchaser Leasing Costs and, without limiting the foregoing, the prorations at the Closing shall include an appropriate credit to Seller consistent with the foregoing.

(b) Seller makes no representations and assumes no responsibility with respect to the continued occupancy of the Property or any part thereof by any tenant. The removal of a tenant whether by summary proceedings or otherwise prior to the Closing Date shall not give rise for Purchaser's refusal or to close this transaction that any tenant is a holdover tenant or in default under its Lease on the Closing Date and Purchaser shall accept title subject to such holding over or default without an abatement on or credit against the Purchase Price.

7.2.4   Seller will keep in force and effect with respect to the Property the insurance policies currently carried by Seller or policies providing similar coverage through the Closing Date.

7.2.5   Seller shall not create any new mortgage, deed of trust, lien, pledge or other encumbrance affecting any portion of the Property.

7.2.6   Seller shall not take any action to modify, amend or otherwise affect the zoning, land-use, landmark or other similar status of the Property.

7.2.7   Seller shall not grant any concessions or rent abatements to any Tenants for any period following the Closing without Purchaser's prior written consent, which consent may be granted or withheld in Purchaser's sole discretion.

7.2.8   Seller shall promptly advise Purchaser of any litigation, arbitration or administrative hearing concerning the Property arising or threatened of which Seller has written notice and shall promptly advise Purchaser of any written notices from any governmental authority asserting a violation of any applicable law.

7.2.9   Seller shall use commercially reasonable efforts to keep the Property free of any Hazardous Materials that violate Environmental Laws and promptly inform Purchaser of any spills, releases, discharges or disposal of Hazardous Materials that occur on or onto the Property in violation of Environmental Laws.

23

7.3   Representations, Warranties and Covenants of Purchaser. Purchaser hereby represents and warrants to Seller that (i) this Agreement and all agreements, instruments and documents herein provided to be executed or caused to be executed by Purchaser are, or on the Closing Date will be, duly authorized, executed and delivered by and are binding upon Purchaser and (ii) the organizational chart of Purchaser set forth in Schedule 3 attached hereto sets forth the true, correct and complete ownership of Purchaser. Purchaser is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Delaware and is duly authorized and qualified to do all things required of it under this Agreement. The representations and warranties of Purchaser shall survive the Closing.

8.   Indemnification and Release.

8.1   Due Diligence Indemnification by Purchaser. Purchaser shall hold harmless, indemnify and defend Seller and the Seller Related Parties from and against: (a) any and all loss, damage or third party claims in any way arising from Purchaser's inspections or examinations of the Property prior to the Closing Date, including, without limitation, any investigations made by Purchaser, and (b) all costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) incurred by Seller as a result of the foregoing.

8.2   RELEASE. EXCEPT AS SET FORTH (A) IN THE LAST SENTENCE OF THIS SECTION 8.2 AND (B) IN ANY OTHER SECTION OF THIS AGREEMENT THAT EXPRESSLY SURVIVES THE CLOSING, EFFECTIVE AS OF THE CLOSING, PURCHASER SHALL BE DEEMED TO HAVE RELEASED SELLER AND ALL SELLER RELATED PARTIES FROM ALL CLAIMS WHICH PURCHASER OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MEMBER, SERVANT, SHAREHOLDER OR OTHER PERSON OR ENTITY ACTING ON PURCHASER'S BEHALF OR OTHERWISE RELATED TO OR AFFILIATED WITH PURCHASER (EACH, A "PURCHASER RELATED PARTY") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED TO OR IN CONNECTION WITH THE PROPERTY INCLUDING THE DOCUMENTS AND INFORMATION REFERRED TO HEREIN, THE LEASES AND THE TENANTS THEREUNDER, ANY CONSTRUCTION DEFECTS, ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF ALL OR ANY PORTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS, AND PURCHASER SHALL NOT LOOK TO SELLER OR ANY SELLER RELATED PARTIES IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION. THE FOREGOING RELEASE SHALL NOT BE APPLICABLE TO PURCHASER'S RIGHT TO IMPLEAD OR OTHERWISE SEEK JOINDER OF SELLER SOLELY WITH RESPECT TO ANY CLAIMS (EXCLUDING COUNTERCLAIMS) BROUGHT AGAINST PURCHASER BY A THIRD PARTY UNAFFILIATED WITH PURCHASER RELATING TO (I) PERSONAL INJURY OR DEATH THAT OCCURRED SOLELY DURING SELLER'S PERIOD OF OWNERSHIP OF THE PROPERTY, OR (II) HAZARDOUS SUBSTANCES DISPOSED OF OR RELEASED IN, ON

24

OR UNDER THE PROPERTY DURING SELLER'S PERIOD OF OWNERSHIP OF THE PROPERTY AND FOR WHICH SELLER SHALL BE LIABLE UNDER ANY STATUTE CONCERNING LIABILITY FOR CONTAMINATION BY HAZARDOUS SUBSTANCES.

8.3   Survival. The provisions of this Section 8 shall survive the Closing or earlier termination of this Agreement.

9.   Remedies for Default and Disposition of the Deposit.

9.1   SELLER DEFAULTS. IF THE TRANSACTION HEREIN PROVIDED SHALL NOT BE CLOSED BY REASON OF SELLER'S DEFAULT UNDER THIS AGREEMENT, THEN PURCHASER SHALL HAVE, AS ITS EXCLUSIVE REMEDIES (ALL OTHER RIGHTS AND/OR REMEDIES, WHETHER AVAILABLE AT LAW OR IN EQUITY BEING IRREVOCABLY WAIVED) THE RIGHT TO EITHER (A) TERMINATE THIS AGREEMENT (IN WHICH EVENT THE DEPOSIT SHALL BE RETURNED TO PURCHASER, SELLER SHALL PAY TO PURCHASER AN AMOUNT EQUAL TO PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES (AS HEREINAFTER DEFINED), AND NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER EXCEPT WITH RESPECT TO THOSE PROVISIONS OF THIS AGREEMENT WHICH EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT, PURCHASER HEREBY WAIVING ANY RIGHT OR CLAIM TO DAMAGES FOR SELLER'S BREACH, OR (B) IF SELLER SHALL WILLFULLY FAIL TO TRANSFER THE PROPERTY PURSUANT TO AND IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, SPECIFICALLY ENFORCE SELLER'S OBLIGATION TO TRANSFER THE PROPERTY (IT BEING ACKNOWLEDGED THAT THE REMEDY OF SPECIFIC PERFORMANCE SHALL NOT BE APPLICABLE TO ANY OTHER COVENANT OR AGREEMENT OF SELLER CONTAINED HEREIN), PROVIDED THAT ANY ACTION BY PURCHASER FOR SPECIFIC PERFORMANCE MUST BE FILED, IF AT ALL, WITHIN SIXTY (60) DAYS OF SELLER'S DEFAULT, AND THE FAILURE TO FILE WITHIN SUCH PERIOD SHALL CONSTITUTE A WAIVER BY PURCHASER OF SUCH RIGHT AND REMEDY. IF PURCHASER SHALL NOT HAVE FILED AN ACTION FOR SPECIFIC PERFORMANCE WITHIN THE AFOREMENTIONED TIME PERIOD OR SO NOTIFIED PURCHASER'S SOLE REMEDY SHALL BE TO TERMINATE THIS AGREEMENT, PURCHASER'S SOLE REMEDY SHALL BE TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH CLAUSE (A) ABOVE. AS USED HEREIN, "PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES" SHALL MEAN AND REFER TO THIRD-PARTY OUT-OF-POCKET EXPENSES ACTUALLY INCURRED BY PURCHASER IN CONNECTION WITH THE NEGOTIATION AND PREPARATION OF THIS AGREEMENT, INCLUDING ATTORNEYS' FEES, AND IN CONNECTION WITH PURCHASER'S INVESTIGATIONS UNDER THIS AGREEMENT PRIOR TO THE TERMINATION OF THIS AGREEMENT BY PURCHASER; PROVIDED, HOWEVER, (I) IN NO EVENT SHALL SELLER BE OBLIGATED UNDER THIS AGREEMENT TO REIMBURSE PURCHASER FOR PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES (IN THE AGGREGATE) IN EXCESS OF ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000) AND (II) SELLER'S OBLIGATION HEREUNDER TO

REIMBURSE PURCHASER FOR PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES SHALL RELATE ONLY TO PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES WITH RESPECT TO WHICH PURCHASER DELIVERS TO SELLER A THIRD-PARTY INVOICE (WITH REASONABLE SUPPORTING INFORMATION AND DOCUMENTATION AND EVIDENCE OF PAYMENT) WITHIN THIRTY (30) DAYS AFTER THE DATE ON WHICH PURCHASER GIVES SELLER WRITTEN NOTICE OF PURCHASER'S TERMINATION OF THIS AGREEMENT.

9.2   PURCHASER DEFAULTS. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN SECTION 9.1, IN THE EVENT THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT SHALL NOT CLOSE ON ACCOUNT OF PURCHASER'S DEFAULT, THEN THIS AGREEMENT SHALL TERMINATE AND THE RETENTION OF THE DEPOSIT SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY UNDER THIS AGREEMENT, SUBJECT TO THE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT; PROVIDED, HOWEVER, NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO LIMIT SELLER'S RIGHTS OR DAMAGES UNDER ANY INDEMNITIES GIVEN BY PURCHASER TO SELLER UNDER THIS AGREEMENT. IN CONNECTION WITH THE FOREGOING, THE PARTIES RECOGNIZE THAT SELLER WILL INCUR EXPENSE IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT THE PROPERTY WILL BE REMOVED FROM THE MARKET; FURTHER, THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICABLE TO ASCERTAIN THE EXTENT OF DETRIMENT TO SELLER CAUSED BY THE BREACH BY PURCHASER UNDER THIS AGREEMENT AND THE FAILURE OF THE CONSUMMATION OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE AMOUNT OF COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF PURCHASER'S BREACH OR DEFAULT.

9.3   Disposition of Deposit. In the event the transaction contemplated by this Agreement shall close, the Deposit shall be applied as a partial payment of the Purchase Price.

10.   Miscellaneous.

10.1   Brokers.

10.1.1   Except as provided in Section 10.1.2 below, Seller represents and warrants to Purchaser, and Purchaser represents and warrants to Seller, that no broker or finder has been engaged by it, respectively, in connection with the sale contemplated under this Agreement. In the event of a claim for broker's or finder's fee or commissions in connection with the sale contemplated by this Agreement, then Seller shall indemnify, defend and hold harmless Purchaser from the same if it shall be based upon any statement or agreement alleged to have been made by Seller, and Purchaser shall indemnify, defend and hold harmless Seller from the same if it shall be based upon any statement or agreement alleged to have been made by Purchaser. The indemnification obligations under this Section 10.1.1 shall survive the Closing or a termination of this Agreement.

10.1.2 If and only if the sale contemplated hereunder closes, Seller has agreed to pay a brokerage commission to US Equities ("Seller's Broker") pursuant to a separate written agreement between Seller and Broker. Purchaser has agreed to pay a brokerage commission to Newmark Knight Franks Retail and Jacqueline Hayes Associates (collectively, "Purchaser's Broker") pursuant to a separate written agreement between Purchaser and Purchaser's Broker. Section 10.1.1 hereof is not intended to apply to leasing commissions incurred in accordance with this Agreement.

10.2 Limitation of Liability.

10.2.1 Notwithstanding anything to the contrary contained in this Agreement or any documents executed in connection herewith, if the Closing of the transaction contemplated hereunder shall have occurred, (i) the aggregate liability of Seller arising pursuant to or in connection with the representations, warranties, indemnifications, covenants or other obligations (whether express or implied) of Seller under this Agreement or any document or certificate executed or delivered in connection herewith shall not exceed Five Million Dollars ($5,000,000) (the "Liability Ceiling") and (ii) in no event shall Seller have any liability to Purchaser unless and until the aggregate liability of Seller arising pursuant to or in connection with the representations, warranties, indemnifications, covenants or other obligations (whether express or implied) of Seller under this Agreement or any document or certificate executed or delivered in connection herewith shall exceed One Hundred Thousand Dollars ($100,000) (the "Liability Floor"). If Seller's aggregate liability to Purchaser shall exceed the Liability Floor, Seller shall be liable for the entire amount thereof up to but not exceeding the Liability Ceiling.

10.2.2 No shareholder or agent of Seller, nor any Seller Related Parties, shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or pursuant to the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall, subject to the terms of Section 10.2.1, look solely to Seller's assets and/or the proceeds of the sale of the Property pursuant to this Agreement actually received by Seller, whether or not the same have been distributed to any principal of Seller (collectively, the "Sale Proceeds") for the payment of any claim or for any performance, and Purchaser, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability (except, subject to the terms of Section 10.2.1, to the extent of any Sale Proceeds).

10.2.3 The provisions of this Section 10.2 shall survive the Closing or a termination of this Agreement.

10.3 Exhibits; Entire Agreement; Modification. All exhibits attached and referred to in this Agreement are hereby incorporated herein as if fully set forth in (and shall be deemed to be a part of) this Agreement. This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes any and all prior agreements between the parties hereto respecting such matters. This Agreement may not be modified or amended except by written agreement signed by both parties.

27

10.4 Business Days. Whenever any action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time or by a particular date) that ends (or occurs) on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "Business Day" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in the State of New York or in the State of Illinois are not required or authorized to be closed for business.

10.5 Interpretation. Section headings shall not be used in construing this Agreement. Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to wit, that ambiguities in this Agreement should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto. Whenever the words "including", "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. Except as otherwise indicated, all Exhibit and Section references in this Agreement shall be deemed to refer to the Exhibits and Sections in this Agreement.

10.6 Governing Law. This Agreement, shall be construed and enforced in accordance with the laws of the State of New York.

10.7 Successors and Assigns. Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of the Seller, which consent may be given or withheld in the sole and absolute discretion of Seller; provided that, in the event of such an assignment or transfer, the transferee shall assume in writing all of the transferor's obligations hereunder (but Purchaser or any subsequent [redacted] Aby Rosen and Michael Fuchs and/or (ii) Raymond Gindi, [redacted] Gindi, Jack Gindi and/or Isaac S. Gindi, collectively. For purposes of this Section, "control" means ownership of no less than 50% of the equity interests in such entity and the power to direct the management and policies of such entity. Notwithstanding and without limiting the foregoing, no consent given by Seller to any transfer or assignment of Purchaser's rights or obligations hereunder shall be deemed to constitute a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder and no transfer or assignment in violation of the provisions hereof shall be valid or enforceable. Subject to the foregoing, this Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the parties.

10.8 Notices. All notices, requests or other communications which may be or are required to be given, served or sent by either party hereto to the other shall be deemed to have been properly given, if in writing and shall be deemed received (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery contemporaneously therewith), or (b) one (1) Business Day after having been deposited

28

for next day overnight delivery with any reputable overnight courier service, and in each case, addressed as follows:

To Seller:

730 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management Inc.
245 Park Avenue
New York, New York 10167
Attention:    Mary Ann Cate
Facsimile:    (212) 648-2195
Telephone:    (212) 648-2266

With a Copy To:

730 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management Inc.
P.O. Box 5005
New York, New York 10163-5005

With a Copy To:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attention:    Brian Diamond, Esq.
Facsimile:    (212) 806-6006
Telephone:    (212) 806-5569

To Purchaser:

Century 21 Chicago, LLC
c/o Century 21 Department Stores
22 Cortlandt Street
New York, New York 10007
Attention:    Raymond Gindi
Facsimile:    (212) 528-0816
Telephone:    (212) 227-9092 ext 503

29

With a Copy To:

Katsky Korins LLP
605 Third Avenue
New York, NY 10158-0038
Attention:    Randolph Amengual, Esq.
Facsimile:    (212) 716-3343
Telephone:    (212) 716-3248

To Escrowee:

First American Title Insurance Company of New York
633 Third Avenue
New York, New York 10017
Attention:    Steven Napolitano
Facsimile:    (212) 331-1579
Telephone:    (212) 850-0640

10.9    Third Parties.  Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement upon any other person other than the parties hereto and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third parties any right of subrogation or action over or against any party to this Agreement.  This Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

10.10    Legal Costs.  The parties hereto agree that they shall pay directly any and all legal costs which they have incurred on their own behalf in the preparation of this Agreement, all deeds and other agreements pertaining to this transaction, and that such legal costs shall not be part of the closing costs.

10.11    Counterparts.  This Agreement may be executed in one or more counterparts, including counterparts transmitted by facsimile, each of which shall be deemed an original, but all of which shall constitute one and the same document.

10.12    Effectiveness.  In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto.  Seller shall have the right to discontinue negotiations and withdraw any draft of this Agreement at any time prior to the full execution and delivery of this Agreement by each party hereto.  Purchaser assumes the risk of all costs and expenses incurred by Purchaser in any negotiations or due diligence investigations undertaken by Purchaser with respect to the Property.

10.13    No Implied Waivers.  No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by such party of any condition hereunder for its benefit (unless the time specified in this Agreement for exercise of such right or

30

remedy has expired) shall constitute a waiver of any other or further right or remedy nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with its obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

10.14 Discharge of Seller's Obligations. Except as otherwise expressly provided in this Agreement, Purchaser's acceptance of the Deed shall be deemed a discharge of all of the obligations of Seller hereunder and all of Seller's representations, warranties, covenants and agreements in this Agreement shall merge in the documents and agreements executed at the Closing and shall not survive the Closing, except and to the extent that, pursuant to the express provisions of this Agreement, any of such representations, warranties, covenants or agreements are to survive the Closing.

10.15 No Recordation. Neither this Agreement nor any memorandum thereof shall be recorded and any attempted recordation hereof shall be void and shall constitute a default hereunder.

10.16 Unenforceability. If all or any portion of any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provision hereof, and such provision shall be limited and construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein unless doing so would materially and adversely affect a party or the benefits that such party is entitled to receive under this Agreement.

10.17 Waiver of Trial by Jury. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.

10.18 Disclosure. Notwithstanding any terms or conditions in this Agreement to the contrary, but subject to restrictions reasonably necessary to comply with federal or state securities laws, any person may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure. For the avoidance of doubt, this authorization is not intended to permit disclosure of the names of, or other identifying information regarding, the participants in the transaction, or of any information or the portion of any materials not relevant to the tax treatment or tax structure of the transaction. The provisions of this Section shall survive the Closing.

10.19 Designation of Reporting Person. In order to assure compliance with the requirements of Section 6045 of the Code and any related reporting requirements of the Code, the parties hereto agree as follows:

31

(a) The Title Company (for purposes of this Section, the "Reporting Person"), shall assume all responsibilities for information reporting required under Section 6045(e) of the Code.

(b) Seller and Purchaser each hereby agree:

(i) to provide to the Reporting Person all information and certifications regarding such party, as reasonably requested by the Reporting Person or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and

(ii) to provide to the Reporting Person such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by the Reporting Person), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to the Reporting Person is correct.

(c) Each party hereto agrees to retain this Agreement for not less than four years from the end of the calendar year in which Closing occurred, and to produce it to the Internal Revenue Service upon a valid request therefore.

(d) The addresses for Seller and Purchaser are as set forth in Section 10.8 hereof, and the real estate subject to the transfer provided for in this Agreement is described in Exhibit A.

The provisions of this Section shall survive the Closing.

10.20 Tax Reduction Proceedings. If Seller has heretofore filed applications for the reduction of the assessed valuation of the Property and/or instituted certiorari proceedings to review such assessed valuations for any prior tax years, Purchaser acknowledges and agrees that Seller shall have sole control of such proceedings, including the right to withdraw, compromise and/or settle appeals, and Purchaser hereby consents to such actions as Seller may take therein. Any refund or the savings or refund for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller. Any tax savings or refund for the tax year in which the Closing occurs shall be prorated between Seller and Purchaser after deduction of reasonable attorneys' fees and other reasonable expenses related to the proceeding and all sums payable to tenants under the Leases. Purchaser and Seller agree that all sums payable to tenants under the Leases on account of such tax savings or refund shall be promptly paid to such tenants following receipt of such tax savings or refund. Purchaser shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate settling such proceeding and collecting the amount of any refund or tax savings. Purchaser shall assume the retainer of the attorney, if any, representing Seller in any tax proceeding pending for the tax year in which the Closing occurs and the subsequent tax year, if applicable. The provisions of this Section shall survive the Closing.

32

10.21. **Ground Lessor Release.** Purchaser shall use commercially reasonable efforts to (i) obtain from the Ground Lessor a release of JPMorgan Chase Bank, N.A. as Trustee, from its obligations accruing from and after the Closing Date under that certain Guaranty made by JPMorgan Chase Bank, N.A., as Trustee, in favor of Ground Lessor, dated as of December 7, 2004, substantially in the form of Exhibit U annexed hereto and made a part hereof (the "Release of Guaranty"), and (ii) cause a replacement guarantor conforming to the requirements of the Ground Lease and satisfying the Minimum Financial Requirement (as defined in the Ground Lease) to be substituted for JPMorgan Chase Bank, N.A., as Trustee to execute and deliver to Ground Lessor at Closing the Guaranty (as defined in the Gr[redacted]

[redacted] the delivery of the Release of Guaranty and the Replacement [redacted] conditions [redacted] Purchaser shall timely furnish such information to Ground Lessor as Ground Lessor may require to confirm that the Replacement Guarantor satisfies the requirements set forth in the Ground Lease in order to obtain the Release of Guaranty.

[redacted]

(1) the deposit by or on behalf of Purchaser at Closing of (i) $16,000,000 in an escrow account held by Escrowee pursuant to an escrow agreement ("Fee Purchase Escrow Agreement") in form and substance reason[redacted] Purchaser [redacted], which [redacted] shall [redacted] (the "Purchase Option") [redacted] and made a part as [redacted] (ii) cash or an Approved Letter of [redacted]

pursuant to the Guaranty (the "Indemnity"), (iii) an environmental indemnity [redacted] with the party or parties providing the same to the lender providing Purchaser with financing to consummate the purchase of the Property ("Purchaser's Lender") substantially in the same form and substance as the environmental indemnity provided to Purchaser's Lender at the Closing indemnifying the Indemnified Parties for any liabilities with respect to environmental matters arising following the Closing, and (iv) an agreement executed by Seller and Purchaser (the "Purchase Option Exercise Agreement"), together with a memorandum of such Purchaser Option Exercise Agreement in form and substance reasonably acceptable to Seller and Purchaser, which shall be recorded at the Closing, pursuant to which (a) Purchaser covenants to consummate the Fee Estate Purchase on the earliest date such purchase may occur pursuant to the Ground Lease (the "Fee Purchase

33

SSL-DOCS1 1642365v16

(2) delivery at Closing of (i) a power of attorney executed by Purchaser in favor of Seller authorizing Seller to exercise the Purchase Option on behalf of Purchaser, (ii) a [redacted] from Purchaser [redacted]

Option Date"), (b) Purchaser covenants to maintain property and liability insurance with respect to the Property reasonably acceptable to Seller and JPMorgan Chase Bank, N.A. and conforming, at a minimum, with the requirements set forth [redacted] attached hereto and made a part hereof, during the period from the Closing until [redacted] of the Fee Estate Purchase, (c) Purchaser covenants to maintain a net worth in excess of $20,000,000 (the "Net Worth Requirement") during the period from the Closing through the consummation of the Fee Estate Purchase (such net worth to be exclusive of the $16,000,000 held pursuant to clause (1)(i) above, which shall not be deemed assets of Purchaser for the purposes of determining Purchaser's net worth), (d) if Purchaser sells the Property prior to the consummation of the Fee Estate Purchase, such [redacted] unconditionally assume, pursuant to an assumption agreement [redacted] attached hereto and made a part hereof, all the obligations of Purchaser [redacted] the [redacted] environmental indemnity, and the Purchase Option Exercise Agreement, (e) obtain the Release of the Guaranty and the return of said Guaranty to Seller simultaneously with the Fee Estate Purchase, and (f) Seller agrees that (x) prior to Seller taking any action under the Purchase Option Exercise Agreement to exercise the Purchase Option on Purchaser's behalf, Purchaser shall have two (2) Business Days to exercise the Purchase Option and thereafter consummate the Fee Estate Purchase in conformance with the provisions of the Ground Lease, (y) in the event that either Seller on behalf of Purchaser, or Purchaser, exercises the Purchase Option, the $16,000,000 held in escrow pursuant to the foregoing clause 1(i) shall be disbursed by Escrowee directly to the Ground Lessor or its designee at the closing of the Fee Estate Purchase, and (z) upon the closing of the Fee Estate Purchase, by Seller (on behalf of Purchaser) of Purchaser, the funds and/or Approved Letter of Credit delivered pursuant to the foregoing clause (1)(i) (or any remaining balance thereof after application pursuant to the immediately succeeding paragraph), shall be promptly returned by Escrowee to Purchaser and no party shall have any further obligation under the Purchase Option Exercise Agreement.

"Approved Letter of Credit" means a clean, irrevocable and unconditional letter of credit (i) entitling Escrowee to draw upon such letter of credit upon presentation to the issuing bank of a sight draft, (ii) naming Escrowee as beneficiary, (iii) providing for a term of not less than one year and, if the initial term expires prior to the date that is 60 days after the Fee Purchase Option Date, an automatic renewal for a period ending no earlier than the date that is 60 days after the Fee Purchase Option Date, without amendment, unless the issuing bank shall send notice to Escrowee by certified mail, return receipt requested, not less than thirty (30) days prior to the expiration date of such letter of credit, that such letter of credit will not be renewed, in which case Escrowee shall draw down such letter of credit, receive the proceeds thereof and hold same in escrow pursuant to the provisions of the Fee Purchase Escrow Agreement, (iv) issued by Purchaser's Lender or a member bank of the New York Clearing House Association, and (v) otherwise acceptable to Seller in its reasonable discretion.

The funds and/or Approved Letter of Credit delivered pursuant to clause (1)(i) of the foregoing sentence shall be provided by Purchaser for the benefit of JPMorgan Chase Bank, N.A. as guarantor under the Guaranty to be utilized by JPMorgan Chase Bank, N.A., in order to cure an event of a default by Purchaser under the Ground Lease, or/as compensation for (A) any and all liabilities arising after the Closing Date pursuant to the Guaranty, (B) any claims by the

34

SSL-DOCS1 1642365v16

Indemnified Parties under the Indemnity, (C) payments by JPMorgan Chase Bank, N.A., to obtain the insurance coverage required in clause 2(b) above to the extent Purchaser fails to do so, as set forth in Schedule 4, and/or (D) to pay any transfer taxes in connection with the Fee Estate Purchase.

10.22   Like Kind Exchange.   Purchaser and/or Seller may desire to effectuate a like-kind exchange pursuant to Section 1031 of the Code in connection with the purchase and sale of the Property. Each party agrees to use reasonable efforts to accommodate the other party in effectuating a like-kind exchange pursuant to Section 1031 of the Code in connection with the sale of the Property, (b) such exchange does not directly or indirectly reduce the Purchase Price, (b) such exchange will not delay or otherwise adversely affect the Closing, (c) there is no additional unreimbursed loss, cost, damage, tax, expense or adverse consequence incurred by such party resulting from, or in connection with, such exchange (including, without limitation, any adverse consequences under ERISA), (d) the party desiring to effectuate a like-kind exchange pursuant to Section 1031 of the Code (the "Exchange Party") executes an indemnity agreement satisfactory to the other party (the "Non-Exchange Party") pursuant to which the Exchange Party shall indemnify, save and hold harmless the Non-Exchange Party of, from and against any such loss, cost, damage, tax, expense or adverse consequence (including attorneys' fees), (e) all documents to be executed by the Non-Exchange Party in connection with such exchange shall be subject to the approval of the Non-Exchange Party, which approval shall not be unreasonably withheld provided that the Exchange Party has otherwise fully complied with the terms and provisions of this Section 10.22, and shall expressly state, without qualification, that the Non-Exchange Party (x) is acting solely as an accommodating party to such exchange, (y) shall have no liability with respect thereto, and (z) is making no representation or warranty that the transactions qualify as a tax-free exchange under Section 1031 of the Code or any applicable state or local laws, (f) in no event shall the Non-Exchange Party be obligated to acquire any property or otherwise be obligated to take title, or appear in the records of title, to any property in connection with such exchange, and (g) the Exchange Party shall pay all of the costs and expenses (including, without limitation, reasonable legal fees and expenses) reasonably incurred by the Non-Exchange Party from and after the date of this Agreement in connection with the consideration and/or consummation of any such exchange. The provisions of this Section 10.22 shall survive the Closing.

[Remainder of Page Intentionally Left Blank]

35

---

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By:  730 NMA Holding, Inc., its sole member

By: _____
Name: Kathy A. Broderick
Title: Vice President

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name: Raymond Gindi
Title: Manager

By: _____
Name: Michael Fuchs
Title: Manager

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name: Raymond Gindi
Title: Manager

By: _____
Name: Michael Fuchs
Title: Manager

SSL-DOCS1 1842846

---

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name: Douglas M. Crocker
Title: Vice President

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name:
Title:

SSL-DOCS1 1842846

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name: Raymond Glnfl
Title: Manager

By: _____
Name: Michael Fuchs
Title: Manager

SSL-DOCS1 1842436416

---

**EXHIBIT A**

(Land)

**Parcel 1:**

Lots 1, 1A, 1B, 3, 4, 4A, 4C, 4L, 5A and 5B in 730 N. Michigan Subdivision in the North fractional half of Section 10, Township 39 North, Range 14, East of the Third Principal Meridian, recorded June 30, 1999 as Document Number 99031406, in Cook County, Illinois.

**Parcel 2:**

The Leasehold Estate as Leasehold Estate is defined in Paragraph 1(c) of ALTA Form 13, created by a certain Agreement to Lease dated May 10, 1994 as disclosed by a Memorandum of Lease entered into as of May 31, 1994 by and between Robert L. Stern, Lessor, and American National Bank and Trust Company, as Trustee under Trust Agreement dated April 20, 1994 and known as Trust Number 118109-01, Lessee recorded June 4, 1994 as Document 94501014, as assigned by Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated December 26, 2000 and recorded December 26, 2000 as Document 00001770R, demising the land described as follows for a term of 99 years:

Lots 2, 2A, 2B, 4K, 5, 8 and 8A in 730 N. Michigan Subdivision in the North fractional half of Section 10, Township 39 North, Range 14, East of the Third Principal Meridian, recorded June 30, 1999 as Document Number 99031406, in Cook County, Illinois.

**Parcel 3:**

Non-exclusive Easements for the benefit of Parcels 1 and 2 as described above created by Easement and Operating Agreement between American National Bank and Trust Company, as Trustee under Trust Agreement dated April 20, 1994 and known as Trust Number 118109-01, and Peninsula Chicago, L.L.C., a Delaware limited liability company, dated June 20, 1999 and recorded July 1, 1999 as Document 99032406 over the land described therein and subject to the terms and provisions contained therein, Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated December 26, 2000 and recorded December 26, 2000 as Document 00001770R.

A-1

SSL-DOCS1 1842436416

# EXHIBIT B
(Additional Exceptions to Title)

1-6. Intentionally deleted.

B-1

7. Easement in favor of Ameritech for poles, wires and underground cable and conduit together with the right of ingress and egress thereto as set forth in the Vacation Ordinance recorded November 1, 1995 as Document 95022324.

8. Survey matters as depicted on survey prepared by National Survey Service, Inc. dated August 24, 2004 as Survey No. N-125752:

a) Encroachments of building located mainly on the land over and onto the public rights of way of varying distances at ground level as follows:

From 0.03 feet to 0.77 feet along the East line of the property onto North Michigan Avenue; and by 1.50 feet along the South line of property onto East Superior Street.

b) Encroachments of building cornice, window sills and walk located mainly on the land over and onto the public rights of way of varying distances at roof level as follows:

From 0.47 feet to 1.88 feet along the North line of property onto East Chicago Avenue;
From 0.65 feet to 2.05 feet along the East line of property onto North Michigan Avenue;
From 0.62 feet to 0.74 feet along the South line of property onto East Superior Street; and
From 0.22 feet to 0.51 feet along the West line of property onto Rush Street.

B-2

**EXHIBIT C**

(Required Tenants)

Banana Republic, LLC
Polo Illinois, LLC
Tiffany and Company
American Girl
Pottery Barn
Victoria's Secret

C-1

SSL-DOCS1 1842256/16

---

c) Encroachments of various items, glass, concrete, and metal canopies affixed to building located mainly on the land over and over the public rights of way, by varying distances, as follows:

From 2.00 feet to 3.88 feet along the North line of property onto East Chicago Avenue;
From 1.62 feet to 2.00 feet along the East line of property onto North Michigan Avenue;
From 3.00 feet to 15.95 feet along the South line of property onto East Superior Street; and
From 3.57 feet to 5.00 feet along the West line of property onto North Rush Street.

d) Encroachment of sign affixed to building located mainly on the land over and onto North Michigan Avenue east and adjoining by an undisclosed amount.

9. Basement and Operating Agreement recorded July 1, 1999 as Document 99523467 made by and between American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated April 29, 1994 and known as Trust Number 118115-01 and Peninsula Chicago LLC, a Delaware Limited Liability Company, and its terms and provisions contained therein, as assigned to 729 North Michigan Avenue L.L.C., an Illinois Limited Liability Company pursuant to Assignment and Assumption of Ground Leases, Subleases and Basement and Operating Agreement dated December 26, 2000 recorded December 26, 2000 as document number 0001017706 to 729 North Michigan Avenue L.L.C., an Illinois Limited Liability Company.

10. Terms and Conditions of the Agreement as Leases dated May 19, 1994 as disclosed by a Memorandum of Lease entered into as of May 31, 1994 by and between Robert L. Stern, Lessor, and American National Bank and Trust Company as Trustee under Trust Agreement dated April 29, 1994 and known as Trust No. 118115-01, Lessee, recorded June 6, 1994 as Document 94502495. Assignment and Assumption of Ground Leases, Subleases and Basement and Operating Agreement dated December 26, 2000 and recorded December 26, 2000 as Document 0001017706.

11. Terms and Conditions of the Memorandum of Lease made as of January 1, 1999 by and between American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated April 29, 1994 and known as Trust No. 118115-01 and Peninsula Chicago LLC, a Delaware Limited Liability Company recorded July 1, 1999 as Document 99523460, and rights of all parties claiming thereunder.

12. Terms and Conditions of a certain Lease made by as of January 25, 1999 by and between American National Bank and Trust Company of Chicago as Trustee under Trust Agreement dated April 29, 1994 and known as Trust No. 118115-01 and Peninsula Chicago LLC, as disclosed by a Memorandum thereof dated June 11, 1999 and recorded July 1, 1999 as Document 99523460, and rights of all parties claiming thereunder, which affects only that part of the premises demised by Robert L. Stern, to American National Bank and Trust Company of Chicago, as Trustee, under trust agreement dated April 29, 1994 and known as Trust Number 118115-01 under that certain Agreement to Lease dated May 19, 1994 as disclosed by Memorandum of Lease dated May 31, 1994 and recorded June 6, 1994 as Document 94502495. Assignment and Assumption of Ground Leases, Subleases and Basement and Operating Agreement dated December 26, 2000 and recorded December 26, 2000 as Document 0001017706 which demised the Leasehold Estate in the parcels described below.

Lots 4F, 4K, 6, and 8A in 729 N. Michigan Avenue Subdivision being a Subdivision in the North fractional 1/2 of Section 10, Township 39 North, Range 14 East of the Third Principal Meridian, recorded June 30, 1999 as Document 99501466, in Cook County, Illinois.

13. The rights of tenants under the Leases as tenants only.

14. Basements as shown on plat of 729 N. Michigan Avenue Subdivision recorded June 30, 1999 as Document Number 99501466.

SSL-DOCS1 1842256/16

B-3

**EXHIBIT D**

**TENANT'S ESTOPPEL CERTIFICATE**

The undersigned ("Tenant") hereby certifies to 730 North Michigan Avenue, L.L.C. ("Landlord") and to any prospective purchaser and such prospective purchaser's lender as follows, with the understanding that Landlord, and such prospective purchaser and prospective purchaser's lender, are relying on such certification in connection with the proposed sale of 730 North Michigan Avenue, Chicago, Illinois (the "Building"):

(1)    Tenant is the tenant under that certain lease (as amended from time to time, the "Lease") dated _____ between Landlord, as landlord, and Tenant, as tenant.

(2)    The Lease has not been amended except as follows: _____

(3)    The Lease is in full force and effect and to the best of Tenant's knowledge and belief, neither Landlord nor the Tenant is in default in any respect under the Lease and Tenant has no existing offsets or defenses against the enforcement of the Lease by Landlord. Except for the Lease, there are no agreements or other arrangements between Tenant and Landlord in respect of the Leased Premises or the Building.

(4)    The Lease commenced on _____ and will expire on _____ unless sooner terminated as provided in the Lease.

(5)    Tenant is in possession of the premises leased to it (the "Leased Premises") and to the best of Tenant's knowledge and belief, Landlord has complied fully and completely with all of its covenants, warranties and other undertakings and obligations under the Lease as of this date (including, without limitation, construction of all tenant or Building improvements and the payment of all landlord work contributions, tenant work allowances or rent abatements).

(6)    The amount of the annual base rental under the Lease is $_____. Tenant has not made any prepayment of rent under the Lease more than one month in advance. All rentals, whether base or additional, and all other sums payable by Tenant under the Lease or any amendment thereto, have been paid through _____. A security deposit in the amount of $_____ was paid upon commencement of the Lease.

(7)    Tenant has no option or right of first refusal to purchase any of the Leased Premises.

(8)    Tenant is solvent and free from bankruptcy and other reorganization proceedings and assignments for the benefit of creditors.

(9)    Tenant has not sublet or assigned any portion of the Leased Premises.

(10)   This letter shall inure to the benefit of Landlord, its successors and assigns, any purchaser of the Building and their lender, and shall be binding upon Tenant and Tenant's heirs,

D-1

legal representatives, successors and assigns. This letter shall not be deemed to alter or modify any of the terms and conditions of the Lease.

EXECUTED this _____ day of _____, 2007?

Name: _____
Address: _____

D-2

**EXHIBIT E**

INTENTIONALLY DELETED

E-1

**EXHIBIT F**

GROUND LEASE ESTOPPEL

LANDLORD ESTOPPEL CERTIFICATE AND AGREEMENT

TO: Century 21 Chicago, LLC, a Delaware LLC ("Purchaser")

THE UNDERSIGNED HEREBY CERTIFIES AND AGREES:

1.    The undersigned, ADELE HILLMAN STERN (as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust), CHICAGO AND RUSH JOINT VENTURE and ADELE HILLMAN STERN (trustee under a declaration of trust dated April 29, 1999 and known as the AHS Trust), collectively, are the Landlord ("Landlord") under that certain Agreement to Lease, dated as of May, 10, 1994, by and between ROBERT L. STERN, an individual residing in the State of California (as predecessor in interest to Landlord), and 730 NORTH MICHIGAN AVENUE L.L.C. ("730", Successor-in-interest to LASALLE BANK NATIONAL ASSOCIATION, as successor trustee to American National Bank and Trust Company of Chicago, not personally but solely as Trustee Under Trust Agreement dated April 20, 1994 and known as Trust No. 118190-01) (the "Ground Lease"). The Ground Lease covers the real property legally described in Exhibit A attached hereto and located within the city block in Chicago, Illinois bordered by Rush Street, North Michigan Avenue, Superior Street, and Chicago Avenue (the "Leased Premises").

2.    A true and complete copy of the Ground Lease, including any and all amendments, assignments or guarantees of the Tenant's obligations under the Ground Lease, is attached as Exhibit B and the Ground Lease is the only agreement between Tenant and Landlord relating to the Leased Premises. Except as indicated in Exhibit B, the Ground Lease has not been amended, assigned or otherwise modified and there are no guarantees of the Tenant's obligations under the Ground Lease except as included in Exhibit B. The Ground Lease is valid, in good standing and in full force and effect on the date hereof.

3.    To the best of Landlord's knowledge, neither Landlord nor Tenant is in default in the performance of any of their respective covenants, agreements or conditions contained in the Ground Lease, and there is no condition, state of facts or event that, with the passage of time or the giving of notice, or both, would constitute a default by either party in performance of its obligations under the Ground Lease.

4.    As of the date hereof, there are no existing claims, set-offs or defenses to the enforcement by Tenant against Landlord of any Landlord's agreements, terms, or covenants or conditions contained in the Ground Lease.

5.    The "Commencement Date" of the Ground Lease was June 3, 1994. The current "Term" of the Ground Lease will expire on June 3, 2093.

F-1

6. The current "Annual Rent" payable by Tenant under the Ground Lease is $_____. Tenant has paid all required installments of Annual Rent through _____. In addition to Annual Rent, Tenant has paid the following amounts of "Rent" in advance through the dates indicated below:

7. The initial "Option Purchase Price" for the "Fee Estate" under Section 22 and Section 23 of the Ground Lease is $_____. As of the date hereof, Tenant has not exercised any of its options or first refusal rights granted under Section 22 or Section 23 of the Ground Lease and no event has occurred which would give Tenant the right to purchase the Fee Estate pursuant to the terms of Section 22 or Section 23 of the Ground Lease. Except as contained in Section 22 and Section 23 of the Ground Lease, Tenant has no option or right of first refusal to purchase the Fee Estate and Landlord has no option to cause Tenant or any guarantor to purchase the Fee Estate.

8. No bankruptcy proceedings, whether voluntary or otherwise, are pending against Landlord. As of the date hereof, there are no Fee Mortgages) as such term is defined in the Ground Lease).

9. This certification is made to induce Purchaser to purchase the Leased Premises (or alternatively to acquire the direct or indirect ownership interest in the Tenant) and Landlord acknowledges that Purchaser will rely upon the truth of this certification. This Estoppel and the representations and agreements made herein shall inure to the benefit of Purchaser, its successors and assigns and shall be binding on Landlord, its heirs, legal representatives, successors and assigns. In addition, this certification may be relied upon by a current mortgage lender to the Tenant.

Dated: _____, 2007.

ADELE HILLMAN STERN, an individual
residing in the State of California (as Legatee)
as successor trustee of trust dated December 2,
1994 and known as the Robert L. Stern
Charitable Remainder Unitrust

CHICAGO AND RUSH JOINT VENTURE

By:
Name: Adele Hillman Stern
Its: Manager

ADELE HILLMAN STERN, Trustee under a
declaration of trust dated April 29, 1999 and
known as the AHS trust

F-2

STATE OF          )
                  ) SS.
COUNTY OF         )

I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that Adele Hillman Stern, an individual residing in the State of California (as Legatee) as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at his own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____, 2007.

_____
Notary Public

My commission expires _____

F-3

STATE OF )
) SS.
COUNTY OF )

I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that Adele Hillman Stern, as trustee under a declaration of trust dated April 29, 1999 and known as the AHS Trust, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at his own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____, 2007.

_____
Notary Public

My commission expires _____

F-5

STATE OF )
) SS.
COUNTY OF )

I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that Adele Hillman Stern, as _____ of Chicago Rush Joint Venture, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at his own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____, 2007.

_____
Notary Public

My commission expires _____

F-4

Exhibit B

Ground Lease

F-7

SSL-DOCS1 1842656416

Exhibit A

Leased Premises

F-6

SSL-DOCS1 1842656416

## EXHIBIT G

### EOA ESTOPPEL

#### EASEMENT AND OPERATING AGREEMENT ESTOPPEL CERTIFICATE

TO: Century 21 Chicago, LLC, a Delaware LLC (the "Purchaser")

730 NORTH MICHIGAN AVENUE, L.L.C., an Delaware limited liability company, as successor in interest to 730 NORTH MICHIGAN AVENUE VENTURE, as successor in interest to AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, NOT PERSONALLY BUT SOLELY AS TRUSTEE UNDER TRUST AGREEMENT DATED APRIL 20, 1994 AND KNOWN AS TRUST NO. 118199-01 ("Retail Owner")

RE: 730 North Michigan Avenue, Chicago, Illinois

Pursuant to Article 15 of that certain Easement and Operating Agreement, dated as of June 30, 1999 by and between Retail Owner (as successor in interest) and Peninsula Chicago LLC, a Delaware limited liability company ("Hotel Owner"), (the "EOA"), the undersigned does hereby certify to the Purchaser, Retail Owner and any lender providing financing to Purchaser, that as of the date hereof, the following:

1. The Hotel Owner is the "Existing Hotel Owner" as described in the EOA, which EOA covers the Retail Parcel legally described in Exhibit A attached hereto and the Hotel Parcel legally described in Exhibit B attached hereto and all of which is located within the city block in Chicago, Illinois bordered by Rush Street, North Michigan Avenue, Superior Street, and Chicago Avenue (the "Property").

2. A true and complete copy of the EOA, including any and all amendments, assignments or guarantees of the Easement and Hotel Owner's obligations under the EOA, is attached as Exhibit C. Except as indicated in Exhibit C, the terms of the EOA are unmodified and are in full force and effect.

3. To the knowledge of the executive officer of Hotel Owner executing this document there exists no default under the EOA by Retail Owner in the performance of any of Retail Owner's covenants, agreements or conditions contained in the EOA, except as follows (if none, please indicate none):

4. There are no sums, other than those arising out of the normal course of operation of the Building (as defined in the EOA) within the previous ninety (90) days, which the Hotel Owner is entitled to receive or demand from the Retail Owner, except as follows (if none, please indicate none):

5. Hotel Owner has not performed nor is performing work (other than services described in Article 5 of the EOA), the cost of which Hotel Owner is or will be entitled to charge in whole or in part to Retail Owner under the provisions of the EOA, but has not yet charged to Retail Owner, except as follows (if none, please indicate none):

G-1

6. Hotel Owner is not asserting nor, to the best knowledge of the executive officer of Hotel Owner executing this document is capable of asserting (after giving the requisite notice, if any, required under the EOA) any set-offs, claims, counterclaims or defenses against the enforcement of the Retail Owner's rights hereunder, except as follows (if none, please indicate none):

7. The Retail Owner has not requested that a matter be submitted to arbitration, which matter has not been discharged, released or otherwise resolved, except as follows (if none, please indicate none) (if such a matter exists, please deliver a copy of any notices with the EOA Estoppel Certificate):

8. The nature of any arbitration proceeding or finding under Article 11 of the EOA made within the ninety (90) days preceding the date of this Estoppel Certificate, except as follows (if none, please indicate none):

9. The current address to which notices given to the Hotel Owner are to be mailed is:

Peninsula Chicago LLC
c/o St. George's Building, 8th Floor
2 Ice House Street, Central
Hong Kong
Attn: Chief Financial Officer
Telecopy: 852-2868-4770

and to

Arnstein & Lehr LLP
120 South Riverside Plaza
Suite 1200
Chicago, Illinois 60606
Attn: Raymond J. Werner, Esq.
Telecopy: 312-876-0288

10. Hotel Owner understands and acknowledges that this certificate is delivered to and shall be relied on by, the Purchaser in connection with a sale of the Retail Owner's interest in the Property and the building located thereon (or alternatively, ownership interests in Retail Owner) and any lender providing financing to such Purchaser.

G-2

Dated: _____, 2007

PENINSULA CHICAGO LLC, a Delaware limited liability company

By: HSH Chicago, Inc. a Delaware corporation, its Member
By: _____
Name: _____
Its: _____

G-3

SSL-DOCS1 1842856v16

---

STATE OF _____ )
                                     ) SS
COUNTY OF _____ )

I, _____, a Notary Public in and for the _____, aforesaid, DO HEREBY CERTIFY, that _____, the _____ of HSH, Chicago, Inc., a Delaware corporation (the "Corporation,") a member of Peninsula Chicago LLC, a Delaware limited liability company, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at the free and voluntary act of the Corporation, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____ 2007.

NOTARY PUBLIC STAMP AND SEAL

G-4

SSL-DOCS1 1842856v16

Exhibit B
Hotel Parcel

G-6

SSL-DOCS1 1842856v16

Exhibit A
Retail Parcel

G-5

SSL-DOCS1 1842856v16

Exhibit C

EOA

# EXHIBIT H

PENINSULA SUBLEASE ESTOPPEL

## GROUND SUBLEASE TENANT ESTOPPEL CERTIFICATE

TO:　Century 21 Chicago, LLC, a Delaware limited liability company (the "Purchaser")

730 NORTH MICHIGAN AVENUE, L.L.C., an Delaware limited liability company ("Landlord"), as successor in interest to 730 NORTH MICHIGAN AVENUE VENTURE, successor in interest to AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, NOT PERSONALLY BUT SOLELY AS TRUSTEE UNDER TRUST AGREEMENT DATED AS OF APRIL 20, 1994 AND KNOWN AS TRUST NO. 118199-01 ("Original Landlord")

RE:　Premises known as and located at 730 North Michigan Avenue (the "Building")

The undersigned, Peninsula Chicago, LLC, a Delaware limited liability company ("Tenant"), does hereby certify to the Purchaser, Landlord and any lender providing financing to the Purchaser, as of the date hereof as follows:

1.　Tenant is the tenant under that certain lease dated January 29, 1999 between Tenant and Original Landlord, sub-leasing certain premises as more particularly described in the said lease (the "Premises"). Said lease, as so amended, modified or supplemented, is hereinafter referred to as the "Lease". A true and complete copy of the Lease is attached hereto as Exhibit A

2.　The Lease is in full force and effect and, except as set forth above, has not been amended, modified or supplemented.

3.　The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing of the Premises, and there are no other agreements of any kind between Landlord and Tenant with respect thereto other than a certain side letter dated as of June 30, 1999 (the "Side Letter"), a certain Memorandum of Agreement of Lease dated June 11, 1999 and a certain Agreement of Subordination, Non-Disturbance and Attornment dated as of June 29, 1999. Without limiting the foregoing, Tenant does not have any rights of first refusal for additional space, options to increase or relocate its space or options to purchase the Premises or any interest therein except as described in the Lease.

4.　To the best of knowledge of the person executing this document, all obligations of each of Landlord and Tenant to be performed or complied with through the date hereof have been fully performed and complied with.

5.　The term of the Lease commenced on June 29, 1999 and shall expire on May 1, 2093, unless sooner terminated in accordance with the terms of the Lease. To the best of

H-1

G-7

SSL-DOCS1 1842265v16

SSL-DOCS1 1842265v16

knowledge of the person executing this document, (i) neither Landlord nor the Tenant is in default in any material respect under the Lease, and (ii) the Tenant has not existing defenses or offsets against the enforcement of the Lease by Landlord.

6.    The current rent under the Lease is as provided in the Lease subject to the Side Letter.

7.    Tenant understands and acknowledges that this certificate is delivered to, and shall be relied on by, the Purchaser and its successors and assigns in connection with a sale to Purchaser of either: (a) the Landlord's interest in the Building and the land on which it stands; or (b) a sale by the direct or indirect owners as Landlord of their ownership interests in Landlord.

8.    The undersigned represents and warrants that he or she is duly authorized to execute and deliver this Estoppel Certificate on behalf of Tenant. In addition, this Estoppel Certificate may be relied upon by the current mortgage lender to Tenant, Purchaser and any lender providing financing to Purchaser.

PENINSULA CHICAGO LLC, a Delaware limited liability company

By:    HSH Chicago, In., a Delaware corporation, its member

By: _____
Name: _____
Its _____
Dated: _____

Exhibit A
The Lease

H-2

H-3

EXHIBIT 1

(Deed)

DOCUMENT PREPARED BY:
_____
_____
_____

AFTER RECORDING RETURN TO:
_____
_____
_____

(Space above this Line for County Recorder's Use Only)

## SPECIAL WARRANTY DEED
*[Illinois]*

THE GRANTOR, _____ a(n) _____ limited liability company, for and in consideration of TEN and 00/100 DOLLARS ($10.00), and other valuable consideration, hereby REMISES, RELEASES, ALIENS and CONVEYS to _____ a(n) _____, all of Grantor's right, title and interest in the real property situated in the State of Illinois, County of _____ legally described on *Exhibit A* attached hereto and made a part hereof, subject to those matters set forth on said *Exhibit A*. The addresses and permanent index numbers of said real estate are set forth on said *Exhibit A*.

TOGETHER WITH all and singular the hereditaments and appurtenances thereunto belonging, or in any way appertaining, TO HAVE AND TO HOLD the said described property forever. Grantor does covenant, promise and agree that it has not done or suffered to be done anything whereby the said described property hereby granted is, or may be, in any manner encumbered or charged, except as herein recited, and Grantor will warrant and defend same for all persons claiming by through or under Grantor, subject to the matters set forth on *Exhibit A*.

1-1

SSL-DOCS1 1842265v16

---

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be executed and delivered as of the _____ day of _____, 20__.

730 NORTH MICHIGAN AVENUE, L.L.C., a
Delaware limited liability company

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

Send subsequent tax bills to:

_____
_____
_____

1-2

SSL-DOCS1 1842265v16

## EXHIBIT J

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "Assignment") is executed as of the _____ day of _____, 20__ by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") and _____, a _____, having an address c/o _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of _____ between Assignor and Assignee).

WHEREAS, the Property is encumbered by those certain tenants (the "Tenants") occupying space under the leases listed and described on Exhibit A annexed hereto and made a part hereof (collectively, the "Tenant Leases").

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as provided herein, all of Assignor's right, title and interest in and to the Tenant Leases.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Tenant Leases.

2. Assignee hereby affirmatively and unconditionally assumes all of Assignor's obligations and liabilities under the Tenant Leases arising from and after the date hereof.

3. This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

4. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

5. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

J-1

SSL-DOCS1 1842856v6

---

STATE OF _____ )
                 ) SS
COUNTY OF _____ )

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that _____ as _____ of _____, a(n) _____ limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ appeared before me this day in person and acknowledged that _he signed and delivered the said instrument as _ own free and voluntary act, and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN, under my hand and Notarial Seal this ___ day of _____, 20__.

_____
Notary Public

J-3

SSL-DOCS1 1842856v6

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

ASSIGNEE:

[_____]

By: _____
Name:
Title:

J-2

---

EXHIBIT A
(List of Leases)

J-3

## EXHIBIT K

### BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignment") is executed as of the ___ day of ___, 20___ by 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") in favor of _____, a _____, having an address c/o _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of ___ between Assignor and Assignee).

WHEREAS, Assignor desires to assign, transfer, setover and deliver to Assignee all of Assignor's rights, if any, in and for all furnishings, fixtures, fittings, appliances, apparatus, equipment, machinery and other items of personal property, if any, affixed or attached to, or placed or situated upon, the Property, and the following incidental rights and appurtenances relating thereto (collectively, the "Assigned Properties"):

A.    To the extent assignable without third party consents or any cost or expense to Assignor, all of Assignor's right, title and interest in and to all use, occupancy, building and operating permits, licenses, approvals, documents, instruments, if any, issued from time to time with respect to the Property or the Assigned Properties; provided, however, if any such assignment may be made at an additional cost or expense, Assignor shall assign all of Assignor's right, title and interest therein if and to the extent Assignee shall pay such additional cost or expense; and

B.    All of Assignor's right, title and interest in and to all existing and assignable guaranties and warranties (express or implied), if any, issued in connection with the construction, alteration and repair of the Property and/or the purchase, installation and the repair of the Assigned Properties.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignor hereby assigns, transfers, sets over and delivers to Assignee, its successors and assigns, all of Assignor's right, title and interest, if any, in and to the Assigned Properties.

2.    This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

K-1

SSL-DOCS1 1842380v6

3.    This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

4.    The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

730 NORTH MICHIGAN AVENUE, L.L.C.

By:  730 NMA Holding Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

K-2

SSL-DOCS1 1842380v6

## EXHIBIT L

### CERTIFICATION OF NON-FOREIGN STATUS UNDER TREASURY REGULATIONS SECTION 1.1445-2(b)

### (NON-DISREGARDED ENTITY GRANTOR/TRANSFEROR)

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by 730 North Michigan Avenue, L.L.C., the undersigned hereby certifies the following on behalf of 730 North Michigan Avenue, L.L.C.:

1.    730 North Michigan Avenue, L.L.C. is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.    730 North Michigan Avenue, L.L.C. is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3.    730 North Michigan Avenue, L.L.C.'s U.S. employer identification number is ___; and

4.    730 North Michigan Avenue, L.L.C.'s office address is c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167.

730 North Michigan Avenue, L.L.C. understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of 730 North Michigan Avenue, L.L.C.

Dated: _____

By: _____
       Name:
       Title:

L-1

SSL-DOCS1 1842306/6

---

## EXHIBIT M

### ASSIGNMENT AND ASSUMPTION OF CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "Assignment") is executed as of the ___ day of ___, 20___, by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") and _____, a _____, having an address _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of October ___, 2007 between Assignor and Assignee).

WHEREAS, in connection with its ownership and management of the Property, Assignor has entered into those certain maintenance, service and supply contracts and equipment leases, in effect on the date hereof, listed and described on Exhibit A annexed hereto and made a part hereof (collectively, the "Contracts").

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as herein provided, all of Assignor's right, title and interest in and to the Contracts.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Contracts.

2.    This Assignment shall constitute a direction and full authority to any person or entity that it is a party to any of the Contracts to perform its obligation under the Contracts for the benefit of Assignee without further proof to any such party of the assignment to Assignee of the Contracts.

3.    Assignee hereby affirmatively and unconditionally assumes all of the obligations and liabilities of Assignor under the Contracts arising from and after the date hereof.

4.    This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

5.    This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall

M-1

SSL-DOCS1 1842306/6

**EXHIBIT A**

(Contracts)

M-3

---

constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

6.  The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

**ASSIGNOR:**

730 NORTH MICHIGAN AVENUE, L.L.C.

By:   730 NMA Holding, Inc., its sole
      member

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**ASSIGNEE:**

By: _____
    Name:
    Title:

N-2

EXHIBIT N

ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASE (this "Assignment") is executed as of the _____ day of _____, 20___ by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") and [_____], a [_____], having an address c/o [_____] ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of _____ between Assignor and Assignee).

WHEREAS, the Property is subject to that certain Agreement to Lease, dated as of May 10, 1994 (the "Ground Lease"), between Robert L. Stern ("Ground Lessor") and 730 North Michigan Avenue L.L.C.

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as provided herein, all of Assignor's right, title and interest in and to the Ground Lease.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Ground Lease.

2. Assignee hereby affirmatively and unconditionally assumes all of Assignor's obligations and liabilities under the Ground Lease arising from and after the date hereof.

3. This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

4. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

5. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

N-1

ASSIGNOR:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

ASSIGNEE:

[_____]

By: _____
    Name:
    Title:

N-2

# EXHIBIT D

(Escrow Agreement)

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement"), dated as of the ___ day of October ___, 20__) is among FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK, having an address at 633 Third Avenue, New York, New York 10017 ("Escrowee"), 730 NORTH MICHIGAN AVENUE, L.L.C., having an address at c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Seller"), and CENTURY 21 CHICAGO, LLC, having an address at 22 Cortlandt Street, New York, New York 10007 ("Purchaser").

## WITNESSETH

WHEREAS, Seller and Purchaser entered into that certain Contract of Sale dated as of October ___, 2007 for the purchase and sale of the property known as 730 North Michigan Avenue, Chicago, Illinois (the "Property"), as more particularly described therein (hereinafter referred to as the "Contract");

WHEREAS, the Contract provides for the terms and conditions applicable to the sale and purchase of the Property and the performance obligations and rights of Seller and Purchaser; and

WHEREAS, Seller and Purchaser agree, pursuant to the Contract, that Escrowee shall hold, in escrow the Deposit (capitalized terms not otherwise defined herein are defined pursuant to Paragraph 6 hereof) in accordance with the terms and conditions of the Contract and this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1. Appointment of Agent.

1.1 Purchaser and Seller hereby appoint Escrowee to act as their escrow agent on the terms and conditions hereinafter set forth, and Escrowee accepts such appointment.

1.2 Escrowee agrees to hold the Deposit on behalf of the parties to the Contract, and to apply, disburse and deliver the Deposit as provided in the Contract and this Agreement. In the event of any conflict between the terms and conditions of the Contract and the terms or conditions of this Agreement, as to the obligations of Escrowee, the terms and conditions of this Agreement shall govern and control.

2. Disposition of the Deposit.

2.1 Escrowee shall hold the Deposit in an interest bearing savings account which rate of interest need not be maximized. Escrowee shall not commingle the Deposit with any other funds.

2.2 Escrowee shall pay the Deposit to Seller or otherwise in accordance with the terms of the Contract. If prior to the Closing, either party makes a demand upon Escrowee for delivery of the Deposit, Escrowee shall give notice to the other party of such demand. If a notice of objection to the proposed payment is not received from the other party within seven (7) Business Days after the giving of notice by Escrowee, Escrowee is hereby authorized to deliver the Deposit to the party who made the demand. If Escrowee receives a notice of objection within said period, then Escrowee shall continue to hold the Deposit and thereafter pay it to the party entitled when Escrowee receives (a) notice from the objecting party withdrawing the objection, or (b) a notice signed by both parties directing disposition of the Deposit, or (c) a judgment or order of a court of competent jurisdiction.

2.3 Nothing in this Section 2 shall have any effect whatsoever upon Escrowee's rights, duties, and obligations under Section 3.

3. Concerning Escrowee.

3.1 Escrowee shall be protected in relying upon the accuracy, acting in reliance upon the contents, and assuming the genuineness of any notice, demand, certificate, signature, instrument or other document which is given to Escrowee without verifying the truth or accuracy of any such notice, demand, certificate, signature, instrument or other document;

3.2 Escrowee shall not be bound in any way by any other contract or understanding between the Seller and Purchaser, whether or not Escrowee has knowledge thereof or consents thereto unless such consent is given in writing;

3.3 Escrowee's sole duties and responsibilities shall be to hold and disburse the Deposit in accordance with this Agreement and the Contract; provided, however, that Escrowee shall have no responsibility for the clearing or collection of the check representing the Deposit;

3.4 Upon the disbursement of the Deposit in accordance with this Agreement, Escrowee shall be relieved and released from any liability under this Agreement;

3.5 Escrowee may resign at any time upon at least ten (10) Business Days prior written notice to the Seller and Purchaser hereto. If, prior to the effective date of such resignation, the Seller and Purchaser hereto shall have approved, in writing, a successor escrow agent, then upon the resignation of Escrowee, Escrowee shall deliver the Deposit to such successor escrow agent. From and after such resignation and the delivery of the Deposit to such successor escrow agent, Escrowee shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement, all of which duties, responsibilities and obligations shall be performed by the appointed successor escrow agent. If for any reason Seller and Purchaser shall

not approve a successor escrow agent within such period, Escrowee may bring any appropriate action or proceeding (or leave to deposit the Deposit with a court of competent jurisdiction, pending the approval of a successor escrow agent, and upon such deposit Escrowee shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement;

3.6     Seller and Purchaser hereby agree to, jointly and severally, indemnify, defend and hold harmless Escrowee from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against, Escrowee (including reasonable attorneys' fees and disbursements) by reason of Escrowee performing its obligations pursuant to, and in accordance with, the terms of this Agreement, but in no event shall Escrowee be indemnified for its negligence, willful misconduct or breach of the terms of this Agreement;

3.7     In the event that a dispute shall arise in connection with this Agreement or the Contract, or as to the rights of Seller and Purchaser in and to, or the disposition of, the Deposit, Escrowee shall have the right to (w) hold and retain all or any part of the Deposit until such dispute is settled or finally determined by litigation, arbitration or otherwise, or (x) deposit the Deposit in an appropriate court of law, following which Escrowee shall thereby and thereafter be relieved and released from any liability or obligation under this Agreement, or (y) institute an action in interpleader or other similar action permitted by stakeholders in the State of New York, or (z) interplead Seller or Purchaser in any action or proceeding which may be brought to determine the rights of Seller and Purchaser to all or any part of the Deposit; and

3.8     Escrowee shall not have any liability or obligation for loss of all or any portion of the Deposit by reason of the insolvency or failure of the institution of depository with whom the escrow account is maintained.

4.     Termination.

This Agreement shall automatically terminate upon the delivery or disbursement by Escrowee of the Deposit in accordance with the terms of the Contract and terms of this Agreement, as applicable.

5.     Notices.

All notices, requests or other communications which may be or are required to be given, served or sent by any party hereto to any other party hereto shall be deemed to have been properly given or made if (a) delivered in person, (b) upon delivery, if delivered in person or by facsimile transmission with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery), (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case, addressed as follows:

If to Seller:

730 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management
Inc.
245 Park Avenue
New York, New York 10167
Attention: Mary Ann Cate
Facsimile: (212) 648-2266

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attention: Brian Diamond, Esq.
Facsimile: (212) 806-6006

If to Purchaser:

Century 21 Chicago, LLC
c/o Century 21 Department Stores
22 Cortlandt Street
New York, New York 10007

Attention: Raymond Gindi
Facsimile: (212) 528-0816

with a copy to:

Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038

Attention: Randolph Amengual, Esq.
Facsimile: (212) 716-3343

If to Escrowee:

First American Title Insurance Company of
New York
633 Third Avenue
New York, New York 10017

Attention: Steven Napolitano
Facsimile (212) 331-1579

6.    Capitalized Terms.

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Contract.

7.    Governing Law/Waiver of Trial by Jury.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE. THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

8.    Successors.

This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto; provided, however, that except as expressly provided herein as to the Escrowee, this Agreement may not be assigned by any party without the prior written consent of the other parties.

9.    Entire Agreement.

This Agreement, together with the Contract, contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

10.    Amendments.

Except as expressly provided in this Agreement, no amendment, modification, termination, cancellation, rescission or supersession to this Agreement shall be effective unless it shall be in writing and signed by each of the parties hereto.

11.    Counterparts and/or Facsimile Signatures.

This Agreement may be executed in any number of counterparts, including counterparts transmitted by facsimile, any one of which shall constitute an original of this Agreement. When counterparts or facsimile copies have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents and copies of such documents shall be deemed valid as originals. The parties agree that all such signatures may be transferred to a single document upon the request of any party. This Agreement shall not be binding unless and until it shall be fully executed and delivered by all parties hereto. In the event that this Agreement is executed and delivered by way of facsimile transmission, each party delivering a facsimile counterpart shall promptly deliver an ink-signed original counterpart of the Agreement to the other party by overnight courier service; provided however, that the failure of a party to deliver an ink-signed original counterpart shall not in any

O-5

SSL-DOCS1 1842365v16

way effect the validity, enforceability or binding effect of a counterpart executed and delivered by facsimile transmission.

12.    Severability.

If any provision of the Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

[Remainder of Page Intentionally Left Blank]

O-6

SSL-DOCS1 1842365v16

IN WITNESS WHEREOF, the parties have executed and delivered this Escrow Agreement as of the date and year first above written.

FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK

By: _____
   Name:
   Title:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

   By: _____
      Name:
      Title:

   By: _____
      Name:
      Title:

[INSERT NAME OF PURCHASER]

By: _____
   Name:
   Title:

O-7

SSL-DOCS1 1842265v16

---

## EXHIBIT P

### (Form of Tenant Notice)

730 North Michigan Avenue, L.L.C.
c/o J.P Morgan Investment Management Inc.
245 Park Avenue
New York, New York 10167

_____, 20___

By Certified Mail -
Return Receipt Requested

_____
_____
_____
_____

Re: Lease (the "Lease") dated _____ between _____ ("Landlord") and _____ as _____ encumbering certain real property known as _____ (the "Property")

Ladies and Gentlemen:

Please be advised that (1) Landlord has conveyed all of its right, title and interest in and to the Property, including its interest as landlord under the Lease, to _____ ("Purchaser"), and (2) Purchaser has assumed Landlord's obligations under the Lease.

Accordingly, effective as of the date hereof, you are hereby notified and directed to deliver all future rent and additional rent payments due under the Lease, and any notices, inquiries or requests relating thereto, to Purchaser at:

_____
_____

P-1

SSL-DOCS1 1842265v16

## EXHIBIT Q

### LEASES

1. Retail Complex Lease dated January 25, 1996 between TKM L.L.C. ("Landlord") and PRL Retail Concepts of Illinois, Inc. ("Tenant"), as amended by that certain First Amendment to Lease dated January 21, 1997 between 730 North Michigan Avenue Venture ("Venture"), as successor in interest to Landlord, and Tenant, as amended by that certain Sublease Agreement dated August 14, 1998 between PRL Restaurant Concepts of Illinois, LLC, as subtenant, and Polo Illinois, LLC, as successor by merger with Tenant, as tenant, as amended by that certain Second Amendment to Lease dated March 10, 1999 between Venture and Tenant and as amended by that certain Third Amendment to Lease dated August 31, 2000 between Venture and Polo Illinois, LLC, as successor by merger to Tenant.

2. Retail Complex Lease dated January 1, 1999 between 730 North Michigan Avenue Venture as landlord and Peninsula Chicago LLC as tenant.

3. Retail Complex Lease dated March 18, 1996 between TKM L.L.C. as landlord and Williams-Sonoma, Inc. as tenant ("Tenant"), as assigned by that certain Assignment and Assumption Agreement dated July 7, 1998 between Tenant as assignor and Williams-Sonoma Stores, Inc. as assignee.

4. Retail Complex Lease dated December 13, 1996 between 730 North Michigan Avenue Venture as landlord and CompUSA Inc. ("Tenant"), as assigned by Tenant as assignor to CompUSA Stores L.P. as assignee by that certain letter dated January 21, 1999.

5. Retail Complex Lease dated January 22, 1996 between TKM L.L.C. as landlord and Tiffany and Company as tenant.

6. Retail Complex Lease dated November 26, 1996 between 730 North Michigan Avenue Venture ("Landlord") and The Gap, Inc. ("Tenant"), as amended by that certain First Amendment to Lease dated March 30, 1999 between Landlord and The Banana Republic, Inc. (as successor in interest to Tenant) and as assigned by The Banana Republic Inc. as assignor to Banana Republic, LLC as assignee by that certain letter dated January 30, 2004.

7. Retail Complex Lease dated February 14, 1998 between 730 North Michigan Avenue Venture ("Landlord") and American Girl Place, Incorporated ("Tenant"), as amended by that certain First Amendment to Lease dated June 29, 1998 between Landlord and Tenant, as amended by that certain Second Amendment to Lease dated March 24, 1999 between Landlord and Tenant, as amended by that certain Landlord's Consent to Transfer dated April 8, 1999 and as amended by that certain Third Amendment to Lease dated September 7, 2000 between Landlord and Tenant.

Q-1

SSL-DOCS1 1842264v6

---

In addition, all security deposits held by Landlord, if any, together with any interest earned thereon, have been transferred to Purchaser.

Very truly yours,

730 North Michigan Avenue, L.L.C.

By: _____
Name: _____
Title _____

P-2

SSL-DOCS1 1842264v6

## EXHIBIT R

### SERVICE CONTRACTS

1. Agreement with Service Contractor dated June 1, 2007 with Global Water Technology, Inc.

2. Agreement with Service Contractor dated March 1, 2006 with ConServ, Inc.

3. Agreement with Service Contractor dated January 25, 2005 with Contech-MSI

4. Agreement with Service Contractor dated December 20, 2004 with Premier Security Corporation.

5. Agreement with Service Contractor dated December 20, 2004 with National Waste Services

6. Agreement with Service Contractor dated May 4, 2007 with The Trane Company

7. Agreement with Service Contractor dated January 17, 2005 with Smithereen Exterminating Company, Inc.

8. Agreement with Service Contractor dated May 24, 2006 with Nalco Company

9. Agreement with Service Contractor dated March 1, 2006 with The Millard Group

10. Agreement with Service Contractor dated May 31 2007 with Comtech Security, Inc.

11. Master Electric Sales Agreement dated February 27, 2007 with Pepco Energy Services, Inc.

12. Commercial Sales Proposal/Agreement dated February 2, 2005 with ADT Security Services, Inc.

13. Standard Uniform Rental Service Agreement dated December 7, 2004 with Cintas

R-1

## EXHIBIT S

### LEASING COMMISSIONS

Letter Agreement dated September 26, 2007, between Mid-America Real Estate Corporation and U.S. Equities Realty, as agent for Seller, relating to the Victoria's Secret lease.

Management and Leasing Agreement dated as of December 7, 2004, between 730 NMA Holding, Inc., as agent for Seller, and U.S. Equities Asset Management, L.L.C., as manager.

S-1

**EXHIBIT 1**

VICTORIA'S SECRET LOI

*U.S. Equities Realty*

August 20, 2007

Mr. Stanley Nitzberg
Principal
Mid-America Real Estate Corporation
Two Mid-America Plaza, Ste. 330
Oakbrook Terrace, IL 60181

Re: 730 North Michigan Avenue, Chicago

Dear Stanley,

Pursuant to our last conversation and our very productive meeting in New York, I am pleased to provide you with this revised proposal for Victoria's Secret Stores, Inc. to open a flagship store in the space currently occupied by Pottery Barn. We look forward to working with you to create a great Victoria's Secret store that will fit with the mix of tenants and the Magnificent Mile. The main terms shall be as follows:

| | |
|---|---|
| Premises: | Ground floor = 11,200 leasable square feet<br>2nd floor = 11,869 leasable square feet<br>Total = 22,869 leasable square feet |
| Tenant: | Victoria's Secret Stores, ~~Inc.~~ LLC |
| Guarantor: | ~~Limited Brands~~ None |
| Use: | Sale of women's clothing ~~and related~~ and such other items ~~accessories~~ typically sold in Victoria's Secret and services provided stores. |
| Lease Term: | 15 years. |
| Renewal Option: | One 5 year option at market rent with a one year advance notice. |
| Delivery Date and Lease Commencement Date: | July 1, 2008 |
| Rent Commencement: | The earlier of store opening or February 1, 2009, subject to possession no later than July 1, 2008. |
| Annual Base Net Rent: | Year 1 $ 3,400,000<br>Year 2 $ 3,500,000<br>Thereafter 3% compounded annually |

20 North Michigan Avenue, Chicago, Illinois 60602    312 456 7000    Fax 312 456 0056    www.usequities.com

Buenos Aires    Chicago    Detroit    Philadelphia    São Paulo    Santiago

*lingerie, intimate apparel, sleepwear, loungewear, dorewear

SSL-DOCS1 1842260/16

T-1

August 20, 2007
Page 2

**Percentage Rent:** None

**Operating Expenses & Real Estate Taxes:** Tenant shall pay its proportionate share of actual operating expenses. 2007 estimates are $7.54 per square foot.

Tenant shall pay its proportionate share of real estate taxes on the basis of a formula, taking into account the value between Michigan Avenue, Chicago and Rush. Estimates for 2007 real estate taxes payable in 2008 are $24.42 per square foot.

**Possession:** Tenant shall take the premises "as is" except for removal of previous tenant's fixtures and equipment and no hazardous materials.

**Tenant Allowance:** Landlord shall contribute $60.00 per square foot.

**Signage:** Signage shall be subject to Landlord, City and Greater North Michigan Avenue Association approvals. The lease will also contain language for Landlord to approve new storefront and window displays, which will be attached as an exhibit to the lease.

**Repairs:** Landlord will maintain all structural elements of the building, including the roof (capitalized costs to be included as part of CAM on GAAP amortized basis). Tenant shall make non-structural repairs within its premises.

**Alterations:** After initial construction, Tenant may make any non-structural alterations without Landlord's prior consent, which are less than $100,000 in any lease year subject to submission of plans and reasonable approval of Landlord.

**Utilities:** Electricity is separately metered and paid directly by Tenant. Tenant pays its pro-rata share of water usage. There is no gas service provided to the space. Tenant pays its pro-rata share of chilled water for fan unit cooling via BTU meters.

---

August 20, 2007
Page 3

**Continuous Operation:** Tenant shall operate the premises on a continuous basis except for renovation, not to exceed 60 days.

**Assignment and Subletting:** To be negotiated in the lease, subject to Landlord reasonable approval. Any profit shall be split 50/50. Landlord shall have the right to recapture.

**Real Estate Commission:** Subject to a separate commission agreement.

This proposal is subject to finalizing a lease termination with Pottery Barn, who presently occupies the premises. This proposal is valid until August 25, 2007.

The terms and conditions set forth above shall not be binding upon Landlord or Tenant until such time as a lease and related documents have been approved by Tenant and such lease and related documents have been fully executed by both Landlord and Tenant and mutually exchanged.

Sincerely,

U.S. EQUITIES REALTY, LLC

Camille P. Julmy
Vice Chairman

Enclosures

If the above terms are acceptable, please have your client sign below.

Agreed and Accepted
VICTORIA'S SECRET STORES, LLC

By: _____

Name: James L. Bersani

Title: Executive Vice President - Retail Real Estate

## EXHIBIT U

### RELEASE OF GUARANTY

This Release of Guaranty (this "Release") is made as of this _____ of _____, 2007, by ADELE HILLMAN STERN, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, CHICAGO AND RUSH JOINT VENTURE, and ADELE HILLMAN STERN, as Successor Trustee of Trust dated April 29, 1999 and known as the AHS Trust (collectively, the "Landlord") to and for the benefit of JPMORGAN CHASE BANK, N.A., AS TRUSTEE UNDER AMENDED AND RESTATED DECLARATION OF TRUST, DATED NOVEMBER 13, 2001, AS AMENDED, FOR ITS COMMINGLED PENSION TRUST FUND (STRATEGIC PROPERTY), (the "Guarantor").

### RECITALS:

WHEREAS, Robert L. Stern ("Stern") and American National Bank and Trust Company of Chicago, not personally but solely as Trustee under Trust Agreement dated as of April 20, 1994 and known as Trust No. 118199-01 ("American National"), entered into that certain Agreement to Lease dated as of May 10, 1994 (the "Lease");

WHEREAS, American National conveyed its interest in the Lease to 730 North Michigan Avenue, L.L.C. ("Owner") pursuant to an Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated as of December 26, 2000 and recorded with the Cook County Recorder on December 28, 2000 as Document Number 0001017706;

WHEREAS, the following have succeeded to Stern's interest in the Lease: (i) Adele Hillman Stern, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, pursuant to a Deed dated December 23, 1994, recorded with the Cook County Recorder as Instrument Number 04-07114, and pursuant to an Independent Administrator Deed dated December 19, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418051; (ii) Chicago and Rush Joint Venture pursuant to an Independent Administrator Deed dated December 18, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418051, and (iii) Adele Hillman Stern, as Successor Trustee of Trust dated April 29, 1999 and known as the AHS Trust pursuant to an Independent Administrator Deed dated December 18, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418052, and a Quit Claim Deed dated December 19, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418054;

WHEREAS, concurrent herewith, Century 21 Chicago, LLC is assuming all of the rights and obligations of Owner under the Lease (the "Transfer");

WHEREAS, Guarantor execute that certain Guaranty dated as of December 7, 2004 (the "Guaranty") in favor of Stern;

WHEREAS, in connection with the Transfer, Owner requires that the Guarantor be released from the Guaranty in connection with Owner's obligations under the Lease arising from and after the date hereof;

WHEREAS, on or about the date hereof, _____a _____ has executed a guaranty of Owner's obligations under the Lease arising from and after the date hereof in favor of the Landlord; and

NOW, THEREFORE, for good and sufficient consideration, the receipt and sufficiency of which is hereby acknowledged by the Landlord, the Landlord hereby agrees as follows:

1.  **Release of Guaranty.** The Guaranty is hereby terminated and released and the Landlord shall have no further rights or claims whatsoever against the Guarantor under or pursuant to the Guaranty, except for those obligations of Guarantor under the Guaranty which relate to the period prior to the date hereof.

2.  **Representations and Warranties.** The Landlord represents and warrants to the Guarantor that (i) the Landlord has not sold, assigned, pledged, encumbered, hypothecated, or otherwise transferred, in whole or in part, whether voluntarily or involuntarily, any of its rights, title or interest in, under, or pursuant to the Guaranty, and (ii) the Landlord has all necessary power and authority to execute this Release and to cause the release of the Guarantor's obligations under the Guaranty as herein provided.

3.  **Miscellaneous.** The provisions hereof shall be binding upon the Landlord, its successors and assigns, and shall inure to the benefit of the Guarantor and its successors and assigns.

# EXHIBIT V

# INDEMNITY

THIS INDEMNITY is executed as of [_____], by CENTURY 21 CHICAGO, LLC ("*Indemnitor*").

## WITNESSETH:

WHEREAS, as of the date hereof, 730 North Michigan Avenue, L.L.C. ("*LLC*") has conveyed to Indemnitor, as purchaser, its interest in that certain Agreement to Lease (the "*Lease*"), dated as of May 10, 1994, between Adele Hillman Stern (as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust), Chicago and Rush Joint Venture, and Adele Hillman Stern (as successor trustee of trust dated April 29, 1999 and known as the AHS Trust) (collectively, "*Landlord*"), as successor-in-interest to Robert L. Stern, an individual residing in the State of California, as landlord, and LLC, as successor-in-interest to American National Bank and Trust Company of Chicago, not personally but solely as Trustee under Trust Agreement dated as of April 20, 1994 and known as Trust No. 118199-01, as tenant (the "*Conveyance*");

WHEREAS, in connection with the transfer of one hundred percent (100%) of the ownership interests in LLC to 730 NMA Holding, Inc., a Maryland corporation, Landlord required that JPMorgan Chase Bank, as Trustee under Amended and Restated Declaration of Trust, dated November 13, 2001, as amended, for its Commingled Pension Trust Fund (Strategic Property) ("*SPF*") execute a guaranty (the "*SPF Guaranty*") in favor of Landlord; and

WHEREAS, as a condition to the consummation of the Conveyance, LLC and SPF require that Indemnitor execute and deliver this Indemnity.

NOW, THEREFORE, in consideration of the Conveyance, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged:

1. Indemnitor hereby covenants and agrees to timely (i) pay all amounts due from Indemnitor as tenant under the Lease and (ii) perform all of its obligations and agreements as tenant under the Lease.

2. Indemnitor covenants and agrees to pay all reasonable costs and expenses incurred by SPF in connection with the SPF Guaranty and or the enforcement of this Indemnity, including, without limitation, reasonable arbitration, paralegals', attorney's and experts' fees and expenses, whether incurred without the commencement of a suit, in any suit, arbitration or administrative proceeding, or in any appellate or bankruptcy proceeding.

3. Indemnitor agrees to defend, indemnify and hold SPF and, to the extent the same incur any Liabilities (hereinafter defined) arising under or in connection with the SPF Guaranty or any Liabilities arising pursuant to or in connection with any indemnification or reimbursement obligations with respect to the SPF Guaranty contained in any other agreement, JPMorgan Chase Bank, N.A., The Prudential Assurance Company Limited, and their respective affiliates, members, officers, directors, employees, agents, managers, advisors, trustees, fiduciaries, or any

SSL-DOCS1 1842265v16

---

IN WITNESS WHEREOF, the Landlord has caused this Release to be executed as of the day and year first written above.

Adele Hillman Stern, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust

CHICAGO AND RUSH JOINT VENTURE

By: _____
Name:
Title:

Adele Hillman Stern, as Successor Trustee of Trust dated April 29, 1999 and known as the AHS Trust

U-3

SSL-DOCS1 1842265v16

owner of legal or beneficial interest in SPF (collectively, the "Indemnified Parties") harmless from any and all debts, guarantees, indemnities, losses, costs, damages, claims, liabilities, expenses (including without limitation, attorneys' fees and disbursements), demands or obligations of any kind or nature whatsoever, whether absolute or contingent, monetary or non-monetary, known or unknown, direct or indirect, matured or unmatured ("Liabilities"), which they may sustain at any time by reason of (i) any breach or alleged breach of the covenants and agreements of Indemnitor set forth in this Indemnity, and/or (ii) any actions, suits, claims, proceedings or investigations, whether at law or in equity before any court, arbitrator, panel or governmental authority ("Actions") arising under, or resulting from the enforcement of, the SPF Guaranty in connection with any events occurring from and after the date hereof, it being agreed that such indemnification shall include, without being limited to, any obligations under the Guaranty to indemnify the Landlord for Actions and/or Liabilities arising as a result of events occurring on or after the date hereof.

4.    Each provision of this Indemnity shall extend to and inure to the benefit of the Indemnified Parties and their successors and assigns.  All references herein to the Indemnified Parties shall be deemed to include all such parties.

IN WITNESS WHEREOF, Indemnitor has executed this Indemnity as of the date first set forth hereinabove.

CENTURY 21 CHICAGO, LLC

By: _____
    Name:
    Title:

## EXHIBIT W

## OWNER'S CERTIFICATE

The undersigned, on behalf of 730 North Michigan Avenue, L.L.C. ("Owner"), the Owner of the premises described in Title Commitment No. _____ (the "Title Commitment") issued by First American Title Insurance Company (the "Title Company"), and in consideration of the Title Company issuing its policy of title insurance insuring an interest in the real estate described herein, hereby certifies to the Title Company that, to the best of Owner's knowledge:

1. Owner is the owner of that certain property commonly known as 730 North Michigan Avenue, located in Chicago, Illinois (the "Property").

2. No proceedings in bankruptcy or receivership have been instituted by or against the Owner within the last ten (10) years, and that the Owner has never made an assignment for the benefit of creditors.

3. The operating agreement of Owner is in full force and effect and no proceeding is pending for its dissolution or annulment, and that all license, state franchise, and city corporation taxes, if applicable, due and payable by Owner have been paid in full.

4. No additions, alterations or improvements for which Owner is responsible, other than those made in the ordinary course of Owner's operation and maintenance of the Property, are now in progress or have been made to the Property in the past one hundred twenty (120) days that have not been paid for by Owner.

5. Owner has not been informed that there are any unpaid bills or claims for construction or repair work for the Property for which Owner is responsible other than those that will be paid in the ordinary course of business.

6. Attached as Exhibit A hereto is a true and correct rent roll of the Property. There are no options to purchase or rights of first refusal to purchase the Property under any of the leases affecting the Property.

7. Owner has not received written notice that the covenants and restrictions contained in the aforesaid title commitment have been violated by the erection of any improvements on the Property.

8. All assessments, if any, due under any of the recorded covenants, conditions or restrictions shown in Schedule B of the Title Commitment have been paid through _____.

9. Between the most recent Effective Date of the Commitment and the date of recording of the Insured Instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken or allowed and will not take or allow any action to encumber or otherwise affect title to the Property. In the event of any lien, encumbrance or other matter affecting title to the Property in the Gap Period arising as

a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof and further undertakes to take all necessary steps to discharge any such lien, encumbrance or other matter in a manner reasonably satisfactory to Title Company. The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

[Signature Page Follows]

EXHIBIT X

POTTERY BARN TERMINATION

This certificate is being delivered by Owner solely for the purpose of inducing the Title Company to issue its title insurance policy insuring title to the Property, and the undersigned avers that the foregoing statements are true and correct to the best of his knowledge and belief. No third party shall have any right to rely upon or be a third party beneficiary with respect to the subject matter of this Certificate. As used herein, the words "to the best of Owner's knowledge" or words of similar import, shall mean the present actual knowledge, without taking into account any constructive or imputed knowledge, of [ ] and shall not be construed, by imputation or otherwise, to impose upon [ ] any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains. Owner hereby represents that [ ] is the officer of Owner who is primarily responsible for the administration of Owner's interest in the Property. [ ] shall have any personal liability in connection with this certificate or the certifications made herein.

Dated: As of _____

730 NMA Holding, Inc.

By: _____
    Name:
    Title:

SSL-DOCS1 1842856v16

SSL-DOCS1 1842856v16

# LEASE TERMINATION AGREEMENT

This Lease Termination Agreement ("Agreement") is made as of the ____ day of ____, 2007 by and between 730 North Michigan Avenue L.L.C., a Delaware limited liability company ("Landlord") and Williams-Sonoma Stores, Inc., a California corporation ("Tenant");

## WITNESSETH

A. Landlord, or its predecessor in interest, and Tenant, or its predecessor in interest (hereinafter "Williams-Sonoma, Inc."), entered into that certain Retail Complex Lease dated as of March 18, 1996 (which lease as amended, modified, supplemented and/or assigned from time to time is collectively referred to herein as the "Lease") whereby Tenant leased from Landlord the premises commonly known as 734 North Michigan Avenue, Chicago, Illinois (the "Premises");

B. In connection with the Lease, Williams-Sonoma, Inc. executed that certain Guaranty dated February 23, 1999 (the "Guaranty"); and

C. Landlord and Tenant desire to terminate the Lease and the Guaranty on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, Landlord and Tenant hereby agree as follows:

1. **Defined Terms.** All terms used herein shall have the same meaning as in the Lease unless otherwise defined herein.

2. **Termination of Lease.** The Lease shall terminate on June 30, 2008 (the "Termination Date") as if said Termination Date were set forth in the Lease as the expiration date of the term of the Lease. Tenant shall vacate and deliver possession of the Premises to Landlord in the manner set forth in the Lease on or before 11:59 p.m. on the Termination Date.

3. **Rent and Other Charges.** Tenant shall pay to Landlord on or before the Termination Date, and shall be responsible for, all rent, utility charges and other charges relating to the Premises which accrue on or prior to the Termination Date. Any undetermined charges may be billed to Tenant when determined (and Tenant's obligation to pay the same shall survive termination of the Lease). Tenant shall indemnify and hold Landlord harmless against any utility charges or other charges relating to the Premises which are the obligation of Tenant under the Lease and which accrue on or prior to the Termination Date.

4. **Certification to Landlord.** Tenant and Williams-Sonoma, Inc. as applicable, hereby certify, with respect to Tenant's rights in and occupancy of the Premises, that the following statements are true as of the date hereof and will be true on the Termination Date:

(a) Tenant owns and holds the entire interest of Tenant under the Lease;

(b) There exist no subleases affecting the Premises or any part thereof;

(c) Tenant has not assigned or encumbered Tenant's interest under the Lease or any part thereof;

(d) No contracts for the furnishing of any labor or materials with respect to improvements or alterations in or about the Premises have been let by Tenant or are outstanding that have not been performed and satisfied; and

(e) Tenant and Williams-Sonoma, Inc. have full authority to execute and deliver this Lease Termination Agreement.

5. **Mutual Releases.** In consideration of the execution of this Agreement and the certifications, representations and other agreements herein contained, Landlord, on the one hand and Tenant and Williams-Sonoma, Inc. on the other hand, hereby release and forever discharge each other, and their respective partners, officers, directors, agents, trustees, beneficiaries, and employees, of and from any and all claims, suits, damages, demands, rights of action and causes of action which each party ever had, now has, or in the future may have, against the other, arising from or in any way connected with the Lease or Guaranty or Landlord's management or operation of the Retail Complex except for (a) those obligations and liabilities contained herein or reinstated pursuant to the provisions hereof and (b) any indemnification obligations set forth in the Lease or Guaranty for third party claims such as personal injury, all of which obligations shall survive the termination of the Lease or Guaranty. The mutual releases given hereunder are intended to and shall be full and general releases of any and all claims, rights, demands, actions, causes of action, indebtedness, obligation, damages, and liabilities of every kind, nature and character whatsoever, whether or not known, suspected or claimed, of which either party hereto ever had, now has, or may hereafter have against the other by reason of any act, omission, matter, cause or thing, including but not limited to any act, omission, cause, matter or thing directly or indirectly arising out of or in connection with the Lease or Guaranty.

The parties understand that the facts in respect of which the release made in this Agreement is given may hereafter turn out to be other than or different from the facts now known or believed by the parties to be true and assume the risk of all facts turning out to be different and agree that this release shall remain in all respects effective and not subject to termination or rescission by virtue of any such difference in facts.

6. **No Disclosure.** Landlord and Tenant agree that neither party shall disclose any of the matters set forth in this Agreement or disseminate or distributed any information concerning the terms, details or conditions hereof to any person, firm or entity without obtaining the express written approval of the other party.

7. **No Offer.** This Agreement shall not be binding until executed and delivered by both parties. This Agreement shall not be relied upon by any other party, individual, corporation, partnership or other entity as a basis for terminating its lease with Landlord.

8. **Whole Agreement.** The mutual obligations of the parties as provided herein are the sole consideration for this Agreement, and no representations, certifications, promises or inducements have been made by the parties other than as appear in this Agreement. This Agreement may not be amended except in writing signed by both parties.

2

66774-0006/LEGAL13929444.4

9. Miscellaneous. Warranties, representations, certifications, agreements, and obligations contained in this Agreement shall survive the execution and delivery of this Agreement and shall survive any and all performances in accordance with this Agreement. This Agreement may be executed in any number of counterparts which together shall constitute the Agreement. If any party obtains a judgment against any other party by reason of breach of this Agreement, reasonable attorneys' fees as fixed by the court shall be included in such judgment. This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the heirs, successors and assigns of the parties. This Agreement shall be construed and enforced in accordance with the laws of the State of Illinois.

10. Successors and Assigns. This Agreement shall bind and inure to the benefit of each of the parties hereto and their respective heirs, personal representatives, successors and assigns.

11. Termination Fee. In consideration of Landlord's execution of this Agreement, and as a condition to the effectiveness of this Agreement, on but not later than the Termination Date, Tenant shall pay to Landlord via certified check or wire transfer of federal funds the sum of $1,250,000.

12. Contingency. Notwithstanding anything to the contrary to the foregoing, this Agreement is contingent upon and subject to the execution on or before February 11, 2008 of a new lease for the Premises with a commencement date of July 1, 2008.

13. Consent. This Agreement is subject to, and conditioned upon, any required consent or approval being granted without any fee or charge that is unacceptable to Landlord, by Landlord's mortgagees or ground lessors. If any such consents shall be denied, or granted subject to the payment of unacceptable fees or charges hereunder, the Lease shall remain in full force and effect. If Landlord fails to notify Tenant to the contrary on or before February 11, 2008, Tenant may presume that such consent has been granted, or that the same is not required.

3

605M-0000LEOAL11383446A

---

IN WITNESS WHEREOF, the parties have executed this Lease Termination Agreement as of the date first written above.

LANDLORD:

730 North Michigan Avenue L.L.C., a Delaware limited liability company

By: TKM L.L.C., an Illinois limited liability company, Managing Member

By: _____

Its: _____

TENANT:

Williams-Sonoma Stores, Inc., a California corporation

By: _____
**ARTHUR TROPP**

Its: **Sr. Vice President, Real Estate**

ATTEST:

By: _____

Its: _____

GUARANTOR:

Williams-Sonoma Stores, Inc., a California corporation

By: _____
**ARTHUR TROPP**

Its: **Sr. Vice President, Real Estate**

ATTEST:

By: _____

Its: _____

4

605M-0000LEOAL11383446A

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that _____, President of Williams-Sonoma Stores, Inc., a California corporation, and _____ Secretary of said corporation, both personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such respective officers, appeared before me this day in person and acknowledged that they signed and delivered such instrument as their own, free and voluntary acts and as the free and voluntary act of said corporation, for/he uses and purposes set forth therein; and the latter officer also then and there acknowledged that (s)he, as custodian of the corporate seal of said corporation, affixed the same to the foregoing instrument as his/her free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal, this _____ day of _____, 2007.

_____
Notary Public

My Commission Expires: _____

6

60318-00003/BOALL35829444.4

---

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that _____, President of Williams-Sonoma Stores, Inc., a California corporation, and _____ Secretary of said corporation, both personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such respective officers, appeared before me this day in person and acknowledged that they signed and delivered such instrument as their own, free and voluntary acts and as the free and voluntary act of said corporation, for/he uses and purposes set forth therein; and the latter officer also then and there acknowledged that (s)he, as custodian of the corporate seal of said corporation, affixed the same to the foregoing instrument as his/her free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal, this _____ day of _____, 2007.

_____
Notary Public

My Commission Expires: _____

5

60318-00003/BOALL35829444.4

State of California )
                ) ss.
County of San Francisco )

On October 5, 2007, before me, personally appeared Arthur H. Tropp, Sr. Vice President Real Estate, Williams-Sonoma Stores, Inc., personally known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY SEAL

[notary stamp: O-SHAN CHEUNG, Commission # 1734824, Notary Public - California, San Francisco County, My Comm. Expires Mar 27, 2011]

O-Shan Cheung
My commission expires March 27, 2011

Lease Termination Agreement
Pottery Barn #330
North Michigan Avenue
Chicago, IL

State of California )
                ) ss.
County of San Francisco )

On October 5, 2007, before me, personally appeared Arthur H. Tropp, Sr. Vice President Real Estate, Williams-Sonoma Stores, Inc., personally known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY SEAL

[notary stamp: O-SHAN CHEUNG, Commission # 1734824, Notary Public - California, San Francisco County, My Comm. Expires Mar 27, 2011]

O-Shan Cheung
My commission expires March 27, 2011

Lease Termination Agreement
Pottery Barn #330
North Michigan Avenue
Chicago, IL

## EXHIBIT Y

### ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is executed as of the _____ day of _____, 20___ by and between CENTURY 21 CHICAGO, L.L.C., a Delaware limited liability company, having an address at 140 Fulton Street, New York, New York 10038 ("Assignor") and _____, a _____, having an address c/o [_____] ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain [Contract of Sale] dated as of _____ between Assignor and Assignee).

WHEREAS, in connection with Assignor's purchase of the Property from 730 North Michigan Avenue, L.L.C. ("Prior Owner"), Assignor and Prior Owner entered into those certain agreements described in Exhibit A hereto (the "Agreements").

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as provided herein, all of Assignor's right, title and interest in and to the Agreements.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Agreements.

2. Assignee hereby affirmatively and unconditionally assumes, for the benefit of Prior Owner, Commingled Pension Fund (Strategic Property) of JPMorgan Chase Bank, N.A., the other parties to the Agreements, and their successors and assigns, all of Assignor's obligations and liabilities under the Agreements arising from and after the date hereof.

3. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

4. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

Y-1

SSL-DOCS1 1842X5646

---

STATE OF _____ )
                    ) SS.:
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that _____ of TKM L.L.C., an Illinois limited liability company which is the Managing Member of 730 North Michigan Avenue L.L.C., a Delaware limited liability company personally known to me to be the same person whose name is subscribed to the foregoing instrument as such, appeared before me this day in person and acknowledged that (s)he signed and delivered such instrument as his/her own free and voluntary acts and as the free and voluntary act of said limited liability company, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal, this _____ day of _____, 2007.

_____
Notary Public

My Commission Expires: _____

7

6678-00066JLEGAL13434464.4

**ASSIGNOR:**

By: _____
Name:
Title:

**ASSIGNEE:**

By: _____
Name:
Title:

Y-2

## Exhibit A

### Agreements

Indemnity dated as of [_____], 2007, between Assignor, as indemnitor, and Prior Owner, as indemnitee.

Environmental Indemnity Agreement, dated as of [_____], 2007, between Assignor, as indemnitor, and Prior Owner, as indemnitee.

Purchase Option Exercise Agreement, dated as of [_____], 2007, between Assignor, as indemnitor, and Prior Owner, as indemnitee.

Y-3

SCHEDULE 2

RENT ARREARAGES

SSL-DOCS1 1842365v16

SCHEDULE 1

SECURITY DEPOSITS

NONE

SSL-DOCS1 1842365v16

SCHEDULE 3

PURCHASER'S ORGANIZATIONAL CHART



ULTIMATE OWNERS
OF
CENTURY 21 CHICAGO, LLC

Aby Rosen & Michael Fuchs — 50%

Raymond Gindi / Isaac A. Gindi } 20%

Jack Gindi / Ezra Gindi / Isaac S. Gindi } 20%

Joseph Chehebar } 10%

SSI-DOCS1 1842355/16

---

| Database: | JPMORGAN | | | Aged Delinquencies | | | | | Page: | 1 |
| PROJ.: | 01551 | | | JP Morgan | | | | | Date: | 9/25/2007 |
| | | | | 730 N. Michigan Ave. - BPF | | | | | Time: | 03:05 PM |
| | | | | Period: 0007 | | | | | | |

| Invoice Date | Category | Source | Amount | Current | 1 Month | 2 Months | 3 Months | 4 Months |
|---|---|---|---|---|---|---|---|---|

01191B-4/32759 - Camp USA, Inc.:    Master Occupant Id: US000001920M-1    Dry Occ: -1 Only Day: 9/25/2007   165,115.46

| 4/1/2007 | BRR | Base Rent - Retail | CH | 21,892.74 | 0.00 | 21,892.74 | 0.00 | 0.00 | 0.00 |
| 5/1/2007 | BRR | Base Rent - Retail | CH | 39,375.00 | 0.00 | 39,375.00 | 0.00 | 0.00 | 0.00 |
| 6/1/2007 | BRR | Base Rent - Retail | CH | 39,375.00 | 0.00 | 39,375.00 | 0.00 | 0.00 | 0.00 |
| 7/1/2007 | BRR | Base Rent - Retail | CH | 39,375.00 | 0.00 | 39,375.00 | 0.00 | 0.00 | 0.00 |
| 8/1/2007 | BRR | Base Rent - Retail | CH | 39,375.00 | 39,375.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Camp USA, Inc. Total:   179,092.74   39,375.00   139,717.74   0.00   0.00   0.00

01191B-4/32759 - Pottery Barn:    Master Occupant Id: US000000183701-1    Dry Occ: -1 Only Day: 8/31/2007   225,575.58

| 12/1/2005 | OPX | RCV-Operating | NC | -1.70 | 0.00 | 0.00 | 0.00 | 0.00 | -1.70 |
| 4/17/2006 | RER | R/E Tax Excal.-retail | CR | -0.01 | 0.00 | 0.00 | 0.00 | 0.00 | -0.01 |

Pottery Barn Total:   -1.71   0.00   0.00   0.00   0.00   -1.71

01191B-4/32759 - Banana Republic:    Master Occupant Id: US000001821701-1    Dry Occ: -1 Only Day: 8/17/2007   336,332.59

| 4/1/2007 | OPX | RCV-Operating | NC | -1,045.56 | 0.00 | 0.00 | 0.00 | 0.00 | -1,045.56 |

Banana Republic Total:   -1,045.56   0.00   0.00   0.00   0.00   -1,045.56

01191B/32759 - Polo / Ralph Lauren:    Master Occupant Id: US000001937704-1    Dry Occ: -1 Only Day: 8/17/2007   390,36

| 3/1/2008 | POC | Prior Yr. Oper Cost Adj | NC | -1,922.58 | 0.00 | 0.00 | 0.00 | 0.00 | -1,922.58 |
| 3/21/2008 | POC | Prior Yr. Oper Cost Adj | NC | -19,552.01 | 0.00 | 0.00 | 0.00 | 0.00 | -19,552.01 |
| 3/21/2008 | PYT | R/E Tax-Prior Yr Billing | CH | 39,338.19 | 0.00 | 0.00 | 0.00 | 0.00 | 39,338.19 |
| 4/1/2007 | OPX | RCV-Operating | NC | -8,538.53 | 0.00 | 0.00 | 0.00 | 0.00 | -8,538.53 |
| 4/17/2007 | RER | R/E Tax Excal.-retail | NC | -41,194.47 | 0.00 | 0.00 | 0.00 | 0.00 | -41,194.47 |
| 4/5/2007 | SVC | Service recovery income | CR | -155.00 | 0.00 | 0.00 | 0.00 | 0.00 | -155.00 |
| 4/20/2007 | SVC | Service recovery income | NC | -200.00 | 0.00 | 0.00 | 0.00 | 0.00 | -200.00 |

Polo / Ralph Lauren Total:   -34,222.01   0.00   0.00   0.00   0.00   -34,222.01

PROJ 01551 Total:   143,723.46   39,375.00   139,717.74   0.00   0.00   -35,369.28

Grand Total:   143,723.46   39,375.00   139,717.74   0.00   0.00   -35,369.28

## SCHEDULE 4

### INSURANCE REQUIREMENTS

(a) Coverages. Purchaser will keep the Property insured for the benefit of Indemnified Parties as follows:

(1) "All Risk" property insurance, including sprinkler leakage in an amount sufficient to prevent Purchaser from becoming a co-insurer of any loss under the terms of the policy but in no event less than the then full replacement value of the Property;

(2) rental value insurance in an amount equal to not less than one (1) year's gross rent from the Property;

(3) to the extent not covered under subsections (1), difference-in-conditions coverage in an amount satisfactory to Seller;

(4) steam boiler and machinery breakdown direct damage insurance and third-party liability coverage (if not covered under the comprehensive general liability policy), with full comprehensive coverage on a repair and replacement cost basis, for all boilers and machinery which form a part of the Property, including rental value insurance in connection therewith in accordance with subsection (2) above;

(5) commercial general liability insurance written on an occurrence basis, in an amount not less than $1,000,000 combined single limit and $2,000,000 aggregate limit for bodily injury and property damage; such insurance shall include premises liability insurance, blanket contractual liability insurance, products liability insurance and personal injury liability insurance with an umbrella liability policy of $50,000,000.

(6) during any period of construction or restoration of the Property, a policy or policies of builder's risk coverage written on a completed value basis insuring against such risks (including, without limitation, fire and extended coverage, collapse of the Property and earthquake coverage to agreed limits) as Seller may request, in form and substance acceptable to Seller; and

(7) policy or policies of workers' compensation insurance as required by workers' compensation insurance laws subject to the statutory limits of the State of Illinois in respect of any work or other operations on, about or in connection with the Property and covering all employees of Purchaser and employer's liability insurance coverage of not less than $1,000,000.

Notwithstanding the foregoing, the insurance policies required under this Schedule 4 shall cover perils of terrorism and acts of terrorism and Purchaser shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism subject to the coverage availability under the Terrorism Risk Insurance Act on terms consistent with the terms set forth herein and in amounts not less than the replacement cost of the Property and otherwise acceptable to Seller in all respects.

(b) Generally. All policies of insurance required under this Schedule 4 shall be issued by companies having a general policy rating of "A": "A" - VIII or better by Best Key Rating Guide or otherwise approved by Seller and which are licensed or authorized to do business in the State of Illinois or with such other companies satisfactory to Seller, and shall be subject to the approval of Seller as to amount, content, form and expiration date. Any proceeds from the insurance maintained under subsections (1) - (4), inclusive, of section (a) above shall be either used to restore the Property or held by Purchaser and not distributed to the extent necessary to satisfy the Net Worth Requirement. The insurance maintained under subsection (5) of section (a) above shall name Seller and JPMorgan Chase Bank, N.A. (collectively, "Seller Entities") as additional insureds. Seller shall be furnished with a duplicate original of each policy required to be provided by Purchaser hereunder, which policy shall provide that no cancellation, material change or reduction thereof shall be effective until at least thirty (30) days after receipt by Seller of written notice thereof. It is agreed that, and each insurance policy shall expressly state that, losses shall be payable notwithstanding (1) any act or negligence of Purchaser or its agents or employees which might, absent such agreement, result in a forfeiture of all or part of such insurance payment, (2) the occupation or use of the Property or any part thereof for purposes more hazardous than permitted by the terms of such policy, or (3) any change in title to or ownership of the Property or any part thereof. All policies shall include effective waivers by the insurer of all claims for insurance premiums against any loss payees, additional insureds and named insureds (other than Purchaser). At least thirty (30) days prior to expiration of any policy required to be provided by Purchaser hereunder, Purchaser shall furnish Seller (without notice or demand by Seller) with a duplicate original of such renewal policy replacing the policy so expiring; provided, however, if such renewal policy is not yet available, Purchaser shall provide Seller with either (x) an insurance certificate or certificates thereof executed by the insurer or its authorized agent evidencing the insurance maintained under such policy, or (y) an insurance binder from the issuer or its authorized agent together with an addendum to the binder containing language, in form, substance and scope satisfactory to Seller, for an endorsement evidencing that (I) Seller Entities are named as loss payees as provided above, and (II) Seller Entities are named as additional insureds as provided above, which, in either case, shall be acceptable to Seller on an interim basis until the duplicate original thereof is available. Provided that Purchaser otherwise is in compliance with all of the terms, covenants and conditions relating to insurance requirements set forth herein, on a quarterly basis, Purchaser shall furnish Seller receipts for the payment of premiums on such insurance policies or other evidence of such payment satisfactory to Seller. In the event that Purchaser does not deposit with Seller (A) a new duplicate original policy of insurance with evidence of payment of premiums thereon, (B) an insurance certificate or certificates described in clause (x) above, or (C) an insurance binder described in clause (y) above, in any case, at least thirty (30) days prior to the expiration of any expiring policy, then Seller may, but shall not be obligated to, procure such insurance and pay the premiums therefor, and Purchaser agrees to repay to Seller the premiums thereon within ten (10) days after Seller's written demand. Upon Purchaser's failure to repay such premiums to Seller, Seller shall be permitted to draw upon the applicable escrow funds or Approved Letter of Credit for repayment of such premiums.

# EXHIBIT B

RFR HOLDING LLC
390 Park Avenue, 3rd Floor
New York, New York 10022

November 9, 2007

Roberto Cibeira
Conte Godea Florida, Inc.
1221 Brickell Ave. Suite 1080
Miami, Florida 33131

Dear Roberto,

In connection with a proposed transaction (the "Proposed Transaction") involving the purchase of, the lease of, or an acquisition of an interest or investment in, the land and improvements commonly known as 730 North Michigan Avenue, Chicago, IL (including any proposed leasing thereof, the "Property"), by Conte Godea Florida, Inc., together with its affiliates, (the "Company"), the Company has requested that RFR Holding LLC, together with its affiliates, (the "Disclosing Party") provide the Company with certain Confidential Information (as hereinafter defined) relating to the Property. In consideration of the Disclosing Party's furnishing the Company with the Confidential Information and as a condition precedent thereto, the Company hereby agrees as follows:

    1.    In connection with the Proposed Transaction, it is understood that the Disclosing Party and its Representatives (as hereinafter defined) are prepared to furnish the Company and its Representatives with certain oral and written information concerning the Property that is or may be nonpublic, confidential and/or proprietary in nature, which may include, without limitation, floor plans, architectural drawings, leases, contracts, documents, files, appraisals, reports, analysis and studies and computer data or files. All such information, regardless of the manner in which it is furnished by the Disclosing Party or its Representatives to the Company and its Representatives, including the Company's interest in the Property and any discussions between the Disclosing Party and the Company or its Representatives, shall, except as otherwise permitted hereunder, be kept strictly confidential by the Company and its Representatives, which information, interest and discussions are hereinafter referred to, collectively, as the "Confidential Information." Notwithstanding the foregoing, the term "Confidential Information" shall not be deemed to include information which (i) was already in the Company's or its Representatives' possession on a non-confidential basis prior to the date hereof, (ii) is or becomes available to the Company or its Representatives from a source other

than the Disclosing Party or its Representatives, provided that such source is not bound by a confidentiality agreement with the Disclosing Party or its Representatives or otherwise bound to keep such information confidential by any legal or fiduciary obligation, and/or (iii) is or becomes generally available to the public. The Confidential Information shall be used by the Company and its Representatives (as hereinafter defined) solely for purposes of the Proposed Transaction. For the purposes hereof, the "Representatives" of each party hereto (each, a "Party"; and collectively, the "Parties") shall mean each such Party's officers, directors, controlling persons, members, partners, lenders, employees, agents, advisors and representatives, including, without limitation, attorneys, accountants, consultants, and financial advisors. The Company shall inform each of its Representatives that receives any of the Confidential Information of the requirements of this letter agreement and shall require each such Representative to comply with such requirements. The Company will only disclose the Confidential Information to those of its Representatives who need access to the Confidential Information for purposes of evaluating the Proposed Transaction. The Company agrees that it will be responsible for any breach of the terms of this letter agreement by any of its Representatives. The Company agrees to notify Disclosing Party, upon request, as to the identity of any Representatives to whom the Company has or is to provide any Confidential Information.

        2.     If any person seeks to compel the Company or any of its Representatives to disclose any Confidential Information under compulsion of law (by oral questions, interrogatories, requests for documents subpoena, civil investigative demand or similar process), the Company shall promptly notify the Disclosing Party thereof so that the Disclosing Party may have an opportunity to seek a protective order or other appropriate remedy (provided that the foregoing shall not be deemed to require that the Company or any of its Representatives refuse to comply with any such disclosure request or demand beyond the time specified for such disclosure).

        3.     The Company (on behalf of itself and its Representatives) acknowledges that remedies at law may be inadequate to protect the Disclosing Party against a breach of this letter agreement by the Company or its Representatives. The Company therefore agrees that in the event that the Company or its Representatives have breached the terms of this letter agreement, then without prejudice to the rights and remedies otherwise available to Disclosing Party, the Company acknowledges and agrees that Disclosing Party shall be entitled to seek equitable relief, without proof of actual damages, including the right to apply to a court of competent jurisdiction for a temporary or permanent injunction or other appropriate decree of specific performance in order to enjoin a breach of this letter agreement. The obligations of the Company hereunder shall be binding upon its successors and assigns.

        4.     The Company agrees not to provide, communicate, or disclose to any third party, directly or indirectly, the Confidential Information, except as required by judicial process, without in each instance the prior written consent of the Disclosing Party, which consent may be withheld in its sole discretion, and then only after such third party executes a confidentiality agreement in favor of the Disclosing Party substantially in the form of this letter agreement. The Company agrees that neither the Company nor its Representatives will discuss the Property with (i) the current fee owner or ground lessee or their affiliates (collectively, the "Owners") of the Property, (ii) any tenant of the Property, (iii) any company currently in discussions with either

the Owners or the Disclosing Party regarding becoming a tenant of the Property or (iv) any third party that prepared the Confidential Information.

     5.    The Company agrees that, promptly upon the Disclosing Party's request, the Company and its Representatives shall surrender to the Disclosing Party or destroy the Confidential Information and all derivatives thereof. The Company acknowledge that all such items are the exclusive property of the Disclosing Party and agree to return or destroy all tangible and confidential material within five (5) business days after written request therefore, such request given at any time at the sole option of the Disclosing Party and will erase any copies of any of the foregoing recorded on any electronic media or optical device. Such return or destruction of Confidential Information and all derivatives thereof, and the erasing of any copies of the foregoing recorded on any electronic media or optical device, shall, upon the written request of the Disclosing Party, be certified in writing to the Disclosing Party by the Company.

     6.    In the event that the Company utilizes the services of any broker, finder or other person or company, as indicated below ("Investor's Rep") in the course of the Proposed Transaction, the Company shall cause such Investor's Rep to sign this document in the space provided below, and Investor's Rep thereby agrees to be bound by the terms of this letter agreement. The Company agrees that Owner shall not be responsible for the payment of any fee, brokerage commission or other compensation to Investor's Rep and/or any other broker, finder or other person or company in conjunction with the Proposed Transaction. The Company agrees to indemnify and hold harmless Owner from any and all claims, liabilities, losses, damages, costs and expenses arising from the claim of Investor's Rep and/or any other broker, finder or other person or company for any compensation claimed by such party due to the action or inaction of the Company. In the course of the Proposed Transaction, in the event the Company utilizes the services of an Investor's Rep, or Investor's Rep assists or claims to have assisted the Company, the Company and Investor's Rep agree that compensation, if any, due to Investor's Rep shall be borne solely by the Company.

     7.    This letter agreement contains the entire agreement between the Parties concerning the confidentiality of the Confidential Information, and no modification of this letter agreement or waiver of the terms and conditions hereof shall be binding upon either Party, unless approved in writing by each Party, which writing shall refer specifically to this letter agreement.

     8.    The illegality, invalidity or unenforceability of any provision of this Letter agreement under the laws of any jurisdiction shall not effect its legality, validity or enforceability under the laws of any other jurisdiction, nor the legality, validity or enforceability of any other provision.

     9.    This letter agreement shall be governed and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed within such state without regard to principles of conflicts of law. In the event of any dispute related to this letter agreement, the Parties shall and hereby do waive any right to trial by jury in connection therewith.

Page 4 of 4

10.     This letter agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same agreement.   A facsimile signature on this letter agreement shall be deemed to constitute an original.

If the foregoing accurately sets forth our understanding, please indicate your concurrence by signing in the space provided below and returning one copy of this letter to the undersigned.

Very truly yours,

RFR HOLDING LLC

By:_____

Accepted and agreed to as of
the 9 day of November, 2007:

_____(Company)

By: _____
    Roberto Cibelli, Manager

_____(Investor's Rep, if any)

By: _____