**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RFR HOLDING LLC and, | ) | |
| CENTURY 21 CHICAGO, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.    08 CV 1555 |
| v. | ) | |
| | ) | Hon. Wayne R. Andersen |
| PONTE GADEA FLORIDA, INC. and | ) | |
| CHICAGO MICHIGAN, LLC, | ) | Magistrate Judge Cole |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION TO DISQUALIFY</u>

Plaintiffs RFR Holding LLC ("RFR Holding") and Century 21 Chicago LLC ("Century 21 Chicago"; and together with RFR Holding, collectively, the "plaintiffs") submit this memorandum of law in support of their motion for an order disqualifying the firm Greenberg Traurig LLP (the "Greenberg firm") from representing defendants Ponte Gadea Florida, Inc. and Chicago Michigan, LLC (the "defendants") in this action.

## <u>PRELIMINARY STATEMENT</u>

The Greenberg firm is <u>currently</u> representing (a) plaintiff RFR Holding and its affiliates, and (b) Century 21 Department Stores LLC, an affiliate of plaintiff Century 21 Chicago, in numerous matters throughout the country. Despite this, and despite the fact that the Greenberg firm failed to obtain a waiver from plaintiffs, the Greenberg firm is, in derogation of its professional obligations, representing defendants in this action where defendants' interests are directly adverse to plaintiffs' interests. Indeed, in this action, plaintiffs seek over $25,000,000 in damages from defendants.

This case is in its earliest stages. As set forth in the accompanying affidavit of Ezra Sultan, when this case was initiated, the Greenberg firm requested that Century 21 Department Stores waive the existing conflict. Mr. Sultan on behalf of Century 21 Department Stores pointedly did not consent. Nevertheless, the Greenberg firm decided that it would represent defendants herein. Plaintiffs vigorously objected to this representation, explaining to the Greenberg firm that it was unethical and legally indefensible to simultaneously represent one set of clients in a litigation against its other _current_ clients. However, apparently not wanting to lose a substantial fee, the Greenberg firm has refused to step aside. Rather, it has attempted to justify its improper conduct by advancing a number of "rationales," none of which withstands factual or legal scrutiny.  Specifically, the Greenberg firm has stated that (i) it does not currently represent the parties that are plaintiffs in this lawsuit but "only" plaintiffs' affiliates, (ii) representation of those affiliates does not warrant disqualification because they are separate legal entities from plaintiffs, and (iii) plaintiffs waived their right to object to the Greenberg firm's representation of defendants because, _before_ this litigation arose, the plaintiffs were aware that the Greenberg firm was representing one of the defendants in the proposed real estate transaction which gave rise to this litigation.

As more fully set forth below and in the accompanying affidavits, none of these assertions is supported by the facts or the law.  Indeed, as a threshold matter, and despite its denial, the Greenberg firm in fact _currently_ represents plaintiff RFR Holding. This fact alone should be the end of the inquiry.

Moreover,  the Greenberg firm _concedes_ that it is _currently_ representing affiliates of plaintiff RFR Holding.  Inasmuch as RFR Holding and the affiliates which the Greenberg firm concedes it currently represents are closely held companies sharing the same ownership, offices,

principals and control group, the technical distinction which the Greenberg firm attempts to draw is irrelevant. Similarly, the Greenberg firm <u>concedes</u> that it is <u>currently</u> representing Century 21 Department Stores LLC, an affiliate of plaintiff Century 21 Chicago. Again, those two companies are closely held and share the same ownership, offices, principals and control group. In fact, as set forth in the accompanying affidavits, the very people to whom the Greenberg Traurig lawyers report on the various matters where they are currently representing these affiliates are the very decision makers (and in some instances potential witnesses) involved in <u>this</u> litigation. For this reason, too, the Greenberg firm's position has no merit.

Finally, it bears emphasis that, in violation of its professional obligations, the Greenberg firm never asked plaintiffs (or their affiliates) for a waiver allowing it to represent either defendant in the proposed transaction at issue.  As set forth below, the law is clear that a current client's mere failure to oppose a firm's representation of a party to a commercial, consensual transaction in which no material adversity between the parties then existed does not constitute a waiver of the firm's conflict when the interests of the clients become adverse to one another. Moreover, even if at the time of the transaction the Greenberg firm had requested that plaintiffs waive the firm's conflicts, based on the Greenberg firm's standard practice for conflict waivers, such waiver would specifically have <u>excluded</u> the Greenberg firm's representation of defendants in any resulting litigation between its two sets of clients. Given that the Greenberg firm's regular practice is to exclude future litigation when requesting an express waiver (See Mangieri Aff. Ex. 4), it is ludicrous for the Greenberg firm to suggest that an implied waiver could be broader.

In short, there is no legal or ethical justification for the Greenberg firm's failure to immediately withdraw.  Accordingly, an order should be entered forthwith disqualifying the Greenberg firm from representing defendants in this action.

## FACTS

The relevant facts are set forth in the accompanying affidavits of Frank Mangieri, sworn to June 12, 2008 and Ezra Sultan, sworn to June 11, 2008.

## ARGUMENT

I.     **THERE CAN BE NO LEGITIMATE DISPUTE THAT THE GREENBERG FIRM IS CURRENTLY REPRESENTING PLAINTIFFS AND THEREFORE IS ETHICALLY BARRED FROM REPRESENTING DEFENDANTS IN THIS ACTION.**

There can be no good faith dispute that plaintiff RFR Holding, as well as affiliates of both RFR Holding and Century 21 Chicago, are all ongoing clients of the Greenberg firm.  As set forth in the Mangieri Affidavit (¶¶5-10), the Greenberg firm is currently representing plaintiff RFR Holding, both directly and indirectly, through its closely held affiliates.  Likewise, the Greenberg firm is currently representing Century 21 Department Stores LLC, a closely held company and an affiliate of plaintiff Century 21 Chicago (Sultan Affidavit at ¶¶2-3, 5).

Few ethical principles are better settled than that a law firm cannot represent one client whose interests are adverse to another client in the absence of affirmative client consent. Illinois law is clear on this point.  Both Rule 1.7 of the Illinois Rules of Professional Conduct and Local Rule 83.51.7 of the Local Rules of the United States District Court for the District of Illinois provide, in relevant part:

> (a)    A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>
> (1)    the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
>
> (2)    each client consents after disclosure.  (emphasis added).

As the Committee Comment to LR 83.51.7 makes clear:  "As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without the

client's consent. Section (a) expresses that general rule. Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." Moreover, under Rule 1.10(a) of the Illinois Rules of Professional Conduct, "No lawyer associated with a firm shall represent a client when the lawyer knows or reasonably should know that another lawyer associated with the firm would be prohibited from doing so by Rule 1.7."

Illinois case law of course is to the same effect. See, e.g., <u>Ransburg Corp. v. Champion Spark Plug Co.</u>, 648 F.Supp. 1040, 1044 (N.D. Ill. 1986) ("The prohibition against . . . simultaneous representations even in unrelated matters is based on the fundamental concept that lawyers owe undivided loyalty to their clients"). As a result, "it is unethical conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." <u>Id</u>.

Similarly, the law in the State of New York, where both plaintiffs maintain their principal offices (and where the entire control group for each plaintiff dealing with the Greenberg firm is located), is no different from the State of Illinois. In fact, under New York law, the Greenberg firm's conduct is "per se" improper. See, e.g., <u>Cinema 5 Ltd. v. Cinerama, Inc.</u>, 528 F.2d 1384, 1386 (2d Cir. 1976); <u>accord</u> DR 5-105, 22 NYCRR § 1200.24 (an attorney may not represent adverse or differing interests from those of the current clients of his or her firm without the knowing and voluntary consent of each such client). Indeed, as the Second Circuit has observed:

> Under the Code, the lawyer who would sue his own client, asserting in justification the lack of 'substantial relationship' between the litigation and the work he has undertaken to perform for that client is leaning on a slender reed indeed. Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned.

<u>Cinema 5</u>, 528 F.2d at 1386.  "Where a clear conflict of interest exists, doubts should 'be resolved in favor of disqualification.'"  <u>Ehrich v. Binghamton City Sch. Dist.</u>, 210 F.R.D. 17, 25 (N.D.N.Y. 2002) (noting that, under <u>Cinema 5</u>, representation adverse to current client is "per se improper" unless attorney can affirmatively demonstrate that there will be no conflict of loyalties); <u>Travelers Indem. Co. v. Gerling Global Reins. Corp.</u>, No. 99 Civ. 4413 (LMM), 2000 U.S. Dist. LEXIS 11639, at *9 (S.D.N.Y. Aug. 14, 2000);[1] <u>Strategem Dev. Corp. v. Heron Int'l N.V.</u>, 756 F. Supp. 789, 792 (S.D.N.Y. 1991).

Thus, the law is abundantly clear that the Greenberg firm is <u>precluded</u> from representing any client in a matter that is adverse to plaintiffs, absent plaintiffs' consent.  Such a conflict plainly exists here.  The Greenberg firm's defense of defendants in this action by plaintiffs to recover millions of dollars from defendants is, without question, directly adverse to plaintiffs. Moreover, it is undisputed that plaintiffs never gave consent for the Greenberg firm to represent defendants in this litigation. Consequently, plaintiffs' motion for an order disqualifying the Greenberg firm should be granted.

The fact that in some instances, the Greenberg firm is representing affiliates of plaintiffs -- as opposed to those particular legal entities --  is likewise irrelevant under the facts and circumstances present here. Specifically, although Illinois State Bar Association Advisory Opinion 95-15 (May 17, 1996) states that in some instances the representation of a corporation does not necessarily require withdrawal where a subsidiary is involved, this exception is not available in "situations where the client corporation and the subsidiary [or other constituent] in question have the same management group." <u>See</u>, <u>e.g.</u>, <u>Board of Managers of Eleventh Street Loftominium Association v. Wabash</u>, 376 Ill. App. 3d 185 (1st Dist. 2007).  <u>See also</u> ABA Formal Opinion 95-390 (January 25, 1995) ("the fact that a lawyer for a subsidiary was engaged

---

[1] Copies of all unpublished cases cited in this Memorandum are attached as Exhibit 1.

by and reports to an officer or general counsel for its parent may support the inference that the corporate parent reasonably expects to be treated as a client").

In this action, the very people to whom the Greenberg firm's lawyers currently report in connection with the various matters where the Greenberg firm is counseling plaintiffs and their affiliates are the decision makers (and in some instances potential witnesses) involved in this litigation. Specifically, as set forth in the Mangieri affidavit, Frank Mangieri is a member of the small management group responsible for decisions on behalf of RFR Holding in this case and is one of the people with whom the Greenberg firm is simultaneously communicating in connection with its various ongoing matters for RFR Holding and its affiliates. Mr. Mangieri is also one of the people to whom others in the RFR organization report who are dealing directly with the Greenberg firm on the matters where the Greenberg is representing RFR Holding and its affiliates. Similarly, as set forth in the Sultan Affidavit, Century 21 Department Stores LLC and its affiliate, GC 730 Michigan LLC (a 50 percent member in Century 21 Chicago), are both closely held companies owned by the same principals and run by a small group, including Ezra Sultan and Raymond Gindi. Messrs. Sultan and Gindi are members of the small management group responsible for decisions on behalf of Century 21 Chicago in this case and they are people with whom the Greenberg firm is simultaneously communicating in connection with its ongoing matters for Century 21 Department Stores LLC.

The material facts in this case are thus readily distinguishable form those in  Reuben H. Donnelley Corporation v. Sprint Publishing & Advertising, Inc., No. 95 C 5825, 1996 U.S. Dist. LEXIS 2363, at **8-9 (N.D. Ill. Feb. 28, 1996), in which this Court held "From the facts presented, it does not appear that the same lawyers in the corporate parent's office are actively managing the Telephone Company's defense of this case and the unrelated United Telephone tax

matters. The fact of active management is crucial because the core policy concern in conflict-of-interest law is the protection of client privacy [citation omitted]. The protection of privacy is far less implicated in a case like this, when different people in different places are intimately involved in the litigation." Here, as noted, it is the <u>same</u> people in the <u>same</u> place for RFR Holding and Century 21 Department Stores LLC, respectively, that are intimately involved both with this litigation and with the other matters outlined above being handled by the Greenberg firm for them and their affiliates. Thus, by any standard, a conflict exists and withdrawal is required.

A client has the legal right to know that its own attorneys will be acting with an undivided loyalty to that client at all times. Indeed, the New York Committee on Professional and Judicial Ethics has recently issued an opinion stating that the representation of an affiliate can be the same as representation of the parent for conflict purposes, where they share stockholders, officers, and offices. See Formal Opinion 2007-3 of the Committee on Professional and Judicial Ethics, 2008, Vol. 63 No.1:

> Although under New York law a subsidiary is legally distinct from its parent, even if it is wholly owned and the two corporations share stockholders, officers, directors and offices, theses facts may nevertheless give rise to a reasonable belief that both entities are clients of the law firm. This rule is especially true if the adverse representation would require the law firm to oppose the same representatives of the affiliate with whom it has regularly communicated while representing the corporate client. <u>Otherwise, an attorney could negotiate in the morning on behalf of the same person whom the attorney is cross-examining in the afternoon.</u> (emphasis added). <u>Id</u>. at 122.

This is the exact situation here, where the representatives of RFR Holding and Century 21 Chicago responsible for the decisions in this litigation, and who were the actors involved in the underlying events, are the same as those of its affiliates with whom the Greenberg firm is presently dealing. As a result, the Greenberg firm's attempt to distinguish the representation of

plaintiffs from the representation of plaintiffs' affiliates for conflict purposes is without any

factual support and an inadequate explanation for its improper behavior.

II.    **THE GREENBERG FIRM NEVER SOUGHT A WAIVER IN THE
       UNDERLYING TRANSACTION AND PLAINTIFFS NEVER CONSENTED TO
       THE GREENBERG FIRM'S REPRESENTATION OF DEFENDANTS IN THIS
       LITIGATION.**

The Greenberg firm's argument that plaintiffs somehow waived the Greenberg firm's

conflict of interest is absurd and without any legal merit. Under the law set forth above, the

Greenberg firm had the responsibility to seek a waiver and the record is crystal clear that the

Greenberg firm never sought (or even attempted to seek) a waiver of its numerous conflicts.

As an initial matter, it cannot be disputed that plaintiffs never expressly waived the

conflict present in this litigation. In fact, the one time that the Greenberg firm did request a

waiver so as to be able to represent defendants -- after this litigation was brought when one of its

partners contacted Ezra Sultan to make such request -- the Greenberg firm's client (Century 21

Department Stores LLC) expressly declined to grant such waiver.

Moreover, the fact that plaintiffs did not object to the Greenberg firm's representation of

Ponte Gadea Florida, Inc at the time plaintiffs were interested in selling the property to it -- i.e.,

in a consensual transaction without material adversity among the parties at the time <u>before</u>

litigation was brought -- is irrelevant because courts have consistently found that such an implied

consent is <u>not</u> to be deemed a waiver of the right to object to its counsel's adverse representation

of another client when litigation ensues. See, e.g., <u>Koehring Company vs. Manitowoc Company</u>,

418 F. Supp. 1133, 1138-39 (E.D. Wisc. 1976) ("The court is of the opinion that the burden of

obtaining and demonstrating a clear waiver of objection to potential conflicts is properly upon

counsel who seek to represent potentially adverse interests of present or former clients. Under

the facts of this case, the court finds that [the objecting client's] consent to [the law firm's]

representation of [its other client] for purposes of settlement negotiations did not constitute a blanket waiver covering the possibility of litigation").  A similar result was reached in <u>White Motor Corporation v. White Consolidated Industries, Inc.</u>, No. 39295, 1980 App. LEXIS 13705, (Ohio App. 8 Dist. 1980).  In that case, the litigation followed a failed merger between the parties, and the court granted the plaintiff's motion to disqualify defendant's counsel (Jones, Day, Reaves & Pogue) because of, among other things, the firm's ongoing representation of plaintiff in various pending legal matters unrelated to the litigation.  The court expressly rejected the defendant's argument that because the plaintiff consented to the firm's representation of the defendant in merger negotiations, the plaintiff had implicitly consented to such firm's representation of the defendant in the litigation that followed.  <u>Id</u>. at **19-22. The Court expressly stated that "<i>Koehring</i>, however, requires a 'clear and unequivocal waiver,' not merely a waiver by implication."  <u>Id</u>. *21.  <u>Accord</u>, <u>Blecher & Collins, P.C. v. Northwest Airlines, Inc.</u>, 858 F.Supp. 1442 (C.D. Cal. 1994) (under California law a current client cannot impliedly consent to a conflicted representation; the attorney must obtain an informed written waiver).  Thus, there is no merit to the assertion that plaintiffs impliedly consented to the Greenberg firm's adverse representation of defendants in this litigation.

The Greenberg firm's reliance on the assertion of implied waiver is especially peculiar because at a time that the Greenberg firm concededly was doing work for RFR Holding (as well as its affiliates), and for Century 21 Department Stores LLC, it failed to ask for a waiver permitting it to represent Ponte Gadea in the transaction. We leave to the Greenberg firm to explain to this Court how, consistent with its express ethical obligations, the Greenberg firm could at that time have proceeded to represent Ponte Gadea in the transaction <u>without</u> having ever sought an express waiver from its clients, i.e., the plaintiffs.

Finally, the Greenberg firm's actions in connection with the Ponte Gadea representation are in sharp contrast with its usual procedures. As evidenced by its April 22, 2008 letter sent (after the commencement of this case) by the Greenberg firm to RFR Holding (see Exhibit 4 to the Mangieri Affidavit), the Greenberg firm clearly recognizes the ethical requirement for obtaining a waiver. Moreover, the April 22, 2008 letter demonstrates the Greenberg firm's understanding that an initial waiver when parties are not materially adverse does not automatically extend to subsequent litigation (Mangieri Aff. Ex. 4) (noting that any waiver on the part of RFR "shall not extend to any litigation with respect to the Transaction which is adverse to RFR" (emphasis added).  What cannot be disputed is that the Greenberg firm never sought, nor did RFR Holding ever expressly or impliedly grant, a waiver of the conflict in the event of litigation involving Ponte Gadea. Given that the Greenberg firm's regular practice is to exclude future litigation when requesting an express waiver, it is ludicrous for the Greenberg firm to suggest that an implied waiver could be broader.

Under these circumstances, disqualification of the Greenberg firm is clearly warranted.

## CONCLUSION

For the reasons set forth above, and in the Mangieri Affidavit and Sultan Affidavit, plaintiffs respectfully request that the Court enter an order disqualifying the Greenberg firm from acting as counsel to defendants in this action and award to plaintiffs the fees and expenses incurred in bringing this motion.

Respectfully submitted,

RFR HOLDING LLC
CENTURY 21 CHICAGO LLC


By:     /s/  Mark Walfish
        One of their Attorneys


Mark Walfish (Admitted *pro hac vice*)
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

Lazar P. Raynal
Jocelyn D. Francoeur
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois  60606
Telephone: (312) 372-2000

319731-4-W

-12-

## CERTIFICATE OF SERVICE

I, Mark Walfish, an attorney, certify that on June 13, 2008, I caused a true and complete copy of this **Memorandum of Law in Support of Plaintiffs' Motion to Disqualify** to be served via CM/ECF mail upon:

Howard Kevin Jeruchimowitz
Rita M. Alliss Powers
Greenberg Traurig, L.L.P.
77 West Wacker Drive
Suite 2500
Chicago, IL  60601


And via first-class mail upon:


Hilarie Bass
Greenberg Traurig LLP
1221 Brickell Avenue
Miamia, FL  33131


_____ s/ Mark Walfish _____

CHI99 4993407-1.052498.0085

# EXHIBIT 1

2000 U.S. Dist. LEXIS 11639, *

**TRAVELERS INDEMNITY COMPANY, Petitioner, -against- GERLING GLOBAL REINSURANCE CORP., Respondent.**

**99 Civ. 4413 (LMM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2000 U.S. Dist. LEXIS 11639**

**August 14, 2000, Decided**
**August 15, 2000, Filed**

**DISPOSITION:**    [*1]  Gerling's motion to disqualify LeBoeuf and underlying arbitration granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Respondent reinsurance company moved to disqualify counsel for petitioner indemnity company in petitioner's action to compel arbitration, and in the underlying arbitration.

**OVERVIEW:** Petitioner indemnity company sought an order to compel arbitration between it and respondent reinsurance company, with respect to agreements under which respondent was to reimburse petitioner for certain claims. Respondent moved to disqualify petitioner's counsel, on the ground that petitioner's counsel had previously represented respondent and currently represented respondent's sister corporation. The court granted the motion to disqualify petitioner's counsel both in the instant action and in the underlying arbitration. Petitioner's counsel's representation of respondent's sister corporation was per se improper as it violated counsel's duty of undivided loyalty, under N.Y. Jud. App., Code of Professional Responsibility Canon 5. Respondent and its sister corporation were closely related and engaged in similar businesses. They shared the same corporate officers, office space, payroll and human resource departments, corporate services, and computer networks and systems. Under the circumstances, petitioner's counsel raised the specter of divided loyalty by representing both petitioner and respondent's sister corporation.

**OUTCOME:** Motion to disqualify petitioner's counsel in the instant action and in the underlying arbitration was granted, because petitioner's counsel also represented respondent's sister corporation, and respondent and its sister corporation shared the same corporate officers, office space, payroll and human resource departments, corporate services, and computer networks and systems.

**CORE TERMS:** disqualification, arbitration, reinsurance, subsidiary, per se, loyalty, settlement, occurrence, prior representation, undivided loyalty, disqualified, scenario, ethical, sister, coverage, overlap, attorney's representation, environmental, disqualify, site, urge, reinsurance agreements, law firm, umbrella policies, burden of demonstrating, adverse parties, concurrently, declaratory, concurrent, preparing

**LexisNexis(R) Headnotes**

*Civil Procedure > Counsel > General Overview*
[HN1]Resolving disqualification of counsel motions requires a fact-specific analysis.

*Civil Procedure > Counsel > General Overview*
*Criminal Law & Procedure > Counsel > Right to Counsel > General Overview*
[HN2]In the context of attorney disqualification, a client's right freely to choose his counsel must be balanced against the need to maintain the highest standards of the profession. Thus, the moving party initially bears a heavy burden of demonstrating that a conflict exists. Once this initial burden is met, however, all doubts must be resolved in favor of disqualification. Disqualification is necessary where there is even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.

*Civil Procedure > Counsel > General Overview*
[HN3]Attorney disqualification is appropriate based on two grounds: (1) where an attorney's conflict of interests among current clients undermines the court's confidence in the vigor of the attorney's representation of one or more of his clients, or, more commonly, (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior

representation. With respect to the first scenario, an attorney that seeks to simultaneously represent two adverse parties is per se disqualified. An attorney faced with the second scenario will be disqualified only if there is a "substantial relationship" between the prior and present representations.

*Civil Procedure > Counsel > General Overview*
*Legal Ethics > Client Relations > Effective Representation*
[HN4]N.Y. Jud. App., Code of Professional Responsibility Canon 5 mandates an attorney's undivided loyalty to his clients. Thus, concurrent representation of adverse clients is prima facie improper. An attorney who seeks to undertake such adverse representation is per se disqualified, unless he satisfies the heavy burden of demonstrating that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation.

*Civil Procedure > Counsel > General Overview*
[HN5]An attorney's representation of a corporate client does not automatically disqualify the attorney from taking action against all members of his client's corporate family irrespective of how distant their relations.

*Civil Procedure > Counsel > General Overview*
[HN6]The purpose of N.Y. Jud. App., Code of Professional Responsibility Canon 5, which mandates an attorney's undivided loyalty to his clients, is to protect a client not only from outright and egregious examples of divided loyalty, but also the subtle and indefinable impact that it might have on an attorney's representation.

*Civil Procedure > Counsel > General Overview*
[HN7]Where there are doubts as to a lawyer's representation in a given case, the lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone.

**COUNSEL:** For TRAVELERS INDEMNITY COMPANY, petitioner: Tracy Ann Stein, John M. Nonna, LeBoeuf,Lamb,Greene & MacRae L.L.P., New York, NY.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINION BY:** Lawrence M. McKenna

**OPINION**

*MEMORANDUM AND ORDER*

McKENNA, D.J.,

Presently before the Court is the motion of Respondent Gerling Global Reinsurance Corp. ("Gerling") to disqualify LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf") from representing Petitioner Travelers Indemnity Company ("Travelers") in this proceeding and the underlying arbitration. For the reasons set forth below, Gerling's motion is granted.

**I. BACKGROUND**

**A. The Gerling Group of Companies**

Non-party Gerling Konzern Global Ruckverischerungs AG ("Gerling AG") is a German corporation that is engaged in the business of insurance and reinsurance. (Banfill Aff. P2). Gerling AG conducts its world-wide business both directly and indirectly through its subsidiaries, which are known collectively as the "Gerling Group." (Kaminsky Aff. P1).

Gerling and non-party Gerling Global Reinsurance Company of America ("GGRCA") are both subsidiaries of Gerling AG. GGRCA, formerly known as Constitution Reinsurance Corporation, was acquired by Gerling AG in October 1998. (*Id.* P3). Together these [*2] companies constitute the North American arm of the Gerling Group's property and casualty reinsurance operations. (*Id.* P6).

The primary distinction between these companies is that Gerling's business is limited to "runoff" of certain North American reinsurance business and, therefore, it does not underwrite any new reinsurance business. (*Id.* P4). GGRCA, on the other hand, underwrites new business. (*Id.*). Otherwise, both companies are engaged in similar administration, handling, payment of claims, and other day-to-day activities. (*Id.*).

While Gerling and GGRCA are separate legal entities, there is substantial overlap in their corporate structures. First, they share common offices in New York City, and the same computer network and systems. (*Id.* P5). Additionally, the two companies maintain common human resource and payroll departments and corporate services staff. (*Id.; see also* Banfill Aff. P31). Finally, there is significant overlap between senior management positions of Gerling and GGRCA, including the chairman, president, chief operating officer, chief financial officer, and chief actuary. (*See* Pet'r Decl., Exs. A & B).

**B. The Witco Arbitration**

[*3]  Early in the 1980s, Witco Chemical Corp. ("Witco") began reporting environmental claims to Travelers, which had issued primary and umbrella policies to Witco. (Nonna Decl. P37). The Witco claims eventually grew to include over 140 sites and resulted in declaratory

judgment actions in both New York and New Jersey. (*Id.* PP38 & 39). In 1995 Travelers settled the claims. (*Id.* P41).

After the settlement, Travelers sought payment from Gerling, which had reinsured certain Witco umbrella policies via facultative certificates. Travelers billed Gerling on a "one occurrence" basis, (*id.*), considering Witco's company-wide failure to implement adequate waste procedures a "common cause, common origin and single occurrence," the series of underlying injuries for which Witco sought coverage." (Banfill Aff. P36, Ex. K). According to Travelers, Gerling refused to take any position with respect to the Witco claim. (Nonna Decl. P43).

In September 1996 Travelers commenced arbitration against Gerling to recover what it claimed was Gerling's share of the Witco settlement. (*See* Banfill Decl. P38). Travelers retained the law firm of Werner & Kennedy; Gerling retained LeBoeuf. Copies of [*4] Gerling's files were made available to LeBoeuf attorneys for review. LeBoeuf attorneys reviewed Gerling's files, interviewed Gerling personnel, prepared preliminary memoranda to advise Gerling, prepared submissions to the arbitration panel, conducted and responded to discovery, and prepared and defended Gerling witnesses for their depositions. (*See id.* PP40-45). Ultimately, the Witco arbitration was settled and the final award on consent was entered on November 26, 1997. (*Id.* P44).

**C. LeBoeuf's Present Representation of GGRCA**

LeBoeuf currently represents GGRCA, Gerling's sister corporation, in at least two active matters. One matter involves the liquidation of Mission Insurance Company in California state court. (Kaminsky Aff. P8(c)). LeBoeuf represents GGRCA in connection with the distribution of funds to reimburse GGRCA for claim payments. (*Id.*). The other matter involves another California state court action, in which LeBoeuf represents GGRCA in connection with litigation that arose over the arbitration of pollution coverage issues. (*Id.* P8(a)).

In addition to the two active litigations, GGRCA considers LeBoeuf its "primary outside counsel with respect to [*5] reinsurance regulatory advice," (Kaminsky Aff. P8(b)), which LeBoeuf denies, (Demmerle Decl. P8).

**D. The Underlying Dispute**

Through a series of reinsurance agreements, Gerling agreed to reinsure Travelers' general and environmental liability policies issued to TRW, Inc. ("TRW") for underwriting years 1970 through 1977. (*See* Nonna Decl. PP14-16). TRW reported hazardous waste claims to Travelers, within Gerling's reinsurance coverage period,

for environmental contamination at approximately 60 of its sites located throughout the United States. (*Id.* P16). Subsequently, TRW commenced declaratory actions against Travelers in Pennsylvania state and federal courts to ascertain Travelers' obligations under TRW's policy. (*Id.* P17). TRW and Travelers settled these actions on July 1, 1996 pursuant to a confidential agreement. (*Id.* P18).

In 1997 Travelers advised Gerling of the TRW settlement and billed Gerling for what Travelers calculated was Gerling's share of the settlement. (*Id.* P20). Travelers' calculation considered the TRW claim to be a "single occurrence" under the terms of the reinsurance agreement for purposes of the deductible and excess provision. (*Id.* [*6] P23). Gerling objected to Travelers' interpretation, arguing, among other things, that each contaminated TRW site constituted a separate occurrence, thereby requiring Travelers to credit its reinsurance deductible for each occurrence. (*See* Nonna Decl. PP21-28).

In December 1998, Travelers retained Werner & Kennedy to recover the amount Travelers believed was due under its reinsurance agreements with Gerling. (Foss Decl. P6). John M. Nonna, a partner at Werner & Kennedy, was lead counsel for Travelers, as he had been in at least twenty other reinsurance disputes, including two disputes with Gerling. (*See id.* PP3-4). Through Werner & Kennedy, Travelers demanded arbitration to resolve Gerling's coverage obligation for the TRW settlement. [1]

    1 TRW is not a party to the arbitration.

In May 1999, while the parties were negotiating the selection of arbitrators, Gerling learned that Werner & Kennedy was dissolving and that Mr. Nonna and several other Werner & Kennedy attorneys were joining LeBoeuf. (Blair [*7] Decl. P6). Shortly thereafter, Gerling's counsel notified Mr. Nonna that he perceived a conflict if Mr. Nonna continued representing Travelers against Gerling, based on LeBoeuf's prior representation of Gerling in the Witco arbitration. (*Id.* P7). A series of letters were exchanged, wherein the parties disputed the existence of a conflict, and Nonna refused to withdraw as counsel for Travelers. (*Id.* PP8-10).

Meanwhile, Travelers petitioned this Court by order to show cause to compel arbitration and to appoint an umpire. The Court stayed Travelers' petition, pending resolution of the instant motion for disqualification.

**II. DISCUSSION**

Courts in this circuit have long recognized that [HN1]resolving disqualification motions requires a fact-specific analysis. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir. 1977) ("In de-

ciding questions of professional ethics men of good will often differ in their conclusions."). Indeed, over forty years ago Chief Judge Kaufman aptly observed:

> When dealing with ethical principles, . . . we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established [*8] when virgin ground is explored, and the conclusion in a particular case can be reached only after a painstaking analysis of the facts and precise application of precedent.

*United States v. Standard Oil Co.*, 136 F. Supp. 345, 367 (S.D.N.Y. 1955).

This oft-quoted admonition has shaped the decisions regarding attorney disqualification in this Circuit, as courts have attempted to resolve the twin tensions underlying any such motion: [HN2]"a client's right freely to choose his counsel," which "must be balanced against the need to maintain the highest standards of the profession." *Government of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978); *accord Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983). Thus, the moving party initially bears a heavy burden of demonstrating that a conflict exists. *Government of India*, 569 F.2d at 739, *see also Evans*, 715 F.2d at 794. Once this initial burden is met, however, all doubts must be resolved in favor of disqualification. *See Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973) (holding disqualification is [*9] necessary where there is "even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.").

In *Board of Educ. of New York v. Nyquist*, the Second Circuit noted that, with rare exceptions, [HN3]disqualification is appropriate based on two grounds: (1) where an attorney's conflict of interests among current clients undermines the Court's confidence in the vigor of the attorney's representation of one or more of his clients, or, more commonly, (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation. 590 F.2d 1241, 1246 (2d Cir. 1979) (citing *Fund of Funds*, 567 F.2d 225, *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976), and *Emle*, 478 F.2d 562). With respect to the first scenario, an attorney that seeks to simultaneously represent two adverse parties is per se disqualified. *Stratagem Dev. Corp v. Heron Int'l N.V.*, 756 F. Supp. 789, 792 (S.D.N.Y. 1991). An attorney faced with the second scenario will be disqualified only if there is a "substantial relationship" between [*10] the prior and present representations. *Id.*

Gerling moves for disqualification based on both grounds. First, Gerling argues that LeBoeuf's simultaneous representation of both GGRCA and Travelers is per se improper as it violates LeBoeuf's duty of undivided loyalty, because GGRCA is Gerling's corporate affiliate. Alternatively, Gerling urges for disqualification based on LeBoeuf's prior representation of Gerling in the Witco arbitration, which Gerling argues involved substantially similar issues as those in the present case. Because the Court agrees with Gerling with respect to Gerling's first argument, the Court holds that LeBoeuf cannot continue to represent Travelers in this case.

## A. Concurrent Representation

[HN4]Canon 5 of the New York Code of Professional Responsibility mandates an attorney's undivided loyalty to his clients. Thus, concurrent representation of adverse clients is "prima facie improper." *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976). An attorney who seeks to undertake such adverse representation is per se disqualified, unless he satisfies the "heavy burden" of demonstrating "that there will be no actual or apparent conflict [*11] in loyalties or diminution in the vigor of his representation." *Id.*

LeBoeuf is not presently retained by Gerling; such representation ended with the conclusion of the Witco arbitration. At issue, instead, is whether LeBoeuf's current representation of Gerling's corporate affiliate, GGRCA, while simultaneously representing Travelers against Gerling, violates Canon 5 and, therefore, is per se impermissible.

Gerling urges the Court to follow *Stratagem Dev. Corp v. Heron Int'l N.V.*, 756 F. Supp. 789 (S.D.N.Y. 1991). In that case, Judge Kram disqualified Epstein Becker & Green ("Epstein Becker") from representing the plaintiff because, while the firm was preparing the suit against the defendant, Heron, it was concurrently representing Heron's subsidiary in an unrelated action. Judge Kram held that the duty of undivided loyalty that Epstein Becker owed to Heron's subsidiary also attached Heron, making the firm's representation of a plaintiff suing Heron per se improper. *Stratagem*, 756 F. Supp. at 792. Gerling argues that this reasoning extends to sister corporations, such that LeBoeuf's duty of loyalty to GGRCA extends to Gerling, thereby disqualifying [*12] LeBoeuf from representing Travelers in this case.

Travelers argues that under *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir. 1981), Gerling is merely a "vicarious" client of LeBoeuf and, therefore, the appropriate test for disqualification is whether the representation of GGRCA is substantially related to the present action. In *Glueck*, a law firm that represented an incorporated trade association sought to represent an

individual client against a corporation that was a member the trade association. The Second Circuit held that the per se rule of disqualification was inappropriate because "when an adverse party is only a vicarious client by virtue of membership in an association, the risks against which Canon 5 guards will not inevitably arise." *Id. at 749*. Instead, because the association member seeking disqualification was not a "client [] in the traditional sense," the substantial relationship test should be used to determine whether disqualification was appropriate. *Id.*

In essence, the Court disagrees with both parties' arguments. Gerling's reading of *Strategem* is over-broad, and per se disqualification of LeBoeuf is not warranted [*13] solely because LeBoeuf also represents GGRCA. [HN5]An attorney's representation of a corporate client does not automatically disqualify the attorney from taking action against all members of his client's corporate family irrespective of how distant their relations, just as the attorney "that represents the American Bar Association need not decline to represent a client injured by an automobile driven by a member of the ABA." *Glueck, 653 F.2d at 749*. Moreover, Judge Kram's reasoning was largely based on the parent company's whole ownership of its subsidiary, which is not a consideration in this case because Gerling and GGRCA are only sister corporations. *See Strategem, 756 F. Supp. at 792* ("Because the liabilities of a subsidiary corporation directly affect the bottom line of the corporate parent . . . [a] fortiori, the duty of undivided loyalty, as set forth in Canon 5, attaches in this case.").

Likewise, with respect to Travelers' argument, the Court notes that "when *Glueck* was reviewed by the Second Circuit, the court did not establish a bright-line rule with regard to subsidiaries" or, for that matter, sister corporations. *Ives v. Guilford Mills, Inc., 3 F. Supp. 2d 191, 203 (N.D.N.Y. 1998)*. [*14] "Rather, . . . it mandated a factual inquiry into the nature of the relationship between the attorney and the party claiming client status." *Id.*

In this action, the nature of the relationship between LeBoeuf and Gerling is predicated upon the relationship between Gerling and GGRCA. It is true that Gerling and GGRCA are separately incorporated entities. Indeed, if Travelers was seeking to impute liability between the two companies, Gerling would no doubt rely on the protection of the corporate veil. However, there is considerable overlap between the two companies, especially within their corporate structures, and this sways the Court to grant Gerling's motion. For example, the companies are engaged in very similar businesses while sharing the same chairman, president, chief operating officer, chief financial officer, and chief actuary. Further, the companies share office space, payroll and human re-source departments, and corporate services. They even share the same computer networks and systems, travel agents, mail services, credit card issuers, and annual employee gatherings.

With such overlap, LeBoeuf's representation of GGRCA while concurrently advocating against Gerling raises [*15] the specter of divided loyalty. One could imagine an endless number of scenarios. For example, LeBoeuf attorneys will no doubt continue to advise GGRCA management regarding ongoing litigation, while at the same time other LeBoeuf attorneys may be preparing to depose these same individuals, in their capacity as Gerling management, for the prosecution of this case. Speculation aside, it is the mere risk of divided loyalty that the Court is concerned with, not only ethical scenarios that can be readily envisioned at this juncture. [HN6]The purpose of Canon 5 is to protect a client not only from outright and egregious examples of divided loyalty, but also the subtle and indefinable impact that it might have on an attorney's representation.

Yet, none of this should be taken to mean that the Court doubts the ethical standards of LeBoeuf or the sincerity and intentions of its attorneys who have submitted affidavits that urge the Court against disqualification. Their good faith is not at issue. But, [HN7]where there are doubts as to a lawyer's representation in a given case, the "lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when [*16] standing alone." *Emle, 478 F.2d at 571*.

## B. Successive Representation

Because the Court finds that a conflict exists by virtue of LeBoeuf's representation of GGRCA, it does not rule as to Gerling's motion relating to LeBoeuf's prior representation of Gerling in the Witco arbitration.

## III. CONCLUSION

For the foregoing reasons, Gerling's motion to disqualify LeBoeuf in this matter and the underlying arbitration is granted.

SO ORDERED

Dated: New York, New York

August 14, 2000

Lawrence M. McKenna

U.S.D.J.

1996 U.S. Dist. LEXIS 2363, *

THE REUBEN H. DONNELLEY CORPORATION, Plaintiff, v. SPRINT
PUBLISHING & ADVERTISING, INC. and CENTRAL TELEPHONE COMPANY
OF ILLINOIS n/k/a SPRINT/CENTEL TELEPHONE COMPANY OF ILLINOIS,
Defendants.

No. 95 C 5825

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

1996 U.S. Dist. LEXIS 2363

February 28, 1996, Dated
February 29, 1996, DOCKETED

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff corporation re-
tained a certain law firm to represent its interests con-
cerning possible breaches of certain directory agreements
against defendants, advertising company and telephone
company. Defendant filed a motion to disqualify the law
firm alleging conflict of interest.

OVERVIEW: The law firm had been representing a
telephone company in another state for several years
before the corporation asked the law firm to represent its
interests. Defendants asserted a conflict of interest be-
cause defendant telephone company and the law firm's
out-of-state client were under common ownership. The
court denied the defendants' motion because it found that
the subsidiary, by virtue of its close connection with the
out-of-state client, should not be treated as an existing
client for the law firm for conflict of interest purposes.
While representation of an interest adverse to a client's
alter ego would have given rise to a conflict of interest
because the client and its alter ego were the same unit, in
the language of Ill. Sup. Ct. R., R. Prof. Conduct 1.7, the
defendant telephone company was not the out-of-state
telephone company's alter ego. The court found that the
companies were separate legal entities and operated in
different states. They also did not share a complete iden-
tity of management and directors. Furthermore, the law-
yer's handling the defenses for the companies were dif-
ferent and the two representations were widely diverse
and offered no danger of overlap.

OUTCOME: The court denied defendants' motion to
disqualify the corporation's law firm.

CORE TERMS: law firm, disqualify, affiliate, vice,
directory, general counsel, disqualification, alter ego, tax

matter, subsidiary, balancing, ethical, privacy, entity,
conflict of interest, confidential information, attorney-
client, multi-national, sophisticated, unrelated, actively,
Illinois Rules, counsel of record, boards of directors,
client consents, new counsel, deterrent effect, disclosure,
depositions, ownership

LexisNexis(R) Headnotes

*Civil Procedure > Counsel > General Overview*
[HN1]A motion to disqualify counsel requires a two-step
analysis. First, the trial court considers whether an ethi-
cal violation has occurred. Second, if the trial court finds
such a violation, the trial court then determines whether
disqualification is the appropriate remedy.

*Legal Ethics > Client Relations > Conflicts of Interest*
[HN2]Ill. Sup. Ct. R., R. Prof. Conduct 1.7 provides (a)
that a lawyer shall not represent a client if the representa-
tion of that client will be directly adverse to another cli-
ent, unless: (1) the lawyer reasonably believes the repre-
sentation will not adversely affect the relationship with
the other client; and (2) each client consents after disclo-
sure; and (b) that a lawyer shall not represent a client if
the representation of that client may be materially limited
by the lawyer's responsibilities to another client or to a
third person, or by the lawyer's own interests, unless: (1)
the lawyer reasonably believes the representation will not
be adversely affected; and (2) each client consents after
disclosure.

*Legal Ethics > Client Relations > Conflicts of Interest*

[HN3]Ill. Sup. Ct. R., R. Prof. Conduct 1.7 prohibits a lawyer from representing a client if the representation of that client will be directly adverse to an existing client.

*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
*Legal Ethics > Client Relations > Conflicts of Interest*
[HN4]Representation of an interest adverse to a client's alter ego gives rise to a conflict of interest because the client and its alter ego are the same unit, the same "client" in the language of Ill. Sup. Ct. R., R. Prof. Conduct 1.7.

*Legal Ethics > Client Relations > Conflicts of Interest*
[HN5]In determining whether there is a conflict of interest in regard to legal representation, the fact of active case management is crucial because of the conflict-of-interest law's concern about protection of client privacy.

*Civil Procedure > Counsel > General Overview*
[HN6]Deciding a motion to disqualify an attorney implicates not only ethical issues, but also a delicate balancing between the privacy of the attorney-client relationship and the prerogative of a party to proceed with counsel of its choice. Disqualification is a drastic measure which courts should hesitate to impose except when absolutely necessary.

**COUNSEL:** [*1]  For REUBEN H. DONNELLEY CORPORATION, THE, plaintiff: James A. White, [COR NTC], Jones, Day, Reavis & Pogue, Chicago, IL. Janine Cone Metcalf, [COR], G. Lee Garrett, Jr., [COR LD NTC A], Gordon Lee Garrett, [COR NTC], Gregory R. Hanthorn, [COR NTC], Jones, Day, Reavis & Pogue, Atlanta, GA.

For SPRINT PUBLISHING & ADVERTISING, INC., and CENTRAL TELEPHONE COMPANY OF ILLINOIS aka Sprint/Centel Telephone Company of Illinois, defendants: Eric A. Oesterle, [COR NTC], Sonnenschein, Nath & Rosenthal, Chicago, IL. Jerome T. Wolf, [COR LD NTC A], Timothy J. Kuester, [COR], Sonnenschein Nath & Rosenthal, Kansas City, MO.

**JUDGES:** Wayne R. Andersen, United States District Judge

**OPINION BY:** Wayne R. Andersen

**OPINION**

*MEMORANDUM OPINION AND ORDER*

This case is before the court on the motion of defendants Sprint Publishing & Advertising, Inc. ("Sprint Advertising") and Central Telephone Company of Illinois (the "Telephone Company") to disqualify the law firm of Jones, Day, Reavis & Pogue ("Jones Day") as counsel of record for plaintiff The Reuben H. Donnelley Corporation ("Donnelley"). For the following reasons, we deny the motion to disqualify.

*BACKGROUND*

Jones Day currently represents [*2]  a company called United Telephone Company of Ohio ("United Telephone") and has represented United Telephone in connection with a number of matters dating back to 1986. Jones Day represents United Telephone in a multi-million dollar tax matter, which is now pending before the Ohio Board of Tax Appeals.

The Telephone Company and Sprint Advertising claim that Jones Day created the present conflict of interest when it chose to bring this action on behalf of Donnelley against the Telephone Company. Both United Telephone and the Telephone Company are under the common ownership of Sprint Corporation ("Sprint"). United Telephone is a wholly-owned subsidiary of Sprint, while Sprint holds a ninety percent ownership interest in the Telephone Company.

United Telephone and the Telephone Company shared no affiliation until March 1993 when Sprint Corporation ("Sprint") acquired the outstanding shares of Centel Corporation. At that time, the Telephone Company became part of the Sprint family of companies. In 1994, the common officers between United Telephone and the Telephone Company amounted to fewer than a quarter of the Telephone Company's officers.

In July 1995, Donnelley contacted Jones Day [*3]  to represent its interests against Centel Directory, Sprint Advertising and the Telephone Company concerning possible breaches of certain directory agreements. Jones Day performed its conflicts check, detected no conflict, and accepted the representation of Donnelley.

In August 1995, after Donnelley retained Jones Day, the Telephone Company appointed six more United Telephone officers to be officers of the Telephone Company. The two corporations share the same President, Vice President of Business and Marketing, Vice President of Network Services, Vice President of Consumer Markets, Vice President of Carrier and Enhanced Services, Vice President of Human Resources, Treasurer and Controller. However, of the apparently 11 present directors of United Telephone and the 18 present direc-

tors of the Telephone Company, the two companies still have only one director in common.

In October 1995, Donnelley filed the complaint in this action, as well as an arbitration demand against Centel Directory. On or about November 1, 1995, United Telephone, through its general counsel, Wayne Walston, brought its perceived conflict to Jones Day's attention. Mr. Walston is general counsel of both United [*4] Telephone and the Telephone Company. On November 3, 1995, G. Lee Garrett, Jr., a Jones Day partner, raised Mr. Walston's claimed conflict with Jerome Wolf of Sonnenschein Nath & Rosenthal, counsel for the Telephone Company. In a letter dated November 8, 1995, Mr. Walston demanded that Jones Day withdraw as counsel for Donnelley.

Donnelley then sought an independent legal opinion from Sidley & Austin about the propriety of Jones Day's representation. Sidley & Austin rendered an opinion in November 1995 concluding that Jones Day's representation was proper. Jones Day claims it has rendered over 3,000 hours of service to date in this case.

## DISCUSSION

[HN1]A motion to disqualify counsel requires a two-step analysis. First, the court considers whether an ethical violation has occurred. Second, if the court finds such a violation, the court then determines whether disqualification is the appropriate remedy. *See Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982); *SWS Financial Fund A v. Salomon Bros. Inc.*, 790 F. Supp. 1392, 1399 (N.D. Ill. 1992).

I. *Has An Ethical Violation Occurred?*

[HN2]Rule 1.7 of the Illinois Rules of Professional Conduct [1] provides: [*5]

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after disclosure.

(b) a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) each client consents after disclosure.

_____

1    The Illinois Rules of Professional Conduct also have been adopted by the United States District Court for the Northern District of Illinois.

[HN3]

Rule 1.7 prohibits a lawyer from representing a client if the representation of that client will be directly adverse to an existing client. United Telephone is an existing client [*6] of Jones Day and has been since 1986. The critical question, therefore, is whether the Telephone Company, by virtue of its close relationship with United Telephone, should also be treated as an existing client of Jones Day for conflict of interest purposes.

The issue of a lawyer's relationship to a client's affiliate is of great importance in today's society because national and multi-national public corporations are acquiring subsidiaries, which may also be national or multi-national, with increasing frequency. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 95-390 at 259 (1995). *See also SWS Fin.*, 790 F. Supp. at 1402. Moreover, law firms also are becoming more national in scope, and large mega-firms often have satellite offices across the country and even the world. The problem is heightened in a situation such as that currently before the court--Sprint currently has over 250 subsidiaries and affiliated entities, and Jones Day consists of 1098 attorneys spread over 20 world-wide offices.

In an effort to provide guidance, the ABA Committee has analyzed the situation where mega-corporations and large, international law firms interact. The Committee determined [*7] that

the Model Rules of Professional Conduct do not prohibit a lawyer from representing a party adverse to a particular corporation merely because the lawyer . . . represents, in an unrelated matter, another corporation that owns the potentially ad-

verse corporation, or is owned by it, or is, together with the adverse corporation, owned by a third entity.

ABA Op. at 259. A situation may arise when a lawyer should regard a client's affiliate as a client, but only if there is at least a "disregard of corporate formalities and/or a complete identity of managements and boards of directors." *Id.* at 265.

According to the ABA Opinion, "the relationship of the corporate client to its affiliate may be such that the lawyer is required to regard the affiliate as his client. This would clearly be true where one corporation is the alter ego of the other." *Id.* [HN4]Representation of an interest adverse to a client's alter ego gives rise to a conflict of interest because the client and its alter ego are the same unit--the same "client" in the language of Rule 1.7(a). In this case, United Telephone is not tantamount to the Telephone Company's alter ego. Apart from the ministerial [*8]   functions United Telephone performs for the Telephone Company, it is undisputed that the companies are separate legal entities and operate in different states.

Moreover, United Telephone and the Telephone Company do not share a complete identity of management and directors. Until the Sprint Corporation acquired the stock of Centel Corporation and became the Telephone Company's affiliate in 1993, United Telephone and the Telephone Company were independent. Even now, approximately half of the Telephone Company's officers do not work for United Telephone, and the two companies' boards of directors have only one common member. Therefore, we do not consider the companies a "single unit".

The Telephone Company argues that a conflict is created by virtue of Mr. Walston's position as general counsel at both United Telephone and the Telephone Company. However, we do not believe that such fact is dispositive. Mr. Walston asserts that he is generally responsible for the retention of outside counsel for the Telephone Company, but he does not assert that he retained the Telephone Company's lawyer in this case. He also does not assert that he actively manages the litigation. From the facts presented, [*9]   does not appear that the same lawyers in the corporate parent's office are actively managing the Telephone Company's defense of this case and the unrelated United Telephone tax matters. [HN5]The fact of active management is crucial because the core policy concern in conflict-of-interest law is the protection of client privacy. *See Schiessle v. Stephens, 717 F.2d 417, 419 (7th Cir. 1983)*. The protection of privacy is far less implicated in a case like this, when different people in different places are intimately involved in the litigation.

When different faces represent the corporations in each litigation, the firm is less likely to feel any divided loyalty that could affect its representation. "The concepts of having a 'personal attorney' or a 'general corporate counsel' are much less meaningful today, especially among sophisticated users of legal services, than in the past." *SWS Financial Fund A, 790 F. Supp. at 1402*. Thus, a case such as this where the general counsel is a supervisor rather than an active participant in the litigation "is at a polar extreme from the case in which an individual has a personal relationship with a particular attorney who provides for all . . .   [*10]   of that client's legal needs." *Id.*

For these reasons, the facts of this case do not establish that the Telephone Company and United Telephone are effectively one company. Therefore, they should not be treated as a single "client" for purposes of Rule 1.7(a).

## II. Is Disqualification Appropriate?

Even if we were to determine that a conflict exists, we would still deny the motion to disqualify because the balancing of interests between Donnelley's desire to continue with its counsel of choice and the Telephone Company's interest in the attorney-client relationship tilts in Donnelley's favor. The Seventh Circuit has repeatedly made clear that [HN6]deciding a motion to disqualify implicates not only ethical issues, but also a delicate balancing between the privacy of the attorney-client relationship and "the prerogative of a party to proceed with counsel of its choice." *Schiessle, 717 F.2d at 420*. Disqualification is a "drastic measure which courts should hesitate to impose except when absolutely necessary." *Id.*

In this case, these competing considerations require denying the motion. First, the Telephone Company points to no actual harm that will befall it from Jones Day's [*11]   continued representation of Donnelley. There is little probability of a transfer of confidential information. The Columbus, Ohio office of Jones Day represents United Telephone in Ohio on tax matters. The Atlanta, Georgia office of Jones Day represents Donnelley in this court in Illinois on matters arising from alleged breaches of directory agreements. There is no allegation that, in the course of representing United Telephone, the Columbus office of Jones Day obtained confidential information regarding the Telephone Company that may prejudice the Telephone Company's interests in this action. Moreover, we have obtained assurances from the Atlanta Jones Day lawyers involved in this litigation that no confidential information will be transferred to the Columbus Jones Day lawyers involved in the United Telephone matters and vice versa. Each Jones Day law-

yer working on these cases has specifically consented to the jurisdiction of this court in the event any breach of this duty should occur.

The events which are the subject of this suit occurred before the Telephone Company and United Telephone shared even a single officer. The common officers of the Telephone Company and United Telephone [*12] were not involved in the negotiations of the agreements or Sprint Advertising's alleged decision to publish the competing directories. United Telephone is not a party to the agreements. Therefore, the two representations are widely diverse and offer no danger of overlap.

On the other hand, Donnelley will suffer greatly if Jones Day is disqualified. Jones Day has represented Donnelley from this dispute's inception. Donnelley has invested substantial resources in Jones Day's efforts to develop the facts and legal theories Donnelley will need to enforce its contractual rights. Disqualification of Jones Day would harm Donnelley in two ways. First, Donnelley would have to pay another firm to spend numerous hours replicating Jones Day's 3,000 hours of work in this case. Jones Day lawyers have already taken and defended several depositions and anticipate taking approximately 13 more depositions in the next month. Jones Day lawyers have also reviewed and produced over 41,000 pages of documents, as well as having reviewed over 23,000 pages of documents produced by defendants and third parties. Second, Donnelley would risk not having the new firm sufficiently prepared to represent it effectively. [*13] Donnelley claims it will move this court for appropriate equitable relief in the near future. There would be a delay in preparation of this case for final disposition of all claims on the merits should new counsel be required. Donnelley would be put to the burden of finding and retaining competent new counsel and of familiarizing such counsel with the subject matter of the instant litigation.

In balancing the harms, we must also consider the deterrent effect. We believe that granting this motion to disqualify will serve no deterrent effect. Even the most sophisticated conflicts system could not have detected the problem in this case. If Sprint wishes to avoid these situations in the future, it can include in its representation agreements a provision that its law firm not accept representation against any of its affiliates and then regularly provide its law firms with updated lists of its affiliates. Perhaps Sprint should avoid hiring large law firms. It is clear that there is no easy solution to this ever-increasing problem.

*CONCLUSION*

For the foregoing reasons, we deny the motion of defendants, Sprint Publishing & Advertising Inc. and Central Telephone Company of Illinois to [*14] disqualify the law firm of Jones, Day, Reavis & Pogue as counsel of record for plaintiff The Reuben H. Donnelley Corporation.

Wayne R. Andersen

United States District Judge

Dated: February 28, 1996

LEXSEE 1980 OHIO APP LEXIS 13705

**WHITE MOTOR CORPORATION, Plaintiff-appellant v. WHITE CONSOLIDATED INDUSTRIES, INC., Defendant-appellee**

No. 39295

**Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County**

*1980 Ohio App. LEXIS 13705*

**January 10, 1980**

**NOTICE:**

PURSUANT TO RULE 2(G) OF THE OHIO SUPREME COURT RULES FOR THE REPORTING OF OPINIONS, UNPUBLISHED OPINIONS MAY BE CITED SUBJECT TO CERTAIN RESTRAINTS, LIMITATIONS AND EXCEPTIONS.

**PRIOR HISTORY:** [*1] APPEAL FROM COMMON PLEAS COURT, No. 956,771

**SYLLABUS**

*SYLLABUS*

1. In a proceeding in which disqualification of counsel is involved, except when purely legal issues are involved, the determination by the trial court of the appropriate sanction under the established standards of professional conduct will be upset only upon a showing of a clear abuse of discretion.

2. In determining the propriety of conduct of an attorney who accepts employment adverse to a present client, as opposed to a former client, the "substantial relationship" test does not apply.

3. Where a lawyer or law firm accepts employment adverse to a client with whom there is a continuing lawyer-client relationship on an unrelated matter, such conduct is prima facie improper and the burden is upon the lawyer or firm to demonstrate, at the very least, that there will be no actual or apparent conflict in loyalties. ( *Cinema 5, LTD. v. Cinerama, Inc. (2d Cir. 1976), 528 F. 2d 1384*, followed.)

4. The maintenance of public confidence in the integrity of the legal profession and in the administration of justice is of such paramount concern to the bar that any doubt as to the existence of an asserted [*2] conflict of interest should be resolved in favor of disqualification.

5. Regardless of whether one is suing or being sued, if either the plaintiff or defendant retains counsel which, because of the relationship of that counsel to the opposing party, creates an apparent conflict in loyalty which may possibly result in demeaning the legal profession in the eyes of the public, disqualification may be ordered by the court.

6. *Canon 9 of the Code of Professional Responsibility*, which prohibits an attorney from engaging in conduct which creates the appearance of impropriety, is not applicable unless there has been conduct which could be construed to be a violation of an established standard of professional conduct.

7. The right of a client to the undivided loyalty of his attorney may be waived by consent of the client to adverse representation.

8. Where express consent of one corporate client is obtained by counsel to adversely represent another corporate client in merger negotiations between the two corporations, the client seeking to retain the same counsel for further adverse representation in litigation arising out of the merger agreement assumes the burden of demonstrating a clear [*3] and unequivocal waiver of objection by the other corporate client to the further adverse representation.

9. Where it is anticipated or contemplated in pending litigation that a lawyer will be called as a witness on behalf of his client to confirm an issue that is not contested, or called as a witness other than on behalf of his client and the testimony will not prejudice his client, disqualification of the lawyer or his firm will not be required. Disciplinary Rules 5-101(B) and 5-102(A) and (B).

**COUNSEL:** For Plaintiff-Appellant: Richard F. Stevens

For Defendant-Appellee: Leigh B. Trevor, Craig Spangenberg

**JUDGES:** JACKSON, J., STILLMAN, P.J., CORRIGAN, J., CONCUR.

**OPINION BY:** JACKSON

**OPINION**

OPINION

JACKSON, J.

This action was initiated by plaintiff-appellant, White Motor Corporation (hereinafter "Motor") for the alleged breach of a merger agreement by defendant-appellee, White Consolidated Industries, Inc. (hereinafter "Consolidated"). Pursuant to the merger agreement, Motor was to become a subsidiary of Consolidated.

The present appeal is from a judgment overruling a motion by Motor to disqualify Jones, Day, Reavis and Pogue (hereinafter "Jones Day") as counsel for Consolidated in this [*4] litigation. [1] A single assignment of error is presented for our review.

> 1 In a separate decision, this court overruled a motion by appellee Consolidated to dismiss the appeal, holding that the overruling of a motion to disqualify counsel is a final appealable order within the meaning of *R.C. 2505.02. White Motor Corp. v. White Industries* (1978), *60 Ohio App. 2d 82.*

THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION TO DISQUALIFY JONES, DAY, REAVIS & POGUE ("JONES DAY") FROM ACTING AS COUNSEL TO DEFENDANT IN THIS CASE.

In November and December, 1975, Motor and Consolidated entered into negotiations with respect to the merger of the two corporations. As a result of these negotiations, the parties entered into an Agreement and Plan of Reorganization dated December 16, 1975. This agreement was subsequently modified by the inclusion of successive amendments.

During the course of the merger negotiations, Motor was represented by the New York law firm of Hughes, Hubbard and Reed. Consolidated was represented by Jones Day. Both Motor and Consolidated were jointly represented with respect to certain specialized aspects of the merger negotiations by Jones Day and by Squire, [*5] Sanders and Dempsey. With the consent of Motor and Consolidated, Jones Day served both parties solely in connection with antitrust matters relating to the merger, and for the limited purpose of negotiating approval of the merger from the Antitrust Division of the Department of Justice. Aside from the antitrust matters,

Jones Day continued to represent only the interests of Consolidated during the merger negotiations. Antitrust clearance was successfully accomplished on March 18, 1976 when a "No-Action" letter was issued by the U.S. Department of Justice.

On May 3, 1976, Consolidated terminated the merger agreement because of the alleged failure of Motor to meet the financing requirements detailed in Section 5.4.2 (iii) of the final agreement. [2] Motor subsequently filed the present action against Consolidated for breach of the merger agreement, asking for damages of not less than $ 30,000,000.00. Motor retained Baker, Hostetler and Patterson for this litigation and continued its retention of merger counsel, Hughes, Hubbard and Reed, as "of counsel." Consolidated retained Spangenberg, Shibley, Traci and Lancione as trial counsel, and also continued to retain its merger counsel, [*6] Jones Day, as "of counsel."

> 2 A public announcement released by Consolidated respecting its termination of the merger agreement, stated:
>
> "White Consolidated Industries announced today that its Directors by majority vote have decided to terminate the proposed transaction between White Consolidated Industries and White Motor Corporation pursuant to the provisions of the Agreement between the two companies. As previously announced, the transaction was subject to completion of arrangements satisfactory to White Consolidated Industries for financing of White Motor after the transaction. While White Motor's bank and insurance company lenders have cooperated extensively in efforts to make such arrangements, nevertheless a majority of the White Consolidated Industries' Directors determined that the proposed financing did not meet the conditions of the Agreement. In addition, concern was expressed by the Directors at the fact that the Department of Justice has made renewed inquiries with respect to the proposed transaction."

Motor filed a motion to disqualify Jones Day from continuing its representation of Consolidated's interests in this litigation because of Jones Day's continuing [*7] representation of Motor in various pending legal matters unrelated to the present litigation. At the time of the motion to disqualify, Jones Day had been representing Motor in a suit brought by Motor in Minnesota challenging a pension funding charge asserted by that state. Jones Day also previously represented Motor in a tax dispute with the City of Euclid, Ohio. In addition, immediately prior to the merger discussions between Motor and Consolidated, Motor had consulted with Jones Day on various

corporate matters, including its poor financial condition and the possibility of bankruptcy.

Motor contends that the trial court abused its discretion by refusing to disqualify Jones Day from the present litigation, and raises four separate arguments in support thereof.

At the outset, we recognize that in a proceeding involving disqualification of counsel, and except when purely legal issues are involved, the determination by the trial court of the appropriate sanction under the established standards of professional conduct will be upset only upon a showing of a clear abuse of discretion. *Hull v. Celanese Corp.* (2d Cir. 1975), *513 F. 2d 568, 571*; *Kroungold v. Triester* (3d Cir. [*8] 1975), *521 F. 2d 763, 765* (n. 2); *International Business Machines Corp. v. Levin* (3d Cir. 1978), *579 F. 2d 271, 279*.

The first and fourth arguments advanced by appellant, which we shall treat together, state:

I. JONES DAY'S DUTY OF UNDIVIDED LOYALTY TO MOTOR AS A CURRENT CLIENT OF THAT FIRM REQUIRED THE COURT BELOW TO DISQUALIFY IT FROM REPRESENTING MOTOR'S OPPONENT IN THIS LITIGATION.

IV. JONES DAY NEVER ASKED FOR NOR RECEIVED MOTOR'S CONSENT TO REPRESENT WCI [CONSOLIDATED] IN THIS LITIGATION.

Motor argues in the first instance that Jones Day's representation of Consolidated in the present litigation violates its duty of undivided loyalty to Motor under *Canon 5 of the Code of Professional Responsibility.* [3] Motor further argues that the contemporaneous adverse representation of itself and Consolidated by Jones Day creates an appearance of impropriety which is prohibited by Canon 9.

> 3   The American Bar Association's Code of Professional Responsibility was adopted by the Ohio Supreme Court on October 5, 1970. *See 23 Ohio St. 2d 1.* This court recently affirmed the binding nature of the Code upon all Ohio lawyers. *Swanson v. Swanson* (1976), *48 Ohio App. 2d 85, 97.*

[*9]   An examination of federal cases construing the provisions of Canons 5 and 9 [4] discloses general acceptance of the "substantial relationship" test in determining whether a lawyer may accept employment against a *former* client.   That test states that an attorney may not accept employment against a *former* client where there is a "substantial relationship" between the subject matter of a *former* representation and that of the current adverse representation. *See Consolidated Theatres, Inc. v. Warner Bros. Circuit Management Corp.* (2d

Cir. 1954), *216 F. 2d 920*; *Redd v. Shell Oil Co.* (10th Cir. 1975), *518 F. 2d 311*; *Richardson v. Hamilton International Corp.* (3d Cir. 1972), *469 F. 2d 1382, cert. den.* (1973), *411 U.S. 986*; *International Electronics Corp. v. Flanzer* (2d Cir. 1975), *527 F. 2d 1288*. However, where the attorney-client relationship is a *continuing* one, as opposed to a former representation, the burden on the attorney is greater to justify the adverse representation:

> 4   Canon 5 provides:
>
> "A lawyer should exercise independent professional judgment on behalf of a client."
>
> Canon 9 provides:
>
> "A lawyer should avoid even the appearance of professional impropriety."

[*10]   Where the relationship is a continuing one, adverse representation is prima facie improper, (citation omitted), and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation.   (Original emphasis.) *Cinema 5, LTD. v. Cinerama, Inc.* (2d Cir. 1976), *528 F. 2d 1384, 1387*.

The case at bar is not one which represents a suit against a former client.   Rather, the present case concerns adverse representation in litigation of one client against another client.   Therefore, the test enunciated in *Cinema 5* is in our opinion applicable to the instant matter.

The facts of *Cinema 5* are as follows: A lawyer who is a partner in a Buffalo law firm was representing Cinerama in one action, while a New York law firm, of which the lawyer was also a partner, was suing Cinerama on behalf of Cinema 5 in a separate matter.   When the Buffalo firm, upon learning of the situation, offered to withdraw its representation of Cinerama, the offer was refused.   Cinerama then moved that counsel for plaintiff Cinema 5 be disqualified.   The trial court ruled that disqualification was required.   [*11]   The Second Circuit Court of Appeals upheld the disqualification order of the lower court, ruling that it was not an abuse of discretion.   The court reasoned that "there [was] at least the appearance of impropriety where half [the attorney's] time is spent with partners who are defending Cinerama in multi-million dollar litigation, while the other half is spent with partners who are suing Cinerama in a lawsuit of equal substance." *528 F. 2d at 1387*. The court emphasized that "[t]he propriety of this conduct must be measured not so much against the similarities in litigation, as against the *duty of undivided loyalty* which an attorney owes to each of his clients," and that "it would be questionable conduct for an attorney to participate in any *lawsuit* against his own client without the knowledge

and consent of all concerned." (Emphasis added.) *528 F. 2d at 1386. See also Fund of Funds, LTD. v. Arthur Anderson and Co.* (2d Cir. 1977), *567 F. 2d 225; International Business Machines Corp. v. Levin* (3d Cir. 1978), *579 F. 2d 271; Grievance Committee of The Bar of Hartford County v. Rottner* (Conn. 1964), *203 A. 2d 82* (cited in *Cinema 5, LTD. v. Cinerama, Inc., supra,* [*12] *at 1386-1387*).

Ethical Considerations 5-1 and 5-14 of the Code of Professional Responsibility provide additional authority for the view that representing one client against another client in litigation can rarely be justified:

EC 5-1. The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, *the interests of other clients,* nor the desires of third persons should be permitted to dilute his loyalty to his client. (Emphasis added.)

EC 5-14. Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of *or dilute his loyalty to a client.* This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant. (Emphasis added.)

In the case at bar, it is not disputed that there exists dual representation of antagonistic clients by Jones Day. Consolidated argues, however, [*13] that *Cinema 5* is distinguishable from the case at bar on the basis that Jones Day did not sue one client on behalf of another client. Rather, it is argued that since Motor, represented by different counsel, initiated the suit against Consolidated, Motor cannot force the disqualification of Jones Day as defense counsel for Consolidated on the basis of adverse representation of an existing client. Consolidated further maintains that Motor consented to Jones Day representing Consolidated adverse to Motor in the merger negotiations; that Consolidated had the right to continue the services of its existing counsel in the litigation which followed the merger negotiations; and that all Jones Day was required to do under these circumstances was to offer to withdraw as counsel for Motor in the Minnesota Pension case pursuant to Ethical Consideration 5-19, [5] and that such offer was made and refused by Motor.

5 Ethical Consideration 5-19 reads:

A lawyer may represent several clients whose interests are not actually or potentially differing. Nevertheless, he should explain any cir-

cumstances that might cause a client to question his undivided loyalty. Regardless of the belief of a lawyer that he may properly represent multiple clients, he must defer to a client who holds the contrary belief and withdraw from representation of that client.

[*14] In considering the arguments of Consolidated, we recognize the interaction of various factors: the maintenance of public confidence in the integrity of the legal profession and in the administration of justice; the obligation of undivided loyalty by an attorney to his client; and the interest of a litigant in retaining counsel of its choice. We are also cognizant of the dynamics and practical "realities" of modern practice of law in the large corporate law firm, and the difficulty sometimes confronted by such a law firm, often representing diverse corporate interests, to ensure against conflict of interest when there exists legal relationships between its clients. *Cleveland v. The Cleveland Electric Illum. Co.* (N.D. Ohio 1977), *44 F. Supp. 193, 196, aff'd w/o opinion,* (6th Cir. 1977), *573 F. 2d 1310, cert. den.* (1978), *98 S. Ct. 1648; International Business Machines Corp. v. Levin, supra,* at 283.

Nevertheless, while we are mindful not to apply the rules of professional conduct in ignorance of current realities, neither can we ignore the paramount purpose for which the rules were promulgated, *viz.,* "[to maintain] the highest standards of professional conduct [*15] and the scrupulous administration of justice." *Hull v. Celanese Corp., supra,* at 569. *See also Richardson v. Hamilton International Corp.* (3d Cir. 1972), *469 F. 2d 1382, cert. den.* (1973), *411 U.S. 986.* As the district court for the Northern District of Ohio recognized, "[The] obligation [of maintaining public confidence in the bar] stands in contrast to the secondary consideration of ensuring the right of the public to legal counsel of its own choice . . . . " Cleveland v. Cleveland Elec. Illum. Co., supra, at 196. Consequently, we consider irrelevant the distinction drawn by Consolidated between the facts in *Cinema 5* and this case. Regardless of whether one is suing or being sued, if either the plaintiff or defendant chooses counsel which, because of that counsel's relationship to the opposing party, may result in demeaning the profession in the eyes of the public, even by the mere appearance of impropriety, disqualification may be ordered by the court. The paramount concern, as expressed in the Code of Professional Responsibility, is that public confidence in the Bar must reign supreme at all times. *See Schloetter v. Railroc of Indiana, Inc.* (7th Cir. [*16] 1976), *546 F. 2d 706; Kramer v. Scientific Control Corp.* (3d Cir. 1976), *534 F. 2d 1085, 1088-1089; Hull v. Celanese Corp., supra,* at 572; *Richardson v. Hamilton International Corp.* (3d Cir. 1972), *469 F. 2d 1382, 1385-1386, cert. den.* (1973), *411 U.S. 986; Chugach Elec.*

*Ass'n v. U.S. District Court for Dist. of Alaska* (9th Cir. 1967), *370 F. 2d 441*, cert. den., *389 U.S. 820. See also General Electric Co. v. Valeron Corp.* (E.D. Mich. 1977), *428 F. Supp. 68*; *Koehring Co. v. Manitowoc Co.* (E.D. Wis. 1977), *418 F. Supp. 1133.*

We are not persuaded that Consolidated has demonstrated "at the very least, that there will be no actual or *apparent* conflict in loyalties" resulting from the adverse representation by Jones Day of Consolidated against Motor. *Cinema 5, LTD. v. Cinerama, Inc., supra.* The apparent conflict in loyalties is not diminished in the case at bar by the absence of a relationship between the subject matters of the present litigation and the Minnesota Pension case. It is the mere appearance of divided loyalty occasioned by the adverse representation which is injurious to public confidence in the profession and should be avoided. [6] [*17] *See Hull v. Celanese Corp., supra; Emle Industries, Inc. v. Patentex, Inc.* (2d Cir. 1973), *478 F. 2d 562, 575.* As the Court of Appeals stated in *International Business Machines Corp. v. Levin, supra:*

> 6 While Jones Day offered to withdraw as counsel for Motor in the Minnesota Pension case, we believe this unnecessarily places the onus of the adverse representation on Motor in this case. The record discloses the Minnesota Pension litigation was already at a late stage when the present action was commenced. This would have made obtaining new counsel very difficult. *See Cinema 5, LTD., supra.*

An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public . . . The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety. (Citations omitted.) *579 F. 2d at 283.*

Cf. *City of Cleveland v. The Cleveland Elec. Illum. Co., supra,* where the court found the dual representation [*18] to be "non-litigious and inherently non-adverse . . . . " *440 F. Supp. at 198, 207* (n. 8).

Consolidated argues, however, that Motor waived any objection it may have had to the adverse representation when it consented to the adverse representation of Consolidated by Jones Day for all matters, other than antitrust clearance, relating to the merger negotiations. The law is well established that the right of a client to the undivided loyalty of his attorney may be waived. The defense of waiver is based upon the consent of a client to an adverse representation by that client's lawyer. *Cleve-*

*land v. Cleveland Elec. Illum. Co., supra,* at 205 [citing *Marketti v. Fitzsimmons* (W.D. Wis. 1974), *373 F. Supp. 637*; *In re Yarn Processing Patent Validity Litigation* (5th Cir. 1976), *530 F. 2d 83, 89]. See also* Disciplinary Rule 5-105. [7]

> 7 Disciplinary Rule 5-105 provides:
>
> "Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.
>
> "(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).
>
> "(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).
>
> "(C) *In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect on such representation on the exercise of his independent professional judgment on behalf of each.*
>
> "(D) If a lawyer is required to decline employment or to withdraw from employment under DR 5-105, no partner or associate of his or his firm may accept or continue such employment." (Emphasis added.)

[*19] The crux of the consent issue in the case at bar is whether by consenting to adverse representation of Consolidated by Jones Day during the merger negotiations, Motor also consented to adverse representation in the present litigation. Consolidated maintains Jones Day was not required to seek new consent from Motor to participate as its defense counsel in the present action. Motor contends that its consent to Jones Day's representation of Consolidated in the merger negotiations does not extend to the present litigation.

The record is unequivocal on the issue of consent by Motor to the adverse representation of Consolidated by Jones Day in the merger negotiations. John E. Sheehan, former president of Motor, stated in his deposition at page 40:

Q. At the same time did you understand, Mr. Sheehan, that Mr. Holmes would represent the interests of WCI as opposed to Motor on the merger negotiations generally?

A. Holmes made that clear at the outset.

Q. All right. And was that satisfactory to you and to your people?

A. Yes.

The record does not disclose, however, the extent to which this consent was intended.

In *Koehring Co. v. Manitowoc Co., supra,* the plaintiff [*20] Koehring consented to the representation of defendant Manitowoc by plaintiff's former counsel in the pre-litigation settlement phase of the case. There was also evidence presented that plaintiff's consent was limited to that purpose and was not all-inclusive. The district court held that once the movant party establishes that disqualification of counsel is required on the grounds of former representation, "the burden shifts to the party seeking to represent the adverse interest of the prior client to affirmatively show a clear and unequivocal waiver of objection to that representation." *418 F. Supp. at 1138.* The court in *Koehring* concluded that plaintiff's consent to the adverse representation during the settlement negotiations "did not constitute a blanket waiver covering the possibility of litigation." *418 F. Supp. at 1139.* We see no reason why *Koehring* is not equally applicable to cases involving adverse representation of *continuing* clients.

In the present case, the evidence is more equivocal than that in *Koehring* as to the intended extent of Motor's consent to adverse representation. The argument is made that the implication of Motor's consent to the adverse [*21] representation during the merger negotiations necessarily included all potential conflicts arising therefrom, including the possibility of future litigation. Motor, it is argued, was sophisticated enough to be aware of these potential conflicts. *Koehring,* however, requires a "clear and unequivocal waiver," not merely a waiver by implication. Moreover, a number of courts, including the *Koehring* court, have recognized that the public interest involved dictates that any doubt as to the existence of an asserted conflict of interest should be resolved in favor of disqualification. *Koehring Co. v. Manitowoc Co., supra,* at 1138; *Hull v. Celanese, supra,* at 571; *Chugach Elec. Ass'n v. United States District Court, supra,* at 444. We therefore conclude that the failure of Consolidated to rebut at least the apparent conflict in loyalty exhibited by the adverse representation of Consolidated by Jones Day against Motor, and the lack of affirmative evidence disclosing a clear and unequivocal waiver of objection to the adverse representation of Consolidated in the present

litigation, required disqualification of Jones Day under these circumstances as a vindication of the integrity [*22] of the bar. *International Business Machines Corp. v. Levin, supra.* Consequently, we find that the failure of the trial court to order the disqualification of Jones Day constituted an abuse of discretion.

Two additional contentions are raised by appellant Motor in arguments II and III which shall be disposed of separately:

II.    JONES    DAY'S    FORMER    JOINT REPRESENTATION    OF    MOTOR    AND    WCI [CONSOLIDATED] IN A MATTER CLOSELY RELATED TO THE INSTANT LAWSUIT ALSO REQUIRED THE COURT BELOW TO DISQUALIFY JONES    DAY    FROM    REPRESENTING    WCI [CONSOLIDATED] IN THIS LITIGATION.

Motor maintains that Jones Day should be disqualified in the present action, even if Jones Day were not currently representing Motor, because of the appearance of impropriety raised by the previous joint representation of Consolidated and Motor on the antitrust aspects of the proposed merger. We disagree.

Canon 9, which prohibits an attorney from engaging in conduct which creates the appearance of impropriety, is not applicable unless there has been conduct which could be construed to be a violation of an established standard of professional conduct. As the Second Circuit Court of Appeals recognized:

"We caution, [*23] as the Connecticut Bar urges us to do, that Canon 9, though there are occasions when it should be applied, should not be used promiscuously as a convenient tool for disqualification when the facts simply do not fit *within the rubric of other specific ethical and disciplinary rules."* (Emphasis added.) *International Electronics v. Flanzer* (2d Cir. 1975), *527 F. 2d 1288, 1295.*

The Fifth Circuit echoed this view when it stated:

"An overly broad application of Canon 9, then, would ultimately be self-defeating. * * * Surely there can be some objective content to any inquiry into whether 'the appearance of justice [or propriety]' has been compromised in a given case. *Consequently, while Canon 9 does imply that there need be no proof of actual wrongdoing, we conclude that there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur."* Note 12.

"Note 12. We emphasize that an attorney need not be disqualified even where there is a reasonable possibility of improper professional conduct. As we have seen, a court must also find that the likelihood of public suspicion or obloquy outweighs the social interests which will

be [*24] served by a lawyer's continued participation in a particular case. Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied." (Emphasis added.) *Wood v. Covington City Bank* (5th Cir. 1976), *537 F. 2d 804, 813.*

In the case at bar, we find no "identifiable impropriety", *e.g.,* divided loyalty or breach of confidentiality, occurred or had a reasonable possibility of occurring because of the former joint representation. The joint representation of Motor and Consolidated by Jones Day was limited in subject matter to the antitrust aspects of the merger, which is not in issue in this litigation [8] and was entered into with the consent of both parties. *See Consolidated Theatres, Inc., supra.* Consequently, the mere fact of the former joint representation, without more, does not create an appearance of impropriety under Canon 9.

8  *See* discussion, *infra,* under argument "III."

III.  JONES  DAY  SHOULD  HAVE  BEEN DISQUALIFIED UNDER CANON *5 OF THE CODE OF PROFESSIONAL RESPONSIBILITY* FROM ACTING  AS  COUNSEL  FOR  WCI [CONSOLIDATED]  BECAUSE  JONES  DAY LAWYERS WILL PROBABLY BE CALLED AS WITNESSES.

Motor further contends that [*25] because one or more Jones Day lawyers will probably be called to testify at trial regarding the antitrust clearance of the merger, the firm should be disqualified under Canon 5 and Disciplinary Rules 5-101(B) and 5-102(A) and (B). [9]

9  Disciplinary Rule 5-101, "Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment," provides in subsection (B):

"(B) A lawyer *shall not* accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, *except that he may undertake the employment and he or a lawyer in his firm may testify:*

"(1) *If the testimony will relate solely to an uncontested matter.*

"(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

"(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

"(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case." (Emphasis added.)

Disciplinary Rule 5-102, "Withdrawal as Counsel When the Lawyer Becomes a Witness," provides in subsections (A) and (B):

"(A) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness *on behalf of his client,* he *shall withdraw* from the conduct of the trial and his firm, if any, shall not continue representation in the trial, *except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101(B) (1) through (4).*

"(B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness *other than on behalf of his client,* he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.*" (Emphasis added.)

[*26]  We are not persuaded that the probability that several attorneys of Jones Day will be required to testify in this case regarding the antitrust clearance of the merger by the Department of Justice requires the withdrawal of Jones Day.

The rationale behind the proscription against an attorney acting both as an advocate and a witness is contained in Ethical Consideration 5-9:

Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

Nevertheless, the disciplinary rules provide for specific exceptions to the general rule. Thus, if the testimony relates [*27] solely to an uncontested or insignificant matter, or if it is apparent the testimony will not prejudice the attorney's client (if the attorney is called by opposing counsel), withdrawal will not be necessary or

required. *See Freeman v. Kulicke and Soffa Industries, Inc.* (E.D. Pa. 1978), *449 F. Supp. 974, 977*; *Kroungold v. Triester* (3d Cir. 1975), *521 F. 2d 763*.

In the present case the sole defense of Consolidated to the charge of breach of contract is the failure of Motor to meet the financing requirements in Sec. 5.4.2 (iii) of the final merger agreement. Consolidated "freely concedes" that it has no right to terminate the agreement because of any failure on the antitrust conditions detailed in Sec. 5.4.2 (ii). (Appellant's brief, p. 29). Therefore, testimony on the antitrust clearance of the merger, including the significance of "renewed inquiries" by the Justice Department, will likely have no effect on the central issue of the litigation.

As noted by the Third Circuit:

. . . The Special Committee for the Evaluation of Ethical Standards which drafted the Canons and the Disciplinary Rules, stated in its Comment on D.R. 5-102(B) that it "was not designed to permit a [*28] lawyer to call opposing counsel as a witness and thereby disqualify him as counsel." (Footnote omitted.) *Kroungold v. Triester, supra,* at 766.

Consequently, Motor may not force the disqualification of Jones Day merely by calling opposing counsel to confirm in testimony a point that is not contested. Disciplinary Rules 5-101(B)(1) and 5-102(A).

Moreover, the burden rested upon Motor to demonstrate in what respect the testimony of the attorneys from Jones Day will prejudice Consolidated, as required by Disciplinary Rule 5-102(B). *Kroungold v. Triester, supra,* at 766. The record demonstrates that it is highly unlikely that testimony on the antitrust aspects of the merger could prejudice the case of Consolidated in any manner. Therefore, withdrawal of Jones Day was not required under these circumstances.

For the reasons advanced in disposition of appellant's arguments I and IV, we conclude that the trial court abused its discretion in overruling appellant's motion for disqualification and accordingly, reverse the judgment of the trial court and grant judgment to the appellant White Motor Corporation.

JOURNAL ENTRY AND OPINION

JACKSON, J.:

This cause came on to be heard [*29] upon the pleading and the transcript of the evidence and record in the COMMON PLEAS Court, and was argued by counsel; on consideration whereof, the court certifies that in its opinion substantial justice has not been done the party complaining, as shown by the record of the proceedings and judgment under review, and judgment of said COMMON PLEAS Court is reversed. Each assignment of error was reviewed by the court and upon review the following disposition made:

SEE OPINION, JACKSON, J., ATTACHED HERETO AND INCORPORATED BY REFERENCE

No other error appearing in the record, the judgment of the trial court is reversed and judgment is granted to the appellant White Motor Corporation.

It is, therefore, considered that said appellants recover of said appellees costs herein.

It is ordered that a special mandate be sent to said Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to *Rule 27 of the Rules of Appellate Procedure.* Exceptions.

N.B. This entry is made pursuant to the third sentence of *Rule 22(D), Ohio Rules of Appellate Procedure.* This is an announcement of decision (see Rule 26). Ten (10) days from the date [*30] hereof this document will be stamped to indicate journalization, at which time it will become the judgment and order of the court and time period for review will begin to run.