**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RFR HOLDING LLC and | ) | |
| CENTURY 21 CHICAGO, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | No. 08 CV 1555 |
| | ) | |
| v. | ) | Judge Wayne R. Andersen |
| | ) | |
| PONTE GADEA FLORIDA, INC. and | ) | Magistrate Judge Jeffrey Cole |
| CHICAGO MICHIGAN, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
12(b)(6) MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**INTRODUCTION**[1]

Under Century 21 Chicago's contract to purchase the Property at 730 North Michigan Avenue, Plaintiffs had no ability to share confidential information about the Property with anyone, let alone market the Property to another prospective purchaser. Nonetheless, RFR Holding had Ponte Gadea sign a Confidentiality Agreement to share that information with, and market the Property to, Ponte Gadea, and to stop Ponte Gadea, and its affiliates, from talking directly with the Seller . . . *forever*. Under Plaintiffs' view of the Confidentiality Agreement, *even after Century 21 Chicago no longer had a contractual right to purchase the Property*, Plaintiffs still could stop Ponte Gadea from ever talking with the Seller. Plaintiffs' position fails as a matter of logic, equity, and, most importantly for this Motion, law.

---

[1] As in Defendants' 12(b)(6) Motion to Dismiss Plaintiffs' Amended Complaint ("Motion"), "Century 21 Chicago" herein refers to Plaintiff Century 21 Chicago, LLC; "RFR Holding" refers to Plaintiff RFR Holding LLC; "Ponte Gadea" refers to Defendant Ponte Gadea Florida, Inc.; "Chicago Michigan" refers to Defendant Chicago Michigan, LLC; "Seller" refers to 730 North Michigan Avenue, LLC; "Property" refers to the land and improvements at issue located at 730 North Michigan Avenue, Chicago, Illinois; and "Confidentiality Agreement" refers to the letter agreement, dated November 9, 2007, executed by Ponte Gadea at RFR Holding's request, referred to in paragraphs 1, 13-20, 24, 30, 31, 33, 34, 35, 37, 39, 40, 54, 55 and 57 of Plaintiffs' Amended Complaint.

## PLAINTIFFS' THREE-COUNT AMENDED COMPLAINT

### Count I – Breach of the Confidentiality Agreement

Plaintiffs allege that, by contract of sale dated October 12, 2007 ("Original Contract of Sale"), Century 21 Chicago contracted with Seller to purchase the Property at 730 North Michigan Avenue for $350 million. (Am. Compl. ¶ 11). Under that Original Contract of Sale:

> Purchaser [Century 21 Chicago] agrees that *neither Purchaser nor Purchaser's Representatives [RFR Holding] shall, at any time or in any manner either directly or indirectly, divulge, disclose or communicate to any person, entity or association the Information [including, inter alia, "all information and documents in any way relating to the Property, the operation thereof or the sale thereof"]*, .... Without Seller's prior written consent, Purchaser ... *shall not market or offer the Property for sale*.

(*See* Ex. A, Original Contract of Sale, § 4.2.1(b) and (e)) (emphasis added).[2]

Despite the restrictions in the Original Contract of Sale, Century 21 Chicago and RFR Holding immediately began to market the Property to Ponte Gadea. (Am. Compl. ¶¶ 12 ("[a]t the same time"), 14, 15, 50 ("resale of the Property" to Defendants)). "In furtherance of such efforts," Plaintiffs had Ponte Gadea enter into a Confidentiality Agreement on November 9, 2007, which purported to prevent Ponte Gadea and its affiliates from disclosing to any third party any confidential information that they received on the Property, and from discussing the Property with the Seller. (Am. Compl., ¶¶ 13-20; Ex. B, Confidentiality Agreement, ¶ 4).[3] Eleven days later, however, on November 20, 2007, Century 21 Chicago terminated its Original Contract of Sale with the Seller. (Am. Compl. ¶ 23). Plaintiffs allege that *after* that termination – "between November 28, 2007 and December 5, 2007" – Defendants "discussed the Property with Seller."

---

[2]  Although Plaintiffs do not attach to their Amended Complaint the Original Contract of Sale with the Seller, the Court is required to consider the Original Contract of Sale not only because is it referred to in Plaintiffs' Amended Complaint (¶¶ 11-12, 21-23, and 56), but also because it is part and parcel of Plaintiffs' claim. *See, e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). It is not surprising that Plaintiffs did not attach the Original Contract of Sale given that contract prohibited Plaintiffs from entering into the very Confidentiality Agreement that they now are trying to enforce.

[3]  Plaintiffs do not attach the Confidentiality Agreement to their Complaint either, despite bringing a claim for its purported breach. The Court is required to consider this letter agreement as well. *Venture Assocs.*, 987 F.2d at 431.

(Am. Compl. ¶ 30). Plaintiffs claim that these discussions, held after Century 21 Chicago's termination of the Original Contract of Sale, were in breach of the Confidentiality Agreement. (Am. Compl. ¶¶ 23, 30, 31, 35, 39).

### Count II – Tortious Interference with Prospective Economic Advantage

To make out its tortious interference claim, Plaintiffs allege that, notwithstanding Century 21 Chicago's termination of the Original Contract of Sale, Century 21 Chicago continued discussions with the Seller and separately continued discussions with Ponte Gadea. (Am. Compl. ¶¶ 23, 42). Plaintiffs then allege that on or after November 28, 2007, "Century 21 Chicago and the Seller confirmed to one another that they were each confident the sale of the Property to Century 21 Chicago could now be finalized." (Am. Compl. ¶¶ 25-26). Plaintiffs allege that "between November 28, 2007 and December 5, 2007, in a purposeful attempt to interfere with Century 21 Chicago's prospective economic advantage and contractual relationship, [Defendants] discussed the Property with Seller," and that, on the latter date, Seller terminated its discussions with Century 21 Chicago. (Am. Compl. ¶¶ 29, 43).

### Count III – Unjust Enrichment

Finally, Plaintiffs claim that because "Defendants have contended in this action that [the Confidentiality Agreement] was not valid and/or enforceable," they bring an alternative claim for unjust enrichment. (Am. Compl., ¶ 55)[4]. In particular, Plaintiffs seek recovery from Defendants on the basis that Defendants allegedly benefited from Plaintiffs' following efforts: (i) Plaintiffs' negotiations of certain issues with Seller; (ii) Plaintiffs' success in having Seller procure a new lease with a particular tenant with a purportedly more favorable provision; and (iii) Plaintiffs' projections and information concerning the Property. (Am. Compl. ¶ 56). Notwithstanding that

---

[4] The place that Defendants "contended in this action that [the Confidentiality Agreement] was not valid and/or enforceable" was in their motion to dismiss the original Complaint. In the face of that motion, Plaintiffs withdrew their original Complaint and filed their instant Amended Complaint, adding their alternative unjust enrichment claim.

the terms of the Original Contract of Sale with Seller prohibited them from reselling the Property, Plaintiffs claim that they were deprived of the opportunity to "resell[] the Property to Defendants for at least $10,000,000 more than they could have purchased it from Seller." (Am. Compl. ¶ 58).

## APPLICABLE LEGAL STANDARDS

As this Court recently noted, "[a]ddressing a motion to dismiss involves two considerations. First, under the notice pleading requirement of Fed. R. Civ. P. 8(a), this Court must determine whether the Complaint sufficiently provides the defendants with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Alvarado v. Battaglia*, 539 F. Supp. 2d 1022, 1024 (N.D. Ill. 2008) (Andersen, J., presiding) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)). A complaint cannot consist merely of conclusory allegations unsupported by factual assertions and, therefore, "[c]ourts are likewise not required to accept legal conclusions alleged or inferred from the facts pled in the complaint." *Hillman v. City of Chicago*, No. 04 C 6671, 2007 WL 2827797, at *1 (N.D. Ill. Sept. 25, 2007) (Andersen, J., presiding) (Ex. C).

Second, "[i]f the complaint sufficiently provides notice of a claim, the Court must then determine if the allegations therein 'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level."'" *Alvarado*, 539 F. Supp. 2d at 1024 (quoting *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007) (citing *Bell Atlantic*, 127 S. Ct. at 1965, 1973)). "Although this does 'not require heightened fact pleading of specifics,' it does require the complaint to contain 'enough facts to state a claim to relief that is plausible on its face.'" *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Bell Atlantic*, 127 S. Ct. at 1974). The mere recitation of the

4

elements of a cause of action is not sufficient. *Gavin v. AT&T Corp.*, 543 F. Supp. 2d 885, 893 (N.D. Ill. 2008) (citing *Bell Atlantic*, 127 S. Ct. at 1964-65).

Moreover, the Court must consider documents attached to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to [the] claim." *Venture Assocs.*, 987 F.2d at 431; *see also Meer v. Graham*, 524 F. Supp. 2d 1044, 1048 (N.D. Ill. 2007). And, importantly, "if the plaintiff pleads facts that demonstrate that he has no claim, he may plead himself out of court." *Alvarado*, 539 F. Supp. 2d at 1025 (citing *McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006)).

## ARGUMENT

### I.   Count I (Breach Of The Confidentiality Agreement) Fails To State A Claim Upon Which Relief Can Be Granted.

The Confidentiality Agreement contains a choice of law provision selecting New York law. (Ex. B, Confidentiality Agreement, ¶ 9).[5] A Court will dismiss a contract claim, pursuant to Rule 12(b)(6), if the contract is void, unenforceable, or expired, or a party's performance is excused. *See e.g., Jones v. Trump*, Nos. 96 CIV. 2995(SAS), 96 CIV. 6927(SAS), 1997 WL 277375, at *5 (S.D.N.Y. May 27, 1997) (void contracts) (Ex. D); *Kimball Assocs., P.A. v. Homer Central Sch. Dist.*, No. 00-CV-897(HGM)(GJD), 2000 WL 1720751, at *3-5 (N.D.N.Y. Nov. 9, 2000) (expired contract) (Ex. E).

### A.   The Confidentiality Agreement Is Void.

New York law does not permit recovery under contracts where a plaintiff's promises to the defendant necessarily involve a breach of another contract with a third party. *See Reiner v. North Am. Newspaper Alliance*, 181 N.E. 561, 563 (N.Y. 1932) (rejecting plaintiff's claim where, in "utter disregard" of two existing contracts, plaintiff entered into contract with

---

[5] Under New York law, "[a] plaintiff seeking to recover for breach of contract . . . must prove (1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages." *Cohen v. Elephant Wireless, Inc.*, No. 03 Civ. 4058(CBM), 2004 WL 1872421, at *3 (S.D.N.Y. Aug. 19, 2004) (Ex. F).

defendant that would make fulfillment of one existing contract impossible and cause plaintiff to breach the other one); *Woodstock Iron Co. v. Richmond & Danville Extension Co.*, 129 U.S. 643, 656 (1889) (holding where a party to a contract enters into a contract with a third party that violates its first agreement, the second agreement is "a void contract, immoral at its conception, and corrupting in its tendency"); 83 A.L.R. 32 (1933) ("[I]t is established that a contract which has, for an integral part of its consideration, the breach of a prior inconsistent contract between one of the contracting parties and a stranger, is based on an illegal consideration, and is void and unenforceable by either party thereto"). Plaintiffs' efforts to resell the Property to Defendants, including disclosing information about the Property, violated the express prohibition in the Original Contract of Sale between Plaintiffs and Seller. (Ex. A, Original Contract of Sale, § 4.2.1(b) and (e)). This prohibition precludes Plaintiffs' breach of contract claim.

**B.     The Prohibition Against Defendants Discussing
the Property with the Seller Is Void as a Matter of Law.**

Although New York law permits certain competitive restrictions in agreements, "contracts to restrain competition are generally against public policy, illegal and void." *Atkin v. Union Processing Corp.*, 77 A.D.2d 791 (N.Y. App. Div. 1980) (citations omitted). In cases involving competition-restrictive covenants, the court assesses the reasonableness of such covenants by "a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract." *Spherenomics Global Contact Centers v. vCustomer Corp.*, 427 F. Supp. 2d 236, 249 (E.D.N.Y. 2006) (citation omitted). "At issue under such an analysis are the legitimate business interests to be served by the covenant, the reasonableness of the geographic scope and *temporal duration of the restriction*, and the hardship enforcement would impose." *Id.* (emphasis added).

6

Here, the restriction against Defendants "discuss[ing] the Property" with the Seller is void for two reasons. First, it is simply too sweeping. *Mathias v. Jacobs*, 167 F. Supp. 2d 606, 612-613 (S.D.N.Y. 2001) (applying the "simple rule of reason" test to find unenforceable a restriction that barred a party from "speak[ing] to or correspond[ing] or hav[ing] any contact whatsoever with" certain persons and entities that had business dealings with the other party). Second, the unlimited duration of the restriction is per se unreasonable and void. *Spherenomics*, 427 F. Supp. 2d at 249 (the restriction must have a "reasonable[] . . . temporal duration").

## C. The Prohibition Was Expired.

Even if the Court were to allow such a sweeping prohibition and try to assist Plaintiffs by implying some time limit on the restriction,[6] the *only* possible reasonable time limit for restraining Defendants from talking with the Seller would have been for as long as Century 21 Chicago was under contract to buy the Property. The Confidentiality Agreement clearly states that it was executed "[i]n connection with a proposed transaction (the 'Proposed Transaction') involving the purchase of, the lease of, or an acquisition of an interest or investment in, the land and improvements commonly known as 730 North Michigan Avenue, Chicago, IL..." (Ex. B, Confidentiality Agreement, at 1). Plaintiffs concede that they terminated their Original Contract of Sale to buy the Property on November 20, 2007. (Am. Compl. ¶ 23). Any possible "Proposed Transaction," and any prohibition on Defendants from talking to Seller, were premised on the condition that Century 21 Chicago had a contractual right to own the Property. Once Plaintiffs terminated that, any obligation of Defendants, if enforceable at all, expired. *See Kimball Assocs.*, 2000 WL 1720751, at *3-5 (deciding the "temporal limit" of a contract from its other terms and granting Rule 12(b)(6) dismissal when said contract, accordingly, was terminated) (Ex. E).

---

[6] *Austin v. Trybus*, 524 N.Y.S.2d 895, 896 (N.Y. App. Div. 1988) ("[W]here no time is expressed in the agreement for the performance of conditions, there is an implied duty to perform within a reasonable time").

**D.    Defendants' Compliance With the Prohibition Was Excused Once
Plaintiffs No Longer Had a Contractual Right to Buy the Property.**

Finally, for the same reasons that the prohibition against Defendants speaking with the Seller was expired, Defendants' compliance with it was excused.  Any possible "Proposed Transaction" was based on the condition that Century 21 Chicago had a contract to own the Property.  When a change in the situation undermines the purposes of a contract, and, given the "altered circumstances, it is clear that reasonable men would not have made the subject contract, and that the contract has been rendered worthless to [a party]," that party's performance "is excused." *City of New York v. Long Island Airports Limousine Serv. Corp.*, 476 N.Y.S.2d 93, 94 (N.Y. App. Div. 1983) (citation omitted).[7]

**II.    Count II (Tortious Interference) Fails As A Matter Of Law.**

**A.    The Tort-Based Claim Is Duplicative of the
Breach of Contract Claim.**

Plaintiffs' second claim, for tortious interference with prospective economic advantage, is merely their breach of contract claim dressed up in tort clothing.  Both New York and Illinois law bar such a duplicative tort-based claim.[8]

Under New York law, "a tort cause of action does not lie where it is duplicative of a claim sounding in contract:  the plaintiff must assert that the defendant breached a duty

---

[7] *cf. Septembertide Publishing, B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989) (quoting *Callanan v. Powers*, 92 N.E. 747 (N.Y. 1910)) (holding it is a "classic expression of [New York] law" that rescission of a contract is warranted when there is a breach "'so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract'"); *Clanton v. Smith*, 567 N.Y.S.2d 67, 68 (N.Y. App. Div. 1991) (finding defendant's "failure to perform was so fundamental that it defeated the object of the parties in making the contract").

[8] To the extent that the choice of law provision in the Confidentiality Agreement would extend to Plaintiffs' non-contract claims, the Court can look to New York law.  The Court, however, also can look to Illinois law – the law of the forum – because the standards and results are the same.  *See Bonestroo, Rosene, Anderlik & Assocs., Inc. v. Devery*, No. 05 C 2184, 2006 WL 1005284, at * 5 (N.D. Ill. Apr. 12, 2006) ("Fortunately, both states' operative rules of law in this area are the same, so [this Court's] opinion ... will draw on both sources in reaching the same destination.") (Ex. G); *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, No. 97 C 2694, 1999 WL 966477, at * 2 (N.D. Ill. Oct. 1, 1999) (citations omitted) ("The Seventh Circuit has stated that when no conflict between the law exists, the 'false conflict' doctrine applies.  Thus, it is unnecessary for this court to address the choice of law issue....") (Ex. H).

8

independent of the claimed contract." *Maxus Leasing Group, Inc. v. Kobelco Am., Inc.*, No. 5:04-CV-518(FJS/DEP), 2007 WL 655779, at *4 (N.D.N.Y. Feb. 26, 2007) (citation omitted) (Ex. I); *Allerand, LLC v. 233 East 18th St. Co.*, 798 N.Y.S.2d 399, 402 (N.Y. App. Div. 2005) (citation omitted) ("The parties' rights and obligations respecting the matter in dispute are governed by their contract and the purported claim for tortious interference with contract does no more than restate plaintiffs' claim for the contract's breach.").

Likewise under Illinois law, courts bar tort claims when they are intertwined with or duplicative of contract claims. *Chicago Messenger Serv., Inc. v. Nextel Comms., Inc.*, No. 01 C 8820, 2003 WL 22225619, at *10 (N.D. Ill. Sept. 24, 2003) ("Illinois law is true to the distinction between contract claims and tort claims. To the extent that [Plaintiffs'] allegations are, at their core, a claim for breach of contract, then relief is not warranted when simply repackaged as fraud-based claims.") (Ex. J); *Hi-Grade Cleaners, Inc. v. Am. Permac, Inc.*, 561 F. Supp. 643, 644 (N.D. Ill. 1982) ("Basically, we believe that when a defendant is already contractually bound to the plaintiff, his assurance that he will perform in accordance with the contract is simply a reiteration of his original promise. It creates no additional liability in contract, let alone in tort.").

Such duplicative claims are dismissed at the pleading stage. *See e.g., Baguer v. Spanish Broadcasting Sys., Inc.*, No. 04-CV-8393(KMK), 2007 WL 2780390, at *3-4 (S.D.N.Y. Sept. 20, 2007) (dismissing tortious breach of contract claim because "[u]nder New York law, absent a breach of a legal duty independent of the contract itself, a plaintiff has no cause of action in tort for a breach of contract" and because plaintiff failed to establish that defendant owed a duty to plaintiff in tort "separate and apart from its failure to fulfill its contractual obligations") (Ex. K); *U.S. Network Servs., Inc. v. Frontier Comms. of the West, Inc.*, 115 F. Supp. 2d 353, 356 (W.D.N.Y. 2000) (dismissing a misrepresentation claim because "the claim [was] duplicative of

plaintiff's contract and warranty claims, and seeks the same compensatory damages as those claims"); *Daredia v. Gold & Diamond Merch. Group, Inc.*, No. 97 C 8149, 1999 WL 965591, at *4 (N.D. Ill. Sept. 30, 1999) ("These claims must be dismissed because they are either impermissible tort claims or claims which are duplicative of the breach of the contract claim.") (Ex. L); *Hi-Grade Cleaners*, 561 F. Supp. at 644 (dismissing misrepresentation claim as duplicative of contract claim).

That Plaintiffs' tortious interference claim is premised on the same purported breach of the Confidentiality Agreement as Plaintiffs' contract claim is manifestly clear from the face of the Complaint:

> "Specifically, Defendants ***took the confidential information*** provided by Plaintiffs and ***used that information to interfere*** with Plaintiffs' proposed acquisition of the property. In other words, Defendants ***breached their express [Confidentiality] [A]greement with Plaintiffs, misused confidential information,*** went behind Plaintiffs' back, and stole the business opportunity from Plaintiffs."

(Am. Compl. ¶ 1) (emphasis added). Importantly, this breach of contract allegation is incorporated into *both* Plaintiffs' breach of contract claim (Count I) and Plaintiffs' tortious interference claim (Count II). (Am. Compl. ¶¶ 33, 40). And, for both counts, Plaintiffs seek the identical, albeit unsupported, damages "in excess of twenty-five million dollars ($25,000,000)." (Am. Compl. ¶¶ 39, 52, Prayers A and B). *See In re WorldCom, Inc.*, 361 B.R. 697, 719 (Bankr. S.D.N.Y. 2007) (finding that the tortious interference claims were duplicative of Debtors' claims for breach of contract that prevented party from soliciting customers and finding that "even if claims for tortious interference were allowable, recovery for claims under the theory of tortious interference would be duplicative of damages already awarded for breach of contract"); *Rockefeller Univ. v. Tishman Constr. Corp. of N.Y.*, 659 N.Y.S.2d 460, 462 (N.Y. App. Div. 1997) (when "the identical contractual benefit of the bargain recovery is sought," the tort action is barred as duplicative).

The Amended Complaint makes clear that Plaintiffs' tortious interference claim merely restates their breach of contract claim.[9] As stated by this Court in *Alvarado,* "if the plaintiff pleads facts that demonstrate that [its has] no claim, [it] may plead [itself] out of court." 539 F. Supp. 2d at 1025. Such indisputably is the case here. Plaintiffs' tortious interference claim must be dismissed.

### B.    Defendants Could Not Have Interfered with Plaintiffs' Prospective Economic Advantage.

In New York, "[o]nly a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." *Widewaters Prop. Dev. Co. v. Katz*, 836 N.Y.S.2d 746, 749 (N.Y. App. Div. 2007) (quotation omitted). Similarly, under Illinois law, "in order to maintain a cause of action for tortious interference with a contract or prospective contractual relationship, the tortfeasor must be a third party to the contractual relationship." *Quist v. Bd. of Trustees of Comm. College Dist. No. 525*, 629 N.E.2d 807, 811 (Ill. App. Ct. 1994) (citing *IK Corp. v. One Fin. Place Partner*, 558 N.E.2d 161, 172 (Ill. App. Ct. 1990)). The "stranger" analysis extends to third-party beneficiaries, whether or not intended by the contracting parties:

> [T]he exclusion of third-party beneficiaries has been expanded to cover those who benefit from the contract of others *without regard to whether the beneficiary was intended by the contracting parties to be a third-party beneficiary*.

1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th ed. Dec. 2007) (emphasis added) (Ex. M).[10]

---

[9] The ultimate proof that Plaintiffs' tortious interference claim merely duplicates Plaintiffs' contract claim is to ask what – other than the Confidentiality Agreement's prohibition – would have made it improper for Defendants (or any other prospective purchaser) to discuss the Property with the Seller? And what "circumstances under which [the Property information] was conveyed to Defendants" – other than under the Confidentiality Agreement – would have provided Plaintiffs "with the reasonable expectation that such information would be kept confidential"? (Am. Compl., ¶ 41). Clearly, Plaintiffs' tortious interference claim is founded solely upon the Confidentiality Agreement. As such, it is duplicative and must be dismissed.

[10] *See e.g., Sea Crest Constr. Corp. v. City of New York*, 730 N.Y.S.2d 332, 333 (N.Y. App. Div. 2001) (city was intended third party beneficiary of subcontractor's contract); *Disaster Servs., Inc. v. ERC P'ship*, 492 S.E.2d 526, 529 (Ga. Ct. App. 1997) ("Where . . . a defendant had a legitimate interest in either the contract or a party to the

Plaintiffs made Defendants third party beneficiaries of Plaintiffs' relationship with Seller by marketing the Property to them and having Ponte Gadea enter into the Confidentiality Agreement on behalf of itself and its affiliates. (Am. Compl. ¶¶ 1, 12, 50). Any sale to Defendants was conditioned on a sale between the Seller and Plaintiffs. Therefore, Defendants were third-party beneficiaries to the business relations between Plaintiffs and the Seller. They were not strangers, as required, for a tortious interference claim as a matter of law.

### C.    **Plaintiffs Fail to Properly Allege Any Tortious Interference Claim.**

The basic elements of a tortious interference claim are the same under New York and Illinois law. *Republic Tobacco, L.P. v. N. Atlantic Trading Co.*, 254 F. Supp. 2d 1007, 1011 (N.D. Ill. 2003). Thus, to state a cause of action for intentional interference with prospective economic advantage, Plaintiffs must allege: (1) a business relationship between Plaintiffs and the Seller; (2) Defendants' knowledge of that relationship and intentional interference with it; (3) Defendants acted with the sole purpose of harming Plaintiffs or used dishonest, unfair or improper means; and (4) injury to the relationship. *Hutton v. Priddy's Auction Galleries, Inc.*, 275 F. Supp. 2d 428, 433 (S.D.N.Y. 2003) (citing *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108-109 (2d Cir. 1997)); *see also Ali v. Shaw*, 481 F.3d 942, 944 (7th Cir. 2007) (quoting *Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877-78 (Ill. 1991)).

Plaintiffs have not alleged a real expectancy of entering into a future business relationship. To assess this, courts look at the degree of specificity of the proposed agreement between the plaintiff and the third party. *See Corroon & Black Inc. v. Magner*, 494 N.E.2d 785, 794 (Ill. App. Ct. 1986) ("As the degree of enforceability of a business relationship decreases,

---

contract, the defendant is not a stranger to the contract, although the defendant is a 'non-signer of a particular contract[, it is not] a stranger to the contract itself or to the business relationship giving rise thereto and underpinning [the contract.]"); *Lake Tightsqueeze, Inc. v. Chrysler First Fin. Servs. Corp.*, 435 S.E.2d 486, 489 (Ga. Ct. App. 1993) ("Inasmuch as the [defendant] was not a stranger and would benefit from any contracts entered into between the [plaintiffs] and residential purchaser, the [defendant] could not have tortiously interfered with any purchase contracts.")

12

the extent of permissible interference by an outsider increases."). For example, in *Kemmerer v. John D. & Catherine T. MacArthur Foundation*, the defendant showed that a real estate transaction upon which the plaintiff's expectation of the payment of a commission depended never proceeded beyond an offer to negotiate. 594 F. Supp. 121, 122 (N.D. Ill. 1984). Ruling that the plaintiff could not make out a reasonable expectation of the alleged business relationship under Rule 12(b)(6), the court found that the plaintiff did not have any reasonable expectancy of economic gain because there was no firm agreement for the sale of the property, but rather there were "contemplated further negotiations on key provisions." *Id. See also Union Carbide Corp. v. Montell, N.V.*, 944 F. Supp. 1119, 1142 (S.D.N.Y. 1996) (dismissing tortious interference with prospective contractual relationship claim because plaintiff failed to allege a reasonable expectation of a prospective contract).

Here, Plaintiffs allege that, after they terminated the Contract with Seller, they believed the deal was back on track and could be finalized when one tenant's lease was improved. (Am. Compl. ¶ 26). This type of wishful thinking or anticipation of agreeing on a contract is not sufficient. *See Hoopla Sports and Ent., Inc. v. Nike, Inc.*, 947 F. Supp. 347, 358 (N.D. Ill. 1996) (quoting *Anderson v. Vander Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)) ("[M]ere allegations that the plaintiff was involved in the process of negotiations with a third party were insufficient to state a claim. 'The hope of receiving a[n] . . . offer is not a sufficient expectancy.'").

### III.    Unjust Enrichment) Is Not a Viable Theory.[11]

The incredible thing about Plaintiffs' unjust enrichment claim is that Plaintiffs do not claim that the "benefit retained by Defendants to Plaintiffs' detriment" is the purchase of

---

[11]  Under both New York and Illinois law, for an unjust enrichment claim, a plaintiff must allege that: (1) the defendant unjustly retained a benefit to the plaintiffs' detriment and (2) that the defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience. *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); *Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp. 2d 439, 454 (E.D.N.Y. 2007). Plaintiffs here cannot satisfy either prong. Count III should be dismissed.

Property, itself. Plaintiffs' Amended Complaint makes clear that what Plaintiffs feel "cheated" out of is the $10,000,000 profit that they would have made by violating their Original Contract of Sale with Seller and "flipping" the Property to Defendants. (Am. Compl., ¶¶ 56, 58). That is what they seek to recover from this Court under their "equitable" unjust enrichment theory. But that cannot be done.

First, Plaintiffs must show that they had some entitlement to a benefit. *See Cement-Lock v. Gas Tech. Inst.*, 523 F. Supp. 827, 863 (N.D. Ill. 2007); *Sotelo v. DirectRevenue, LLC*, 384 F. Supp. 2d 1219, 1234 (N.D. Ill. 2005); *Gristede's Foods*, 532 F. Supp. 2d at 454. Plaintiffs concede that they terminated their Original Contract of Sale with Seller before any alleged discussions between Seller and Defendants. (Am. Compl. ¶¶ 23, 43, 54.) Plaintiffs had no contract to purchase the Property as of November 20, 2007. So, they had nothing to "flip" to Defendants and no entitlement to their desired $10 million profit.

Moreover, on Plaintiffs' own pleading, Defendants have not retained any benefit that violates fundamental principles of justice, equity, and good conscience. *HPI Health Care*, 545 N.E. 2d at 679; *Gristede's Foods*, 532 F. Supp. 2d at 454. To the contrary, it is Plaintiffs' own conduct – namely Plaintiffs' blatant breach of their own contractual obligations to Seller – that violates these fundamental principles.[12] Thus, Plaintiffs' own actions require dismissal of their unjust enrichment claim in Count III. *See TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 829 (7th Cir. 1998) (upholding dismissal of unjust enrichment claim and stating "[a]n unjust enrichment claim or other equitable relief is denied to a plaintiff whose recklessness caused his claimed injury"); *Kinsey v. Cendant Corp.*, No. 04 Civ. 0582(RWS), 2004 WL 2591946, at *18 (S.D.N.Y. Nov. 16, 2004) (dismissing unjust enrichment claim when the

---

[12] Plaintiffs' obligations under the Original Contract of Sale not to share Property information or market or sell the Property expressly survived termination of that agreement. (Ex. A, Original Contract of Sale, § 4.2.1(h)).

purported benefit was a result of purported misconduct and not a benefit conferred by plaintiff) (Ex. N); *Fandy Corp. v. Chang*, 707 N.Y.S.2d 361 (N.Y. App. Div. 2000) (rejecting unjust enrichment claim when plaintiff was not a good-faith purchaser for value of the property); *Cohn & Berk v. Rothman-Goodman Mgt. Corp.*, 509 N.Y.S.2d 367, 368 (N.Y. App. Div. 1986) (affirming dismissal of claims and barring plaintiff from recovery because he engaged in "inequitable or unconscionable conduct"). Plaintiffs cannot cry foul for their own misconduct … even at the pleading stage.

## CONCLUSION

WHEREFORE, for the reasons set forth above and set forth in the Motion, Defendants Ponte Gadea Florida, Inc. and Chicago Michigan, LLC respectfully request that this Court enter an Order: (a) dismissing Plaintiffs' Amended Complaint in its entirety with prejudice; and (b) awarding Defendants all such other and further relief as this Court deems just and proper.

Dated: July 21, 2008

PONTE GADEA FLORIDA, INC. and
CHICAGO MICHIGAN, LLC

By:    /s/ Rita M. Alliss Powers
       One of Their Attorneys

Rita M. Alliss Powers, Esq.
Howard K. Jeruchimowitz, Esq.
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 2500
Chicago, Illinois 60601
(312) 456-8400

Hillarie Bass, Esq. (admitted *pro hac vice*)
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
CHI 57,334,683v2 7-15-08

# EXHIBIT A

# CONTRACT OF SALE

## WITNESSETH:

THIS CONTRACT OF SALE (this "Agreement") is made and entered into as of the 12th day of October, 2007, by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company having an address c/o J.P. Morgan Investment Management, Inc., 245 Park Avenue, New York, New York 10167 ("Seller") and Century 21 Chicago, LLC, a Delaware limited liability company, having an address at 140 Fulton Street, New York, New York 10038 ("Purchaser").

A. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Agreement, (a) that certain parcel of land more particularly described on Exhibit A attached hereto and made a part hereof (the "Fee Interest"), which together with the Leasehold Interest (as hereinafter defined) is commonly known as 730 North Michigan Avenue, Chicago, Illinois, (b) all right, title and interest of Seller in, to and under the Ground Lease (as hereinafter defined) (the "Leasehold Interest," and together with the Fee Interest, the "Land"), (c) the buildings, improvements, and structures located upon the Land (collectively, the "Improvements"), (d) all other easements and rights appurtenant to the Land, if any (collectively, the "Appurtenant Rights"), (e) all right, title and interest of Seller in, to and under the Leases (as hereinafter defined) and the Contracts (as hereinafter defined), and (f) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property owned by Seller and attached or appurtenant to the Property (collectively, the "Personal Property"); the Land, the Appurtenant Rights, the Improvements, the Leases, the Contracts and the Personal Property, collectively, the "Property").

B. Purchaser acknowledges that the Property is being sold on an "as is" "where is" and "with all faults" basis on the terms and conditions hereinafter set forth.

NOW, THEREFORE, for $10.00 in hand paid and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1. Purchase and Sale. Upon the terms and conditions hereinafter set forth, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Property.

2. Purchase Price. The purchase price (the "Purchase Price") for the Property shall be the sum of ███████████████████.

3. Payment of Purchase Price. The Purchase Price shall be paid to Seller by Purchaser as follows:

3.1 Deposit. Purchaser shall (a) within two (2) Business Days (as hereinafter defined) after the date this Agreement is executed by Seller and Purchaser, deposit with First American Title Insurance Company of New York ("Escrowee"), by wire transfer of immediately available federal funds to an account designated by Escrowee, the sum of ███████████████, (together with all interest thereon, the "Deposit"), which Deposit shall be held by Escrowee pursuant to the escrow agreement (the

SSL-DOCS1 1842326v6

"Escrow Agreement") attached hereto as Exhibit O and hereby made a part hereof. If Purchaser shall fail to deposit the Deposit with Escrowee within two (2) Business Days after the date this Agreement shall be executed by Seller and Purchaser, at Seller's election, this Agreement shall be null, void ab initio and of no force or effect. At Closing, interest accrued on the Deposit as of the Closing Date shall be applied to payment of the Purchase Price.

3.2 Closing Payment. The Purchase Price, as adjusted by the application of the Deposit and by the prorations and credits specified herein, shall be paid by Purchaser, by wire transfer of immediately available federal funds to an account or accounts designated in writing by Seller.

4. Title Matters; Due Diligence Review; Estoppel Certificates; Conditions Precedent.

4.1 Title Matters.

4.1.1 Title to the Property.

(a) As a condition to the Closing, First American Title Insurance Company of New York (the "Title Company") shall have committed to insure Purchaser's ownership of the Fee Interest and the Leasehold Interest in the amount of the Purchase Price by issuance of an ALTA owner's title insurance policy (the "Owner's Policy") and in the standard form issued by the Title Company in the State of Illinois, subject only to the Permitted Exceptions (as hereinafter defined); provided, however, that Purchaser may obtain co-insurance (pursuant to a "me-too" endorsement), as to not more than fifty percent (50%) of such Owner's Policy, from Madison Title Agency.

(b) Purchaser shall order, at its sole cost and expense, within ██████████ following the date hereof, a commitment for an owner's fee title insurance policy or policies with respect to the Property (the "Title Commitment") from the Title Company, and shall cause the Title Company to deliver a copy of the Title Commitment, together with true, legible and complete copies of all instruments giving rise to any defects or exceptions to title to the Property, to Seller's attorneys concurrently with delivery of the Title Commitment to Purchaser or Purchaser's attorneys. If any exception(s) to obtain title insurance appear in the Title Commitment other than the Permitted Exceptions (such exception(s) being herein called, collectively, the "Unpermitted Exceptions"), subject to which Purchaser is unwilling to accept title, and Purchaser shall provide Seller with written notice (the "Title Objection Notice") thereof within ten (10) Business Days after receipt of the Title Commitment by Purchaser's attorneys, Seller, in its sole and absolute discretion, subject to the terms and conditions of this Section 4.1, may undertake to eliminate the same. Purchaser hereby waives any right Purchaser may have to advance, as grounds for Purchaser's refusal to close this transaction, any Unpermitted Exception of which Purchaser does not notify Seller within such ten (10) Business Day period pursuant to the Title Objection Notice (unless (i) such Unpermitted Exception was first raised by the Title Company subsequent to the date of the Title Commitment, and (ii) Purchaser shall notify Seller of the same within five (5) days after the Title Company shall notify Purchaser of such Unpermitted Exception (failure to so notify Seller shall be deemed

2

SSL-DOCS1 1842326v6

conveyed subject to the following exceptions to title (the "Permitted Exceptions"):

4.1.2 Permitted Exceptions to Title. The Property shall be sold and made

(a) any state of facts shown by that certain survey made by National Survey Service, Inc. dated August 24, 2004 (the "Existing Survey") and any other state of facts that a current survey would show prior to the Closing Date, provided that such other facts do not materially adversely affect Purchaser's use of the Property for retail use;

(b) those matters specifically set forth on Exhibit B attached hereto and made a part hereof;

(c) all laws, ordinances, rules and regulations of the United States, the State of Illinois, or any agency, department, commission, bureau or instrumentality of any of the foregoing having jurisdiction over the Property (each, a "Governmental Authority"), as the same may now exist or may be hereafter modified, supplemented or promulgated;

(d) all presently existing and future liens of real estate taxes or assessments and water rates, water meter charges, water frontage charges and sewer taxes, rents and charges, if any, provided that such items are not yet due and payable and are apportioned as provided in this Agreement;

(e) any other matter or thing affecting title to the Property that Purchaser shall have agreed to be deemed to have agreed to waive as an Unpermitted Exception;

(f) all violations of laws, ordinances, orders, requirements or regulations of any Governmental Authority applicable to the Property and existing on the Closing Date (collectively, the "Violations"), whether or not noted in the records of or issued by any Governmental Authority, provided that at Closing, Seller shall provide Purchaser with a credit against the Purchase Price in the amount of any unpaid penalties or fines that have been assessed against the Property as a result of such Violations, which credit shall in no event exceed Two Hundred Thousand Dollars ($200,000); and

(g) all utility easements of record which do not interfere with the present use of the Property;



4.1.3 ▮▮▮▮▮▮▮▮▮▮▮

4.2 Due Diligence Reviews. Except for the provisions of Section 4.1 above, Purchaser shall be governed by the provisions of Section 4.1 above), Purchaser shall have until 5:00 p.m. (Eastern time) on November 2, 2007, TIME BEING OF THE ESSENCE (the period of time

4

---

to be a waiver by Purchaser of its right to raise such Unpermitted Exception as an objection to title or as a ground for Purchaser's refusal to close the transaction contemplated by this Agreement). Notwithstanding anything to the contrary contained in this Agreement, Seller, in its sole discretion, shall have the right to adjourn the Closing for the purpose of curing any Unpermitted Exception noted in the Title Objection Notice for a period not to exceed sixty (60) days (such period of time being herein called the "Extension Period"), provided that Seller shall notify Purchaser, in writing, within ten (10) days after receipt by Seller of the Title Objection Notice, whether or not it will endeavor to eliminate such Unpermitted Exceptions. Notwithstanding anything to the contrary set forth in this Agreement, Seller shall not under any circumstances be required or obligated to cause the cure or removal of any Unpermitted Exception including, without limitation, to bring any action or proceeding to make any payments or otherwise to incur any expense in order to eliminate any Unpermitted Exception or to arrange for title insurance issuing against enforcement of such Unpermitted Exception against, or collection of the same out of, the Property, notwithstanding that Seller may have attempted to do so, or may have obtained an adjournment of the Scheduled Closing Date for such purpose; provided, however, Seller shall (x) satisfy any mortgage or deed of trust placed on the Property by Seller, and (y) in addition to Seller's compliance with Section 7.2.3, cause the removal (by bonding or otherwise) of other monetary liens encumbering the Property in an amount not to exceed One Million Dollars ($1,000,000) in the aggregate.

(c) In the event that Seller is unable, or elects not, to eliminate all Unpermitted Exceptions in accordance with the provisions of this Section 4.1.1, or to arrange for title insurance, without special premium to Purchaser, insuring against enforcement of such Unpermitted Exceptions against or collection of the same out of, the Property, and to convey title to the Property in accordance with the terms of this Agreement on or before the Closing Date (whether or not the Closing is adjourned as provided in Section 4.1.1(b)), Seller shall notify Purchaser that it elects not to remove the same, in which event Purchaser shall have the right, as its sole remedy (upon such election of Seller, by delivery of written notice to Seller within five (5) Business Days following receipt of notice from Seller of its election not to remove such Unpermitted Exceptions, to either (i) terminate this Agreement by written notice delivered to Seller (in which event Escrowee shall return the Deposit to Purchaser and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement), or (ii) accept title to the Property subject to such Unpermitted Exception(s) without an abatement in or credit against the Purchase Price. The failure of Purchaser to deliver timely any written notice of election under this Section 4.1.1(c) shall be conclusively deemed to be an election under clause (ii) above.

(d) If, on the Closing Date, there are any liens or encumbrances that Seller is obligated to discharge under this Agreement, Seller shall have the right (but not the obligation) to either (i) arrange, at Seller's cost and expense, for affirmative title insurance or special endorsements insuring against enforcement of such liens or encumbrances against, or collection of the same out of, the Property, or (ii) use any portion of the Purchase Price to pay and discharge the same, either by way of payment or by alternative manner reasonably satisfactory to the Title Company, and the same shall not be deemed to be Unpermitted Exceptions.

3

commencing upon the date hereof and continuing through and including such time on such date being herein called the "Due Diligence Period") within which to perform and complete all of Purchaser's due diligence examinations, reviews and inspections of all matters pertaining to the purchase of the Property, including all leases and service contracts, and all physical, environmental and compliance matters and conditions respecting the Property (collectively, the "Investigations"), which Investigations shall at all times be subject to Purchaser's compliance with the provisions of this Section 4.2. During the Due Diligence Period, Seller shall provide Purchaser with reasonable access to the Property upon reasonable advance notice and shall also make available to Purchaser, at the offices of Seller and/or the property manager of the Property (or, upon Purchaser's request, by copies delivered by e-mail, facsimile or overnight courier, to the extent reasonably practicable), access to such leases, service contracts, and other contracts and agreements with respect to the Property in Seller's possession as Purchaser shall reasonably request, all upon reasonable advance written notice; provided, however, in no event shall Seller be obligated to make available (1) any document or correspondence pertaining to the Property for sale to prospective purchasers; (4) any internal memoranda, reports or assessments of Seller or Seller's affiliates relating to Seller's valuation of the Property; (5) appraisals of the Property whether prepared internally by Seller or Seller's affiliates or externally; or (6) any documents which Seller considers confidential or proprietary, in its reasonable discretion. Any entry upon the Property and all Investigations shall be made or performed during Seller's normal business hours and at the sole risk and expense of Purchaser, and shall not interfere with the activities on or about the Property of Seller, its tenants and their employees and invitees. Purchaser shall:

(a) promptly repair any damage to the Property resulting from any such Investigations and replace, refill and regrade any holes made in, or excavations of, any portion of the Property used for such Investigations so that the Property shall be in the same condition that it existed in prior to such Investigations;

(b) fully comply with all laws applicable to the Investigations and all other activities undertaken in connection therewith;

(c) permit Seller to have a representative present during all Investigations undertaken hereunder at the Property;

(d) take all actions and implement all protections necessary to assure that the Investigations and the equipment, materials, and substances generated, used or brought onto the Property in connection with the Investigations, pose no threat to the safety or health of persons or the environment, and cause no damage to the Property or other property of Seller or other persons;

(e) furnish to Seller, at no cost or expense to Seller, copies of all surveys, soil test results, engineering, asbestos, environmental and other studies and reports (other than internal analysis and proprietary information of the Purchaser, Purchaser's lender and/or Purchaser's Representatives) relating to the Investigations which Purchaser shall obtain with respect to the Property promptly after Purchaser's receipt of same;

(f) maintain or cause to be maintained, at Purchaser's expense, a policy of commercial general liability insurance, with a broad form contractual liability endorsement and with a combined single limit of not less than $1,000,000 per occurrence for bodily injury and property damage, automobile liability coverage including owned and hired vehicles with a combined single limit of $1,000,000 per occurrence for bodily injury and property damage, and an excess umbrella liability policy for bodily injury and property damage in the amount of $5,000,000, insuring Purchaser, Seller, 730 NMA Holding llc., J.P. Morgan Investment Management Inc. and JPMorgan Chase Bank, N.A., as additional insureds, against any injuries or damage to persons or property that may result from or are related to (i) Purchaser's and/or Purchaser's Representatives' (as hereinafter defined) entry upon the Property, (ii) any Investigations or other activities conducted thereon by Purchaser or any and all other activities undertaken by Purchaser and/or Purchaser's Representatives, all of which insurance shall be on an "occurrence form" and otherwise in such forms acceptable to Seller and with an insurance company acceptable to Seller, and deliver a copy of such insurance policy to Seller prior to the first entry onto the Property;

(g) not permit the Investigations or any other activities undertaken by Purchaser or Purchaser's Representatives to result in any liens, judgments or other encumbrances being filed or recorded against the Property, and Purchaser shall, at its sole cost and expense, immediately discharge of record any such liens or encumbrances that are no filed or recorded (including, without limitation, liens for services, labor or materials furnished); and

(h) Indemnify Seller and any agent, advisor, representative, affiliate, employee, director, partner, member, beneficiary, investor, servant, shareholder, trustee or other person or entity acting on Seller's behalf or affiliated with Seller (collectively, "Seller Related Parties") and hold Seller and Seller Related Parties harmless from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements), suffered or incurred by Seller or any Seller Related Party and arising out of or in connection with (i) Purchaser's and/or Purchaser's Representatives' entry upon the Property in connection with the Investigations, (ii) any Investigations or other activities conducted thereon by Purchaser or Purchaser's Representatives, (iii) any liens or encumbrances filed or recorded against the Property as a consequence of the Investigations and/or (iv) any and all other activities undertaken by Purchaser or Purchaser's Representative with respect to the Investigations. The foregoing indemnity shall not include any claims, demands, causes of action, losses, damages, liabilities, costs or expenses (including, without limitation, attorneys' fees and disbursements) that result solely from the mere discovery, by Purchaser or Purchaser's Representatives, of existing conditions on the Property during Investigations conducted pursuant thereto and in compliance with the terms of this Agreement or any gross negligence or willful misconduct of Seller or Seller Related Parties.

Without limiting the foregoing, in no event shall Purchaser or Purchaser's Representatives, without the prior written consent of Seller: (x) make any intrusive physical testing (environmental, structural or otherwise) at the Property (such as soil borings, water sampling or the like), and/or (y) contact any tenant of the Property, except for confirmatory

tenant interviews; provided, however, that Purchaser shall notify Seller of those tenants which Purchaser desires to interview, Seller or Seller's agent(s) shall schedule such confirmatory tenant interviews, and Seller or Seller's agent(s) shall have the right to be present at the confirmatory tenant interview (Purchaser acknowledges that Purchaser shall have no right to directly notify any tenant of an interview request, and that such interview requests shall be directed to Seller, who shall, or shall direct its agent(s) to, schedule such confirmatory tenant interviews).

The foregoing obligations shall survive the Closing or a termination of this Agreement.

4.2.1   Property Information and Confidentiality.  All Information (as hereinafter defined) provided to Purchaser shall be subject to the following terms and conditions:

(a)   Neither Seller nor any Seller Related Party makes any representation or warranty as to the truth, accuracy or completeness of the Information, or any other studies, documents, reports or other information provided to Purchaser hereunder and expressly disclaims any implied representations as to any matter disclosed or omitted.

(b)   Purchaser agrees that neither Purchaser nor Purchaser's Representatives shall, at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, entity or association the Information, or any other knowledge or information acquired by Purchaser or Purchaser's Representatives from Seller, any Seller Related Party or by Purchaser's own inspections and investigations, other than matters that are in the public domain at the time of receipt by Purchaser or Purchaser's Representatives. Without Seller's prior written consent, Purchaser shall not disclose and Purchaser shall direct Purchaser's Representatives not to disclose to any person, entity or association or any of the terms, conditions or other facts with respect to this Agreement, including, without limitation, the status hereof, and shall not market or offer the Property for sale. Notwithstanding the foregoing, Purchaser may disclose such of the Information and the other reports, studies, documents and other matters generated by it as required by law or court order (provided prior written notice of such disclosure shall be provided to Seller) and (i) as Purchaser deems necessary or desirable to Purchaser's Representatives in connection with Purchaser's investigation and the transaction contemplated hereby, provided that those to whom such Information is disclosed and informed of the confidential nature thereof and agree(s) to keep the same confidential in accordance with the terms and conditions hereof.

(c)   Purchaser shall indemnify and hold harmless Seller and all Seller Related Parties from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) suffered or incurred by Seller or any Seller Related Party and arising out of or in connection with a breach by Purchaser or Purchaser's Representatives of the provisions of this Section 4.2.1.

(d)   Purchaser and Purchaser's Representatives shall use reasonable care to maintain in good condition all of the Information furnished or made available to Purchaser and/or Purchaser's Representatives in accordance with this Section 4.2. In the event

this Agreement is terminated, Purchaser and Purchaser's Representatives shall promptly deliver to Seller all originals and copies of the Information in the possession of Purchaser and Purchaser's Representatives.

(e)   As used in this Agreement, the term "Information" shall mean any of the following: (i) all information and documents in any way relating to the Property, the operation thereof or the sale thereof, including, without limitation, all leases and contracts furnished to, or otherwise made available for review by, Purchaser or its directors, officers, employees, affiliates, partners, members, brokers, agents or other representatives, including, without limitation, attorneys, accountants, accountants, contractors, consultants, engineers and financial advisors (collectively, "Purchaser's Representatives"), by Seller or any Seller Related Party or their agents or representatives, including, without limitation, their contractors, engineers, attorneys, accountants, consultants, brokers or advisors, and (ii) all analyses, compilations, data, studies, reports or other information or documents prepared or obtained by Purchaser or Purchaser's Representatives containing or based on, in whole or in part, the information or documents described in the preceding clause (i), the investigations, or otherwise reflecting their review or investigation of the Property.

(f)   In addition to any other remedies available to Seller, Seller shall have the right to seek equitable relief, including, without limitation, injunctive relief or specific performance, against Purchaser or Purchaser's Representatives in order to enforce the provisions of this Section 4.2.1.

(g)   Notwithstanding any terms or conditions in this Agreement to the contrary, no conditions of confidentiality within the meaning of IRC Sec. 6011 or the Treasury Regulations promulgated under IRC Sec. 6011 are intended, and the parties hereto are expressly authorized to disclose every U.S. federal income tax aspect of any transaction covered by this Agreement with any and all persons, without limitation of any kind.

(h)   The provisions of this Section 4.2.1 shall survive the Closing or a termination of this Agreement.

4.2.2   Termination Right.  If, on or before the expiration of the Due Diligence Period, Purchaser shall determine that it no longer intends to acquire the Property for any reason or no reason, then Purchaser shall promptly notify Seller of such determination in writing on or before 5:00 p.m. (Eastern time) on the date that the Due Diligence Period shall expire (such notice being herein called the "Termination Notice"), whereupon the Deposit shall be promptly returned to Purchaser, and this Agreement and the obligations of the parties hereunder shall terminate (and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement). In the event that Purchaser shall fail to deliver the Termination Notice to Seller on or before 5:00 p.m. (Eastern time) on the date that the Due Diligence Period shall expire, TIME BEING OF THE ESSENCE, Purchaser shall be deemed to have agreed that it intends to proceed with the acquisition of the Property without a reduction in, or an abatement in or credit against, the Purchase Price (and, thereafter, Purchaser shall have no further right to terminate this Agreement pursuant to this Section 4.2.2).

4.3 **Tenant Estoppel Certificates.** (a) Receipt of estoppel certificates (each, a "Tenant Estoppel Certificate", and collectively, the "Tenant Estoppel Certificates") dated not sooner than the date hereof from the tenants identified on Exhibit C attached hereto and made a part hereof (collectively, the "Required Tenants"), shall be a condition precedent to Purchaser's obligation to purchase the Property hereunder. Seller shall use commercially reasonable efforts to include (and, as used in this Agreement, commercially reasonable efforts shall not be deemed to include any obligation to institute legal proceedings, deliver notices of default or to expend any monies in excess of the de minimus amounts customarily expended by landlords in connection with obtaining tenant estoppel certificate(s)) to obtain such Tenant Estoppel Certificates, which certificates shall be substantially in the form attached hereto and made a part hereof as Exhibit D (or if Seller, after attempting to obtain certificates in such form, is unable to obtain the same, then in the form, if any, prescribed in the applicable lease or other operative document).

(b) Seller agrees to use commercially reasonable efforts to obtain Tenant Estoppel Certificates from all tenants at the Property other than the Required Tenants (the "Remaining Tenants"). Purchaser acknowledges that receipt of Tenant Estoppels from one or all of the Remaining Estoppels shall not be a condition precedent to Purchaser's obligation to close hereunder.

4.4 **Ground Lease Estoppel.** Receipt of an estoppel certificate substantially in the form of Exhibit F annexed hereto and made a part hereof (the "Ground Lease Estoppel Certificate"), executed by the Ground Lessor (as hereinafter defined), shall be a condition precedent to Purchaser's obligation to close hereunder. Seller shall use commercially reasonable efforts (and, as used in this Section, commercially reasonable efforts shall not be deemed to include any obligation to institute legal proceedings, deliver notices of default or to expend any monies in excess of de minimus amounts) to obtain such Ground Lease Estoppel Certificate.

4.5 **EOA Estoppel Certificate.** Receipt of an estoppel certificate substantially in the form of Exhibit G annexed hereto and made a part hereof (the "EOA Estoppel Certificate"), executed by Peninsula Chicago LLC, shall be a condition precedent to Purchaser's obligation to close hereunder. Seller shall use commercially reasonable efforts to obtain EOA Estoppel Certificate.

4.6 **Peninsula Sublease Estoppel Certificate.** Receipt of an estoppel certificate substantially in the form of Exhibit H annexed hereto and made a part hereof (the "Sublease Estoppel Certificate"), executed by Peninsula Chicago LLC, shall be a condition precedent to Purchaser's obligation to close hereunder. Seller shall use commercially reasonable efforts to obtain such Sublease Estoppel Certificate.

4.7 **Conditions Regarding Estoppel Certificates.** Seller shall deliver to Purchaser estoppel certificates required to be delivered pursuant to this Article 4 (collectively, "Estoppel Certificates") promptly following Seller's receipt thereof, and it shall be a condition to Purchaser's obligation to close hereunder that each Required Tenant, the Ground Lessor and the Required Tenants, the Ground Lease Estoppel Certificate, the EOA Estoppel Certificate and the Sublease Estoppel Certificate be delivered "clean" (the "Estoppel Condition"). For the purposes of this Agreement, an Estoppel Certificate shall be deemed "clean" if it (x) complies with the

9

requirements set forth in this Article 4 with respect to the date and form thereof, and (y) does not allege any material default or material claim under the document pursuant to which such Estoppel Certificate was delivered and (z) does not materially contradict the terms set forth in such subject document. Seller shall have the right to adjourn the Closing Date one or more times in order to satisfy the Estoppel Condition.

4.8 **Pottery Barn Termination; Comp USA Termination; Victoria's Secret Lease.** (a) Purchaser acknowledges that Seller has entered into a termination agreement with Pottery Barn (the "Pottery Barn Termination") terminating the Pottery Barn lease and providing for a lease termination date of June 30, 2008. A true and correct copy of the Pottery Barn Termination is annexed hereto as Exhibit X.

(b) As a condition to Purchaser's obligation to close hereunder, Seller shall have entered into a termination agreement with Comp USA (the "Comp USA Termination") terminating the Comp USA lease and providing for (i) a termination date prior to Closing, and (ii) monthly payments by Comp USA in the amount of $190,000 covering a period commencing on the month the lease termination date and terminating in December, 2008.

(c) [redacted] ... Seller shall have entered into a new lease with [redacted] or its affiliate (the "Victoria's Secret Lease"), substantially in accordance with the terms of that certain Letter of Intent dated August 20, 2007, a copy of which is annexed hereto as Exhibit [redacted] covering space currently leased to Pottery Barn. [redacted] commercially reasonable provisions substantially consistent with [redacted] with the retail space currently at the Property. Seller shall promptly submit to Purchaser copies of any markups of or comments to the draft Lease that it receives from Victoria's Secret. Seller shall deliver [redacted] (marked to show changes from the prior agreement delivered to Purchaser) promptly following distribution of such redrafts to Victoria's Secret. Seller shall have the right, in its sole and [redacted]

4.9 **SNDA; Financing.** Promptly following Purchaser's request, Seller shall deliver subordination, non-disturbance and attornment agreements (each, an "SNDA") to Tenants as requested by Purchaser, provided that Seller shall have no obligation to obtain the execution of same by any Tenant. Purchaser shall have the right to communicate directly with Tenants with respect to the negotiation of such SNDAs. Purchaser acknowledges and agrees that neither the execution of an SNDA by any Tenant nor Purchaser's receipt of financing for the purchase contemplated pursuant to this Agreement is a condition to Purchaser's obligation to close hereunder.

4.10 **Conditions Precedent to Obligations of Purchaser.** The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the performance and observance by Seller of all covenants, warranties and agreements of this Agreement to be performed or observed by Seller prior to or on the Closing Date and the

10

SSL-DOCS1 1842316/6

fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Purchaser specifically enumerated in this Agreement, any or all of which may be waived by Purchaser in its sole discretion.

4.11 Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement shall be subject to the performance and observance by Purchaser prior to or on the Closing Date and the fulfillment on or before the Closing Date of all other conditions precedent to Closing benefiting Seller specifically set forth in this Agreement, any or all of which may be waived by Seller in its sole discretion.

5. Closing. The closing (the "Closing") of the sale and purchase contemplated herein shall occur at 10:00 a.m. on or before December 17, 2007 (the "Scheduled Closing Date"). TIME BEING OF THE ESSENCE with respect to Purchaser's obligation to close on such date, at the offices of Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York, or at the offices of Purchaser's lender, if located in New York County, or, if agreed to by all parties hereto, through escrow with the Title Company (the date on which the Closing shall occur being herein referred to as the "Closing Date"). The Closing shall constitute approval by each party of all matters to which such party has a right of approval and a waiver of all conditions precedent.

5.1 Seller Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser the following items executed and acknowledged by Seller, as appropriate

(a) a deed (the "Deed") in the form attached hereto and made a part hereof as Exhibit I.

(b) an assignment (the "Assignment and Assumption of Leases") of all right, title and interest of Seller under the Leases (to the extent assignable) which are in effect on the Closing Date, without recourse, representation or warranty, in the form attached hereto and made a part hereof as Exhibit J, which shall include Purchaser's assumption of Seller's obligations under the Leases accruing from and after the Closing Date.

(c) a bill of sale (the "Bill of Sale") in the form attached hereto and made a part hereof as Exhibit K.

(d) a certification of non-foreign status in the form attached hereto and made a part hereof as Exhibit L.

(e) an assignment (the "Assignment and Assumption of Contracts") of all right, title and interest of Seller under the Contracts (to the extent assignable) which are in effect on the Closing Date and to which Seller is a party, without recourse, representation or warranty, in the form attached hereto and made a part hereof as Exhibit M, which shall include Purchaser's assumption of Seller's obligations under the Contracts accruing from and after the Closing Date.

11

---

Lease") of all right, title and interest of Seller under the Ground Leases, without recourse, representation or warranty, in the form attached hereto and made a part hereof as Exhibit N, which shall include Purchaser's assumption of Seller's obligations under the Ground Lease accruing from and after the Closing Date.

(g) all existing surveys, blueprints, drawings, plans and specifications for or with respect to the Property or any part thereof, to the extent the same are in Seller's possession.

(h) all keys to the Improvements, to the extent the same are in Seller's possession.

(i) Original counterparts of all Leases in effect on the Closing Date, together with files containing the documentation relating to such Leases, to the extent the same are in Seller's possession, and if such original Leases are not in Seller's possession, then copies of the Leases.

(j) all Contracts that shall remain in effect after the Closing, to the extent the same are in Seller's possession.

(k) all applicable transfer tax forms, if any.

(l) such further instruments as may be necessary to record the Deed.

(m) notices to each of the tenants under the Leases (each, a "Tenant Notice", and collectively, the "Tenant Notices") in the form attached hereto and made a part hereof as Exhibit P advising such tenants of the sale of the Property to Purchaser and directing them to make all payments to Purchaser or its designee, which Tenant Notices Purchaser shall, at Purchaser's sole cost and expense, either mail by certified mail return receipt requested or hand-deliver to each applicable tenant.

(n) evidence reasonably satisfactory to the Title Company respecting the due organization of Seller and the due authorization and execution by Seller of this Agreement and the documents required to be delivered hereunder.

(o) a certificate (the "Update") of Seller dated as of the Closing Date certifying that the representations and warranties of Seller set forth in Section 7.11 of this Agreement (collectively, the "Closing Date Representations") remain true and correct in all material respects as of the Closing Date, it being agreed that if any Closing Date Representation shall no longer be true and correct in any material respect due to a change in the facts or circumstances which do not otherwise constitute a default of Seller pursuant to the express terms of this Agreement and Seller is unable to deliver the Update, the failure of Seller to deliver the Update shall constitute a failure of a condition to Closing and shall not constitute a default by Seller under this Agreement, and Purchaser's sole remedy in connection therewith shall be to terminate this Agreement by written notice to Seller (in which event the Deposit shall be

SSL-DOCS1 1842316/6

12

returned to Purchaser and neither party hereto shall have any further obligations under this Agreement except under those provisions of this Agreement that expressly survive a termination of this Agreement.

(p) an Owner's affidavit, substantially in the form of Exhibit W annexed hereto and made a part hereof.

(q) original counterparts of all Estoppel Certificates received by Seller.

(r) originals or, if originals are unavailable, copies of any permits and licenses relating to the ownership, use or operation of the Premises, to the extent same are in Seller's possession.

5.2   Purchaser Deliveries. At the Closing, Purchaser shall deliver or cause to be delivered to Seller, the following items executed and acknowledged by Purchaser, as appropriate:

(a) payment of the Purchase Price to be made in accordance with Section 3 above.

(b) the Assignment and Assumption of Leases.

(c) the Assignment and Assumption of Contracts.

(d) all applicable transfer tax forms, if any.

(e) such further instruments as may be necessary to record the Deed.

(f) the Tenant Notices.

(g) evidence reasonably satisfactory to Seller and the Title Company respecting the due organization of Purchaser and the due authorization and execution by Purchaser of this Agreement and the documents required to be delivered hereunder.

(h) subject to Section 10.21, the Replacement Ground Lease Guaranty (as hereinafter defined).

(i) subject to Section 10.21, the Release of Guaranty (as hereinafter defined).

5.3   Closing Costs. Seller shall pay (x) all transfer taxes, including transfer taxes of the State of Illinois and of Cook County, payable in connection with the transaction contemplated herein, (y) all recording charges payable in connection with Seller's cure of any Unpermitted Exceptions pursuant to Section 4.1.1 hereof, and (z) one-half (1/2) of the costs of Escrows. Purchaser shall pay (a) the title insurance premium for the Owner's Policy, (b) the cost of any title endorsements and affirmative insurance required by Purchaser, (c) the costs of any survey (or an update thereto), (d) all recording charges payable in connection with the

13

recording of the Deed, (e) the one-half of the costs of Escrows, (f) the City of Chicago transfer tax applicable to the transaction contemplated herein, and (g) all fees, costs or expenses in connection with Purchaser's due diligence reviews hereunder. Any other closing costs shall be allocated in accordance with local custom. Except as expressly provided in the indemnities set forth in this Agreement, Seller and Purchaser shall pay their respective legal, consulting and other professional fees and expenses incurred in connection with this Agreement and the transaction contemplated hereby and their respective shares of prorations as hereinafter provided. The provisions of this Section 5.3 shall survive the Closing or a termination of this Agreement.

5.4   Prorations.

5.4.1   The following shall be prorated between Seller and Purchaser as of 11:59 of the day immediately preceding the Closing Date (on the basis of the actual number of days elapsed over the applicable period):

(a) All real estate taxes, water charges, sewer rents, vault charges and assessments on the Property on the basis of the tax bill for fiscal year 2006 (payable in 2007). In no event shall Seller be charged with or be responsible for any increase in the taxes on the Property resulting from the sale of the Property or from any improvements made or leases entered into on or after the Closing Date. If any assessments on the Property are payable in installments, then the installment for the current period shall be prorated (with Purchaser assuming the obligation to pay any installments due after the Closing Date).

(b) Subject to this Section 5.4.1(b), all fixed rent and regularly scheduled items of additional rent under the Leases, and other tenant charges, including without limitation any payment received from Comp USA pursuant to the Comp USA Termination, if, as and when received. Seller shall deliver or provide a credit in an amount equal to all prepaid rentals for periods after the Closing Date and all refundable cash security deposits (to the extent the foregoing were made by tenants under the Leases and are not applied or forfeited prior to the Closing Date, in accordance with the provisions of the applicable Lease) to Purchaser on the Closing Date. Seller shall deliver to Purchaser any tenant security deposits which are held in the form of letters of credit. Items which as of the Closing Date shall not be prorated on the Closing Date. Purchaser shall include such delinquencies in its normal billing and shall diligently pursue the collection thereof in good faith after the Closing Date (but Purchaser shall not be required to litigate or declare a default in any Lease). To the extent Purchaser receives rents on or after the Closing Date, such payments shall be applied first toward the rents for the month in which the Closing occurs, second to the rents for the month preceding the month in which the Closing occurs, third to the rents that shall then be due and payable to Purchaser, and fourth, to any delinquent rents owed to Seller, with Seller's share thereof being held by Purchaser in trust for Seller and promptly delivered to Seller by Purchaser. Purchaser may not waive any delinquent rents nor modify a Lease so as to reduce or otherwise affect amounts owed thereunder for any period in which Seller is entitled to receive a share of charges or amounts without first obtaining Seller's written consent, which consent may be given or withheld in Seller's sole and absolute discretion. Seller hereby reserves the right to pursue any remedy against any tenant owing delinquent rents and any other amounts to Seller (but shall not be entitled to terminate any lease or any tenant's right to possession), which right shall include

14

the right to continue or commence legal actions or proceedings against any tenant. Delivery of the Assignment and Assumption of Leases shall not constitute a waiver by Seller of such right, and such right shall survive the Closing. Purchaser shall reasonably cooperate with Seller in any collection efforts hereunder (but shall not be required to litigate or or declare a default under any Lease). With respect to delinquent rents and any other amounts or other rights of any kind respecting tenants who are no longer tenants of the Property as of the Closing Date, Seller shall retain all rights relating thereto.

(iii)    All operating expenses.

(d)    Value of building supplies stored at the Property, at Seller's cost, including any taxes, on the basis of a statement from Seller's supplier.

(e)    Charges and payments under Contracts or permitted renewals or replacements thereof assigned to Purchaser pursuant to the Assignment and Assumption of Contracts.

(f)    Any prepaid items, including, without limitation, fees for licenses which are transferred to Purchaser at the Closing and annual permit and inspection fees.

(g)    Utilities, including, without limitation, telephone, steam, electricity and gas, on the basis of the most recently issued bills therefor, subject to adjustment after the Closing when the next bills are available, or if current meter readings are available, on the basis of such readings.

(h)    Deposits with telephone and other utility companies, and any other persons or entities who supply goods or services in connection with the Property if the same are assigned to Purchaser at the Closing, which shall be credited in their entirety to Seller.

(i)    Personal property taxes, if any, on the basis of the fiscal year for which assessed.

(j)    Permitted administrative charges, if any, on those tenants' security deposits transferred by Seller pursuant to the Assignment and Assumption of Leases.

(k)    Taxes payable by Seller relating to operations of the Property, including, without limitation, business and occupancy taxes and sales taxes, if any.

(l)    Rent under that certain Agreement of Lease dated May 10, 1994 by and between Robert I. Stern, as the original lessor, and American National Bank and Trust Company, as trustee under Trust Agreement dated April 20, 1994 and known as Trust No. 118199-01, as the original lessee, as amended by that certain First Amendment to Lease by and among Adele Hillman Stern, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert I. Stern Charitable Remainder Unitrust, Chicago and Rush Joint Venture, and Adele Hillman Stern, as Successor Trustee of Trust dated April 29, 1999 and

known as the AHS Trust (collectively, the "Ground Lessor") and Property Owner (the Ground Lease").

(m)    Such other items as are customarily apportioned between sellers and purchasers of real properties of a type similar to the Property and located in the State of Illinois subject to Section 7.2.3(a) hereof.

5.4.2

(a)    If any of the items described in Section 5.4.1 hereof cannot be apportioned at the Closing because of the unavailability of information as to the amounts which are to be apportioned or otherwise, or are incorrectly apportioned at Closing or subsequent thereto, such items shall be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing Date or the date such error is discovered, as applicable; provided that (i) with the exception of any item required to be apportioned pursuant to Section 5.4.1(a), (b), (c) or (g), neither party shall have the right to request apportionment or reapportionment of any such item at any time following the one hundred eightieth (180th) day after the Closing Date, (ii) with respect to any item required to be apportioned pursuant to Section 5.4.1(a), neither party shall have the right to request reapportionment of any such item at any time following the Closing Date, and (iii) with respect to the items required to be apportioned pursuant to Section 5.4.1(b), (c), or (g), neither party shall have the right to request apportionment or reapportionment of any such item at any time following the one (1) year anniversary of the Closing Date.

(b)    In the event that the Leases require the reconciliation of additional rent "pass-throughs" to the landlord for common area maintenance charges, real estate taxes or other operating expenses, Purchaser shall perform all of the obligations of the landlord under the Leases with respect to such reconciliations for the year of Closing as and when required by the terms of the Leases and provide Seller with the results of such reconciliations simultaneously with Purchaser's delivery thereof to the appropriate tenants no later than March 31st of the calendar year succeeding the Closing Date. If such results reflect the underpayment of additional rent by tenants of the Property for the year of Closing, Purchaser shall bill the appropriate prorata share of such amounts to such tenants in accordance with the terms of their Leases and remit to Seller its prorata share of such amounts within thirty (30) days of Purchaser's collection of the same. If such results reflect the overpayment of additional rent by tenants of the Property for the year of Closing, Purchaser shall deliver to Seller an invoice from Purchaser together with evidence reasonably satisfactory to Seller indicating that such sums are due to such tenants. Seller shall pay Purchaser Seller's prorata share of the amounts due to such tenants within thirty (30) days of Purchaser's demand, provided that Seller shall have no obligation to reimburse Purchaser for any sums not invoiced on or before December 31st of the calendar year succeeding the Closing date. The provisions of this Section 5.4.2(b) shall survive the Closing.

5.4.3    Items to be prorated at the Closing shall include a credit to Seller for costs and expenses incurred by Seller in connection with any new Leases or modifications to any existing Leases entered into after the date hereof and for which Seller is permitted to enter into in accordance with the terms and conditions set forth in Section 7.2.3(a) of this Agreement.

Million Eighty-Seven Thousand Five Hundred Dollars ($2,087,570), representing a portion of Purchaser's brokerage fees in connection with this Agreement. Purchaser acknowledges and agrees that (a) this sum is the sole credit Purchaser shall receive in connection with brokerage fees and (b) no third party, including, without limitation, Purchaser's Broker (as hereinafter defined), shall have any claim against Seller in connection with this credit or be a third party beneficiary of this credit.

5.4.7    The provisions of this Section 5.4 shall survive the Closing.

6.    Condemnation or Destruction of Property. In the event that, after the date hereof but prior to the Closing Date, either any portion of the Property is taken pursuant to eminent domain proceedings (or Seller receives written notice that eminent domain proceedings have been commenced or condemnation or any of the improvements on the Property are damaged or destroyed by fire or other casualty, Seller shall promptly deliver or cause to be delivered, to Purchaser, notice of any such eminent domain proceedings or casualty. Except as otherwise expressly provided herein, Seller shall have no obligation to restore, repair or replace any portion of the Property or any such damage or destruction by fire or other casualty, provided that Seller shall exercise reasonable efforts to commence the repair and restoration of any fire or other casualty damage to the Property which Seller is required to maintain insurance against hereunder not entitling Purchaser to terminate this Agreement. In no event shall Seller be obligated to commence such repair or restoration (other than temporary repairs properly made by a prudent real estate investor) until settlement of all insurance claims. Seller shall, at the Closing, assign to Purchaser all of Seller's interest in all awards or other proceeds for such taking by eminent domain or condemnation or the proceeds of any insurance collected by Seller for such damage or destruction (unless Seller shall have repaired such damage or destruction prior to the Closing and except to the extent any such awards, proceeds or insurance are attributable to lost rents or items applicable to any period prior to the Closing), less the amount of all reasonable costs incurred by Seller in connection with the repair of such damage or destruction [or reasonable collection costs of Seller respecting any awards or other proceeds for such taking by eminent domain or condemnation or any uncollected insurance proceeds which Seller may be entitled to receive from such damage or destruction, as applicable. In connection with any assignment of awards, proceeds or insurance hereunder, Seller shall credit Purchaser with an amount equal to the applicable deductible amount under Seller's insurance (but not more than the amount by which the cost, as of the Closing Date, to repair the damage is greater than the amount of insurance proceeds assigned to Purchaser) and Seller shall not compromise or settle any claims with respect to such proceeds without Purchaser's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, if either (i) the amount of the damage (as determined by an independent third party contractor or engineer selected by Seller and reasonably approved by Purchaser) or the amount of condemnation award shall exceed the sum of Twenty Million Dollars ($20,000,000) or (ii) such casualty or condemnation is of a character which permits any of Banana Republic, LLC, Polo Illinois, LLC, Tiffany and Company or Victoria's Secret to terminate its Lease, then in either case, Purchaser shall have the right to terminate this Agreement by notice to Seller given within ten (10) days after notification to Purchaser of the estimated amount of damages or the determination of the amount of any

18

SSL-DOCS1 1842283v46

---

Seller shall be responsible for all brokerage and leasing commissions and tenant improvement costs for the initial term of all Leases entered into prior to the date of this Agreement and for any execution, renewal or expansion of any such Leases exercised prior to the date of this Agreement, provided in all such instances, the term of such Lease, extension, renewal or expansion and the regularly scheduled payment of rent commences prior to the date of this Agreement (collectively, "Seller Leasing Costs"). Purchaser shall be responsible for and expressly assume the obligation to pay all brokerage and leasing commissions payable to third parties unaffiliated with Seller, provided the same are at commercially reasonable rates, and to pay tenant improvement costs and other costs and expenses including attorney's fees for any new leases entered into from and after the date of this Agreement and any extension, renewal or expansion of any existing Lease exercised or entered into from and after the date of this Agreement (other than the Seller's Leasing Costs) in connection with the Victoria's Secret Lease and any expenses incurred by Seller in connection with the Pottery Barn Termination and the Comp USA Termination) including, without limitation, amounts owed under the Brokerage Agreements, provided in all such instances, that (i) Seller is permitted under this Agreement to enter into such new lease or such extension, renewal or expansion of such existing Lease, and (ii) the term of such Lease, extension, or expansion or the regularly scheduled payment of rent commences from and after the date of this Agreement (collectively, "Purchaser Leasing Costs"). If at the Closing Seller has paid any Purchaser Leasing Costs, the provisions at the Closing shall include an appropriate credit to Seller. If at the Closing there remain unpaid Seller Leasing Costs, Purchaser shall expressly assume the responsibility to pay such unpaid Seller Leasing Costs, and the prorations at the Closing shall include an appropriate credit to Purchaser.

5.4.4    Purchaser shall be given a credit at the Closing in the amount of Sixteen Million Dollars ($16,000,000), representing the cost of acquisition of the Ground Lease, assuming the option to purchase the Ground Lessor's interest in the Ground Lease or the right of first refusal, as set forth in Sections 22 and 23 of the Ground Lease would be exercised. This amount shall be the sole credit Purchaser receives in connection with said option or any other right to purchase the Ground Lessor's interest in the Ground Lease, whether or not such option or rights are exercised.

[redacted] Purchaser shall be given a credit at the Closing in the amount of ▮▮▮▮▮▮ Dollars (▮▮▮▮▮▮▮▮), a tenant improvement allowance, and a rent credit in connection with the Victoria's Secret Lease. Prior to the Closing, Seller shall pay 50% of the ▮▮▮▮▮ portion of the leasing brokerage fee payable in connection with the Victoria's Secret Lease ("Seller's Leasing Fee"). Purchaser expressly assumes the responsibility in connection with the Victoria's Secret Lease improvement allowances in connection with the Victoria's Secret Lease other than Seller's Leasing Fee, and shall indemnify, defend, and hold Seller and the Seller Related Parties harmless from and against any and all claims, losses and liabilities (including, without limitation, reasonable attorneys' fees) arising from, or in connection with any and all leasing brokerage fees and tenant improvement allowances in connection with said lease other than Seller's Leasing Fee. Purchaser acknowledges and agrees that the sum set forth in this Section 5.4.5 shall be the sole credit Purchaser receives in connection with said lease.

17

SSL-DOCS1 1842283v46

condemnation award whereupon the Deposit, shall be promptly returned to Purchaser, and this Agreement and the obligations of the parties hereunder shall terminate (and no party hereto shall have any further obligations in connection herewith except under those provisions that expressly survive the Closing or a termination of this Agreement). The parties hereby waive the provisions of any statute which provides for a different outcome or treatment in the event of a casualty or a condemnation or eminent domain proceeding.

7. **Representations, Warranties and Covenants.**

7.1 Representations, Warranties and Covenants of Seller.

7.1.1 **Representations and Warranties of Seller.** Subject to the provisions of this Section 7.1.1, Seller hereby represents to Purchaser that, as of the date of this Agreement:

(a) **Leases.** Seller has no knowledge of any leases, licenses or other occupancy agreements to which Seller is a party or is bound affecting any portion of the Property which will be in force on the Closing Date other than the Leases. As used herein, "Leases" shall be deemed to mean, collectively, (i) the leases described on Exhibit O attached hereto and made a part hereof (the "Lease Exhibit"), and (ii) the leases entered into in accordance with this Agreement. To the best of Seller's knowledge, as of the date of this Agreement (x) the Leases are in full force and effect and have not been amended except as set forth in the Lease Exhibit, and (y) the Lease Exhibit is true and correct in all material respects. With respect to the Leases: (1) Seller has not sent, and from and after December 7, 2004, Seller has not received, any written notice of default which is continuing or remains uncured with respect to any Lease; (2) Schedule 1 is a true, correct and complete (in all material respects) list of the security deposits currently held by Seller under the Leases in effect as of the date set forth thereon; and (3) Schedule 2 is a tenant arrearage schedule which, to the best of Seller's knowledge, is true, correct and complete in all material respects as of the date set forth thereon.

(b) **Litigation.** To the best of Seller's knowledge, there is no material pending or threatened litigation or condemnation action against the Property or against Seller with respect to the Property which pending or threatened litigation or condemnation action would have a material adverse effect on the use or operation of the Property.

(c) **No Insolvency.** Seller is not a debtor in any state or a Federal insolvency, bankruptcy, receivership proceeding.

(d) **Non-Foreign Person.** Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code, as amended (the "Code").

(e) **Contracts.** Seller has not entered into any service or equipment leasing contracts relating to the Property which will be in force after the Closing, except for the Contracts. As used in this Agreement, the "Contracts" shall be deemed to mean, collectively, (i) the contracts described on Exhibit B attached hereto and made a part hereof, (ii) contracts which are cancelable on thirty (30) days or less notice without premium or penalty, and (iii) contracts

19

entered into by Seller which Seller is permitted to enter into in accordance with this Agreement. Seller has not sent, or to the best of Seller's knowledge, received any written notices of default under any Contract from and after December 7, 2004.

(f) **Lease Brokerage Agreements; Leasing Commission Agreements.** As of the date hereof, Seller has not entered into any lease brokerage agreements or lease commission agreements other than as described on Exhibit S attached hereto and made a part hereof (the "Brokerage Agreements") or in the Leases that shall be binding upon Purchaser following Closing.

(g) **Due Authority.** This Agreement and all agreements, instruments and documents herein provided to be executed or to be caused to be executed by Seller are, or on the Closing Date will be, duly authorized, executed and delivered by and are binding upon Seller. Seller is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Delaware, and is duly authorized and qualified to do all things required of it under this Agreement.

(h) **Personal Property.** To the best of Seller's knowledge, the Personal Property has not been assigned or conveyed to any other party (other than (i) as security for any financing which shall be, with respect to the Property, released at Closing and (ii) to Purchaser at Closing pursuant to the terms of this Agreement).

(i) **Environmental Matters.** To the best of Seller's knowledge, as of the date of this Agreement, Seller has not received written notice from any governmental authority of any material violation at the Property of laws relating to Hazardous Materials (as hereinafter defined) which violation occurred since December 7, 2004 and remains uncured in any material respect. For purposes of this Agreement, the term Hazardous Materials shall mean (a) any toxic substance or hazardous waste, hazardous substance or related hazardous material; (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of presently existing federal, state or local safety guidelines, whichever are more stringent; and (c) any substance, material or chemical which is defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials", "hazardous waste" or words of similar import under any federal, state or local statute, law, code, or ordinance or under the regulations adopted or guidelines promulgated pursuant thereto, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9061 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; and the Federal Water Pollution Control Act, as amended, 33 U.S.C. §1251, et seq.).

(j) **Ground Lease.** To the best of Seller's knowledge, (i) the Ground Lease is in full force and effect, (ii) the Ground Lease has not been amended, and (iii) there are no defaults by Seller thereunder.

20

force and effect, and (ii) there are no defaults by Seller thereunder.

(k) **EOA.** To the best of Seller's knowledge, (i) the EOA is in full force and effect, and (ii) there are no defaults by Seller thereunder.

(l) **Peninsula Sublease.** To the best of Seller's knowledge, (i) the Peninsula Sublease is in full force and effect, (ii) the Peninsula Sublease has not been amended, and (iii) there are no defaults by Seller thereunder.

(m) **Employees.** Seller employs no persons at the Property.

Notwithstanding and without limiting the foregoing, (i) if any of the representations or warranties of Seller that survive Closing contained in this Agreement or in any document or instrument delivered in connection herewith are materially false or inaccurate, or Seller is in material breach or default of any of its obligations under this Agreement that survive Closing, and Purchaser nonetheless closes the transactions hereunder and purchases the Property, then Seller shall have no liability or obligation respecting such false or inaccurate representations or warranties or other breach or default and any cause of action resulting therefrom shall terminate upon the Closing) in the event that either (x) on or prior to Closing, Purchaser shall have had knowledge of the false or inaccurate representations or warranties or of the breach or default, or (y) the accurate state of facts pertinent to such false or inaccurate representations or warranties or other breach or default was contained in any of the information furnished or made available to or otherwise obtained by Purchaser prior to the expiration of the Due Diligence Period contain provisions or information that are inconsistent with the foregoing representations and warranties, Seller shall have no liability or obligation respecting such inconsistent representations or warranties (and Purchaser shall have no cause of action or right to terminate this Agreement with respect thereto), and such representations and warranties shall be deemed modified to the extent necessary to eliminate such inconsistency and to conform such representations and warranties to such Leases, Contracts and other information.

References to the "knowledge", "best knowledge" and/or "actual knowledge" of Seller or words of similar import shall refer only to the current actual (as opposed to implied or constructive) knowledge of Mary Ann Cata and Sheryl Croshand and shall not be construed, by imputation or otherwise, to refer to the knowledge of Seller or any parent, subsidiary or affiliate of Seller or to any other officer, agent, manager, representative or employee of Seller or to impose upon Mary Ann Cata or Sheryl Croshand any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains. Notwithstanding anything to the contrary contained in this Agreement, neither May Ann Cata nor Sheryl Croshand shall have no personal liability hereunder. The provisions of this Section 7.1.1 shall survive the Closing for a period of one hundred eighty (180) days.

7.1.2 GENERAL DISCLAIMER. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS IS" "WHERE IS," AND WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR OTHERWISE, INCLUDING ANY REPRESENTATION OR WARRANTY CONCERNING TITLE TO THE PROPERTY, THE PHYSICAL CONDITION

OF THE PROPERTY (INCLUDING THE CONDITION OF THE SOIL OR THE IMPROVEMENTS), THE ENVIRONMENTAL CONDITION OF THE PROPERTY (INCLUDING THE PRESENCE OR ABSENCE OF HAZARDOUS SUBSTANCES ON OR AFFECTING THE PROPERTY, THE COMPLIANCE OF THE PROPERTY WITH APPLICABLE LAWS AND REGULATIONS (INCLUDING ZONING AND BUILDING CODES OR THE STATUS OF DEVELOPMENT OR USE RIGHTS RESPECTING THE PROPERTY, THE FINANCIAL CONDITION OF THE PROPERTY OR ANY OTHER REPRESENTATION OR WARRANTY RESPECTING ANY INCOME, EXPENSES, CHARGES, LIENS OR ENCUMBRANCES, RIGHTS OR CLAIMS ON, AFFECTING OR PERTAINING TO THE PROPERTY OR ANY PART THEREOF. PURCHASER ACKNOWLEDGES THAT, DURING THE DUE DILIGENCE PERIOD, PURCHASER WILL EXAMINE, REVIEW AND INSPECT ALL MATTERS WHICH IN PURCHASER'S JUDGMENT BEAR UPON THE PROPERTY AND ITS VALUE AND SUITABILITY FOR PURCHASER'S PURPOSES. EXCEPT AS TO MATTERS SPECIFICALLY SET FORTH IN THIS AGREEMENT, (A) PURCHASER WILL ACQUIRE THE PROPERTY SOLELY ON THE BASIS OF ITS OWN PHYSICAL AND FINANCIAL EXAMINATIONS, REVIEWS AND INSPECTIONS AND THE TITLE INSURANCE PROTECTION AFFORDED BY THE OWNER'S POLICY, AND (B) WITHOUT LIMITING THE FOREGOING, PURCHASER WAIVES ANY RIGHT IT OTHERWISE MAY HAVE AT LAW OR IN EQUITY, INCLUDING, WITHOUT LIMITATION, THE RIGHT TO SEEK DAMAGES FROM SELLER IN CONNECTION WITH THE ENVIRONMENTAL CONDITION OF THE PROPERTY, INCLUDING ANY RIGHT OF CONTRIBUTION UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT.

7.2 **Interim Covenants of Seller.** Until the Closing Date or the sooner termination of this Agreement in accordance with the terms and conditions of this Agreement:

7.2.1 Seller shall maintain the Property in substantially the same manner as prior hereto pursuant to Seller's normal course of business (such as maintenance obligations but not including extraordinary capital expenditures or expenditures not incurred in such normal course of business), subject to reasonable wear and tear and further subject to destruction by casualty or other events beyond the control of Seller.

7.2.2 Subject to the terms set forth in this Section 7.2.2, Seller may cancel, modify, extend, renew or permit the expiration of Contracts or enter into any new service contract without Purchaser's consent. After the expiration of the Due Diligence Period, Seller shall not modify, extend, renew or cancel (except as a result of a default by the other party thereunder) any Contract or enter into any additional service contracts or other similar agreements without the prior consent of Purchaser, which consent shall not be unreasonably withheld or delayed; provided, however, Purchaser's consent shall not be required if such contract is cancelable upon not more than thirty (30) days notice.

7.2.3 (a) Seller shall have the right to continue to offer the Property for lease in the same manner as prior pursuant to its normal course of business and, upon request, shall keep Purchaser reasonably informed as to the status of leasing prior to the Closing

21

22

SSL-DOCS1 184226/v6

Date. Seller shall not during the term of this Agreement enter into any new leases or, unless required by the term of existing Leases, material modifications of existing Leases without the prior written consent of Purchaser, which consent may be granted or withheld in Purchaser's sole discretion. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, (x) Purchaser agrees that Seller may enter into (i) the Victoria's Secret Lease, and (ii) the Comp USA Termination, (y) Purchaser's failure to disapprove any request for consent by Seller under this Section 7.2.3 within five (5) Business Days following Seller's request therefor shall be deemed to constitute Purchaser's consent thereto, provided that Seller's request for consent contains a copy of the proposed lease, together with financial and background information regarding the proposed tenant and guarantor and detailed information regarding any Purchaser Leasing Costs, and (z) Purchaser shall bear all Purchaser Leasing Costs and, without limiting the foregoing, the prorations at the Closing shall include an appropriate credit to Seller consistent with the foregoing.

(b)   Seller makes no representations and assumes no responsibility with respect to the continued occupancy of the Property or any part thereof by any tenant. The removal of a tenant whether by summary proceedings or otherwise prior to the Closing Date shall not give rise to any claim on the part of Purchaser. Further, Purchaser agrees that it shall not be grounds for Purchaser's refusal to close this transaction that any tenant is a holdover tenant or in default under its Lease on the Closing Date and Purchaser shall accept title subject to such holding over or default without an abatement in or credit against the Purchase Price.

7.2.4   Seller will keep in force and effect with respect to the Property the insurance policies currently carried by Seller or policies providing similar coverage through the Closing Date.

7.2.5   Seller shall not create any new mortgage, deed of trust, lien, pledge or other encumbrance effecting any portion of the Property.

7.2.6   Seller shall not take any action to modify, amend or otherwise affect the zoning, land-use, landmark or other similar status of the Property.

7.2.7   Seller shall not grant any concessions or rent abatements to any Tenants for any period following the Closing without Purchaser's prior written consent, which consent may be granted or withheld in Purchaser's sole discretion.

7.2.8   Seller shall promptly advise Purchaser of any litigation, arbitration or administrative hearing concerning the Property arising or threatened of which Seller has written notice and shall promptly advise Purchaser of any written notices from any governmental authority asserting a violation of any applicable law.

7.2.9   Seller shall use commercially reasonable efforts to keep the Property free of any Hazardous Materials that violate Environmental Laws and promptly inform Purchaser of any spills, releases, discharges or disposal of Hazardous Materials that occur on or onto the Property in violation of Environmental Laws.

23

7.3   Representations, Warranties and Covenants of Purchaser. Purchaser hereby represents and warrants to Seller that (i) this Agreement and all agreements, instruments and documents herein provided to be executed or caused to be executed by Purchaser are, or on the Closing Date will be, duly authorized, executed and delivered by and are binding upon Purchaser and (ii) the organizational chart of Purchaser set forth in Schedule 2 attached hereto sets forth the true, correct and complete ownership of Purchaser. Purchaser is a limited liability company, duly organized and validly existing and in good standing under the laws of the State of Delaware and is duly authorized and qualified to do all things required of it under this Agreement. The representations and warranties of Purchaser shall survive the Closing.

8.   Indemnification and Release.

8.1   Due Diligence Indemnification by Purchaser. Purchaser shall hold harmless, indemnify and defend Seller and the Seller Related Parties from and against: (a) any and all loss, damage or third party claims in any way arising from Purchaser's inspection or examinations of the Property prior to the Closing Date, including, without limitation, any investigations made by Purchaser, and (b) all costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Seller as a result of the foregoing.

8.2   RELEASE. EXCEPT AS SET FORTH (A) IN THE LAST SENTENCE OF THIS SECTION 8.2 AND (B) IN ANY OTHER SECTION OF THIS AGREEMENT THAT EXPRESSLY SURVIVES THE CLOSING, EFFECTIVE AS OF THE CLOSING, PURCHASER SHALL BE DEEMED TO HAVE RELEASED SELLER AND ALL SELLER RELATED PARTIES FROM ALL CLAIMS WHICH PURCHASER OR ANY AGENT, REPRESENTATIVE, AFFILIATE, EMPLOYEE, DIRECTOR, OFFICER, PARTNER, MEMBER, SERVANT, SHAREHOLDER OR OTHER PERSON OR ENTITY ACTING ON PURCHASER'S BEHALF OR OTHERWISE RELATED TO OR ON A "PURCHASER RELATED PARTY") HAS OR MAY HAVE ARISING FROM OR RELATED TO ANY MATTER OR THING RELATED IN OR IN CONNECTION WITH THE PROPERTY INCLUDING THE DOCUMENTS AND INFORMATION REFERRED TO HEREIN, THE LEASES AND THE TENANTS THEREUNDER, ANY CONSTRUCTION DEFECTS, ERRORS OR OMISSIONS IN THE DESIGN OR CONSTRUCTION OF ALL OR ANY PORTION OF THE PROPERTY AND ANY ENVIRONMENTAL CONDITIONS, AND PURCHASER SHALL NOT LOOK TO SELLER OR ANY SELLER RELATED PARTIES IN CONNECTION WITH THE FOREGOING FOR ANY REDRESS OR RELIEF. THIS RELEASE SHALL BE GIVEN FULL FORCE AND EFFECT ACCORDING TO EACH OF ITS EXPRESSED TERMS AND PROVISIONS, INCLUDING THOSE RELATING TO UNKNOWN AND UNSUSPECTED CLAIMS, DAMAGES AND CAUSES OF ACTION. THE FOREGOING RELEASE SHALL NOT BE APPLICABLE TO A PURCHASER'S RIGHT TO IMPLEAD OR OTHERWISE SEEK JOINDER OF SELLER SOLELY WITH RESPECT TO ANY CLAIMS (INCLUDING COUNTERCLAIMS) BROUGHT AGAINST PURCHASER BY A THIRD PARTY UNAFFILIATED WITH PURCHASER RELATING TO (I) PERSONAL INJURY OR DEATH THAT OCCURRED SOLELY DURING SELLER'S PERIOD OF OWNERSHIP OF THE PROPERTY, OR (II) HAZARDOUS SUBSTANCES DISPOSED OF OR RELEASED IN, ON

24

OR UNDER THE PROPERTY DURING SELLER'S PERIOD OF OWNERSHIP OF THE PROPERTY AND FOR WHICH SELLER SHALL BE LIABLE UNDER ANY STATUTE CONCERNING LIABILITY FOR CONTAMINATION BY HAZARDOUS SUBSTANCES.

8.3    Survival. The provisions of this Section 8 shall survive the Closing or earlier termination of this Agreement.

9.    Remedies for Default and Disposition of the Deposit.

9.1    SELLER DEFAULTS. IF THE TRANSACTION HEREIN PROVIDED SHALL NOT BE CLOSED BY REASON OF SELLER'S DEFAULT UNDER THIS AGREEMENT, THEN PURCHASER SHALL HAVE, AS ITS EXCLUSIVE REMEDIES (ALL OTHER RIGHTS AND/OR REMEDIES, WHETHER AVAILABLE AT LAW OR IN EQUITY, BEING IRREVOCABLY WAIVED) THE RIGHT TO EITHER (A) TERMINATE THIS AGREEMENT (IN WHICH EVENT THE DEPOSIT SHALL BE RETURNED TO PURCHASER, SELLER SHALL PAY TO PURCHASER AN AMOUNT EQUAL TO PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES (AS HEREINAFTER DEFINED), AND NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER EXCEPT WITH RESPECT TO THOSE PROVISIONS OF THIS AGREEMENT WHICH EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT, PURCHASER HEREBY WAIVING ANY RIGHT OR CLAIM TO DAMAGES FOR SELLER'S BREACH, OR (B) IF SELLER SHALL WILLFULLY FAIL TO TRANSFER THE PROPERTY PURSUANT TO AND IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, SPECIFICALLY ENFORCE SELLER'S OBLIGATION TO TRANSFER THE PROPERTY (IT BEING ACKNOWLEDGED THAT THE REMEDY OF SPECIFIC PERFORMANCE SHALL NOT BE APPLICABLE TO ANY OTHER COVENANT OR AGREEMENT OF SELLER CONTAINED HEREIN); PROVIDED THAT ANY ACTION BY PURCHASER FOR SPECIFIC PERFORMANCE MUST BE FILED, IF AT ALL, WITHIN SIXTY (60) DAYS OF SELLER'S DEFAULT, AND THE FAILURE TO FILE WITHIN SUCH PERIOD SHALL CONSTITUTE A WAIVER BY PURCHASER OF SUCH RIGHT AND REMEDY. IF PURCHASER SHALL NOT HAVE FILED AN ACTION FOR SPECIFIC PERFORMANCE WITHIN THE AFOREMENTIONED TIME PERIOD OR SO NOTIFIED SELLER OF ITS ELECTION TO TERMINATE THIS AGREEMENT, PURCHASER'S SOLE REMEDY SHALL BE TO TERMINATE THIS AGREEMENT IN ACCORDANCE WITH CLAUSE (A) ABOVE.    AS USED HEREIN, "PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES" SHALL MEAN AND REFER TO THIRD-PARTY OUT-OF-POCKET EXPENSES ACTUALLY INCURRED BY PURCHASER IN CONNECTION WITH THE NEGOTIATION AND PREPARATION OF THIS AGREEMENT, INCLUDING ATTORNEYS' FEES, AND IN CONNECTION WITH PURCHASER'S INVESTIGATIONS UNDER THIS AGREEMENT PRIOR TO THE TERMINATION OF THIS AGREEMENT BY PURCHASER; PROVIDED, HOWEVER, (I) IN NO EVENT SHALL SELLER BE OBLIGATED UNDER THIS AGREEMENT TO REIMBURSE PURCHASER FOR PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES (IN THE AGGREGATE) IN EXCESS OF ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000) AND (II) SELLER'S OBLIGATION HEREUNDER TO

25

REIMBURSE PURCHASER FOR PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES SHALL RELATE ONLY TO PURCHASER'S REIMBURSABLE DUE DILIGENCE EXPENSES WITH RESPECT TO WHICH PURCHASER DELIVERS TO SELLER A THIRD-PARTY INVOICE (WITH REASONABLE SUPPORTING INFORMATION AND DOCUMENTATION AND EVIDENCE OF PAYMENT) WITHIN THIRTY (30) DAYS AFTER THE DATE ON WHICH PURCHASER GIVES SELLER WRITTEN NOTICE OF PURCHASER'S TERMINATION OF THIS AGREEMENT.

9.2    PURCHASER DEFAULTS. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN SECTION 9.1, IN THE EVENT THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT SHALL NOT CLOSE ON ACCOUNT OF PURCHASER'S DEFAULT, THEN THIS AGREEMENT SHALL TERMINATE AND THE RETENTION OF THE DEPOSIT SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY UNDER THIS AGREEMENT, SUBJECT TO THE PROVISIONS OF THIS AGREEMENT THAT EXPRESSLY SURVIVE THE TERMINATION OF THIS AGREEMENT; PROVIDED, HOWEVER, NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO LIMIT SELLER'S RIGHTS OR DAMAGES UNDER ANY INDEMNITIES GIVEN BY PURCHASER TO SELLER UNDER THIS AGREEMENT. IN CONNECTION WITH THE FOREGOING, THE PARTIES RECOGNIZE THAT SELLER WILL INCUR EXPENSE IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT AND THAT THE PROPERTY WILL BE REMOVED FROM THE MARKET; FURTHER, THAT IT IS EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN THE EXTENT OF DETRIMENT TO SELLER CAUSED BY THE BREACH BY PURCHASER UNDER THIS AGREEMENT AND THE FAILURE OF THE CONSUMMATION OF THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE AMOUNT OF COMPENSATION SELLER SHOULD RECEIVE AS A RESULT OF PURCHASER'S BREACH OR DEFAULT.

9.3    Disposition of Deposit. In the event the transaction contemplated by this Agreement shall close, the Deposit shall be applied as a partial payment of the Purchase Price.

10.    Miscellaneous.

10.1    Brokers.

10.1.1 Except as provided in Section 10.1.2 below, Seller represents and warrants to Purchaser, and Purchaser represents and warrants to Seller, that no broker or finder has been engaged by it, respectively, in connection with the sale contemplated under this Agreement. In the event of a claim for broker's or finder's fee or commissions in connection with the sale contemplated by this Agreement, then Seller shall indemnify, defend and hold harmless Purchaser from the same if it shall be based upon any statement or agreement alleged to have been made by Seller, and Purchaser shall indemnify, defend and hold harmless Seller from the same if it shall be based upon any statement or agreement alleged to have been made by Purchaser. The indemnification obligations under this Section 10.1.1 shall survive the Closing or a termination of this Agreement.

26

10.1.2 If and only if the sale contemplated hereunder closes, Seller has agreed to pay a brokerage commission to US Equities ("Seller's Broker") pursuant to a separate written agreement between Seller and Broker. Purchaser has agreed to pay a brokerage commission to Newmark Knight Franks Retail and Jacqueline Hayes Associates (collectively, "Purchaser's Broker") pursuant to a separate written agreement between Purchaser and Purchaser's Broker. Section 10.1.1 hereof is not intended to apply to leasing commissions incurred in accordance with this Agreement.

10.2 Limitation of Liability.

10.2.1 Notwithstanding anything to the contrary contained in this Agreement or any documents executed in connection herewith, if the Closing of the transaction contemplated hereunder shall have occurred, (i) the aggregate liability of Seller arising pursuant to or in connection with the representations, warranties, indemnifications, covenants or other obligations (whether express or implied) of Seller under this Agreement or any document or certificate executed or delivered in connection herewith shall not exceed Five Million Dollars ($5,000,000) (the "Liability Ceiling") and (ii) in no event shall Seller have any liability to Purchaser unless and until the aggregate liability of Seller arising pursuant to or in connection with the representations, warranties, indemnifications, covenants or other obligations (whether express or implied) of Seller under this Agreement or any document or certificate executed or delivered in connection herewith shall exceed One Hundred Thousand Dollars ($100,000) (the "Liability Floor"). If Seller's aggregate liability to Purchaser shall exceed the Liability Floor, Seller shall be liable for the entire amount thereof up to but not exceeding the Liability Ceiling.

10.2.2 No shareholder or agent of Seller, nor any Seller Related Parties, shall have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or pursuant to the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter, and Purchaser and its successors and assigns and, without limitation, all other persons and entities, shall look solely to Seller's assets and/or the proceeds of the sale of the Property pursuant to the terms of this Agreement actually received by Seller, whether or not the same have been distributed to any principal of Seller (collectively, the "Sale Proceeds"), for the payment of any claim or for any performance, and Purchaser, on behalf of itself and its successors and assigns, hereby waives any and all such personal liability (except, subject to the terms of Section 10.2.1, to the extent of any Sale Proceeds).

10.2.2 The provisions of this Section 10.2 shall survive the Closing or a termination of this Agreement.

10.3 Exhibits; Entire Agreement; Modification. All exhibits attached and referred to in this Agreement are hereby incorporated herein as if fully set forth in (and shall be deemed a part of) this Agreement. This Agreement contains the entire agreement between the parties respecting the matters herein set forth and supersedes any and all prior agreements between the parties hereto respecting such matters. This Agreement may not be modified or amended except by written agreement signed by both parties.

27

SSL-DOCS1 1842266/6

10.4 Business Days. Whenever any action must be taken (including the giving of notice or the delivery of documents) under this Agreement during a certain period of time (or by a particular date) that ends (or occurs) on a non-Business Day, then such period (or date) shall be extended until the next succeeding Business Day. As used herein, the term "Business Day" shall be deemed to mean any day, other than a Saturday or Sunday, on which commercial banks in the State of New York or in the State of Illinois are not required or authorized to be closed for business.

10.5 Interpretation. Section headings shall not be used in construing this Agreement. Each party acknowledges that such party and its counsel, after negotiation and consultation, have reviewed and revised this Agreement. As such, the terms of this Agreement shall be fairly construed and the usual rule of construction, to wit, that ambiguities in this Agreement should be resolved against the drafting party, shall not be employed in the interpretation of this Agreement or any amendments, modifications or exhibits hereto or thereto. Whenever the words "including" "include" or "includes" are used in this Agreement, they shall be interpreted in a non-exclusive manner. Except as otherwise indicated, all Exhibit and Section references in this Agreement shall be deemed to refer to the Exhibits and Sections in this Agreement.

10.6 Governing Law. This Agreement, shall be construed and enforced in accordance with the laws of the State of New York.

10.7 Successors and Assigns. Purchaser may not assign or transfer its rights or obligations under this Agreement without the prior written consent of the Seller, which consent may be given or withheld in the sole and absolute discretion of Seller; provided that, in the event of such an assignment, the transferee shall assume in writing all of the transferor's obligations hereunder (but Purchaser or any entity ███████████ ███████████████████████████████████████████████████████ Abby Rosen and Michael Fuchs and/or (ii) Raymond Gindi, ██████ ███ Gindi and/or Isaac S. Gindi, collectively. For purposes of this Section, "control" means ownership of no less than 50% of the equity interests in such entity and the power to direct the management and policies of such entity. Notwithstanding and without limiting the foregoing, no consent given by Seller to any transfer or assignment of Purchaser's rights or obligations hereunder shall be deemed to constitute a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder and no transfer or assignment in violation of the provisions hereof shall be valid or enforceable. Subject to the foregoing, this Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the successors and assigns of the parties.

10.8 Notices. All notices, requests or other communications which may be or have been required to be given, served or sent by either party hereto to the other shall be deemed to have been properly given, served or sent (a) upon delivery, if delivered in person or by facsimile transmission, with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery contemporaneously therewith), or (b) one (1) Business Day after having been deposited

28

SSL-DOCS1 1842266/6

for next day overnight delivery with any reputable overnight courier service, and in each case, addressed as follows:

To Seller:

710 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management Inc.
245 Park Avenue
New York, New York 10167
Attention: Mary Ann Cate
Facsimile: (212) 648-2195
Telephone: (212) 648-2266

With a Copy To:

710 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management Inc.
P.O. Box 5005
New York, New York 10163-5005

With a Copy To:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038-4982
Attention: Brian Diamond, Esq.
Facsimile: (212) 806-6006
Telephone: (212) 806-5369

To Purchaser:

Century 21 Chicago, LLC
c/o Century 21 Department Stores
22 Cortlandt Street
New York, New York 10007
Attention: Raymond Gindi
Facsimile: (212) 528-0816
Telephone: (212) 227-9092 ext 503

29

With a Copy To:

Katsky Korins LLP
605 Third Avenue
New York, NY 10158-0038
Attention: Randolph Amengual, Esq.
Facsimile: (212) 716-3343
Telephone: (212) 716-3243

To Escrowee:

First American Title Insurance Company of New York
633 Third Avenue
New York, New York 10017
Attention: Steven Napolitano
Facsimile: (212) 331-1579
Telephone: (212) 850-0640

10.9 **Third Parties.** Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement upon any other person other than the parties hereto and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third parties any right of subrogation or action over or against any party to this Agreement. This Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

10.10 **Legal Costs.** The parties hereto agree that they shall pay directly any and all legal costs which they have incurred on their own behalf in the preparation of this Agreement, all deeds and other agreements pertaining to this transaction, and that such legal costs shall not be part of the closing costs.

10.11 **Counterparts.** This Agreement may be executed in one or more counterparts, including counterparts transmitted by facsimile, each of which shall be deemed an original, but all of which shall constitute one and the same document.

10.12 **Effectiveness.** In no event shall any draft of this Agreement create any obligation or liability, it being understood that this Agreement shall be effective and binding only when a counterpart hereof has been executed and delivered by each party hereto. Seller shall have the right to discontinue negotiations and withdraw any draft of this Agreement at any time prior to the full execution and delivery of this Agreement by such party hereto. Purchaser assumes the risk of all costs and expenses incurred by Purchaser in any negotiations or due diligence investigations undertaken by Purchaser with respect to the Property.

10.13 **No Implied Waiver.** No failure or delay of either party in the exercise of any right or remedy given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified in this Agreement for exercise of such right or

30

remedy has expired) shall constitute a waiver of any other or further right or remedy nor shall any single or partial exercise of any right or remedy preclude other or further exercise thereof or any other right or remedy. No waiver by either party of any breach hereunder or failure or refusal by the other party to comply with the obligations shall be deemed a waiver of any other or subsequent breach, failure or refusal to so comply.

14.14 Disclosure of Seller's Obligations. Except as otherwise expressly provided in this Agreement, Purchaser's acceptance of the Deed shall be deemed a discharge of all of the obligations of Seller hereunder and all of Seller's representations, warranties, covenants and agreements in this Agreement shall merge in the documents and agreements executed at the Closing and shall not survive the Closing, except and to the extent that, pursuant to the express provisions of this Agreement, any of such representations, warranties, covenants or agreements are to survive the Closing.

14.15 No Recordation. Neither this Agreement nor any memorandum thereof shall be recorded and any attempted recordation hereof shall be void and shall constitute a default hereunder.

14.16 Unenforceability. If all or any portion of any provision of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, then such invalidity, illegality or unenforceability shall not affect any other provision hereof, and such provision shall be limited and construed as if such invalid, illegal or unenforceable provision or portion thereof were not contained herein unless doing so would materially and adversely affect a party or the benefits that such party is entitled to receive under this Agreement.

14.17 Waiver of Trial by Jury. SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING.

14.18 Disclosure. Notwithstanding any terms or conditions in this Agreement to the contrary, but subject to restrictions reasonably necessary to comply with federal or state securities laws, any person may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure. For the avoidance of doubt, this authorization is not intended to permit disclosure of the names of, or other identifying information regarding, the participants in the transaction, or of any information on the portion of any materials not relevant to the tax treatment or tax structure of the transaction. The provisions of this Section shall survive the Closing.

14.19 Designation of Reporting Person. In order to assure compliance with the requirements of Section 6045 of the Code and any related reporting requirements of the Code, the parties hereto agree as follows:

31

SSL-DOCS1 1842326v6

Person"), shall assume all responsibilities for information reporting required under Section 6045(e) of the Code.

(b) Seller and Purchaser each hereby agree:

(i) to provide to the Reporting Person all information and certifications regarding such party, as reasonably requested by the Reporting Person or otherwise required to be provided by a party to the transaction described herein under Section 6045 of the Code; and

(ii) to provide to the Reporting Person such party's taxpayer identification number and a statement (on Internal Revenue Service Form W-9 or an acceptable substitute form, or on any other form the applicable current or future Code sections and regulations might require and/or any form requested by the Reporting Person), signed under penalties of perjury, stating that the taxpayer identification number supplied by such party to the Reporting Person is correct.

(c) Each party hereto agrees to retain this Agreement for not less than four years from the end of the calendar year in which Closing occurred, and to produce it to the Internal Revenue Service upon a valid request therefore.

(d) The addresses for Seller and Purchaser are as set forth in Section 10.8 hereof, and the real estate address subject to the transfer provided for in this Agreement is described in Exhibit A.

The provisions of this Section shall survive the Closing.

14.20 Tax Reduction Proceedings. If Seller has heretofore filed applications for the reduction of the assessed valuation of the Property and/or instituted certiorari proceedings to review such assessed valuations for any prior tax years, Purchaser acknowledges and agrees that Seller shall have sole control of such proceedings, including the right to withdraw, compromise and/or settle the same or cause the same to be brought on for trial and to take, conduct, withdraw and/or settle appeals and Purchaser hereby consents to such actions as Seller may take therein. Any refund or the savings or refund for any year or years prior to the tax year in which the Closing occurs shall belong solely to Seller. Any tax savings or refund for the tax year in which the Closing occurs shall be prorated between Seller and Purchaser after deduction of reasonable attorneys' fees and other reasonable expenses related to the proceeding and all sums payable to tenants under the Leases. Purchaser and Seller agree that all sums payable to tenants under the Leases on account of such tax savings or refund shall be promptly paid to such tenants following receipt of such tax savings or refund. Purchaser shall execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate settling such proceeding and collecting the amount of any refund or tax savings. Purchaser shall assume the retainer of the attorney, if any, representing Seller in any tax proceeding pending for the tax year in which the Closing occurs and the subsequent tax year, if applicable. The provisions of this Section shall survive the Closing.

32

SSL-DOCS1 1842326v6

1121    Ground Lessor Release. Purchaser shall use commercially reasonable efforts to (i) obtain from the Ground Lessor a release of JPMorgan Chase Bank, N.A. as Trustee, from its obligations accruing from and after the Closing Date under that certain Guaranty made by JPMorgan Chase Bank, N.A., as Trustee, in favor of Ground Lessor, dated as of December 7, 2004, substantially in the form of Exhibit U annexed hereto and made a part hereof (the "Release of Guaranty"), and (ii) cause a replacement guarantor conforming to the requirements of the Ground Lease and satisfying the Minimum Financial Requirement (as defined in the Ground Lease) to be substituted for JPMorgan Chase Bank, N.A., as Trustee to execute and deliver to Ground Lessor at Closing the Guaranty (as defined in the G[...]

[redacted] [...] and delivery [...]

of the Release of Guaranty and the Replacement [...]

Ground Lessor as Ground Lessor may require to confirm that the Replacement Guarantor satisfies the requirements set forth in the Ground Lease in order to obtain the Release of Guaranty.

[redacted]

(1) the deposit by or on behalf of Purchaser at Closing of (i) $16,000,000 in an escrow account held by Escrowee pursuant to an escrow agreement ("Fee Purchase Escrow Agreement") in form and substance reasonab[...] [redacted] [...] (ii) cash or an Approved Letter of

[redacted]

(2) delivery at Closing of (i) a power of attorney executed by Purchaser in favor [...] Seller authorizing Seller to exercise the Purchase Option on behalf of Purchaser as [...] hereto and made a part hereof as [redacted]

pursuant to the Guaranty (the "Indemnity"), (iii) an environmental [...] party or parties providing the same to the lender providing Purchaser with financing to consummate the purchase of the Property ("Purchaser's Lender") substantially in the same form and substance as the environmental indemnity provided to Purchaser's Lender at the Closing indemnifying the Indemnified Parties for any liabilities with respect to environmental matters arising following the Closing, and (iv) an agreement executed by Seller and Purchaser (the "Purchase Option Exercise Agreement"), together with a memorandum of such Purchase Option Exercise Agreement in form and substance reasonably acceptable to Seller and Purchaser, which shall be recorded at the Closing, pursuant to which (a) Purchaser covenants to consummate the Fee Estate Purchase on the earliest date such purchase may occur pursuant to the Ground Lease (the "Fee Purchase

33

Option Date"), (b) Purchaser covenants to maintain property and liability insurance with respect to the Property reasonably acceptable to Seller and JPMorgan Chase Bank, N.A. and conforming, at a minimum, with the requirements set forth [...] attached hereto and made a part hereof, during the period from the Closing until the closing of the Fee Estate Purchase, (c) Purchaser covenants to maintain a net worth in excess of $20,000,000 (the "Net Worth Requirement") during the period from the Closing through the consummation of the Fee Estate Purchase (such net worth to be exclusive of the $16,000,000 held pursuant to clause (1)(i) above, which shall not be deemed assets of Purchaser for the purposes of determining Purchaser's net worth), (d) if Purchaser sells the Property prior to the consummation of the Fee Estate Purchase, such [...] assume, pursuant to an assumption agreement [...] attached hereto and made a part hereof [...] environmental indemnity and the Purchase Option Exercise Agreement, (e) [obtain the Release of the Guaranty] and the return of said Guaranty to Seller simultaneously with the Fee Estate Purchase, and (f) Seller agrees that (x) prior to Seller taking any action under the Purchase Option Exercise Agreement to exercise the Purchase Option on Purchaser's behalf, Purchaser shall have two (2) Business Days to exercise the Purchase Option and thereafter consummate the Fee Estate Purchase in conformance with the provisions of the Ground Lease, (y) in the event that either Seller on behalf of Purchaser, or Purchaser, exercises the Purchase Option, the $16,000,000 held in escrow pursuant to the foregoing clause 1(i) shall be disbursed by Escrowee directly to the Ground Lessor or its designee at the closing of the Fee Estate Purchase, and (z) upon the closing of the Fee Estate Purchase, by Seller (on behalf of Purchaser) or Purchaser, the funds and/or Approved Letter of Credit delivered pursuant to the foregoing clause (1)(i) (or any remaining balance thereof after application pursuant to the immediately succeeding paragraph), shall be promptly returned by Escrowee to Purchaser and no party shall have any further obligation under the Purchase Option Exercise Agreement.

"Approved Letter of Credit" means a clean, irrevocable and unconditional letter of credit (i) entitling Escrowee to draw upon such letter of credit upon presentation to the issuing bank of a sight draft, (ii) naming Escrowee as beneficiary, (iii) providing for a term of not less than one year and, if the initial term expires prior to the date that is 60 days after the Fee Purchase Option Date, an automatic renewal for a period ending on no earlier than the date that is 60 days after the Fee Purchase Option Date, without amendment, unless the issuing bank shall send notice to Escrowee by certified mail, return receipt requested, not less than thirty (30) days prior to the expiration date of such letter of credit that such letter of credit will not be renewed, in which case Escrowee shall draw down such letter of credit, receive the proceeds thereof and hold same in escrow pursuant to the provisions of the Fee Purchase Escrow Agreement, (iv) issued by a member bank of the New York Clearing House Association, and (v) otherwise acceptable to Seller in its reasonable discretion.

The funds and/or Approved Letter of Credit delivered pursuant to clause (1)(i) of the foregoing sentence shall be provided to Purchaser for the benefit of JPMorgan Chase Bank, N.A. as guarantor under the Guaranty to be utilized by JPMorgan Chase Bank, N.A. in order to cure an event of a default by Purchaser under the Ground Lease, or as compensation for (A) any and all liabilities arising after the Closing Date pursuant to the Guaranty, (B) any claims by the

34

Indemnified Parties under the Indemnity, (C) payments by JPMorgan Chase Bank, N.A., to obtain the insurance coverage required in clause 2(b) above or to the extent Purchaser fails to do so, as set forth in Schedule 4, and/or (D) to pay any transfer taxes in connection with the Fee Estate Purchase.

10.22    Like-Kind Exchange.  Purchaser and/or Seller may desire to effectuate a sale of the Property.  Each party agrees to use reasonable efforts to accommodate the other party in effectuating a like-kind exchange pursuant to Section 1031 of the Code in connection with the sale of the Property; provided however, that (a) such exchange does not directly or indirectly reduce the Purchase Price, (b) such exchange will not delay or otherwise adversely affect the Closing, (c) there is no additional unreimbursed loss, cost, damage, tax, expense or adverse consequence incurred by such party resulting from, or in connection with, such exchange (including, without limitation, any adverse consequences under ERISA), (d) the party desiring to effectuate a like-kind exchange pursuant to Section 1031 of the Code (the "Exchange Party") pursuant to which the Exchange Party shall indemnify, save and hold harmless the Non-Exchange Party to which the Exchange Party shall indemnify, save and hold harmless the Non-Exchange consequence (including attorneys' fees), (e) all documents to be executed by the Non-Exchange party in connection with such exchange shall be subject to the approval of the Non-Exchange Party, which approval shall not be unreasonably withheld provided that the Exchange Party has otherwise fully complied with the terms and provisions of this Section 10.22, and shall expressly state, without qualification, that the Non-Exchange Party (x) is acting solely as an accommodating party to such exchange, (y) shall have no liability with respect thereto, and (z) is making no representation or warranty that the transactions qualify as a tax-free exchange under Section 1031 of the Code or any applicable state or local laws, (f) in no event shall the Non-Exchange Party be obligated to acquire any property or otherwise be obligated to take title, or appear in the records of title, to any property in connection with such exchange, and (g) the Exchange Party shall pay all of the costs and expenses (including, without limitation, reasonable legal fees and expenses) reasonably incurred by the Non-Exchange Party from and after the date of this Agreement in connection with the consideration and/or consummation of any such exchange.  The provisions of this Section 10.22 shall survive the Closing.

[Remainder of Page Intentionally Left Blank]

34

SSL-DOCS1 1842336v6

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By:  730 NMA Holding, Inc., its sole member

By: _____
Name: Kelvin A. Fronterhouse
Title: Vice President

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name: Raymond Gindi
Title: Manager

By: _____
Name: Michael Fuchs
Title: Manager

SSL-DOCS1 1842336v6



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name: Raymond Gindi
Title: Manager

By: _____
Name: Michael Fools
Title: Manager

SSL-DOCS1 1842604/6

---

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name: Sheryl A Crosland
Title: Vice President

By: _____
Name:
Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
Name:
Title:

SSL-DOCS1 1842605

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER:

730 NORTH MICHIGAN AVENUE, L.L.C.

By:    730 NNA Holding, Inc., its sole member

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

PURCHASER:

CENTURY 21 CHICAGO, LLC

By: _____
    Name: Raymond Gindi
    Title: Manager

By: _____
    Name: Michael Fuchs
    Title: Manager

SSL-DOCS1 1M026/46

EXHIBIT A

(Land)

Parcel 1:

Lots 1, 1A, 1B, 3, 4, 4A, 4B, 4C, 4L, 5A and 5B in 730 N. Michigan Subdivision in the North fractional half of Section 10, Township 39 North, Range 14, East of the Third Principal Meridian, recorded June 30, 1999 as Document Number 99635406, in Cook County, Illinois.

Parcel 2:

The Leasehold Estate as Leasehold Estate is defined in Paragraph 1(h) of ALTA Form 13, created by a certain Agreement to Lease dated May 10, 1994 as disclosed by a Memorandum of Lease entered into as of May 31, 1994 by and between Robert J. Stern, Leasor, and American National Bank and Trust Company, as Trustee under Trust Agreement dated April 23, 1994 and known as Trust Number 118189-04, Lessee recorded June 6, 1994 as Document 94492845, as assigned by Assignment and Assumption of Ground Lease, Subleases and Easement and Operating Agreement dated December 26, 2000 and recorded December 29, 2000 as Document 00033706, demising the land described as follows for a term of 99 years:

Lots 2, 2A, 2B, 4H, 4K, 5, 5 and 5A in 730 N. Michigan Subdivision in the North fractional half of Section 10, Township 39 North, Range 14, East of the Third Principal Meridian, recorded June 30, 1999 as Document Number 99635406, in Cook County, Illinois.

Parcel 3:

Non-exclusive Easements for the benefit of Parcels 1 and 2 as described above created by Easement and Operating Agreement between American National Bank and Trust Company, as Trustee under Trust Agreement dated April 23, 1994 and known as Trust Number 118189-04, and Chicago Title and Trust Company, LLC, a Delaware limited liability company, dated June 30, 1999 and recorded July 1, 1999 as Document 99635407 over the land described therein and subject to the terms and provisions contained therein. Assignment and Assumption of Ground Lease, Subleases and Easement and Operating Agreement dated December 26, 2000 and recorded December 29, 2000 at Document 00033706.

A-1

SSL-DOCS1 1M026/46

7. Easement in favor of Ameritech for poles, wires and underground cable and conduit together with the right of ingress and egress thereto as set forth in the Vacation Ordinance recorded November 1, 1996 as Document 96832324.

8. Survey matters as depicted on survey prepared by National Survey Service, Inc. dated August 24, 2006 as Survey No. N-25728:

a) Encroachments of building located mainly on the land over and onto the public rights of way of varying distances at ground level as follows:

From 0.03 feet to 0.77 feet along the East line of the property onto North Michigan Avenue and by 1.50 feet along the South line of property onto East Superior Street.

b) Encroachments of building canopy, window sills and wall located mainly on the land over and onto the public rights of way of varying distances at roof level as follows:

From 0.97 feet to 1.68 feet along the North line of property onto East Chicago Avenue;
From 2.60 feet to 2.66 feet along the East line of property onto North Michigan Avenue;
From 0.03 feet to 0.74 feet along the South line of property onto East Superior Street; and
From 0.23 feet to 0.51 feet along the West line of property onto South Street.

B-2

## EXHIBIT B
(Additional Exceptions to Title)

1-6. Intentionally deleted.

B-1

**EXHIBIT C**

(Required Tenants)

Banana Republic, LLC
Polo Illinois, LLC
Tiffany and Company
American Girl
Pottery Barn
Victoria's Secret

C-1

---

c) Encroachment of various home, glass, concrete, and metal canopies affixed to building located mainly on the land over and onto the public rights of way, by varying distances, as follows:

From 2.00 feet to 3.68 feet along the North line of property onto East Chicago Avenue;
From 1.68 feet to 2.00 feet along the East line of property onto North Michigan Avenue;
From 3.18 feet to 13.60 feet along the South line of property onto East Superior Street; and
From 3.57 feet to 5.00 feet along the West line of property onto Rush Street.

d) Encroachment of sign affixed to building located mainly on the land over and onto North Michigan Avenue east and adjoining by an unclosed amount.

9. Easement and Operating Agreement recorded July 1, 1999 as Document 99023467 made by and between American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated April 30, 1994 and known as Trust Number 118119-01 and Marshall Field's company, an Illinois limited liability company, and the terms and provisions contained therein, as amended by 730 North Michigan Avenue, L.L.C., an Illinois limited liability company pursuant to Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated December 29, 2000 and recorded December 29, 2000 as Document number 0001027704 to 730 North Michigan Avenue L.L.C., an Illinois Limited Liability Company.

10. Terms and Conditions of the Agreement to Leases dated May 25, 1994 as disclosed by a Memorandum of Lease entered into as of May 25, 1994 by and between Robert L. Stern, Lessor, and American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated April 30, 1994 and known as Trust No. 118119-01 as Lessee, recorded June 1, 1994 as Document 94051519. Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated December 29, 2000 and recorded December 29, 2000 as Document 0001027704.

11. Terms and Conditions of the Memorandum of Lease made as of January 1, 1999 by and between American National Bank and Trust Company of Chicago, as Trustee under Trust Agreement dated April 30, 1994 and known as Trust No. 118119-01 and Polo Illinois, L.L.C., a Delaware Limited Liability Company recorded July 1, 1999 as Document 99023465, and rights of all parties claiming thereunder.

12. Terms and Conditions of a certain Lease made by as of January 25, 1999 by and between American National Bank and Trust Company of Chicago as Trustee under Trust Agreement dated April 30, 1994 and known as Trust No. 118119-01 and Banana Republic, LLC, as evidenced by a Memorandum thereof dated June 11, 1994 and recorded July 1, 1999 as Document 99023460, and rights of all parties claiming thereunder which affects only part of the premises demised by Robert L. Stern, to American National Bank and Trust Company of Chicago, as Trustee, under trust agreement dated April 30, 1994 and known as Trust Number 118119-01 under that certain Agreement to Lease dated May 25, 1994 as disclosed by Memorandum of Lease dated May 25, 1994 and recorded June 1, 1994 as Document 94051519, and Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated December 29, 2000 and recorded December 29, 2000 as Document 0001027704 which demises the Leasehold Estate in the parcel described below:

Lots 45, 46, 47, and 48 in 730 N. Michigan Avenue Subdivision being a Subdivision in the North fractional 1/2 of Section 10, Township 39 North, Range 14 East of the Third Principal Meridian, recorded June 30, 1999 as Document 99051468, in Cook County, Illinois.

13. The rights of tenants under the Leases as tenants only.

14. Easements as shown on plat of 730 N. Michigan Avenue Subdivision recorded June 30, 1999 as Document Number 99051468.

B-3

## EXHIBIT D

### TENANT'S ESTOPPEL CERTIFICATE

The undersigned ("Tenant") hereby certifies to 730 North Michigan Avenue, L.L.C. ("Landlord") and to any prospective purchaser and such prospective purchaser's lender as follows, with the understanding that Landlord, such prospective purchaser and prospective purchaser's lender, are relying on such certification in connection with the proposed sale of 730 North Michigan Avenue, Chicago, Illinois (the "Building"):

(1)   Tenant is the tenant under that certain lease (as amended from time to time, the "Lease") dated _____ between Landlord, as landlord, and Tenant, as tenant.

(2)   The Lease has not been amended except as follows: _____

(3)   The Lease is in full force and effect and to the best of Tenant's knowledge and belief, neither Landlord nor the Tenant is in default in any respect under the Lease and Tenant has no exiting offsets or defenses against the enforcement of the Lease by Landlord. Except for the Lease, there are no agreements or other arrangements between Tenant and Landlord in respect of the Leased Premises or the Building.

(4)   The Lease commenced on _____ and will expire on _____ unless sooner terminated as provided in the Lease.

(5)   Tenant is in possession of the premises leased to it (the "Leased Premises") and to the best of Tenant's knowledge and belief, Landlord has complied fully and completely with all of its covenants, warranties and other undertakings and obligations under the Lease as of this date (including, without limitation, construction of all tenant or Building improvements and the payment of all landlord work contributions, tenant work allowances or rent abatements).

(6)   The amount of the annual base rental under the Lease is $_____. Tenant has not made any prepayment of rent under the Lease more than one month in advance. All rentals, whether base or additional, and all other sums payable by Tenant under the Lease or any amendment thereto, have been paid through _____. A security deposit in the amount of $_____ was paid upon commencement of the Lease.

(7)   Tenant has no option or right of first refusal to purchase any of the Leased Premises.

(8)   Tenant is solvent and free from bankruptcy and other reorganization proceedings and assignments for the benefit of creditors.

(9)   Tenant has not sublet or assigned any portion of the Leased Premises.

(10)   This letter shall inure to the benefit of Landlord, its successors and assigns, any purchaser of the Building and their lender, and shall be binding upon Tenant and Tenant's heirs,

D-1

legal representatives, successors and assigns.  This letter shall not be deemed to alter or modify any of the terms and conditions of the Lease.

EXECUTED this ____ day of _____, 2007.

Name: _____
Address: _____

D-2

**EXHIBIT E**

**INTENTIONALLY DELETED**

E-1

---

**EXHIBIT F**

**GROUND LEASE ESTOPPEL**

**LANDLORD ESTOPPEL CERTIFICATE AND AGREEMENT**

TO:  Century 21 Chicago, LLC, a Delaware LLC ("Purchaser")

THE UNDERSIGNED HEREBY CERTIFIES AND AGREES:

1.    The undersigned, ADELE HILLMAN STERN (as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust), CHICAGO AND RUSH JOINT VENTURE and ADELE HILLMAN STERN (trustee under a declaration of trust dated April 29, 1999 and known as the AHS Trust), collectively, are the Landlord ("Landlord") under that certain Agreement to Lease, dated as of May, 10, 1994, by and between ROBERT L. STERN, an individual residing in the State of California (as predecessor in interest to Landlord), and 730 NORTH MICHIGAN AVENUE L.L.C. ("730" Successor-in-interest to LASALLE BANK NATIONAL ASSOCIATION, as successor trustee to American National Bank and Trust Company of Chicago, not personally but solely as Trustee Under Trust Agreement dated April 20, 1994 and known as Trust No. 118199-01) (the "Ground Lease"). The Ground Lease covers the real property legally described in Exhibit A attached hereto and located within the city block in Chicago, Illinois bordered by Rush Street, North Michigan Avenue, Superior Street, and Chicago Avenue (the "Leased Premises").

2.    A true and complete copy of the Ground Lease, including any and all amendments, assignments or guarantees of the Tenant's obligations under the Ground Lease, is attached as Exhibit B and the Ground Lease is the only agreement between Tenant and Landlord relating to the Leased Premises. Except as indicated in Exhibit B, the Ground Lease has not been amended, assigned or otherwise modified and there are no guarantees of the Tenant's obligations under the Ground Lease except as included in Exhibit B. The Ground Lease is valid, in good standing and in full force and effect on the date hereof.

3.    To the best of Landlord's knowledge, neither Landlord nor Tenant is in default in the performance of any of their respective covenants, agreements or conditions contained in the Ground Lease, and there is no condition, state of facts or event that, with the passage of time or the giving of notice, or both, would constitute a default by either party in performance of its obligations under the Ground Lease.

4.    As of the date hereof, there are no existing claims, set-offs or defenses to the enforcement by Tenant against Landlord of any Landlord's agreement, terms, or covenants or conditions contained in the Ground Lease.

5.    The "Commencement Date" of the Ground Lease was June 3, 1994. The current "Term" of the Ground Lease will expire on June 3, 2093.

F-1

6. The current "Annual Rent" payable by Tenant under the Ground Lease is $_____. Tenant has paid all required installments of Annual Rent through _____. In addition to Annual Rent, Tenant has paid the following amounts of "Rent" in advance through the dates indicated below:

7. The initial "Option Purchase Price" for the "Fee Estate" under Section 22 and Section 23 of the Ground Lease is $_____. As of the date hereof, Tenant has not exercised any of its options or first refusal rights granted under Section 22 or Section 23 of the Ground Lease and no event has occurred which would give Tenant the right to purchase the Fee Estate pursuant to the terms of Section 22 or Section 23 of the Ground Lease. Except as contained in Section 22 and Section 23 of the Ground Lease, Tenant has no option or right of first refusal to purchase the Fee Estate and Landlord has no option to cause Tenant or any guarantor to purchase the Fee Estate.

8. No bankruptcy proceedings, whether voluntary or otherwise, are pending against Landlord. As of the date hereof, there are no Fee Mortgages (as such term is defined in the Ground Lease).

9. This certification is made to induce Purchaser to purchase the Leased Premises (or alternatively to acquire the direct or indirect ownership interest in the Tenant) and Landlord acknowledges that Purchaser will rely upon the truth of this certification. This Estoppel and the representations and agreements made herein shall inure to the benefit of Purchaser, its successors and assigns and shall be binding on Landlord, its heirs, legal representatives, successors and assigns. In addition, this certification may be relied upon by a current mortgage lender to the Tenant.

Dated: _____, 2007.

ADELE HILLMAN STERN, an individual residing in the State of California (as Legatee) as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust

CHICAGO AND RUSH JOINT VENTURE

By:
Name: Adele Hillman Stern
Its:   Manager

ADELE HILLMAN STERN, Trustee under a declaration of trust dated April 29, 1999 and known as the AHS trust

F-2

SSL-DOCS1 1842856v6

STATE OF          )
                  ) SS.
COUNTY OF         )

I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that Adele Hillman Stern, an individual residing in the State of California (as Legatee) as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at his own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____, 2007.

_____
Notary Public

My commission expires _____

F-3

SSL-DOCS1 1842856v6

STATE OF )
) ss.
COUNTY OF )

I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that Adele Hillman Stern, as _____ of Chicago Rush Joint Venture, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at his own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____ 2007.

_____
Notary Public

My commission expires _____

F-4

SSL-DOCS1 1842264/6

STATE OF )
) ss.
COUNTY OF )

I, _____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY, that Adele Hillman Stern, as trustee under a declaration of trust dated April 29, 1999 and known as the AHS Trust, who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed and delivered the said instrument at his own free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____ 2007.

_____
Notary Public

My commission expires _____

F-5

SSL-DOCS1 1842264/6

Exhibit B

Ground Lease

F-7

SSL-DOCS1 1842304v6

Exhibit A

Leased Premises

F-6

SSL-DOCS1 1842654v6

# EXHIBIT G

## EOA ESTOPPEL

### EASEMENT AND OPERATING AGREEMENT ESTOPPEL CERTIFICATE

TO: Century 21 Chicago, LLC, a Delaware limited liability company (the "Purchaser")

730 NORTH MICHIGAN AVENUE, L.L.C., as Delaware limited liability company, as successor in interest to 730 NORTH MICHIGAN AVENUE VENTURE, as successor in interest to AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, NOT PERSONALLY BUT SOLELY AS TRUSTEE UNDER TRUST AGREEMENT DATED APRIL 20, 1994 AND KNOWN AS TRUST NO. 118199-01 ("Retail Owner")

RE: 730 North Michigan Avenue, Chicago, Illinois

Pursuant to Article 15 of that certain Easement and Operating Agreement, dated as of June 30, 1999 by and between Retail Owner (as successor in interest) and Peninsula Chicago LLC, a Delaware limited liability company ("Hotel Owner"), (the "EOA"), the undersigned does hereby certify to the Purchaser, Retail Owner and any lender providing financing to Purchaser, that as of the date hereof, the following:

1. The Hotel Owner is the "Existing Hotel Owner" as described in the EOA, which EOA covers the Retail Parcel legally described in Exhibit A attached hereto and the Hotel Parcel legally described in Exhibit B attached hereto and all of which is located within the city block in Chicago, Illinois bordered by Rush Street, North Michigan Avenue, Superior Street, and Chicago Avenue (the "Property").

2. A true and complete copy of the EOA, including any and all amendments, assignments or guaranties of the Retail Owner's and Hotel Owner's obligations under the EOA, is attached as Exhibit C. Except as indicated in Exhibit C, the terms of the EOA are unmodified and are in full force and effect.

3. To the knowledge of the executive officer of Hotel Owner executing this document there exists no default under the EOA by Retail Owner in the performance of any of Retail Owner's covenants, agreements or conditions contained in the EOA, except as follows (if none, please indicate none):

4. There are no sums, other than those arising out of the normal course of operation of the Building (as defined in the EOA) within the previous ninety (90) days, which the Hotel Owner is entitled to receive or demand from the Retail Owner, except as follows (if none, please indicate none):

5. Hotel Owner has not performed nor is performing work (other than services described in Article 5 of the EOA), the cost of which Hotel Owner is or will be entitled to charge in whole or in part to Retail Owner under the provisions of the EOA, but has not yet charged to Retail Owner, except as follows (if none, please indicate none):

G-1

SSL-DOCS1 1842350-6

6. Hotel Owner is not asserting nor, to the best knowledge of the executive officer of Hotel Owner executing this document is capable of asserting (after giving the requisite notice, if any, required under the EOA) any set-offs, claims, counterclaims or defenses against the enforcement of the Retail Owner's rights hereunder, except as follows (if none, please indicate none):

7. The Retail Owner has not requested that a matter be submitted to arbitration, which matter has not been discharged, released or otherwise resolved, except as follows (if none, please indicate none) (if such a matter exists, please deliver a copy of any notices with the Estoppel Certificate):

8. The nature of any arbitration proceeding or finding under Article 11 of the EOA made within the ninety (90) days preceding the date of this Estoppel Certificate, except as follows (if none, please indicate none):

9. The current address to which notices given to the Hotel Owner are to be mailed is:

Peninsula Chicago LLC
c/o St. George's Building, 8th Floor
2 Ice House Street, Central
Hong Kong
Attn: Chief Financial Officer
Telecopy: 852-2868-4770

and to

Arnstein & Lehr LLP
120 South Riverside Plaza
Suite 1200
Chicago, Illinois 60606
Attn: Raymond J. Werner, Esq.
Telecopy: 312-876-0288

10. Hotel Owner understands and acknowledges that this certificate is delivered to and shall be relied on by, the Purchaser in connection with a sale of the Retail Owner's interest in the Property and the building located thereon (or alternatively, ownership interests in Retail Owner) and any lender providing financing to such Purchaser.

G-2

SSL-DOCS1 1842350-6

Dated: _____, 2007

PENINSULA CHICAGO LLC, a Delaware limited
liability company

By:   HSH Chicago, Inc. a Delaware corporation,
      its Member
      By: _____
      Name: _____
      Its: _____

G-3

SSL-DOCS1 1842856v6

STATE OF _____ )
                    ) SS
COUNTY OF _____ )

I, _____, a Notary Public in the _____ aforesaid, DO
HEREBY CERTIFY, that _____ of HSH, Chicago, Inc.,
a Delaware corporation (the "Corporation"), a member of Peninsula Chicago LLC, a Delaware
limited liability company, who is personally known to me to be the same person whose name is
subscribed to the foregoing instrument, appeared before me this day in person and acknowledged
that he signed and delivered the said instrument at the free and voluntary act of the Corporation,
for the uses and purposes therein set forth.

Given under my hand and Notarial Seal this _____ day of _____,
2007.

NOTARY PUBLIC STAMP AND SEAL

G-4

SSL-DOCS1 1842856v6

Exhibit B
Hotel Parcel

G-6

SSL-DOCS1 1922554/6

Exhibit A
Retail Parcel

G-5

SSL-DOCS1 1842254V6

Exhibit C

EOA

# EXHIBIT H

## PENINSULA SUBLEASE ESTOPPEL

### GROUND SUBLEASE TENANT ESTOPPEL CERTIFICATE

TO:     Century 21 Chicago, LLC, a Delaware LLC (the "Purchaser")

730 NORTH MICHIGAN AVENUE, L.L.C., an Delaware limited liability company ("Landlord"), as successor in interest to 730 NORTH MICHIGAN AVENUE VENTURE, successor in interest to AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, NOT PERSONALLY BUT SOLELY AS TRUSTEE UNDER TRUST AGREEMENT DATED AS OF APRIL 20, 1994 AND KNOWN AS TRUST NO. 118189-01 ("Original Landlord")

RE:     Premises known as and located at 730 North Michigan Avenue (the "Building")

The undersigned, Peninsula Chicago LLC, a Delaware limited liability company ("Tenant"), does hereby certify to the Purchaser, Landlord and any lender providing financing to the Purchaser, as of the date hereof as follows:

1.      Tenant is the tenant under that certain lease dated January 29, 1999 between Tenant and Original Landlord, sub-leasing certain premises as more particularly described in the said lease (the "Premises"). Said lease, as so amended, modified or supplemented, is hereinafter referred to as the "Lease". A true and complete copy of the Lease is attached hereto as Exhibit A.

2.      The Lease is in full force and effect and, except as set forth above, has not been amended, modified or supplemented.

3.      The Lease represents the entire agreement between Tenant and Landlord with respect to the leasing of the Premises, and there are no other agreements of any kind between Landlord and Tenant with respect thereto other than a certain side letter dated as of June 30, 1999 (the "Side Letter"), a certain Memorandum of Agreement of Lease dated June 11, 1999 and a certain Agreement of Subordination, Non-Disturbance and Attornment dated as of June 29, 1999. Without limiting the foregoing, Tenant does not have any rights of first refusal for additional space, options to increase or relocate its space or options to purchase the Premises or any interest therein except as described in the Lease.

4.      To the best of knowledge of the person executing this document, all obligations of each of Landlord and Tenant to be performed or complied with through the date hereof have been fully performed and complied with.

5.      The term of the Lease commenced on June 29, 1999 and shall expire on May 1, 2093, unless sooner terminated in accordance with the terms of the Lease.     To the best of

H-1

G-7

SSL-DOCS1 1842365v6

knowledge of the person executing this document, (i) neither Landlord nor the Tenant is in default in any material respect under the Lease; and (ii) the Tenant has not existing defenses or offsets against the enforcement of the Lease by Landlord.

Letter.

6. The current rent under the Lease is as provided in the Lease subject to the Side Letter.

7. Tenant understands and acknowledges that this certificate is delivered to, and shall be relied on by, the Purchaser and its successors and assigns in connection with a sale to Purchaser of either: (a) the Landlord's interest in the Building and the land on which it stands; or (b) a sale by the direct or indirect owners as Landlord of their ownership interests in Landlord.

8. The undersigned represents and warrants that he or she is duly authorized to execute and deliver this Estoppel Certificate on behalf of Tenant. In addition, this Estoppel Certificate may be relied upon by the current mortgage lender to Tenant, Purchaser and any lender providing financing to Purchaser.

PENINSULA CHICAGO LLC, a Delaware limited liability company

By: HSH Chicago, In., a Delaware corporation, its member

By: _____
Name: _____
Its _____
Dated: _____

H-2

SSL-DOCS1 1842560/6

Exhibit A
The Lease

H-3

SSL-DOCS1 1842560/6

## EXHIBIT I
### (Deed)

DOCUMENT PREPARED BY:
_____
_____
_____

AFTER RECORDING RETURN TO:
_____
_____
_____

(Space above this Line for County Recorder's Use Only)

### SPECIAL WARRANTY DEED
### (Illinois)

THE GRANTOR, _____, a(n) _____ limited liability company, for and in consideration of TEN and 00/100 DOLLARS ($10.00), and other valuable consideration, hereby REMISES, RELEASES, ALIENS AND CONVEYS to _____, a(n) _____, all of Grantor's right, title and interest in the real property situated in the State of Illinois, County of _____, legally described on *Exhibit A* attached hereto and made a part hereof, subject to those matters set forth on said *Exhibit A*. The addresses and permanent index numbers of said real estate are set forth on said *Exhibit A*.

TOGETHER WITH all and singular the hereditaments and appurtenances thereunto belonging, or in any way appertaining, TO HAVE AND TO HOLD the said described property forever. Grantor does covenant, promise and agree that it has not done or suffered to be done anything whereby the said described property hereby granted is, or may be, in any manner encumbered or charged, except as herein recited, and Grantor will warrant and defend same for all persons claiming by through or under Grantor, subject to the matters set forth on *Exhibit A*.

SSL-DOCS1 1842865v16

I-1

---

IN WITNESS WHEREOF, Grantor has caused this Special Warranty Deed to be executed and delivered as of the _____ day of _____, 20__.

730 NORTH MICHIGAN AVENUE, L.L.C., a Delaware limited liability company

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

Send subsequent tax bills to:
_____
_____
_____

SSL-DOCS1 1842865v16

I-2

# EXHIBIT I

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (this "Assignment") is executed as of the _____ day of _____, 20___ by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") and _____, a _____, having an address c/o _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of _____ between Assignor and Assignee).

WHEREAS, the Property is encumbered by those certain tenants (the "Tenants") occupying space under the leases listed and described on Exhibit A annexed hereto and made a part hereof (collectively, the "Tenant Leases").

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as provided herein, all of Assignor's right, title and interest in and to the Tenant Leases.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Tenant Leases.

2. Assignee hereby affirmatively and unconditionally assumes all of Assignor's obligations and liabilities under the Tenant Leases arising from and after the date hereof.

3. This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

4. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

5. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

I-1

SSL-DOCS1 1842305v6

---

STATE OF _____ )
                      ) SS
COUNTY OF _____ )

I, the undersigned, a Notary Public in and for the County and State aforesaid, do hereby certify that _____ a(n) _____ of _____ limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such _____ appeared before me this day in person and acknowledged that __he signed and delivered the said instrument as _____ own free and voluntary act, and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

GIVEN, under my hand and Notarial Seal this _____ day of _____, 20___.

_____
Notary Public

I-3

SSL-DOCS1 1842305v6

**EXHIBIT A**
(List of Leases)

J-3

---

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

ASSIGNEE:

[_____]

By: _____
Name:
Title:

J-2

EXHIBIT K

## BILL OF SALE AND GENERAL ASSIGNMENT

THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignment") is executed as of the _____ day of _____, 20___ by 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") in favor of _____, having an address c/o _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of _____ between Assignor and Assignee).

WHEREAS, Assignor desires to assign, transfer, setover and deliver to Assignee all of Assignor's rights, if any, in and for all furnishings, fixtures, fittings, appliances, apparatus, equipment, machinery and other items of personal property, if any, affixed or attached to, or placed or situated upon, the Property, and the following incidental rights and appurtenances relating thereto (collectively, the "Assigned Properties"):

A.    To the extent assignable without third party consents or any cost or expense to Assignor, all of Assignor's right, title and interest in and to all use, occupancy, building and operating permits, licenses, approvals, documents, instruments, if any, issued from time to time with respect to the Property or the Assigned Properties; provided, however, if any such assignment may be made at an additional cost or expense, Assignor shall assign all of Assignor's right, title and interest therein if and to the extent Assignee shall pay such additional cost or expense; and

B.    All of Assignor's right, title and interest in and to all existing and assignable guaranties and warranties (express or implied), if any, issued in connection with the construction, alteration and repair of the Property and/or the purchase, installation and the repair of the Assigned Properties.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignor hereby assigns, transfers, sets over and delivers to Assignee, its successors and assigns, all of Assignor's right, title and interest, if any, in and to the Assigned Properties.

2.    This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

K-1

3.    This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

4.    The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, Assignor has caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

730 NORTH MICHIGAN AVENUE, L.L.C.

By:    730 NMA Holding Inc., its sole member

    By: _____
        Name:
        Title:

By: _____
    Name:
    Title:

K-2

## EXHIBIT L

### CERTIFICATION OF NON-FOREIGN STATUS UNDER TREASURY REGULATIONS SECTION 1.1445-2(b)

#### (NON-DISREGARDED ENTITY GRANTOR/TRANSFEROR)

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by 730 North Michigan Avenue, L.L.C., the undersigned hereby certifies the following on behalf of 730 North Michigan Avenue, L.L.C.:

1. 730 North Michigan Avenue, L.L.C. is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2. 730 North Michigan Avenue, L.L.C. is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3. 730 North Michigan Avenue, L.L.C.'s U.S. employer identification number is _____; and

4. 730 North Michigan Avenue, L.L.C.'s office address is c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167.

730 North Michigan Avenue, L.L.C. understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of 730 North Michigan Avenue, L.L.C.

Dated: _____

By: _____
Name:
Title:

L-1

SSL-DOCS1 1842816v6

## EXHIBIT M

### ASSIGNMENT AND ASSUMPTION OF CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "Assignment") is executed as of the ____ day of ____ 20__ by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") and _____, a _____, having an address _____ ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of October __, 2007 between Assignor and Assignee).

WHEREAS, in connection with its ownership and management of the Property, Assignor has entered into those certain maintenance, service and supply contracts and equipment leases, in effect on the date hereof, listed and described on Exhibit A annexed hereto and made a part hereof (collectively, the "Contracts").

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as herein provided, all of Assignor's right, title and interest in and to the Contracts.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Contracts.

2. This Assignment shall constitute a direction and full authority to any person or entity that is a party to any of the Contracts to perform its obligation under the Contracts for the benefit of Assignee without further proof to any such party of the assignment to Assignee of the Contracts.

3. Assignee hereby affirmatively and unconditionally assumes all of the obligations and liabilities of Assignor under the Contracts arising from and after the date hereof.

4. This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

5. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall

M-1

SSL-DOCS1 1842816v6

**EXHIBIT A**

(Contracts)

M-3

---

constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

6. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

ASSIGNOR:

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
Name:
Title:

By: _____
Name:
Title:

ASSIGNEE:

[_____]

By: _____
Name:
Title:

N-2

## EXHIBIT N

### ASSIGNMENT AND ASSUMPTION OF GROUND LEASE

THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASE (this "Assignment") is executed as of the ____ day of _____, 20__ by and between 730 North Michigan Avenue, L.L.C., a Delaware limited liability company, having an address c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Assignor") and [_____] ("Assignee"). c/o [_____] [_____].

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain Contract of Sale dated as of _____ between Assignor and Assignee).

WHEREAS, the Property is subject to that certain Agreement to Lease, dated as of May 10, 1994 (the "Ground Lease"), between Robert L. Stern ("Ground Lessor"), and 730 North Michigan Avenue L.L.C.

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as provided herein, all of Assignor's right, title and interest in and to the Ground Lease.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Ground Lease.

2. Assignee hereby affirmatively and unconditionally assumes all of Assignor's obligations and liabilities under the Ground Lease arising from and after the date hereof.

3. This Assignment is made without warranty, representation, or guaranty by, or recourse against Assignor of any kind whatsoever.

4. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

5. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

N-1

SSL-DOCS1 1842354/6

**ASSIGNOR:**

730 NORTH MICHIGAN AVENUE, L.L.C.

By: 730 NMA Holding, Inc., its sole member

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

**ASSIGNEE:**

By: _____
   Name:
   Title:

N-2

SSL-DOCS1 1842354/6

## EXHIBIT O

(Escrow Agreement)

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement"), dated as of the ___ day of the _____, 20__, is among FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK, having an address at 633 Third Avenue, New York, New York 10017 ("Escrowee"), 730 NORTH MICHIGAN AVENUE, L.L.C., having an address at c/o J.P. Morgan Investment Management Inc., 245 Park Avenue, New York, New York 10167 ("Seller"), and CENTURY 21 CHICAGO, LLC, having an address at 22 Cortlandt Street, New York, New York 10007 ("Purchaser").

## WITNESSETH

WHEREAS, Seller and Purchaser entered into that certain Contract of Sale dated as of October ___ 2007 for the purchase and sale of the property known as 730 North Michigan Avenue, Chicago, Illinois (the "Property"), as more particularly described therein (hereinafter referred to as the "Contract");

WHEREAS, the Contract provides for the terms and conditions applicable to the sale and purchase of the Property and the performance obligations and rights of Seller and Purchaser; and

WHEREAS, Seller and Purchaser agree, pursuant to the Contract, that Escrowee shall hold, in escrow the Deposit (capitalized terms not otherwise defined herein are defined pursuant to Paragraph 6 hereof) in accordance with the terms and conditions of the Contract and this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1. Appointment of Agent.

   1.1 Purchaser and Seller hereby appoint Escrowee to act as their escrow agent on the terms and conditions hereinafter set forth, and Escrowee accepts such appointment.

   1.2 Escrowee agrees to hold the Deposit on behalf of the parties to the Contract, and to apply, disburse and deliver the Deposit as provided in the Contract and this Agreement. In the event of any conflict between the terms and conditions of the Contract and the terms or conditions of this Agreement, as to the obligations of Escrowee, the terms and conditions of this Agreement shall govern and control.

2. Disposition of the Deposit.

O-1

2.1 Escrowee shall hold the Deposit in an interest bearing savings account which rate of interest need not be maximized. Escrowee shall not commingle the Deposit with any other funds.

2.2 Escrowee shall pay the Deposit to Seller or otherwise in accordance with the terms of the Contract. If prior to the Closing, either party makes a demand upon Escrowee for delivery of the Deposit, Escrowee shall give notice to the other party of such demand. If a notice of objection to the proposed payment is not received from the other party within seven (7) Business Days after the giving of notice by Escrowee, Escrowee is hereby authorized to deliver the Deposit to the party who made the demand. If Escrowee receives a notice of objection within said period, then Escrowee shall continue to hold the Deposit and thereafter pay it to the party entitled when Escrowee receives (a) notice from the objecting party withdrawing the objection, or (b) a notice signed by both parties directing disposition of the Deposit, or (c) a judgment or order of a court of competent jurisdiction.

2.3 Nothing in this Section 2 shall have any effect whatsoever upon Escrowee's rights, duties, and obligations under Section 3.

3. Concerning Escrowee.

   3.1 Escrowee shall be protected in relying upon the accuracy, acting in reliance upon the contents, and assuming the genuineness of any notice, demand, certificate, signature, instrument or other document which is given to Escrowee without verifying the truth or accuracy of any such notice, demand, certificate, signature, instrument or other document;

   3.2 Escrowee shall not be bound in any way by any other contract or understanding between the Seller and Purchaser, whether or not Escrowee has knowledge thereof or consents thereto unless such consent is given in writing;

   3.3 Escrowee's sole duties and responsibilities shall be to hold and disburse the Deposit in accordance with this Agreement and the Contract; provided, however, that Escrowee shall have no responsibility for the clearing or collection of the check representing the Deposit;

   3.4 Upon the disbursement of the Deposit in accordance with this Agreement, Escrowee shall be relieved and released from any liability under this Agreement;

   3.5 Escrowee may resign at any time upon at least ten (10) Business Days prior written notice to the Seller and Purchaser hereto. If, prior to the effective date of such resignation, the Seller and Purchaser hereto shall have approved, in writing, a successor escrow agent, then upon the resignation of Escrowee, Escrowee shall deliver the Deposit to such successor escrow agent. From and after such resignation and the delivery of the Deposit to such successor escrow agent, Escrowee shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement, all of which duties, responsibilities and obligations shall be performed by the appointed successor escrow agent. If for any reason Seller and Purchaser shall

O-2

not approve a successor escrow agent within such period, Escrowee may bring any appropriate action or proceeding for leave to deposit the Deposit with a court of competent jurisdiction, pending the approval of a successor escrow agent, and upon such deposit Escrowee shall be fully relieved of all of its duties, responsibilities and obligations under this Agreement;

3.6    Seller and Purchaser hereby agree to, jointly and severally, indemnify, defend and hold harmless Escrowee from and against any liabilities, damages, losses, costs or expenses incurred by, or claims or charges made against, Escrowee (including reasonable attorneys' fees and disbursements) by reason of Escrowee performing its obligations pursuant to, and in accordance with, the terms of this Agreement, but in no event shall Escrowee be indemnified for its negligence, willful misconduct or breach of the terms of this Agreement;

3.7    In the event that a dispute shall arise in connection with this Agreement or the Contract, or as to the rights of Seller and Purchaser in and to, or the disposition of, the Deposit, Escrowee shall have the right to (w) hold and retain all or any part of the Deposit until such dispute is settled or finally determined by litigation, arbitration or otherwise, or (x) deposit the Deposit in an appropriate court of law, following which Escrowee shall thereby and thereafter be relieved and released from any liability or obligation under this Agreement, or (y) institute an action in interpleader or other similar action permitted by stakeholders in the State of New York, or (z) interplead Seller or Purchaser in any action or proceeding which may be brought to determine the rights of Seller and Purchaser to all or any part of the Deposit; and

3.8    Escrowee shall not have any liability or obligation for loss of all or any portion of the Deposit by reason of the insolvency or failure of the institution of depository with whom the escrow account is maintained.

4.    Termination.

This Agreement shall automatically terminate upon the delivery or disbursement by Escrowee of the Deposit in accordance with the terms of the Contract and terms of this Agreement, as applicable.

5.    Notices.

All notices, requests or other communications which may be or are required to be given, served or sent by any party hereto to any other party hereto shall be deemed to have been properly given, if in writing and shall be deemed delivered (a) upon delivery, if delivered in person or by facsimile transmission with receipt thereof confirmed by printed facsimile acknowledgment (with a confirmation copy delivered in person or by overnight delivery), (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the United States Postal Office and sent by registered or certified mail, postage paid, return receipt requested, and in each case, addressed as follows:

SSL-DOC21 1942426v16

O-3

---

If to Seller:

730 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management Inc.
245 Park Avenue
New York, New York 10167
Attention: Mary Ann Cate
Facsimile: (212) 648-2266

with a copy to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attention: Brian Diamond, Esq.
Facsimile: (212) 806-6006

If to Purchaser:

Century21 Chicago, LLC
c/o Century 21 Department Stores
22 Cortlandt Street
New York, New York 10007

Attention: Raymond Gindi
Facsimile: (212) 528-0816

Katsky Korins LLP
605 Third Avenue
New York, New York 10158-0038

Attention: Randolph Annenquai, Esq.
Facsimile: (212) 716-3343

with a copy to:

If to Escrowee:

First American Title Insurance Company of New York
633 Third Avenue
New York, New York 10017

Attention: Steven Napolitano
Facsimile: (212) 331-1579

O-4

SSL-DOC21 1942426v16

6. Capitalized Terms.

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Contract.

7. Governing Law/Waiver of Trial by Jury.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES OF SUCH STATE. THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT.

8. Successors.

This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto; provided, however, that except as expressly provided herein as to the Escrowee, this Agreement may not be assigned by any party without the prior written consent of the other parties.

9. Entire Agreement.

This Agreement, together with the Contract, contains the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

10. Amendments.

Except as expressly provided in this Agreement, no amendment, modification, termination, cancellation, rescission or supersession to this Agreement shall be effective unless it shall be in writing and signed by each of the parties hereto.

11. Counterparts and/or Facsimile Signatures.

This Agreement may be executed in any number of counterparts, including counterparts transmitted by facsimile, any one of which shall constitute an original of this Agreement. When counterparts or facsimile copies have been executed by all parties, they shall have the same effect as if the signatures to each counterpart or copy were upon the same documents and copies of such documents shall be deemed valid as originals. The parties agree that all such signatures may be transferred to a single document upon the request of any party. This Agreement shall not be binding unless and until it shall be fully executed and delivered by all parties hereto. In the event that this Agreement is executed and delivered by way of facsimile transmission, each party delivering a facsimile counterpart shall promptly deliver an ink-signed original counterpart of the Agreement to the other party by overnight courier service; provided, however, that the failure of a party to deliver an ink-signed original counterpart shall not in any

O-5

way effect the validity, enforceability or binding effect of a counterpart executed and delivered by facsimile transmission.

12. Severability.

If any provision of the Agreement or the application of any such provision to any person or circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

[Remainder of Page Intentionally Left Blank]

O-6

IN WITNESS WHEREOF, the parties have executed and delivered this Escrow Agreement as of the date and year first above written.

FIRST AMERICAN TITLE INSURANCE
COMPANY OF NEW YORK

By: _____
   Name:
   Title:

730 NORTH MICHIGAN AVENUE, L.L.C.

By:  730 NMA Holding, Inc., its sole
     member

     By: _____
       Name:
       Title:

     By: _____
       Name:
       Title:

[INSERT NAME OF PURCHASER]

By: _____
   Name:
   Title:

O-7

---

# EXHIBIT P

## (Form of Tenant Notice)

730 North Michigan Avenue, L.L.C.
c/o J.P. Morgan Investment Management Inc.
245 Park Avenue
New York, New York 10167

_____, 20__

**By Certified Mail-**
**Return Receipt Requested**

_____
_____
_____
_____

Re:  Lease (the "Lease") dated _____ between _____ ("Landlord") and _____, encumbering certain real property known as _____ (the "Property")

Ladies and Gentlemen:

Please be advised that (1) Landlord has conveyed all of its right, title and interest in and to the Property, including its interest as landlord under the Lease, to _____ ("Purchaser"), and (2) Purchaser has assumed Landlord's obligations under the Lease.

Accordingly, effective as of the date hereof, you are hereby notified and directed to deliver all future rent and additional rent payments due under the Lease, and any notices, inquiries or requests relating thereto, to Purchaser at:

_____
_____
_____

P-1

## EXHIBIT Q

## LEASES

1. Retail Complex Lease dated January 25, 1996 between TKM L.L.C. ("Landlord") and PRL Retail Concepts of Illinois, Inc. ("Tenant"), as amended by that certain First Amendment to Lease dated January 21, 1997 between 730 North Michigan Avenue Venture ("Venture"), as successor in interest to Landlord, and Tenant, as amended by that certain Sublease Agreement dated August 14, 1998 between PRL Restaurant Concepts of Illinois, LLC as subtenant, and Polo Illinois, LLC, as successor by merger with Tenant, as tenant, as amended by that certain Second Amendment to Lease dated March 10, 1999 between Venture and Tenant and as amended by that certain Third Amendment to Lease dated August 31, 2000 between Venture and Polo Illinois, LLC, as successor by merger to Tenant.

2. Retail Complex Lease dated January 1, 1999 between 730 North Michigan Avenue Venture as landlord and Peninsula Chicago LLC as tenant.

3. Retail Complex Lease dated March 18, 1996 between TKM L.L.C. as landlord and Williams-Sonoma, Inc. as tenant ("Tenant"), as assigned by that certain Assignment and Assumption Agreement dated July 7, 1998 between Tenant as assignor and Williams-Sonoma Stores, Inc. as assignee.

4. Retail Complex Lease dated December 13, 1996 between 730 North Michigan Avenue Venture as landlord and CompUSA Inc. ("Tenant"), as assigned by Tenant as assignor to CompUSA Stores L.P. as assignee by that certain letter dated January 21, 1999.

5. Retail Complex Lease dated January 22, 1996 between TKM L.L.C. as landlord and Tiffany and Company as tenant.

6. Retail Complex Lease dated November 26, 1996 between 730 North Michigan Avenue Venture ("Landlord") and The Gap, Inc. ("Tenant"), as amended by that certain First Amendment to Lease dated March 30, 1999 between Landlord and The Banana Republic, Inc. (as successor in interest to Tenant) and as assigned by The Banana Republic Inc. as assignor to Banana Republic, LLC as assignee by that certain letter dated January 30, 2004.

7. Retail Complex Lease dated February 14, 1998 between 730 North Michigan Avenue Venture ("Landlord") and American Girl Place, Incorporated ("Tenant"), as amended by that certain First Amendment to Lease dated June 29, 1998 between Landlord and Tenant, as amended by that certain Second Amendment to Lease dated March 24, 1999 between Landlord and Tenant, as amended by that certain Third Amendment to Lease dated April 8, 1999 and as amended by that certain Third Amendment to Lease dated September 7, 2000 between Landlord and Tenant.

Q-1

---

In addition, all security deposits held by Landlord, if any, together with any interest earned thereon, have been transferred to Purchaser.

Very truly yours,

730 North Michigan Avenue, L.L.C.

By: _____
Name: _____
Title

P-2

## EXHIBIT R

### SERVICE CONTRACTS

1.  Agreement with Service Contractor dated June 1, 2007 with Global Water Technology, Inc.

2.  Agreement with Service Contractor dated March 1, 2006 with ConServ, Inc.

3.  Agreement with Service Contractor dated January 25, 2005 with Comtech-MSI

4.  Agreement with Service Contractor dated December 20, 2004 with Premier Security Corporation.

5.  Agreement with Service Contractor dated December 20, 2004 with National Waste Services

6.  Agreement with Service Contractor dated May 4, 2007 with The Trane Company

7.  Agreement with Service Contractor dated January 17, 2005 with Smithereen Exterminating Company, Inc.

8.  Agreement with Service Contractor dated May 24, 2006 with Nalco Company

9.  Agreement with Service Contractor dated March 1, 2006 with The Millard Group

10. Agreement with Service Contractor dated May 31 2007 with Comtech Security, Inc.

11. Master Electric Sales Agreement dated February 27, 2007 with Pepco Energy Services, Inc.

12. Commercial Sales Proposal/Agreement dated February 2, 2005 with ADT Security Services, Inc.

13. Standard Uniform Rental Service Agreement dated December 7, 2004 with Cintas

R-1

SSL-DOCS1 1842345v6

## EXHIBIT S

### LEASING COMMISSIONS

Letter Agreement dated September 26, 2007, between Mid-America Real Estate Corporation and U.S. Equities Realty, as agent for Seller, relating to the Victoria's Secret lease.

Management and Leasing Agreement dated as of December 7, 2004, between 730 NMA Holding, Inc., as agent for Seller, and U.S. Equities Asset Management, L.L.C., as manager.

S-1

SSL-DOCS1 1842345v6

EXHIBIT T

VICTORIA'S SECRET LOI

*USA Equities Realty*

August 20, 2007

Mr. Stanley Nitzberg
Principal
Mid-America Real Estate Corporation
Two Mid America Plaza, Ste. 330
Oakbrook Terrace, IL 60181

Re: 730 North Michigan Avenue, Chicago

Dear Stanley,

Pursuant to our last conversation and our very productive meeting in New York, I am pleased to provide you with the revised proposal for Victoria's Secret Stores, Inc. to open a flagship store in the space currently occupied by Pottery Barn. We look forward to working with you to create a great Victoria's Secret store that will fit with the mix of tenants and the Magnificent Mile. The main terms shall be as follows:

| | |
|---|---|
| Premises: | Ground floor = 11,200 leasable square feet<br>2nd floor = 11,609 leasable square feet<br>Total = 22,809 leasable square feet |
| Tenant: | Victoria's Secret Stores, ~~Inc.~~ LLC |
| Guarantor: | ~~Limited Brands~~ None |
| Use: | Sale of women's clothing ~~and other~~ and such other items sometimes typically sold in Victoria's Secret stores, and services provided |
| Lease Term: | 15 years. |
| Renewal Option: | One 5 year option at market rent with a one year advance notice. |
| Delivery Date and Lease<br>Commencement Date: | July 1, 2008 |
| Rent Commencement: | The earlier of store opening or February 1, 2009, subject to possession no later than July 1, 2008. |
| Annual Base Net Rent: | Year 1 $ 3,400,000<br>Year 2 $ 3,500,000<br>Thereafter 3% compounded annually |

20 North Michigan Avenue, Chicago, Illinois 60602    312 466 7000    Fax 312 456 0055    www.usaeqrltsa.com

Buenos Aires    Chicago    Detroit    Philadelphia    Sao Paulo    Santiago

*lifestyle, infilsale apparel, sleepwear, loungewear, outerwear*

T-1

SSL-DOCS1 1842250v16

August 20, 2007
Page 2

**Percentage Rent:** None

**Operating Expenses & Real Estate Taxes:** Tenant shall pay its proportionate share of actual operating expenses. 2007 estimates are $7.54 per square foot.

Tenant shall pay its proportionate share of real estate taxes on the basis of a formula, taking into account the value between Michigan Avenue, Chicago and Rush. Estimates for 2007 real estate taxes payable in 2008 are $24.42 per square foot.

**Possession:** Tenant shall take the premises "as is" except for removal of previous tenant's fixtures and equipment and no hazardous materials.

**Tenant Allowance:** Landlord will contribute $60.00 per square foot.

**Signage:** Signage shall be subject to Landlord, City and Greater North Michigan Avenue Association approvals. The lease will also contain language for Landlord to approve new storefront and window displays, which will be attached as an exhibit to the lease.

**Repairs:** Landlord will maintain all structural elements of the building, including the roof (capitalized costs to be included as part of CAM on GAAP amortized basis). Tenant shall make the non-structural repairs within its premises.

**Alterations:** After initial construction, Tenant may make any non-structural alterations without Landlord's prior consent, which are less than $100,000 in any lease year subject to submission of plans and reasonable approval of Landlord.

**Utilities:** Electricity is separately metered and paid directly by Tenant. Tenant pays its pro-rata share of water usage. There is no gas service provided to the space. Tenant pays its pro-rata share of chilled water for fan unit cooling via BTU meters.

20 North Michigan Avenue, Chicago, Illinois 60602    212 456 7000    Fax 312 456 0058    www.useaofiles.com
Buenos Aires    Chicago    Detroit    Philadelphia    São Paulo    Santiago

---

August 20, 2007
Page 3

**Continuous Operation:** Tenant shall operate the premises on a continuous basis except for renovation, not to exceed 60 days.

**Assignment and Subletting:** To be negotiated in the lease, subject to Landlord reasonable approval. Any profit shall be split 50/50. Landlord shall have the right to recapture.

**Real Estate Commission:** Subject to a separate commission agreement.

This proposal is subject to finalizing a lease termination with Pottery Barn, who presently occupies the premises. This proposal is valid until August 25, 2007.

The terms and conditions set forth above shall not be binding upon Landlord or Tenant until such time as a lease and related documents have been approved by Tenant and such lease and related documents have been fully executed by both Landlord and Tenant and mutually exchanged.

Sincerely,

U.S. EQUITIES REALTY, LLC

Camille P. Julmy
Vice Chairman

Enclosures

If the above terms are acceptable, please have your client sign below.

**Agreed and Accepted**

VICTORIA'S SECRET STORES, LLC

By: _____

Name: James L. Bersani

Title: Executive Vice President - Retail Real Estate

20 North Michigan Avenue, Chicago, Illinois 60602    312 456 7000    Fax 312 456 0058
Buenos Aires    Chicago    Detroit    Philadelphia    São Paulo    Santiago

LEGAL FORM APPD
AS PER DIGEST
DIGEST APPD
www.usaeqfiles.com

# EXHIBIT U

## RELEASE OF GUARANTY

This Release of Guaranty (this "Release") is made as of this ___ day of _____, 2007, by ADELE HILLMAN STERN, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, CHICAGO AND RUSH JOINT VENTURE, and ADELE HILLMAN STERN, as Successor Trustee of Trust dated April 29, 1999 and known as the AHS Trust (collectively, the "Landlord") to and for the benefit of JPMORGAN CHASE BANK, N.A., AS TRUSTEE UNDER AMENDED AND RESTATED DECLARATION OF TRUST, DATED NOVEMBER 13, 2001, AS AMENDED, FOR ITS COMMINGLED PENSION TRUST FUND (STRATEGIC PROPERTY), (the "Guarantor").

### RECITALS:

WHEREAS, Robert L. Stern ("Stern") and American National Bank and Trust Company of Chicago, not personally but solely as Trustee under Trust Agreement dated as of April 20, 1994 and known as Trust No. 118199-01 ("American National"), entered into that certain Agreement to Lease dated as of May 10, 1994 (the "Lease").

WHEREAS, American National conveyed its interest in the Lease to 730 North Michigan Avenue, L.L.C. ("Owner") pursuant to an Assignment and Assumption of Ground Leases, Subleases and Easement and Operating Agreement dated as of December 26, 2000 and recorded with the Cook County Recorder on December 28, 2000 as Document Number 0001017706;

WHEREAS, the following have succeeded to Stern's interest in the Lease: (i) Adele Hillman Stern, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust, pursuant to a Deed dated December 23, 1994, recorded with the Cook County Recorder as Instrument Number 04-071144, and pursuant to an Independent Administrator Deed dated December 19, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418053; (ii) Chicago and Rush Joint Venture pursuant to an Independent Administrator Deed dated December 18, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418051, and (iii) Adele Hillman Stern, as Successor Trustee of Trust dated April 29, 1999 and known as the AHS Trust pursuant to an Independent Administrator Deed dated December 18, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418052, and a Quit Claim Deed dated December 19, 2003, recorded with the Cook County Recorder December 30, 2003 as Document Number 0336418054;

WHEREAS, concurrent herewith, Century 21 Chicago, LLC is assuming all of the rights and obligations of Owner under the Lease (the "Transfer");

WHEREAS, Guarantor execute that certain Guaranty dated as of December 7, 2004 (the "Guaranty") in favor of Stern;

U-1

WHEREAS, in connection with the Transfer, Owner requires that the Guarantor be released from the Guaranty in connection with Owner's obligations under the Lease arising from and after the date hereof;

WHEREAS, on or about the date hereof, _____ has executed a guaranty of Owner's obligations under the Lease arising from and after the date hereof in favor of the Landlord; and

NOW, THEREFORE, for good and sufficient consideration, the receipt and sufficiency of which is hereby acknowledged by the Landlord, the Landlord hereby agrees as follows:

1. Release of Guaranty. The Guaranty is hereby terminated and released and the Landlord shall have no further right or claims whatsoever against the Guarantor under or pursuant to the Guaranty, except for those obligations of Guarantor under the Guaranty which relate to the period prior to the date hereof.

2. Representation and Warranties. The Landlord represents and warrants to the Guarantor that (i) the Landlord has not sold, assigned, pledged, encumbered, hypothecated, or otherwise transferred, in whole or in part, whether voluntarily or involuntarily, any of its rights, title or interest in, under, or pursuant to the Guaranty, and (ii) the Landlord has all necessary power and authority to execute this Release and to cause the release of the Guarantor's obligations under the Guaranty as herein provided.

3. Miscellaneous. The provisions hereof shall be binding upon the Landlord, its successors and assigns, and shall inure to the benefit of the Guarantor and its successors and assigns.

U-2

# EXHIBIT Y

# INDEMNITY

THIS INDEMNITY is executed as of [_____], by CENTURY 21 CHICAGO, LLC ("Indemnitor").

WITNESSETH:

WHEREAS, as of the date hereof, 730 North Michigan Avenue, L.L.C. ("LLC") has conveyed to Indemnitor, as purchaser, its interest in that certain Agreement to Lease (the "Lease"), dated as of May 10, 1994, between Adele Hilliman Stern (as successor trustee of trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust), Chicago and Rush Joint Venture, and Adele Hilliman Stern (as successor trustee of trust dated April 29, 1999 and known as the AHS Trust) (collectively, "Landlord"), as successor-in-interest to Robert L. Stern, an individual residing in the State of California, as landlord, and LLC, as successor-in-interest to American National Bank and Trust Company of Chicago, not personally but solely as Trustee under Trust Agreement dated as of April 20, 1994 and known as Trust No. 118199-01, as tenant (the "Conveyance");

WHEREAS, in connection with the transfer of one hundred percent (100%) of the ownership interests in LLC to 730 NMA Holding, Inc., a Maryland corporation, Landlord required that JPMorgan Chase Bank, as Trustee under Amended and Restated Declaration of Trust, dated November 13, 2001, as amended, for its Commingled Pension Trust Fund (Strategic Property) ("SPF") execute a guaranty (the "SPF Guaranty") in favor of Landlord; and

WHEREAS, as a condition to the consummation of the Conveyance, LLC and SPF require that Indemnitor execute and deliver this Indemnity.

NOW, THEREFORE, in consideration of the Conveyance, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged:

1.    Indemnitor hereby covenants and agrees to timely (i) pay all amounts due from Indemnitor as tenant under the Lease and (ii) perform all of its obligations and agreements as tenant under the Lease.

2.    Indemnitor covenants and agrees to pay all reasonable costs and expenses incurred by SPF in connection with the SPF Guaranty and or the enforcement of this Indemnity, including, without limitation, reasonable arbitration, paralegal's, attorney's and experts' fees and expenses, whether incurred without the commencement of a suit, in any suit, arbitration or administrative proceeding, or in any appellate or bankruptcy proceeding.

3.    Indemnitor agrees to defend, indemnify and hold SPF, and, to the extent the same incur any Liabilities (hereinafter defined) arising under or in connection with the SPF Guaranty or any Liabilities arising pursuant to or in connection with any indemnification or reimbursement obligations with respect to the SPF Guaranty contained in any other agreement, JPMorgan Chase Bank, N.A., The Prudential Assurance Company Limited, and their respective affiliates, members, officers, directors, employees, agents, managers, advisors, trustees, fiduciaries, or any

SSL-DOCS1 1842356/6

---

IN WITNESS WHEREOF, the Landlord has caused this Release to be executed as of the day and year first written above.

Adele Hilliman Stern, as Successor Trustee of Trust dated December 2, 1994 and known as the Robert L. Stern Charitable Remainder Unitrust

CHICAGO AND RUSH JOINT VENTURE

By:
Name:
Title:

Adele Hilliman Stern, as Successor Trustee of Trust dated April 29, 1999 and known as the AHS Trust

U-3

SSL-DOCS1 1842356/6

owner of legal or beneficial interest in SPF (collectively, the "Indemnified Parties") harmless from any and all debts, guarantees, indemnities, losses, costs, damages, claims, liabilities, expenses (including without limitation, attorneys' fees and disbursements), demands or obligations of any kind or nature whatsoever, whether absolute or contingent, monetary or non-monetary, known or unknown, direct or indirect, matured or unmatured ("Liabilities"), which they may sustain at any time by reason of (a) any breach or alleged breach of the covenants and agreements of Indemnitor set forth in this Indemnity, and/or (b) any actions, suits, claims, proceedings or investigations, whether at law or in equity before any court, arbitrator, panel or governmental authority ("Actions") arising under, or resulting from the enforcement of, the SPF Guaranty in connection with any events occurring from and after the date hereof, it being agreed that such indemnification shall include, without being limited to, any obligations under the Guaranty to indemnify the Landlord for Actions and/or Liabilities arising as a result of events occurring on or after the date hereof.

4.      Each provision of this Indemnity shall extend to and inure to the benefit of the Indemnified Parties and their successors and assigns. All references herein to the Indemnified Parties shall be deemed to include all such parties.

SSL-DOCS1 1842356/16

IN WITNESS WHEREOF, Indemnitor has executed this Indemnity as of the date first set forth hereinabove.

CENTURY 21 CHICAGO, LLC

By: _____
       Name:
       Title:

SSL-DOCS1 1842356/16

# EXHIBIT W

## OWNER'S CERTIFICATE

The undersigned, on behalf of 730 North Michigan Avenue, L.L.C. ("Owner"), the Owner of the premises described in Title Commitment No. _____ (the "Title Commitment") issued by First American Title Insurance Company (the "Title Company"), and in consideration of the Title Company issuing its policy of title insurance insuring an interest in the real estate described herein, hereby certifies to the Title Company that, to the best of Owner's knowledge:

1.    Owner is the owner of that certain property commonly known as 730 North Michigan Avenue, located in Chicago, Illinois (the "Property").

2.    No proceedings in bankruptcy or receivership have been instituted by or against the Owner within the last ten (10) years, and that the Owner has never made an assignment for the benefit of creditors.

3.    The operating agreement of Owner is in full force and effect and no proceeding is pending for its dissolution or annulment, and that all license, state franchise, and city corporation taxes, if applicable, due and payable by Owner have been paid in full.

4.    No additions, alterations or improvements for which Owner is responsible, other than those made in the ordinary course of Owner's operation and maintenance of the Property, are now in progress or have been made to the Property in the past one hundred twenty (120) days that have not been paid for by Owner.

5.    Owner has not been informed that there are any unpaid bills or claims for construction or repair work for the Property for which Owner is responsible other than those that will be paid in the ordinary course of business.

6.    Attached as Exhibit A hereto is a true and correct rent roll of the Property. There are no options to purchase or rights of first refusal to purchase the Property under any of the leases affecting the Property.

7.    Owner has not received written notice that the covenants and restrictions contained in the aforesaid title commitment have been violated by the erection of any improvements on the Property.

8.    All assessments, if any, due under any of the recorded covenants, conditions or restrictions shown in Schedule B of the Title Commitment have been paid through _____.

9.    Between the most recent Effective Date of the Commitment and the date of recording of the insured instrument(s) but in no event later than five (5) business days from the date hereof (hereinafter, the "Gap Period"), the undersigned has not taken or allowed and will not take or allow any action to encumber or otherwise affect title to the Property. In the event of any lien, encumbrance or other matter affecting title to the Property in the Gap Period arising as

a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof and further undertakes to take all necessary steps to discharge any such lien, encumbrance or other matter in a manner reasonably satisfactory to Title Company. The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

[Signature Page Follows]

This certificate is being delivered by Owner solely for the purpose of inducing the Title Company to issue its title insurance policy insuring title to the Property, and the undersigned avers the foregoing statements are true and correct to the best of his knowledge and belief. No third party shall have any right to rely upon or be a third party beneficiary with respect to the subject matter of this Certificate. As used herein, the words "to the best of Owner's knowledge" or words of similar import, shall mean the present actual knowledge, without taking into account any constructive or imputed knowledge, of [_____] and shall not be construed, by imputation or otherwise, to impose upon [_____] any duty to investigate the matter to which such actual knowledge, or the absence thereof, pertains. Owner hereby represents that [_____] is the officer of Owner who is primarily responsible for the administration of Owner's interest in the Property. [_____] shall have any personal liability in connection with this certificate or the certifications made herein.

Dated: As of _____

730 NMA Holding, Inc.

By: _____
Name:
Title:

SSL-DOCS1 1842635v16

EXHIBIT X

POTTERY BARN TERMINATION

SSL-DOCS1 1842635v16

## LEASE TERMINATION AGREEMENT

This Lease Termination Agreement ("Agreement") is made as of the _____ day of _____, 2007 by and between 730 North Michigan Avenue L.L.C., a Delaware limited liability company ("Landlord") and Williams-Sonoma Stores, Inc., a California corporation ("Tenant");

### WITNESSETH

A.    Landlord, or its predecessor in interest, and Tenant, or its predecessor in interest (hereinafter "Williams-Sonoma, Inc."), entered into that certain Retail Complex Lease dated as of March 18, 1998 (which lease as amended, modified, supplemented and/or assigned from time to time is collectively referred to herein as the "Lease") whereby Tenant leased from Landlord the premises commonly known as 734 North Michigan Avenue, Chicago, Illinois (the "Premises");

B.    In connection with the Lease, Williams-Sonoma, Inc. executed that certain Guaranty dated February 23, 1999 (the "Guaranty"); and

C.    Landlord and Tenant desire to terminate the Lease and the Guaranty on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, Landlord and Tenant hereby agree as follows:

1.    Defined Terms.  All terms used herein shall have the same meaning as in the Lease unless otherwise defined herein.

2.    Termination of Lease.  The Lease shall terminate on June 30, 2008 (the "Termination Date") as if said Termination Date were set forth in the Lease as the expiration date of the term of the Lease. Tenant shall vacate and deliver possession of the Premises to Landlord in the manner set forth in the Lease on or before 11:59 p.m. on the Termination Date.

3.    Rent and Other Charges.  Tenant shall pay to Landlord on or before the Termination Date, and shall be responsible for, all rent, utility charges and other charges relating to the Premises which accrue on or prior to the Termination Date. Any undetermined charges may be billed to Tenant when determined (and Tenant's obligation to pay the same shall survive termination of the Lease). Tenant shall indemnify and hold Landlord harmless against any utility charges or other charges relating to the Premises which are the obligation of Tenant under the Lease and which accrue on or prior to the Termination Date.

4.    Certification to Landlord.  Tenant and Williams-Sonoma, Inc., as applicable, hereby certify, with respect to Tenant's rights in and occupancy of the Premises, that the following statements are true as of the date hereof and will be true on the Termination Date:

(a)    Tenant owns and holds the entire interest of Tenant under the Lease;

(b)    There exist no subleases affecting the Premises or any part thereof;

607S-0000/LEGAL13569446.4

(c)    Tenant has not assigned or encumbered Tenant's interest under the Lease or any part thereof;

(d)    No contracts for the furnishing of any labor or materials with respect to improvements or alterations in or about the Premises have been let by Tenant or are outstanding that have not been performed and satisfied; and

(e)    Tenant and Williams-Sonoma, Inc. have full authority to execute and deliver this Lease Termination Agreement.

5.    Mutual Release.  In consideration of the execution of this Agreement and the certifications, representations and other agreements herein contained, Landlord, on the one hand and Tenant and Williams-Sonoma, Inc. on the other hand, hereby remise and forever discharge each other, and their respective partners, officers, directors, agents, trustees, beneficiaries, and employees, of and from any and all claims, acts, damages, demands, rights of action and causes of action which each party ever had, now has, or in the future may have, against the other, arising from or in any way connected with the Lease or Guaranty, or Landlord's management or operation of the Retail Complex except for (a) those obligations and liabilities contained herein or reinstated pursuant to the provisions hereof and (b) any indemnification obligations set forth in the Lease or Guaranty for third party claims such as personal injury, all of which obligations shall survive the termination of the Lease or Guaranty. The mutual releases given hereunder are intended to and shall be full and general releases of any and all claims, rights, demands, actions, causes of action, indebtedness, obligations, damages, and liabilities of every kind, nature and character whatsoever, whether or not known, suspected or claimed (of which either party hereto ever had, now has, or may hereafter have against the other by reason of any act, omission, matter, cause or thing, including but not limited to any act, omission, cause, matter or thing directly or indirectly arising out of or in connection with the Lease or Guaranty).

The parties understand that the facts in respect of which the release made in this Agreement is given may hereafter turn out to be other than or different from the facts now known or believed by the parties to be true and assume the risk of all facts turning out to be different and agree that this release shall remain in all respects effective and not subject to termination or rescission by virtue of any such difference in facts.

6.    No Disclosure.  Landlord and Tenant agree that neither party shall disclose any of the matters set forth in this Agreement or disseminate or distribute any information concerning the terms, details or conditions hereof to any person, firm or entity without obtaining the express written approval of the other party.

7.    No Offer.  This Agreement shall not be binding until executed and delivered by both parties. This Agreement shall not be relied upon by any other party, individual, corporation, partnership or other entity as a basis for terminating its lease with Landlord.

8.    Whole Agreement.  The mutual obligations of the parties as provided herein are the sole consideration for this Agreement, and no representations, certifications, promises or inducements have been made by the parties other than as appear in this Agreement. This Agreement may not be amended except in writing signed by both parties.

607S-0000/LEGAL13569446.4

2

9.   **Miscellaneous.**   Warranties, representations, certifications, agreements, and obligations contained in this Agreement shall survive the execution and delivery of this Agreement and shall survive any and all performances in accordance with this Agreement. This Agreement may be executed in any number of counterparts which together shall constitute the Agreement. If any party obtains a judgment against any other party by reason of breach of this Agreement, reasonable attorneys' fees as fixed by the court shall be included in such judgment. This Agreement and the terms and provisions hereof shall inure to the benefit of and be binding upon the heirs, successors and assigns of the parties. This Agreement shall be construed and enforced in accordance with the laws of the State of Illinois.

10.   **Successors and Assigns.**   This Agreement shall bind and inure to the benefit of each of the parties hereto and their respective heirs, personal representatives, successors and assigns.

11.   **Termination Fee.**   In consideration of Landlord's execution of this Agreement, and as a condition to the effectiveness of this Agreement, on but not later than the Termination Date, Tenant shall pay to Landlord via certified check or wire transfer of federal funds the sum of $1,250,000.

12.   **Contingency.**   Notwithstanding anything to the contrary to the foregoing, this Agreement is contingent upon and subject to the execution on or before February 11, 2008 of a new lease for the Premises with a commencement date of July 1, 2008.

13.   **Consent.**   This Agreement is subject to, and conditioned upon, any required consent or approval being granted without any fee or charge that is unacceptable to Landlord, by Landlord's mortgagees or ground lessors. If any such consents shall be denied, or granted subject to the payment of unacceptable fees or charges hereunder, the Lease shall remain in full force and effect. If Landlord fails to notify Tenant to the contrary on or before February 11, 2008, Tenant may presume that such consent has been granted, or that the same is not required.

IN WITNESS WHEREOF, the parties have executed this Lease Termination Agreement as of the date first written above.

LANDLORD:

730 North Michigan Avenue L.L.C., a
Delaware limited liability company

By:   TKM L.L.C, an Illinois limited
     liability company, Managing
     Member

    By: _____

    Its: _____

TENANT:

Williams-Sonoma Stores, Inc., a California
corporation

By: _____
    ARTHUR TROPP
Its: _Sr. Vice President, Real Estate_

ATTEST:

By: _____

Its: _____

GUARANTOR:

Williams-Sonoma, Inc., a California
corporation

By: _____
    ARTHUR TROPP
Its: _Sr. Vice President, Real Estate_

ATTEST:

By: _____

Its: _____

6075-6/000/LSDALL1533464.4

4

STATE OF _____ )
                    ) SS:
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that _____, President of Williams-Sonoma Stores, Inc., a California corporation, and _____ Secretary of said corporation, both personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such respective officers, appeared before me this day in person and acknowledged that they signed and delivered such instrument as their own free and voluntary acts and as the free and voluntary act of said corporation, for the uses and purposes set forth therein; and the latter officer also then and there acknowledged that (s)he, as custodian of the corporate seal of said corporation, affixed the same to the foregoing instrument as his/her free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal, this ____ day of _____, 2007.

_____
Notary Public

My Commission Expires: _____

5

60316-0000/LEGAL13584464.4

STATE OF _____ )
                    ) SS:
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that _____, President of Williams-Sonoma Stores, Inc., a California corporation, and _____ Secretary of said corporation, both personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such respective officers, appeared before me this day in person and acknowledged that they signed and delivered such instrument as their own free and voluntary acts and as the free and voluntary act of said corporation, for the uses and purposes set forth therein; and the latter officer also then and there acknowledged that (s)he, as custodian of the corporate seal of said corporation, affixed the same to the foregoing instrument as his/her free and voluntary act and as the free and voluntary act of said corporation, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal, this ____ day of _____, 2007.

_____
Notary Public

My Commission Expires: _____

6

60316-0000/LEGAL13584464.4

State of California )
) ss.
County of San Francisco )

On October 5, 2007, before me, personally appeared Arthur H. Tropp, Sr. Vice President Real Estate, Williams-Sonoma Stores, Inc., personally known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY SEAL

[notary stamp: O-SHAN CHEUNG, Commission # 1734816, Notary Public - California, San Francisco County, My Comm. Expires Mar 27, 2011]

O-Shan Cheung
My commission expires March 27, 2011

Lease Termination Agreement
Pottery Barn #350
North Michigan Avenue
Chicago, IL.

State of California )
) ss.
County of San Francisco )

On October 5, 2007, before me, personally appeared Arthur H. Tropp, Sr. Vice President Real Estate, Williams-Sonoma Stores, Inc., personally known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

NOTARY SEAL

[notary stamp: O-SHAN CHEUNG, Commission # 1734816, Notary Public - California, San Francisco County, My Comm. Expires Mar 27, 2011]

O-Shan Cheung
My commission expires March 27, 2011

Lease Termination Agreement
Pottery Barn #350
North Michigan Avenue
Chicago, IL.

**EXHIBIT Y**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is executed as of the _____ day of _____, 20___, by and between CENTURY 21 CHICAGO, LLC, a Delaware limited liability company, having an address at 140 Fulton Street, New York, New York 10038 ("Assignor") , a l_____, having an address c/o l_____ ] ("Assignee").

WHEREAS, Assignee is this day purchasing from Assignor and Assignor is conveying to Assignee the Property (as such term is described in that certain [Contract of Sale] dated as of _____ between Assignor and Assignee).

WHEREAS, in connection with Assignor's purchase of the Property from 730 North Michigan Avenue, L.L.C. ("Prior Owner"), Assignor and Prior Owner entered into those certain agreements described in Exhibit A hereto (the "Agreements").

WHEREAS, Assignor desires to transfer and assign to Assignee, and Assignee desires to assume as provided herein, all of Assignor's right, title and interest in and to the Agreements.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignor hereby transfers and assigns to Assignee all right, title and interest of Assignor in and to the Agreements.

2. Assignee hereby affirmatively and unconditionally assumes, for the benefit of Prior Owner, Commingled Pension Fund (Strategic Property) of JPMorgan Chase Bank, N.A., the other parties to the Agreements, and their successors and assigns, all of Assignor's obligations and liabilities under the Agreements arising from and after the date hereof.

3. This Assignment may be executed in any number of counterparts, each of which may be executed by any one or more of the parties hereto, but all of which shall constitute one and the same instrument, and shall be binding and effective when all parties hereto have executed and delivered at least one counterpart.

4. The terms and provisions of this Assignment shall be binding upon and inure to the benefit of the respective parties hereto, and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be duly executed as of the day and year first written above.

Y-1

SSL-DOCS1 1042326/6

---

STATE OF _____ )
                       ) SS:
COUNTY OF _____ )

I, _____, a Notary Public in and for said County in the State aforesaid, do hereby certify that _____ of TKM LLC., an Illinois limited liability company which is the Managing Member of 730 North Michigan Avenue L.L.C., a Delaware limited liability company personally known to me to be the same person whose name is subscribed to the foregoing instrument as such, appeared before me this day in person and acknowledged that (s)he signed and delivered such instrument as his/her own free and voluntary acts and as the free and voluntary act of said limited liability company, for the uses and purposes set forth therein.

GIVEN under my hand and notarial seal, this _____ day of _____, 2007.

_____
Notary Public

My Commission Expires: _____

7

60256-0004/LEGAL13282444.4

**Exhibit A**

Agreements

Indemnity dated as of [\_\_\_\_], 2007, between Assignor, as indemnitor, and Prior Owner, as indemnitee.

Environmental Indemnity Agreement, dated as of [\_\_\_\_], 2007, between Assignor, as indemnitor, and Prior Owner, as indemnitee.

Purchase Option Exercise Agreement, dated as of [\_\_\_\_], 2007, between Assignor, as indemnitor, and Prior Owner, as indemnitee.

Y-3

SSL-DOCS1 1842580/6

---

**ASSIGNOR:**

By: _____
   Name:
   Title:

**ASSIGNEE:**

By: _____
   Name:
   Title:

Y-2

SSL-DOCS1 1842580/6

## SCHEDULE 2

RENT ARREARAGES

## SCHEDULE 1

SECURITY DEPOSITS

NONE

SSL-DOCS1 1842856416

SSL-DOCS1 1842856416

SCHEDULE 3

PURCHASER'S ORGANIZATIONAL CHART



ULTIMATE OWNERS
OF
CENTURY 21 CHICAGO, LLC

Aby Rosen & Michael Fuchs — 50%

Raymond Gindi
Isaac A. Gindi — 20%

Jack Gindi
Ezra Gindi
Isaac S. Gindi — 20%

Joseph Chehebar — 10%

SSL-DOCS1 1842854v16

## SCHEDULE 4

### INSURANCE REQUIREMENTS

(a) Coverages. Purchaser will keep the Property insured for the benefit of Indemnified Parties as follows:

(1) "All Risk" property insurance, including sprinkler leakage in an amount sufficient to prevent Purchaser from becoming a co-insurer of any loss under the terms of the policy but in no event less than the then full replacement value of the Property;

(2) rental value insurance in an amount equal to not less than one (1) year's gross rent from the Property;

(3) to the extent not covered under subsections (1), difference-in-conditions coverage in an amount satisfactory to Seller;

(4) steam boiler and machinery breakdown direct damage insurance and third-party liability coverage (if not covered under the comprehensive general liability policy), with full comprehensive coverage on a repair and replacement cost basis, for all boilers and machinery which form a part of the Property, including rental value insurance in connection therewith in accordance with subsection (2) above;

(5) commercial general liability insurance written on an occurrence basis, in an amount not less than $1,000,000 combined single limit and $2,000,000 aggregate limit for bodily injury and property damage; such insurance shall include premises liability insurance, blanket contractual liability insurance, products liability insurance and personal injury liability insurance with an umbrella liability policy of $50,000,000.

(6) during any period of construction or restoration of the Property, a policy or policies of builder's risk coverage written on a completed value basis insuring against such risks (including, without limitation, fire and extended coverage, collapse of the Property and earthquake coverage to agreed limits) as Seller may request, in form and substance acceptable to Seller; and

(7) policy or policies of workers' compensation insurance as required by workers' compensation insurance laws subject to the statutory limits of the State of Illinois in respect of any work or other operations on, about or in connection with the Property and covering all employees of Purchaser and employer's liability insurance coverage of not less than $1,000,000.

Notwithstanding the foregoing, the insurance policies required under this Schedule 4 shall cover perils of terrorism and acts of terrorism and Purchaser shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism subject to the coverage availability under the Terrorism Risk Insurance Act on terms consistent with the terms set forth herein and in amounts not less than the replacement cost of the Property and otherwise acceptable to Seller in all respects.

(b) Generally. All policies of insurance required under this Schedule 4 shall be issued by companies having a general policy rating of "A-: VIII or better by Best Key Rating Guide or otherwise approved by Seller and which are licensed or authorized to do business in the State of Illinois or with such other companies satisfactory to Seller, and shall be subject to the approval of Seller as to amount, content, form and expiration date. Any proceeds from the insurance maintained under subsections (1) - (4), inclusive, of section (a) above shall be either used to restore the Property held by Purchaser and not distributed to the extent necessary to satisfy the Net Worth Requirements. The insurance maintained under subsection (5) of section (a) above shall name Seller and JPMorgan Chase Bank, N.A. (collectively, "Seller Entities") as additional insureds. Seller shall be furnished with a duplicate original of each policy required to be provided by Purchaser hereunder, which policy shall provide that no cancellation, material change or reduction thereof shall be effective until at least thirty (30) days after receipt by Seller of written notice thereof. It is agreed that, and each insurance policy shall expressly state that, losses shall be payable notwithstanding (1) any act or negligence of Purchaser or its agents or employees which might, absent such agreement, result in a forfeiture of all or part of such insurance payment, (2) the occupation or use of the Property or any part thereof for purposes more hazardous than permitted by the terms of such policy, or (3) any change in title to or ownership of the Property or any part thereof. All policies shall include effective waivers by the insurer of all claims for insurance premiums against any loss payee, additional insureds and named insureds (other than Purchaser). At least thirty (30) days prior to expiration of any policy required to be provided by Purchaser hereunder, Purchaser shall furnish Seller (without notice or demand by Seller) with a duplicate original of such renewal policy replacing the policy so expiring; provided, however, if such renewal policy is not yet available, Purchaser shall provide Seller with either (x) an insurance certificate or certificate thereof executed by the insurer or its authorized agent evidencing the insurance maintained under such policy, or (y) an insurance binder from the insurer or its authorized agent together with an addendum to the binder containing language, in form, substance and scope satisfactory to Seller, for an endorsement evidencing that (I) Seller Entities are named as loss payees as provided above, and (II) Seller Entities are named as additional insureds as provided above, which, in either case, shall be acceptable to Seller on an interim basis until the duplicate original thereof is available. Provided that Purchaser otherwise is in compliance with all of the terms, covenants and conditions relating to insurance requirements set forth herein, on a quarterly basis, Purchaser shall furnish Seller receipts for the payment of premiums on such insurance policies or other evidence of such payment satisfactory to Seller. In the event that Purchaser does not deposit with Seller (A) a new duplicate original policy of insurance with evidence of payment of premiums thereon, (B) an insurance certificate or certificates described in clause (x) above, or (C) an insurance binder described in clause (y) above, in any case, at least thirty (30) days prior to the expiration of any expiring policy, then Seller may, but shall not be obligated to, procure such insurance and pay the premiums therefor, and Purchaser agrees to repay to Seller the premiums thereon within ten (10) days after Seller's written demand. Upon Seller's failure to repay such premiums or Seller, Seller shall be permitted to draw upon the applicable escrow funds or Approved Letter of Credit for repayment of such premiums.

# EXHIBIT B

RFR HOLDING LLC
390 Park Avenue, 3rd Floor
New York, New York 10022

November 9, 2007

Roberto Ribeira
Conte Godea Florida, Inc.
1221 Brickell Ave. Suite 1080
Miami, Florida 33131

Dear Roberto,

In connection with a proposed transaction (the "Proposed Transaction") involving the purchase of, the lease of, or an acquisition of an interest or investment in, the land and improvements commonly known as 730 North Michigan Avenue, Chicago, IL (including any proposed leasing thereof, the "Property"), by Conte Godea Florida, Inc., together with its affiliates, (the "Company"), the Company has requested that RFR Holding LLC, together with its affiliates, (the "Disclosing Party") provide the Company with certain Confidential Information (as hereinafter defined) relating to the Property. In consideration of the Disclosing Party's furnishing the Company with the Confidential Information and as a condition precedent thereto, the Company hereby agrees as follows:

1.      In connection with the Proposed Transaction, it is understood that the Disclosing Party and its Representatives (as hereinafter defined) are prepared to furnish the Company and its Representatives with certain oral and written information concerning the Property that is or may be nonpublic, confidential and/or proprietary in nature, which may include, without limitation, floor plans, architectural drawings, leases, contracts, documents, files, appraisals, reports, analysis and studies and computer data or files. All such information, regardless of the manner in which it is furnished by the Disclosing Party or its Representatives to the Company and its Representatives, including the Company's interest in the Property and any discussions between the Disclosing Party and the Company or its Representatives, shall, except as otherwise permitted hereunder, be kept strictly confidential by the Company and its Representatives, which information, interest and discussions are hereinafter referred to, collectively, as the "Confidential Information." Notwithstanding the foregoing, the term "Confidential Information" shall not be deemed to include information which (i) was already in the Company's or its Representatives' possession on a non-confidential basis prior to the date hereof, (ii) is or becomes available to the Company or its Representatives from a source other

Page 2 of 4

than the Disclosing Party or its Representatives, provided that such source is not bound by a confidentiality agreement with the Disclosing Party or its Representatives or otherwise bound to keep such information confidential by any legal or fiduciary obligation, and/or (iii) is or becomes generally available to the public. The Confidential Information shall be used by the Company and its Representatives (as hereinafter defined) solely for purposes of the Proposed Transaction. For the purposes hereof, the "Representatives" of each party hereto (each, a "Party"; and collectively, the "Parties") shall mean each such Party's officers, directors, controlling persons, members, partners, lenders, employees, agents, advisors and representatives, including, without limitation, attorneys, accountants, consultants, and financial advisors. The Company shall inform each of its Representatives that receives any of the Confidential Information of the requirements of this letter agreement and shall require each such Representative to comply with such requirements. The Company will only disclose the Confidential Information to those of its Representatives who need access to the Confidential Information for purposes of evaluating the Proposed Transaction. The Company agrees that it will be responsible for any breach of the terms of this letter agreement by any of its Representatives. The Company agrees to notify Disclosing Party, upon request, as to the identity of any Representatives to whom the Company has or is to provide any Confidential Information.

2.    If any person seeks to compel the Company or any of its Representatives to disclose any Confidential Information under compulsion of law (by oral questions, interrogatories, requests for documents subpoena, civil investigative demand or similar process), the Company shall promptly notify the Disclosing Party thereof so that the Disclosing Party may have an opportunity to seek a protective order or other appropriate remedy (provided that the foregoing shall not be deemed to require that the Company or any of its Representatives refuse to comply with any such disclosure request or demand beyond the time specified for such disclosure).

3.    The Company (on behalf of itself and its Representatives) acknowledges that remedies at law may be inadequate to protect the Disclosing Party against a breach of this letter agreement by the Company or its Representatives. The Company therefore agrees that in the event that the Company or its Representatives have breached the terms of this letter agreement, then without prejudice to the rights and remedies otherwise available to Disclosing Party, the Company acknowledges and agrees that Disclosing Party shall be entitled to seek equitable relief, without proof of actual damages, including the right to apply to a court of competent jurisdiction for a temporary or permanent injunction or other appropriate decree of specific performance in order to enjoin a breach of this letter agreement. The obligations of the Company hereunder shall be binding upon its successors and assigns.

4.    The Company agrees not to provide, communicate, or disclose to any third party, directly or indirectly, the Confidential Information, except as required by judicial process, without in each instance the prior written consent of the Disclosing Party, which consent may be withheld in its sole discretion, and then only after such third party executes a confidentiality agreement in favor of the Disclosing Party substantially in the form of this letter agreement. The Company agrees that neither the Company nor its Representatives will discuss the Property with (i) the current fee owner or ground lessee or their affiliates (collectively, the "Owners") of the Property, (ii) any tenant of the Property, (iii) any company currently in discussions with either

Page 3 of 4

the Owners or the Disclosing Party regarding becoming a tenant of the Property or (iv) any third party that prepared the Confidential Information.

5.   The Company agrees that, promptly upon the Disclosing Party's request, the Company and its Representatives shall surrender to the Disclosing Party or destroy the Confidential Information and all derivatives thereof.  The Company acknowledge that all such items are the exclusive property of the Disclosing Party and agree to return or destroy all tangible and confidential material within five (5) business days after written request therefore, such request given at any time at the sole option of the Disclosing Party and will erase any copies of any of the foregoing recorded on any electronic media or optical device.  Such return or destruction of Confidential Information and all derivatives thereof, and the erasing of any copies of the foregoing recorded on any electronic media or optical device, shall, upon the written request of the Disclosing Party, be certified in writing to the Disclosing Party by the Company.

6.   In the event that the Company utilizes the services of any broker, finder or other person or company, as indicated below ("Investor's Rep") in the course of the Proposed Transaction, the Company shall cause such Investor's Rep to sign this document in the space provided below, and Investor's Rep thereby agrees to be bound by the terms of this letter agreement. The Company agrees that Owner shall not be responsible for the payment of any fee, brokerage commission or other compensation to Investor's Rep and/or any other broker, finder or other person or company in conjunction with the Proposed Transaction. The Company agrees to indemnify and hold harmless Owner from any and all claims, liabilities, losses, damages, costs and expenses arising from the claim of Investor's Rep and/or any other broker, finder or other person or company for any compensation claimed by such party due to the action or inaction of the Company. In the course of the Proposed Transaction, in the event the Company utilizes the services of an Investor's Rep, or Investor's Rep assists or claims to have assisted the Company, the Company and Investor's Rep agree that compensation, if any, due to Investor's Rep shall be borne solely by the Company.

7.   This letter agreement contains the entire agreement between the Parties concerning the confidentiality of the Confidential Information, and no modification of this letter agreement or waiver of the terms and conditions hereof shall be binding upon either Party, unless approved in writing by each Party, which writing shall refer specifically to this letter agreement.

8.   The illegality, invalidity or unenforceability of any provision of this Letter agreement under the laws of any jurisdiction shall not effect its legality, validity or enforceability under the laws of any other jurisdiction, nor the legality, validity or enforceability of any other provision.

9.   This letter agreement shall be governed and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed within such state without regard to principles of conflicts of law. In the event of any dispute related to this letter agreement, the Parties shall and hereby do waive any right to trial by jury in connection therewith.

NYK 1040278-1.052498.0010

Page 4 of 4

10.    This letter agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same agreement. A facsimile signature on this letter agreement shall be deemed to constitute an original.

If the foregoing accurately sets forth our understanding, please indicate your concurrence by signing in the space provided below and returning one copy of this letter to the undersigned.

Very truly yours,

RFR HOLDING LLC

By:_____

Accepted and agreed to as of
the ___ day of November, 2007:

Ponte Godey Florida, Inc. (Company)

By: _Roberto Ciberia, Manager_

_____ (Investor's Rep, if any)

By: NONE

NYK 1040278-1,052498.0010

# EXHIBIT C

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 2827797 (N.D.Ill.)
**2007 WL 2827797 (N.D.Ill.)**

**H**Hillman v. City of Chicago
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Robert P. HILLMAN, Plaintiff,
v.
CITY OF CHICAGO, et al., Defendants.
**No. 04 C 6671.**

Sept. 25, 2007.

Kathryn Margaret Reidy, Law Offices of Kathryn M.
Reidy, Spokane, WA, Brian M. Ozog, Stephen P.
Carponelli, Carponelli & Krug, P.C., Chicago, IL,
Bryon D. Knight, Elizabeth Ann Knight, Knight,
Hoppe, Kurnik & Knight LLC, Des Plaines, IL, for
Plaintiff.
Naomi Ann Avendano, Jay Michael Kertez, Melanie
Patrick Neely, Law Department Corporation Counsel,
Mara Stacy Georges, Department of Law, Patrick
Edward Deady, Matthew James Cleveland, Timothy
Brennan Caprez, Hogan Marren, Ltd., Limo T.
Cherian, O'Rourke, McCloskey & Moody, Chicago,
IL, for Defendants.

### MEMORANDUM, OPINION AND ORDER

WAYNE R. ANDERSEN, United States District
Court Judge.
*1 This case is before the Court on the motion of
Defendant Laborers' Local 1001 (the "Union") to
dismiss Plaintiff's Third Amended Complaint
pursuant to Fed.R.Civ.P. 12(b)(6). For the following
reasons, the motion is granted.

Despite a rather lengthy procedural history in this
case, the Union was not made a party to this litigation
until Plaintiff recently filed his Third Amended
Complaint ("Complaint"). In the Complaint, Plaintiff
mentions the Union only once and tails; to set forth
the nature of his relationship with the Union and the
Union's connection to the claims alleged, requested.
Specifically, Plaintiff has failed to plead the existence
of any relationship, contractual or otherwise, between
him and the Union, whereby the Union would be a
party from whom relief should be obtained.

Although courts should accept as true all well-plead
allegations, as well as inferences that may be
reasonably drawn from same, a complaint must at
least set out facts sufficient to outline the basis of the
claim. *Panares v. Liquid Carbonic Industries Corp.,*
74 F.3d 786, 792 (7th Cir.1996). This requirement
cannot be evaded by ascribing a bare legal conclusion
to facts narrated. *Id.* A complaint that consists of
conclusory allegations unsupported by factual
assertions falls short of even the liberal standards of
Rule 12(b)(6).*Id.* Courts need not strain to find
inferences favorable to plaintiffs which are not
apparent on the face of the complaint. *Coates v.
Illinois State Bd. of Ed.,* 559 F.2d 445, 447 (7th
Cir.1977). Courts are likewise not required to accept
legal conclusions alleged or inferred from the facts
plead in the complaint. *Nelson v. Monroe Regional
Medical Center,* 925 F.2d 1555, 1559 (7th Cir.1991);
*Barrett v. Poag & McEwen Lifestyle Centers-Deer
Park Town Center, LLC,* 1999 WL 691850, at *2
(N.D.Ill., August 26, 1999).

In this case, Plaintiff's failure to specifically set forth
the nature of his relationship with the Union and the
Union's connection to the relief requested
necessitates dismissal of Plaintiff's Complaint as to
the Union. Although it appears that the Union's
alleged involvement in this case stems from the
collective bargaining agreement it has with the City,
Plaintiff has merely attached a legal conclusion to his
belief that the Union is a party through whom some
of his requested relief must be obtained. If Plaintiff
prevails in his case against the City, the provisions of
the collective bargaining agreement would govern
Plaintiff's employment status with the City. No
separate approval from the Union is necessary to
effectuate a judgment in Plaintiff's favor. These facial
deficiencies in Plaintiff's Complaint constitute a
failure to state a claim upon which relief can be
granted against the Union.

Moreover, involving the Union in this case and
requiring it to participate and defend in this litigation
seems premature and unnecessary. In the event that
Plaintiff ultimately obtains a judgment from the City,
we will revisit this issue to determine if the Union's
presence in the lawsuit is necessary to effectuate

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2827797 (N.D.Ill.)
**2007 WL 2827797 (N.D.Ill.)**

relief.

**\*2** For these reasons, we grant the Union's
Fed.R.Civ.P. 12(b)(6) motion to dismiss Plaintiff's
Third Amended Complaint. (# 150). If the Union's
involvement in this case is necessitated by a
judgment rendered in favor of Plaintiff against the
City, that issue can be revisited at a later date.

It is so ordered.

N.D.Ill.,2007.
Hillman v. City of Chicago
Slip Copy, 2007 WL 2827797 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

▷Jones v. Trump
S.D.N.Y.,1997.

United States District Court, S.D. New York.
Charles JONES, Plaintiff,
v.
Donald TRUMP, Marla Maples Trump, Plaza Hotel,
a/k/a Plaza Operating Partners, Ltd., Jane Elder,
Richard Fields, Ann Ogletree, Domenic Pezzo,
Matthew Calamari, The Trump Organization,
Michael Berger, Jay Goldberg, City of New York,
Doreen Klein, individually and as an Assistant
District Attorney for the County of New York,
Robert Gianetta, Brian Higgins, John Baner and
William Lynch, individually and as police officers of
the City of New York, Jeanine Pirro, individually and
as District Attorney, County of Westchester, Albert
Pirro, Jr., Robert M. Morgenthau, individually and as
District Attorney of New York, CDL Hotels,
Defendants.
andCharles JONES, Plaintiff,
v.
Marla Maples TRUMP, Donald J. Trump, The Plaza
Hotel, Robert M. Morgenthau, Doreen Klein, The
Trump Organization, Jeanine Pirro, Albert Pirro, Jr.,
Matthew Calamari, John Baner, Domenic Pezzo,
Robert Gianetta, Della Rocca, The City of New York,
Jane Elder, Frederick Cohn, Executive Plaza
Condominium, CDL Hotels, Michael Berger, Richard
Fields, Defendants.
**Nos. 96 CIV. 2995(SAS), 96 CIV. 6927(SAS).**

May 27, 1997.

Appearances Plaintiff (pro se) Charles Jones 150 W.
51st St., Suite 802 New York, N.Y. 10019 Tel: (212)
969-9500
For Defendants: Frederick H. Cohn 500 Fifth
Avenue, 33rd Fl. New York, N.Y. 10110-3398 Tel:
(212) 768-1110
Michael Berger 250 Park Avenue, 14th Fl. New
York, N.Y. 10177-0077 Tel: (212) 983-6000
Douglas H. FlaumFried, Frank, Harris, Shriver &
Jacobson One New York Plaza New York, New York
10004-1980 Tel: (212) 859-8259
Assistant District Attorney Morrie I. KleinbartOne
Hogan Place, New York, New York 10013 Tel: (212)
335-9000

Assistant Corporation Counsel Brigitte Duffy Law
Department 100 Church Street New York, New York
10007 Tel: (212) 788-8684
Assistant County Attorney Mary K. HafterOffice of
the Westchester County Attorney 600 Michaelian
Office Building, 148 Martine Avenue White Plains,
New York 10601 Tel: (914) 285-2685
Philip M. HalpernOne NorthLexington Avenue, 15th
Fl. White Plains, New York 10601 Tel: (914) 684-
6800

*OPINION AND ORDER*

SCHEINDLIN
**\*1** These consolidated actions consist of 125 pages of
pleadings setting forth a combined total of 54
independent claims against 25 defendants.[FN1]
Plaintiff's multiple claims are predicated on 21
different legal theories: violations of 42 U.S.C. §
1983, violations of the RICO statute (18 U.S.C. §
1962), malicious abuse of process, retaliatory
prosecution, fraud, extortion, conspiracy, defamation,
breach of contract, intentional infliction of emotional
distress, trespass, conversion, theft, invasion of
privacy, harassment, false arrest, wrongful
imprisonment, violation of the New York
Constitution, breach of fiduciary duty, assault and
battery. All defendants now move to dismiss
plaintiff's claims pursuant to Rules 8 and 12(b)(6) of
the Federal Rules of Civil Procedure. The City of
New York and five members of the New York City
Police Department (defendants Gianetta, Higgins,
Lynch, Baner and Della Rocca) (the "municipal
defendants") also move for partial summary
judgment. Plaintiff cross-moves for summary
judgment on his claims against the municipal
defendants. For the reasons that follow, defendants'
motions to dismiss are granted, the municipal
defendants' motion for partial summary judgment is
granted, and plaintiff's cross-motion for partial
summary judgment is denied. Plaintiff's claims are
dismissed with prejudice.

I. Introduction

This case brings into stark contrast the tension
between the long-standing statutory right of access to
the United States courts by *pro se* litigants [FN2] and the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 2
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

increasing need to protect scarce judicial resources. Each year, the volume of law suits filed without benefit of legal counsel grows larger.[FN3] The *pro se* docket is akin to the proverbial haystack, and the needles hidden therein may seem at times to be few and far between. Yet only recently the Court of Appeals issued a reminder that the law does not permit premature dismissal of arguably meritorious claims brought *pro se. See Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996).

If a *pro se* plaintiff pays the required $120 filing fee, a district court is required to countenance even what appear to be fantastic and delusional claims. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1988) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations").[FN4] *But see Parris v. Kelly,* No. 93 Civ. 7391, 1993 WL 497979 (S.D.N.Y. Nov. 30, 1993) (dismissing fantastic and delusional action *sua sponte* even though plaintiff paid filing fee). A *pro se* party's motions must be "liberally construed" in his or her favor and are held to "less stringent standards than formal pleadings drafted by lawyers,"*Hughes v. Rowe,* 449 U.S. 5, 10 (1980) (per curiam) (citing *Haines v. Kerner,* 404 U.S. 519, 520 (1972)). In addition, this Circuit has held that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

*2 Certain *pro se* cases consume more resources than others. Plaintiff's Complaints, for example, have generated hundreds of pages of motion papers and affidavits from defendants. Were I to address each of plaintiff's claims individually-and each defendant's corresponding arguments-this Opinion would be the length of a Tom Clancy novel. However, the legal issues raised by plaintiff's claims and defendants' motions are not terribly complex. Furthermore, many of the defendants' motions share common ground. Thus, for efficiency's sake, I will address plaintiff's claims and defendants' motions in appropriate groups.

## II. Procedural Background

On April 15, 1993, plaintiff was indicted for unlawfully entering the apartment of his employer,

Marla Maples, and stealing various items of her property. He was charged with second degree burglary and fourth degree criminal possession of stolen property in violation of New York Penal Law §§ 140.25(2) and 165.45(1). Because a search of plaintiff's office revealed a loaded .25 caliber semi-automatic pistol, he was also charged with criminal possession of a weapon in the fourth degree under New York Penal Law § 265.02(1).

Plaintiff was convicted of all charges after a three-week jury trial, and was sentenced to one and one-half to four and one-half years in prison. Plaintiff's appeals in the state courts were unsuccessful. However, in an Order issued on September 19, 1996, I granted his habeas petition for a new trial on the ground that the trial court committed reversible error in banning plaintiff from consulting with his attorney during his trial. *See Jones v. Vacco,* No. 96 Civ. 4907, 1996 WL 535544 (S.D.N.Y. Sept. 19, 1996). The government's appeal of the September 19, 1996 Order is pending.

Plaintiff's Complaints are, for the most part, based on claims arising from the events surrounding the searches of his office and home, his arrest, prosecution, and subsequent conviction. His initial action ("Jones I") was filed in the District of Connecticut on June 26, 1995. This action was then transferred to the Southern District of New York under docket number 96 Civ. 2995. Plaintiff filed an Amended Complaint in Jones I on December 3, 1996. Plaintiff's second action ("Jones II") was originally filed on September 12, 1996 under docket number 96 Civ. 6927. Plaintiff filed an Amended Complaint in Jones II on December 31, 1996.

## III. Discussion

### A. Cross-Motions for Partial Summary Judgment

#### 1. Applicable Legal Standard

A party is entitled to summary judgment when there is "no genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. See Fed.R.Civ.P. 56(c); *Celotex v. Catrett,* 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). The burden of demonstrating the absence of a material factual dispute rests on the moving party. *See Gallo v.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

*Prudential Residential Svcs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). Once that burden is met, the non-moving party must present "significant probative supporting evidence" that a factual dispute exists. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249.

**\*3** The court's role is not to try issues of fact, but rather to determine whether issues exist to be tried. *See Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). All ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *See Anderson,* 477 U.S. at 255; *Donahue,* 834 F.2d at 57, 60. If there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

2. Municipal Defendants' Motion for Partial Summary Judgment

Pursuant to Rule 56 and New York General Municipal Law §§ 50-e and 50-i, the municipal defendants move for summary judgment on plaintiff's state law tort claims. Sections 50-e and 50-i require a plaintiff asserting a state law tort claim against a municipal entity or its employees to file a notice of claim against the City within ninety days of the occurrence giving rise to the claim and commence that action within a year and ninety days. *See Annis v. N.Y.C. Transit Authority,* 485 N.Y.S.2d 529, 531 (1st Dep't 1985). Furthermore, plaintiff must affirmatively plead service of the notice of claim, the passage of thirty days since service, and the failure of the city to satisfy or adjust the claim. *See Davidson v. Bronx Municipal Hospital,* 484 N.Y.S.2d 533, 534-35 (1984). Plaintiff's failure to comply with these pleading rules requires dismissal of these claims.

Plaintiff did in fact file a notice of claim on December 22, 1995, although he failed to state this in his pleadings. This notice of claim relates to the events that form the basis for Jones II. *See* Declaration of Brigitte Duffy, Counsel to Municipal Defendants ("Duffy Decl."), dated February 26, 1997, Ex. F. Review of the notice of claim indicates that plaintiff did not identify his claim for defamation, intentional infliction of emotional

distress, assault or battery on the notice of claim form. He therefore failed to effectively file a notice of claim for these claims as required by statute. As plaintiff has failed to amend his notice of claim to include these claims within the statutory period-that is, within a year and ninety days of the December 10, 1995 incident-he cannot do so now. *See Pierson v. City of New York,* 453 N.Y.S.2d 615, 617 (1982). The municipal defendants are therefore entitled to judgment as a matter of law with regard to these claims.

Plaintiff's remaining state law tort claims are for false arrest and wrongful imprisonment. Defendants move for summary judgment with regard to these claims on the grounds that they are barred by the applicable one year statute of limitations. *See* N.Y.C.P.L.R. § 215(3). All of plaintiff's state law claims arose from events that took place in July of 1992. Plaintiff's earliest claims for false arrest and wrongful imprisonment were filed in 1995. They are therefore barred by the applicable statute of limitations, and defendants are entitled to judgment as a matter of law.

3. Plaintiff's Cross-Motion for Summary Judgment

**\*4** As discussed above, the municipal defendants are entitled to summary judgment as to plaintiff's state law tort claims against them. As these claims must therefore be dismissed pursuant to Fed.R.Civ.P. 56, plaintiff's motion for partial summary judgment on these claims cannot succeed.

B. Rule 12(b)(6)

1. Applicable Legal Standard

In deciding a Rule 12(b)(6) motion to dismiss, a court must accept as true material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). Such a motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                      Page 4
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

*Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)), *cert. denied,* 117 S.Ct. 50 (Oct. 7, 1996)). Rather, dismissal can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. at 236.

Typically, in deciding a motion to dismiss a district court will outline the required elements for each cause of action set forth in the complaint and discuss whether the factual allegations in the pleadings can survive a 12(b)(6) motion to dismiss. Unfortunately, the number of claims set forth in these two Complaints prevents such an approach. This Opinion therefore addresses the specific deficiencies in plaintiff's claims only where necessary.

2. Plaintiff's Malicious Prosecution Claim

A large cluster of plaintiff's claims arise out of an alleged malicious prosecution on the part of multiple defendants. An essential element of this tort is the termination of the proceeding in favor of the accused. *See Witcher v. Children's Television Workshop,* 589 N.Y.S.2d 454, 454 (1st Dep't 1992) (citing *Broughton v. State of New York,* 373 N.Y.S.2d 87, *cert. denied sub. nom. Schanbarger v. Kellogg,* 423 U.S. 929 (1975)). While plaintiff's habeas petition was granted, this ruling merely gave plaintiff the right to a new trial. *See Jones v. Vacco,* No. 96 Civ. 4907, 1996 WL 535544 (S.D.N.Y. Sept. 19, 1996). No new trial has taken place to date. As a result, the criminal case has not been "terminated" in plaintiff's favor. Because plaintiff has not-and cannot-allege facts sufficient to constitute a *prima facie* claim for malicious prosecution, all such claims must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6). Furthermore, all claims based on the allegedly malicious prosecution-specifically, plaintiff's extortion claims-must also be dismissed.

3. Plaintiff's Claims for Intentional Infliction of Emotional Distress, [FN5] Abuse of Process, Conspiracy, Breach of Fiduciary Duty, Invasion of Privacy, Violation of the New York Constitution, and Fraud.

**\*5** The required elements for each of the claims listed above are well-established. *See, e.g., Howell v. New York Post Co.,* 596 N.Y.S.2d 350, 352-54 (1993) (intentional infliction of emotional distress and

invasion of privacy); *Curiano v. Suozzi,* 480 N.Y.S.2d 466, 468 (1984) (abuse of process); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.) (conspiracy), *cert. denied,* 484 U.S. 965 (1987); *V. Ponte & Sons, Inc. v. American Fibers Int'l,* 635 N.Y.S.2d 193, 194 (1st Dep't 1995) (breach of fiduciary duty); *People v. Cibelli,* 404 N.Y.S.2d 811, 813 (Sup.Ct. Suffolk Co.1978) (New York Constitution); *Jo Ann Homes v. Dworetz,* 302 N.Y.S.2d 799, 803 (1969) (fraud). A thorough review of plaintiff's Complaints reveals that they fail to set forth allegations which, even if presumed to be true for purposes of a motion to dismiss, constitute a *prima facie* case against any defendant for any of the above claims. [FN6] These claims are therefore dismissed pursuant to Rule 12(b)(6).

4. Plaintiff's Defamation Claims

The Second Circuit has held that "a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject." *Guccione v. Hustler Magazine, Inc.,* 800 F.2d 298, 303 (2d Cir.1986), *cert. denied,* 479 U.S. 1091 (1987). Such a plaintiff is known as a "libel-proof plaintiff", and cannot succeed on a claim for libel or defamation where "the allegedly libelous statement cannot realistically cause impairment of reputation because the person's reputation is already so low." *Id.* Plaintiff has already been held to be "libel-proof" as to his reputation regarding his arrest and subsequent conviction for burglary and unlawful possession of property. *See Jones v. The Globe Int'l, Inc. et al.,* 94 Civ. 1468, 1995 WL 819177 at \*9-\*11 (D.Conn. Sept. 26, 1995) ("The true facts surrounding the plaintiff's criminal conviction along with the unchallenged statements in the articles at issue, had a devastating impact upon the plaintiff's reputation."). [FN7] Because this issue has already been resolved adversely to plaintiff, plaintiff is collaterally estopped from litigating the same issue in this action, and his claims for defamation must be dismissed pursuant to Rule 12(b)(6). *See, e.g., Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir.1986), *cert. denied,* 480 U.S. 948 (1987).

5. Plaintiff's Breach of Contract Claims

Plaintiff's breach of contract claims rest on alleged oral agreements with various defendants, such as a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

marriage brokerage contract with Marla Maples and an agreement with Donald Trump and other defendants to discontinue their participation in plaintiff's criminal prosecution. Even if such contracts existed, they would be unenforceable under New York law. *See State v. Leifer,* 392 N.Y.S.2d 175, 177 (Sup.Ct.N.Y.Co.1976) ("Marriage brokerage contracts have been held void as against public policy in New York") (citing, *inter alia, Duval v. Wellman,* 124 N.Y. 156 (1891)); *Doucet v. Massachusetts Bonding & Ins. Co.,* 167 N.Y.S. 892 (1917) (agreement to refrain from pursuing or assisting with a criminal proceeding is void as against public policy). These claims must therefore be dismissed pursuant to Rule 12(b)(6).

6. Plaintiff's § 1983 Claims

*6 Plaintiff alleges various defendants violated his Fourth Amendment right against unreasonable searches and seizures during the search of plaintiff's office on July 15, 1992. In a decision dated.january 19, 1994, Justice Andrias (then of the New York Supreme Court) determined that the search of plaintiff's office did not violate plaintiff's Fourth Amendment rights because plaintiff consented to the search at the time. *See* Duffy Decl., Ex. C. Thus, plaintiff is now collaterally estopped from bringing a claim under § 1983 based on the allegation that defendants violated his Fourth Amendment rights by searching his office. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 85 (1984); *Allen v. McCurry,* 449 U.S. 90, 105 (1980).

Plaintiff also claims that certain defendants violated his Fourth Amendment rights by making false statements in order to obtain a warrant to search plaintiff's Connecticut home. These claims must also fail. The law enforcement officials who lawfully searched plaintiff's New York office discovered evidence that indicated that plaintiff had stolen Marla Maples' property and that he was in unlawful possession of a firearm.[FN8] This evidence provided sufficient grounds to find that probable cause existed to search plaintiff's Connecticut home for additional evidence. Thus, a warrant to search the Connecticut home could have been issued even if defendants had not made the allegedly false statements that plaintiff consented to a search of his New York office and he possessed personal property of Marla Maples. As defendants' allegedly false statements were not a necessary basis on which the warrant for the Connecticut home was issued, plaintiff's claims relying on the allegedly fraudulent procurement of a search warrant must be dismissed pursuant to Rule 12(b)(6). *See Franks v. Delaware,* 438 U.S. 154, 155-56 (1978) (allegedly false statement made to procure warrant must be necessary to finding of probable cause to implicate Fourth Amendment rights).

7. Plaintiff's Trespass, Theft and Conversion Claims

Plaintiff asserts claims for trespass, theft and conversion based on alleged damage to or seizure of his property during defendants' search of plaintiff's office.[FN9] The New York courts have already found that this search and the related seizures were constitutionally valid. *See* Duffy Decl., Ex. C. Plaintiff's claims for trespass and conversion, therefore, cannot provide a basis for relief and must be dismissed under Rule 12(b)(6). *See, e.g., East Coast Novelty v. City of New York,* 809 F.Supp. 285, 302 (S.D.N.Y.1992) ( "Federal courts and the courts of the State of New York consistently hold that an officer who entered premises pursuant to a valid search warrant cannot be held liable for trespass.") (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 489 n. 3 (1986)); *Key Bank of New York v. Grossi,* 642 N.Y.S.2d 403, 405 (3d Dep't 1996) (conversion claim requires allegation that property is in the unauthorized possession of another who has acted to exclude the rights of the owner).

8. Plaintiff's RICO Claims

*7 Plaintiff's RICO claims are brought under 18 U.S.C. § 1962(b), (c) and (d). Plaintiff has failed to allege facts sufficient to state a claim under any of these statutes. *See United States v. Ianniello,* 808 F.2d 184, 192 (2d Cir.1986) (§ 1962(b)), *cert. denied,* 483 U.S. 1006 (1987); *Reyes v. Ernst & Young,* 507 U.S. 170, 183 (1993) (§ 1962(c)); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990) ( § 1962(d)). Accordingly, his claims must be dismissed under Rule 12(b)(6).

Furthermore, the factual allegations on which plaintiff's RICO claims are based have already been rejected by prior courts. For example, in *People v. Jones,* No. 3108/93 (Sup.Ct.N.Y.Co. Jan. 19, 1994), Justice Andrias rejected plaintiff's Fourth

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 6
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

Amendment claims, as well as his claims for false imprisonment and unlawful arrest. *See* Affidavit of Michael Berger ("Berger Aff."), dated February 28, 1997, Ex. A. Furthermore, plaintiff raised virtually identical conspiracy claims in a § 1983 action brought in state court. In *Jones v. The Plaza Hotel, et al.,* No. 117696/93 (Sup.Ct.N.Y.Co. Sept. 30, 1996), Justice York held that plaintiff was collaterally estopped from bringing these claims as they relied on factual allegations already determined adversely to plaintiff by Justice Andrias. *See* Berger Aff., Ex. B. Plaintiff is therefore collaterally estopped from bringing the same-or virtually identical-conspiracy claims in this or any other forum. *See Central Hudson Gas & Elec. v. Empresa Naviera,* 56 F.3d 359, 366-67 (2d Cir.1995).

9. Summary of Claims Dismissed Pursuant to Rule 12(b)(6)

To summarize, plaintiff's claims for malicious prosecution, extortion, intentional infliction of emotional distress, abuse of process, conspiracy, breach of fiduciary duty, invasion of privacy, violation of the New York Constitution, fraud, defamation, breach of contract, violation of § 1983, trespass, theft, conversion, and violation of the RICO statute must all be dismissed under Rule 12(b)(6) as they fail to state a claim for which relief can be granted.

C. Rule 8

Designed to shelter both litigants and courts from the expense and delay that result from prolix pleadings, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading shall contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Each averment of a pleading shall be simple, concise, and direct." Fed.R.Civ.P. 8(e)(1). More specifically, "complaints which ramble, which needlessly speculate, accuse and condemn, and which contain circuitous diatribes far removed from the heat of the claim do not comport" with the requirements of Rule 8. *Jones v. Capital Cities/ABC Inc.,* 874 F.Supp. 626, 628 (S.D.N.Y.1995) (quoting *Prezzi v. Berzak,* 57 F.R.D. 149, 151 (S.D.N.Y.1972)). *Accord Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (*per curiam* ) (dismissing 88-page *pro se* complaint for failure to meet Rule 8 requirements), *cert. denied,* 411

U.S. 935 (1973). A complaint that does not comply with Rule 8's requirements may be dismissed *sua sponte* by the Court. *See Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988).

*8 Dismissal pursuant to Rule 8 is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised," and leave to file an amended pleading that conforms to Rule 8 is usually granted. *Id.* (citing *Gillibeau v. City of Richmond,* 417 F.2d 426, 431 (9th Cir.1969)). However, where successive pleadings remain prolix and unintelligible, or where the substance of the claim pleaded is frivolous on its face, leave to amend may properly be denied. *Id.* (citing *Schelter,* 469 F.2d at 692 and *Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982)).

Even keeping in mind the relaxed pleading requirements to which *pro se* litigants are held, the two Complaints filed in this law suit manifestly violate Rule 8. Besides their needless length and complexity, they contain allegations that are scandalous, impertinent, immaterial and provocative. *See* Fed. R. Civ. P. 12(f) (court may order stricken from pleadings any "redundant, immaterial, impertinent, or scandalous matter"). Furthermore, because they include myriad and repetitious factual allegations that are unrelated to plaintiff's claims, the Complaints are unfairly confusing. The Court of Appeals has held that such "[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin,* 861 F.2d at 42 (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1281, at 265 (1969)). Rule 8 therefore provides the final basis to dismiss plaintiff's Complaints in their entirety. Plaintiff's leave to replead will be addressed in Part IV of this Opinion.

IV. Denial of Leave to Replead

Rule 15(a) of the Federal Rules of Civil Procedure provides that the court should grant leave to amend "freely ... when justice so requires." The Second Circuit has noted that "[w]hen a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.' ...Although the decision whether to grant leave to amend is within the discretion of the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

district court, refusal to grant leave to amend must be based on a valid ground." *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991) (quoting *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990) (quotations omitted)). Where the possibility exists that the defect can be cured, leave to amend at least once should normally be granted unless doing so would prejudice the defendant. *Oliver Schools, Inc.,* 930 F.2d at 253 (2d Cir.1991).

The large majority of plaintiff's dismissed claims cannot be cured by amending the Complaints for a second time. For example, those claims that are barred by the statute of limitation, or the doctrine of *res judicata,* cannot succeed no matter how they are pleaded. Similarly, plaintiff's malicious prosecution claim cannot succeed until the criminal action brought against him is finally resolved;[FN10] plaintiff cannot succeed in a claim for defamation because he is "libel-proof"; plaintiff's alleged contracts are unenforceable under New York law; plaintiff's RICO and § 1983 claims are collaterally estopped; and plaintiff's trespass and conversion claims cannot succeed because the search and seizure of plaintiff's office and home were lawfully conducted.

**\*9** More importantly, however, I find that given the fantastic and delusional nature of plaintiff's claims it would be unfairly prejudicial to defendants to require them to undergo the expense of responding to yet another amended version of plaintiff's claims. Justice and the Rules of Civil Procedure require that a *pro se* plaintiff be allowed to amend his pleadings so that arguably meritorious claims may be heard in a court of law. I am convinced that none of plaintiff's claims are arguably meritorious, and are rather an attempt to use the courts to harass defendants through a continued course of vexatious litigation. Plaintiff's claims are therefore denied with prejudice.

Finally, I note that the Second Circuit has recently confirmed that a district court may enjoin a litigant from filing further related actions in any federal court where that person "abuse[s] the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive ... proceedings". *Malley v. N.Y.C. Bd. of Educ.,*--- F.3d ----, No. 96 Civ. 9013, 1997 WL 195425, \*1 (2d Cir. Apr. 23, 1997) (quoting *In re Martin-Trigona,* 737 F.2d 1254, 1261 (2d Cir.1984), *cert. denied,*474 U.S. 1061 (1986)). Plaintiff has already commenced two actions in state

court and five actions in federal court, all of which are essentially related to the same events. While not all of these actions have been resolved by a final judgment, I note that if plaintiff files any future actions related to the events from which these prior seven actions arose that are deemed "meritless, frivolous, vexatious or repetitive", he may be subject to an injunction barring him from filing subsequent actions of this nature in the courts of the United States.

V. Conclusion

For the reasons set forth above, the municipal defendants' motion for partial summary judgment is granted with regard to plaintiff's state law claims against them. Plaintiff's cross-motion for partial summary judgment is denied. Defendants' motions are granted pursuant to Rules 12(b)(6) and 8 of the Federal Rules of Civil Procedure with regard to each of plaintiff's claims. Accordingly, it is hereby

ORDERED that plaintiff's claims are dismissed in their entirety with prejudice; and it is furthermore

ORDERED that the Clerk of the Court close this case.

Dated: New York, New York May 22, 1997

> FN1. Plaintiff's Amended Complaint in the initial action, filed under docket number 96 Civ. 2995, is 83 pages long, and contains 23 causes of action with a total of 30 claims. Plaintiff's Amended Complaint in the second action, filed under docket number 96 Civ. 6927, is 42 pages long, contains 12 causes of action, with a total of 24 claims.

> FN2.28 U.S.C. § 1654 (1948) permits *pro se* litigants personally to plead, manage and conduct their own cases. *See Phillips v. Tobin,* 548 F.2d 408, 411 (2d Cir.1976).

> FN3. In 1996, 2,293 actions were filed *pro se* in this district. This figure is only a moderate increase from the 2,256 *pro se* actions filed in 1995, but is an approximately 12% increase from the 2,014 *pro se* actions filed in 1994. The Pro Se

Not Reported in F.Supp.                                                                        Page 8
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322
**1997 WL 277375 (S.D.N.Y.)**

Office of the Southern District of New York estimates that the number of actions filed *pro se* has increased roughly 10% to 15% each year since 1989.

FN4. By contrast, where a plaintiff applies for and is granted *in forma pauperis* status, a district court not only has the authority under 28 U.S.C. § 1915(e)(2) to "dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those complaints whose factual contentions are clearly baseless." *Denton v. Hernandez,* 504 U.S. 25, 32 (1992) (quotation omitted).

FN5. Plaintiff also pleads a claim for "harassment". Because New York law does not recognize any independent tort for "harassment", I interpret plaintiff's claim to be one for intentional infliction of emotional distress.

FN6. For example, an action for breach of fiduciary duty must first allege facts sufficient to establish the existence of a fiduciary duty on defendant's part to the plaintiff. *See American Fibers Int'l,* 635 N.Y.S.2d at 194. Plaintiff has failed to allege any facts that-even if presumed to be true-establish that any defendant owed him a fiduciary duty. Therefore plaintiff's claim for breach of fiduciary duty must be dismissed pursuant to Rule 12(b)(6).

FN7. That plaintiff's conviction was subsequently vacated pursuant to his habeas petition because of a procedural error by the trial court does not alter that fact that his diminished reputation renders him libel-proof.

FN8. Plaintiff's office was searched after Marla Maples noticed that several of her shoes were missing from her apartment and after a privately installed video camera revealed that plaintiff had entered her apartment in July, 1992.

FN9. Because New York common law does

not recognize an independent tort of theft or larceny, I interpret plaintiff's claim for "theft" to be one for conversion.

FN10. If a new trial is held and plaintiff is acquitted, he may then have a claim for malicious prosecution. However, that claim would have to be filed in a new action.

S.D.N.Y.,1997.
Jones v. Trump
Not Reported in F.Supp., 1997 WL 277375 (S.D.N.Y.), RICO Bus.Disp.Guide 9322

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

Page 1

CKimball Associates, P.A. v. Homer Cent. School
Dist.
N.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
KIMBALL ASSOCIATES, P.A., Plaintiff,
v.
HOMER CENTRAL SCHOOL DISTRICT,
Defendants.
**No. 00-CV-897(HGM)(GJD).**

Nov. 9, 2000.

Harter, Secrest Law Firm, Rochester, NY, for the
Plaintiff, Jeffrey J. Calabrese, of counsel.
Harris Lindenfeld, Cazenovia, New York, for the
Defendant, of counsel.

*MEMORANDUM DECISION AND ORDER*

MUNSON, Senior J.

*INTRODUCTION*

**\*1** Currently before the court are defendant's motion
to dismiss the complaint and motion for summary
judgment. *See*Dkt. No. 6. These motions were made
in lieu of an answer. Plaintiff opposes these motions
and moves pursuant to Rule 56(f) of the Federal
Rules of Civil Procedure to obtain the discovery that
is necessary to oppose summary judgment. *See*Dkt.
No. 13.For the following reasons, the court grants
defendant's motion to dismiss, and denies defendant's
motion for summary judgment and plaintiff's Rule
56(f) motion for responsive discovery.

*BACKGROUND*

Plaintiff, L. Robert Kimball & Associates
("Kimball"), is an architectural firm incorporated in
the State of North Carolina and doing business
principally in the State of Pennsylvania. Defendant,
Homer Central School District ("the District"), is a
New York State municipal corporation located in
Cortland County. Plaintiff brings this cause of action
pursuant to the court's diversity jurisdiction alleging a
breach of contract.[FN1] *See*28 U.S.C. § 1332.

Specifically, Kimball asserts the following five
causes of action: (1) breach of contract; (2) breach of
binding preliminary agreement; (3) breach of binding
preliminary commitment; (4) promissary estoppel;
and (5) unjust enrichment/quantum meruit.

> FN1. According to plaintiff, the parties
> entered into a two stage contract for general
> architectural services.

Defendant moves to dismiss the complaint pursuant
to Rule 12(b)(6) of the Federal Rules of Civil
Procedure claiming the contract expired under its
own terms and that the District fully performed its
contractual obligations. *See*Dkt. No. 6. Although it
has not yet answered, defendant also moves for
summary judgment on the basis that: (1) the contract
is invalid because it was not authorized by the Board
of Education; (2) plaintiff failed to timely file a
Notice of Claim as required by New York State
Education Law § 3813(1); and (3) the applicable
statute of limitations expired before plaintiff
instituted this action. *Id.*

In response, plaintiff seeks a continuance to obtain
discovery specific to the issues presented in
defendant's summary judgment motion. *See*Dkt. No.
13.Kimball asserts that it needs to depose witnesses,
review records, plans, specifications and other
documents relating to the District's capital
improvement project. *Id.* Moreover, plaintiff argues
that the proposed discovery will create issues of
material fact that will prohibit summary dismissal. *Id.*
The court will address these issues *seriatim.*

*FACTS*

On July 10, 1996, plaintiff entered into a written
agreement with Harold Ferguson, Superintendent of
the Homer School District, in which it committed to
supply architectural and engineering services for the
District. The agreement states that plaintiff would
provide two stages of services for the District's 1997
capital improvement program. *See* Compl. Ex. A.
Apparently, the District sought to improve its
existing facilities and construct several new buildings
during the 1997/1998 school year. However, these

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

Page 2

improvements could not occur without approval of a Bond referendum by the District's voters. Therefore, the agreement includes provisions for Stage 1 (pre-referendum) services and Stage 2 (post-referendum) services.

\*2 In Stage 1, the agreement states that plaintiff would: (1) survey the District's facilities; (2) develop a construction budget; (3) prepare and present materials for a Bond referendum vote; (4) participate in public information meetings; and (5) participate in a development meeting with the District Administration. In Stage 2, plaintiff agreed to complete Architectural/Engineering services for the approved Bond referendum project. The details of these services were to be outlined in a Standard Agreement between Owner and Architect, AIA B141.

The July 10, 1996, agreement also contains a preliminary outline of the scope of work to be undertaken by the District. Moreover, it describes the services to be rendered at each stage, contains a fee proposal for these stages and a preliminary work schedule. *Id.* In exchange for these services, plaintiff agreed to complete Stage 1 for the lump sum of $15,000 and carry out Stage 2 for 6% of the project cost.

On August 20, 1996, Superintendent Ferguson executed the July 10, 1996, agreement and plaintiff began Stage 1. On June 23, 1997, the parties presented the resultant capital improvement plan for voter approval, but the referendum was defeated. Despite the referendum's failure, the District paid plaintiff the agreed sum of $15,000 and allowed it to undertake a second capital improvement plan for voter referendum. Plaintiff was paid another $15,000 for these services. At this time, the parties also began to negotiate the terms of the Standard Agreement between Owner and Architect, but, on March 3, 1998, the second referendum failed. After this defeat, the District allegedly breached the July 10, 1996, agreement when it would not allow Kimball to produce a third capital improvement plan. Subsequently, defendant hired a new architectural firm to perform pre-referendum services and produce a third capital improvement plan. The resulting referendum for the amount of $30,000,000 was approved on June 15, 1999.[FN2]

FN2. Based upon this figure, plaintiff contends that its fee for Stage 2 services would have equaled $1,800,000 and argues that it would have realized 40% or $720,000 in profit. It also states that its Stage 1 services were actually worth $170,466.94 for which $138,787.25 remains unpaid.

*DISCUSSION*

I. *Motion to Dismiss: The Legal Standard*

Federal Rule of Civil Procedure 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted."In analyzing a motion to dismiss, the facts alleged by plaintiff are assumed to be true and must be liberally construed in the light most favorable to him. *See e.g.,Easton v. Sundram,* 947 F.2d 1011, 1014-15 (2d Cir.1991). While a court need not accept mere conclusions of law, it should accept the pleader's description of what happened along with any conclusions that can reasonably be drawn therefrom. *SeeMurray v. City of Milford,* 380 F.2d 468 (2d Cir.1967). Furthermore, when a party makes a Rule 12(b)(6) motion, a court will limit its consideration to the facts asserted on the face of the complaint. *SeeCosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). A complaint will not be dismissed for failure to state a claim unless it appears, beyond a reasonable doubt, that a plaintiff cannot prove any set of facts entitling him or her to relief. *SeeWanamaker v. Columbian Rope Co.,* 740 F.Supp. 127 (N.D.N.Y.1990). With this standard in mind, the court turns to the sufficiency of plaintiff's claims.

II. *The Contract Claims*

\*3 It is well settled under New York law that to establish a claim for breach of contract, a plaintiff must prove: (1) that an agreement existed between it and defendant; (2) what the respective obligations of the parties were; (3) that plaintiff performed its obligations; (4) that defendant breached the agreement by failing to perform its obligations; and (5) that plaintiff was damaged by the breach. *SeeEli Attia Architects v. Safra,* 1996 WL 480721, at \*3 (S.D.N.Y. August 23, 1996). In this case, the existence of a contract and plaintiff's performance under the agreement are not disputed issues.[FN3]However, great discord exists between the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

litigants concerning defendant's contractual obligations and whether it breached the July 10, 1996, agreement.

> FN3. In its motion to dismiss, defendant concedes that a contract exists. Specifically, defendant argues that it fully performed its Stage 1 obligations under the contract and in so doing admits that it contracted with plaintiff. However, defendant does not concede that it agreed to include Stage 2 services in the July 10, 1996, contract.

In its motion to dismiss, defendant contends that it fully performed its obligations under the agreement. Specifically, it argues that its agreement with plaintiff was limited in scope to the development of a capital project plan to be passed in the 1997/1998 school year. Once that academic year ended without a referendum having passed voter muster, defendant believes that the contract terminated and the District was free to seek another architect. To support this assertion, defendant refers, as it should, to the specific language of the contract which includes, *inter alia,* a preliminary schedule for project completion and references to the 1997/1998 school year. While admitting that the contract lacks a specific provision regarding duration, defendant argues that the court should assume that the parties intended to limit their respective obligations for a reasonable time limit. Essentially, defendant contends that no reasonable party would bind itself to a perpetual contractual obligation. For this reason, the District insists that the court must cure the contract's failings, supply the missing ephemeral term and find that the agreement ended once the 1997/1998 academic year passed without an approved referendum.

In response, plaintiff argues that the services performed by the District's new architect and the approved capital improvement project itself are identical to those contemplated in the July 10, 1996, contract. For reasons not clearly articulated, plaintiff believes that the similarities between its two failed referendums and the successful plan substantiate its claims. Yet, despite its professed conviction about the assonant nature of these projects, Kimball also suggests that questions of fact exist concerning whether or not the new project and the new architect's services are identical to those contemplated by the

litigants in the July 10, 1996, contract. According to plaintiff, these questions should be explored through discovery and must be resolved at trial.

Plaintiff also contends that defendant, through its motion, raises other factual issues that must be resolved at trial. In particular, plaintiff attacks the idea that the July 10, 1996, contract was limited to the 1997/1998 school year. It claims that the specific academic year is irrelevant to the actual duration of the parties' contractual obligations. Instead, it maintains that the exact nature of the capital program contemplated at the time of contract controls the duration of the parties' obligations. Because it alleges that the approved project was part of the contemplated project, Kimball believes that it is entitled to discovery on this issue.

*4 Furthermore, plaintiff argues that the actual language of the contract does not support the District's interpretation of its temporal limit. Specifically, plaintiff finds it significant that the contract does not contain the terms "school year" or "academic year." It also notes that the contract's only temporal reference is found in the first sentence, where it states that the District would undertake its capital program in 1997/1998. Moreover, plaintiff implies that the contract could not terminate without a specific provision stating that a referendum must pass in the 1997/1998 school year.

Next, plaintiff contends that the District's post-referendum actions belie its argument that the academic year controls the contract's life span. According to Kimball, the District never indicated that it would terminate plaintiff if a referendum did not pass during the 1997/1998 school year. Plaintiff also indicates that it was actually terminated before the end of that academic year. Finally, Kimball argues that whether or not the District should have awarded its capital improvement contract to plaintiff is a question of fact that must be decided by the trier of fact. For these reasons, it maintains that the District's motion to dismiss the complaint must be denied.[FN4]

> FN4. To the extent that plaintiff's argument is an aspect of his Rule 56(f) motion, the court concludes that additional discovery is not required. The type of project approved on July 15, 1999, is not relevant to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

Page 4

resolution of defendant's motion to dismiss.

Essentially, the instant dispute is a matter of contract interpretation. When construing contracts, a trial court's primary objective is to "give effect to the intent of the parties as revealed by the language they chose to use."*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 103 F.Supp.2d 711, 721 (S.D.N.Y.2000)(quotingSeiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992)(internal quotation marks omitted)).* Therefore, New York law requires a court to first decide whether the contract is ambiguous. *Id.* A contract provision is considered ambiguous

whenever it admits more than one interpretation when viewed objectively by a reasonable intelligent person who examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business.

*Id.* at 722. A provision is not ambiguous if it has a "definite and precise meaning" and there is no danger of misconception or basis for differing opinions. *Id.* If the contract terms are not ambiguous, a court need not investigate extrinsic evidence to determine the parties respective obligations. *Id.* However, if the contract is ambiguous evidence of the parties intent is admissible. *Id.*

Furthermore, New York courts have made it clear that "in searching for the probable intent of the parties, lest form swallow substance, [the court's] goal must be to accord the words of the contract their 'fair and reasonable meaning' " *Sutton v. East River Savings Bank, 55 N.Y.2d, 555, 450 N.Y.S.2d 460, 463, 435 N.E .2d 1075, 1078 (1982)* (citations omitted). In other words, "the aim [of a court] is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." *Id.* This means that "not merely literal language, but whatever may be reasonably implied therefrom must be taken into account." *Id.* However, "unless there are reservations to the contrary, embraced in the interpretative result should be 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.' " *Id. (quotingRowe v. Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 830, 385 N.E.2d 566, 569 (1978)).*

**\*5** In this case, the specific question raised by the litigants concerns the intended duration of their agreement. Defendant maintains that the existence of the contract was limited to the 1997/1998 academic year, while plaintiff insists that the nature of the project contemplated in the agreement determines its life span. The court does not fully agree with either party. Instead, it finds that the contract is not ambiguous in any material term and so consideration of any extrinsic evidence, ie., the parties' intent, is unnecessary. Furthermore, review of the contract reveals that the scope of work contemplated by the contract signatories was limited to the District's 1997/1998 capital improvement program. Not only does the contract state that it concerned the "1997 Capital Program", *see* Compl. Ex. A; Dkt. No. 1, but it also establishes a proposed work schedule, which ended in November of 1998. This clearly shows the contract to be an agreement with a terminable existence.

Regardless, the actual duration of the contract and any possible ambiguity that may surround the parties' intent are not material to plaintiff's breach of contract claims. Instead, the appropriate inquiry relates to whether the contract terminated after failure of the first referendum. Once again, the contract's terms plainly show that defendant's obligation to plaintiff ended with the failure of the first referendum. Specifically, the contract is constructed in two parts. In Stage 1, the parties agreed that plaintiff would prepare a referendum for voter approval for a cost of $15,000. In Stage 2, plaintiff agreed to "undertake complete Architectural/Engineering Services for the *approved* Bond Referendum Project ..."*See* Compl. Ex. A (emphasis added). The only reasonable interpretation of this provision is that plaintiff would undertake Stage 2 services if their Stage 1 referendum was approved. Because the first proposed referendum failed, the contract automatically terminated and defendant's obligation to plaintiff ceased.

Furthermore, the District's decision to permit plaintiff to develop a second referendum did not create a perpetual obligation to allow Kimball to participate in the project. Moreover, even if the District's actions resurrected the original contract or if it created a new agreement under identical terms, defendant's contractual obligations would again terminate after

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

the second referendum failed. Therefore, the District's contractual obligation to allow plaintiff to further participate in Stage 1, and eventually engage in Stage 2, terminated after the demise of the first and second referendums. Thereafter, defendant was free to retain a new architect without breaching its contract with plaintiff. For these reasons, the court finds that plaintiff's breach of contract claim is deficient and grants defendant's Rule 12(b)(6) motion to dismiss.

III. *Remaining Claims*

Although defendant does not address them in its motion, plaintiff asserts four additional causes of action: (1) breach of binding preliminary agreement; (2) breach of binding preliminary commitment; (3) promissory estoppel; and (5) unjust enrichment/quantum meruit. In spite of defendant's disregard of these claims, the court will briefly address each as necessary.

A. *Binding Preliminary Agreement/Commitment Claims*

*6 Preliminary agreements are manifestations of assent requiring further negotiation or further contracts. See*Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996). Normally, these agreements do not create binding obligations, except in rare circumstances where the agreement clearly manifests the intention to be bound. *Id.* There are two types of preliminary agreements: (1) the binding preliminary agreement, and (2) the binding preliminary commitment. *See*Gorodensky v. Mitsubishi Pulp Sales, Inc.,* 92 F.Supp.2d 249, 254 (S.D.N.Y.2000). The binding preliminary agreement is created " 'when the parties agree on all points that require negotiation ... but agree to memorialize their agreement in a more formal document." ' *Id.* (quoting*Adjustrite Sys., Inc. v. GAB Business Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998)). This agreement is binding because it contemplates the execution of an elaborate contract only as a formality. *See*Id.*(citing*Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987)). A binding preliminary commitment is created " 'when the parties agree on certain major terms, but leave other terms open for further negotiation." ' *Id.* (quoting*Adjustrite,* 145 F.3d at 548). Parties to these agreements accept the commitment to negotiate in good faith to reach a final

agreement. *See*Id.(quoting*Tribune,* 670 F.Supp. at 498).

In order to ascertain the parties' intent to be bound by a binding preliminary agreement, the court must examine: (1) the language of the agreement; (2) the existence of open terms; (3) whether there has been partial performance; and (4) the necessity of putting the agreement in final form as indicated by the customary form of such transactions. *See*Id.* at 254-255. To determine the intent to enter a binding preliminary commitment, the court examines the same four factors plus the context of the negotiations resulting in the commitment. *See*Id.*

In the instant case, plaintiff contends that the July 10, 1996, contract is both a preliminary binding agreement and a binding preliminary commitment. In regard to the binding agreement, plaintiff claims that the parties consented to memorialize their agreement in a more formal document, namely the Standard Agreement between Owner and Architect referenced in the Stage 2 provision of the July 10, 1996, contract. Regarding the binding commitment, plaintiff contends that the parties agreed to negotiate the open terms of Stage 2 services.

Despite plaintiff's convictions, the agreement between Kimball and the District is neither a binding preliminary agreement nor a binding preliminary commitment. First, the defendant concedes, and the court agrees, that the parties entered into a contract. Next, the specific language of the contract does not indicate that the parties agree to either formalize their contract terms in a more elaborate document, or negotiate in good faith about open terms. Although the contract states that plaintiff would undertake Stage 2 services for the approved project as outlined in the Standard Agreement between Owner and Architect, it does not contemplate the need to execute an elaborate contract as a mere formality. In fact, there is no indication that the Standard Owner and Architect agreement is anything more than an addendum to the existing contract; the court certainly considers it as such.

*7 Furthermore, the contract does not clearly indicate the commitment to negotiate in good faith to reach a final agreement. Even if the contract did manifest such a need, further negotiation would only become necessary once the bond referendum project was

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

approved. Since neither of plaintiff's proposed projects were approved, the obligation to negotiate did not materialize. Certainly the conditional nature of this contingency does not absolutely commit defendant to negotiate to reach a final agreement. At most, this indicates the District's intent to finalize plaintiff's duties under the contract, if the appropriate condition materializes.

Because preliminary agreements are not normally binding and the court must avoid trapping parties into unintended contractual obligations, the undersigned finds that these claims are legally deficient. Consequently, plaintiff's binding preliminary agreement and commitment claims are dismissed.

### B. *Promissary Estoppel*

A cause of action for promissory estoppel under New York law requires plaintiff to prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. See*Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000). In this case, plaintiff maintains that its agreement with defendant constitutes a promise to allow Kimball to perform Stage 1 pre-referendum services and Stage 2 post-referendum services. It also claims that it reasonablely relied upon that promise and was subsequently damaged by defendant's breach.

Although the principle of promissory estoppel allows enforcement of a promise even in the absence of an enforceable contract, plaintiff states no claim herein. For the reasons articulated above, the court has found that defendant's commitment to allow plaintiff to conduct both Stage 1 and State 2 services ended when the contract terminated. Specifically, defendant's promises to plaintiff were conditioned upon the passage of a voter referendum within the 1997/1998 academic year. Since this condition did not occur, not only did defendant not breach its contractual obligations but any reliance by plaintiff upon these promises was unjustified.

Moreover, plaintiff's estoppel claim is based upon promises that are consistent with the obligations contemplated in the contract between the parties. The argument that defendant breached its promise to plaintiff is duplicative of its breach of contract claim

and so it must be dismissed. See*Four Finger Art Factory, Inc., v. Dinicola,* 2000 WL 145466, at *8 (S.D.N.Y. February 9, 2000)(dismissing promissary estoppel claim as duplicative of breach of contract claim). For the reasons stated above, plaintiff's promissary estoppel claims are dismissed.

### C. *Unjust Enrichment/Quantum Meruit*

Invoking the doctrines of quantum meruit and unjust enrichment, plaintiff contends that it performed Stage 1 services, which were actually worth $170, 466.94, but received only $31, 679.69 in fees. For this reason, plaintiff alleges that the District was unjustly enriched when it knowingly accepted Stage 1 services without fully compensating Kimball.

**\*8** Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject ... precludes recovery in quasi-contract ..." which includes both quantum meruit and unjust enrichment theories. See*Valley Juice Ltd. v. Evian Waters of France, Inc.,* 87 F.3d 604 (2d Cir.1996);see also*Fercus S.R .L. v. Palazzo,* 2000 WL 1118925, at *4 & *5 (S.D.N.Y. August 8, 2000). In this case, plaintiff specifically contracted to perform Stage 1 services for $15,000. Because it performed these services twice, plaintiff was paid $31,679.69.[FN5] Although the actual value of these services far exceeds the amount paid, plaintiff knowingly contracted to provide them for this amount and cannot recover under either quantum meruit or unjust enrichment theories. These claim are dismissed.

> FN5. The contract stated that plaintiff would conduct Stage 1 services for a lump sum of $15,000 and that the District would pay for collateral costs. There is no explanation why plaintiff was paid $1, 679.69 beyond the agreed fee.

### IV. *Summary Judgment: Procedural Issues*

Defendant has also moved for summary judgment claiming that: (1) the contract is invalid because it was not authorized by the Board of Education; (2) plaintiff failed to timely file a Notice of Claim as required by New York State Education Law § 3813(1); and (3) the applicable statute of limitations expired before institution of this claim. At this

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)
**2000 WL 1720751 (N.D.N.Y.)**

juncture, the court notes that defendant makes this motion despite not having answered the complaint. Although it refers to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1, defendant seems unaware that neither rule allows a litigant to move for summary judgment in lieu of answer. Since the court has already granted defendant's motion to dismiss, consideration of the summary judgment motion is not necessary at this juncture.

V. *Motion for Responsive Discovery*

Finally, plaintiff moves pursuant to Rule 56(f) of the Federal Rules of Civil Procedure to obtain the discovery that is necessary to oppose summary judgment. *See* Dkt. No. 13.Because the court has granted defendant's motion to dismiss, the requested discovery is unnecessary and plaintiff's motion is dismissed.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED, that defendant's Rule 12(b)(6) motion to dismiss the complaint is GRANTED. It is further

ORDERED, that defendant's Rule 56 motion for summary judgment is DENIED. It is further

ORDERED, that plaintiff's Rule 56(f) motion for a continuance to obtain responsive discovery is DENIED. It is further

ORDERED, that the Clerk of the Court serve a copy of this Memorandum Decision and Order upon the parties by regular mail.

N.D.N.Y.,2000.
Kimball Associates, P.A. v. Homer Cent. School Dist.
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

Page 1

C Cohen v. Elephant Wireless, Inc.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Molly COHEN, Diane Cohen, The Albert Cohen
Foundation, and Benjamin Cohen Plaintiffs,
v.
ELEPHANT WIRELESS, INC. Defendant.
**No. 03 Civ. 4058(CBM).**

Aug. 19, 2004.

Amos Alter, Jenkens & Gilchrist Parker Chapin LLP,
New York, NY, for plaintiffs.
Moshe Maimon, Levy Phillips & Konigsberg, LLP,
New York, NY, for defendant.

OPINION

MOTLEY, J.
*1 This case arises out of a stock repurchase
agreement between plaintiffs and defendant.
Plaintiffs claim that they performed their obligations
under the agreement but defendant has not.
Defendant claims that plaintiffs breached an implied
promise in the agreement, thereby barring defendant
from tendering plaintiffs the amounts allegedly due
under the contract. Currently before the court is
plaintiffs' motion to dismiss defendant's
counterclaims and defenses and for summary
judgment. For the reasons stated below, plaintiffs'
motion is GRANTED IN PART, DENIED IN PART
and DISMISSED WITHOUT PREJUDICE IN
PART.

BACKGROUND

On January 16, 2002, plaintiffs Molly Cohen, Diane
Cohen, Benjamin Cohen and the Albert Cohen
Foundation (hereinafter "plaintiffs" or the "Cohens"
'), defendant Elephant Wireless, Inc ., (hereinafter
"defendants" or "EWI") and other nonparty sellers
entered into a written Stock Repurchase Agreement
("SRA") for the purchase and sale of shares of
defendant and its affiliate companies .FN1Complaint at
¶ 6; Pl.'s Rule 56.1 Stmt. at ¶ 3. In relevant part, the
SRA provided that plaintiffs would sell back to

defendant certain shares of defendant's common
stock in consideration for $2,880,000, payments for
which would be paid in monthly installments over the
course of two years, and that plaintiffs would retain a
share in 20% stock ownership in defendant.
Complaint at ¶¶ 7, 11; Pl.'s Rule 56.1 Stmt. at ¶ 8.
Plaintiffs transferred their shares as contemplated by
the SRA and the defendant paid the $100,000 that
was due at closing to plaintiffs and the other nonparty
sellers. Complaint at ¶ 8; Pl.'s Rule 56.1 Stmt. at ¶ 5,
9; Def.'s Reply Brief, page 3. Since then, defendant
has not made any of the 29 monthly payments of
$100,000 called for under the contract, nor has it
delivered new shares of stock to plaintiffs as the
agreement provides.

> FN1. At the time the SRA was executed,
> defendant was known as Direct
> Communications, Inc., ("DCI"). Thus, any
> and all references in the agreement or this
> opinion to DCI refer to defendant Elephant
> Wireless. Any and all references to "Sellers"
> in the SRA refer to plaintiffs.

Plaintiffs filed this action on June 4, 2003, charging
defendant with breach of contract. Collectively, they
seek their share of each of the outstanding monthly
payments, totaling $48,000 per month, their portion
of the 20% shares of stock in defendant's company
(collectively, 10%) and all reasonable fees and
expenses.

Defendant replied to plaintiffs' complaint with a
series of affirmative defenses and counterclaims.
Their affirmative defenses are: 1) the complaint fails
to state a claim upon which relief can be granted, 2)
lack of subject matter jurisdiction, 3) plaintiffs'
claims are barred by the doctrines of unclean hands,
setoff, and waiver and/or estoppel; 4) plaintiff
breached an implied promise of cooperation and the
covenant of good faith and fair dealing by failing to
assist defendant in obtaining the requisite financing
to enable defendant to pay plaintiffs amounts due;
and 5) the damages plaintiffs seek were directly and
proximately caused by the plaintiffs themselves.
Further, defendant counterclaims that it is entitled to
setoff payments owed to plaintiffs (if any) by
payments defendant has made and continues to make

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
2004 WL 1872421 (S.D.N.Y.)

on behalf of plaintiffs for automobile and health insurance costs. Defendant also seeks indemnification for all undisclosed accounts payable and costs associated with undisclosed litigations at the time the parties entered into the SRA. EWI further counterclaims on the grounds that the agreement contained an implied promise that plaintiffs would cooperate in defendant's efforts to secure financing. According to defendant, the parties understood that the financing was necessary to facilitate defendant's anticipated public offering. With the capital obtained from the offering, defendant could then pay plaintiffs the amounts due under the agreement. Because plaintiffs breached this implied promise by refusing to subordinate their interests to a lender who was allegedly willing to finance the public offering, defendant claims plaintiffs are not entitled to recover under the contract.

**\*2** On August 26, 2003, plaintiffs moved for an order pursuant to Fed . R.Civ.P. 12(b)(6) dismissing defendant's counterclaims, for an order pursuant to Fed.R.Civ.P. 12(f) striking defendant's defenses, and for an order pursuant to Fed.R.Civ.P. 56 granting plaintiffs summary judgment on their complaint.

The case was transferred from Judge Batts to this court on October 15, 2003.

MOTION TO DISMISS AND MOTION TO STRIKE STANDARDS

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint where the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). At the motion to dismiss stage, the issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test."*Phelps v. Kapnolas,* 308 F.3d 180, 184-85 (2d Cir.2002)*quotingChance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

In assessing the merits of a 12(b)(6) motion, a court is required to accept as true the factual assertions in the complaint. *Charles W.V. Maul,* 214 F.3d 350, 356 (2d Cir.2000). A district court should grant such a motion only where, viewing plaintiff's allegation in

the most favorable light, "it appears beyond doubt that plaintiff can prove no set of facts in support of plaintiff's claim which would entitle plaintiff to relief."*SeeHarris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1990). A court may consider documents referred to in the complaint, explicitly or by reference, matters of which judicial notice may be taken, and documents either in the plaintiff's possession or of which the plaintiff had knowledge and relied in bringing the claim. *SeeGregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001); *Brass,* 987 F.2d at 150.

Federal Rule of Civil Procedure 12(f) allows a court to strike "from any pleading any insufficient defense."Fed.R.Civ.P. 12(f). The standard that applies to a motion to strike is the "mirror image" of the standard on a 12(b)(6) motion to dismiss for failure to state a claim. *SeeSony Fin. Servs., LLC v. Multi Video Group, Ltd.,* 2003 WL 22928602, at 8 (S.D.N.Y. Dec. 12, 2003) Motions to strike are generally disfavored and courts will not strike an affirmative defense unless the defense is clearly insufficient as a matter of law. *SeeAvent v. Solfaro,* 210 F .R.D. 91, 94 (S.D.N.Y.2002); *Forschner Group, Inc. v. B-line A.G.,* 943 F.Supp. 287, 291 (S.D.N.Y.1996).*See alsoUlla-Maija, Inc. v. Kivimaki,* 2003 WL 160777, at 4 (S.D.N.Y.2003) (motion to strike "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation"). In addition, the moving party must also show that it would be prejudiced if the defense were to remain in the pleading. *SeeAvent,* 210 F.R.D. at 94. Increased time and expense of trial may warrant a court in granting a Rule 12(f) motion and a court should strike a defense to eliminate the delay and unnecessary expense from litigating an invalid claim when it is insufficient as a matter of law. *SeeEstee Lauder, Inc. v. The Fragrance Counter, Inc.,* 189 F.R.D. 269, 272 (S.D.N.Y.1999). Notably for the purposes of this case, however, when there has been no significant discovery, courts are even more reluctant to grant a motion to strike an affirmative defense. *Oneida Indian Nation of New York v. New York,* 194 F.Supp.2d 104, 117 (N.D.N.Y.2002).

ANALYSIS

**\*3** The court begins its analysis by examining defendant's affirmative defenses and, where they rest

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

upon the same allegations as its counterclaims, considering defendant's defenses and counterclaims together.

## I. Failure to State a Claim

Defendant's first affirmative defense is that plaintiffs' complaint fails to state a claim upon which relief can be granted. Plaintiffs' claim is for breach of contract. A plaintiff seeking to recover for breach of contract under New York State law must prove (1) the existence of a contract, (2) plaintiff's performance, (3) breach by the defendant, and (4) damages. _Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir.2000); Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir.1996)_. Plaintiffs' complaint alleges that the parties entered into a stock redemption agreement, plaintiffs tendered their shares back to defendant, defendant has not compensated plaintiffs pursuant to the terms of the agreement, and that plaintiffs have been damaged as a result. Having alleged all of the elements of breach of contract, defendant's first affirmative defense that plaintiffs fail to state a claim is stricken under _Fed.R.Civ.P. 12(f)_ because it is clearly insufficient as a matter of law.

## II. Doctrine of Unclean Hands

Defendant's third affirmative defense is that plaintiffs' claims are barred by the doctrine of unclean hands.[FN2] Unclean hands is an equitable defense and unavailable in an action seeking money damages. _See e.g., Nomura Securities Intern., Inc. v. ETrade Securities, Inc._ 280 F.Supp.2d 184, 196 (S.D.N.Y.2003). Here, plaintiffs seek money damages for defendant's alleged breach. As such, the court strikes defendant's unclean hands defense as clearly insufficient as a matter of law.

> FN2. Defendants withdrew their second affirmative defense that the court lacks subject matter jurisdiction.

## III. Doctrine of Setoff

Defendant's fourth affirmative defense is that plaintiffs' claims are barred in whole or in part by the doctrine of setoff. In the same vein, defendant's first counterclaim avers that defendant is entitled to set off all payments it has made and continues to make on behalf of plaintiffs for certain automobiles, insurance costs, and parking violations according to the specific terms of the stock repurchase agreement, and that defendant is also entitled to set off sums it has expended for plaintiffs' payroll and health insurance. Thus, the court will consider defendant's fourth affirmative defense and first counterclaim together.

The common law doctrine of setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." _In re Malinowski,_ 156 F.3d 131 (2d Cir.1998) (internal quotation marks omitted). In setoff, the debts and credits between the parties may arise from different transactions, _Midland Ins. Co. v. Corcoran,_ 79 N.Y.2d 253, 259-60 & n. 2, 590 N.E.2d 1186, 1189, 582 N.Y.S.2d 58, 61 (1992), but they must be mutual, _Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.),_ 181 B.R. 730, 740 (Bankr.S.D.N.Y.1995). "[D]ebts are mutual when they are due to and from the same persons in the same capacity." _Id.; accord In re Midland Ins. Co.,_ 79 N.Y.2d at 259, 582 N.Y.S.2d 58, 590 N.E.2d 1186. "'Capacity' means legal capacity (e.g., principal, agent, trustee, beneficiary)." _Midland,_ 590 N.E.2d at 1192, 582 N.Y.S.2d at 64.

*4 Because the stock redemption agreement is incorporated by reference in the complaint, the court considers it in deciding plaintiffs' motion to dismiss. _See Leonard F. v. Israel Discount Bank of New York,_ 199 F.3d 99, 107 (2d Cir.1999). Section 8.4 of that agreement provides:

"Sellers ... and/or their families are presently in possession of certain automobiles leased ("the Leases") and insured by DCI, a list of which is annexed hereto as Exhibit C. Sellers ... and DCI agree that DCI shall continue to lease and insure these vehicles for the benefit of Sellers ... so long as Sellers ... agree to be responsible and indemnify DCI for all payments and obligations of DCI in connection with the lease and use of these vehicles. _Sellers ... further agree that any such sums shall be set-off against the payments due hereunder on a monthly basis._"

Affidavit of G. Lewis, Ex. A., at 19 (emphasis added). Accordingly, the contract provides a legally sufficient basis for defendant's claim that it is entitled to setoff amounts due to plaintiff for costs incurred in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

Page 4

connection with plaintiff's continued lease and use of certain vehicles made on plaintiffs' behalf.

Although the agreement does not similarly mention payroll and health insurance payments, the doctrine of setoff may apply even if the debt or credit arises from different transactions than the contract being sued upon, _Midland Ins. Co., 79 N.Y.2d at 259-60, 590 N.E.2d at 1189, 582 N.Y.S.2d 58_, creating the possibility that the parties entered into a different transaction that so provides. And while there may be a question as to whether plaintiffs and defendant acted in the same capacity in agreeing to setoff health insurance and payroll amounts as they acted in agreeing to setoff amounts paid for vehicle insurance, this is a question of fact necessitating discovery. Thus, defendant's fourth affirmative defense for setoff and its first counterclaim alleging the same survive plaintiff's motion to strike and to dismiss.

IV. Waiver/Estoppel

Defendant's fifth affirmative defense is that plaintiffs' claims are barred by the doctrines of waiver and/or estoppel. Citing _D.S. America East v. Chromografx Imaging Systems, 873 F.Supp. 786, 798, (E.D.N.Y.1995)_ and _Teletronics Proprietary v. Medtronic, 687 F.Supp. 832, 841 (S.D.N.Y.1988)_, plaintiffs argue that dismissal of the estoppel/waiver defense is warranted on the grounds that pleading the word "estoppel," without more, is not a sufficient state of the defense. This court, however, chooses instead to follow _Cattaraugus County Project Head Start, Inc. v. Executive Risk Indemnity, Inc._, 2000 WL 1737943 (W.D.N.Y. Nov. 8, 2000) rejecting that proposition on the grounds that "the affirmative defense of estoppel is akin to that of the statute of limitations; however the Second Circuit Court of Appeals has held that the identification of the particular statute of limitations is not required, and indeed the statute of limitations defense is sufficiently raised under _FRCP 8_ by its mere assertion." _Cattaraugus, 2000 WL 1737943, at 2_ (holding that pleading the word "estoppel" without more, is a sufficient statement of the defense and therefore survives the motion to strike) citing _Santos v. District Council of New York City, Etc., 619 F.2d 963, 967 (2d Cir.1980)_.

**\*5** Equitable estoppel is "imposed by law in the interest of fairness to prevent the enforcement of

rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." _Nassau Trust Co. v. Montrose Concrete Prods. Corp._, 56 N.Y.2d 175, 184, 451 N.Y.S.2d 663, 436 N. E.2d 1265 (1982). Thus, equitable estoppel is a principle or an affirmative defense that serves to stop another party from denying a material fact. _See_ 57 _N.Y. Jur.2d, Estoppel_ § 13, at 17-18 (1986) (equitable estoppel "is the principle by which a party is absolutely precluded from denying, or asserting the contrary of, any material fact"); 28 Am.Jur.2d, _Estoppel & Waiver_ § 27, at 629 (1966) (equitable estoppel is a "rule ... of substantive law, for the reason that it absolutely precludes a person from asserting what would otherwise be his right"). Similarly, waiver is the "voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." _Nassau Trust Co._, 56 N.Y.2d at 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265.

Under New York law, the defense of equitable estoppel requires proof of three elements: 1) conduct which amounts to a false representation or concealment of material facts; 2) intention that such conduct will be acted upon by the other party; and 3) knowledge of the true facts. _SeeInt'l Minerals and Resources, S.A. v. Pappas_, 96 F.3d 586, 594 (2d Cir.1996); _Readco, Inc. v. Marine Midland Bank_, 81 F.3d 295, 301 (2d Cir.1996); _Benincasa v. Garrubbo_, 141 A.D.2d 636, 638, 529 N.Y.S.2d 797, 800 (2d Dep't 1988). In addition, the party alleging estoppel must show that it 1) lacked knowledge of the true facts, 2) relied upon the conduct of the party estopped, and 3) changed its position in a prejudicial manner. _Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp ._, 76 A.D.2d 68, 81-82, 430 N.Y.S.2d 179 (4th Dep't 1980)

At this stage in the litigation, the court is not prepared to hold that there is "no question of fact which might allow the defense to succeed" or that "plaintiff would be prejudiced by the inclusion of the defense." _SEC v. McCaskey_, 56 F.Supp.2d 323, 326 (S.D.N.Y.1999). During discovery, it is conceivable that defendant could gather evidence showing that plaintiffs represented that they would not enforce the contract unless and until defendant acquired the necessary

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

financing for its public offering. The defense of waiver and/or estoppel is not clearly insufficient as a matter of law and therefore survive plaintiff's motion to strike.

## V. Lack of Injury or Damages

Defendant's sixth affirmative defense is that "plaintiffs have not, nor will they, suffer injury or damages as a result of any conduct by EWI."Def.'s Amended Answer at 3.

"(I)t is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any."*Hirsch Elec. Co. v. Cmty. Servs., Inc.,* 145 A.D.2d 603, 605, 536 N.Y.S.2d 141, 143 (2d Dep't 1988) (citation omitted); *accordFreund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 384, 357 N.Y.S.2d 857, 861, 314 N.E.2d 419 (1974) (plaintiff entitled to nominal damages where compensatory damages not proven with certainty; "Though these are damages in name only and not at all compensatory, they are nevertheless awarded as a formal vindication of plaintiff's legal right to compensation which has not been given a sufficiently certain monetary valuation."); *Manhattan Sav. Inst. v. Gottfried Baking Co.,* 286 N.Y. 398, 400, 36 N.E.2d 637 (1941) (same); *C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc.,* 172 A.D.2d 206, 208, 567 N.Y.S.2d 716, 718 (1st Dep't 1991) ("Even if it were shown that no actual damages have been sustained, plaintiff would seem entitled to proceed to trial at least on its contract cause of action[,] if only to vindicate its right to nominal damages.") (citations omitted); *Good Karma Prods. v. Penthouse Int'l, Ltd.,* 88 A.D.2d 561, 450 N .Y.S.2d 486, 486-87 (1st Dep't 1982); *see also Vazquez v. Salomon Smith Barney Inc.,* 2002 WL 10493, at 6 (S.D.N.Y. Jan. 4, 2002) (lack of damage did not defeat breach of contract claim); *Mermaid Neptune Dev. Corp. v. Home Owners Warranty Corp.,* 1988 WL 45653, at 4 (S.D.N.Y. May 4, 1988) (same); *UV Indus., Inc. v. Sharon Steel Corp.,* 631 F.Supp. 1219, 1221 (S.D.N.Y.1986) (same). This is because "[w]henever there is a breach of a contract or the invasion of a legal right[,] the law infers some damage."*Finley v. Atlantic Transp. Co.,* 220 N.Y. 249, 258, 115 N.E. 715 (1917).

**\*6** If defendant breached the stock repurchase agreement as plaintiffs' complaint avers, plaintiffs have suffered some form of compensable damage. However, in order for defendant's affirmative defense to be clearly legally insufficient on the grounds that every breach of contract gives rise to damages as a matter of law, the court must first find that such a breach in fact occurred. Given that the issue of breach has yet to be determined, plaintiff's motion to strike defendant's sixth affirmative defense is denied.

## VI. Implied Promise of Cooperation and the Covenant of Good Faith and Fair Dealing

### A. Defendant's Claims

Defendant's seventh affirmative defense is that "plaintiff's claims are barred by the operation of an implied promise of cooperation and by the covenant of good faith and fair dealing, each of which plaintiff breached by failing to assist EWI in obtaining the requisite financing to perform under the Agreement."Def.'s Amended Answer at 3. Defendant's eighth affirmative defense appears to rest on the same allegation to the extent that it alleges that any damages plaintiffs have suffered pursuant to this transaction stem from plaintiffs' own misconduct. *Id.*

Similarly, defendant counterclaims on the grounds that at the time the parties entered into the agreement, the parties understood that the purpose of plaintiffs selling their shares back to defendant was to "facilitate the infusion of financing into the company from financial institutions and/or private investors."Def.'s Amended Answer, 8 at ¶ 32. "Indeed, all parties to the Agreement understood that EWI could not make the monthly payments to the counterclaim defendants ... without the necessary financing."*Id.*"Accordingly, the Agreement contained an implied promise by the parties to cooperate in securing financing, including adjusting the seniority of their ownership interests in EWI to the demands of financial institutions."*Id.* at 8, ¶ 33.Defendant avers that after the agreement was executed, plaintiffs refused to subordinate their interests in EWI to the demands of a lender that would have provided the credit to facilitate defendant's anticipated public offering and, in turn, its ability to make monthly payments to plaintiffs as contemplated under the contract. *Id.* at 8, ¶ 34.Defendant therefore claims in

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

its fourth counterclaim that plaintiffs breached the implied promise to cooperate in defendant's efforts to secure financing for the public offering.

Defendant's fifth counterclaim for breach of implied covenant of fair dealing turns upon the same allegation that plaintiffs failed to "cooperate in securing financing, including adjusting the seniority of their ownership interests in EWI to the demands of a financial institution."*Id.* at 9, ¶ 43.

Because defendant's seventh and eight affirmative defenses and fourth and fifth counterclaims all rest upon the same allegation that plaintiff promised to cooperate in defendant's attempt to secure financing and thereafter failed to do so, the court analyzes them together.

B. Analysis

*1. Implied Promise to Cooperate in Defendant's Efforts to Secure Financing and Subordinate Their Interests*

**\*7** It is well-settled that under New York law, implied promises in commercial agreements are enforceable. *See e.g.,Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917) ("A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed."). A court may not, however, "rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts in a given case."*Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir.1992) (citation omitted).*See alsoDalton v. Educational Testing Service,* 87 N.Y.2d 384, 639 N.Y.S.2d 977, 663 N.E.2d 289, 291 (1995) (a court may not imply an obligation that is inconsistent with the other terms of the contractual relationship). Courts will not find an implied covenant when doing so is unnecessary to give effect to the terms of the contract. *Vacuum Concrete Corp. v. Am. Machine & Foundry Co.,* 321 F.Supp. 771, 773 (S.D.N.Y.1971). New York law requires courts to interpret a contract "so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."*Cruden,* 957 F.2d at 976. Moreover, in construing a contract, court should not "suppose that one party was to be placed at the mercy of the

other."*Wood,supra,* at 214 (citing cases).

"A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally in admissible to add to or vary the writing."*W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990). This proposition is the parol evidence rule. The parol evidence rule bars the introduction and consideration of extrinsic evidence of the meaning of a complete written agreement, if the terms of the agreement are clear and unambiguous. *Id.* at 162-63, 566 N.E.2d at 642, 565 N.Y.S.2d at 443. If the terms of the complete written contract are unclear, ambiguous, or contradictory, however, the parol evidence rule permits the consideration of such evidence in order to ascertain the true meaning of the terms. *See generally Alexander & Alexander Servs., Inc., v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998).

Application of the parol evidence rule requires a three-step inquiry: first, whether the written contract is an integrated agreement; if it is, then second, whether the language of the written contract is clear or unambiguous; and, if the language is clear, then third, applying that clear language, whether plaintiff has alleged breach of the written contract. *SeeInvestors Ins. Co. v. Dorinco Reinsurance Co.,* 917 F.2d 100, 103-05 (2d Cir.1990). Unless plaintiffs can satisfy these criteria, the parol evidence rule has no application and proof of the contemporaneous agreement can be admitted. *Lee v. Joseph E. Seagram & Sons, Inc.,* 413 F.Supp. 693, 701-02 (S.D.N.Y.1976) (citation omitted).

**\*8** Turning to the first step of the inquiry, "an integrated agreement is one which represents the entire understanding of the parties to the transaction. Under New York law a contract that appears complete on its face is an integrated agreement as a matter of law."*Wayland Inv. Fund, LLC v. Millennium Seacarriers, Inc.,* 111 F.Supp.2d 450, 454 (S.D.N.Y.2000) (citing, inter alia, *Investors Ins. Co.,* 917 F.2d at 104;*Battery Steamship Corp. v.. Refineria Panama, S.A.,* 513 F.2d 735, 738 n. 3 (2d

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

Cir.1975)) (internal quotation marks omitted). Here, the contract contains an explicit integration agreement. Section 10.3, labeled "Entire Agreement" provides: "This instrument and the Exhibits "A" through C which are hereby incorporated herein by reference, embody the entire agreement among the parties hereto with respect to the subject matter hereof, and supercede (sic) any and all prior understandings, written or oral, formal or informal."The contract, therefore, is integrated, and plaintiff has satisfied the first prong of the test to exclude parol evidence.

The second prong queries whether the language of the contract is clear or whether it is ambiguous. *Investors Ins. Co.,* 917 F.2d at 104. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."*W.W.W. Assocs.,* 77 N.Y.2d at 162, 566 N.E.2d at 642, 565 N.Y.S.2d at 443. An ambiguity arises if "the terms of a contract could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." ' *Alexander & Alexander Servs.,* 136 F.3d at 86,*quotingLightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997).

Defendant points to language in Section 1.2 of the SRA as establishing an ambiguity in the agreement. That section is entitled "Redemption of Shares of DCI." It states:

"Upon the terms and subject to the conditions contained herein, Sellers shall sell, transfer and deliver to the DCI, and DCI shall redeem and acquire from the Sellers the Shares, which Shares shall be free of any adverse claim or encumbrance. The number of Shares to be redeemed by DCI from the Sellers ... is such that upon consummation of the transaction, contemplated by this Agreement the Sellers as a group in such proportion between themselves as they deem proper and appropriate shall retain a 20% interest in DCI ... It is understood between the parties that a third party will in the near term acquire a stock interest in DCI. If there is no third party investor Sellers may cancel this Agreement upon the return of any money paid to them hereunder, at which time all shares redeemed

shall be returned to Sellers ... The DCI stock to be sold, transferred or conveyed in the first subsequent investment shall occur in such a way that at the conclusion of this first subsequent investment into DCI the Sellers proportionate interest in DCI shall still be 20% of the then issued and outstanding shares in existence, Sellers understand that their interest(s) will be proportionally diluted in any subsequent investments or transactions."

**\*9** Affidavit, of G. Lewis, Ex. A., at 2-3.

This language does not suggest more than one meaning when viewed objectively by a reasonably intelligent person. *Alexander & Alexander Servs.,* 136 F.3d at 86. It simply means what it says: plaintiff sellers were to maintain a 20% stock interest in defendant, with the understanding that subsequent investors may acquire an interest in the corporation thereafter. There is nothing in this language to even remotely suggest that plaintiffs were to play a role in securing the third party investment mentioned in the agreement.

Defendants next point to Section 7.2 as establishing an ambiguity in the SRA. It provides:

"Sellers ... shall not voluntarily undertake any course of action inconsistent with the satisfaction of the requirements of the conditions applicable to him or her set forth in this Agreement, and each Seller ... shall promptly do all such acts and take all such measures as may be appropriate to enable them to perform as early as possible the obligations herein provided to be performed by them."

Affidavit of G. Lewis, Ex. A., at 17. Defendants suggest that this language is amenable to the interpretation that under the SRA, plaintiffs had an obligation to assist defendants in securing financing by agreeing to subordinate their interests to a future lender. This argument is circular. The language cited above does not lend itself to a possible meaning that plaintiffs were to help defendants secure financing; it merely states that the parties shall perform their obligations under the agreement. Thus, the quoted language does not create an ambiguity because it is not reasonably susceptible to differing interpretations. *Seiden v. Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 8
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

Turning to the third and final prong to the inquiry, the question is whether defendant breached the SRA. Defendant does not dispute that it has not tendered plaintiffs the amounts owing under the agreement or a 20% stock ownership interest in defendant. It is therefore reasonable to conclude that if the SRA is a legally operative contract, then defendant was in breach. Therefore, plaintiffs have satisfied the criteria necessary to apply the parol evidence rule to the agreement.

Having concluded that the parol evidence rule applies, the court must nevertheless consider whether the rule bars admission of the evidence proffered by defendant. Defendant appears to aver that its performance was subject to a condition precedent, namely, the ability of defendant to secure financing for its public offering with the cooperation of plaintiffs. "The applicable law is clear, the relevant principles settled. Parol testimony is admissible to prove a condition precedent to the legal effectiveness of a written agreement if the condition does not contradict the express terms of such written agreement."*Morgan Stanley High Yield Securities, Inc. v. Seven Circle Gaming Corp.,* 269 F.Supp.2d 206, 216 (S.D.N.Y.2003)*citingHicks v. Bush,* 10 N.Y.2d 488, 225 N.Y.S.2d 34, 180 N.E.2d 425 (1962).

**\*10** Here, section 4.2 of the SRA specifically identifies conditions precedent to the agreement's execution, with no mention of defendant's ability to securing financing or plaintiffs' cooperation therein. Article 6 specifically identifies conditions precedent to plaintiffs' obligations to perform, but there is no comparable section to the Agreement delineating conditions precedent to defendant's performance. Even more important, section 10.12 provides that no modifications shall be legally effective unless made in writing and signed. Section 10.13 provides that subject to IRS approval of plaintiffs as proper shareholders as an S corporation prior to closing, "this Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns."Article 3 similarly states: "This Agreement has been duly authorized, executed, and delivered by and constitutes the valid and legally binding obligation of, DCI."Affidavit of G. Lewis, Ex. A., at 10-11.

Accordingly, there is a conflict between defendant's

allegation that its performance was subject to a condition precedent and the explicit language requiring modifications to be in writing. *SeeMizuna, Ltd. v. Crossland Fed. Sav. Bank,* 90 F.3d 650, 659-60 (2d Cir.1996) (alleged oral condition precedent inconsistent with clause prohibiting amendment except by written agreement); *Bank Leumi Trust Co. of New York v. Wulkan,* 735 F.Supp. 72, 76 (S.D.N.Y.1990) (alleged oral condition precedent inconsistent with the provision that no modifications shall be deemed to be made unless the same shall be in writing); *Hicks,* 10 N.Y.2d at 492, 225 N.Y.S.2d at 37, 180 N.E.2d 425 (alleged oral condition precedent inconsistent with the contractual term stating that no oral modifications would be binding on the parties). Moreover, the SRA is clear that it represents a binding obligation upon the parties. The court can think of nothing more inconsistent with that express contractual language and any assertion that the SRA never became a valid, binding obligation requiring defendant to perform. *SeeMorgan Stanley,* 269 F.Supp.2d at 220 ("It simply defies logic to contend that a condition precedent, which would be introduced for the purpose of proving that the Agreement never became a legally valid and binding document, would not contradict a term, agreed to by both parties, stating that 'this Agreement is [the signing party's] legal, valid and binding obligation enforceable in accordance with its terms.' ").*See alsoBank Leumi Trust Co.,* 735 F.Supp. at 76 ("Wulkan's contention that Bank Leumi orally agreed that the effectiveness of the Guaranty was conditioned upon Wulkan obtaining the requisite authority from the Israeli government obviously varies the express written terms of the Guaranty, which states that he 'irrevocably and unconditionally' undertook to guarantee Dumax's liabilities to Bank Leumi, and that 'no modifications or amendment of the guaranty shall be deemed to be made unless the same shall be in writing." ").

**\*11** Because the parol evidence rule bars the introduction of extrinsic evidence to show that plaintiffs promised to assist defendant in securing financing for its anticipated public offering by subordinating their interests to a potential lender, there are no facts upon which defendant can show that the contract contained such an implied promise or condition precedent. Defendant's seventh and eight affirmative defenses are stricken and fourth and fifth counterclaims are dismissed as being clearly legally insufficient as a matter of law.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

*1. Good Faith and Fair Dealing*

Defendant's seventh affirmative defense and fifth counterclaim also include an allegation that plaintiff breached the implied covenant of good faith and fair dealing by failing to cooperate in defendant's efforts to procure financing for the planned public offering.

Under New York law, every contract includes an implied covenant of good faith and fair dealing. *Travellers Intern., A.G., v. Trans World Airlines,* 41 F.3d 1570, 1575 (S.D.N.Y.2003). At the same time, the covenant cannot be used to create new contractual rights between the parties. *In re Houbigant,* 914 F.Supp. 964, 995 (S.D.N.Y.1995). Because breach of the covenant is "merely a breach of the underlying contract,"*Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992), "as a general rule, the cause of action alleging breach of the implied covenant is duplicative of a cause of action alleging breach of contract."*OHM Remediation Servs. Corp. v. Hughes Envntl. Sys., Inc.,* 952 F.Supp. 120, 124 (S.D.N.Y.1997) (citation and internal citations omitted). To the extent that defendant's seventh affirmative defense and fifth counterclaim charging breach of the implied covenant of good faith and fair dealing rests upon plaintiffs' alleged breach of the implied promise to assist defendant in obtaining financing, they are duplicative and therefore dismissed. *See*MDC Corp., Inc. v. John Harland Co., 228 F.Supp.2d 387, 395 (S.D.N.Y.2002).

For the reasons stated above, plaintiffs' motion to strike defendant's seventh and eighth affirmative defenses and to dismiss its fourth and fifth counterclaims is granted.

VII. Indemnification

Defendant's second counterclaim is for indemnification for undisclosed accounts payable. Defendant's third counterclaim is for indemnification for indemnification for undisclosed litigations. In New York, indemnification claims must be grounded in contract either express or implied. *McDermott v. City of New York,* 50 N.Y.2d 211, 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980) ( "The right to indemnity ... springs from a contract, express or implied, and full, not partial, reimbursement is sought") (internal

quotations omitted).

Under the heading "Representation and Warranties of Sellers," Section 2.5 of the SRA provides:

"Exhibit D to this Agreement sets forth the unaudited Financial Statements for DCI, each of the Affiliated Companies, and Anything Wireless, Inc., at September 30, 2001, except that accounts payable are set forth as of November 30, 2001, fairly present the financial position of DCI, each of the Affiliated Companies, and Anything Wireless, Inc., at the balance sheet dates and the result of operations for the period covered thereby. To Sellers' knowledge current the books and records of DCI, each of the Affiliated Companies, and Anything Wireless, Inc. fully and fairly reflect all of its transactions, properties, assets and liabilities [sic]. Except as set forth in the Financial Statements there are no special or non-recurring items of income or expense during the periods covered by the Financial Statements, and except as set forth in the Financial Statements, the balance sheets included in the Financial Statements do not reflect any write-up or revaluation increasing the book value of any assets. There are no material changes in the Financial Statements since September 30, 2001 and there are no other liabilities, contingent or other, other than in the ordinary course of business. The Financial Statements reflect all adjustments necessary for a fair representation of the financial information contained therein ..."

***12** Affidavit of G. Lewis, Ex. A, at 7. Similarly, Section 2.8 of the SRA includes a representation by plaintiffs that at the time of the execution of the agreement, there were no undisclosed litigations or suits pending against plaintiffs or defendant, nor any facts known to plaintiffs that might result in such litigation. *Id.* at 8.

Under section 8.2, entitled "indemnification," plaintiffs agreed to "indemnify and hold DCI harmless from any damage, loss, claim, liability, deficiency or expense, inclusive of reasonable attorneys' and accountants' fees, arising out of or relating to the breach of any representation or warranty of" plaintiffs.*Id.* at 18.

In light of these express provisions in the SRA, defendant's claim for indemnification for undisclosed amounts payable and undisclosed litigations is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 10
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

grounded in contract. Although both parties concede that "Exhibit D" that allegedly sets forth the "financial statements" is not annexed to the contract, its absence and the explanation therefor should be explored during discovery. As such, defendant's counterclaims for indemnification survive plaintiffs' motion to dismiss; they are not clearly legally insufficient as a matter of law.

## SUMMARY JUDGMENT STANDARD

In addition to moving to dismiss defendant's counterclaims and to strike defendant's affirmative defenses, plaintiffs move the court for summary judgment in their favor on all of the claims set forth in their complaint. Defendants object to any ruling on the merits of a summary judgment motion given that the case has yet to proceed with discovery.

Under Fed.R.Civ.P. 56(c), summary judgment "shall be rendered forthwith" if it is shown that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 n. 4, 106 S.Ct. 2548, 2552 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading [s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. See *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. See *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). If the initial burden is met, the non-moving party "must produce specific facts

indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (internal quotations and citations omitted) (alteration in original).

## ANALYSIS

**\*13** Given the court's conclusions above sustaining defendant's fourth, fifth, and sixth affirmative defenses and first, second, and third counterclaims over plaintiffs' motion to dismiss, there are genuine issues of fact necessitating further evidentiary support before the court can enter judgment as a matter of law on plaintiffs complaint. "Only in the rarest of cases may summary judgment be granted against a [party] who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir.2000). The Second Circuit has denied motions for summary judgment as premature in cases where the nonmoving party did not have a "fully adequate opportunity for discovery" at the time the moving party sought summary judgment. *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989. See *Hellstrom,* 201 F.3d at 97; *Berger v.. United States,* 87 F.3d 60, 65 (2d Cir.1996); *Sutera v. Schering Corp.,* 73 F.3d 13, 18 (2d Cir.1995) (reversing summary judgment granted before any discovery had taken place); see also *Crystalline H2O Inc., v. D. Orminski,* 105 F.Supp.2d 3 (N.D.N.Y.2000) (declining to hear motion for summary judgment on the merits in a contract case before the discovery phase); *Ammcon, Inc. v. Kemp,* 826 F.Supp. 639, 647 (E.D.N.Y.1993); *Wright v. Eger,* 224 A.D.2d 795, 637 N.Y.S.2d 514, 514-15 (3d Dep't 1996); *cf.Trebor Sportswear Co.,* 865 F.2d at 511 ("The nonmoving party should not be 'railroaded' into his offer of proof in opposition to summary judgment. The nonmoving party must have had the opportunity to discovery information that is essential to his opposition to the motion for summary judgment. But the trial court may property deny further discovery *if the nonmoving party has had a fully adequate opportunity for discovery.*") (quotations and internal citations omitted) (emphasis added).

Accordingly, at the very least, a resolution of the issues before the court requires that defendant have

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)
**2004 WL 1872421 (S.D.N.Y.)**

Page 11

the opportunity to conduct limited discovery with respect to its claims of waiver/estoppel, setoff and indemnification. Thus, plaintiffs' motion for summary judgment is premature and is dismissed without prejudice.

CONCLUSION

Plaintiffs' motion to strike defendant's first, third, seventh and eighth affirmative defenses is GRANTED. Plaintiffs' motion to strike defendant's fourth and fifth affirmative defenses is DENIED. Plaintiffs' motion to dismiss defendant's fourth and fifth counterclaims is GRANTED. Plaintiff's motion to dismiss defendant's first, second, and third counterclaims is DENIED. Plaintiff's motion for summary judgment is DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

S.D.N.Y.,2004.
Cohen v. Elephant Wireless, Inc.
Not Reported in F.Supp.2d, 2004 WL 1872421 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

**H**Bonestroo, Rosene, Anderlik & Associates, Inc. v.
Devery
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
BONESTROO, ROSENE, ANDERLIK &
ASSOCIATES, INC., Plaintiff,
v.
Robert J. DEVERY, Defendant.
**No. 05 C 2184.**

April 12, 2006.

Rachel Beth Cowen, Jennifer Lynn Camden, Kevin
Vincent Dunphy, Connelly, Sheehan & Moran,
Chicago, IL, for Plaintiff.
Alan E. Richards, David J. Schwab, Michael L.
Ralph, Richards, Ralph & Schwab, Chartered,
Vernon Hills, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SHADUR, Senior J.
*1 Bonestroo, Rosene, Anderlik & Associates, Inc.
("Bonestroo") has sued Robert Devery ("Devery") in
its four count First Amended Complaint ("FAC"),
comprising three charges of breach of contract and
one charge of breach of fiduciary duty. After
discovery, Devery has now responded with a
Fed.R.Civ.P. ("Rule") 56 motion for summary
judgment. For the reasons set out in this
memorandum opinion and order, Devery's motion is
denied in part and granted in part.

*Summary Judgment Standard*

Familiar Fed.R.Civ.P. ("Rule") 56 principles impose
on movant Devery the burden of establishing the lack
of a genuine issue of material fact (*Celotex Corp. v.
Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986)).[FN1] For that purpose this Court
must "consider the evidentiary record in the light
most favorable to the nonmoving party ... and draw
all reasonable inferences in his favor" (*Lesch v.
Crown Cork & Seal Co.,* 282 F.3d 467, 471 (7th
Cir.2002)). That said, to avoid summary judgment a

nonmovant still "must produce more than a scintilla
of evidence to support his position" that a genuine
issue of material fact exists (*Pugh v. City of Attica,*
259 F.3d 619, 625 (7th Cir.2001)). In the end,
however, summary judgment is warranted only if a
reasonable jury could not return a verdict for the
nonmovant (*Anderson v. Liberty Lobby, Inc.,* 477
U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202
(1986)). What follows is a summary of the facts
viewed in the light most favorable to Bonestroo, but
only so long as those facts are supported by record
evidence.[FN2]

> FN1. To that end this District Court's LR
> 56.1 calls for evidentiary statements by the
> movant and itemized responses to such
> statements by the nonmovant (in each
> instance with record citations), thus
> highlighting the existence or nonexistence of
> factual disputes. This opinion cites to
> Devery's LR 56.1(a)(3) statement of
> material facts as "D. St. ¶ -," to Bonestroo's
> LR 56.1(b)(3)(A) response as "B. St. ¶ - "
> and to Bonestroo's LR 56.1(b)(3)(B)
> statement of additional facts as "B. Add. St.
> ¶ -" (to which Devery filed no response).
> "D." and "B." will also be used to identify
> the litigants' legal memoranda ("Mem.") and
> supplemental memoranda ("Supp.Mem."),
> Bonestroo's second supplemental
> memorandum of law ("2d Supp. Mem.") and
> Devery's exhibits ("Ex.").

> FN2. Some of Bonestroo's LR 56.1
> submissions overstate the evidence to which
> they cite (see, e.g., B.Add.St.¶¶ 18-19).
> Although strict compliance with LR 56.1 is
> the norm (see, e.g., *Ammons v. Aramark
> Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th
> Cir.2004)), this opinion has not stricken
> those submissions altogether, instead
> crediting them only to the degree justified
> by the evidentiary record.

*Background*

On March 22, 2001 Bonestroo purchased all the stock
of Devery Engineering, Inc. ("Devery Corp."), a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

corporation providing "engineering and other related services" (D.St.¶ 5, B.Add.St.¶ 1). In connection with that acquisition, Devery Corp. shareholder Devery entered into two agreements with Bonestroo: an Agreement and Plan of Merger ("Merger Agreement") and a Second Amendment to Stock Purchase and Redemption Agreement ("Shareholder Amendment") (D.St.¶¶ 5-6). Devery also signed an Employment Agreement under which he agreed to serve as a Branch Manager for Bonestroo's Grayslake, Illinois office (id. ¶ 6; D. Ex. 11 § 1.1). All three agreements (collectively "Acquisition Agreements") included noncompete covenants precluding Devery, among other things, from soliciting, transacting or accepting any business from Bonestroo clients or customers, either on his own behalf or on behalf of another person or corporation (D.St.¶¶ 18-20).

As B. Mem. 3 explains from Bonestroo's perspective:

Sometime in late 2003, Devery advised senior management at Bonestroo that he wanted to begin transitioning out of Bonestroo. Bonestroo, of course, needed time to find a replacement and transition Devery's clients to that replacement.

That led to a major recasting of the parties' relationship. By their entry into two related contracts-a Separation Agreement and General Release ("Separation Agreement") and an Independent Contractor Agreement ("Contractor Agreement")-they agreed to terminate Devery's employment effective January 8, 2004, after which he would provide services to Bonestroo as an independent contractor until December 31, 2004 "or such other date as acceptable to the parties by mutual agreement" (D. St. ¶¶ 9, 38, 39; D. Exs. 12, 13).

**\*2** In part the new agreements (1) specified 17 services Devery was obligated to render (D. Ex. 13 Sch. A), (2) required Bonestroo to pay Devery both a weekly payment for the duration of the Contractor Agreement and a severance payment once it was terminated (other than by Bonestroo for cause) (D. St. ¶¶ 15, 40; D. Ex. 12 § 2), (3) required the parties to "cooperate in drafting public communications regarding Devery's transition and departure" (D. Ex. 12 § 5) and (4) provided that Devery could not be terminated without notice and an opportunity to cure (D. Ex. 13 § 6). As for the preexisting "non-

competition, non-solicitation and confidential information" provisions that had been set out in the Acquisition Agreements, Separation Agreement § 9 confirmed that those were still viable (each had a defined duration that was not altered), but the same section carved out a general exception to the Acquisition Agreements' non-compete provisions under which Devery could "become a full-time employee of a client of [Bonestroo] provided that in Devery's capacity with the client, Devery shall fairly consider the Bonestroo firm for opportunities to provide services to the client."

In January 2004, soon after those agreements were made and the Contractor Agreement had come into effect, Devery informed the Village of Round Lake Beach ("Round Lake Beach"), a Bonestroo client, that there was "an opportunity for [Devery] to work for them" and asked if they would be interested in hiring him (Devery Dep. 6; B. Add. St. ¶ 16). Discussions between Devery and Round Lake Beach continued "throughout the year," culminating with the November 8, 2004 signing of an Independent Contractor/Official Contract For Services ("Round Lake Beach Contract") to take effect January 1, 2005 (Devery Dep. 10; D. Ex. 15).

In the meantime, beginning in the summer of 2004 Bonestroo Branch Manager Thomas Palansky ("Palansky") began to meet with Devery to discuss his plans as to the potential December 31, 2004 expiration of his Contractor Agreement (B.Add.St.¶¶ 6-7). Devery, who had not informed Palansky or Bonestroo of his negotiations with Round Lake Beach (id. ¶ 22),"appeared interested in continuing his relationship with Bonestroo, and promised to let [Palansky] know as soon as he made a decision" (Palansky Aff. ¶ 3).

Palansky and Devery then had three lunch meetings between September and November 2004, during each of which Devery told Palansky that he was possibly interested in staying with Bonestroo beyond the contract's expiration (id. ¶ 4). In the last two meetings they went so far as to sketch out organizational charts to figure out where Devery might fit best (B.Add.St.¶ 11). Meanwhile, during the same time period-the summer and fall of 2004-Devery repeatedly declined Palansky's requests that he accompany Devery to client meetings, stating that the timing was not good (id. ¶ 9).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

Just one day after the last of their meetings, Devery told Palansky that he would not be staying on with Bonestroo past the December 31, 2004 expiration date (*id.* ¶ 12). But Palansky was then still unaware of Devery's agreement with Round Lake Beach (or of the negotiations leading up to it), until a Bonestroo employee passed on a rumor that Devery had accepted a position there (B.Add.St.¶¶ 13, 22, 23). When Palansky then confronted him, Devery said that he had accepted full-time employment with Round Lake Beach-he did not refer to his contractual status there designating him as an independent contractor (*id.* ¶ 24). Based on their conversation, Devery and Bonestroo agreed to carve out a specific exception to Devery's noncompete covenants, modeled on the general exception included in the Separation Agreement, allowing Devery to "work full-time" for Round Lake Beach as long as he "fairly considered" Bonestroo for opportunities to provide services to Round Lake Beach (*id.* ¶ 24).

**\*3** During the fall of 2004 Devery also spoke with Dan Quick ("Quick"), Administrator of another Bonestroo client, the Village of Wauconda ("Wauconda"), telling him that he would be leaving Bonestroo and that Bonestroo had allowed him to accept a full-time position with Round Lake Beach despite his noncompete agreements (B.Add.St.¶¶ 25-27). When Quick asked Devery (on a couple of occasions) about Bonestroo's plans for dealing with his departure and related "transition" issues, Devery told him he "didn't have any answer for him" (Devery Dep. 20). Nor did Devery tell Bonestroo about Quick's transition questions (B.Add.St.¶ 30).

Palansky also remained unaware of the conversations between Devery and Quick until the latter asked to meet with him just a few days after Palansky had learned Devery was leaving (B.Add.St.¶¶ 33, 34). At that meeting Quick told Palansky that he knew of Devery's impending departure, that Wauconda wanted Bonestroo to allow Devery to continue to serve as its Village Engineer once he left Bonestroo's employment (D.St.¶ 34(viii)) and that Wauconda would fire Bonestroo if Bonestroo did not allow such continuation (*id.* ¶ 34 (ix)), but that if Devery were permitted to stay on he would have the authority to select outside engineering firms when additional assistance was needed (Quick Aff. ¶ 10).

In the face of that message and believing that there could be significant overflow work that Devery could steer its way, Bonestroo agreed to Quick's request (B.Add.St.¶¶ 35-39). Accordingly Bonestroo created a specific exception to Devery's noncompete covenants under which Devery could "work as a Consultant for Wauconda as Village Engineer," again as long as he fairly considered Bonestroo for opportunities to provide services to Wauconda (*id.* ¶ 39). Both that carve-out and the understanding as to Round Lake Beach were incorporated into the parties' Amendment to Independent Contractor Agreement ("Contractor Amendment"), to take effect December 31, 2004 (D.Ex. 14).

Still another Bonestroo client, the Village of Round Lake Park ("Round Lake Park"), had become involved in the events that fall, once more without Palansky's knowledge. It had also heard about Devery's impending departure from Devery among others, and it too wanted him to stay on after the Contractor Agreement expired (B. Add. St. ¶¶ 41-42; Palansky Aff. ¶ 14). Although the chronology is not clear, Round Lake Park Mayor Ila Bauer ("Bauer") made two different attempts to secure Devery's continued employment. First, at some point Bauer simply asked Devery directly to continue working for Round Lake Park after he left Bonestroo (D.St.¶ 35(ii)), but Devery cited his noncompete covenants and declined (*id.* ¶ 35(iii)). Later, when Palansky arrived to break the news (or so he thought) to Bauer about Devery's departure, Bauer asked Palansky to extend Devery yet another dispensation from his noncompete covenants (Palansky Aff. ¶ 13). This time Palansky refused (B.Add.St.¶ 43), and Devery has not performed any engineering services for Round Lake Park since his relationship with Bonestroo ended (D.St.¶ 35(iv)).

**\*4** On December 31, 2004 the Contractor Agreement expired by its terms (D.St.¶ 24). At no point during the contractual term had Devery been given written notice that he was assertedly failing to perform the duties that the agreement assigned to him, nor had the agreement been terminated for cause (*id.* ¶¶ 42-43). Hence Bonestroo dutifully made both the weekly payments and the post-termination severance payments required under the Separation Agreement (*id.* ¶¶ 15, 44-45).

On January 1, 2005 the Round Lake Beach Contract

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

came into effect (*id.* ¶ 26), and four days later Devery formed the second incarnation of Devery Engineering Incorporated ("Devery Engineering"), which firm Wauconda hired to provide consulting services as its Village engineer (id. ¶¶ 24, 34 (xiii)). Just over a week later Wauconda fired Bonestroo from a wastewater project on which it had been working, and at some point (the record again leaves the timing unclear) Bauer fired Bonestroo from at least some aspect of Round Lake Park's work because of Bonestroo's failure to inform her of Devery's departure in a timely manner (B.Add.St.¶¶ 44-45). On April 13, 2005 Bonestroo filed this action.

*Choice of Law*

In a diversity case such as this, a district court must follow the choice of law rules of the forum to determine the applicable substantive law (*Thomas v. Guardsmark, Inc.,* 381 F.3d 701, 704-05 (7th Cir.2004))-and with limited exceptions, not applicable here, Illinois caselaw honors a contract's choice of law provision (*id.* at 705). In this instance the Merger Agreement, Employment Agreement and Contractor Agreement all call for the application of Minnesota law (D. Ex. 9 § 13.2; D. Ex. 11 § 5.1; D. Ex. 13 § 11(c)). And because the Contractor Amendment is a "modif[ication] and amend[ment]" of the Contractor Agreement and specifies that all other provisions of the Contractor Agreement are to remain in force (D. Ex. 14 Recitals), that too will follow the same route. Similarly, the Shareholder Amendment is also controlled by the choice of law provisions of the agreements that it modifies and amends-the Stock Purchase and Redemption Agreement and its 1st Amendment-and once again they look to Minnesota law (D. Ex. 10 Recitals; Stock Purchase and Redemption Agreement § 11.5; 1st Amendment to Stock Purchase and Redemption Agreement Recitals).

When on the other hand a contract does not include a choice of law provision, as is the case with the Separation Agreement, Illinois courts utilize the "most significant contacts" test (*Hinc v. Lime-O-Sol Co.,* 382 F.3d 716, 719 (7th Cir.2004)), which this Court has often characterized as a "center of gravity" approach. Although most of the factors relevant to such an analysis are a wash (for example, the parties offer no information about the place of contracting or negotiation, and while Bonestroo is a Minnesota

corporation with its principal place of business in that state, Devery is an Illinois citizen (id.;D. St. §§ 1-2)), the subject matter of the agreement-looking to the windup of Devery's then-new independent contractor status-was Illinois based.

*5 That focus would appear to suggest the application of Illinois substantive law. On the other hand, the Separation Agreement's preservation of various of the covenants in the prior agreements, all of which contained Minnesota choice of law provisions, would seem to look to that state's substantive law. Fortunately, both states' operative rules of law in this area are the same, so that the section of this opinion dealing with the Separation Agreement will draw on both sources in reaching the same destination.

*Count I: Breach of the Contractor Agreement*

Bonestroo's Count I alleges that Devery breached the Contractor Agreement by failing to perform these services it required of him (D. Ex. 13 Sch. A):

5. Actively work to develop a relationship between Bonestroo staff and existing clients in order to transfer client management tasks to the Libertyville Branch Office Manager and other Bonestroo staff ...

6. Make appropriate efforts and strategize with the Office Manager all efforts needed to retain existing clients.

14. Cooperate in the transition of clients, personnel, and business in a positive professional manner.

Although Bonestroo never specifies just which of Devery's alleged actions (or non-actions) it feels violated those provisions, its filings suggest that such delinquencies would at least encompass (1) Devery's failures to bring Palansky with him to client meetings, (2) his multiple assurances that he was "interested" in renewing the Contractor Agreement, despite his having told clients that he would not be returning to Bonestroo and his having been in negotiations with Round Lake Beach for a post-Contractor Agreement position shortly after the Contractor Agreement took effect, (3) his agreement with Round Lake Beach to an employment relationship beyond that allowed by the Separation

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

Agreement, (4) his giving Wauconda information that allowed it to pressure Bonestroo into allowing Devery to work for Wauconda independently and (5) his failure to tell Bonestroo that Quick (who was aware Devery was leaving) had inquired about how Bonestroo planned to deal with the transition.

In response Devery makes two arguments as to why Count I should be dismissed on summary judgment. First Devery quibbles about the precise duties created by the Contractor Agreement, arguing for example that the above-quoted Sch. A ¶ 5 does not require him to "retain clients" (D.Mem.2-3). But while that paragraph does not expressly speak of client retention, the next paragraph certainly does, and in any case the actions (or failures to act) with which Devery is charged might perhaps be found to have violated his obligations-including his helping to develop "relationship[s]" between Bonestroo and existing clients and his assistance in retaining clients for Bonestroo.

Alternatively Devery argues that because Bonestroo "lulled" him into thinking that he was performing his duties under the Contractor Agreement adequately, it is equitably estopped from now suing for failure to perform (D.Mem.4-7). Even though it will become evident that "estoppel" is an inapt label for Devery's Count I defense, this opinion will initially take him at his word in that respect, but will then pose a more appropriate alternative analysis.

**\*6** To establish an equitable estoppel defense under Minnesota law, a defendant must show that plaintiff (1) misrepresented material facts, (2) knew its representations were untrue and (3) intended that the representations be acted upon, while defendant (4) did not have knowledge of the true facts and (5) relied upon the misrepresentations to his detriment (_Transam. Ins. Group v. Paul,_ 267 N.W.2d 180, 183 (Minn.1978)). As those elements suggest, an estoppel claim tends to be highly fact-specific and is therefore generally incapable of being resolved on summary judgment (_Brenner v. Nordby,_ 306 N.W.2d 126, 127 (Minn.1981)).

Here Devery has failed to show the required absence of a genuine question of material fact as to more than one of those elements. First, even if Bonestroo's silence and its continued payment of Devery's weekly salary could some how be labeled as a

"misrepresentation" of a material fact (D.Mem.4-6)-the alleged inadequacy of Devery's performance-Devery has pointed to no evidence in support of the second required element that Bonestroo _intended_ to mislead him. Indeed, despite Devery's argument to the contrary (D.Mem.7), there is a dispute as to the degree (or even the existence) of Bonestroo's awareness of many of Devery's activities at the time of such purported "misrepresentations." For example, Bonestroo says it was never informed of some of the complained-of conduct, such as Devery's failure to pass along Quick's inquiries about Bonestroo's transition plans or his signing of an agreement (the Round Lake Beach Contract) that allegedly went beyond the personal employment services allowed by his agreements with Bonestroo (B.Add.St. §§ 24, 30, 32).

Furthermore, when looked at as a whole, Bonestroo's evidence might arguably support a finding that, despite Bonestroo's silence, not only was Devery well aware of "the true facts"-that he had failed to help develop Bonestroo-client relationships and had not made "appropriate efforts" in retaining clients-but that his actions were part of an intentional attempt to undermine those relationships and lay the groundwork for his own acquisition of those clients.[FN3] With that pro-Bonestroo scenario buttressed by reasonable pro-Bonestroo inferences, Devery could not claim that he had innocently and unknowingly relied on Bonestroo's alleged misrepresentations to his detriment. While this Court of course makes no findings as to the parties' actual knowledge or intent at this stage, Bonestroo has at least raised sufficient questions as to those issues to preclude judgment as a matter of law on equitable estoppel grounds.

> FN3. Bonestroo has adduced evidence that Devery engaged in lengthy (and undisclosed) negotiations with Round Lake Beach, that those negotiations resulted in a contract with Round Lake Beach that Bonestroo contends went beyond limits allowed by his Bonestroo agreements, that Devery repeatedly indicated that he was interested in staying on with Bonestroo while simultaneously engaging in undisclosed activity that indicated otherwise, that Devery told clients of his departure plans before informing Bonestroo,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

that he failed to inform Bonestroo that one client posed questions about how Bonestroo would deal with Devery's departure, that Devery formed Devery Engineering immediately after the Contractor Agreement expired and that either Devery, Devery Engineering or both have since begun working for two significant Bonestroo clients, Wauconda and Round Lake Beach.

Devery's equitable estoppel argument also points to the Contractor Agreement's notice and cure provision and the fact that no notice or opportunity to cure was provided to him (D.Me.4-7). Although such lack of notice might ultimately defeat Bonestroo's claim of contractual breach for reasons explained hereafter, it does not do the job at this stage on estoppel grounds.

*7 First, even on the premise that such notice and opportunity were required in these circumstances, the failure to provide it hardly establishes equitable estoppel as a matter of law, given the already-identified questions of fact. Moreover, the Contractor Agreement frames the notice and cure clause as a prerequisite to termination of that agreement (D. Ex. 13 § 6), not as a prerequisite to bringing suit for breach of contract. If the latter were the case, a party injured by a contractual breach would have no remedy in damages, being forced instead to let the violator go scot free without paying for the harm he had caused.

Devery's supplemental memorandum [FN4] found no Minnesota caselaw supporting such an expansion of the contract's plain language,[FN5] and the cases that he cites from other jurisdictions are readily distinguishable (B.2d Supp. Mem. 2; D. Supp. Mem. 5).[FN6] As Devery himself points out (albeit in a different context), it is ordinarily "not for [the] court to create or add exceptions to the contract or to remake it in behalf of either of the contracting parties" (D. Mem. 3, quoting _Telex Corp. v. Data Prods. Corp.,_ 271 Minn. 288, 135 N.W.2d 681, 687 (Minn.1965)), and he has presented no reason to depart from that well-established rule in this case.

FN4. At this Court's invitation the parties submitted supplemental memoranda that examined both the notice and cure issues raised here and the extent, if any, to which Devery's disclosure of his post-Contractor

Agreement plans to clients before telling Bonestroo violated his contractual obligations.

FN5. While _Nadeau v. County of Ramsey,_ 310 Minn. 549, 245 N.W.2d 254, 256 (Minn.1976) (per curiam) found a lawsuit to be barred for lack of notice, that bar was provided by statute.

FN6. For example, while _Colony Square Co. v. Prudential Ins. Co. of Am.,_ 843 F.2d 475 (11th Cir.1988) did hold suit precluded due to plaintiff's failure to follow a notice and cure procedure, that was because "the context of the entire contract" required notice and an opportunity to cure "as conditions precedent to an action for damages"(_id._ at 481). By contrast, here the inclusion of such a requirement as a precondition to termination, coupled with silence on the subject as to contractual breaches, creates a negative inference under ordinary principles of contract interpretation. More on point is _Ameritech Info. Sys. v. Bar Code Res.,_ 331 F.3d 571 (7th 2003), where our Court of Appeals found that a notice and cure provision similar to that at issue here applied only to termination of the contract and did not "set out conditions precedent to fifing a suit for breach of contract"(_id . at 574)._

As said earlier, however, the just-completed analysis really reflects Devery's counsel's having fallen victim to the tyranny of labels by inappropriately invoking the estoppel doctrine. This Court would be remiss if it failed to identify a more plausible relevance of the notice-and-opportunity-to-cure provision.

It will be recalled that the provision was part of the restructuring of the parties' relationship that committed Devery only until the end of 2004. Unsurprisingly, then, all of the earlier-quoted contractual provisions (Contractor Agreement §§ 5, 6 and 14) called for cooperative transition efforts involving both Devery and Bonestroo's people-not just those by Devery. Just as importantly, it would be only reasonable-and very much in Bonestroo's self-interest-for those joint efforts to have begun early on, not well into 2004. And that in turn strongly suggests

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

the reasonableness of Devery's contention that if Bonestroo had viewed him at any point as not performing as he had promised, it would then have served him with the contractual notice (carrying with it the concomitant opportunity to cure).

From that perspective, the absence of notice on Bonestroo's part implies the absence of a breach on Devery's part. But the parties have not provided the kind of input that would allow a disposition of that claim at this stage. All that Bonestroo has adduced is Devery's putting off of Palansky's requests to meet jointly with clients, and even those requests have not been time-identified, nor have the bona fides of Devery's stated reasons been confirmed or negated. In sum, the approach suggested here, although certainly a better fit than Devery's estoppel theory, does not alter the current denial of summary judgment

**\*8** Although what has gone before has dispatched Devery's motion without any need to rely on Bonestroo's challenge to his having negotiated with clients without informing Bonestroo, something should be added as to the invalidity of that criticism- or at least the bulk of it. After all, the very nature of the restructuring of the parties' relationship–the shift from an employment relationship to that of independent contractor, with no commitment beyond the end of 2004–entitled Devery to make whatever plans he wanted to make for the post-2004 period without any obligation to inform Bonestroo, either in advance or afterwards.

That would not of course excuse any such activity that actually violated Devery's contractual non-solicitation or noncompete covenants, but those things are independent of Bonestroo's unwarranted pejorative criticism of Devery's negotiation of any other post-2004 contacts as such. It should be added as well that neither the parties nor this Court have or has evaluated the propriety of Devery's assertedly stringing Bonestroo along, in response to Bonestroo's questions, as to whether he had reached a decision about extending the independent contractor arrangement beyond 2004.

*Count II: Breach of Noncompete Provisions*

Bonestroo also charges that Devery breached his noncompete covenants by impermissibly soliciting

and accepting business from Bonestroo clients, either as an individual or through his newly formed Devery Engineering corporation (FAC § 47).[FN7] As the ensuing discussion reflects, those charges get mixed reviews.

> FN7. Bonestroo originally alleged two additional ways in which Devery breached those provisions-by forming a competing company that provides the same services in the same geographic area and by soliciting Bonestroo employees (FAC § 47)-but those claims have since been abandoned (B. R.St. §§ 25, 32; B. Mem. 12 n. 3).

As for the solicitation charge, Bonestroo has limited that aspect of its claim to Devery's interaction with two specific clients, Wauconda and Round Lake Park (D.St. § 33). On that score Devery's motion is partially successful and partially not.

In Wauconda's case Devery supports his bid for summary judgment by pointing to Village Administrator Quick's statement (echoed by Devery's own affidavit) that "at no time did Robert Devery solicit the Village of Wauconda for employment" (D. Mem. 9; Quick Dep. § 15; D. Aff. ¶ 26). But Bonestroo counters by contending that the content of Devery's interactions with Quick is nevertheless sufficient to raise a genuine question as to whether he engaged in prohibited "direct[ ] or indirect[ ]" solicitation of Wauconda (D. Ex. 9 § 11.12).

Solicitation requires more than simply notifying a client of one's impending departure-there must also be "some element of attempted persuasion" (*Benfield v. Moline,* No. 04-3513, 2006 WL 452903, at \*6 (D.Minn. Feb. 22)). That element of persuasion need not be overt or explicit, but can be satisfied by an "implication" that a client should "switch their business to his new enterprise" (*Bellboy Seafood Corp. v. Nathanson,* 410 N.W.2d 349, 353 (Minn.Ct.App.1987)). Deciding whether such an implication is in fact sufficient to constitute solicitation is "a matter of nuance and inference which [is] for the jury to determine"(*id.*).

**\*9** Here Devery told Quick not only that he was leaving Bonestroo but also that Bonestroo had already allowed him to accept work from another client (Round Lake Beach). When Quick then asked

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

Devery more than once what Bonestroo was planning to do about transition when Devery left, Devery simply told Quick he "didn't have any answer" (and he made no later effort to provide one). On the present record those responses might be perceived as an attempt to suggest to Quick that Bonestroo was unprepared to address Wauconda's needs upon Devery's departure.[FN8] Again such a perception could allow a jury to find that Devery had implicitly attempted to persuade Quick to "switch his business"-a possibility sufficient to ward off summary judgment on that facet of Bonestroo's solicitation claim.

> FN8. As indicated earlier, the record presented to this Court on the current motion does not answer such questions as whether Devery's responses were truthful or whether, if so, that was the result of Bonestroo's or his own deficiency in their efforts at transition earlier in the independent contractor period.

On the other hand, no such potential exists as to Devery's claimed "solicitation" of Round Lake Park. This time Bonestroo has offered no evidence or even argument suggesting that Devery *did* solicit Round Lake Park. Where as here a summary judgment movant has met its initial burden of production, the nonmovant may not simply rest on its pleadings-it must provide "more than a mere scintilla of evidence" in its favor (*CAE, Inc. v. Clean Air Eng'g, Inc.* 267 F.3d 660, 667 (7th Cir.2001)). In this instance there is not even a scintilla, so that Devery is granted summary judgment on that portion of Bonestroo's solicitation claim.

In addition to solicitation, Bonestroo also charges Devery with improperly accepting work from Wauconda and Round Lake Beach. In that regard Devery contends that the work that he and Devery Engineering have done is within the exceptions to his noncompete limitations carved out by the Contractor Amendment (D.Mem.9-11). To be sure, those exceptions allow Devery to work for Wauconda and Round Lake Beach in some capacity, but they also require him to "fairly consider [Bonestroo] for opportunities to provide services" (D.Ex. 14, §§ 4-5). Here the evidence tendered on the current motion (while perhaps not as inculpatory as Bonestroo would have it) suggests the opposite: that

as to at least some opportunities Devery has affirmatively not considered Bonestroo, either fairly or otherwise (D.Aff.62-63). Under these circumstances there is at least a genuine question of fact as to whether Devery's actions qualified under those noncompete exceptions, so that his motion for summary judgment on the issue must be and is denied.[FN9]

> FN9. Bonestroo's Mem. 12-13 also argues that the terms of those noncompete exceptions allowed Devery to accept work from clients only in his *individual* capacity, not through his corporation. Although Bonestroo disclaims the notion that simply setting up the corporation was itself a breach, it articulates no basis (and cites no authority) for the proposition that the corporation cannot be a contracting party. In that regard it will be recalled that Bonestroo acceded to an amended noncompete provision that permitted both full-time work for Round Lake Beach *and* consultation for Wauconda, arrangements that had to put Bonestroo on notice that Devery could not reasonably be expected to be rendering all of the required personal services by himself. But that issue need not be resolved at this time, for the question whether Bonestroo was "fairly considered" for the opportunities to provide services precludes summary judgment in any event.

*Count III: Breach of the Separation Agreement*

Bonestroo's FAC Count III alleges breach of the Separation Agreement. Here are the substantive allegations in that respect (Count III ¶¶ 52 and 53):

52. Devery's Separation Agreement and General Release required Devery to comply with the terms of his Independent Contractor Agreement, and with the non-compete and non-solicitation provisions of his Employment Agreement, the Plan of Merger, and the Shareholder Agreement.

*10 53. By his breaches of those agreements, as described above, Devery breached his Separation Agreement and General Release. Accordingly, Devery was not entitled to the severance payments provided by the Separation Agreement and General

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

Release.

Separation Agreement § 2 sets out the terms on which Bonestroo was obligated to make a severance payment to Devery, but neither that nor any other provision of the agreement conditions Devery's right to that severance payment on compliance either with the Contractor Agreement or with his noncompete provisions. That right is subjected to only one qualification by Separation Agreement § 2 itself:

Provided the Independent Contractor Agreement is not terminated by the Company for cause, the Company shall pay Devery a severance payment. The amount of the severance payment shall be $46,995. The severance payment shall be paid in six equal monthly installments beginning the 1st day of the month following termination of the Independent Contractor Agreement. If the Company terminates the Contractor Agreement for cause, no severance payment shall be due.

Under Illinois law courts construing contracts "must ascertain parties' intentions exclusively from an agreement's language if it is clear and unambiguous" (*PPM Fin., Inc. v. Norandal USA, Inc.,* 392 F.3d 889, 892 (7th Cir.2004)).[FN10] Here the language is indeed both clear and unambiguous: There is only one precondition to the severance payment-Bonestroo's termination of the Contractor Agreement for cause.

> FN10. Devery appears to have assumed that Minnesota law rather than Illinois law applied to the Separation Agreement (D.Mem.13). As already stated in the *Choice of Law* section, even on that premise the issue presents what conflict of law jurisprudence terms a "false conflict" (see, e.g., *In re Air Crash Disaster,* 644 F.2d 594, 605 n. 2 (7th Cir.1981)), for Minnesota law also instructs courts not to rewrite or modify an agreement when its terms are clear and unambiguous (*Travertine Corp. v. Lexinston-Silverwood,* 683 N.W.2d 267, 271 (Minn.2004)). Hence the result is the same in all events.

With no such termination having taken place, that is the end of the matter. Indeed, Bonestroo's entire response to Devery as to Count III is a single three-sentence paragraph challenging only a peripheral Devery argument about forfeiture (B.Mem.13). There being no genuine issue of material fact on this issue, Devery's motion for summary judgment on Count III is granted.[FN11]

> FN11. Bonestroo's Supp. Mem. 5 attempts to shoehorn into the lawsuit another dispute as to a different provision of the Separation Agreement: its Section 5. But that contention finds no warrant in the pleadings, and it was absent from Bonestroo's original responsive memorandum-which would itself have been too late for advancing the new argument under such cases (*Andree v. Ashland County,* 818 F.2d 1306, 1314 n. 11 (7th Cir.1987)). Accordingly the newly-asserted contention will be rejected as a matter of principle, though this Court hastens to add that it has reviewed the assertion and found it wanting in substantive merit in any event.

### Count IV: Breach of Fiduciary Duties

Bonestroo's final count alleges (1) that "during the term of ... the [Contractor Agreement], Devery was Bonestroo's agent for the purposes set forth in that Agreement," (2) that certain fiduciary duties-particularly a duty of loyalty-necessarily attached to that agency and (3) that Devery breached those duties (FAC ¶¶ 56-58).[FN12] Devery does not apeak to the issue of fiduciary status vel non at all-instead his Mem. 14 simply quotes Bonestroo's nonspecific response to Devery's written interrogatory on the subject and concludes from that response (justifiably, it would seem) that Bonestroo's asserted "factual basis" for Count IV is the same as its basis for the claimed breach of the Contractor Agreement (Count I). Therefore, Devery says, "[i]f summary judgment is entered in favor of Devery on Count I, summary judgment should also be entered in favor of Devery on Count IV."

> FN12. Bonestroo's Mem. 14 suggests in passing that Devery's fiduciary duties are also grounded in his status as a shareholder. Like Bonestroo's new Count III claim rejected in n. 11, this contention is not to be found anywhere in its pleadings (FAC ¶¶ 55-59), and it too is therefore barred (see *Andree,* 818 F.2d at 1314 n. 1).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)
**2006 WL 1005284 (N.D.Ill.)**

Bonestroo's broad-brush approach clearly poses conceptual problems. After all, independent contractor status (which the parties agreed Devery occupied during the 2004 period) is normally the antithesis of a fiduciary relationship, and the parties plainly recognized that when they restructured their relationship at the beginning of 2004:

**\*11** 1. Separation Agreement § 1 began by stating "Devery's employment with the Company shall terminate effective January 8, 2004" and continued by recognizing that relationship was being superseded by an independent contractor relationship. All that survived from the prior relationship, as provided in Separation Agreement § 9, were "the non-competition, non-solicitation and confidential information provisions" set out in the Acquisition Agreements.

2. In turn Contractor Agreement § 9 expressly negated any employer-employee relationship and defined the parties' responsibilities in a manner that cannot fairly be described as fiduciary in nature-in either direction.

3. Each document contained an integration clause that negated the existence of any other agreements between the parties (Separation Agreement § 11 and Contractor Agreement § 11(B)).

Thus Bonestroo blurs the issues when it states, seeking in its Interrogatory Answer 16 to explain the basis for FAC ¶ 57's charge of Devery's breach of fiduciary duties:
As stated in the First Amended Complaint, Devery breached the duty of loyalty he owed to Bonestroo by failing to honor his contractual obligations under his agreement and, in fact, working against Bonestroo's interests by diverting clients from Bonestroo to himself.

In sum, Bonestroo's inclusion of a separate FAC Count IV labeled "Breach of Fiduciary Duty" adds nothing of value to the mix. What has been said here as to Bonestroo's other claims sufficiently identifies those that are viable and why.

Essentially Bonestroo's treatment provides just one more illustration of the principle that the use of separate counts to set out different theories of recovery is a mistaken manifestation of the state law "cause of action" approach, rather than the federal concept of "claim for relief" (see *NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 292* (7th Cir.1991)). That is not what Rule 10(b)'s last sentence defines as the proper role for any such separation of a pleading into different counts. From here on out FAC Count IV will simply be disregarded as a claim for relief-something that does not prejudice either party.

*Conclusion*

As stated at the outset, Devery's motion for summary judgment has been denied in part and granted in part. Because of the existence of genuine issues of material fact, summary judgment is denied as to Bonestroo's FAC Count I, while the absence of such issues causes the granting of Devery's motion as to Count III. With regard to Count II, a comparable analysis calls for the denial of summary judgment except as to Devery's claimed solicitation of Round Lake Park, on which Bonestroo fails as a matter of law. Finally, Count IV is out of the case as a purportedly separate claim for relief.

Because next week this Court will be sitting with the Court of Appeals by designation, it is compelled to set a very early status hearing date: April 14, 2006 at 9:30 a.m. At that time the parties will be expected to discuss both the procedure and timing for the next steps in this litigation.

N.D.Ill.,2006.
Bonestroo, Rosene, Anderlik & Associates, Inc. v. Devery
Not Reported in F.Supp.2d, 2006 WL 1005284 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 1999 WL 966477 (N.D.Ill.)
**1999 WL 966477 (N.D.Ill.)**

**H**China Ocean Shipping (Group) Co. v. Simone
Metals Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
CHINA OCEAN SHIPPING (GROUP) COMPANY
and Cosco North America, Inc., Plaintiffs,
v.
SIMONE METALS INCORPORATED, Soo Line
R.R. Co., individually and d/b/a Cprs, Glenway, Inc.,
E.J. Metal Products, Inc. and Southern Pacific
Transportation Company, Defendants.
**No. 97 C 2694.**

Oct. 1, 1999.

*MEMORANDUM OPINION AND ORDER
REGARDING COSCO'S AND SOUTHERN
PACIFIC'S MOTIONS FOR SUMMARY
JUDGMENT*

HOLDERMAN, J.
**\*1** Plaintiffs China Ocean Shipping (Group)
Company and COSCO North American, Inc.
(hereinafter referred to collectively as "COSCO")
filed suit against defendant Southern Pacific
Transportation Company ("Southern Pacific") as well
as Simone Metals Inc. ("Simone"), Soo Line R.R.
Co. ("Soo Line"), Glenway, Inc. ("Glenway"), and E
.J. Metal Products, Inc. ("E.J.Metal"), arising from
damages sustained from a train derailment. Plaintiffs
COSCO has filed a motion for summary judgment
against defendant Southern Pacific on Count VI,
COSCO's negligent spoilation of evidence claim,
which was filed on September 15, 1998 as an
additional count to COSCO's First Amended
Complaint. That count alleges that defendant
Southern Pacific was negligent in destroying a
critical piece of evidence, namely the 20 foot long
COSCO shipping container which was integral to the
train derailment. Defendant Southern Pacific has filed
a cross motion for summary judgment on Count VI,
COSCO's spoilation of evidence claim. For the
following reasons, plaintiffs COSCO's motion for
summary judgment against defendant Southern
Pacific is DENIED. Defendant Southern Pacific's
motion for summary judgment on plaintiffs COSCO's
spoilation claim is also DENIED.

*STATEMENT OF FACTS*[FN1]

FN1. The following statement of facts
comes from the parties' Local General Rule
12(M) and (N) statements (renumbered
effective September 1, 1999 as Local
General Rule 56.1(a) and (b) statements) of
material facts and accompanying exhibits.

On April 17, 1995, while en route from Illinois to
California, a freight train derailed in Hutchinson,
Kansas. The train was carrying, among other items,
six 20 foot COSCO shipping containers which had
been loaded with scrap metal. The cause of the train's
derailment was attributed to the railroad car carrying
one of COSCO's containers, COSU-302262-1
("Container"), which derailed when the scrap metal
contents fell through the Container's floor to the
ground below the moving train. COSCO alleges that
it was the improper packaging, bracing, and loading
of the scrap metal into Container which caused the
derailment. Glenway, E.J. Metal, and Simone
contended that the derailment was not caused by their
conduct in packaging, bracing, or loading the metal
into the Container. Rather, Glenway, E.J. Metal, and
Simone asserted that it was COSCO's alleged
defective Container that caused the derailment
because of a weld failure. The true cause of the
derailment may never be determined because,
sometime during the fall of 1996, Southern Pacific
destroyed the Container.

On July 9, 1998, this court ordered both COSCO and
Southern Pacific to produce the Container for
inspection by July 25, 1998. Neither COSCO nor
Southern Pacific complied with this Order because
the Container had already been destroyed. In
conjunction with that Rule 37 discovery order
violation, this court granted defendants Glenway, E.J.
Metal, and Simone's motions for sanctions in this
court's September 30, 1999 Memorandum Opinion
and Order Imposing Sanctions. In that Order, this
court found that, at that time, both COSCO and
Southern Pacific were culpable for the failure to
produce the Container. For the reasons stated in that
Order, this court imposed the ultimate sanction of
dismissing COSCO's claims against defendants

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 966477 (N.D.Ill.)
**1999 WL 966477 (N.D.Ill.)**

Glenway, E.J. Metals, and Simone and dismissing Southern Pacific's cross-claims against Glenway and E.J. Metal.

### STANDARD OF REVIEW

**\*2** Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. _Celotex Corp. v. Catrett,_ 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."_Anderson,_ 477 U.S. at 249, 106 S.Ct. at 2511.

### DISCUSSION

I. _Choice of Law Issue_

As an initial matter, the parties dispute, although not whole-heartedly, which state law applies. COSCO argues that Illinois law controls, and Southern Pacific argues that Kansas law applies. Ultimately, however, both parties acknowledge that the law in both states is the same. The Seventh Circuit has stated that when no conflict between the law exists, the "false conflict" doctrine applies. _SeeBarron v. Ford Motor Co. of Canada, Ltd.,_ 965 F .2d 195, 197 (7th Cir.1992); _In re Aircraft Disaster,_ 644 F.2d 594, 605 (7th Cir.1981). Thus, it is unnecessary for this court to address the choice of law issue because the law regarding the negligent spoliation of evidence is identical in both Illinois and Kansas.

II. _Negligent Spoliation of Evidence_

Courts in Illinois and Kansas do not recognize an independent tort of negligent spoliation of evidence. _SeeBoyd v. Travelers Ins. Co.,_ 166 Ill.App.2d 188, 195, 652 N.E.2d 267, 270 (1995); _Koplin v. Rosel Well Perforators, Inc.,_ 241 Kan. 206, 734 P.2d 1177 (1987). Rather, courts in those states afford redress for the destruction of evidence under existing negligence law without creating a new tort. _Id._ Thus, under both Illinois and Kansas law, in order to sustain an action for negligent spoliation of evidence, the party must prove: (1) the existence of a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) an injury proximately caused by the breach; and (4) damages. _Boyd,_ 166 Ill.2d at 195, 652 N.E.2d at 271;_Foster v. Lawrence Memorial Hosp.,_ 809 F.Supp. 831 (D.Kan.1992) (applying Kansas law).

A party has a duty of due care to preserve evidence "if a reasonable person in [his or her] position should have foreseen that the evidence was material to a potential civil action."_Boyd,_ 166 Ill.2d at 195, 652 N.E.2d at 271;_Koplin,_ 241 Kan. at 208, 734 P.2d at 1179 (stating the general rule that absent some special relationship or circumstance there is no duty to preserve evidence for the benefit of another). Southern Pacific initially argues that a determination of whether it owed COSCO a duty to preserve the Container and thereby breached the duty when the Container was destroyed, should be resolved by a trier of fact. On the other hand, COSCO argues that the facts are uncontroverted that Southern Pacific had a duty and breached its duty to preserve the Container.

**\*3** Under both Illinois and Kansas law, however, a determination of whether a duty is owed is a question of law for the court to decide, while a determination of whether a breach of that duty occurred is a question of fact for the trier of fact. _SeeWard v. Kmart Corp .,_ 136 Ill.2d 132, 140, 143 Ill.Dec. 288, 554 N.E.2d 223, 226 (1990) (citation omitted); _Foster,_ 809 F.Supp. at 838 (citing _McGee v. Chalfant,_ 248 Kan. 434, 806 P.2d 980 (1991)). Unfortunately for Southern Pacific, it fails to focus on either of these elements because it misstates the law. First of all, this court must decide, not the trier of fact, if Southern Pacific owed COSCO a duty to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 966477 (N.D.Ill.)
**1999 WL 966477 (N.D.Ill.)**

preserve the Container. COSCO asserts that Southern Pacific had a duty because it asserted physical possession and control over the Container. Furthermore, COSCO have pointed to certain facts to show that Southern Pacific knew or should have known that the Container was material to a potential civil action prior to its destruction. Southern Pacific has not presented any evidence to establish that it did not have a duty. Therefore, this court finds that Southern Pacific had a specific duty to preserve the Container.

Second, because COSCO contends that the facts are uncontroverted that Southern Pacific breached its duty, Southern Pacific now must show with specific factual allegations that it did not breach the duty. Fed.R.Civ.P. 56(c); Celotex Corp., 477 U.S. at 324. As noted by COSCO, merely because an issue is a question of fact, it does not necessarily mean that the issue must be decided by a jury. Rather, if there is no genuine issue of material fact, then the moving party is entitled to a judgment as a matter of law. SeeFed.R.Civ.P. 56(c). Southern Pacific has failed to present any facts demonstrating that there is a genuine issue as to whether it breached its duty to preserve the Container. Nevertheless, since Southern Pacific owed a duty to preserve the Container and then ultimately destroyed the Container, this court finds based on the undisputed material facts that Southern Pacific breached its duty.

From the arguments presented in the parties' briefs, it is evident that the parties believed at the time of the filing of their briefs that the central point of contention was whether COSCO can show causation and prejudice. Under both Illinois and Kansas law, a plaintiff must prove, with sufficient facts, that the loss or destruction of the evidence caused the plaintiff to be unable to prove its case and thereby prejudiced. Boyd, 166 Ill.2d at 196, 652 N.E.2d at 271;Foster, 809 F.Supp. at 836. Courts have stated that if the lost or destroyed evidence would not help establish the claim, then the plaintiff is unable to show as a matter of law the causation element. Boyd, 166 Ill.2d at 196-97, 652 N.E.2d at 271-273. In other words, a plaintiff must be able to prove with sufficient facts that the loss or destruction of the evidence hindered its ability to maintain or defend a suit and thereby prejudiced. Id.

**\*4** A review of these relevant legal standard reveals

that to determine whether or not Southern Pacific is liable for destroying the Container, the court must determine if COSCO is hindered in its ability to maintain its claims against Southern Pacific and the other defendants and defend against any counterclaims. If COSCO is so hindered, it is thereby prejudiced. COSCO contends that it has been prejudiced by and hindered in its ability to prosecute its claims and defend against the counterclaims by Southern Pacific and other defendants because without the Container it is unable to establish that it was the improper blocking and bracing of the metal that was the sole proximate cause of the accident. Southern Pacific argues to the contrary, that COSCO is not hindered in its ability to prosecute or defend the suit because COSCO had already conducted three tests on the Container prior to its destruction, one of which was conducted by a renowned expert in the field.

Southern Pacific's argument may be viable as to COSCO's case against Southern Pacific, but falls short as to COSCO's case against Glenway, E.J. Metal, and Simone. Without the Container, these defendants were unable to test the reliability of COSCO's expert's conclusion because they did not have the ability to examine the Container, which is why this court entered the sanctions it entered on September 30, 1999 in the court's Memorandum Opinion and Order Imposing Sanctions. Consequently, COSCO has been hindered in maintaining the lawsuit against Glenway, E.J. Metal, and Simone. Against Southern Pacific, however, COSCO is not hindered or prejudiced in the same manner.

A key issue of material fact which precludes summary judgment for either party is the question, not fully explored by the parties in their briefs, of their comparative negligence in not preserving the Container. As this court found in its Memorandum Opinion and Order Imposing Sanctions, both parties were culpable for the destruction of the Container. Moreover, Southern Pacific has presented evidence that COSCO, as owner of the Container, took no direct action to maintain and preserve the Container. On the other hand, COSCO has presented evidence that Southern Pacific destroyed the Container, knowing that there was a need to preserve the Container because the Container was material to potential litigation regarding the derailment. Since

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 966477 (N.D.Ill.)
**1999 WL 966477 (N.D.Ill.)**

Illinois and Kansas negligence law applies to the nonpreservation of the Container, the question of comparative negligence must be addressed. *See*735 ILCS § 5/2-1116(c); Kan. Stat. Ann. § 60-258a(a). Thus, based on the facts in this record, this issue can only be determined by a factfinder at a trial unless the case is settled before trial. *Savage v. Martin, 256 Ill.App.3d 272 280, 195 Ill.Dec. 142, 628 N.E.2d 606 (1993)* (quoting *Doris v. Bradley, 76 Ill.App.3d 890, 892-93, 32 Ill.Dec. 406, 395 N.E.2d 636 (1979)*); Kan. Stat. Ann. § 60-258a(b).

As previously stated, in ruling on each party's motion for summary judgment, the evidence of the non-movant must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S .Ct. 2505, 2513 (1986).* The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. It is clear that there is a genuine issue of material fact regarding COSCO's and Southern Pacific's comparative negligence and the extent thereof. Thus, because there is a genuine dispute of a material fact, both COSCO and Southern Pacific's motions for summary judgment must be denied. This issue must await a resolution at trial where the facts can be evaluated and found without the analytic constraints imposed on the court by a motion for summary judgment.

*CONCLUSION*

**\*5** For the above stated reasons, plaintiffs COSCO's motion for summary judgment on Count VI, COSCO's negligent spoilation of evidence claim, is DENIED. Defendant Southern Pacific's motion for summary judgment on Count VI is also DENIED. The parties are strongly urged to discuss settlement and report to status at 10:00 a .m. on October 12, 1999.

N.D.Ill.,1999.
China Ocean Shipping (Group) Co. v. Simone Metals Inc.
Not Reported in F.Supp.2d, 1999 WL 966477 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

**C**Maxus Leasing Group, Inc. v. Kobelco America, Inc.
N.D.N.Y.,2007.

United States District Court,N.D. New York.
MAXUS LEASING GROUP, INC., Plaintiff,
v.
KOBELCO AMERICA, INC.; Kobelco Construction Machinery America LLC; Brownell Steel Inc.; Allan J. Bentkofsky, Chapter 7 Trustee for Syracuse Equipment Leasing Co., Inc.; Wells Fargo Equipment Finance, Inc.; and Syracuse Equipment Leasing Co., Inc., Defendants.
**No. 5:04-CV-518 (FJS/DEP).**

Feb. 26, 2007.

Green & Seifter, Attorneys, PLLC, Robert K. Weiler, Esq., Kimberly M. Zimmer, Esq., of counsel, Syracuse, NY, for Plaintiff.
Bleakley Platt & Schmidt, LLP, Thomas G. Bailey, Jr., Esq., White Plains, NY, Hiscock & Barclay LLP, J. Eric Charlton, Esq., John P. Langan, Esq., of counsel, Syracuse, NY, for Defendants Kobelco America, Inc. and Kobelco Construction Machinery America LLC.
Whiteman Osterman & Hanna LLP, John J. Henry, Esq., Albany, NY, for Defendants Brownell Steel, Inc.; Wells Fargo Equipment Finance, Inc.; and Syracuse Equipment Leasing Co.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.

**I. INTRODUCTION**

*1 On May 10, 2004, Plaintiff Maxus Leasing Group, Inc. ("Maxus") filed its complaint alleging seven causes of action: (1) conversion against Defendant Wells Fargo Equipment Finance, Inc. ("Wells Fargo"); (2) recovery of chattel against Defendants Wells Fargo and Brownell Steel, Inc. ("Brownell"); (3) breach of warranty of title against Defendants Kobelco America, Inc. and Kobelco Construction Machinery America LLC (collectively referred to as "Kobelco"); (4) fraud against Defendant Kobelco; (5)

conspiracy against Defendant Kobelco; (6) unjust enrichment against Defendant Kobelco; and (7) conversion against Defendant Kobelco.

Currently before the Court are Defendants Wells Fargo and Brownell's motion for summary judgment, Defendant Kobelco's motion for summary judgment, and Plaintiff Maxus' cross-motion for summary judgment as to all claims.

**II. BACKGROUND**

The present dispute arises from a series of transactions involving two Kobelco cranes. In October 2000, Defendant Kobelco sold and delivered two Model CK 1000 crawler cranes to Defendant Syracuse Equipment Leasing Co., Inc. ("SELC") for $588,920.18 per crane.[FN1],[FN2]

> FN1. The cranes had serial numbers GD0201061 ("61 crane") and GD0201063 ("63 crane").

> FN2. It is unclear how much Defendant SELC actually paid Defendant Kobelco on the cranes. An internal Kobelco memorandum suggests that nothing was paid on these cranes. *See* Affidavit of Kimberly M. Zimmer, sworn to Oct. 18, 2005, at Exhibit "K."

On approximately May 10, 2001, Defendant Kobelco, claiming difficulty collecting payments from SELC, entered into another transaction regarding the same cranes. In this transaction, Plaintiff Maxus remitted $715,000 per crane to Defendant Kobelco. Defendant Kobelco applied Plaintiff Maxus' $1,430,000 payment to Defendant SELC's account, crediting entries for the two cranes and another piece of equipment.

By late 2001 and early 2002, Defendant SELC's financial situation was deteriorating, and it defaulted on all of its obligations concerning the two cranes. Defendant SELC filed for bankruptcy on April 22, 2002.[FN3]

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

> FN3. Although SELC and its Chapter 7 Trustee are named Defendants, Plaintiff Maxus seeks no recovery from either.

The nature of the transaction entered into between Defendant Kobelco and Plaintiff Maxus in May 2001 is the crux of this dispute. Plaintiff Maxus claims that it did not have knowledge of Defendant Kobelco's prior sale of the cranes to Defendant SELC and that it intended to purchase the cranes new from Defendant Kobelco in order that they could then lease them to Defendant SELC.

Defendant Kobelco sees the May 2001 transaction differently. Defendant Kobelco claims that it told Plaintiff Maxus that it had already sold the cranes to Defendant SELC and that Plaintiff Maxus, as a result of some business arrangement with Defendant SELC, had agreed to re-finance the cranes for Defendant SELC.

## III. DISCUSSION

### A. Summary judgment standard

A district court will grant summary judgment when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing the pleadings, affidavits, depositions, and admissions on file, the court must " 'resolve all ambiguities and draw all inferences in favor of the non-moving party.' " Chan v. Gantner, 464 F.3d 289, 292 (2d Cir.2006) (quotation omitted).

### B. Standing

**\*2** As an initial matter, with respect to Plaintiff Maxus' claims for conversion and recovery of chattel (Causes of Action 1 and 2), Defendants Kobelco, Wells Fargo, and Brownell contend that Plaintiff Maxus lacks standing to bring this action.

To complete the May 2001 transaction with Defendant Kobelco, Plaintiff Maxus needed to obtain financing from third parties. Therefore, Plaintiff Maxus obtained a "bridge loan" from First Merit Bank for $715,000 and assigned its security interest in the 61 crane as collateral. That crane was later reassigned to Plaintiff Maxus in March 2002.[FN4]

> FN4. See Affidavit of Anthony Granata, sworn to Oct. 17, 2005, at ¶ 4.

Under New York law, assignment of a security interest passes all rights and interests to the assignee, including the right to seek delinquent payments or recover collateral. See Rockland Lease Funding Corp., Inc. v. Waste Mgmt. of N.Y., Inc., 245 A.D.2d 779, 779 (3d Dep't 1997) (citations omitted). A complete assignment, without qualification, cuts off the assignor's rights. See In re Stralem, 303 A.D.2d 120, 122-23 (2d Dep't 2003) (quotation and other citations omitted). Therefore, the assignor is no longer a real party in interest and lacks standing. See James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc., 61 N.Y.2d 836, 838 (1984). However, a reassignment back to the assignor restores standing. Cf. Walsh v. Woarms, 109 A.D. 166, 168 (2d Dep't 1905).

Since the 61 crane was reassigned to Plaintiff Maxus in March 2002, the Court concludes that Maxus is a real party in interest with standing as to that crane.[FN5]

> FN5. Defendant Kobelco also contends that Plaintiff Maxus suffered no injury concerning the 63 crane and, therefore, lacks standing to pursue its causes of action concerning that crane.
>
> Following Defendant SELC's default, Plaintiff Maxus recovered the 63 crane and leased it to third parties, receiving approximately $140,000 in payments; and, on March 22, 2005, Plaintiff Maxus sold the 63 crane for $323,000.
>
> However, as the facts are currently presented, the Court cannot conclude that Plaintiff Maxus suffered no actual or threatened injury concerning the 63 crane. See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982) (quotation omitted). Although the situation is unclear, it appears likely that Plaintiff Maxus suffered a loss of control over the crane and incurred costs in recovering and selling the crane. In addition, Plaintiff Maxus did not recover

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

the full May 2001 "purchase price" of $715,000 for the crane because the subsequent lease and sale transactions netted only $463,000. Therefore, at this time, the Court rejects Defendant Kobelco's contention that Plaintiff Maxus suffered no injury concerning the 63 crane.

**C. Plaintiff Maxus' conversion claim against Defendant Wells Fargo and recovery of chattel claim against Defendants Wells Fargo and Brownell**

Plaintiff Maxus argues that, because it had a superior security interest in the 61 crane, Defendant Wells Fargo wrongfully repossessed the crane and sold it to Defendant Brownell.

In the time between the two transactions at issue in this case, Defendant SELC obtained a $2,540,000 loan from Defendant Wells Fargo on November 22, 2000. As collateral, Defendant SELC pledged the 61 crane and other equipment. Therefore, on November 22, 2000, Defendant Wells Fargo filed a UCC-1 financing statement attempting to designate the crane and other items as collateral. However, Defendant Wells Fargo omitted a zero in its filing, so that the serial number for the 61 crane incorrectly read GD02-0161 rather than the correct serial number GD0201061.

Following the May 2001 transaction between Plaintiff Maxus and Defendant Kobelco, and without conducting a UCC search, Plaintiff Maxus also attempted to create a security interest in the 61 crane. On May 29, 2001, Plaintiff Maxus filed a UCC-1 financing statement listing the 61 and 63 cranes along with their correct serial numbers.

As noted above, Defendant SELC defaulted on all obligations regarding the cranes including its loan obligations to Defendant Wells Fargo and its lease obligations to Plaintiff Maxus. In March 2002, Defendant Wells Fargo repossessed the 61 crane and sold it to Defendant Brownell for $480,000 net.

*3 In order to be valid as a properly recorded security interest, a UCC financing statement must provide a description of the collateral that "reasonably identifies what is described." N.Y. U.C.C. §§ 9-504,

9-108. Collateral is reasonably identified if its identity is "objectively determinable." N.Y. U.C.C. § 9-108(b)(6). Even with minor errors, a financing statement is effective unless the errors make it "seriously misleading." N.Y. U.C.C. § 9-506(a) and cmt. 2; *see also In re The Bennett Funding Group, 255 B.R. 616, 636 (N.D.N.Y.2000)* (holding that a financing statement's description must allow distinction between the collateral and other, similar goods that the debtor owns) (quotation omitted); *John Deere Co. of Baltimore, Inc. v. William C. Pahl Constr. Co., Inc., 34 A.D.2d 85, 88 (4th Dep't 1970)* (holding that a UCC filing is meant to provide mere inquiry notice to serve as starting point for further investigation).

The weight of authority supports the validity of a financing statement with a "one digit" error.[FN6] *See* N.Y. U.C.C. § 9-108 cmt. 2 (rejecting a serial number test); *In re Sarex Corp., 509 F.2d 689, 691 (2d Cir.1975)* (same); *In re Esquire Produce Co., No. 66-B-1052, 1968 WL 9183 (Bankr.E.D.N.Y. Feb. 27, 1968)* (finding a one digit typographical error "harmless"); *Marine Midland Bank, N.A. v. Smith Boys, Inc., 129 Misc.2d 37, 40 (N.Y.Sup.Ct.1985)* (rejecting a serial number test) (citations omitted).

> FN6. White & Summers include an analogous example in their treatise, stating that a description of a "1998 Mack Truck with serial number AB7777" would be adequate even if the serial number actually read "AB7888" because it is objectively determinable that the debtor owned only one such truck and the parties intended to create a security interest therein. 4 *White & Summers* UCC § 3103(b) (5th ed.2006) (citations omitted).

Here, Defendant Wells Fargo filed a UCC financing statement on November 22, 2000, describing the collateral as "One (1) New 2000 Kobelco Crane, Model CK 1000, s/n GD02-0161" and including an extensive list of the crane's attachments. *See* Affidavit of John J. Henry, sworn to Sept. 8, 2005, at Exhibit "Q." As stated, the actual serial number of the 61 crane was GD0201061. [FN7]

> FN7. The Court notes that Plaintiff Maxus made similar serial number errors while

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y,), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

renting the 63 crane following SELC's default.

The completeness of the financing statement's description and the totality of the circumstances in this case lead the Court to conclude that the one-digit error was not seriously misleading. Defendant Wells Fargo's financing statement contained the proper debtor along with an accurate description of the year, make, and model of the crane. It also had an extensive list of attachments associated with the 61 crane. A UCC search would have provided inquiry notice regarding Defendant Wells Fargo's security interest in a new 2000 Kobelco Model CK 1000 crane owned by Defendant SELC with an extensive list of attachments and a very similar serial number. The Court finds that this information provided at least a starting point for further investigation and provided enough information to distinguish this collateral from other similar equipment.[FN8] Moreover, pursuant to N.Y. U.C.C. § 9-617(a) and (b), Defendant Wells Fargo's transfer of the 61 crane to Defendant Brownell precludes any claim of Plaintiff Maxus against Defendant Brownell.

> FN8. The cases that Plaintiff Maxus cites are readily distinguishable. In *John Deere Co., Inc. v. Richards,* the serial numbers used "[were] not even close," and the accompanying collateral description was inaccurate. 136 Misc.2d 923, 924 (N.Y.Sup.Ct.1987). Although *In re Aragon Indus., Inc.* states that parties who use serial numbers in multiple item transactions run the risk of subjecting their security interest to attack, that case "was not simply a question of the number being off a digit or being otherwise garbled;" rather, serial numbers were completely omitted. No. 73-263-BK-CF-Y, 1973 WL 21377 (Bankr.S.D.Fla. Nov. 21, 1973). Similarly, *In re The Bennett Funding Group* involved "comparatively extreme example[s]," some of which were "incomprehensible and provide[d] no way ... to ascertain the identity" of the collateral. 255 B.R. at 636 n. 16. Furthermore, the court explicitly limited its holding to use of the serial number test only when "there is no other way to identify a piece of collateral" and then as part of a multi-factor inquiry. *Id.* at 636-37.

Accordingly, the Court **GRANTS** Defendants Wells Fargo and Brownell's motion for summary judgment on Plaintiff Maxus' conversion and recovery of chattel claims relating to the 61 crane (Causes of Action 1 and 2); and the Court further **DENIES** Plaintiff Maxus' cross-motion for summary judgment on these claims.

**D. Breach of warranty**

*\*4* Plaintiff Maxus asserts that Defendant Kobelco breached warranties of title pursuant to UCC § 2-312 by entering a contract for sale in May 2001 without having the cranes' titles free of security interests, liens, and encumbrances.

A contract for sale contains a warranty that "the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge."N.Y. U.C.C. § 2-312(1)(b). However, an exception exists in "circumstances which give the buyer reason to know that the person selling does not claim title in himself...."N.Y. U.C . C. § 2-312(2). The official comments clarify that the exception applies to sales by sheriffs, executors, foreclosing lienors, and similarly situated persons, such that the character of the transaction is "immediately apparent" as being outside the ordinary commercial course. N.Y. U.C.C. § 2-312 cmt. 5.

Notwithstanding the parties' arguments about the exception's applicability, the threshold issue is whether a contract for sale was formed between the parties. Without a contract for sale, no warranty under § 2-312 could attach. This matter is disputed, and the parties offer widely divergent factual allegations, supported by employee depositions.[FN9][FN10]

> FN9. The following key facts are in dispute: (1) Plaintiff Maxus alleges that it received a list of equipment prior to the transaction with a cover sheet indicating that the cranes were new; (2) three former employees of Defendant Kobelco assert that they notified Plaintiff Maxus that the cranes had already been delivered to Defendant SELC; and (3) Defendant Kobelco claims that Maxus' employees directed it to "fix" invoices that

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

showed a previous sale of the cranes to Defendant SELC by inserting Plaintiff Maxus' name as buyer for the purpose of enabling Maxus to obtain financing.

FN10. Even if the contract's existence were not disputed, the applicability of the "reason to know" exception is a question of fact that cannot be decided on summary judgment. *See, e.g., Jones v. Linebaugh,* 34 Mich.App. 305, 310 (Mich.Ct.App.1971) (citations omitted). The Second Circuit has stated that, in UCC matters, out-of-state precedents are " 'more than persuasive authority.' " *In re Lou Levy & Sons Fashions, Inc.,* 988 F.2d 311, 316 n. 5 (2d Cir.1993) (quotation omitted).

Accordingly, the Court **DENIES** both Defendant Kobelco's motion and Plaintiff Maxus' cross-motion for summary judgment on Plaintiff Maxus' breach-of-warranty cause of action (Cause of Action 3).

**E. Tort Claims**

*1. Fraud and Conversion*

It is a well-settled matter of New York law that a tort cause of action does not lie where it is duplicative of a claim sounding in contract: the plaintiff must assert that the defendant breached a duty independent of the claimed contract. *See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19-20 (2d Cir.1996) (citations omitted).[FN11] Thus, the addition of a scienter allegation alone is generally insufficient to transform a contract cause of action into an actionable tort. *See Bibeau v. Ward,* 228 A.D.2d 943, 943-44 (3d Dep't 1996) (citation omitted). When "the identical contractual benefit of the bargain recovery is sought," the tort action is barred as duplicative. *Rockefeller Univ. v. Tishman Constr. Corp. of N.Y.,* 240 A.D.2d 341, 342 (1st Dep't 1997).

FN11.*See also Grappo v. Alitalia Linee Aeree Italiane,* 56 F.3d 427, 434 (2d Cir.1995) (citations omitted); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389 (1987) (citations omitted); *Merzon v. Lefkowitz,* 289 A.D.2d 142, 143 (1st Dep't 2001) (citation omitted);

*Interstate Adjusters, Inc. v. First Fidelity Bank, N.A.,* 251 A.D.2d 232, 234 (1st Dep't 1998) (quotation omitted); *Stella Flour & Feed Corp. v. Nat'l City Bank of N.Y.,* 285 A.D. 182, 187 (1st Dep't 1954) (citations omitted).

In this case, all allegations in the fraud, conversion, and breach-of-warranty causes of action are identical, except for an additional allegation of scienter. Moreover, Plaintiff Maxus seeks to recover the identical contractual benefit of the bargain or "purchase price" in each cause of action and alleges no independent facts to support tort liability.[FN12][FN13] Therefore, the Court finds that Plaintiff Maxus' fraud and conversion claims are duplicative of its breach-of-warranty claim.

FN12. Plaintiff Maxus' reliance on Rule 8(e) of the Federal Rules of Civil Procedure and *Henry v. Daytop Village, Inc.,* 42 F.3d 89, 95 (2d Cir.1994), for the proposition that it can plead alternative causes of action, is misplaced. These authorities address pleading potentially inconsistent causes of action, but precedent indicates that these tort causes of action cannot coexist at all with a seemingly consistent contract claim based on identical allegations.

FN13. Furthermore, the Court recognizes the inherent logic of the rule barring duplicative tort and contract actions. On one hand, if Plaintiff Maxus proves the existence of a contract, it will recover contract-based damages for any breach. On the other hand, if no contract of sale existed, Defendant Kobelco could not have defrauded Plaintiff Maxus because it did not attempt to sell already-sold cranes. Also, if no contract existed, Defendant Kobelco could not have committed conversion because Plaintiff Maxus had no superior right to the cranes.

Accordingly, the Court **GRANTS** Defendant Kobelco's motion for summary judgment on Plaintiff Maxus' fraud and conversion claims (Causes of Action 4 and 7).

*2. Conspiracy*

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

**\*5** There is no substantive tort of conspiracy in New York. *See Stuart v. Tomasino,* 148 A.D.2d 370, 372 (1st Dep't 1989) (citation omitted). An allegation of conspiracy is "permitted only to connect the actions of separate defendants with an otherwise actionable tort...."*Id.*(citation omitted); *see also Alexander & Alexander of N.Y., Inc. v. Fritzen,* 68 N.Y.2d 968, 969 (1986) (citations omitted). Therefore, conspiracy to commit fraud is not an independent cause of action. *See Alexander,* 68 N.Y.2d at 969 (quotation and other citations omitted); *MBF Clearing Corp. v. Shine,* 212 A.D.2d 478, 479 (1 st Dep't 1995) (quotation and other citation omitted). Moreover, once the underlying fraud cause of action is dismissed, "the charge of conspiracy to effectuate [it] adds nothing and must also fall."*Block v. Chassin,* 36 A.D.2d 703, 703 (1st Dep't 1971) (citation omitted).

In this case, Plaintiff Maxus alleges that a conspiracy to defraud existed between Defendant Kobelco and Defendant SELC.[FN14]However, it asserts this cause of action against Defendant Kobelco only and does not use it to connect separate defendants to the alleged fraud. In addition, since the Court has already granted summary judgment on the fraud cause of action to Defendant Kobelco, the conspiracy claim "must also fall." *Id.*

> FN14. The Court notes that, because Plaintiff Maxus would be a party to any contract that might have existed, it is barred from asserting a cause of action for conspiracy to breach a contract. *See North Shore Bottling Co., Inc. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 179 (1968) (quotation and other citations omitted).

Accordingly, the Court **GRANTS** Defendant Kobelco's motion for summary judgment on Plaintiff Maxus' conspiracy claim (Cause of Action 5).

## F. Unjust enrichment and money had and received

Unjust enrichment is based on implied or quasi-contract.[FN15]*See Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir.1982) (citation omitted). The plaintiff is required to "establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."*Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citation omitted). A restitution remedy is available whether the defendant engaged in wrongdoing or merely obtained the plaintiff's money by mistake. *See Citipostal, Inc. v. Unistar Leasing,* 283 A.D.2d 916, 919 (4th Dep't 2001) (citations omitted).

> FN15. The causes of action for unjust enrichment and money had and received are identical. *See In re Estate of Witbeck,* 245 A.D.2d 848, 850 (3d Dep't 1997).

Since this form of relief is quasi-contractual, "[i]t applies in situations where no legal contract exists."*Indyk,* 694 F.2d at 57. Therefore, the existence of an enforceable contract generally precludes recovery on this theory. *See Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537, 2003 WL 23018888, \*17 (S.D.N.Y. Dec. 22, 2003) (quotation omitted).

In this case, due to the quasi-contractual nature of this cause of action, there is a threshold issue regarding the existence of a contract. As noted above, this issue is disputed. If a contract were formed between Plaintiff Maxus and Defendant Kobelco, then quasi-contractual relief would be precluded. However, if no contract existed, a remedy may be afforded if the facts show that it would be unjust for Kobelco to keep the "purchase" money that Maxus remitted for the 61 crane. *See Indyk,* 694 F.2d at 57 (quotation omitted). Therefore, the Court cannot rule at this time as a matter of law, but must await a jury's determination as to whether there is a contract cause of action.

**\*6** Accordingly, the Court **DENIES** both Defendant Kobelco's motion and Plaintiff Maxus' cross-motion for summary judgment on Plaintiff Maxus' unjust enrichment and money had and received claim (Cause of Action 6).

## IV. CONCLUSION

Accordingly, after reviewing the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants Wells Fargo and Brownell's motion for summary judgment is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140
**2007 WL 655779 (N.D.N.Y.)**

**GRANTED** and Plaintiff Maxus' cross-motion for summary judgment is **DENIED** on Plaintiff Maxus' conversion and recovery-of-chattel claims concerning the 61 crane (**Causes of Action 1 and 2**); and the Court further

**ORDERS** that Defendant Kobelco's motion for summary judgment is **GRANTED** and Plaintiff Maxus' cross-motion for summary judgment is **DENIED** on Plaintiff Maxus' fraud, conspiracy, and conversion claims (**Causes of Action 4, 5, and 7**); and the Court further

**ORDERS** that both Defendant Kobelco's motion and Plaintiff Maxus' cross-motion for summary judgment are **DENIED** on Plaintiff Maxus' breach-of-warranty and unjust enrichment claims (**Causes of Action 3 and 6**); [FN16] and the Court further

> [FN16]. Accordingly, two matters remain for trial: (1) Plaintiff Maxus' breach of warranty of title claim against Defendant Kobelco (**Cause of Action 3**); and (2) Plaintiff Maxus' unjust enrichment and money had and received claim against Defendant Kobelco (**Cause of Action 6**).

**ORDERS** that Plaintiff Maxus' counsel is to initiate a telephone conference with the Court and opposing counsel for the one remaining Defendant, Defendant Kobelco, using a professional conferencing service on March 6, 2007 at 9:45a.m. to set a trial date for this action.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.
Maxus Leasing Group, Inc. v. Kobelco America, Inc.
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

HChicago Messenger Service, Inc. v. Nextel
Communications, Inc.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois, Eastern
Division.
    CHICAGO MESSENGER SERVICE, INC. and
    Veterans Messenger Service, Inc., Plaintiffs,
                        v.
    NEXTEL COMMUNICATIONS, INC. and Nextel
            West Corp. Defendants.
               **No. 01 C 8820.**

                 Sept. 24, 2003.

Daniel John Voelker, William Nicholas Howard,
Robert J. Hall, Freeborn & Peters, Chicago, IL, for
Plaintiffs/Counter-defendants.
Frederic R. Klein, Deborah Rzasnicki Hogan,
Matthew H. Metcalf, Goldberg, Kohn, Bell, Black,
Rosenbloom & Moritz, Ltd., Chicago, IL, for
Counter-claimant.

             OPINION AND ORDER

NORGLE, J.
**\*1** Before the court is Defendants Nextel
Communications, Inc. and Nextel West Corp.'s
Motion for Summary Judgment as to Plaintiffs
Chicago Messenger Service, Inc. and Veterans
Messenger Service, Inc.'s Amended Complaint. Also
before the court is Defendant Nextel West's Motion
for Summary Judgment as to its Amended
Counterclaim. For the following reasons, Defendants'
Motion for Summary Judgment as to Plaintiffs'
Amended Complaint is granted, and Nextel West's
Motion for Summary Judgment as to its Amended
Counterclaim is granted in part and denied in part.

             I. BACKGROUND [FN1]

    FN1. The court takes the facts from the
    parties' Local Rule 56.1 statements and
    accompanying briefs. Disputed facts are
    noted in the text.

Plaintiffs, Chicago Messenger Service, Inc. and

Veterans Messenger Service, Inc. (collectively
"Messengers"), bring this diversity suit against
Defendants, Nextel Communications, Inc. and Nextel
West Corp. (collectively "Nextel"). Messengers are
Illinois corporations in the business of providing
messenger delivery services. Messengers employ
numerous couriers and maintain communication with
its staff of couriers by way of wireless
communication equipment. Nextel are Delaware
corporations in the business of providing wireless
communications equipment and services.[FN2]Nextel
provides a wireless communications system, which
Messengers utilized at all times relevant to the
present dispute.

    FN2. Nextel Communications has its
    principal place of business in Virginia, and
    Nextel West has its principal place of
    business in Michigan. Jurisdiction is proper
    under 28 U.S.C. § 1332, as the parties are
    diverse and the amount in controversy
    exceeds $75,000, exclusive of interests and
    costs.

In the fall of 1997, Messengers' General Manager,
Milt Buzil ("Buzil") was responsible for finding a
wireless communications provider. On or about
November 10, 1997, Buzil initially entered into
negotiations with Robert Picchietti ("Picchietti"), a
Nextel employee, which resulted in a written
agreement to purchase wireless communications
equipment and services from Nextel. Shortly
thereafter, Buzil was contacted by an independent
dealer of Nextel equipment and services, Scott
Lambert ("Lambert") of Radco Communications.
Lambert offered Buzil a better price for Nextel
equipment. On or about November 12, 1997, Buzil
sent a letter to Picchietti rescinding the November 10,
1997 written agreement. Also on or about November
12, 1997, Lambert and Buzil executed written
Subscriber Agreements for Nextel equipment and
wireless services (more on Lambert to come later).
Over the next three years, Messengers entered into
numerous similar Subscriber Agreements as it
purchased additional wireless equipment to be used
on Nextel's wireless system. The Subscriber
Agreements were standard form contracts, which
Nextel provided to dealers of Nextel equipment and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

services.

The Subscriber Agreements executed by Messengers expressly noted that by signing, the customer signified that he had read, understood, agreed to and accepted the terms and conditions stated on the face and reverse of the Subscriber Agreements. The Subscriber Agreements between Messengers and Nextel included the following pertinent provisions, or provisions substantively similar thereto:

6. RATES, CHARGES AND PAYMENT-Company shall issue invoices for Service. Monthly Access charges shall be invoiced in advance. Airtime and long distance charges shall be invoiced in arrears. Customer is responsible to pay Company, on a timely basis, for charges for Service as set forth in the front of this Agreement, and any modifications thereto....

**\*2** 13. COMPLETE AGREEMENT / SEVERABILITY / WAIVER-This Agreement sets forth all of the agreements between the parties concerning the Service and Purchase of the Equipment, and there are no oral or written agreements between them other than as set forth in this Agreement. No amendment or addition to this Agreement shall be binding upon Company unless it is in writing and signed by both parties. Company shall not be bound by the terms and conditions in Customer's purchase order or elsewhere, unless expressly agreed to in writing. This Agreement becomes effective when accepted by the Company....

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

Under the parties' agreements, the Monthly Access charge was a fixed monthly fee of $38.25 for all wireless telephones that were assigned to Messengers' accounts. Messengers knew that Monthly Access charges were billed one month in advance, and that in the event Nextel was informed to deactivate a phone during a month, the following month Messengers would receive a prorated credit against the amount it had paid in advance for that phone. Reasons to deactivate a wireless telephone would be if a phone was lost, stolen, damaged, or simply unused and placed in inventory.

Responsibility for managing the wireless telephones was assigned to Messengers' Communications

Department. Messengers' Vice President, Paul Pitaro ("Pitaro"), supervised the Communications Department. Other employees of the Communications Department, including Juanita Krmaschek ("Krmaschek") and Jessie Portillo ("Portillo"), issued wireless telephones to Messengers' staff of couriers and maintained related internal documentation. While aware that notifying Nextel that a wireless telephone had to be deactivated would stop that phone from incurring the Monthly Access charge, the Communications Department would not routinely do so. Messengers do not dispute that the contracts between the parties regarding wireless service were written contracts governed by the terms and conditions stated in the Subscriber Agreements; however, Messengers contend that there was also an oral agreement, which was reiterated on several occasions, that Messengers would only be charged Monthly Access charges for wireless telephones that were actually used. Messengers refer to this oral agreement as the "no usage, no access charge" term.

Messengers received detailed monthly bills from Nextel for every month that the parties' three-year relationship existed. Messengers' bookkeeper, Haydee Romo, generally reviewed the Nextel bills every month, and then presented the bills to Messengers' owner and President, William Factor ("Factor"), for payment.

The controversy giving rise to the present case began in March 2001, when Lambert contacted Messengers in regard to Messengers' Nextel bills. Lambert, this time in a capacity as auditor, offered to review Messengers' Nextel bills. After Lambert's audit, Messengers believed that Nextel was improperly charging Monthly Access charges for some wireless telephones that Messengers were not using, contrary to the "no usage, no access charge" term that Messengers allege was orally communicated on numerous occasions. Based on Lambert's audit, Messengers stopped paying Nextel's bills.

**\*3** Messengers contacted Nextel and requested that its accounts be credited for unused wireless telephones that were assessed the Monthly Access charge. The parties engaged in numerous attempts to rectify the billing dispute. During the course of the dispute, Messengers allege that Nextel employees, Michael Beltrano ("Beltrano") and Randall Burns

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
2003 WL 22225619 (N.D.Ill.)

("Burns"), told Messengers not to pay the bills until the issue was resolved.

Ultimately, in October 2001, Nextel demanded that Messengers pay the full amounts reflected as owed in Nextel's bill, or Messengers' wireless service would be discontinued. On November 6, 2001, Messengers delivered a check to Nextel in the amount of $123,287.50, representing the amounts that Messengers did not dispute. On November 13, 2001, Factor contacted Burns and requested another meeting to resolve the billing dispute; however, Burns refused and stated that wireless service would be discontinued if the full amounts reflected as owed were not paid by November 16, 2001. On November 15, 2001, Messengers paid an additional $33,000 to Nextel, in exchange for Nextel's agreement to continue Messengers' wireless service through November 27, 2001.

On November 15, 2001, Messengers also filed a complaint in Illinois state court seeking an injunction to prevent Nextel from terminating wireless service to Messengers, and Nextel removed the case to this court that very day. After removal of the case, the parties continued their efforts to resolve the dispute; however, those efforts proved unsuccessful and Nextel terminated Messengers' wireless service on November 28, 2001. As a result of the termination of Messengers' wireless service, Nextel filed a motion to dismiss the complaint as moot and also filed a counterclaim seeking payment of the balance alleged to be due, plus late fees and attorney fees and costs. The parties then entered an agreed order granting Messengers time to file an amended complaint. Messengers proceeded to file a three count amended complaint alleging breach of contract, common law fraud, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. The gist of all three counts is that Nextel made an oral promise not to charge Messengers the Monthly Access charges for wireless telephones that were not actually used, and that Nextel has not fulfilled that promise.

Nextel has filed a motion for summary judgment, which is fully briefed and ready for ruling.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Seventh Circuit has indicated that cases involving contract interpretation are "particularly well-suited to disposition on summary judgment."*Neuma, Inc. v. AMP, Inc.,* 259 F.3d 539, 542 (7th Cir.2000).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party has the initial burden to prove that no genuine issue of material fact exists. *SeeMatsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial. *SeeCelotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

\*4 The non-moving party cannot rest on the pleadings alone, but must identify specific facts that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. *SeeMurphy v. ITT Technical Services, Inc.,* 176 F.3d 934, 936 (7th Cir.1999); *seealso*Fed.R.Civ.P. 56(e)."Conclusory allegations alone cannot defeat a motion for summary judgment."*See Thomas v. Christ Hosp. and Medical Center,* 328 F.3d 890, 893-94 (7th Cir.2003) (citing *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 888-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Local Rule 56.1 requires both the moving and non-moving parties to submit a statement of material facts, including "specific references to the affidavits, parts of the record, and other supporting materials relied upon."Local Rule 56.1(a)(3); Local Rule 56.1(b)(3)(B). Evidence submitted at summary judgment must ultimately be admissible at trial under the Federal Rules of Evidence. *SeeWoods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir.2000). Specifically, hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial. *SeeEisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). Thus, all facts not properly supported by the record evidence must be disregarded. *Brasic v. Heinemunn's, Inc.,* 121 F.3d 281, 284 (7th Cir.1997).[FN3]

FN3. Along with Nextel's Amended Reply

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

Memorandum in Support of its Motion for Summary Judgment, Nextel also filed a Motion to Strike Messengers' Amended Local Rule 56.1 Counter-Statement of Material Facts. In light of this court's standard of decision to be applied in a motion for summary judgment, Nextel's Motion to Strike is disregarded as moot.

The court views the record evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *See* Fed.R.Civ.P. 56(c). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make a "choice of inferences." *See* *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 922 (7th Cir.1996). The choice between reasonable inferences from facts is a jury function. *See* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. DISCUSSION

In cases where a federal district court's jurisdiction is based upon diversity jurisdiction, the court must use the substantive law of the state in which it sits. *See* *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (indicating "the proper function of the ... federal court is to ascertain what the state law is, not what it ought to be"); *see also* *Land v. Yamaha Motor Corp.,* 272 F.3d 514, 516 (7th Cir.2001). "Rules of contract interpretation are treated as substantive." *Dawn Equipment Co. v. Micro-Trak Systems, Inc.,* 186 F.3d 981, 986 (7th Cir.1999) (citing *Bourke v. Dun & Bradstreet,* 159 F.3d 1032, 1036 (7th Cir.1998)). "As a court sitting in diversity, we attempt to predict how the [Illinois] Supreme Court would decide the issues presented here." *Id.* (citing *Allen v. Transamerica Ins. Co.,* 128 F.3d 462, 466 (7th Cir.1997)).

#### A. Breach of Contract

##### 1. Effect of Integration Clause on Admissibility of Parol Evidence

Count III of Messengers' Amended Complaint alleges breach of contract. The parties present the court with an issue involving the parol evidence rule. Illinois courts have embraced the parol evidence rule in its more conservative approach, which has been termed

the "four corners" rule. *See e.g.,* *Air Safety, Inc. v. Teachers Realty Corp.,* 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (Ill.1999) (rejecting application of the "extrinsic ambiguity" doctrine, and reiterating "four corners" rule as the proper method for contract interpretation). Under Illinois Supreme Court case law, the "four corners" rule provides: " 'An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Id.* (citing *Western Illinois Oil Co. v. Thompson,* 26 Ill.2d 287, 186 N.E.2d 285, 291 (Ill.1962)). In applying the "four corners" rule, Illinois courts look to the language of the contract alone in order to determine whether an ambiguity exists. *See id.* If an ambiguity exists, parol evidence may be introduced. *See id.* (discussing the determination of whether an ambiguity exists in a written contract so as to require admission of parol evidence).

**\*5** The importance of an integration clause in the parties' written contract takes on great significance under this "four corners" rule. As stated by the Illinois Supreme Court, "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Id* . at 885. Thus, under Illinois law, the presence of an integration clause is evidence that the parties have executed a fully integrated contract, to be interpreted solely within the four corners of that contract, and which cannot be altered by extrinsic evidence.

In this case, it is undisputed that the parties' written agreements all contained integration clauses, which provided:

13. COMPLETE AGREEMENT / SEVERABILITY / WAIVER - This Agreement sets forth all of the agreements between the parties concerning the Service and Purchase of the Equipment, and there are no oral or written agreements between them other than as set forth in this Agreement. No amendment or addition to this Agreement shall be binding upon Company unless it is in writing and signed by both parties. Company shall not be bound by the terms and conditions in Customer's purchase order or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

elsewhere, unless expressly agreed to in writing....

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

The presence of such an integration clause "is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement."*Air Safety,* 236 Ill.Dec. 8, 706 N.E.2d at 886. Prior to the final execution of each written Subscriber Agreement, Messengers were free to contract as they saw fit. The Subscriber Agreements themselves contemplate that the parties may add or delete terms and conditions to the parties' written agreement before execution. In fact, Messengers took advantage of this opportunity in some of the contracts that the parties executed. By way of example, on the front of one such Subscriber Agreement the following additional contract terms appear:

Payment Terms. Net 30 days after completion of installation of equipment 1% discount if paid within 10 days of completion of installations To be installed first week of December (by December 5th)

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H. By this handwritten amendment, the parties added a payment term and a delivery term. Thus, Messengers could have easily added the alleged "no usage, no access charge" term to the front of each and every Subscriber Agreement that they executed. However, Messengers failed to do so. The parol evidence rule precludes Messengers from now arguing that the alleged "no usage, no access charge" term, which appears nowhere in the Subscriber Agreements, is a term of the parties' written agreements.

This court recently wrote on the mischief that such claims bring to the stability and certainty of written contracts. *SeeDavis v. G N Mortgage Corp.,* 244 F.Supp.2d 950, 960-61 (N.D.Ill.2003) ("Claims seeking to add to, modify, or contradict a written agreement ... work mischief with the law of contracts and the attendant stability that the law of contracts brings to a myriad of transactions."). The following quote from the Seventh Circuit is also instructive on this issue:

**\*6** Memory plays tricks. Acting in the best of faith,

people may "remember" things that never occurred but now serve their interests. Or they may remember events with a change of emphasis or nuance that makes a substantial difference to meaning.... A statement such as "[no usage, no airtime charges]" may be recalled years later as "[no usage, no access charges]." Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing, and promoting the primacy of the written word....

*Rissman v. Rissman,* 213 F.3d 381, 384 (7th Cir.2000).

*2. Existence of Ambiguity in Contract Language*

Messengers offer an additional argument in support of its breach of contract claim. Messengers contend that the language of the Subscriber Agreements is ambiguous, as the Subscriber Agreements do not address the issue of whether the Monthly Access charge will be applied to unused wireless telephones. In response, Nextel contends that the language of the Subscriber Agreements is unambiguous, as the Subscriber Agreements require payment of a fixed Monthly Access charge for each wireless telephone, and that such obligation is not conditioned in any way.

In Illinois, a court "must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent."*Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 994 (Ill.1990). Again this is done under the traditional "four corners" rule. *SeeAir Safety,* 236 Ill.Dec. 8, 706 N.E.2d at 884. An ambiguity is present only if "the language of the contract is susceptible to more than one meaning."*Id.*"If no ambiguity exists in the writing, the parties' intent must be derived ... as a matter of law, solely from the writing itself."*Id.* As aptly stated by the Illinois Supreme Court: "The court must take the contract as made by the parties. It cannot make a new contract for them or add anything to its provisions."*Ortman v. Kane,* 389 Ill. 613, 60 N.E.2d 93, 98 (1945).

On the front of each Subscriber Agreement, the parties indicated how many wireless telephones would be purchased and subscribed to Nextel's

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

system, and the Monthly Access charge for each wireless telephone. It is undisputed that this Monthly Access charge was \$38.25 per each wireless telephone. The back of each Subscriber Agreement provided how the Monthly Access charge would be billed, stating: "Monthly Access charges shall be invoiced in advance."*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I. Within the Subscriber Agreements, this statement is not conditioned in any manner. Thus, there is no ambiguity, and the parties' written agreements provide that every wireless telephone that Messengers subscribed to Nextel's system was to be billed the Monthly Access charge. What Messengers claim to be ambiguous contract language is simply its own belief imposed onto the unambiguous text of the parties' written Subscriber Agreements. *CompareAir Line Pilots Ass'n., Intern. v. Midwest Exp. Airlines, Inc.,* 279 F.3d 553, 556 (7th Cir.2002) (stating: "the party challenging the literal meaning must present *objective* evidence, not just his say-so, that the contract does not mean what it says") (emphasis in original). Messengers must present more than its interpretation of the language of the contract; it must demonstrate that the language is truly ambiguous - meaning susceptible to more than one meaning - which it has not done. "Any particular interpretation that only the plaintiff may have envisioned at the time a contract is executed is immaterial."*Eichengreen v. Rollins, Inc.,* 325 Ill.App.3d 517, 259 Ill.Dec. 89, 757 N.E.2d 952, 958 (Ill.App.Ct.2001).

*7 Applying the traditional contract interpretation principles of the "four corners" rule, as provided by the Illinois Supreme Court, Messengers may not introduce parol evidence of the alleged "no usage, no access charge" term. The parties' agreement is to be found solely within the Subscriber Agreements. Therefore, since Messengers cannot establish its breach of contract claim against Nextel, Nextel is entitled to judgment as a matter of law. *SeeCelotex,* 477 U.S. at 322.

B. Common Law Fraud and Illinois Consumer Fraud and Deceptive Practice Act

Counts I and II of Messengers' Amended Complaint allege common law fraud and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, respectively. Both claims allege that Nextel

charged Messengers the Monthly Access fees for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term. In short, both of these fraud claims are simply a repackaged version of Messengers' breach of contract claim.

*1. Promissory Fraud*

Under Illinois law, the elements of the tort of fraudulent misrepresentation are: "(1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) made to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance."*Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co.,* 114 Ill.2d 278, 102 Ill.Dec. 306, 499 N.E.2d 1319, 1323 (Ill.1986)."In addition, the reliance upon the misrepresentation must have been justified, i.e., the other party had a right to rely upon the statement."*Id.*

Unlike most states, Illinois generally does not provide a remedy for fraudulent promises. *See* Michael J. Polelle, *An Illinois Choice: fossil Law or an Action for Promissory Fraud?,*32 DePaul L.Rev. 565, 569-70 (1983). The basis for this general prohibition is that the misrepresentation must be based on present or preexisting facts, and thus, statements of future intent generally cannot be the basis for a claim of promissory fraud. *SeeHPI Healthcare Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (Ill.1989). This general prohibition is tempered by one exception, "where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud."*Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634, 641 (Ill.1977); *seealsoRoda v. Berko,* 401 Ill. 335, 81 N.E.2d 912, 915 (Ill.1948) (recognizing the general prohibition against claims for promissory fraud, but stating that "where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud and thereby cheat and defraud another of his property, equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed"). Commentators have noted that this "scheme to defraud" exception has not been elucidated, and has resulted in confusion and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

inconsistent application among Illinois courts. *See* Roger L. Price and Mark L. Johnson, <u>*Understanding the "Scheme To Defraud" Exception to Promissory Fraud in Illinois,*</u> 90 Ill. B.J. 536, 536 (2002) ("The [scheme to defraud] exception has generated a confusing body of case law ...."); *seealso*<u>*Desnick v. American Broadcasting Cos., Inc.,*</u> 44 F.3d 1345, 1354 (7th Cir.1995) ("The distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge.").

**\*8** Messengers' claim can be disposed of without this court having to enter the bramble bush that is the "scheme to defraud" exception. Messengers allege that Nextel charged the Monthly Access fees for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term, and buried these charges in voluminous invoices as part of a scheme to defraud.

Messengers provide no admissible evidence for the alleged "no use, no access charge" term. Messengers simply state: "It was [Messengers'] understanding, based on the representations made by Nextel during negotiations, and throughout the relationship, that Nextel would not charge [Messengers] for wireless telephones which were unusable, replaced, unused or otherwise not in service." *See* Pls.' Amended Local Rule 56.1 Counter-Statement of Additional Uncontested Facts, ¶ 96. The record citations to support ¶ 96 are devoid of any evidence to support this statement. Messengers fail to indicate when "throughout the relationship" these statements were made. The statements that Messengers proffer as having been made by Nextel where made by Lambert, the independent dealer of Nextel equipment and services. However, the record contains no affidavit or deposition testimony from Lambert. Further, Messengers offer no evidence that Lambert was an agent of Nextel, or that Nextel had any knowledge of Lambert's statements, so as to bring Lambert's statements within <u>Federal Rule of Evidence 801</u>. With such deficiencies, the alleged statements are nothing more than hearsay, which is inadmissible and an improper method of defending a motion for summary judgment. *See*<u>*Eisenstadt,* 113 F.3d at 742</u>. In short, Messengers simply concludes that the statements were made by Nextel; however, such conclusory allegations are insufficient to create

a genuine issue of material fact. *See*<u>*Thomas,* 328 F.3d at 894</u> (reiterating that "<u>Rule 56(e) of the Federal Rules of Civil Procedure</u> specifically prohibits a party from relying upon his allegations to contest entry of summary judgment").

Additionally, Messengers must establish that its reliance on the statements was justified. <u>*Charles Hester Enterprises,* 102 Ill.Dec. 306, 499 N.E.2d at 1323</u>, which it cannot do. As this "no usage, no access charge" term was not in the parties' written contracts, and in fact contradictory to the unambiguous text of the Subscriber Agreements, any such reliance could not be justified. Further, assuming *arguendo* that admissible evidence supported the alleged "no usage, no access charge" term, the record evidence belies Messengers' argument that they relied on that term. In order to avoid the Monthly Access charges, it was Messengers' responsibility to call and request that a wireless telephone be deactivated. The following deposition testimony shows that Messengers knew of this obligation:

Q. What does the messenger companies do when a phone is lost?

A. I know what they're supposed to do. They're supposed to call the company and stop the service because they can't use it for phones.

**\*9** Q. When you say, "they're supposed to call the company and stop the service," you mean they're supposed to call Nextel to stop the service, correct?

A. I believe so, but you have to check that out with the communications department. I don't know what their procedure is.

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Exh. A, Buzil Dep. pg. 94. When the supervisor of Messengers' Communications Department was asked about this obligation, the following deposition testimony was elicited:
Q. Whose responsibility was it to deactivate phones that weren't being used?

A. .... [I]t would be the responsibility of Juanita [Krmaschek] or Jessie [Portillo] to call in and tell Nextel that we lost a radio; it has to be deactivated.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

See id., Exh. D, Pitaro Dep. pg. 63. This evidence shows that Messengers were aware of their obligation to contact Nextel and request deactivation to avoid being billed the Monthly Access charge.

In short, Messengers cannot satisfy the elements required for a claim based on promissory fraud. As Messengers bear the burden of proving each element of its fraud claim at trial, which it has shown it cannot do, summary judgment is appropriate. See Celotex, 477 U.S. at 322.

*2. Illinois Consumer Fraud and Deceptive Business Practices Act*

The elements for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") are: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." Oliveira v. Amoco Oil Co., 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (Ill.2002). In contrast to a claim of common law fraud, a "[p]laintiff's reliance is not an element of statutory consumer fraud." Connick v. Suzuki Motor Co., Ltd., 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996) (citation omitted).

"The Consumer Fraud Act defines 'unfair or deceptive acts or practices' to include the use or employment of any 'deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact.' " Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A., 186 Ill.2d 472, 239 Ill.Dec. 12, 713 N.E.2d 543, 552 (Ill.1999) (citing 815 Ill. Comp. Stat. 505/2).

As with the promissory fraud claim, Messengers allege that Nextel charged the Monthly Access charges for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term, and buried these charges in voluminous invoices as part of a scheme to defraud. Messengers argue that this qualifies as "deceptive conduct" under the Consumer Fraud Act. See 815 Ill. Comp. Stat.

505/2 (2003). Messengers argue that they present more than a simple breach of contract case, arguing that Nextel made the false representations intending for Messengers to rely on those statements and continue to purchase Nextel equipment and services. However, this argument suffers from the same shortcomings that plagued the promissory fraud claim. Messengers offer no admissible evidence of any statements made by Nextel, and simply provide conclusory allegations, the type which summary judgment seeks to avoid. See Thomas, 328 F.3d at 742. The allegedly "deceptive conduct" is nothing more than an allegedly false promise not to charge monthly access fees for wireless telephones that were not being used by Messengers.

*10 Further, the court cannot accept the argument that Nextel's invoices were deceptive. Nextel simply billed Messengers in accordance with the terms of the Subscriber Agreements. Again, Messengers were responsible for requesting that any unused wireless telephones be deactivated, which they failed to routinely do. Messengers cannot turn their own shortcomings into a cause of action against Nextel. Nextel's actions, reflected in the detailed invoices sent to Messengers, were consistent with the parties' written agreements.

Illinois case law interpreting claims for violations of the Consumer Fraud Act (as well as claims for promissory fraud) make clear that the general bar against such claims is to prevent every breach of contract claim from giving rise to a duplicative tort claim. See Zankle v. Queen Anne Landscaping, 311 Ill.App.3d 308, 244 Ill.Dec. 100, 724 N.E.2d 988, 992-93 (Ill.App.Ct.2000) (stating that "it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy"). Thus, Illinois law is true to the distinction between contract claims and tort claims. To the extent that Messengers' allegations are, at their core, a claim for breach of contract, then relief is not warranted when simply repackaged as fraud-based claims.

*C. Nextel West's Counterclaim*

In its counterclaim, Nextel West seeks to have Messengers pay all charges invoiced, as well as late fees, attorney fees and costs, as provided in the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**

Page 9

parties' written agreements. The Subscriber Agreements provided:

7.   NONPAYMENT/BREACH-A late payment charge of 1.5% (or the maximum interest rate permitted by law) per month, may be applied to Customer's account if monthly invoices are not paid by the due date. The late payment charge is applied to the total unpaid balance due and outstanding.... If Company obtains the services of a collection or repossession agency or an attorney to assist Company in remedying Customer's breach of this Agreement, including but not limited to the nonpayment for charges hereunder, Customer shall be liable for this expense....

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

Based on this court's analysis, it is clear that Messengers have breached the unambiguous terms of the parties' Subscriber Agreements by failing to pay Nextel for wireless telephone service, and are liable to Nextel as to the counterclaim. However, the court cannot determine the amount that Messengers are liable for with any degree of certainty.

In their Amended Counterclaim, Nextel West states the amount of charges owed by Messengers as $139,319.64. *See* Defs.' Am. Counterclaim, ¶ 26. However, in their motion for summary judgment, Nextel West states the amount of charges owed as $128,729.54. *See* Defs.' Mot. for Summ. J., pg. 16. Nextel West explains this disparity by indicating that certain valid credits were not applied to Messengers' accounts, and with these credits the amount owed is then $128, 729.54.

**\*11** Messengers offer numerous arguments in opposition to Nextel's motion for summary judgment as to the counterclaim. First, Messengers contend that no outstanding balance exists, as Nextel breached the "no usage, no access charge" term of the parties' agreements; however, this claim has been rejected. Second, Messengers dispute that their outstanding balance is $139,319.64, as they contend that this amount does not take into account substantial credits that Nextel admittedly owes to Messengers. In support of the argument that Nextel owes substantial credits, Messengers point to the depositions of two Nextel employees who concede that errors did occur

with regard to the billing of Messengers' account. *See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Exh. K, Burns Dep., pg. 75 (indicating that some errors had been made with regard to Messengers' invoices); Exh. J, Black Dep., pg. 129 (same). Beyond these admissions that errors were made with regard to the billing of Messengers' account, there is no further evidence detailing what credits were given and what credits, if any, remain. Based on the dearth of information in the record concerning the credits which Messengers have received, or may still be entitled to, the court cannot determine the amounts due to Nextel for wireless service with any degree of certainty.

Furthermore, the exact amount of Messengers' liability for late fees is also uncertain based on representations made by Nextel employees indicating that Messengers did not have to pay the charges until the billing dispute was resolved. After Messengers stopped paying Nextel's invoices, the parties engaged in extensive discussions and negotiations to resolve this dispute. During the course of those negotiations, Messengers state that employees of Nextel, Beltrano and Burns, repeatedly instructed Messengers not to make any further payments until the dispute had been resolved. Since the dispute is not resolved, as evidenced by this lawsuit, and construing the facts in the light most favorable to Messengers, it is not clear that late fees should be calculated from November 28, 2001, the date of the service termination, as argued by Nextel.

In short, while Messengers are liable to Nextel West for breaching the Subscriber Agreements by failing to make payments, the exact amount of damages cannot be determined on the current record.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment as to Plaintiffs' Amended Complaint is granted, and Nextel West's Motion for Summary Judgment as to its Amended Counterclaim is granted in part and denied in part.

IT IS SO ORDERED.

N.D.Ill.,2003.
Chicago Messenger Service, Inc. v. Nextel Communications, Inc.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)
**2003 WL 22225619 (N.D.Ill.)**


Not Reported in F.Supp.2d, 2003 WL 22225619
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

C Baguer v. Spanish Broadcasting System, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Michael BAGUER, Plaintiff,
v.
SPANISH BROADCASTING SYSTEM, INC.,
Defendant.
**No. 04-CV-8393 (KMK).**

Sept. 20, 2007.

Jerry S. Goldman, Esq., Gina MarieMac Neill, Esq.,
Jerry S. Goldman and Associates, P.C., New York,
NY, for Plaintiff.
William Charles Zifchak, Esq., Neil Stuart Kaufman,
Esq., Margo Ferrandino, Esq., Kaye Scholer, LLP,
New York, NY, for Defendant.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.
*1 Plaintiff Michael Baguer brings this action to
recover money allegedly owed to him by his former
employer, Spanish Broadcasting System, Inc.
("SBS"). The First Amended Complaint, which
contains thirteen causes of action, alleges that SBS
breached its employment contract with Plaintiff,
discriminated against him on the basis of age, race,
and national origin, and violated New York labor
laws by failing to pay commissions and benefits due
to Plaintiff. The First Amended Complaint also
contains several contract and quasi-contract claims,
including claims based on quantum meruit, tortious
breach of contract, promissory estoppel, and violation
of the implied covenant of good faith and fair
dealing. With this Motion, SBS moves to dismiss the
ninth (tortious breach of contract), tenth (promissory
estoppel), and thirteenth (good faith and fair dealing)
causes of action. For the reasons stated herein, the
Motion is granted in part and denied in part.

*I. Background*

The Court will accept the following facts as true for
the purposes of this Motion. Plaintiff is a fifty-five-
year-old, Cuban-born, naturalized American citizen.

(Am.Compl.¶ 15.) SBS owns and operates
approximately fifty radio stations, including two that
are based in New York City. (*Id.* ¶ 14.)In January of
1996, Plaintiff was hired by SBS as an at-will
employee to serve as an Account Executive, where
his duties included building and maintaining
relationships with advertising clients for SBS's two
New York radio stations.(*Id.* ¶ 16.)Plaintiff allegedly
performed well as an Account Executive, and by
January 2003 Plaintiff was responsible for accounts
worth approximately $1.1 million. (*Id.* ¶ 17.)

Plaintiff alleges that, despite his strong performance,
SBS "determined that it wanted to use younger and
more 'Anglo' sales persons to directly interface with
the more important accounts."(*Id.* ¶ 21.)Allegedly as
a result of this decision, beginning in 2003 SBS
changed its policies such that individual account
executives were permitted to sell to only one New
York radio station, as opposed to both New York
stations under the previous policy. (*Id.* ¶ 22.)In
implementing this policy change, SBS promised that
all account executives would receive equal treatment
and, in particular, that Plaintiff would be provided
with additional accounts in compensation for any
accounts that he lost during the transition process.
(*Id.*) However, despite SBS's promises, Plaintiff was
not provided with accounts of similar value to those
he lost, and ultimately Plaintiff received replacement
accounts valued at only approximately $350,000. (*Id.*
¶ 23.)Because Plaintiff's compensation was based in
large part on commissions tied to the value of his
accounts, his annual compensation declined by
approximately $45,000 as a result of the policy
change. (*Id.* ¶ 26.)

On July 18, 2003, SBS fired Plaintiff and allegedly
replaced him with a younger, American-born, non-
Hispanic employee, who was less qualified than
Plaintiff. (*Id.* ¶ 28.)At the time of Plaintiff's
termination, SBS allegedly owed Plaintiff
approximately $50,000 in commissions for the
advertising that he had already sold to his clients. (*Id.*
¶ 30.)SBS has allegedly refused to pay this amount.
(*Id.* ¶ 31.)As a result of SBS's actions, Plaintiff seeks
compensatory and punitive damages.

*II. Discussion*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

*A. Standard of Review*

**\*2** SBS claims that general causes of action fail to state a claim. *See* Fed.R.Civ.P. 12(b)(6). The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Bell Atlantic, id.* at 1964-69, the Supreme Court also abandoned reliance on the oft-cited line from *Conley v. Gibson* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]" 355 U.S. 41, 45-46 (1957). As the Court explained, a literal application of *Conley's* "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Bell Atl.,* 127 S.Ct. at 1968 (alteration in original). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level ... [,]" *id.* at 1965, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint [,]" *id.* at 1969. A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. If it "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.; see also* Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.").

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint via reference. *See* Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir.1996) (citation omitted). The Court will accept as true Plaintiff's allegations, and draw all reasonable inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys,* 371 F.Supp.2d 469, 470-71 (S.D.N.Y.2005). At this stage, the Court is not concerned with weighing the evidence which would be presented at trial. *See Chosun Int'l Inc. v. Chrisha Creations, Ltd.,* 413 F.3d 324, 327 (2d Cir.2005).

*B. Plaintiff's Ninth Cause of Action*

*1. Tortious Breach of Contract*

**\*3** In his ninth cause of action, Plaintiff seeks to recover compensatory and punitive damages for what the First Amended Complaint labels "Tortious Breach of Contract." (Am.Compl.¶¶ 95-103.) Specifically, Plaintiff alleges that SBS terminated Plaintiff's employment for "improper motives" and that "the breach of contract was so intended and planned ... as to cease to be a mere breach of contract and become, in association with the attendant circumstances, a tortuous [sic] and wrongful act or omission."(*Id.* ¶ 100.)In short, the First Amended Complaint alleges that SBS's breach of contract was so malicious as to constitute a tort.

Under New York law, absent a breach of a legal duty independent of the contract itself, a plaintiff has no cause of action in tort for a breach of contract. *See Orlando v. Novurania of Am., Inc.,* 162 F.Supp.2d 220, 224 (S.D.N.Y.2001) ("[A] breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 516 N.E.2d 190, 193 (N.Y.1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."). Moreover, allegations of improper motives alone will not convert a simple breach of contract into a tortious act. *See Merrin Jewelry Co. v. St. Paul Fire & Marine Ins. Co.,* 301 F.Supp. 479, 481 (S.D.N.Y.1969) ( "[A] claim in tort does not lie on allegations of conspiracy of a party to a contract to break it, and his consequent failure to carry out the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

Page 3

contract, in pursuance of the conspiracy, without more."); _Burlew v. Am. Mut. Ins. Co.,_ 471 N.Y.S.2d 908, 912 (App.Div.1984) ("The allegations in the complaint of malice, wantonness and grossly negligent conduct and the conclusory claims in the affidavit, which are obviously made to buttress the suit for punitive damages, cannot convert the action from one in contract to one in tort."(citation omitted)).

Plaintiff does not dispute that a cause of action in tort may not be sustained unless a defendant has violated an independent legal duty. (Pl.'s Mem. of Law in Opp'n to the Def.'s Mot. to Dismiss 8 ("Pl.'s Mem.").) However, Plaintiff argues that SBS in fact violated such an independent duty when it engaged in discriminatory employment practices in contravention of federal, state, and city law. (_Id._ at 8-9 (identifying the independent legal duty as the "federal, state, and city constitutional protections, laws, rules and regulations barring the invidious discriminatory practices which the defendant allegedly engaged in").) This argument, however, reads New York tort law too broadly. To sustain an independent action in tort, Plaintiff must establish not merely that SBS violated _some_ independent legal duty; rather, Plaintiff must establish that SBS violated a duty owed to Plaintiff _in tort._ _See N.Y. Univ. v. Continental Ins. Co.,_ 662 N.E.2d 763, 770 (N.Y.1995) (noting that the "tort" cause of action was "duplicative of the first cause of action for breach of contract" because "the use of familiar tort language in the pleading does not change the cause of action to a tort claim in the absence of an underlying _tort duty...._" (emphasis added)). Thus, a "defendant may be liable in tort when it has breached _a duty of reasonable care_ distinct from its contractual obligations, or when it has engaged in _tortious conduct_ separate and apart from its failure to fulfill its contractual obligations." _Id._ at 767 (emphases added).

*4 Here, the alleged violations of federal, state, and city anti-discrimination laws are not torts under New York law. _See Rivera v. Heyman,_ 157 F.3d 101, 105 (2d Cir.1998) (noting that "discrimination claims under the [New York] Human Rights Laws" are not tort claims); _Treanor v. Metro. Transp. Auth.,_ 414 F.Supp.2d 297, 303 (S.D.N.Y.2005) ("New York cases reason [ ] that a discrimination claim is not a tort because it is 'a new statutory cause of action

which was not cognizable at common law.' " (quoting _Picciano v. Nassau Co. Civil Serv. Comm'n,_ 736 N.Y.S.2d 55, 60 (App.Div.2001))); _Bauman v. Garfinkle,_ 652 N.Y.S.2d 32, 33 (App.Div.1997) ("The Federal court claims for breach of contract and discrimination are not in tort."); _Lane-Weber v. Plainedge Union Free Sch. Dist.,_ 624 N.Y.S.2d 185, 186 (App.Div.1995) ("[A]n action brought pursuant to [New York's employment discrimination statute] is not a tort claim."). Therefore, Plaintiff's reliance on SBS's alleged violation of federal, state, and city anti-discrimination laws cannot constitute the "independent legal duty" necessary to sustain his cause of action for tortious breach of contract.

Moreover, Defendant's alleged breach of contract implicates no other independent tort duty. In determining whether a cause of action in tort may be sustained, courts applying New York law look, _inter alia,_ to the type of injury allegedly caused by a defendant's actions and to the type of damages sought. _See, e.g., Sommer v. Fed. Signal Corp.,_ 593 N.E.2d 1365, 1369 (N.Y.1992) ( "In disentangling tort and contract claims, we have also considered the nature of the injury, the manner in which the injury occurred and the resulting harm."(citation omitted)); _Bellevue S. Assocs. v. HRH Constr. Corp.,_ 579 N.E.2d 195, 200 (N.Y.1991) (considering the injury and the damages sought in determining whether a claim is actionable in tort). Where, as here, "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory."[FN1] _Sommer,_ 593 N.E.2d at 1369 (citations omitted); _see also Bellevue,_ 579 N.E.2d at 200 (finding no cause of action in tort where the "injury ... was not personal injury or property damage" but "simply a case of economic disappointment"). Moreover, the New York Court of Appeals has unequivocally held that there is no independent cause of action in tort for wrongful discharge of an employee. _See Murphy v. Am. Home Prods. Corp.,_ 448 N.E.2d 86, 87 (N.Y.1983) ("This court has not and does not now recognize a cause of action in tort for abusive or wrongful discharge of an employee; such recognition must await action of the Legislature.").

> FN1. With this cause of action, Plaintiff admittedly seeks no compensation for personal injury or property damage, but instead claims to have suffered contract-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

related "economic damages ... including ... back pay, back benefits, future earnings and future benefits."(Am.Compl.¶ 102.)

Accordingly, because Plaintiff is unable to identify any legal duty in tort that SBS violated when it discharged Plaintiff and because, absent such a violation, "[t]here is no such thing as a tortious breach of contract under New York law,"*Onanuga v. Pfizer, Inc.,* No. 03 Civ. 5405, 2003 WL 22670842, at *3 (S.D.N.Y. Nov. 7, 2003), the Court will dismiss Plaintiff's ninth cause of action for failure to state a claim upon which relief can be granted.

*2. Plaintiff's Request to Amend*

**\*5** As an alternative, Plaintiff seeks leave to amend his sixth cause of action, for ordinary breach of contract, to include a claim for punitive damages. (Pl.'s Mem. 11-12.) Under New York law, to obtain punitive damages in an action for breach of contract: "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature ...; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally."*N.Y. Univ.,* 662 N.E.2d at 767 (citations omitted); *accord Carvel Corp. v. Noonan,* 350 F.3d 6, 24 (2d Cir.2003). As noted, Plaintiff has not pled facts sufficient to establish that SBS's conduct with respect to the alleged breach of contract was "actionable as an independent tort," and thus Plaintiff fails to meet even the first prong of this test. Plaintiff also has failed to allege that SBS's conduct was directed at the public generally (and has not suggested in his brief that he could make such an allegation), and therefore his punitive damages amendment fails on this ground as well. Furthermore, although Plaintiff declares in his opposition brief that SBS's alleged discriminatory actions were "tortuous [sic] in nature," he does not identify any additional facts that might be included in a second amended complaint that would support this position. Accordingly, as Plaintiff has provided no reason to suggest that his proposed amendment would withstand a renewed motion to dismiss, the Court finds it unnecessary to further delay this litigation with an additional amended complaint. *See Hall v. United Techs., Corp.,* 872 F.Supp. 1094, 1100 (D.Conn.1995) ("The decision whether to grant leave to amend is within the court's sound discretion ....").

*C. Plaintiff's Tenth Cause of Action*

*1. Promissory Estoppel*

Plaintiff's tenth cause of action is based in promissory estoppel. Plaintiff alleges that SBS promised to pay Plaintiff commissions and benefits and to reassign and reallocate advertising accounts to Plaintiff. (Am.Compl.¶¶ 106-07.) Plaintiff further claims that he "reasonably relied upon [these promises], by staying" at his employment with SBS (Pl.'s Mem. 16), and that consequently he "suffered substantial economic damages" when SBS reneged on these promises and terminated Plaintiff "based upon a discriminatory basis." (Am.Compl.¶¶ 106-11.) As a result, Plaintiff seeks both compensatory and punitive damages.

" 'A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance.' " *Fontana v. Potter,* No. 01 Civ. 7002, 2005 WL 2039194, at *6 (E.D.N.Y. Aug. 24, 2005) (quoting *Kaye v. Grossman,* 202 F.3d 611, 615 (2d Cir.2000)); *accord Rogers v. Town of Islip,* 646 N.Y.S.2d 158, 158 (App.Div.1996). However, several courts within the Second Circuit have held that "New York does not recognize promissory estoppel as a valid cause of action in the employment context." *Fontana,* 2005 WL 2039194, at *7 (quotations omitted); *see also Weinberg v. Mizuho Capital Mkts. Corp.,* No. 03 Civ. 2612, 2003 WL 22462022, at *7 (S.D.N.Y. Oct. 30, 2003) ("New York does not recognize promissory estoppel as a valid cause of action when raised in the employment context." (quotations omitted)); *Deutsch v. Kroll Assoc.,* No. 02 Civ. 2892, 2003 WL 22203740, at *3 (S.D.N.Y. Sept. 23, 2003) ("New York law, which here governs, does not recognize promissory estoppel in the employment context."); *Miller v. Citicorp,* No. 95 Civ. 9728, 1997 WL 96569, at *10 (S.D.N.Y. Mar. 4, 1997) ("New York does not recognize promissory estoppel as a valid cause of action in the employment context.").

**\*6** While this Court is aware of no New York State case that has similarly adopted a categorical rejection of promissory estoppel in the employment context, several New York courts have held that changing, or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

Page 5

failing to change, one's employment is insufficient to establish the injury requisite to a promissory estoppel claim, "unless the plaintiff's rights under the previous situation, or missed opportunity, were so valuable that injury of unconscionable proportions would flow from the failure to enforce the oral contract ."*Cunnison v. Richardson Greenshields Sec.,* 485 N.Y.S.2d 272, 276 (App.Div.1985) ("[I]t has been consistently held that a change of job or residence, by itself, is insufficient to trigger invocation of the promissory estoppel doctrine."); *see also Stillman v. Townsend,* No. 05 Civ. 6612, 2006 WL 2067035, at *5 (S.D.N.Y. July 26, 2006) ("It is well-settled that change of job or residence, by itself, is insufficient to trigger invocation of the promissory estoppel doctrine."(quotations omitted)); *Dalton v. Union Bank of Switz.,* 520 N.Y.S.2d 764, 766 (App.Div.1987) ("[A] change of job, even with increased emoluments and advanced status, is not sufficient to call promissory estoppel into play."(quotations omitted)); *Swerdloff v. Mobil Oil Corp.,* 427 N.Y.S.2d 266, 270 (App.Div.1980) ("A change of job or residence (and, a fortiori, the failure to make such change), by itself, is not sufficient to call promissory estoppel into play ...."). Such a rule is consistent with New York's restrictive approach to promissory estoppel, which reserves the doctrine only "for a limited class of cases based on unusual circumstances."*Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.,* 452 N.Y.S.2d 590, 593 (App.Div.1982); *accord Miller,* 1997 WL 96569, at *10 (citing *Tribune Printing* ).

Here, the only injury that Plaintiff claims to have suffered as a result of his reliance on SBS's alleged promises was his failure to "leave the employer and seek a better deal elsewhere."(*See* Pl.'s Mem. 16.) But as discussed above, even assuming, contrary to the clear weight of the authority in this district, that promissory estoppel is applicable in the employment context, Plaintiff's failure to change his employment is insufficient to trigger promissory estoppel under New York law without a further claim that the missed opportunity caused injury of "unconscionable proportions ." Plaintiff makes no such claim here, and therefore, without more, Plaintiff cannot survive SBS's motion to dismiss his promissory estoppel claim.

Perhaps recognizing this, Plaintiff points the Court to cases that he interprets as using "a classic promissory

estoppel analysis to describe how a plaintiff might sustain a claim for severance in the absence of a written promise."(Pl.'s Mem. 13.) The earliest of these cases is *Smith v. N.Y. State Elec. & Gas Corp.,* 548 N.Y .S.2d 117 (App.Div.1989). In *Smith,* the Third Department held that, to survive summary judgment on a claim for severance payments, "plaintiff was required to come forward with evidence of (1) a regular practice by defendant to make severance payments, and (2) his reliance on that practice in accepting or continuing his employment."*Id.* at 118 (citations omitted). The *Smith* analysis was again applied to claims for severance payments in *Deutsch,* 2003 WL 22203740, at *3-4, and in *Hirschfeld v. Institutional Investor, Inc.,* 617 N.Y.S.2d 11, 12 (App.Div.1994). In Plaintiff's view, *"Smith, Hirschfeld,* and *Deutsch* stand for the proposition that, while an employer may terminate [an employee] 'at will,' an employer may not deny the employee the wages and other benefits to which he was entitled for the term of his employment, and the existence and amount of those benefits may be determined, where necessary, by reference to the doctrine of promissory estoppel."(Pl.'s Mem. 14.)

*7 Contrary to Plaintiff's claims, however, *Smith* and its progeny are not promissory estoppel cases. Although the test set forth in *Smith* lists "reliance" as one of its two factors, it differs from the well-established three-prong promissory estoppel test used in New York, as it requires neither a clear and unambiguous promise nor an injury stemming from reliance on that promise. *See Kaye,* 202 F.3d at 615 (listing the "three elements" of a promissory estoppel claim under New York law). This distinction is perhaps clearest in the cases that address both promissory estoppel claims and other claims under *Smith.*For example, in *Deutsch* and *Graff v. Enodis Corp.,* No. 02 Civ. 5922, 2003 WL 1702026 (S.D.N.Y. Mar. 28, 2003), the courts treated as separate the plaintiffs' promissory estoppel claims and their claims based on *Smith,* rejecting the plaintiffs' *Smith* claims only after independently rejecting distinct promissory estoppel claims as inapplicable in the employment context. *See Deutsch,* 2003 WL 22203740, at *3-4;*Graff,* 2003 WL 1702026, at *2-3. Moreover, in *Smith* itself, the court characterized the test that it set forth as one for breach of contract, not promissory estoppel. 548 N.Y.S.2d at 118 ("[T]he contract which plaintiff claims defendant breached was not supported by

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

consideration and is, accordingly, unenforceable as a matter of law."(citations omitted)); *see also Hirschfeld,* 617 N.Y.S.2d at 12 (summarily applying *Smith* analysis). In fact, the Court is aware of no case that applies the *Smith* analysis to a promissory estoppel claim, rather than to a claim for breach of contract. Accordingly, Plaintiff's reliance on *Smith* to establish that promissory estoppel is applicable in the employment context fails.

Instead of an alternative analysis by which to assess promissory estoppel claims, New York courts apply the test set forth in *Smith* only to employees' claims for severance payments and only when such claims are based upon a regular practice by their employers to issue such payments. *See, e.g., Deutsch,* 2003 WL 22203740, at *3-4 (applying *Smith* test to "Deutsch's severance claims" based on "breach of an oral contract"); *Graff,* 2003 WL 1702026, at *3 (applying *Smith* to plaintiff's "claim for severance pay"); *Hirschfeld,* 617 N.Y.S.2d at 12 (applying test to "plaintiff's claim for severance benefits"). Thus, even if the Amended Complaint were to satisfy the *Smith* test, Plaintiff would be eligible only to receive severance payments, not the "back pay, back benefits, future earnings and future benefits" (Am.Compl.¶ 111) that he seeks with his tenth cause of action. Furthermore, because Plaintiff has not pled "a regular practice by [SBS] to make severance payments,"*Smith,* 548 N.Y.S.2d at 118, his claim fails even under *Smith.*Accordingly, Plaintiff's tenth cause of action fails to state a claim upon which relief can be granted.

### 2. Plaintiff's Request to Amend

**\*8** As with his ninth cause of action, Plaintiff again seeks leave to amend his Complaint in the event the Court dismisses Count Ten. (Pl.'s Mem. 17-18.) But, here too, Plaintiff has provided no reason to believe that an amendment would cure the defects found in this count. Plaintiff's promissory estoppel claim fails because he does not plead an injury that is cognizable under New York's limited promissory estoppel doctrine. A curative amendment would therefore need to plead an "injury of unconscionable proportions." *Cunnison,* 485 N.Y.S.2d at 276. Plaintiff's proposed amendment-that he "relied on the defendant's statements and ... 'reasonably expected' that the accounts would be properly reallocated" (Pl.'s Mem. 18)-does not plead an unconscionable

injury and therefore does not save this cause of action. Accordingly, Plaintiff's request to amend his tenth cause of action is denied.

### D. Plaintiff's Thirteenth Cause of Action

With his thirteenth cause of action, Plaintiff alleges that SBS breached its implied duty of good faith and fair dealing under the employment contract when it failed to pay him commissions for the sales that he executed prior to his termination, and when it unfairly reallocated his accounts. (Am.Compl.¶ 128.) "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."*511 W. 232nd Owners Corp v. Jennifer Realty Co.,* 773 N.E.2d 496, 500 (N.Y.2002) (citations omitted). This covenant is breached "when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."*O'Neill v. Warburg, Pincus & Co.,* 833 N .Y.S.2d 461, 463 (App.Div.2007) (internal quotations and citations omitted); *accord Jaffe v. Paramount Commc'ns Inc.,* 644 N.Y.S.2d 43, 47 (App.Div.1996). To prevail on such a claim, a plaintiff must establish that the defendant violated an implied term *"apart from the terms of the contract"* itself.*Brooks v. Key Trust Co. Nat'l Assoc.,* 809 N.Y.S.2d 270, 272 (App.Div.2006) (internal quotations omitted). If the alleged violation cannot be distinguished from the explicit contractual obligations, then the claim is "properly dismissed as duplicative" of the underlying contract claim. *Id.*

Addressing the implied covenant of good faith and fair dealing, the New York Court of Appeals has held repeatedly that " '[n]o obligation can be implied ... which would be inconsistent with other terms of the contractual relationship.' " *Horn v. N.Y. Times,* 790 N.E.2d 753, 756 (N.Y.2003) (quoting *Murphy v. Am. Home Prods. Corp.,* 448 N.E.2d 86, 91 (N.Y.1983)). Accordingly, a "defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract[ ] ...." *DCMR v. Trident Precision Mfg.,* 317 F.Supp.2d 220, 226 (W.D.N.Y.2004) (internal quotations omitted). In the context of an at-will employment contract, this means that "it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination." *Murphy,* 448 N.E.2d at 91.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                      Page 7
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

**\*9** Consistent with this policy, the New York Court of Appeals has regularly declined to alter at-will employment relationships through the imposition of implied contractual terms. *See Horn,* 790 N.E.2d at 759 ("The only exceptions to the employment-at-will rule ever adopted by this Court have involved very specific substitutes for a written employment contract .... We have consistently declined to ... recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into employment contracts ....").*But see Wieder v. Skala,* 609 N.E.2d 105, 109 (N.Y.1992) (applying covenant of good faith and fair dealing in the limited circumstances where the "unique characteristics of the legal profession ... make the relationship of an associate to a law firm employer intrinsically different from that of ... financial managers to ... corporate employers ...."). For example, the Court of Appeals has rejected claims of implied contractual terms where a plaintiff was discharged for "refus[ing] to participate in certain illegal activities,"*Sabetay v. Sterling Drug, Inc.,* 506 N.E.2d 919, 920 (N.Y.1987), where a plaintiff was discharged as the result of age discrimination, *see Murphy,* 448 N.E.2d at 87, and where a plaintiff was discharged so that defendant corporation could avoid paying a higher stock buy-back price for shares of its securities, *see Gallagher v. Lambert,* 549 N.E.2d 136, 136 (N.Y.1989).

*Gallagher* is particularly relevant here. In *Gallagher,* the plaintiff alleged that "defendants fired him for the sole purpose of recapturing his shares at an unfairly low price and redistributing them among themselves."549 N.E.2d at 140 (Kaye, J., dissenting). The plaintiff did not seek compensation for his improper termination; rather, he sought "the higher repurchase price" that he would have been entitled to under his employment contract had he been fired on January 31, 1985, instead of on January 10, 1985. *Id.* at 136.The trial court denied summary judgment on the grounds that "factual issues were raised relating to defendants' motive in firing plaintiff."*Id.* at 137.The Court of Appeals, however, refused to consider defendants' motive for the firing. Noting that the plaintiff was "at all times an employee at will,"*id.* at 136, the Court of Appeals rejected plaintiff's claim, reasoning that any other holding would "frustrate" the employer's "unfettered discretion to fire plaintiff at any time."*Id.* at 138.

Thus, there is a clear line of cases in New York upholding a strict reading of an employer's right to terminate an at-will employee, even for allegedly "improper" motives. In the Southern District, however, this line of precedent is complicated by the Second Circuit's twenty-two-year-old holding in *Wakefield v. N. Telecom, Inc.,* 769 F.2d 109 (2d Cir.1985). In *Wakefield,* which preceded the New York Court of Appeals' decision in *Gallagher,* the plaintiff salesman claimed that the defendant breached the implied covenant of good faith in the employment contract when the defendant discharged him "in order to avoid paying him commissions on sales that were completed but for formalities."*Id.* at 112.The *Wakefield* court, applying New York law as it stood in 1985, held that plaintiff would prevail on his implied contract claim if he could prove that defendant's "desire to avoid paying him commissions that were virtually certain to become vested was a substantial motivating factor in the decision to discharge him."*Id.* at 114.However, if "the discharge was otherwise motivated, he [would] not recover on the good faith theory."*Id.* The court reached this conclusion despite a provision in the employment contract explicitly stating that no incentive compensation would be paid unless plaintiff were employed "on the date the incentive compensation is to be paid pursuant to the [contract]."*Id.* at 111.

**\*10** Because *Wakefield* preceded *Gallagher,* it is unclear whether *Wakefield* remains good law. A few courts in this District have tried to reconcile the two decisions, reaching varying conclusions. *Compare Plantier v. Cordiant plc,* No. 97 Civ. 8696, 1998 WL 661474, at \*3 (S.D.N.Y. Sept. 24, 1998) (distinguishing *Wakefield* from *Gallagher), and Knudsen v. Quebecor Printing (U.S.A.) Inc.,* 792 F.Supp. 234, 239 (S.D.N.Y.1992) (distinguishing *Wakefield* from *Gallagher,* and holding that *Wakefield* is still good law), *with Butler v. Cadbury Beverages, Inc.,* No. 3:97-CV-2241, 1999 WL 464527, at \*4 n. 2 (D. Conn. June 30, 1999) ("[N]ot[ing] that the validity of *Wakefield...* has been called into question."), *and Collins & Aikman Floor Coverings Corp. v. Froehlich,* 736 F.Supp. 480, 486 (S.D.N.Y.1990) (reading *Gallagher* to mean that "[r]eliance upon *Wakefield* turned out to be in error under New York law").

In distinguishing *Wakefield* from *Gallagher,* the *Plantier* and *Knudsen* courts found that when the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

plaintiff in *Gallagher* was terminated, he had not yet earned the higher stock price that he sought; whereas, according to their reading, the plaintiff in *Wakefield* had already earned his sales commission by the time that he was dismissed from his employment. *See Plantier,* 1998 WL 661474, at *3;*Knudsen,* 792 F.Supp. at 239. In the view of this Court, however, this distinction fails to take into account a key fact in *Wakefield:* namely, that at the time of his termination, the plaintiff in *Wakefield* was not yet contractually entitled to his sales commission. Instead, pursuant to an express provision in his employment contract, his commissions did not vest until the date that they were scheduled to be paid: "In order to receive incentive compensation under this Plan, the participant must be a[n] ... employee on the date the incentive compensation is to be paid pursuant to the Plan."*Wakefield,* 769 F.2d at 111. Faced with this contract provision, the *Wakefield* court permitted recovery not because the plaintiff had already earned his commissions, but because defendant's *motives* in firing plaintiff were improper. *Id.* at 113.The *Wakefield* court's focus on the employer's motives is confirmed by its explicit holding that the plaintiff would not be permitted to recover under the covenant of good faith and fair dealing if a jury determined that he was fired for an innocuous reason-or, indeed, even for a "mistaken or arbitrary" reason-rather than in an attempt to avoid payment of the sales commissions. *Id.* Yet, it is precisely the consideration of the employer's motives that later was rejected by the New York Court of Appeals in *Gallagher.See Gallagher,* 549 N.E.2d at 137 (reversing district court's holding that summary judgment was inappropriate because "factual issues were raised relating to defendants' motive in firing plaintiff"). Given these seemingly incompatible holdings, it may be that "[r]eliance upon *Wakefield* turned out to be in error under New York law."*Collins & Aikman,* 736 F.Supp. at 486.

**\*11** This does not end the inquiry, however. For even if *Wakefield* does not survive the Court of Appeals' decision in *Gallagher,* the present case differs from *Gallagher* with respect to a key issue. Like *Wakefield, Gallagher* involved an express contractual provision which limited the employee's ability to receive certain compensation in the event of his termination. Here, however, no such provision governs the employment contract. This difference is clearly material, as under New York law, an implied contractual term cannot conflict with an express term.

*See Horn,* 790 N.E.2d at 756 ("No obligation can be implied ... which would be inconsistent with other terms of the contractual relationship."). Indeed, in *Gallagher,* the court focused on the express provision in the contract, reasoning that a rule that strictly applied express contractual terms better enabled the parties to define their rights through contract. *See*549 N.E .2d at 138 ("[Ignoring an express term] would frustrate the agreement and would be disruptive of the settled principles governing like agreements where parties contract between themselves in advance so that there may be reliance, predictability and definitiveness between themselves on such matters."). Here, because Plaintiff's employment contract contains no provision conditioning his ability to collect commissions on his employment status at a certain date, his claim will not be dismissed on this ground.

Moreover, Defendant gains no cover from the fact that Plaintiff was an "at-will" employee. This is not a claim for wrongful termination; rather, Plaintiff claims that SBS implicitly violated the employment contract when it failed to pay him commissions for the sales that he executed before termination by SBS. The implied term sought by Plaintiff-that his commissions vested at the point that he made the relevant sales-is entirely compatible with at-will employment, just as a salaried at-will employee who is fired before being paid may be compensated for the work done since his last paycheck. *See Sipkin v. MLB Advance Media,* 808 N.Y.S.2d 920, 920 (App.Div.2005) (per curiam) (finding that at-will employee was entitled to "earned" compensation, even though he had been terminated prior to receiving payment). Moreover, because Plaintiff's compensation largely consisted of these incentive-based commissions, failure to honor the implied term sought by Plaintiff would "deprive [Plaintiff] of the right to receive the benefits under the[ ] [employment] agreement."*O'Neill,* 833 N.Y.S.2d at 463 (quotations omitted). Accordingly, the Court will not dismiss Plaintiff's claim for commissions based on the implied covenant of good faith and fair dealing.

However, the second part of Plaintiff's good faith and fair dealing claim, which is premised on SBS's reallocation of Plaintiff's accounts, fails to state a claim upon which relief can be granted. Unlike Plaintiff's claim for commissions earned, on this

Slip Copy                                                                                              Page 9
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)
**2007 WL 2780390 (S.D.N.Y.)**

issue, Plaintiff's at-will employment status is a bar to recovery. Under the employment contract, SBS had the authority to terminate Plaintiff's employment at any time and for any reason. Possessed of this greater power to terminate the contract, SBS also had the authority to reallocate Plaintiff's accounts. *See Danzig v. Dikman,* 434 N.Y.S.2d 217, 219 (App.Div.1980) ("The power to modify [a contract] is implicit from the power to terminate, in that the effect of a modification is the production of a new contract."). As such, an implied term prohibiting SBS from reallocating Plaintiff's accounts would be "inconsistent with other terms of the contractual relationship,"*Horn,* 790 N.E.2d at 756, namely, the at-will employment provision. Moreover, even absent Plaintiff's at-will employment status, Plaintiff has failed to establish that reallocation of his accounts "would deprive [him] of the right to receive the benefits under [the employment] agreement."*O'Neill,* 833 N.Y.S.2d at 463. Assuming that Plaintiff was fully compensated for the advertising revenue that he generated-or, to the extent that he was not, he seeks redress elsewhere in his Complaint-SBS's alleged reallocation of Plaintiff's accounts does not "prevent performance of the contract or to withhold its benefits [Plaintiff's compensation] from the plaintiff."*Aventine Inv. Mgmt., Inc. v. Can. Imperial Bank of Commerce,* 697 N.Y.S.2d 128, 130 (App.Div.1999). The Court therefore will not imply a contract term prohibiting the reallocation of Plaintiff's accounts and SBS's Motion to Dismiss this aspect of Plaintiff's thirteenth cause of action is granted. [FN2]

> FN2. Plaintiff also alleges that the reallocation of his accounts was "carried out in contravention of the agreements and understandings reached with plaintiff and in contravention of the representations made by the defendant."(Am.Compl.¶ 79.) To the extent that Plaintiff claims that the account reallocation violated such express agreements, he has preserved that claim in his breach of contract cause of action, which is not challenged in this Motion to Dismiss.

### III. Conclusion

**\*12** For the reasons stated herein, SBS's Motion to Dismiss Plaintiff's ninth and tenth causes of action is granted. SBS's Motion to Dismiss Plaintiff's

thirteenth cause of action is granted with respect to the reallocation of Plaintiff's accounts and denied with respect to Plaintiff's claim for commissions. The Clerk of the Court is directed to terminate the Motion (Docket Nos. 8, 17).

SO ORDERED.

S.D.N.Y.,2007.
Baguer v. Spanish Broadcasting System, Inc.
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT L

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

**C**Daredia v. Gold & Diamond Merchants Group,
Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
  United States District Court, N.D. Illinois, Eastern
Division.
Shabbudin ("Sam") DAREDIA, Individually and as
Representative for Carats and Karats, Inc.; Gheilam
("George") Meghani, Individually and as
Representative for General Management Group; Mr.
& Mrs. Syed Aly, Individually and as Representative
for Elegance Jewelry, Arlan Jirani, Individually and
as Representative for J.C. Sons Jewelers, and Nooraii
Jirani, Individually and as Representative for Karat
Gold, Plaintiffs,
v.
GOLD & DIAMOND MERCHANTS GROUP, INC.
and Avondale Federal Savings Bank, Defendants.
**No. 97 C 8149.**

Sept. 30, 1999.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, J.
**\*1** Plaintiffs Shabbudin Daredia ("Daredia"),
individually and as representative for Carats and
Karats, Inc. ("Carats & Karats"), Gheilam Meghani
("Meghani"), individually and as representative for
General Management Group ("GMG"), and Mr. and
Mrs. Syed Aly, individually and as representative for
Elegance Jewelry ("Elegance Jewelry") (collectively,
"Plaintiffs"), have brought this action against
Defendants Gold and Diamond Merchants Group,
Inc. ("Gold and Diamond") and Avondale Federal
Savings Bank ("Avondale"),[FN1] alleging numerous
claims, all which essentially revolve around the
parties' contract dispute. The contracts involved in
this case were part of a credit card loan program run
by Avondale and entered into by various jewelry
merchants, including Plaintiffs. Plaintiffs allege, *inter
alia*, that Avondale breached the contracts with them
by wrongfully charging back transactions to
Plaintiffs' accounts.

> FN1. Since this case has been filed, the
> following parties have been voluntarily
> dismissed from the action: Plaintiffs Arlan

Jirani, J.C. Sons Jewelers, Noorali Jirani and
Karat Gold and Defendant Gold and
Diamond.

In addition, Avondale has filed (1) a Counterclaim
against Plaintiffs seeking, *inter alia*, "chargeback"
amounts for alleged violations of the contracts, and
(2) a Third-Party Complaint against Shirazuddin
Jiwani ("Jiwani") (Count I) and Ashraf Riayyani [FN2]
(Count II), based on each of their personal guarantees
of two of the contracts with Avondale.

> FN2. This claim seeks judgment against
> Ashraf Raiyyani, the president of Hamida,
> Inc. based on her guaranty of the Hamida,
> Inc. indebtedness. Avondale explains that
> this claims was brought as a third-party
> claim because Avondale was unaware that
> the plaintiff identified as "Mrs. Syed Aly"
> was in fact Ashraf Riayyani ("Riayyani").
> (*See* Avondale Mem. at 18, n. 25.)

Avondale now moves for summary judgment on (1)
all causes of action in Plaintiffs' Complaint, (2)
Counts I, II, V, VIII and IX of Avondale's
Counterclaim,[FN3] and (3) Count II of Avondale's
Third-Party Complaint. For the reasons set forth
below, the Court grants in part and denies in part
Avondale's summary judgment motion on Plaintiffs'
Complaint and denies Avondale's motion for its
summary judgment on Counts I, II, V, VIII and IX of
its Counterclaim and Count II of its Third-Party
Complaint.

> FN3. Avondale says that it will not pursue
> Counts III, IV, VI, VII and X of the
> Counterclaim in the event that summary
> judgment is entered in its favor on the
> counts which are the subject of this motion.
> The remaining portions of the Counterclaim-
> Counts XI, XII, XIII, XIV and XV-
> constitute claims asserted against the
> plaintiffs who have not answered the
> Counterclaim and who have since
> voluntarily dismissed their claims against
> Avondale. Avondale says that it will later
> move for a default judgment against those
> parties. (*See* Avondale Mem. at 18, n. 25.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

### BACKGROUND[FN4]

FN4. Plaintiffs argue that the affidavit of Tina Perez ("Perez"), which Avondale relies on in support of a number of its material facts, should be stricken as improper. (*See* Pls. Resp. at 2-6.) Specifically, Plaintiffs argues that Perez does not have personal knowledge to testify as to some of her statements and that her deposition testimony contradicts other statements. Rule 56(e) of the Federal Rules of Civil Procedure requires that any affidavit submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."Perez testifies that she is the vice-president of Avondale, that she has been part of the Credit Card Program department since its inception and that she has personal knowledge of the facts set forth in the affidavit. Thus, this Court finds her competent to testify to matters concerning the operation of the Credit Card Program. In addition, the Court has reviewed Perez's affidavit and has not found any relevant portion of the affidavit to be in violation of Rule 56(e).

Unless otherwise noted, the following facts are undisputed. Daredia is the president and one of two shareholders of Carats & Karats. Meghani is the president and one of two shareholders of GMG. Riayyani is the president and a shareholder of Hamida, Inc., of which Elegance Jewelry is the trade name. The Individual Plaintiffs are residents of Texas, and the Corporate Plaintiffs- Carats & Karats, GMG, and Elegance Jewelry-are Texas corporations with their principal places of business in Texas. Avondale is a federal savings bank with its principal place of business in Chicago, Illinois.

In June 1996, through the execution of standard form "Merchant Agreements," Avondale began entering into contracts with various jewelry merchants in connection with a Private Label Credit Card Program ("Credit Card Program" or the "Program") started in conjunction with Gold and Diamond, a jewelry

wholesaler having contractual relationships with small jewelry merchants. Under the Credit Card Program, Avondale was to act as a merchant processing bank for credit card transactions initiated by customers of jewelry merchants at the merchants' place of business. These customers would complete an application and provide two forms of identification, and the jewelry merchant would transmit the information to Avondale through a credit card computer terminal. Avondale then would conduct a credit check on each applicant, and within a few minutes, would either approve or reject the applicant for credit. Approved applicants would receive a credit limit and could, at that point, complete the purchase; approved applicants would also receive a private label credit card on which to make subsequent purchases. Avondale would then bill the merchant's customer on a monthly basis for the amount of the purchase. Avondale received a discount percentage from the retailer at the time the charge was made and would also charge interest on the customer's charge account.

*2 Jewelry merchants participating in the Credit Card Program were required to sign a Merchant Agreement and the principals of the jewelry retailers signed a Payment and Performance Guaranty Agreement ("Guaranty Agreement"), guaranteeing the payment of sums due and owing under the Merchant Agreement. Among other things, the Merchant Agreement contained certain provisions which entitled Avondale to charge back the sale amount to the merchant where the transaction violated certain warranties set forth in the Agreement. (*See* Avondale 12(M) Exs. E, H, and L at ¶¶ 5-6.)

Carats & Karats, GMG, and Elegance Jewelry all participated in the Credit Card Program and processed jewelry purchase credit transactions through Avondale. It is undisputed that each of the Corporate Plaintiffs executed the signature page of a Merchant Agreement with Avondale in or about June 1996, but there is some disagreement as to whether they each saw and/or received a full copy of this Agreement. (*See* Pls. 12(N) ¶¶ 7-16.) In addition, Daredia, Meghani, Raiyyani each executed a Guaranty Agreement in June 1996, securing the debts of Carats & Karats, GMG and Elegance Jewelry, respectively.[FN5]

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

Page 3

FN5. Riayyani contends that at the time she signed the Guaranty Agreement on June 3, 1996, she only saw the last page; she did not ask to see or review the other pages of the document. (Avondale 12(M) ¶ 16.)

During 1996, the volume of business generated from the Credit Card Program, both in terms of jewelry merchants and the number of credit cards, greatly exceeded Avondale's original estimates. After only six months of operation, there were over 370 merchants participating in the program from all over the country. By December 1996, Avondale had suffered significant losses in the Credit Card Program as a result of unauthorized transactions and delinquencies in credit card accounts opened by jewelry merchant customers. Avondale charged back several of Plaintiffs' accounts in cases where, according to Avondale, an original loan application was not submitted, a customer disputed the account for defective merchandise, or the accounts were found to be fraudulent at the point of sale. Plaintiffs contend that Avondale was not entitled to make such chargebacks under the Agreement and specifically deny that they failed to submit any original loan applications.[FN6]

FN6. Plaintiffs have submitted evidence, by way of deposition testimony, that the merchants had mechanisms in place to mail the applications each week to Avondale, that they did, in fact, mail all original applications and that, when originally notified that certain applications had not been received, they resent the applications, in some instances more than once. (See, e.g., Pls. 12(N) at ¶¶ 47, 52; Avondale 12(M) Ex. F at 106; Ex. I at 63-65, Ex. M at 56-57.)

In February 1997, Avondale decided that various changes needed to be made to the Program. Representatives of Avondale, with Gold and Diamond, organized a meeting of jeweler merchants at a jewelry convention in Las Vegas in early February 1997. At that meeting, Avondale informed the attendees, *inter alia,* of problems that it was experiencing with the Program and that it might be increasing the percentage of sales owed to Avondale.[FN7]

FN7. Plaintiffs assert that at this Las Vegas

meeting, Avondale referred to Pakistani jewelers as "crooks," (see, e.g., Pls. 12(N) ¶ 61, Avondale 12(M), Ex. M. pp. 41-54)-an assertion Avondale disputes (see Avondale 12(N)(3) ¶ 16).

On February 5, 1997, Avondale sent notices to all jewelry merchants who were then participating in the Credit Card Program, notifying them of changes to the Merchant Agreement. These changes included changes in the discount percentages payable by merchants for credit card transactions and changes in the termination provisions. For example, instead of the 90-day notice of termination previously required, Avondale could now cancel the program at any time and for any reason, upon giving written notice to the jewelry merchant. (Avondale 12(M) ¶ 21, Ex. O.) Each of the Corporate Plaintiffs received copies of Avondale's notice. Plaintiffs all processed credit card transactions after receipt of this notice from Avondale.

*3 According to Avondale, the changes to the Credit Card Program initiated in February 1997 did not lessen the continuing losses accruing from the Programs; as a result, in May 1997, Avondale decided to terminate the Credit Card Program. The termination of the Program took place in stages, and the first notices of termination were sent to all jewelry merchants in Texas and Oklahoma. Carats & Karats, GMG, and Elegance Jewelry each received their respective notices of termination of the Credit Card Program on or about Friday, May 2, 1997, informing them that the Program was no longer in effect as of Monday, May 5, 1997. Plaintiffs complain that this termination came at an inopportune time-just six days before Mothers' Day-and that Mothers' Day Sales were hurt because merchants were unable to sell their merchandise on credit to the credit card holders in the Program.

All other jewelry merchants in the Credit Card Program were terminated during the summer of 1997, and the Program was completely shut down by the end of August 1997. Thereafter, Plaintiffs filed the present action.[FN8]

FN8. This action was originally filed in Texas state court and was later removed to the United States District Court for the Southern District of Texas on diversity

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

jurisdiction grounds. It ultimately was transferred to this Court based on the fact that the Merchant Agreements contain a mandatory forum and jurisdiction selection clause requiring that any suit arising from the contract be filed in Chicago and be governed by Illinois law.

Plaintiffs' Complaint alleges, among other things, that beginning in March 1997, Avondale began to make large and numerous chargebacks to Plaintiffs' accounts and that "when Plaintiffs began to complain and make demand for proper documentation of the forgery complaints, Avondale, without notice or warning, shut down the computer terminals ... and refused to honor any purchases by any cardholders."(Compl.¶ 13.) Plaintiffs further allege that "Plaintiffs' respective businesses have suffered a severe loss in sales" as a result of Avondale's actions (*id.* at ¶ 14), and claim that Avondale breached the terms of the Merchant Agreement in that the "chargebacks to Plaintiffs' accounts were unauthorized,"(*id.* at 4). In addition to their breach of contract claim, Plaintiffs also assert the following host of claims: conspiracy, fraud, disparate discriminatory treatment based on nationality (Pakistani), deceptive trade practices, unconscionability and misrepresentation regarding contract terms, breach of duty of good faith and fair dealing, wrongful chargeback, fraud in the transaction, negligence and gross negligence, and conversion.

Avondale's Counterclaim and Third-Party Complaint allege that several accounts from each of the Corporate Plaintiffs failed to meet the requirements under the Merchant Agreements for jewelry purchases. As a result, Avondale alleges that it was entitled to, and did, charge back Plaintiffs for such breaches. Avondale seeks to recover from the Corporate Plaintiffs the chargebacks amounts remaining on their account or to recover payment on the Individual Plaintiffs' Guarantees for the alleged amounts due and owing from their corporations.

*DISCUSSION*

I. *Standards for Summary Judgment*

Summary judgment is appropriate where the pleadings, answers to interrogatories, affidavits, and

other materials show that there exists "no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists only if there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."*Id.* at 249.When considering a motion for summary judgment, a court must view the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the non-movant. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

II. *Plaintiffs' Complaint*

A. *The Individual Plaintiffs*

*4 Before reaching the merits of Plaintiffs' claims, the Court first addresses Avondale's contention that the four Individual Plaintiffs should be dismissed from the action because there is "no discernable basis upon which the individual plaintiffs possess a claim against Avondale."(Avondale Mem. at 6.) Avondale asserts that, with the exception of the disparate treatment claim, all of the other causes of action in Plaintiffs' Complaint relate to the Merchant Agreements and to the operation of the Credit Card Program. Because the Merchant Agreements were executed by Carats & Karats, GMG and Hamida, Inc./ Elegance Jewelry-Texas Corporations-Avondale argues that the Individual Plaintiffs have no basis to seek damages.

"As a general principle, a corporate shareholder does not have an individual right of action against third persons for damages to the shareholder resulting indirectly from injury to the corporation."*Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989). There are certain exceptions to this general rule, "such as where a special contractual duty exists between the wrongdoer and shareholder or where the shareholder suffers an injury separate and distinct from that suffered by other shareholders."*Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985).

Plaintiffs offer two reasons why the Individual

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

Page 5

Plaintiffs have claims in this case: (1) because the Individuals Plaintiffs signed Guarantees of the corporate debt to Avondale, if any, and have a right to defend against Avondale's Counterclaims against them, and (2) because each Individual Plaintiff has "lost assets, goodwill, good business reputation and customers."(Pls. Resp. at 7, ¶ 22.) Neither reason is sufficient, however. First, the Complaint does not assert any cause of action based on the Guaranty Agreements, nor have any facts supporting such a cause of action been set forth by Plaintiffs in their 12(N) Statement.[FN9] Second, although Plaintiffs argue in their response brief that injuries have been alleged which "have a direct impact on the business reputation and good will built over a long period of time by the individual plaintiffs, (Pls. Resp. at 25), such damages have not been set forth in any pleading thus far. The injuries alleged here are solely to the corporations who entered into the Merchant Agreements and, as such, are the only parties authorized to vindicate their respective rights.

> FN9. In fact, one of the Individual Plaintiffs-Syed Ayed-did not even execute a Guaranty Agreement. As best the Court can determine, his sole relationship to the action is that he is the husband of Raiyyani-the owner and president of Hamida, Inc.

B. *Breach of Contract Claims*

At the heart of this action is Plaintiffs' claim that Avondale has breached the Merchant Agreement by wrongfully charging back various transactions to Plaintiffs' respective accounts. Plaintiffs, however, have unnecessarily muddied the waters by including a hodgepodge of other claims in their Complaint which are intertwined with the breach of contract issue. These claims must be dismissed because they are either impermissible tort claims [FN10] or claims which are duplicative of the breach of contract claim.[FN11]

> FN10. The economic loss doctrine prohibits recoveries in tort which are also recoverable in contract. *SeeMoorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 435 N.E.2d 443 (1982)*seealsoGetto v. Village of Palos Park,* 1998 WL 801987, at *1 (N.D.Ill. Nov. 12, 1998) (same). Because Plaintiffs' relationship with Avondale is contractual,

Plaintiffs' "negligence and gross negligence" claim (Compl.¶ K) and conversion claim (Compl.¶ G) are dismissed. Furthermore, as for the conversion claim, because Plaintiffs "seek only a certain amount of money rather than a specifically identifiable fund or account," Plaintiffs cannot state a claim for conversion. *SeeHorbach v. Kaczmarek,* 934 F.Supp. 981, 986 (N.D.Ill.1996); *seealsoSutherland v. O'Malley,* 882 F.2d 1196, 1200 (7th Cir.1989).

> FN11. The duplicative contract claims include: (1) "wrongful charge back"; (2) "breach of good faith and fair dealing"; and (3) "fraud in the transaction." The wrongful charge back claim contains identical allegations as Plaintiffs' breach of contract claim and is wholly unnecessary. (Compl.¶ I.) As for Plaintiffs' claim that Avondale "failed to act in good faith and failed to deal fairly with Plaintiffs"(*id.* at ¶ H), the proper place for such an argument is within a breach of contract claim, not standing alone as its own claim. *SeeEcho, Inc. v. Baxter Health Care Corp.,* 121 F.3d 1099, 1106 (7th Cir.1997); *seealsoCobb-Alvarez v. Union Pac. Corp.,* 962 F.Supp. 1049, 1054 (N.D.Ill.1997) ("Illinois does not recognize a breach of good faith and fair dealing cause of action, apart from a breach a contract claim."). Finally, Plaintiffs' claim that Avondale breached the Merchant Agreement by not properly documenting Plaintiffs' customers' complaints of forgery (Compl.¶ J), is really just another way of claiming that Avondale wrongfully charged back their accounts; it is not an independent cause of action. In any event, because Plaintiffs have failed to demonstrate that any of the chargebacks here were "fraudulent," this claim is dismissed.

*5 The contract dispute here essentially revolves around the interpretation of two paragraphs in the Merchant Agreement. Specifically, Plaintiffs claim that Avondale breached the terms of the Merchant Agreement in that the chargebacks it made to Plaintiffs' accounts were not authorized by the merchants' representations and warranties set forth in the contract. (*See* Cmpl. ¶¶ B, I.) [FN11] Avondale

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

disagrees, asserting that Plaintiffs' interpretation of the contract "makes no sense." (Avondale Reply at 13.)

> FN11. In addition, Plaintiffs assert (in their response brief only) that the Merchant Agreements constitute contracts of adhesion because Plaintiffs "did not freely choose the terms of the agreement. Either they signed it or they did not have an outlet for selling their merchandise."(Pls. Resp. at 16.) Such an argument is meritless. Each of the Plaintiffs testified that they accept MasterCard, Visa and American Express from their customers (Avondale 12(M) Ex. F at 15-17; Ex. I at 12-13; Ex. M at 15-16), and the customers could have certainly paid with cash or by check.

In _Taracorp, Inc. v. NL Industries, Inc.,_ 73 F.3d 738 (7th Cir.1996), the Seventh Circuit explained how contracts are to be interpreted under Illinois law: FN12

> FN12. Illinois law applies to the claims here by virtue of Plaintiffs' contractual agreement to that effect. (_See_ Merchant Agreements, at ¶ 10.)

"The starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over."....If the plain language of the contract is ambiguous, then "the court must go on to declare [the contract's] meaning."....If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide.... However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a fact-finder must be called upon to determine the intent of the parties. _Id._ at 743 (citing _Lumpkin v. Envirodyne Indus.,_ 933 F.2d 449, 456 (7th Cir.1991)). Illinois requires that contracts be interpreted as a whole, in a way that gives effect to all terms, in the light of their ordinary and natural meanings. _LaSalle National Trust, N.A. v. ECM Motor Co.,_ 76 F.3d 140, 144 (7th Cir.1996) (citations omitted).

Under Illinois law, a contract is intrinsically ambiguous if "its language is reasonably and fairly susceptible to more than one meaning."_CSX Transp._ _v. Chicago & North W. Transp. Co.,_ 62 F.3d 185, 189 (7th Cir.1995). However, the contractual language "is not ambiguous simply because the parties disagree upon its meaning ... nor is it ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."_Foxfield Realty, Inc. v. Kubala,_ 287 Ill.App.3d 519, 678 N.E.2d 1060, 1063 (2d Dist.1997) (citations omitted); _seealsoMatter of Envirodyne Indus., Inc.,_ 29 F.3d 301, 304 (7th Cir.1994).

With these general statements of law in mind, the Court turns to the paragraphs of the Merchant Agreement at issue. Paragraph 5 of the Agreement sets forth the following warranties:

5. _Representations and Warranties._Merchant represents and warrants that (a) each transaction submitted to Bank complies with the terms of this Agreement, any policies and procedures of Bank with respect to the Program and applicable laws, rules and regulations, including these representations and warranties, ... (e) each account and transaction results from a bona fide sale of merchant in its ordinary course of business at its place of business ..., (f) the establishment of the account and each transaction is valid and legally enforceable and is not subject to any claim or defense whatsoever ... (g) the cardholder does not dispute the sale transaction or the delivery for quality of the merchandise or services and has no claim or defense to payment, (h) no information has been altered or is fraudulent....

*6 (Merchant Agreement, ¶ 5.) Paragraph 6 of the Merchant Agreement provides that:
In the event of any breach of any term, condition, convenant, representation or warranty in the Agreement ... or any transaction is subject to claim or defense or other dispute, then Merchant shall upon demand repurchase any transaction or account so affected.... Bank may charge Merchant's account for any such claims or losses....

(_Id._ at ¶ 6.)

Avondale has charged back Plaintiffs' accounts for several purchases that it asserts failed to "meet the requirements of the Agreement" because (1) "Plaintiffs failed to submit the original loan

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

application," (2) "the customer disputed the accounts for defective merchandise" or (3) "the accounts were found to be fraudulent at the point of sale."(Countercl.¶ 5.) Plaintiffs primarily take issue with respect to the last two of these three reasons, and thus, the Court addresses them first. Specifically, Plaintiffs argue that the warranties regarding fraudulent transactions made in paragraph five of the Agreement only apply to fraudulent acts by the *merchants* and should not be read as extending to any transactions instituted by a merchants' customers. (Pls. Resp. at 13-14.) Plaintiffs further maintain that the warranty section is vague and ambiguous and that the only reasonable interpretation is that the merchants are not responsible for the acts of a third party. (*Id.*) On the other hand, Avondale argues that because it was the jewelry merchants themselves who would be handling the applications for credit and participating in the point-of sale transaction, "the Merchant Agreement was drafted so as to place the responsibility for the legitimacy of transactions and customer satisfaction on the individual jewelry merchants."(Avondale Mem. at 14.) According to Avondale, "[i]t is not the establishment of the fact of a fraudulent transaction or the legitimacy of a customer dispute which gave Avondale the right to charge back the merchant; rather it is the *existence* of such a claim or dispute which constitutes the breach of the representation and warranty."(*Id.*) (emphasis in original.)

The Court first notes that it does not find the relevant provisions of the Merchant Agreement to be "intrinsically ambiguous ." *SeeCSX Transp.,* 62 F.3d at 189. Rather, as to the question of whether Avondale was entitled to chargeback Plaintiffs for customer dissatisfaction and/or fraudulent transactions, the Court finds that the clear and express language of the warranty provisions to be susceptible to only one reasonable interpretation- the one suggested by Avondale. In paragraph 5, subsections (f), (g) and (h) of the Merchant Agreement, the merchant warrants that "(f) the establishment of the account and each transaction is valid and legally enforceable and not subject to any claim or defense whatsoever," that (g) "the cardholder does not dispute the transaction or the delivery or quality of the merchandise or service and has no claim or defense to payment," and that (h) no information has been altered or is fraudulent." (Merchant Agreement ¶ 5.) Paragraph six then authorizes Avondale to charge back merchants for

breach of the warranties and representations set forth in the Agreement. (*Id.* at ¶ 6.) It is clear to this Court that, pursuant to the unambiguous language of paragraphs five and six, the merchants have agreed to essentially indemnify Avondale for any transaction that a customer disputes, for any reason. While it is possible that Plaintiffs may not have understood the full extent of these warranties, there is no question as to what the provisions in dispute plainly provide.

**\*7** However, in addition to the chargebacks for customer disputes and/or fraudulent transactions, Avondale has also charged back Plaintiffs' accounts based on its claim that Plaintiffs failed to submit all original credit card applications from Plaintiffs. (*See* Countercl. ¶ 5.) Plaintiffs contend, and have offered deposition testimony in support of their contention, that they did not fail to submit any original applications to Avondale. (*See, e.g.,* Avondale 12(M) Ex. F at 106; Ex. I at 63-65, Ex. M at 56-57.) Plaintiffs suggest instead that Avondale was unprepared for the tremendous amount of applications that it received and that it had an imperfect system for imputing the receipt of the applications. (Pls. Resp. at 14.)

This Court finds that there is sufficient evidence in the record to create a genuine issue of material fact as to whether Plaintiffs actually sent the original credit card applications in question to Avondale, and consequently, whether Avondale's chargebacks to Plaintiffs' accounts based on "the missing applications" was proper. Because it cannot be determined from the evidence here which chargebacks were based on fraudulent transactions and/or customer disputes and which were based on "the missing applications," summary judgment must be denied on Plaintiffs' breach of contract claim. (*See* Compl. ¶ B.)[FN10]

> FN10. Parenthetically, although none of the breach of contract claims specifically include a claim of improper termination, because Plaintiffs seem to suggest such a claim in their brief and in several attached depositions, the Court addresses this issue briefly. All Plaintiffs admit to receiving Avondale's February 5, 1997 letter notifying them that the second sentence of Section 9 of the Merchant Agreement was to be changed to the following:

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

Bank may terminate this Agreement at any time for any

reason upon the giving of written notice to Merchants, ... (Avondale 12(M) Ex. O.) It is also undisputed that all Plaintiffs processed transactions after receipt of the notice. (*Id.* ¶¶ 21-22.)Given the fact that each Plaintiff further admits to having received their respective notices of termination on May 2, 1997, just prior to the termination of the Program on May 5, 1997, the Court finds that there was no improper termination of the Merchant Agreements.

C. *Conspiracy Claim*

Plaintiffs' Complaint alleges a cause of action for conspiracy between Avondale and Gold and Diamond consisting of a "plan or scheme for the unlawful purpose of taking over Plaintiffs' business enterprise."(Compl.¶ 15(A)).

In Illinois "[c]ivil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerned action either an unlawful purpose or a lawful purpose by unlawful means."*Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62, 645 N.E.2d 888, 894 (1995). To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character. *Id.* at 894.

Here, Plaintiffs do not identify a specific tortuous act in furtherance of the conspiracy in their Complaint, but suggest in their response brief that the tortuous act was "the way Avondale went about terminating the merchants accounts."(Pls. Resp. at 10-11.) Specifically, Plaintiffs complain that the February 7, 1997 notice changed the terms of the Merchants Agreements from requiring a 90-day notice of termination to requiring no notice at all and that Avondale then, almost exactly 90-days later, terminated the Program with no notice, just before Mother's Day sales. (*Id.*) Plaintiffs seem to argue in their response brief that the alleged conspiracy was a scheme to permit Gold and Diamond to sell Mother's Day inventory to Plaintiffs before the Credit Card

Program was terminated. (*Id.*)

However, while Plaintiffs are undoubtedly unhappy with the situation they found themselves in when the Program was terminated, they have offered no evidence that such actions by Avondale were tortuous or unlawful. As a result, there is no evidence in the record to support a conspiracy, and Avondale is entitled to summary judgment on this claim.

D. *Formation of the Contract Issues*

**\*8** Plaintiffs' Complaint also asserts two claims which raise issues relating to the formation of the contract at issue here. (*See* Compl. ¶¶ C and G.) Specifically, Plaintiffs allege that Defendants "procured the Merchant Agreement by fraudulent representations"(*id.* ¶ C)-(although they do not identify what these representations were), and "that [Avondale] "purposefully and with malice misrepresented the length of the Merchants Agreements Plaintiffs were asked to sign."(*id.* at ¶ G). Plaintiffs have not produced evidence supporting either claim, and summary judgment is granted as to both of these claims.

E. *Deceptive Business Practices Act*

Plaintiffs allege in their Complaint that Defendants have engaged in false, misleading or deceptive acts that violate the Texas Deceptive Trade Practices Act § 17.46. (Compl.¶ F.) However, because Illinois law governs their business relationship, Plaintiffs re-characterize this claim in their response brief as arising under the Illinois Consumer Fraud and Deceptive Business Practices Act, 825 ILCS 505/101-505 (the "Act"). The elements under the Act are: (1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception; and (3) that the deception have occurred in the course of conduct involving trade or commerce. *Siegel v. The Levy Org. Dev. Co.,* 153 Ill.2d 534, 542, 607 N.E.2d 194, 198 (1992).

Plaintiffs have not and cannot establish a claim under this Act. First, Plaintiffs have not shown that Avondale engaged in any deceptive acts or practices. Second, the Corporate Defendants do not qualify as "consumers" under the Act. *SeeDoherty v. Kahn,* 289 Ill.App.3d 563-64, 682 N.E.2d 163, 176-77 (Ill.App.Ct.1997)."[W]here a dispute involves two

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)
**1999 WL 965591 (N.D.Ill.)**

Page 9

businesses that are not consumers, the proper test is 'whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." ' *Id.* at 564 (citation omitted).*Seealso*Empire Home Servs. Inc. v. Carpet Amer., Inc., 274 Ill.App.3d 666, 669, 653 N.E.2d 852, 854 (Ill.App.Ct.1995). The Credit Card Program in this case was not offered generally to consumers but only to specified jewelry merchants and then only in connection with a detailed contractual relationship. The Act does not apply to the Corporate Plaintiffs here and, thus, the deceptive trade practices claim is dismissed.

F. *"Disparate Treatment" Claim*

Finally, in Section E of the Complaint, Plaintiffs allege that "Defendants purposefully singled them out because of their nationality (Pakistani) and terminated their agreements for that reason."(Compl.¶ E.) The record is void of evidence supporting such an allegation.

At best, Plaintiffs have created a genuine issue of material fact as to whether Avondale harbored any racial animus toward Pakistani merchants. (*See* Pls. 12(N) ¶ 61, Avondale 12(M), Ex. M at 41-54.) However, there is absolutely no evidence that Plaintiffs' Merchant Agreements were terminated because of the nationality of the jewelry merchants. Instead, Perez testified that the changes to the Merchant Agreement and the final termination of the Credit Card Program were actions taken by Avondale that affected *all* merchants in the Program; nationality was irrelevant. (*See* Avondale 12(M), Ex. D at ¶ 13.) Plaintiffs have produced no evidence which contradicts Perez' statements concerning how and in what manner the Credit Card Programs was changed and ultimately terminated. Accordingly, Plaintiffs' "disparate treatment" claim fails.

III.  *Avondale's Counterclaim and Third-Party Complaint*

*9 Avondale also seeks summary judgment in its favor on Counts I, II, V, VII and IX of its Counterclaim and Count II of its Third-Party Complaint. All of these claims seek recovery from the Corporate Plaintiffs for the alleged deficits remaining in their accounts after the termination of the Credit Card Program or seek payment on the

Individual Plaintiffs' Guarantees for the alleged amounts due and owing from their respective corporations. As the Court has found that there is a genuine issue of material fact as to which chargebacks, if any, were authorized by the Merchant Agreement, summary judgment is also precluded on these counts of Avondale's Counterclaim and Third-Party Complaint.

*CONCLUSION*

At the end of the day, there remains a genuine issue of material fact regarding which of Avondale's chargebacks to Plaintiffs' accounts were authorized under the terms of the Merchant Agreement, and which were not, as discussed *supra* in Section II.B. Accordingly, the Court grants Avondale's motion for summary judgment as to all claims in the Complaint other than this breach of contract claim. The Court denies Avondale's motion for summary judgment on Counts I, II, V, VIII and IX of its Counterclaim and Count II of its Third-Party Complaint.

N.D.Ill.,1999.
Daredia v. Gold & Diamond Merchants Group, Inc.
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M

Westlaw.

CALLMANN § 9:5                                                                                    Page 1
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)


Callmann on Unfair Competition, Trademarks and Monopolies (4th Edition)
Current through April 2008

Louis Altman and Malla Pollack

Part III. Unfair Interference with a Competitor's Business Relations
Chapter 9. Interference with a Competitor's Contractual Rights and Bargaining Possibilities

Correlation TableReferences

§ 9:5. The parties—The third-party requirement

It is well settled that an action for tortious interference with contract can only lie against one who was not a party to the contract.[FN1] Furthermore, if one of several contracting parties induces breach by another party to the very same contract on which the defendant is bound, the defendant is answerable only for breach of contract, not in tort.[FN2] But in one case, although the court dismissed the plaintiff's action against his fellow contracting party, it suggested that there might nevertheless be recourse in tort against others, who were not parties to the contract but were otherwise involved in a joint venture with the defendant.[FN3]

The third party requirement also applies to *prospective* contractual relations.[FN4] The requirement also applies when the plaintiff brings a claim of tortious interference against a defendant contracting party which is a corporation, even though the acts complained of were actually done by individuals acting on behalf of that corporation[FN5] who are not joined as defendants.[FN6]

Because of the requirement that the defendant be separate from the contracting parties, it has been held that a dominant shareholder[FN7] or alter ego[FN8] of a corporation cannot interfere with that corporation's contract even though the two are technically separate entities.[FN9]

But another court has held that a parent company may be liable for interfering with the contractual relations of its subsidiary company if the parent owns less than 100% of its subsidiary; a mere majority interest does not suffice. That court reasoned that only a complete identity of interest can justify treating two legally separate entities as one, in extending the immunity from tortious interference that is normally enjoyed only by the parties to a contract. The court also added that the interests of the majority shareholder are often different from and antagonistic to the interests of the minority shareholders; and in fact, the plaintiff in this case was a minority shareholder whose interests had been subjugated to those of the majority shareholder, which may help to explain the result.[FN9.50]

In addition, it has been held that a corporation can be liable for inducing its dominant shareholder to breach an obligation toward another party.[FN10] A defendant *wholly owned corporation or wholly owned subsidiary corporation,* however, cannot be liable for interfering with the contracts of its *sole owner or parent corporation,*[FN11] because the defendant corporation is under the control of its sole owner or parent. Corporate affiliations also raise privilege issues, which are discussed in another section.[FN12]

There is also no liability for interfering with the relationship between a corporation and its alter ego.[FN13] Subsidiaries of a common parent cannot be liable for interfering with each other's contracts.[FN14] But in that situation a plaintiff has been allowed to assert inconsistent claims: an interference claim which denies that a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

CALLMANN § 9:5
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

Page 2

defendant shareholder is the alter ego of a corporate defendant, and a different type of claim which asserts that there is an alter ego relationship between them; and when some defendants lost on both claims the court merely ordered the plaintiff to elect one of the inconsistent remedies.[FN15] There is some authority suggesting that the shareholder cannot assert its own alter ego status as a defense, but in one case the defendant was nevertheless able to benefit from the alter ego doctrine because the plaintiff himself had already established the defendant's alter ego status for the purpose of holding the defendant liable for breach of the underlying contract.[FN16]

Where various clergy or church organs are not legally distinct from the church itself, they cannot interfere with the church's contracts.[FN17] Similarly, since a partnership is not a separate legal entity, but is an aggregation of individuals, a general partner could not be held liable for interfering with a contact entered into by the partnership, since he personally was a party to the contract.[FN18]

For the same reason, a trustee in bankruptcy, who stands in the debtor's shoes, cannot be liable in tort for interfering with the debtor's contract.[FN19] The same is true of a personal representative of a contracting party.[FN20] Similarly, the assignee of the contract rights of one of the parties to a contract can not be liable for tortious interference with that contract, because he stands in the shoes of the assignor.[FN21]

It has been held, however, that if a plaintiff and defendant each have a contractual relationship with the same third party, the defendant can be liable in tort for interfering with the plaintiff's relationship with the third party, even though the plaintiff's and the defendant's respective contracts are both embodied in a single document or arise out of a single transaction.[FN22] In addition, a defendant may be liable for interfering with a plaintiff's relationships with other parties, even though the plaintiff and defendant are parties to a contract or joint venture, and the relationships with the other parties relate to the subject matter of the plaintiff's and defendant's contract or joint venture.[FN23]

The mere fact that a defendant's consent is required to the formation of a contract between others does not make the defendant a party to that contract; therefore the defendant can be liable for interfering tortiously with that contract.[FN24] But some cases have explained such holdings by saying that the defendant is not liable because the tort of interference does not exist where the defendant was the source of the business opportunity allegedly interfered with.[FN24.50] Similarly, a defendant who gave consent to a principal contract by way of a side agreement did not thereby become a party to the principal contract, and so could be liable for tortious interference therewith.[FN25]

It has also been held that an intended third-party beneficiary of a contract may not be liable for interference therewith.[FN26] Moreover, the exclusion of third-party beneficiaries has been expanded to cover those who benefit from the contract of others without regard to whether the beneficiary was intended by the contracting parties to be a third-party beneficiary.[FN27]

It has been held that a defendant does not waive the third-party requirement by failing to plead it as a defense because the fact that a defendant is not a party to the relationship is an element of the plaintiff's tortious interference claim.[FN28]

The mere fact that a defendant has a contract with the plaintiff does not insulate the defendant from liability for tortious interference with that plaintiff's contractual relation with a third party.[FN29] Accordingly, it has been held that separate corporations can be liable for interfering with each others' contracts, even if they are affiliated with each other and the contracts in question are with the same party and relate to the same type of service.[FN30]

Because alternative pleadings are permissible, if it is not clear whether the defendant or another entity is the contracting party, it is "proper for plaintiff to allege that defendants either breached the ... contract or tortiously interfered with a contract between plaintiff and" another entity.[FN31]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

The third party requirement may have been stretched too far in *Parks v. CAI Wireless Systems*.[FN32] There the plaintiff entered into a joint venture agreement which provided that the interests of the joint venture partners in the agreement were not transferable, and that any attempted transfer would be ineffective. It further provided that the plaintiff would have the right of first refusal to purchase the interest of its joint venture partner. But without any notice to the plaintiff, the defendant acquired the plaintiff's joint venture partner and merged its business into one of the defendant's subsidiaries. When the plaintiff later found out about the acquisition, it sued on the theory that the defendant had tortiously interfered with the joint venture agreement by inducing the plaintiff's joint venture partner to breach the no-transfer clause as well as the right of first refusal. It would seem that, at the time it induced this breach, the defendant was still a stranger to the joint venture agreement; but the court ruled that, since the surviving corporation after a merger is liable for all the debts and obligations of the non-surviving corporation, the failure of the joint venture to perform its obligations under the agreement must be treated as equivalent to the failure of the defendant to perform those obligations, and therefore the defendant was liable in contract but not tort.[FN32.50]

The Supreme Court of Georgia has stretched the requirement of separateness even further. In *Atlanta Mkt. Ctr. Mgmt. v. McLane*[FN33] it said that

One is not a stranger to the contract just because one is not a party to the contract … [O]ne must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract …. in other words, all partys [sic] to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships.

There the court held that the employee of a leasing agent company, which had the exclusive right to lease a commercial building, could not recover for tortious interference with the employee's commissions for leasing space in that building, because the allegedly interfering defendant was a subsidiary of the managing partner of the building. No rationale for this holding was stated, but the court may have thought that, if the managing partner of the building was free to interfere directly with its own exclusive leasing contract without tort liability, then it should be free to do so through its subsidiary as well.

Subsequently, the same court similarly held that the owner and operator of nursing homes could not be liable for tortious interference with contractual relationships between the residents of its nursing home and an independent health care provider serving the residents. The court reasoned that the nursing home and the health care provider "were parties to an interwoven contractual relationship in which each was responsible, and provided care, for the residents." Therefore it concluded that the nursing home "was not a stranger to the health care provider's contracts with residents of the nursing homes."[FN34]

Similarly, another court has held that that a medical insurer's explanation of a claim denial to its own insured could not constitute tortious interference with the contractual relation between the insured and the medical provider. The court reasoned that

while Dr. Guthrie charged Blue Cross with interfering with his contractual relations with his patients Reasoner and Cantrell, Blue Cross was, itself, a party to these same contractual relations. The record establishes both explicitly and implicitly that Dr. Guthrie and his patients contracted together in reliance on the contractual obligation of Blue Cross to pay for dental services covered by the policy between Blue Cross and the patients. Interdependent contractual relations existed among Dr. Guthrie, his patients, and Blue Cross. This contractual situation invokes the rule that a party to a contract cannot be charged with interfering with that contract.[FN35]

This trend to expansion of the third party requirement has extended even to some cases in which there is already a perfectly good traditional reason to deny liability for tortious interference: i.e., the privilege of the defendant to assert his own contractual rights.[FN36] In one such case, the plaintiff, a distributor, argued that the defendant, a

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

manufacturer of goods formerly distributed by the plaintiff, had tortiously interfered with the plaintiff's relations with some of its employees by soliciting the employees to establish a competing distributorship. The court did not make the traditional inquiries into whether the former employees were free to leave the plaintiff's employ,[FN37] or whether they were privileged to compete with their former employer[FN38] after leaving; instead it dismissed the claim for tortious interference on the perplexing ground that there was no evidence that the defendant was a stranger to the relationship between the plaintiff and its employees.[FN39] This reasoning is perplexing because it is difficult to understand why the court would expect a manufacturer to be involved at all in the relationships between its distributor and the latter's employees.

In another case it was held that the Atlanta Police Department was immune from a charge of tortious interference with the plaintiff security company's plans to hire off-duty Atlanta police officers to perform security functions for baseball games, on the ground that the Police Department was not a third party to the relationship between the security company and the baseball team.[FN40] But the same result could have been reached on the traditional ground that the Police Department had a legitimate interest[FN41] In controlling the off-duty police work of its officers.

The trend to immunize non-contracting parties from liability for tortious interference on the basis of some other relationship to the relevant contract continued in another case, where one Lee and his company entered into a joint venture agreement with two Taiwanese companies in order to develop a particular type of integrated circuit. The joint venturers created a new Taiwanese corporation as the joint venture vehicle, and the board of the new corporation subsequently incorporated a wholly-owned subsidiary, based in California, to begin work on the products contemplated by the joint venture agreement. After the working relationship between Lee and the other joint venture partners had broken down, Lee accused the California subsidiary of tortious interference with the joint venture agreement; but the court ruled that the California subsidiary, although not a party to the joint venture agreement, had a direct involvement in the joint venture relationship such that it could not be liable for interfering therewith.[FN42]

Georgia law continued to lead the way in this respect when a federal court in that state held that two basketball coaches could not hold the National Collegiate Athletic Association (NCAA) and its agents liable for interfering with the coaches' employment contracts with the University of Georgia, even though the NCAA was not a party thereto, because those contracts

specifically required compliance with NCAA legislation and provided for termination of the contract for failure to maintain compliance. The NCAA was "an essential entity" in the employment relationships at issue. ... Therefore, the NCAA is not a stranger to the contracts, and thus, cannot be liable for tortious interference with those contracts.[FN43]

The same result, however, could have been reached without stretching the third party requirement out of recognition, on the traditional ground that the interfering acts of the NCAA and its agents were done in pursuit of the NCAA's legitimate interests, which is among the recognized defenses to a claim of tortious interference.[FN44]

Similarly, in the *Benefit Support* case[FN45] the court elected to invoke Georgia's "interwoven set of contracts" theory when it could have simply relied on the well established rule that an agent can not be liable for interfering with a contract of his principal which is within the scope of the agent's authority.[FN46]

Again, in the J. Kinson Cook case, a Georgia court held (1) that a construction manager could not interfere with the contract between a property owner and its construction contractor, and also (2) that the construction manager's statements that the construction contractor had failed to pay the subcontractors could not interfere with the relationship between the construction contractor and its surety; and in both instances the stated reason for the holding was that the entire construction project encompassed a comprehensive interwoven set of contracts.[FN47]

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Yet it would have sufficed to hold (1) that the construction manager could not interfere with the contract between the property owner and the construction contractor on the traditional ground that the construction manager was acting as the agent of the property owner,[FN48] and (2) that the construction manager could not interfere with the relationship between the construction contractor and its surety on the traditional ground that the property owner, acting through its agent the construction manager, had a legitimate interest in making sure that the subcontractors on its construction project were paid so they would not place mechanics' liens on the property.[FN49]

[FN1]  Hein v. Chrysler Corp., 45 Wash. 2d 586, 277 P.2d 708 (1954); Cuker Industries, Inc. v. William L. Crow Const. Co., 6 A.D.2d 415, 178 N.Y.S.2d 777 (1st Dep't 1958); Kay v. Sussel, 22 Misc. 2d 627, 199 N.Y.S.2d 180 (Sup 1960); Caryl v. Greenwald, 21 Misc. 2d 712, 196 N.Y.S.2d 427 (Sup 1960); O'Connor v. Harms, 111 N.J. Super. 22, 266 A.2d 605 (App. Div. 1970).

Cherberg v. Peoples Nat. Bank of Washington, 15 Wash. App. 336, 549 P.2d 46 (Div. 2 1976), decision rev'd, 88 Wash. 2d 595, 564 P.2d 1137 (1977) (lessee sued lessor for breach of contractual obligation to make repairs and for "unprivileged business interference." Dismissing the latter charge, the court said "one cannot be guilty of the separate tort of interfering with one's own contract.").

Robbins v. Ogden Corp., 490 F. Supp. 801 (S.D. N.Y. 1980); EFCO Importers v. Halsobrunn, 500 F. Supp. 152 (E.D. Pa. 1980); DP Service, Inc. v. AM Intern., 508 F. Supp. 162 (N.D. Ill. 1981).

Frost Nat. Bank v. Matthews, 713 S.W.2d 365 (Tex. App. Texarkana 1986), writ refused n.r.e. (Oct. 15, 1986); Miller v. Fairchild Industries, Inc., 668 F. Supp. 461, 469 (D. Md. 1987); Wilmington Trust Co. v. Clark, 289 Md. 313, 329, 424 A.2d 744 (1981); Singh v. Curry, 667 F. Supp. 603 (N.D. Ill. 1987), on reconsideration, 1988 WL 5004 (N.D. Ill. 1988), judgment vacated, 866 F.2d 432 (7th Cir. 1988).

Garshman v. Universal Resources Holding, Inc., 641 F. Supp. 1359, 1374, 1986-2 Trade Cas. (CCH) ¶67281 (D.N.J. 1986), order aff'd, 824 F.2d 223, 1987-1 Trade Cas. (CCH) ¶67626 (3d Cir. 1987) (even though the breach was allegedly effected through the use of threats and duress).

Lolley v. Howell, 504 So. 2d 253, 255 (Ala. 1987) ("a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract").

CIBC Bank and Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil, 886 F. Supp. 1105, 1119 (S.D. N.Y. 1995) (New York law); Koret, Inc. v. Christian Dior, S.A., 161 A.D.2d 156, 554 N.Y.S.2d 867, 869 (1st Dep't 1990) (Table); Bernhard v. Dutchess Community College, 28 Empl. Prac. Dec. (CCH) ¶32540, 1982 WL 193 (S.D. N.Y. 1982) (New York law); Fisher v. Maxwell Communications Corp., 205 A.D.2d 356, 613 N.Y.S.2d 369, 370 (1st Dep't 1994); Bradford v. Weber, 138 A.D.2d 860, 525 N.Y.S.2d 968, 970 (3d Dep't 1988); Murphy v. Capone, 120 A.D.2d 714, 502 N.Y.S.2d 511 (2d Dep't 1986); Albemarle Theatre, Inc. v. Bayberry Realty Corp., 27 A.D.2d 172, 277 N.Y.S.2d 505, 508 (1st Dep't 1967); Warner Bros. Pictures, Inc. v. Simon, 21 A.D.2d 863, 251 N.Y.S.2d 70, 71 (1st Dep't 1964), order aff'd, 15 N.Y.2d 836, 257 N.Y.S.2d 947, 205 N.E.2d 869 (1965).

East Penn Sanitation, Inc. v. Grinnell Haulers, Inc., 294 N.J. Super. 158, 682 A.2d 1207 (App. Div. 1996).

Harbit v. Voss Petroleum, Inc., 553 N.W.2d 329 (Iowa 1996).

Hamilton v. Spencer, 929 S.W.2d 762, 1996-2 Trade Cas. (CCH) ¶71503 (Mo. Ct. App. W.D. 1996).

Mackey v. U.P. Enterprises, Inc., 935 S.W.2d 446 (Tex. App. Tyler 1996) (employer corporation not liable for tortious interference with employment).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

CALLMANN § 9:5
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

Page 6

Brown v. Armstrong, 957 F. Supp. 1293, 1997-2 Trade Cas. (CCH) ¶72020 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997) (defendant cannot be liable for tortious interference with his own contract).

Resource Ventures, Inc. v. Resources Management Intern., Inc., 42 F. Supp. 2d 423 (D. Del. 1999).

Vasquez v. State, Dept. of Social and Health Services, 94 Wash. App. 976, 974 P.2d 348 (Div. 3 1999).

Electronics Store, Inc. v. Cellco Partnership, 127 Md. App. 385, 732 A.2d 980 (1999) (Table) (defendant can not be liable for interfering with its own contract with plaintiff). But it was held unfair competition for the defendant to use deceit to prevent plaintiff, acting as defendants agent, from enrolling a third party prospect in a contractual relationship with the defendant.

New Jersey Auto. Ins. Plan v. Sciarra, 103 F. Supp. 2d 388 (D.N.J. 1998).

Hern v. Bankers Life Cas. Co., 133 F. Supp. 2d 1130 (D. Minn. 2001) (employee may not sue employer for tortious interference with contract to promote the employee).

Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, 239 F. Supp. 2d 180, 2003-1 Trade Cas. (CCH) ¶73957 (D.R.I. 2003), aff'd, 373 F.3d 57, 2004-1 Trade Cas. (CCH) ¶74459 (1st Cir. 2004) (health insurer cannot be liable for tortious interference with prescription drug sales because insurer, not patient, is the true purchaser of the drugs, and therefore is a party to the transaction).

Cromeens, Holloman, Sibert, Inc. v. AB Volvo, 349 F.3d 376 (7th Cir. 2003) (a party may not be charged with tortious interference with respect to its own contract).

K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702 (Alaska 2003).

The fact that a defendant is not a party to the affected relationship is an element of the plaintiff's tortious-interference claim, not an affirmative defense which the defendant must plead and prove. Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711 (Tex. 2001) (with a separate opinion arguing that it is more appropriately treated as an affirmative defense); Atlanta Market Center Management, Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998); Alcazar Amusement Co. v. Mudd & Colley Amusement Co., 204 Ala. 509, 86 So. 209 (1920).

The administrator of an estate is not a third party, and therefore cannot be liable for interfering with the disposition of a bequest. Waterhouse v. Hagar, 41 Conn. L. Rptr. 593, 2006 WL 2089203 (Conn. Super. Ct. 2006). See § 9:2 regarding tortious interference with a legacy.

Buscher v. Boning, 114 Haw. 202, 159 P.3d 814 (2007). Plaintiff Buscher was injured by Boning while driving within the scope of her employment by the State of Hawai'i. Buscher made a claim for workers' compensation benefits to the State, and also sued Boning. Buscher and Boning agreed to settle the case, but the state refused to consent to the settlement. Buscher then sued the state for tortious interference with the settlement agreement. But the court held that the State could not improperly interfere with the alleged settlement agreement because, by statute, the State was a necessary party to that agreement.

Cf. National Data Payment Systems, Inc. v. Meridian Bank, 212 F.3d 849 (3d Cir. 2000) (defendant was privileged to interfere with contract after the announcement of defendant's intended merger with one of the contracting parties).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01555    Document 36-5    Filed 07/21/2008    Page 8 of 32

CALLMANN § 9:5                                                                    Page 7
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

But cf. General Business Machines v. National Semiconductor Datachecker/DTS, 664 F. Supp. 1422 (D. Utah 1987) (even one who breaches his own contract can be guilty of a tort if the breach involves a violation of a fiduciary obligation).

Contra, Regional Reps Corp. v. WOLI Broadcasting Corp., 166 U.S.P.Q. 299, 1970 WL 10041 (N.D. Ill. 1970) (defendant's contractual breach held an improper and actionable interference with plaintiff's business); Kay v. Sussel, 22 Misc. 2d 627, 199 N.Y.S.2d 180 (Sup 1960) (one party to a contract can be liable for tortiously interfering with another party's performance of that contract); Medline Industries Inc. v. Maersk Medical Ltd., 230 F. Supp. 2d 857 (N.D. Ill. 2002) (defendant who granted license to third party in derogation of plaintiff's exclusive license can be liable for tortious interference).

[FN2]   Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP, 440 F. Supp. 2d 1184 (D. Nev. 2006) (defendant attorney's suggestion to client that she could fire co-counsel did not amount to tortious interference with co-counsel's contractual relations with client, where defendant attorney was a party to same retainer agreement with client, because defendant attorney could not tortiously interfere with his own contract).

Sax v. Sommers, 108 N.Y.S.2d 467 (Sup 1951).

Cf. Cobb v. Union Camp Corp., 786 So. 2d 501 (Ala. Civ. App. 2000), rev'd, 816 So. 2d 1039 (Ala. 2001). Cobb had a contract with Evergreen to cut timber on Union Camp's land. Union Camp instructed Evergreen to discharge Cobb, whereupon Cobb sued Union Camp for interfering with the Cobb-Evergreen contract. The court held that "the object of their contract, i.e., the wood to be cut, was provided by and located on Union Camp property. We conclude that Union Camp was an essential party to the business relationship between Evergreen and Cobb and, therefore, cannot be held liable for Cobb's claim of intentional interference with a business relationship."

**Comment:** The result seems correct, but perhaps it should have been based on a different rationale: i.e., Union Camp's privilege to protect its timber assets (see § 9:8).

Piedmont Cotton Mills, Inc. v. H. W. Ivey Const. Co., 109 Ga. App. 876, 137 S.E.2d 528 (1964); Bennett v. Storz Broadcasting Co., 270 Minn. 525, 134 N.W.2d 892 (1965); Calbom v. Knudtzon, 65 Wash. 2d 157, 396 P.2d 148 (1964); Lyons v. Farmers Ins. Exchange, 26 S.W.3d 888 (Tenn. Ct. App. 2000) ; Lombardi v. Board of Trustees Hinsdale School Dist. 86, 463 F. Supp. 2d 867, 215 Ed. Law Rep. 836, 12 Wage & Hour Cas. 2d (BNA) 244, 153 Lab. Cas. (CCH) ¶35232 (N.D. Ill. 2006).

Restatement Second, Torts § 766 cmt. v.

[FN3]   Caryl v. Greenwald, 21 Misc. 2d 712, 196 N.Y.S.2d 427 (Sup 1960).

[FN4]   Dow Chemical Corp. v. Weevil-Cide Co., Inc., 897 F.2d 481, 29 Fed. R. Evid. Serv. 1394 (10th Cir. 1990).

[FN5]   Montage Group, Ltd. v. Athle-Tech Computer Systems, Inc., 889 So. 2d 180 (Fla. Dist. Ct. App. 2d Dist. 2004).

[FN6]   With respect to an action for tortious interference brought against such individuals as defendants, see § 9:6.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

CALLMANN § 9:5
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

Page 8

[FN7]   Waste Conversion Systems, Inc. v. Greenstone Industries, Inc., 33 S.W.3d 779 (Tenn. 2000).

Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 44 U.C.C. Rep. Serv. 2d 681 (3d Cir. 2001).

Hammer Corp. v. Wade, 278 Ga. App. 214, 628 S.E.2d 638 (2006).

A parent corporation cannot be liable for tortious interference with the contractual relations of its subsidiary. In re Hercules Automotive Products, Inc., 245 B.R. 903, 910 (Bankr. M.D. Ga. 1999); Perry v. Unum Life Ins. Co. of America, 353 F. Supp. 2d 1237 (N.D. Ga. 2005); In re WorldCom, Inc., 368 B.R. 308 (Bankr. S.D. N.Y. 2007).

Cf. Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass. App. Ct. 416, 765 N.E.2d 800 (2002): "Not only were the Phillipses the sole stockholders and chief executive officers of Norwood [Realty, Inc.], but they also were the direct and principal potential beneficiaries of the letter of intent to which they were party. Hunneman's claim, therefore, is 'subject to the embarrassment' that it essentially alleged that the Phillipses interfered with their own affairs, an activity which carries no liability."

[FN8]   Schoellkopf v. Pledger, 778 S.W.2d 897, 902–03 (Tex. App. Dallas 1989), writ denied, (June 13, 1990) (no tortious interference when company owned, controlled, and dominated by two individuals had a unity of interest with the individuals and were thus so closely aligned as to be one entity), writ denied.

Knickman v. Midland Risk Services-Illinois, Inc., 298 Ill. App. 3d 1111, 233 Ill. Dec. 153, 700 N.E.2d 458, 14 I.E.R. Cas. (BNA) 1875 (4th Dist. 1998): "We have been unable to find a case where the same entity has been held liable on a contract for its breach and also liable for the tort of interfering with the contract .... To so hold here would make [the shareholder] liable for inducing the breach of a contract to which it was constructively a party."

If a corporation has the right to terminate a business relationship, a shareholder of that corporation who is its alter ego would not be liable in tort for deciding on behalf of the corporation that it should do so. "[I]t would exalt form over substance to hold that the corporation could not be sued successfully in contract, but that the corporation's alter ego could be sued successfully in tort .... We would do considerable damage to [contract law] if we permitted a tortious interference claim against an individual decision maker who is indistinguishable from the corporation itself." Harrison v. NetCentric Corp., 433 Mass. 465, 744 N.E.2d 622 (2001).

Vinton v. Adam Aircraft Industries, Inc., 232 F.R.D. 650 (D. Colo. 2005) (because the plaintiff has taken the position that the individual defendant Adam is the alter ego of AAI corporation, no claim can be brought against Adam for interfering with the contract between Adam's alter ego, AAI, and the plaintiff).

Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd., 475 F.3d 783, 2007 FED App. 0048P (6th Cir. 2007) (where the court is prepared to pierce the corporate veil between a parent corporation and its subsidiary, the parent is not a stranger to the subsidiary's contracts).

For more on the tort liability of shareholders for interfering with the contracts of their corporations, see § 9:8 regarding the privilege which is attached to stock ownership.

[FN9]   See Willis v. New World Van Lines, Inc., 123 F. Supp. 2d 380 (E.D. Mich. 2000) (co-subsidiaries of a common parent).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01555    Document 36-5    Filed 07/21/2008    Page 10 of 32

CALLMANN § 9:5                                                                                           Page 9
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

The result in these cases probably would have been the same if they had been decided on the basis of the shareholder's traditional privilege to protect his ownership interest in the corporation. See § 9:8.

[FN9.50]   Cambio Health Solutions, LLC v. Reardon, 213 S.W.3d 785, 25 I.E.R. Cas. (BNA) 854, 153 Lab. Cas. (CCH) ¶60327 (Tenn. 2006).

The Cambio court said that it knew of only three cases that found an identity of interest where a parent corporation owned less than 100% of its subsidiary, and only one of those cases actually exculpated the parent corporation: Phil Crowley Steel Corp. v. Sharon Steel Corp., 782 F.2d 781, 783 (8th Cir. 1986) (applying Missouri law; parent owned 86% of subsidiary) (parent corporation's interference not justified because it acted with an improper purpose); Paglin v. Saztec Intern., Inc., 834 F. Supp. 1184, 1195 (W.D. Mo. 1993) (applying Missouri law; parent owned 80% of subsidiary) (parent corporation's interference not justified because it acted with an improper purpose); Hansen v. Transworld Wireless TV-Spokane, Inc., 111 Wash. App. 361, 44 P.3d 929, 936, 47 U.C.C. Rep. Serv. 2d 460 (Div. 3 2002) (parent owned 66 2/3% of subsidiary) (parent corporation's interference justified). Even in the Hansen case the court recognized that the interests of a subsidiary that is not wholly-owned may be more divergent from its parent's interests than the interests of a wholly-owned subsidiary. Hansen v. Transworld Wireless TV, Inc., 44 P.3d at 936 n. 7.

But the Hansen court concluded that it is "incumbent on the party opposing summary judgment to articulate those diverging interests." Hanson, 44 P.3d at 936 n. 7. The Cambio court disagreed with Hansen that the plaintiff should have this burden or that the trial court or a jury should have to make such a determination. It reasoned as follows:
In adopting the bright line rule that the privilege does not extend unless the parent corporation owns 100% of a subsidiary, we reject a rule that would require trial courts to determine, on a case by case basis, whether the interests of a parent and subsidiary are identical when a parent is alleged to have tortiously interfered in the affairs of its subsidiary. If we were to decide otherwise, trial courts would be required to inquire into all the interests of majority and minority shareholders and into the motives and means of the majority shareholder, an inquiry that could not be resolved by referring to the ownership interest of the majority shareholder. In effect, trial courts would be required to conduct a trial within a trial to determine whether a parent and subsidiary shared an identity of interest. In light of our reasoning in this case, we believe that imposing such a great burden on trial courts would be inappropriate.

[FN10]   Matter of Kearney Chemicals, Inc., 468 F. Supp. 1107, 5 Bankr. Ct. Dec. (CRR) 349, 20 C.B.C. 182 (D. Del. 1979) (an officer or agent of Kearney Chemicals, other than the dominant shareholder, might have conceived the idea of authorizing and issuing more shares, and then persuaded the dominant shareholder to go along with it).

[FN11] A corporation which is wholly owned by a contracting party cannot be liable for inducing that party to breach the contract, because for this purpose they are not different persons. Wausau Medical Center, S.C. v. Asplund, 182 Wis. 2d 274, 514 N.W.2d 34 (Ct. App. 1994).

Deauville Corp. v. Federated Dept. Stores, Inc., 756 F.2d 1183, 1196, 1985-1 Trade Cas. (CCH) ¶66537 (5th Cir. 1985) (neither a parent corporation nor its wholly owned subsidiary is liable for interfering with the other's business relations), citing the single-entity theory of Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628, 1984-2 Trade Cas. (CCH) ¶66065 (1984) (parent and wholly owned subsidiary cannot conspire for antitrust purposes).

But cf. Heil-Quaker Corp. v. Mischer Corp., 863 S.W.2d 210 (Tex. App. Houston 14th Dist. 1993), vacated

pursuant to settlement, 877 S.W.2d 300 (Tex. 1994) and writ granted, (May 25, 1994) (an agreement to be acquired, which was not consummated until later, did not create a unity of interest at the time the interference occurred, and thus did not avoid liability).

[FN12] See § 9:8.

[FN13] OnTap Premium Quality Waters, Inc. v. Bank of Northern Illinois, N.A., 262 Ill. App. 3d 254, 199 Ill. Dec. 586, 634 N.E.2d 425 (2d Dist. 1994) (the plaintiff corporation's directors personally borrowed money to set up, and were the principals in, an alter ego corporation created for the purpose of effecting a refinancing of the plaintiff's leasing business).

[FN14]    Webber v. Inland Empire Investments, 74 Cal. App. 4th 884, 88 Cal. Rptr. 2d 594 (4th Dist. 1999).

[FN15]    Webber v. Inland Empire Investments, 74 Cal. App. 4th 884, 88 Cal. Rptr. 2d 594 (4th Dist. 1999).

[FN16]    Knickman v. Midland Risk Services-Illinois, Inc., 298 Ill. App. 3d 1111, 233 Ill. Dec. 153, 700 N.E.2d 458, 14 I.E.R. Cas. (BNA) 1875 (4th Dist. 1998): "We recognize that, under the authorities cited, [defendant] MFG could not have interjected the theory of piercing the corporate veil between MFG and Midland Illinois, but once plaintiff interjected the theory into the case, he had to live with the consequences."

[FN17]    F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 754 F.2d 216, 221, 225 U.S.P.Q. 278 (7th Cir. 1985) (bishop not legally distinct from parish churches which he instructed to stop using plaintiff's hymnals).

The various organs of the Seventh-Day Adventist Church are all part of the same organization, and are not liable for interfering with each other's contracts. Proctor v. General Conference of Seventh-Day Adventists, 651 F. Supp. 1505, 1986-2 Trade Cas. (CCH) ¶67339 (N.D. Ill. 1986).

[FN18]    Battista v. Lebanon Trotting Ass'n, 538 F.2d 111, 116, 3 Ohio Op. 3d 230 (6th Cir. 1976) (Ohio law).

A complaint against a cooperative dairy association, which had acted as the agent for its farmer member, should have been dismissed. Terry v. Dairymen's League Co-op. Ass'n, 2 A.D.2d 494, 157 N.Y.S.2d 71 (3d Dep't 1956); Gammon v. Federated Milk Producers Ass'n, 14 Utah 2d 291, 383 P.2d 402 (1963).

[FN19] In re Baldwin, 184 B.R. 558 (Bankr. E.D. Ark. 1995).

[FN20]    Ray v. American Nat. Bank & Trust Co. of Sapulpa, 1994 OK 100, 894 P.2d 1056 (Okla. 1994) (conservator of incompetent).

The personal representative of a decedent cannot be liable for interfering with the decedent's contract. Colorado Nat. Bank of Denver v. Friedman, 846 P.2d 159 (Colo. 1993).

[FN21]    G. Golden Associates of Oceanside, Inc. v. Arnold Foods Co., Inc., 870 F. Supp. 472, 480 (E.D. N.Y. 1994).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01555    Document 36-5    Filed 07/21/2008    Page 12 of 32

CALLMANN § 9:5                                                          Page 11
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

In <u>Ahearn v. Anderson-Bishop Partnership, 946 P.2d 417 (Wyo. 1997)</u>, A and B began negotiating a real estate deal, and before an agreement was reached B informed A that he wanted to form a partnership with another to purchase the land. A agreed as long as the terms of the sale remained the same, and then proceeded to negotiate with B's partnership. They eventually reached an agreement that culminated in the sale of the land by A to B's partnership on less favorable terms. Subsequently A claimed that the partnership had tortiously interfered with the superior deal between A and B alone. The court dismissed this claim, however, saying: "the Partnership was not an outside party that came along and induced [B] to back out of the contract (or proposed contract). [B] created the Partnership for the very purpose of purchasing the" land.

In <u>Disaster Services, Inc. v. ERC Partnership, 228 Ga. App. 739, 492 S.E.2d 526 (1997)</u>, it was held that a defendant who had a contract to purchase a building was not liable for asking the leaseholder of the building to exercise its contractual right to terminate repair work being done by plaintiff on the building before title passed to defendant; the court said that the defendant "was ... a legitimately interested party to the contract between [the leaseholder] and [plaintiff] ..., because [defendant] would receive the ... [b]uilding upon closing." The court acknowledged, however, that the defendant was technically not a party to, or third-party beneficiary of, the contract between the plaintiff and the leaseholder. It should also be noted that the more probable interpretation of the rationale of this decision is the doctrine that the defendant has a privilege to interfere with a contract in pursuit of his own legitimate interest; see <u>§ 9:8</u>.

Neither the original contracting party nor the assignee of the contract can be liable for interfering therewith. <u>K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702 (Alaska 2003)</u>.

[FN22]    <u>Sufrin v. Hosier, 128 F.3d 594 (7th Cir. 1997)</u>: "Telesonics had independent contractual obligations to Hosier and to Sufrin, and Hosier had no greater right to interfere with the obligation to Sufrin than he would have had if that obligation had been set forth on a separate piece of paper. We cannot find a published judicial opinion on the question, but the answer seems clear as a matter of principle."

[FN23]    <u>Nautica Intern., Inc. v. Intermarine USA, L.P., 5 F. Supp. 2d 1333 (S.D. Fla. 1998)</u>.

[FN24]    <u>ESI, Inc. v. Coastal Power Production Co., 13 F. Supp. 2d 495 (S.D. N.Y. 1998)</u>:
La Casa Castro's consent was merely a condition precedent to the valid formation of DELASA-ESI Assignment. Once La Casa Castro consented and the contract was formed, La Casa Castro had no rights or obligations under the contract. Thus, La Casa Castro did not become a party to the DELASA-ESI Assignment simply by consenting to the assignment .... Instead, it is a third party unrelated to that contract and may be sued for tortiously interfering with it.

[FN24.50] In <u>Genet Co. v. Annheuser-Busch, Inc., 498 So. 2d 683 (Fla. Dist. Ct. App. 3d Dist. 1986)</u>, the plaintiff, Genet, contracted to purchase from Lopez an Annheuser-Busch, Inc. wholesalership. Lopez had acquired the wholesalership pursuant to Annheuser-Busch's Wholesaler Equity Agreement, which reserved to Annheuser-Busch the right to approve Lopez's transfer of ownership of the business. Accordingly, Lopez's contract for sale to Plaintiff expressly conditioned the sale upon Annheuser-Busch's approval. When Annheuser-Busch did not approve the sale, Genet sued Annheuser-Busch for tortiously interfering with its business relationship with Lopez. The trial court granted summary judgment in favor of Annheuser-Busch, which the appellate court affirmed, noting that Annheuser-Busch "was the source of the business opportunity which plaintiffs sought." But the case could also have been decided on the ground that Annheuser was privileged to exercise its contractual right to refuse to approve the sale; see <u>§ 9:8</u>.

The reasoning of the Genet case, supra, was expressly adopted in <u>Romika-USA, Inc. v. HSBC Bank USA, N.A., 514 F. Supp. 2d 1334 (S.D. Fla. 2007)</u> (bank not liable for exercising its contractual right to refuse

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01555    Document 36-5    Filed 07/21/2008    Page 13 of 32

CALLMANN § 9:5                                                                          Page 12
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

payment under a letter of credit relationship between itself and Romika-USA, because the bank was the "source" of the relationship it is accused of interfering with). But here too the case could have been decided on the ground that a creditor has the right to protect its own interests by refusing to extend credit; see § 9:8.

[FN25]  TVT Records v. Island Def Jam Music Group, 244 F. Supp. 2d 263 (S.D. N.Y. 2003).

[FN26]  Southern Union Co. v. Southwest Gas Corp., 165 F. Supp. 2d 1010 (D. Ariz. 2001).

Sea Crest Const. Corp. v. City of New York, 286 A.D.2d 652, 730 N.Y.S.2d 332 (1st Dep't 2001).

[FN27]  Lake Tightsqueeze, Inc. v. Chrysler First Financial Services Corp., 210 Ga. App. 178, 435 S.E.2d 486 (1993) (one who would benefit from the contract is not a stranger to the contract, and therefore cannot have tortiously interfered); Nicholson v. Windham et al., 257 Ga. App. 429, 571 S.E.2d 466, R.I.C.O. Bus. Disp. Guide (CCH) ¶10348 (2002).

Cf. Disaster Services, Inc. v. ERC Partnership, 228 Ga. App. 739, 492 S.E.2d 526 (1997) (one with a direct economic interest in the contract, even though not a third-party beneficiary, is not a stranger to the contract).

[FN28]  BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So. 2d 203 (Ala. 2001).

[FN29]  Valley Properties, Inc. v. Strahan, 565 So. 2d 571, 583 (Ala. 1990).

[FN30]  Baltimore & Ohio R. Co. v. Central Ry. Services, Inc., 636 F. Supp. 782, 785 (E.D. Pa. 1986).

[FN31]  The In Porters, S.A. v. Hanes Printables, Inc., 663 F. Supp. 494, 504, 1988-1 Trade Cas. (CCH) ¶68047 (M.D. N.C. 1987).

[FN32]  Parks v. CAI Wireless Systems, Inc., 85 F. Supp. 2d 549 (D. Md. 2000).

[FN32.50]  But cf. Freeman Management Corp. v. Shurgard Storage Centers, LLC, 461 F. Supp. 2d 629 (M.D. Tenn. 2006) (an acquiring corporation, prior to the acquisition, does not have sufficient unity of interest with the target corporation to confer on the acquiring corporation a privilege to interfere with the target corporation's contract).

[FN33]  Atlanta Market Center Management, Co. v. McLane, 269 Ga. 604, 503 S.E.2d 278, 283 (1998).

Prior to the *McLane* case, supra, in Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting, Ltd. of Atlanta, 205 Ga. App. 57, 60, 421 S.E.2d 295 (1992), the Court of Appeals reasoned that "all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership" were not strangers; thus the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders.

See also Renden, Inc. v. Liberty Real Estate Ltd. Partnership III, 213 Ga. App. 333, 336, 444 S.E.2d 814, 818 (1994) (Liberty was not a stranger to the business relationship at issue, but rather, as lessor, was an essential entity in the prospective lessor/lessee/sublessee relationship).

Cf. Cumberland Center Associates v. Southeast Management & Leasing Corp., 228 Ga. App. 571, 492 S.E.2d 546 (1997) (disapproved of by, Atlanta Market Center Management, Co. v. McLane, 269 Ga. 604,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01555   Document 36-5   Filed 07/21/2008   Page 14 of 32

CALLMANN § 9:5                                                                          Page 13
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

503 S.E.2d 278 (1998)) (tenant who had been procured by a leasing agent to rent office space could be held liable for tortious interference with a commission agreement between the leasing agent and the landlord).

Cf. Sunamerica Financial, Inc. v. 260 Peachtree Street, Inc., 202 Ga. App. 790, 415 S.E.2d 677 (1992) (disapproved of by, Atlanta Market Center Management, Co. v. McLane, 269 Ga. 604, 503 S.E.2d 278 (1998)) (declining to hold as a matter of law that a parent corporation is not a stranger to the contracts of the corporation's wholly-owned subsidiary or of the latter's wholly-owned subsidiaries).

In re Hercules Automotive Products, Inc., 245 B.R. 903 (Bankr. M.D. Ga. 1999) (if plaintiff and defendant were both parties to a comprehensive interwoven set of contracts or relations, then defendant was not a stranger to plaintiff's business or contractual relations).

The McLane case, supra, was followed in Calhoun v. Cullum's Lumber Mill, Inc., 247 Ga. App. 859, 545 S.E.2d 41 (2001) (real estate broker who was authorized to negotiate sale of land on the seller's behalf and signed the contract of sale in the seller's stead, was not a stranger to the contract, and therefore could not be liable for tortious interference therewith).

The McLane case was also followed in Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711 (Tex. 2001) (a defendant who is a member of a tripartite business relationship cannot be liable for interfering with a contract between the other two parties which is a component of the tripartite relationship, even though the defendant is not technically a party to the contract). The court reasoned that, since Cellulink and Wal-Mart could not have consummated the Lease Agreement without BellSouth's approval, BellSouth had the legal right to terminate Cellulink's relationship with Wal-Mart directly. Therefore BellSouth could do the same thing indirectly, by inducing Wal-mart to terminate its relationship with Cellulink. To similar effect is BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So. 2d 203 (Ala. 2001).

The McLane case was also followed in Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143 (Ala. 2003), as modified on denial of reh'g, (Sept. 5, 2003) (a defendant insurance agent was a participant in the business relationships between a plaintiff insurance company and the holders of insurance policies which it procured for the plaintiff, and therefore the defendant could not be liable for tortious interference with those policies when it later replaced them with policies underwritten by other insurance companies).

The McLane case was also followed in LaSonde v. Chase Mortg. Co., 259 Ga. App. 772, 577 S.E.2d 822 (2003)dismissed, (June 2, 2003) (mortgagee of real property is too closely related to contract for sale of that property by mortgagor to be liable to would-be purchaser for tortious interference with the sale).

The McLane case was also followed in Galardi v. Steele-Inman, 266 Ga. App. 515, 597 S.E.2d 571 (2004).

Accord, Nobel Lodging, Inc. v. Holiday Hospitality Franchising, Inc., 249 Ga. App. 497, 548 S.E.2d 481 (2001): "Moreover, Holiday as the franchisor was not a stranger to either the proposed contract or its underlying business relationship, in which Nobel intended to sell the franchise to a third party, and thus Holiday could not be held for tortious interference with such."

Accord, Britt Paulk Insurance Agency, Inc. v. Vandroff Insurance Agency, Inc., Equipment Dealers Insurance, Northbrook Property and Casualty Insurance Company, 952 F. Supp. 1575 (N.D. Ga. 1996), aff'd, 137 F.3d 1356 (11th Cir. 1998) (Table) (insurance company could not tortiously interfere with an insurance sales agent's business relations with its insureds because the sales agent was not a stranger to the insurance contract).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-01555    Document 36-5    Filed 07/21/2008    Page 15 of 32

CALLMANN § 9:5                                                          Page 14
1A Callmann on Unfair Comp., Tr. & Mono. § 9:5 (4th Ed.)

Accord, Carey Station Village Home Owners Ass'n, Inc. v. Carey Station Village, Inc., 268 Ga. App. 461, 602 S.E.2d 233 (2004) (homeowners association was not a stranger to the relationship between real estate developer and purchasers of lots).

[FN34] Pruitt Corp. v. Strahley, 270 Ga. 430, 510 S.E.2d 821, 14 I.E.R. Cas. (BNA) 1326 (1999).

Cf. Physician Specialists in Anesthesia, P.C. v. MacNeill, 246 Ga. App. 398, 539 S.E.2d 216 (2000) (physicians, who were former shareholders in a closely held professional corporation, can not be liable for interfering with the patient relations of their former corporation). The court reasoned that the former shareholder physicians were not strangers to their former corporation's professional relationships with its patients. The policy dimensions of this reasoning remained unplumbed.

[FN35] Ex parte Blue Cross and Blue Shield of Alabama, 773 So. 2d 475 (Ala. 2000), followed in Griffiths v. Blue Cross and Blue Shield of Alabama, 147 F. Supp. 2d 1203, 2001-2 Trade Cas. (CCH) ¶73413 (N.D. Ala. 2001).

[FN36] See, for example, the following cases, and see also the discussion of those case in § 9:8, which deals with the subject of a privilege to interfere:

Cook v. Little Caesar Enterprises, Inc., 972 F. Supp. 400 (E.D. Mich. 1997), aff'd, 210 F.3d 653, 2000 FED App. 0147P (6th Cir. 2000); Stephenson v. Allstate Ins. Co., 141 F. Supp. 2d 784 (E.D. Mich. 2001), order aff'd, 2003 WL 1795712 (6th Cir. 2003), published at, 328 F.3d 822, 2003 FED App. 0142P (6th Cir. 2003).

Cf. Colonial Bank v. Patterson, 788 So. 2d 134 (Ala. 2000) (bank's contract with depositor corporation permitted it to refuse to allow withdrawals by depositor's shareholders until bank was satisfied that dispute between shareholders was resolved). But the court adopted another ground for its decision: when tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises under its contract with the other two parties is not recognized because the third party is not considered a stranger to the overall relationship.

Cf. LaSonde v. Chase Mortg. Co., 259 Ga. App. 772, 577 S.E.2d 822 (2003) (mortgagee of real property is too closely related to contract for sale of that property by mortgagor to be liable to would-be purchaser for tortious interference with the sale). Perhaps the decision could have been based on the mortgagee's traditional interest in protecting its security interest in the real property (for which see § 9:8).

[FN37] See §§ 9:21 to 9:23.

[FN38] See § 9:27.

[FN39] Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274 (11th Cir. 2003).

[FN40] Cox v. City of Atlanta, 266 Ga. App. 329, 596 S.E.2d 785 (2004).

[FN41] As discussed in § 9:8.

[FN42] ViChip Corp. v. Lee, 438 F. Supp. 2d 1087 (N.D. Cal. 2006).

[FN43] Harrick v. National Collegiate Athletic Ass'n, 454 F. Supp. 2d 1255, 214 Ed. Law Rep. 319 (N.D.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Ga. 2006).

[FN44] See § 9:8.

See also Rogers & Willard, Inc. v. Harwood, 2007 WL 2684542 (Ala. Civ. App. 2007) (shareholder of a general contractor firm that was involved in a contractual dispute with a building owner was not a stranger to the building owner's relationship to the bank which provided the construction financing, and therefore was not liable for informing the bank that the general contractor would be filing a lien on the building and therefore the bank should disburse no more construction-loan funds to the building owner). As an alternate ground, the court held that, as a co-owner of the general contractor, the shareholder had a sufficient economic interest in the construction-loan financing agreement between the building owner and the bank to justify the interference.

[FN45]   Benefit Support, Inc. v. Hall County, 281 Ga. App. 825, 637 S.E.2d 763 (2006), cert. denied, (Feb. 26, 2007).

[FN46] See § 9:6.

[FN47]   J. Kinson Cook of Georgia, Inc. v. Heery/Mitchell, 284 Ga. App. 552, 644 S.E.2d 440 (2007) (alternate holding as to the first point).

[FN48] See § 9:6.

[FN49] See § 9:8.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CALLMANN § 9:5

END OF DOCUMENT

# EXHIBIT N

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

**H**Kinsey v. Cendant Corp.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Douglas KINSEY, Plaintiff,
v.
CENDANT CORPORATION, Fairfield Resorts Inc.,
and FFD Development Company, L.L.C.,
Defendants.
**No. 04 Civ.0582(RWS).**

Nov. 16, 2004.

King, Pagano & Harrison, New York, NY, By:
Jeffrey W. Pagano, IRA M. Saxe, for Plaintiff, of
counsel.
Skadden, Arps, Slate, Meagher & Flom, New York,
NY, By: Samuel Kadet, Timothy K. Giordano, for
Defendants, of counsel.

*OPINION*

SWEET, J.
*1 Defendants Cendant Corporation ("Cendant"),
Fairfield Resorts, Inc. ("Fairfield"), and FFD
Development Company, L.L.C. ("FFD")
(collectively, the "Defendants") have moved pursuant
to Rules 12(b)(6) and 9(b), Federal Rules of Civil
Procedure, and Section 21D of the Securities
Exchange Act of 1934 (the "Exchange Act"), as
amended by the Private Securities Litigation Reform
Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4, to
dismiss claims 1, 3, 4, 5, 7 (to the extent based on
gross negligence) and 8 in the amended complaint
(the "Amended Complaint") of plaintiff Douglas
Kinsey ("Kinsey"). For the reasons set forth below,
the motion is granted and Kinsey is granted leave to
move to file a second amended complaint.

*The Parties*

Kinsey is a resident of Georgia and a former
employee of both Fairfield and FFD. (*See* Am.
Compl. at ¶¶ 2, 9, 29.) Kinsey resigned from Fairfield
in or about May 2003. (*See* Am. Compl. at ¶ 65.)

Fairfield is a Delaware corporation with its principal

place of business in Florida and was at one time
purported to be the largest vacation ownership
company in the world. (*See* Am. Compl. at ¶¶ 4, 9.)

Cendant is a Delaware Corporation with its principal
place of business in New York and is the parent
company of Fairfield, having acquired it in April
2001. (*See* Am. Compl. at ¶¶ 3, 17.) Cendant is
primarily a travel and real estate company with
world-wide operations. (*See* Am. Compl. at ¶ 18;
*see also* Excerpts from Cendant's Form 10-K, filed
Mar. 29, 2001, attached as Exhibit B to the
Declaration of Samuel Kadet, dated May 10, 2004
("Kadet Decl."), at 4.)

FFD, a Delaware corporation with its principal place
of business in Florida, was formed in connection with
Cendant's acquisition of Fairfield in April 2001. (*See*
Am. Compl. at ¶¶ 5, 17.)

*Prior Proceedings*

Kinsey commenced this action on January 26, 2004.
In his initial complaint (the "Original Complaint")
against Fairfield, FFD, Cendant and the Cendant
Corporation Employee Stock Purchase Plan
(collectively, the "Initial Defendants"), Kinsey
alleged claims under the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. §
1001*et seq.*, as well as common law claims and
violations of Section 10(b) of the Exchange Act and
Rule 10b-5 promulgated thereunder. (*See* Original
Compl. at ¶¶ 48-143.)

The Initial Defendants moved to dismiss the Original
Complaint on March 26, 2004, including the
purported ERISA claims and the claim for securities
fraud. Kinsey then filed the Amended Complaint on
April 23, 2004, alleging securities fraud in Count 1,
breach of contract in Count 2, breach of fiduciary
duty in Count 3, breach of the implied duty of good
faith and fair dealing in Count 4, fraud and deceit in
Count 5, negligent misrepresentation in Count 6,
negligence in Count 7, unjust enrichment in Count 8,
and failure to pay wages in Count 9, as well as
seeking a declaratory judgment in Count 10.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

**\*2** The Defendants thereafter moved to dismiss Counts 1, 3, 4, 5, and 8 of the Amended Complaint in their entirety and Count 7 in part.[FN1]The motion was heard and marked fully submitted on June 16, 2004.

> FN1. As set forth in a letter from the Defendants' counsel to the Court following the filing of both the Amended Complaint and the Defendants' motion to dismiss the Amended Complaint, "[i]n light of these events, the parties believe and agree that there is no need for the argument on the Initial Motion to Dismiss...." (Letter of Samuel Kadet to the Court, dated May 14, 2004, at 1.) Accordingly, the Initial Defendants' motion to dismiss the Original Complaint, filed on March 26, 2004, is deemed moot.

*The Facts*

The following factual background is drawn primarily from the allegations of the Amended Complaint and from documents referenced in and integral to the Amended Complaint, including, *interalia,* the Fairfield Communities, Inc.1997 Stock Option Plan (the "Plan") and the related option agreement between Kinsey and Fairfield (the "Option Agreement"), as well as public documents filed with the Securities and Exchange Commission (the "SEC").See*Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (stating that "when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents"); *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* No. 99 Civ. 8556(JGK), 2000 WL 1277303, at \*3 (S.D.N.Y. Sept.8, 2000) (holding that where a complaint contains allegations that the defendants breached a contract, the complaint "incorporates by reference the allegedly breached contract and the Court may consider the terms of that contract on a motion to dismiss") (citing *Allworld Communications Network, L.L.C. v. MCI Worldcom, Inc.,* No. 99 Civ. 4256(DC), 2000 WL 1013956, at \*2 n. 1 (S.D.N.Y. July 24, 2000), *appeal dismissed,*98 Fed. Appx. 72 (2d Cir.2004); *Cary Oil Co. v. MG Refining & Mktg., Inc.,* 90 F.Supp.2d 401, 407 n. 19 (S.D.N.Y.2000)).

The factual allegations are accepted as true for the purposes of this motion, see*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002), and do not constitute findings of fact by the Court.

In or about 1981, Kinsey commenced employment with Fairfield. He subsequently left employment with Fairfield in or around 1989 and commenced employment with Fairfield again in or around 1995. (*See* Am. Compl. at ¶¶ 9, 10.) In or about Fall 1996, Kinsey rose to the position of Vice President of Acquisitions for Fairfield. (*See* Am. Compl. at ¶ 10.)

In March 1997, Fairfield established the Plan (*see* Am. Compl. ¶ 11), which authorized the Fairfield Board of Directors (the "Fairfield Board") or its compensation committee to make discretionary awards to employees of options to purchase shares of Fairfield common stock. (*See* Plan, Kadet Decl., Exh. C, at 2.) Under the Plan, any award of options would specify the required period of continuous employment and any other conditions to be satisfied before the awarded options would become exercisable. (*See* Plan, Kadet Decl., Exh. C, at 3.) The award could also provide for, or be amended to provide for, the earlier exercise of options in the event of a change in control of Fairfield. (*See* Plan, Kadet Decl., Exh. C, at 3.)

**\*3** Under the Plan, each award of options was to be evidenced by a stock option agreement executed on behalf of Fairfield and delivered to the recipient employee. (*See* Plan, Kadet Decl., Exh. C, at 3.) The Fairfield Board (or the compensation committee) was authorized, without the consent of the recipient employee, to "amend any agreement evidencing a Stock Option granted under the Plan, or otherwise take action, to accelerate the time or times at which the Stock Option granted under the Plan, [and] to extend the expiration date of the Stock Option...." (Plan, Kadet Decl., Exh. C, at 4.) The Fairfield Board or any duly authorized committee also could amend the Plan or terminate it at any time. (*See* Plan, Kadet Decl., Exh. C, at 5.)

On May 22, 1997, Kinsey was granted certain stock options (the "Awarded Options"), pursuant to which he had the right to purchase 10,000 shares of Fairfield common stock at $30.00 per share. (*See* Am. Compl. at ¶ 12.) As contemplated by the Plan, the terms and conditions of this grant were set forth

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

in the Option Agreement, an agreement entered into by Kinsey on or about June 5, 1997 and executed effective as of May 22, 1997. (*See* Am. Compl. at ¶ 14; *seegenerally* Option Agreement, Kadet Decl., Exh. D.)

According to the Option Agreement, the Awarded Options were to vest (*i.e.,* become exercisable) at a rate of 25% on each of the second, third, fourth and fifth anniversaries of the date of the award, provided that Kinsey remained in continuous employment with Fairfield from the award date until each such vesting date. (*See* Am. Compl. at ¶ 12.) So long as Kinsey remained employed by Fairfield, he could exercise any of the Awarded Options that had vested up to ten years after the May 22, 1997 award date. (*See* Am. Compl. at ¶ 12.)

On the other hand if Kinsey ceased to be an employee of Fairfield for any reason other than death or discharge for cause (or resignation in anticipation of discharge for cause), the Option Agreement provided that Kinsey could exercise his vested Awarded Options only during the ninety calendar days following such termination, but in no event after the otherwise applicable ten-year expiration date. (*See* Option Agreement, Kadet Decl., Exh. D, at 2.) The Option Agreement further provided that any subsequent amendment to the Plan would be deemed an amendment to the Option Agreement, subject only to the requirement that no amendment would adversely affect Kinsey's rights thereunder without his consent. (*See* Option Agreement, Kadet Decl., Exh. D, at 3.)

Following this grant, Fairfield announced two stock splits, a 3-for-2 split effective July 15, 1997, and a 2-for-1 split effective January 30, 1998. In connection with each stock split, the Plan was amended appropriately. (*See* Am. Compl. at ¶¶ 15, 16.) Neither of the amendments changed the time within which Kinsey was entitled to exercise the Awarded Options. (*See* Am. Compl. at ¶¶ 15, 16.)

**\*4** In April 2001, Cendant acquired Fairfield pursuant to a merger (the "Merger") and assumed the outstanding and unexercised options issued pursuant to the Plan. (*See* Am. Compl. at ¶ 17, 30.) As a result, in conjunction with the Merger, all such options, including Kinsey's, automatically became fully vested and were converted to options to purchase

shares of Cendant common stock. (*See* Am. Compl. at ¶¶ 30, 31.) Under the applicable conversion factor, the Awarded Options became fully-vested options to purchase 33,918 shares of Cendant common stock at a "strike" price of $8.85 per share. (*See* Am. Compl. at ¶¶ 31, 32.)

As of December 31, 2000, the last full fiscal year before Cendant acquired Fairfield, there were approximately 917 million shares of Cendant common stock, and 187 million options to purchase shares of such stock, outstanding. (*See* Excerpts, Kadet Decl., Exh. B, at F-8, F-30.)

Kinsey received notice of the conversion of Fairfield stock options in a Statement of Stock Option Award, which explained that the newly-converted options remained subject to the terms and conditions set forth in the Plan and Option Agreement. (*See* Am. Compl. at ¶ 32.) As stated in a notice accompanying the Statement of Stock Option Award, "[t]his means that the original expiration date of [the] options will continue to apply, as well as the terms and conditions applicable to [the] options upon your separation from employment with Cendant and/or Fairfield."(Notice, Kadet Decl., Exh. E, at 1.)

In or around April 2001, Kinsey, who had been employed by Fairfield, became an employee of FFD. FFD was formed in connection with the Cendant acquisition of Fairfield. (*See* Am. Compl. at ¶¶ 17, 29.) In or about June 2001, Cendant sent a notice to Kinsey informing him that his stock options would expire on or about June 30, 2001. (*See* Am. Compl. at ¶ 36.)

On or about July 3, 2001, the Defendants informed Kinsey that the notice that his stock options would expire on June 30, 2001 was sent to Kinsey in error. The Defendants informed Kinsey that the Plan had been amended to provide that employment at FFD would "count" as continued employment at Fairfield and thus would not trigger the Plan's 90-day post-termination period after which all unexercised options would expire. (*See* Am. Compl. at ¶ 37.) According to Kinsey, on or about July 3, 2001 he was informed by a FFD officer, Greg Bendlin ("Bendlin"), in an e-mail that his unexercised options had not expired. (*See* Am. Compl. at ¶ 37.) On or about August 14, 2001, Bendlin informed Kinsey that his stock options would not expire until the later of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

one year after the Merger (*i.e.*, April 2, 2002) or the ten-year term set forth in the Option Agreement (May 21, 2007). (*See* Am. Compl. at ¶ 39.)

Kinsey accepted employment with Fairfield again in or around October 2001, assuming the position of Senior Vice President of Real Estate Acquisitions. (*See* Am. Compl. at ¶¶ 40, 46, 47.)

**\*5** On or about April 3, 2003 a Cendant officer informed Kinsey that the Cendant stock options converted from the Awarded Options had actually expired in April 2002, on the first anniversary of the Merger. (*See* Am. Compl. at ¶ 55.) Kinsey resigned from Fairfield in or about May 2003, shortly after a dispute arose concerning the expiration of his stock options. (*See* Am. Compl. at ¶ 65.) According to Kinsey, at all relevant times, the amount that would have been realized by Kinsey had the stock options at issue been exercised exceeded $100,000. (*See* Am. Compl. at ¶ 67.)

*The Rule 12(b)(6)Standard*

In considering a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor,"*Chambers, 282 F.3d at 152* (citing *Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001)*), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994).*"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)*). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir.2004)* (quoting *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)*). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir.2000)*; *accordEternity Global Master*

*Fund, 375 F.3d at 176-77.*

*Choice of Law*

As to Kinsey's state law claims, a court must apply the choice-of-law rules prevailing in the state in which the court sits. *See,e.g.,Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Krauss v. Manhattan Life Ins. Co., 643 F.2d 98, 100 (2d Cir.1981)*. In this case, New York's choice-of-law principles are applied, according to which the governing law with respect to Kinsey's state-law claims is that " 'of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." ' *Tartaglia v. Paul Revere Life Ins. Co., 948 F.Supp. 325, 326 (S.D.N.Y.1996)* (quoting *Babcock v. Jackson, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (N.Y.1963)*). Under New York's choice-of-law principles, "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir.2002)* (quoting *Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 419-20 (2d Cir.2001)* (citing *In re Allstate Ins. Co., 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (N.Y.1993)*)).

**\*6** Kinsey has alleged in the Amended Complaint that "a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District."(Am. Compl. at ¶ 8.) While Kinsey has cited to both Georgia and New York law in his opposition papers with respect to his claim for breach of the implied duty of good faith and fair dealing, noting slight variations between the two bodies of law, he has otherwise relied on case law from New York with respect to his state law claims and has expressly asserted that his claim for breach of a fiduciary duty must stand "under any applicable state law...." (Pl. Opp. Mem. at 2.)

For their part, the Defendants note in their moving papers that the Option Agreement provides that it is to be governed by Arkansas law except as to matters of corporate law, which are to be governed by Delaware law (*see* Option Agreement, Kadet Decl., Exh. D, at 3), although they cite to no Arkansas law with respect to Kinsey's claim for breach of the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 5
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

implied duty of good faith and fair dealing arising out of the Option Agreement. The Defendants otherwise assert that the conduct alleged in the Amended Complaint at least arguably occurred either in Florida, Georgia or New York, but that "no conflict issue for purposes of this motion" is perceived. (Defs. Mem. at 21-22 n.7.)

Since "implied consent to use a forum's law is sufficient to establish choice of law, *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989), and, with the exception of the fiduciary duty claim, the parties have relied, at least in part, upon New York law and have noted no relevant conflicts with the law of the other potentially applicable jurisdictions, New York law will be applied here except as otherwise noted.

*Discussion*

I. *The Defendants' Motion Is Granted*

A. *The Securities Fraud Claim Is Dismissed*

Count 1 of the Amended Complaint alleges that the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j and the regulations promulgated thereunder. (*See* Am. Compl. at ¶¶ 75-87.) Kinsey alleges, *interalia,* that the Defendants intentionally and knowingly failed to disclose material facts and made false statements of fact, knowing them to be false, in relation to the time period within which Kinsey had to exercise his stock options. (*See* Am. Compl. at ¶ 78.)

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury."*Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks omitted); *accordLawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003). A claim under Section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule 9(b), Fed.R.Civ.P. *See,e .g.,In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.), *cert. denied sub nomScholastic Corp. v. Truncellito,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001). Such a

claim must also satisfy the requirements of the PSLRA, 15 U.S.C. §§ 78u-4(b)(1) and 78u-4(b)(2).

*7 The Defendants argue that Count 1 fails because Kinsey did not "purchase" the Awarded Options within the meaning of Section 10(b) and that, even if he had, none of the purported misrepresentations occurred "in connection with" that award of options. The Defendants further argue that Count 1 does not comply with the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P., and of the PSLRA.

1. *Kinsey Did Not "Purchase" the Awarded Options or the Converted Cendant Stock Options*

Kinsey does not dispute the Defendants' contention that his receipt of the Awarded Options in 1997 fails to qualify as a "purchase" for Exchange Act purposes. Instead, Kinsey argues that he purchased the Cendant stock options converted from the Awarded Options in April 2001 when he accepted employment with FFD and that he purchased the converted Cendant stock options again when he subsequently returned to work for Fairfield in October 2001. Kinsey contends that he accepted the employment offered to him in both instances based in part on the Defendants' representations to him concerning the period within which he could exercise his stock options.[FN2]

> FN2. Kinsey has alleged that, over the course of the negotiations leading to his October 2001 decision to return to Fairfield, the Defendants "also provided [Kinsey] with options in 50,000 shares of Cendant stock if he rejoined Fairfield."(Am. Compl. at ¶ 41.) These additional 50,000 shares of Cendant stock are not referenced in Count 1 of the Amended Complaint, which cites only the Awarded Options and the "converted Cendant stock options" (Am. Compl. at ¶ 77) as the relevant "securities" within the meaning of 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10). (*See* Am. Compl. at ¶¶ 77-78.) Accordingly, these additional non-converted Cendant stock options are not relevant here and the discussion of Kinsey's stock options refers only to the Awarded Options and the Cendant stock options to which the Awarded Options were converted.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

As the Defendants acknowledge in their moving papers, if an individual receives an award of grant stock options (or stock) in exchange for accepting employment, then, under the Second Circuit's decision in <u>Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555 (2d Cir.1985)</u>, that individual might be found to have made a "purchase" for Exchange Act purposes. See <u>Yoder, 751 F.2d at 558-61</u> (holding that stock offered as an inducement to accept employment qualifies as a "purchase" of securities under the Exchange Act); see also <u>Lawrence, 325 F.3d at 152-53</u> (collecting cases demonstrating that standing to sue under Section 10(b) is limited to actual purchasers and sellers of a security or to plaintiffs with a contractual right to purchase or sell a security). Even construing the allegations of the Amended Complaint as true, no such "purchase" occurred here.

As an initial matter, Kinsey has alleged in the Amended Complaint that all options under the Plan, including his Awarded Options, were automatically converted to options to purchase Cendant common stock upon Cendant's acquisition of Fairfield. (See Am. Compl. at ¶ 30 ("Under the Agreement and Plan of Merger between Cendant and Fairfield, Cendant assumed the outstanding and unexercised options under the 1997 Stock Option Plan, including [Kinsey's] options."), ¶ 31 ("As a result of Cendant's acquisition of Fairfield, all options to purchase stock under the 1997 Stock Option Plan became options to purchase Cendant common stock."); see also Am. Compl. at ¶ 77 (referring to "[t]he converted Cendant stock options issued to [Kinsey] as a result of the negotiations in connection with Cendant's acquisition of Fairfield").) Thus, according to the Amended Complaint, Kinsey received the converted options as a result of the Merger and not as the result of any employment decision in April 2001.<u>FN3</u>

> FN3. Although the exchange or conversion of securities in connection with a merger may constitute a purchase for purposes of a Section 10(b) claim where the plaintiff shareholder has alleged that he or she was deceived into approving the merger, see, e.g., <u>S.E .C. v. Nat'l Secs., Inc.</u>, 393 U.S. 457, 467 (1969), no such allegations are present here, and the conversion of the Awarded Options therefore does not constitute an investment decision or

"purchase."

**\*8** To the extent that the Amended Complaint suggests an inconsistent allegation, <i>i.e.</i>, that Kinsey was somehow different from the other Plan participants or that the Awarded Options were not automatically converted and vested upon the Merger (see, e.g., Am. Compl. at ¶ 24 (explaining that "[d]uring the course of [the April 2001] negotiations, Fairfield, FFD and Cendant management advised [Kinsey] that in the event that he chose to become employed by Cendant through FFD, his Fairfield stock options would be converted to Cendant stock options"), ¶ 77 (alleging that Kinsey "acquired the converted Cendant stock options as a result of individualized negotiations in connection with his decision to accept employment with Cendant through FFD and his decision to remain with Cendant through employment with Fairfield")), such a contradictory allegation does not undermine the conclusion just reached. See, e.g., <u>In re Livent, Inc. Noteholders Sec. Litig., 151 F.Supp.2d 371, 405-06 (S.D.N.Y.2001)</u> (explaining that "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely") (collecting cases).

Second, the allegations of the Amended Complaint do not suggest that Kinsey "purchased" the converted stock options in April 2001 and October 2001 within the meaning of Section 10(b) and the applicable case law. <i>Yoder</i> and the other cases on which Kinsey relies are inapposite, as they stand for the proposition that a plaintiff who received stock options in exchange for and as in inducement for accepting employment has standing as a "purchaser." See, e.g., <u>Yoder, 751 F.2d at 558-61</u>; <u>Dubin v. E.F. Hutton Group, Inc., 695 F.Supp. 138, 145 (S.D.N.Y.1988)</u> (explaining that the plaintiff, in accepting the defendant's job offer, had exchanged "something of tangible value-he changed his way of life and his job-in return for the stock and stock options available through the Plan" and concluding that the plaintiff qualified as a "purchaser" of a security); <u>Collins v. Rukin, 342 F.Supp. 1282, 1287-89 (D.Mass.1972)</u> (determining that the plaintiff, who had agreed, in accepting employment with the defendant, that he should receive certain stock options, qualified as a purchaser of securities). Unlike

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

the plaintiffs in *Yoder,Dubin,* and *Collins,* Kinsey does not allege that he received the converted stock options in exchange for or as an inducement for acceptance of employment either in April 2001 or in October of that same year. Rather, Kinsey is alleged to have received the Awarded Options in May 1997 (*see* Am. Compl. at ¶ 12), which Awarded Options were converted to Cendant stock options upon the Merger. (*See* Am. Compl. at ¶¶ 30-31). Even taking as true the allegations that Kinsey was induced to accept employment with FFD in April 2001 and with Fairfield in October 2001 based, in part, on the Defendants' representations and omissions concerning the relevant period in which he could exercise the converted stock options (*see* Am. Compl. at ¶¶ 24, 29, 45, 46) these allegations are insufficient to establish that Kinsey was a "purchaser" of securities on either occasion, as no purchase or sale of the converted stock options occurred. To conclude otherwise would lead to the untenable result that a purchase or sale could be said to have occurred upon any misrepresentation concerning a security *already* purchased or sold. Consequently, Kinsey's securities fraud claim must be dismissed.[FN4]

> FN4. As the allegations of the Amended Complaint fail to establish that a "purchase" of the converted stock options occurred in either April 2001 or October 2001, the Defendants' alternate argument that any alleged misrepresentations did not occur "in connection with" those purchases need not be reached.

*2. The Securities Fraud Claim Is Not Pled With Sufficient Particularity*

**\*9** Count 1 fails for the additional reason that it has not been pled with sufficient particularity, as required by both Rule 9(b), Fed.R.Civ.P., and the PSLRA. *See,e.g.,Novak v. Kasaks,* 216 F.3d 300, 306-07 (2d Cir.2000) (setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b-5); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule 10b-5 are subject to the pleading requirements of Rule 9(b)").

To satisfy Rule 9(b), a complaint setting forth a claim

pursuant to Section 10(b) and Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Shields,* 25 F.3d at 1128 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)); *accordStevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir.1999). To plead a material misrepresentation or omission under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Amended Complaint does not include sufficiently particular allegations concerning the majority of misrepresentations and omissions cited by Kinsey. There are no allegations, for instance, concerning when and where the "individualized negotiations" between Kinsey and the Defendants leading to Kinsey's decisions to accept employment with FFD in April 2001 and with Fairfield in October 2001 took place, nor does the Amended Complaint indicate who participated in those negotiations, the identity of the speaker of the alleged representations made to Kinsey during those negotiations, or when the representations themselves were made. (*See* Am. Compl. at ¶¶ 23-29, 40-46, 77). Similarly, Kinsey has failed to identify when Cendant's writing or writings concerning the conversion of the Awarded Options to Cendant stock options were issued. (*See* Am. Compl. at ¶ 32.) Although the details of statements concerning the exercise period for Kinsey's stock options purportedly made by Bendlin, an FFD officer, in e-mails on or about July 3, 2001 and August 14, 2001 (*see* Am. Compl. at ¶¶ 37, 39) are pled with adequate particularity, these allegations would only potentially salvage Kinsey's claim if he were a "purchaser" of converted Cendant stock options in October 2001 (*i.e.,* following the issuance of the e-mails), which, for the reasons stated above, he was not, and if he had adequately pled scienter, which, for the reasons stated below, he has not.

**\*10** Moreover, Kinsey has not refuted the Defendants' argument that the Amended Complaint, which is replete with references to the Defendants'

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

purported actions and omissions, fails to satisfy the basic requirement that "[w]here multiple defendants are involved, the complaint is required to describe specifically each defendant's alleged participation in the fraud."*Spira v. Curtin,* No. 97 Civ. 2637(TPG), 2001 WL 611386, at *3 (S.D.N.Y. June 5, 2001); *seealsoDouble Alpha, Inc. v. Mako Partners, L.P.,* No. 99 Civ. 11541(DC), 2000 WL 1036034, at *3 (S.D.N.Y. July 27, 2000) (dismissing Section 10(b) claims where the complaint did not distinguish among the multiple defendants and "alleg[e] specific acts of wrongdoing as to each one of them"); *In re Blech Secs. Litig.,* 928 F.Supp. 1279, 1294 (S.D.N.Y.1996) (dismissing Section 10(b) and other claims for failure to satisfy Rule 9(b), since "Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations' " (quoting *Three Crown Ltd. P'ship v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993)). Kinsey's cursory allegation that the Defendants shared common ownership and common officers and/or directors at all relevant times following the Merger (*see* Am. Compl. at ¶ 35) and his argument that all of the Defendants were " 'one" ' with respect to the wrongdoing alleged in the Amended Complaint (Pl. Opp. Mem. at 13) do not excuse his failure to differentiate among the Defendants or otherwise exempt his pleadings from the requirements of Rule 9(b).*See,e.g.,Filler v. Hanvit Bank,* Nos. 01 Civ. 9510(MGC) & 02 Civ. 8251(MGC), 2003 WL 22110773, at *3 (S.D.N .Y. Sept. 12, 2003) (dismissing fraud claims against related corporate entities for lack of specificity where "[t]he complaints are full of conclusory allegations that the Korean entity acted through [its] parent [and] assume that these two corporations constitute a single entity [without] any explanation of why these distinct corporations should be regarded as one"); *Kolbeck v. LIT America, Inc.,* 923 F.Supp. 557, 570 (S.D.N.Y.1996) (explaining that "[b]road allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b)") (citing *Landy v. Mitchell Petroleum Tech. Corp.,* 734 F.Supp. 608, 620-21 (S.D.N.Y.1990)), *aff'd,*152 F.3d 918 (2d Cir.1998).

Kinsey has also failed to plead scienter adequately. In order to plead scienter under the PSLRA, "plaintiffs must 'state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind,' as required by the language of the Act itself."*Novak,* 216 F.3d at 311 (quoting 15 U.S.C. § 78u-4(b)(2)). In order to satisfy this requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."*Rombach v. Chang,* 355 F.3d 164, 176 (2d Cir.2004) (quoting *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000)). Pursuant to Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). Notwithstanding the generosity of this standard, the Second Circuit has long recognized that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito,* 47 F.3d at 52 (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)).

**\*11** Kinsey argues that the Defendants had both motive and opportunity to commit the fraud alleged. In support of his argument, he points to allegations in the Amended Complaint concerning Cendant's "questionable accounting practices" (Am. Compl. at ¶ 20) at or around the time of the Merger and Cendant's "scheme to understate its liabilities for off balance sheet entities and its employee stock options."(Am. Compl. at ¶ 21). It is alleged that Cendant announced in or about August 2002 that it would end its practice of refusing to report employee stock options as expenses as of January 2003 and reduce its issuance of employee stock options in the future. (*See* Am. Compl. at ¶¶ 48-49.) It is further alleged that at or around that same time Cendant's shareholders determined that Cendant's president should no longer have the right to a mandatory grant of stock options and that Cendant "took these actions in response to the business scandals and securities fraud lawsuits that it was facing."(Am. Compl. at ¶ 53.) Kinsey argues that motive may be inferred from the timing of the August 2002 announcement and the decision by Cendant's shareholders, both made after Kinsey was told that he had until May 2007 to exercise his converted stock options and before Kinsey was informed that his options had expired. (*See* Am. Compl. at ¶¶ 37-39, 55; *seealso* Am. Compl. at ¶ 82 (alleging that the Defendants "had the motive to commit fraud because Cendant decided to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

Page 9

drastically curtail its grant of stock options, including those to its own President, and therefore determined that it would not allow [Kinsey] to enjoy a right no longer available to its own President").)

Kinsey's allegations of general wrongdoing and the reduction in the *award* of employee stock options have no discernible bearing on any motive that the Defendants may have had to misrepresent to Kinsey the relevant *exercise* period for his converted stock options. This is particularly so in light of the timing of the August 2002 announcement and the shareholder decision, both of which came well after the summer of 2001, when the only misleading statements alleged with sufficient particularity purportedly occurred. Moreover, even accepting Kinsey's cursory allegation of the Defendants' "scheme" to mislead the public with regard to Cendant's accounting for awards of stock options as true, there are no allegations in the Amended Complaint suggesting how the purported misrepresentations to Kinsey concerning the exercise period for his Awarded Options, later the converted stock options, could have furthered that scheme.

Kinsey's conclusory allegation that the Defendants-including certain unidentified "directors and officers"-had the motive to commit fraud "because they were then able to realize, or believed themselves able to realize, concrete and personal benefits from the false statements and/or the wrongful disclosures ..., specifically in relation to reducing the liability that it faced in connection with the securities fraud and other lawsuits that it faced and in its struggle to remove the public taint of financial scandal that had fallen upon Cendant and to increase the value of their own stock options" (Am. Compl. at ¶ 83) fares little better. Even adopting, *arguendo,* the somewhat strained assumption that the benefits alleged are sufficiently concrete, *seegenerallyChill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996) (explaining that motive entails " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged'") (quoting *Shields,* 25 F.3d at 1130), there is no suggestion offered by Kinsey as to how the Defendants, by purportedly misleading Kinsey concerning the exercise period for his Awarded Options, might have realized any of the generalized benefits alleged. As the Defendants observe, the notion that Kinsey's exercise of his 33,918 Awarded Options would have anything more

than a *deminimis* effect on another shareholder's, much less the Defendants', holdings of Cendant common stock-of which there were nearly one billion shares outstanding as of December 21, 2000-is implausible and no allegations to the contrary have been offered.

**\*12** Kinsey has also contended that the factual allegations in the Amended Complaint adequately plead scienter because they set forth strong circumstantial evidence of recklessness. "To qualify as reckless conduct, defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Scholastic,* 252 F.3d at 76 (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)) (alteration in original). Thus, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *Id.* Where, however, a "plaintiff has failed to demonstrate that defendants had a motive to defraud ..., he must produce a stronger inference of recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 143 (2d Cir.2001); *seealsoChill,* 101 F.3d at 270 (noting that there is a "significant burden on the plaintiff in stating a fraud claim based on recklessness"). Kinsey fails to demonstrate how the allegations in the Amended Complaint in any way support such a "stronger inference ."

In opposition to the Defendants' motion, Kinsey has recited various alleged misrepresentations and then proffered the conclusions that "[t]hese representations were profoundly false" (Pl. Opp. Mem. at 17) and that recklessness has been established because the Defendants allegedly made misrepresentations "on no less than seven occasions."(*Id.*). Even assuming that these representations-the majority of which, as stated above, have not been pled with sufficient particularity-were false, or repeatedly made, such falsity or repetition does not demonstrate that the representations were made knowingly or recklessly.

Kinsey argues that knowledge may be inferred

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

because on or about April 3, 2003, two years after the alleged misrepresentations, an officer of Cendant, Richard Meisner ("Meisner"), allegedly informed him that "the Board of Directors had determined" that all Fairfield options became fully vested at the time of the Merger in April 2001 and that for Fairfield employees (like Kinsey) who became employed by FFD, the applicable option agreements "was amended" to provide that those employees had one year (rather than three months) from the date of the Merger to exercise their options. (See Am. Compl. at ¶ 55.) Thus, according to Kinsey, at the time of the challenged representations in 2001, it had already been decided by the Board of Directors that Kinsey would be unable to exercise his stock options through 2007.

First, the Amended Complaint does not make clear at what point the unspecified Defendant's Board of Directors allegedly made the determination to which Kinsey refers or when and by whom the amendment referenced was made. Kinsey alleges merely that the Board of Directors "had determined that all Fairfield options became fully vested at the time of the Cendant-Fairfield acquisition in April 2001" and that "Meisner's e-mail also stated that if a Fairfield employee had been transferred to FFD, that employee's option was amended to provide an extended post-termination exercise period which ended on or about April 2002...." (Am. Compl. at ¶ 55.) Just when the unidentified Board of Directors is alleged to have reached its determination is not clear, as the clause "at the time of the Cendant-Fairfield acquisition in April 2001" could apply logically to the moment at which the options were fully vested or to the moment at which the determination was made. Further, there is no indication that the amendment to which Kinsey refers was effectuated simultaneous with the determination of the Board of Directors, or by whom that amendment was made.

**\*13** Even adopting Kinsey's construction of his own allegation, *i.e.,* that the determination of the Board of Directors was made as of the time of the Merger and that the amendment was made by that same Board at the same time, this allegation is not enough to ascribe scienter to the Defendants. With regard to recklessness,

It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement.

*In re Apple Computer, Inc. Sec. Litig.,* 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435-36 (9th Cir.1995)); *seealsoSouthland Sec. Corp. v. Inspire Ins. Solutions Inc.,* 365 F.3d 353, 366 (5th Cir.2004) ("For purposes of determining whether a statement by a corporation was made by it with the requisite 10(b) scienter" one must "look to the state of mind of the individual corporate official or officials who make or issue the statement" at issue.); *First Equity Corp. of Fla. v. Standard & Poor's Corp.,* 690 F.Supp. 256, 260 (S.D.N.Y.1988) ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."), *aff'd,*869 F.2d 175 (2d Cir.1989). The sole allegations of misleading statements set forth with particularity here concern the e-mails purportedly sent by Bendlin in the summer of 2001. Kinsey does not argue, nor does the Amended Complaint offer particularized facts from which to conclude, that Bendlin acted knowingly or recklessly when he made the representations at issue. Accordingly, no inference of recklessness may be drawn here, much less the "stronger inference" required.[FN5]

> FN5. Kinsey's scienter allegations also fail for the independent reason that none of them differentiates between Cendant, FFD and Fairfield. *See,e.g.,Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707, 716 (E.D.Va.2003) ("Plaintiffs' scienter allegations fail for the independent reason[ ] that ... [they] lump Defendants together....").

Even drawing all reasonable inferences in Kinsey's favor and assuming, *arguendo,* that Kinsey was a "purchaser" of the Awarded Options in April 2001 and October 2001, Count 1 of the Amended Complaint nonetheless must be dismissed, as Kinsey's claim has not been pled with the particularity required by both Rule 9(b), Fed.R.Civ.P., and the PSLRA.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

B. *The Breach Of Fiduciary Duty Claim Is Dismissed*

Count 3 alleges a common law claim of breach of fiduciary duty. Specifically, Kinsey alleges that, "[b]ased upon the business and personal relations developed since in or about 1981 between Plaintiff and various officers, directors and executives of Defendants Fairfield, FFD and Cendant, Plaintiff reposed his trust and confidence in their integrity and fidelity," and, "[a]s a result, a fiduciary relationship developed between Plaintiff and such various officers, directors and executives...." (Am. Compl. at ¶¶ 96, 97.) According to Kinsey, this fiduciary relationship created in the Defendants "a duty to refrain from making a false statement of material fact to him in relation to such business and employment decisions" and "a duty to provide him with accurate information in connection with representations of material fact...." (Am. Compl. at ¶¶ 98, 99.) The Defendants contend that Count 3 should be dismissed because Kinsey has not pled sufficient facts to establish that a fiduciary relationship ever existed between him and any of the Defendants.

*14 The law, whether that of New York or of Georgia,[FN6] will not imply a fiduciary relationship based merely on Kinsey's status as an employee. *See, e.g., Lind v. Vanguard Offset Printers, Inc. ., 857 F.Supp. 1060, 1067 (S.D.N.Y.1994)* (dismissing a breach of fiduciary duty claim where the purported fiduciary relationship was based on the plaintiff's status as an employee, since "under New York law, an employer-employee relationship is not fiduciary in nature") (citing *Van Brunt v. Rauschenberg, 799 F.Supp. 1467, 1474 (S.D.N.Y.1992); Ingle v. Glamore Motor Sales, Inc., 140 A.D.2d 493, 494, 528 N.Y.S.2d 602, 604 (2d Dept.1988), aff'd,73 N.Y.2d 183, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989)); Atlanta Mkt. Ctr. Mgmt. Co. v. McLane, 269 Ga. 604, 607, 503 S.E.2d 278, 281-82 (Ga.1998)* ("The employee-employer relationship is not one from which the law will necessarily imply fiduciary obligations; however, the facts of a particular case may establish the existence of a confidential relationship between an employer and an employee concerning a particular transaction, thereby placing upon the parties the fiduciary obligations associated with a principal-agent relationship."). Thus, without additional factual allegations, Kinsey's breach of fiduciary duty claim fails as a matter of law.

*See Madera v. Metro. Life Ins. Co.,* No. 99 Civ. 4005(MBM), 2002 WL 1453827, at *8 (S.D.N.Y. July 3, 2002) (dismissing a claim that depended on the existence of a fiduciary relationship between an employer and an employee because under New York law "[t]he employer-employee relationship is not fiduciary in nature, and plaintiff alleges no further facts from which to infer that such a relationship existed") (citation omitted); *ServiceMaster Co. v. Martin, 252 Ga.App. 751, 758, 556 S.E.2d 517, 524 (Ga.Ct.App.2001)* (holding that a breach of fiduciary duty claim was properly dismissed where the plaintiff was merely an employee and there were no well-pled facts indicating that a confidential relationship existed, since the law will not imply a fiduciary relationship).

> FN6. Kinsey has cited to authority from both jurisdictions in opposing the Defendants' motion to dismiss Count 3. As the result reached here would be the same under either New York or Georgia law, it need not be determined which jurisdiction's law applies.

Kinsey's assertions that a fiduciary duty developed based upon the "business and personal relations" between Kinsey and certain unidentified officers, directors and executives of the Defendants (Am. Compl. at ¶ 96) or that the Defendants had superior information in respect to the Awarded Options are not sufficient allegations of fact to demonstrate the existence of a fiduciary relationship. *See, e.g., ServiceMaster, 252 Ga.App. at 758, 556 S.E.2d at 524* (stating that "conclusory statements" of a confidential relationship are an insufficient basis upon which to infer that an employer-employee relationship is fiduciary in nature); *Freedman v. Pearlman, 271 A.D.2d 301, 305, 706 N.Y.S.2d 405, 409 (N.Y.App. Div. 1st Dep't 2000)* (concluding that allegations that an employee trusted his employer to treat him fairly "do[ ] not give rise to a fiduciary duty"); *see also Onanuga v. Pfizer, Inc.,* No. 03 Civ. 5405(CM), 2003 WL 22670842, at *3 (S.D.N.Y. Nov.7, 2003) (holding that a claim depending on the existence of a special relationship must be dismissed where the plaintiff has not pled facts from which to infer that a fiduciary relationship existed). Nor does the purported length of Kinsey's employment relationship with some of the Defendants suffice to establish a fiduciary relationship here. *See id.* ("Plaintiff's allegation that her husband was a

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

life-long employee of Pfizer does not plead any special relationship ."); _Ellis v. Provident Life & Acc. Ins. Co.,_ 3 F.Supp.2d 399, 402, 411 (S.D.N.Y.1998) (concluding that no fiduciary relationship existed between the plaintiff and his employer of approximately 24 years), _aff'd,_ 172 F.3d 37 (2d Cir.1999).

*15 As the allegations of the Amended Complaint are insufficient to establish the existence of a fiduciary relationship between Kinsey and the Defendants, Count 3 must be dismissed.

C. _The Claim For Breach Of Implied Duty Of Good Fair And Fair Dealing Is Dismissed_

In Count 4 of the Amended Complaint Kinsey alleges that "[b]y virtue of the contractual and fiduciary relationship" between Kinsey and each of the Defendants, each of the Defendants owed Kinsey an implied duty of good faith and fair dealing. (Am. Compl. at ¶¶ 104-106.) The Defendants breached this implied duty, according to Kinsey, "by, without limitation, failing to act in a fair and good faith manner in relation to their representation of material facts, and their omission of material facts, to [Kinsey] in relation to the significant business and employment decisions that he faced."(Am. Compl. at ¶ 107.) For the reasons just set forth, the Amended Complaint contains no factual allegations giving rise to a fiduciary relationship, leaving only the contractual relationship among the parties as the basis for Kinsey's claim.

Although Count 4 does not specify from which contract arises the implied duty allegedly breached by the Defendants, Kinsey has argued in opposition to the Defendants' motion that both the Plan and Option Agreement give rise to the duty at issue. Thus, according to Kinsey, the Plan provides that the Compensation Committee or the Board may, without Kinsey's consent, amend any stock option agreement granted under the Plan with respect to the time or times within which the stock options must be exercised. The Option Agreement states that,

Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; _provided, however,_ that no amendment shall adversely affect the rights of the Participant hereunder without the Participant's

consent.

(Option Agreement, Kadet Decl., Exh. D, at 3.) Kinsey argues that these provisions imply that the exercise period could not be modified without an amendment to the Plan and Kinsey's consent, and that, as a result of these provisions, it was incumbent upon the Defendants to notify Kinsey if and when they chose to change the expiration date of the exercise period and to refrain from misrepresenting that expiration date to him.

Under the law of New York, a covenant of good faith and fair dealing is implied with respect to every contract. _See_ _New York Univ. v. Cont'l Ins. Co.,_ 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763, 769 (N.Y.1995). This covenant is breached when a party "acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."_Jaffe v. Paramount Communications Inc.,_ 222 A.D.2d 17, 22-23, 644 N.Y.S.2d 43, 47 (N.Y.App. Div. 1st Dep't 1996). Where a claim for breach of the covenant of good faith and fair dealing is duplicative of a claim for breach of contract, the claim for breach of the covenant of good faith and fair dealing is properly dismissed. _See_ _Engelhard Corp. v. Research Corp.,_ 268 A.D.2d 358, 358-59, 702 N.Y.S.2d 255, 256 (N.Y.App. Div. 1st Dep't 2000) (holding that a claim for breach of the implied covenant of good faith and fair dealing was properly dismissed as duplicative of a breach of contract claim).

*16 Kinsey has failed to allege facts that would support a claim for breach of the covenant of good faith and fair dealing as distinct from a claim for breach of express contract. The crux of Kinsey's allegations is that the Defendants did not act in good faith under the Option Agreement when they purportedly shortened the expiration date of the Awarded Options without providing notice to Kinsey and obtaining his consent. Whether, as Kinsey argues, the Defendants "actually clandestinely amended the Plan or the [Option] Agreement without informing [Kinsey], or just plain refused to abide by their terms" (Pl. Surreply Mem. at 4), the conduct alleged relates to the Defendants' purported breach of express provisions of the subject agreements rather than any separate and independent grounds for Kinsey's claim of breach of the covenant of good

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

faith and fair dealing. Accordingly, Kinsey's claim of breach of the implied covenant of good faith and fair dealing is dismissed. *See, e.g.,ICD Holdings S.A. v. Frankel, 976 F.Supp. 234, 243-44 (S.D.N.Y.1997)* ( "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.") (internal quotation marks omitted).

### D. *The Fraud And Deceit Claim Is Dismissed*

In Count 5 of the Amended Complaint Kinsey alleges that Fairfield represented to him that the options provided to him did not expire until May 22, 2007, ten years from the date of the grant. (*See* Am. Compl. at ¶ 111.) Kinsey further alleges, upon information and belief, that "at the time of the above-mentioned representation by Defendant Fairfield regarding [Kinsey's] rights in relation to his stock options, Defendant Fairfield knew that [Kinsey] would not be allowed to exercise his stock options up to and including May 21, 2007."(Am. Compl. at ¶ 112.) The Defendants are also alleged to have represented to Kinsey that "his newly-converted Cendant stock options remained subject to the terms of the 1997 Stock Option Plan" and to have intentionally failed to disclose to Kinsey, "until well after one year following Cendant's acquisition of Fairfield, of their position that [Kinsey's] stock options expired one year after that acquisition."(Am. Compl. at ¶¶ 113-114.) Kinsey alleges that "[t]hese omissions were material to [Kinsey's] business and employment decisions," and he assertedly relied upon the Defendants' "promises, representations and omissions" as the Defendants allegedly indicated that he would. (Am. Compl. at ¶¶ 115-116.) As a result of the alleged conduct, Kinsey alleges that he has sustained economic and other injuries. (*See* Am. Compl. at ¶ 119.)

The Defendants argue that Count 5 must be dismissed because Kinsey has failed to allege fraud with the particularity required by Rule 9(b), Fed.R.Civ.P. Specifically, the Defendants contend that Kinsey has only provided conclusory allegations that the supposedly fraudulent acts were committed knowingly, intentionally or recklessly, and that such allegations are insufficient.

*17 As set forth above, although Rule 9(b) provides that the requisite state of mind may be "averred generally," Fed.R.Civ.P. 9(b), Rule 9(b) is not "a 'license to base claims of fraud on speculation and conclusory allegations.' " *Acito, 47 F.3d at 52* (quoting *Wexner, 902 F.2d at 172*). Thus, a conclusory allegation of knowledge or intent without a sufficient motive theory or allegations of fact constituting strong circumstance evidence of conscious misbehavior is insufficient to withstand a motion to dismiss. *Seeid.* at 53.

As previously discussed, there are no allegations in the Amended Complaint suggesting why the Defendants would have been motivated to defraud Kinsey or that the purported misinformation that Kinsey received concerning the expiration date for the exercise of the Awarded Options was the result of anything more than negligence or mistake. In particular, even accepting as true the allegations in the Amended Complaint concerning Cendant's accounting practices (*see* Am. Compl. at ¶ 20), its purported desire "to mislead the public regarding the value of the company" at or around the time of the Merger (Am. Compl. at ¶ 20), and its announcement in or about August 2002 that it planned to reduce the issuance of employee stock options (*see* Am. Compl. at ¶ 49), these allegations are not relevant to, nor sufficient to establish, any purported motive to defraud Kinsey with respect to the expiration date for exercise of his stock options. *See,e.g.,Kalnit, 264 F.3d at 139* ("Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.") (internal quotations omitted). Nor are the Amended Complaint's allegations of false statements and misrepresentations adequate to "establish conscious behavior and recklessnes[s]" on the part of the Defendants, as Kinsey suggests. (Pl. Opp. Mem. at 17.) Accordingly, Count 5 must be dismissed, as Kinsey has failed to plead scienter with sufficient particularity.

### E. *The Gross Negligence Claim Is Dismissed*

Count 7 sets forth a claim for negligence. According to the Amended Complaint, the Defendants had a duty to administer stock options in a reasonable manner and to inform participants and beneficiaries of any information impacting the rights of those participants and beneficiaries under the Plan. (*See*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

Am. Compl. at ¶ 135.) Kinsey alleges that the Defendants breached their duty by failing to advise him "on a timely basis of their position that his rights to exercise his stock options ended within one year of the Cendant[ ] acquisition of Fairfield."(Am. Compl. at ¶ 136.) In addition, the Defendants are alleged to have acted "recklessly and/or with a conscious disregard of [Kinsey's] rights by failing to ascertain the facts available to them in relation to such representations," which conduct, according to Kinsey, amounts to gross negligence. (Am. Compl. at ¶ 138.) The Defendants do not challenge Kinsey's negligence claim itself but argue that Kinsey has failed to state a claim for gross negligence.

**\*18** Kinsey concedes that to state a claim for gross negligence, as opposed to ordinary negligence, the facts alleged must demonstrate "the want of even scant care,"*Hong Kong Exp. Credit Ins. Corp. v. Dun & Bradstreet,* 414 F.Supp. 153, 160 (S.D.N.Y.1975), and the purported misconduct must "smack[ ] of intentional wrongdoing." *Tevdorachvili v. Chase Manhattan Bank,* 103 F.Supp.2d 632, 644 (E.D.N.Y.2000) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.,* 81 N.Y.2d 821, 824, 595 N.Y.S.2d 381, 383, 611 N.E.2d 282, 284 (N.Y.1993)) (internal quotation marks omitted). Kinsey's allegations demonstrate only that the Defendants purportedly made representations to Kinsey regarding the exercise period for his stock options and then completely contradicted those representations almost two years later. No factual allegations in the Amended Complaint show why this supposed transmission of misinformation alone establishes the want of scant care, or suggest that the Defendants' purported failure to provide accurate information to Kinsey "smacks" of intentional wrongdoing. Thus, while Kinsey may adequately have pled a claim for ordinary negligence, the Amended Complaint does not state a claim for gross negligence. *See,e.g.,Sutton Park Dev. Corp. Trading Co. v. Guerin & Guerin Agency Inc.,* 297 A.D.2d 430, 431, 745 N.Y.S.2d 622, 624 (N.Y.App. Div.3d Dep't 2002) (concluding that a properly pled claim for ordinary negligence did not support a claim for gross negligence where the complaint lacked factual allegations demonstrating that the purported negligence was of an aggravated character that evinced a reckless disregard of plaintiff's rights or smacked of intentional wrongdoing). The claim of gross negligence included in Count 7 is therefore dismissed.

## F. *The Unjust Enrichment Claim Is Dismissed*

In Count 8 of the Amended Complaint, Kinsey alleges that the Defendants were unjustly enriched at his expense insofar as they are alleged, by "acting in concert and conspiracy with each other" and "as agents for each other," to have "made material misrepresentations and failed to disclose material information within their knowledge regarding the time period by which [Kinsey] had to exercise his stock options."[FN7](Am. Compl. at ¶ 142.)

> FN7. As set forth above, *seesupra* note 2, the only relevant stock options are those converted from the Awarded Options. Although Kinsey has alleged that he received additional Cendant stock options in October 2001 (*see* Am. Compl. at ¶ 41), he has not alleged what exercise price applies or applied to those additional stock options or suggested that any of the Defendants' representations might be related to the exercise of those additional stock options. Accordingly, the analysis of Count 8 does not concern the additional stock options provided to Kinsey in October 2001.

The Defendants argue that for Kinsey to sustain his claim of unjust enrichment he must identify a benefit that he conferred on the Defendants such that it would be inequitable for them to retain the conferred benefit without paying for it. *See,e.g.,Smith v. Chase Manhattan Bank, USA, N.A.,* 293 A.D.2d 598, 600, 741 N.Y.S.2d 100, 102 (N.Y.App. Div.2d Dep't 2002). In opposition, Kinsey asserts that the Defendants benefitted from their purported misconduct because the Awarded Options became part of the pool of authorized Cendant stock that Defendants either sold or may sell on the open market.[FN8]However, as this so-called benefit is a result of the purported misconduct rather than a benefit that Kinsey conferred on the Defendants, his claim for unjust enrichment is dismissed. *Seeid.*[FN9]

> FN8. Kinsey does not explain how FFD or Fairfield could be said to possess or have the ability to sell shares of Cendant common stock that otherwise would have been issued to Kinsey had he timely exercised his stock options.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045
**2004 WL 2591946 (S.D.N.Y.)**

FN9. The single case cited by Kinsey, _Paramount Film Distrib. Corp. v. State of New York,_ 30 N.Y.2d 415, 334 N.Y.S.2d 388, 285 N.E.2d 695 (N.Y.1972), is not to the contrary. There, unlike here, the plaintiff sought to recover a purported benefit that it had actually conferred on the defendant (_i.e.,_ the payment of motion picture license fees). _SeeParamount Film Distrib.,_ 30 N.Y.2d at 416, 334 N.Y.S.2d at 389, 285 N.E.2d at 695.

## II. _Leave To Move to Eile A Second Amended Complaint Is Granted_

**\*19** Rule 15(a) only permits an amendment of a pleading "once as a matter of course," provided no responsive pleading has been served. Fed.R.Civ.P. 15(a). "Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party...." _Id._ Kinsey used his sole opportunity to amend as of right when, instead of responding to the initial motion to dismiss, he filed the Amended Complaint. He, nevertheless, "reserves his right" to amend the Amended Complaint in his papers submitted in opposition to the Defendants' motion. (Pl. Opp. Mem. at 4.)

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Thus, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead ." _Cortec Indus.,_ 949 F.2d at 48 (citing _Ronzani v. Sanofi S.A .,_ 899 F.2d 195, 198 (2d Cir.1990); _Devaney v. Chester,_ 813 F.2d 566, 569 (2d Cir.1987); _Pross v. Katz,_ 784 F.2d 455, 459-60 (2d Cir.1986)). In view of certain of the grounds for dismissal set forth above, the discretion of the Court is invoked and leave is granted to move to amend the Amended Complaint.

## _Conclusion_

For the reasons set forth above, Counts 1, 3, 4, 5, and 8 of the Amended Complaint are dismissed in their entirety and Count 7 is dismissed in part. Leave to move to file a second amended complaint within thirty (30) days of the entry of this opinion and order is granted.

It is so ordered.

S.D.N.Y.,2004.
Kinsey v. Cendant Corp.
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.