**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RFR HOLDING LLC and,<br>CENTURY 21 CHICAGO, LLC | ) ) ) | |
| Plaintiffs, | ) ) | No.    08 CV 1555 |
| v. | ) ) | Hon. Wayne R. Andersen |
| PONTE GADEA FLORIDA, INC. and<br>CHICAGO MICHIGAN, LLC, | ) ) ) | Magistrate Judge Cole |
| Defendants. | ) | |

**REPLY MEMORANDUM OF LAW**

Plaintiffs submit this reply memorandum of law in further support of their motion for an order disqualifying the Greenberg firm from representing defendants in this action.

**I.    THE GREENBERG FIRM'S ADMISSIONS**

The Greenberg firm's papers in opposition to plaintiffs' motion are far more significant for what they don't say than for what they do say. In fact, a careful review of those papers -- including the failure to rebut numerous material facts set forth in the moving papers -- demonstrates that the Greenberg firm is <u>currently</u> representing plaintiffs -- and affiliates of plaintiffs with the same control group and the same in-house counsel -- and therefore cannot represent defendants in this action, whose interests are concededly adverse.

**A.    The Unrebutted Facts Concerning Century 21**

The Greenberg firm does not deny or even attempt to refute that it is <u>currently</u> representing Century 21 Department Stores LLC ("Century 21 Department Stores"), a family owned limited liability company run by a small group including Ezra Sultan and Raymond Gindi (Sultan Mov. Aff. ¶¶1, 2); nor does the Greenberg firm deny or even attempt to refute that a Century 21 Department Stores' affiliate, GC 730 Michigan LLC ("GC 730"), is a single purpose

entity which was formed for the express purpose of acting as a 50 percent member of plaintiff Century 21 Chicago (Sultan Mov. Aff. ¶3); nor does the Greenberg firm deny or even attempt to refute that Century 21 Department Stores and its affiliate, GC 730, share the same office, principals and decision makers (Sultan Mov. Aff. ¶3); nor does the Greenberg firm deny or even attempt to refute that Ezra Sultan and Raymond Gindi are the <u>identical</u> individuals (i) with whom the Greenberg firm has been regularly communicating respecting the <u>current</u> on-going land use matter for Century 21 Department Stores, and (ii) who were two of the primary decision makers on behalf of plaintiffs respecting the events giving rise to this lawsuit (Sultan Mov. Aff. ¶¶2, 4). None of the foregoing facts -- not one -- has been denied by the Greenberg firm in its papers.

In fact, conspicuously absent from that firm's opposing papers is an affidavit from the lawyer at the Greenberg firm, Jay Segal, who is in charge of the legal work for Century 21 Department Stores and who has been representing that client for years (Sultan Mov. Aff. ¶2). And most significantly, with respect to such representation, <u>the Greenberg firm does not deny that at the time this litigation was initiated, Mr. Segal of the Greenberg firm called Mr. Sultan to ask him whether Century 21 would waive the conflict so as to permit the Greenberg firm to represent defendants herein and that Century 21 expressly refused that request</u> (Sultan Mov. Aff. ¶5).[1]

These facts make clear that the Greenberg firm is in fact currently representing one client,

---

[1]    Rather than placing before this Court an affidavit of Mr. Segal explaining his actions, the Greenberg firm instead, in an unsworn statement in its memorandum in opposition (at 11), states that the fact that "a GT attorney" (i.e., Mr. Segal) asked Mr. Sultan for a waiver "is not an acknowledgment that an actual conflict exists. Rather, by reaching out, GT sought to avoid any unnecessary disputes and facilitate the smoothest possible representation for all involved." However, no amount of spin can alter the fact that, in recognition of the conflict and of the fact that the very same people involved in the Greenberg firm's representation of Century 21 Department Stores are also directly involved in this lawsuit, the Greenberg lawyer representing Century 21 Department Stores asked his client for a conflict waiver, that client refused, and the Greenberg firm nevertheless proceeded to represent its more valuable clients in this lawsuit, adverse to Century 21 Department Stores' interests.

Century 21 Department Stores, and reporting to its decision makers, Ezra Sultan and Raymond Gindi, while it is simultaneously representing defendants in this lawsuit whose interests are diametrically opposed to those entities. For this reason alone, the motion to disqualify the Greenberg firm should be granted.

B.    **The Unrebutted Facts Concerning the Southbeach Project**

In his moving affidavit (¶5(a)), Frank Mangieri explained that the Greenberg firm had been representing the interests of RFR Holding LLC ("RFR Holding") in connection with this project, and Mr. Mangieri identified five separate lawyers at the Greenberg firm -- Seann Frazier, Todd Sumner, Lucia Dougherty, Alfredo Gonzales and Gary Saul – who had worked on RFR's matters in connection with the Project. Significantly, in response, the Greenberg firm has failed to submit an affidavit from any one of those lawyers or, indeed, from any lawyer involved in the Southbeach Project.  Instead, its simplistic argument is that RFR Holding is not formally listed on the Greenberg firm's records as "the client" and, consequently, according to the Greenberg firm, no conflict exists.[2]

Not only has the Greenberg firm failed to submit a sworn statement rebutting that it has performed and is performing legal work for RFR Holding respecting this Project, but it has also failed to explain why the Greenberg firm has addressed numerous bills respecting that Project to RFR Holding and listed RFR Holding as the client on such bills (Mangieri Mov. Aff. ¶6; Ex. 3).

---

[2]    Because the Greenberg firm has failed to submit (i) an affidavit from any of the lawyers in the Greenberg firm who have performed work on the Southbeach Project, (ii) an affidavit from any of the lawyers in the Greenberg firm who have performed work on the Miami Herald Property, and (iii) an affidavit from any of the lawyers in the Greenberg firm who have performed work for Century 21 Department Stores, all of the sworn statements in the moving papers respecting the Greenberg firm's activities for Century 21 Department Stores and RFR Holding are entirely unrebutted.  So, too, with Mr. Mangieri's statements that he is "a member of the small management group responsible for decisions on behalf of plaintiffs in this case," he is also "one of the people with whom the Greenberg firm is communicating in connection with its various ongoing matters for RFR Holding and its affiliates," and he is one of the people to whom others in the RFR organization report who are dealing directly with the Greenberg firm on the matters in which it represents RFR Holding and its affiliates (emphasis in original) (Mangieri Mov. Aff. ¶9).

Indeed, it bears emphasis that the bills are not merely <u>addressed</u> to RFR Holding; on the

Remittance Advice attached to the various bills comprising Exhibit 3, on the form after **"Client**

**Name,"** the name filled in is **RFR HOLDING**. In fact, nowhere on the bill is any <u>other</u> client

listed. We respectfully submit that the Greenberg firm's failure (a) to submit an affidavit from

<u>any</u> of the attorneys identified above who Mr. Mangieri has swore have been rendering the

services to and interacting with RFR Holding personnel respecting this Project, and (b) to

provide any reason or rationale (i) for having sent its bills respecting the Project to RFR Holding,

and (ii) for listing RFR Holding as the client on those bills, without more, convincingly

establishes the clear and actual conflict that exists here.

       C.      **The Unrebutted Facts Concerning the Miami Herald Property**

      In his moving affidavit (¶5(b)), Mr. Mangieri explained that the Greenberg firm had been

representing RFR Holding's interests in connection with this property, and Mr. Mangieri

identified eight separate lawyers at the Greenberg firm -- Pedro Martin, Kerri Barsh, Lucia

Dougherty, Paul Savage, Seth Entin, Jason Lourmiet, Brigid Cech Samole and Maribel

Nicholson -- who had worked on RFR's matters in connection with the property. <u>Once again, in</u>

<u>response, the Greenberg firm has conspicuously failed to submit an affidavit from any one of</u>

<u>those lawyers or, indeed, from any lawyer involved in the Miami Herald project</u>. Instead, once

again, its simplistic argument is that RFR Holding is not formally listed on its records as "the

client" and, consequently, according to the Greenberg firm, no conflict exists.

      Not only has the Greenberg firm failed to submit a sworn statement rebutting Mr.

Mangieri's sworn assertions but, in addition, the Greenberg firm has failed to deny or even

explain away the facts set forth in our moving papers, that (a) as recently as May 27, 2008, Kerri

Barsh of the Greenberg firm sent an e-mail to Mr. Mangieri respecting the Property in

recognition of RFR Holding's active involvement therein (Mangieri Mov. Aff. ¶10), and (b)

again, in recognition of the involvement of RFR Holding in this matter, Pedro Martin, of counsel

to the Greenberg firm, specifically asked Mr. Mangieri to waive a conflict so as to permit the

Greenberg firm to represent an interested party relating to that Property (Id.). Once again, these

facts -- which are wholly undisputed -- demonstrate not only that the Greenberg firm has been

rendering legal services and advice to RFR Holding respecting this Property but additionally

that, in connection therewith, it has been dealing with the very people at RFR Holding

responsible for the prosecution of this lawsuit.[3]

> D.     **The Unrebutted Facts Concerning the Representation of RFR Realty**

The Greenberg firm admits, as it must, that it currently performs work for RFR Realty.

What it nowhere denies -- or even attempts to refute -- is the near identity of interest between

RFR Realty, on the one hand, and RFR Holding, on the other. In fact, in the moving papers, Mr.

Mangieri explained that RFR Holding owns 99 percent of RFR Realty (which acts as RFR

Holding's agent) and that the two companies occupy the same premises and have the same

control group (Mangieri Mov. Aff. ¶7). None of these facts was denied by the Greenberg firm.

In fact, recognizing the interrelationship of the two companies, in the affidavit of Jerrold

Goldberg (¶¶8-10), Mr. Goldberg concedes that in those instances when he performed work for

RFR Holding, he did not even feel the need to prepare a separate engagement letter separate and

distinct from RFR Realty or even to render a bill directly to RFR Holding. Plainly, if Mr.

Goldberg felt that the two companies were truly "separate," a separate engagement letter for the

RFR Holding work would have been required as well as a separate invoice addressed to RFR

---

[3]     We note that the Greenberg firm's representation of RFR's interests respecting the Miami Herald
Property continues unabated. Attached to the reply affidavit of Frank Mangieri, sworn to August 19,
2008, is an e-mail from Kerri Barsh to Mr. Mangieri respecting her work on the Miami Herald property.
The e-mail was sent on August 7, 2008 -- after the Greenberg firm filed its opposing papers on this
motion in which the firm conclusively denied in its memorandum (but with no sworn denial from any of
its lawyers) that it was furnishing legal services to RFR Holding respecting this matter. The latest e-mail
clearly shows that Ms. Barsh continues to communicate with Mr. Mangieri at RFR Holding respecting
steps she intends to take in the course of her representation.

Holding. Yet, as Mr. Goldberg's affidavit makes clear, neither of these things were done, given the close interrelationship between the two companies of which the Greenberg firm is keenly aware.

In a similar vein, in his moving affidavit (¶8; Ex. 4), Mr. Mangieri pointed out that in late April 2008, the Greenberg firm sought a waiver due to the Greenberg firm's representation of RFR Realty. However, recognizing the close interrelationship between the two companies, the letter was addressed to RFR Holding. Once again, nowhere does the Greenberg firm deny this or even provide an explanation for its actions, all of which make clear that an actual conflict currently exists.[4]

## II.    THE GREENBERG FIRM'S ACTUAL CONFLICT PRECLUDES ITS REPRESENTATION OF DEFENDANTS, NOTWITHSTANDING DEFENDANTS' DESIRE TO RETAIN THE GREENBERG FIRM

The general public policy favoring a client's right to select its counsel does not trump a law firm's ethical obligations.  See, e.g., Stratagem Development Corp. v. Heron International N.V., 756 F.Supp. 789, 795 (S.D.N.Y. 1991).  When a firm undertakes to represent a client, the firm assumes "the full panoply of duties that a law firm owes to its client.  [The firm] may not undertake to represent two potentially adverse clients and then, when the potential conflict becomes actuality, pick and choose between them."  Id. at 794.[5] Yet, this is exactly the impermissible professional behavior the Greenberg firm seeks to have this Court condone.

---

[4]    We note that the Greenberg firm has abandoned the contention, originally set forth in its April 25, 2008 letter (Mangieri Mov. Aff. Ex. 2),  that plaintiffs waived the conflict that existed because they did not object to the Greenberg firm's representation of Ponte Gadea in the proposed real estate transaction. See the Greenberg firm's Mem. in Opp. (at 11) ("GT does not believe that Plaintiffs waived a conflict of interest by permitting GT to represent Ponte Gadea in the underlying deal").

[5]    Of the numerous Greenberg lawyers who have performed work for RFR Holding and Century 21 Department Stores, the only one who has submitted an affidavit in opposition to this motion is Jerrold Goldberg. Mr. Goldberg states that he has formally represented "only" RFR Holding's subsidiary, RFR Realty (as distinct from RFR Holding itself). In what can only be characterized as a remarkable coincidence, Mr. Goldberg was the very lawyer involved in the Stratagem decision cited above. As the reported decision makes clear, his then firm was disqualified because Mr. Goldberg was performing labor

In fact, in <u>Owen v. Wangerin</u>, 985 F.2d 312 (7th Cir. 1993), the Court disqualified the plaintiff's attorney because the attorney owed a debt to one of the defendants (which, we submit, is an actual conflict of a lesser magnitude than the massive conflicts of the Greenberg firm in this case). The Seventh Circuit made such ruling <u>after</u> recognizing the general rules that a party "is entitled to a degree of deference in the prerogative to select its own counsel and that disqualification is a drastic measure." <u>Id</u>. at 317.  <u>See</u> <u>also</u> <u>United States v. Alex</u>, 788 F. Supp. 359, 362 (N.D. Ill.1992) (disqualifying an attorney because the interests of his clients in a RICO extortion case were "diametrically opposed").  Moreover, courts in other jurisdictions have uniformly reached similar results.  For example, in <u>International Longshoremen's Association, Local 1332 v.  International Longshoremen's Association</u>, 909 F.Supp. 287 (E.D. Pa. 1995), the district court concluded that a violation of Rule 1.7 of the Pennsylvania Rules of Professional Conduct[6] was "simply too severe to allow the defense team to remain on the case. . . . The court is especially concerned with maintaining confidence in the judicial system." <u>Id</u>. at 293-94.  <u>See</u> <u>also</u> <u>Polydoroff v. Interstate Commerce Comm'n</u>, 773 F.2d 372, 374-75 (D.C. Cir. 1985).[7]

In the face of these principles, defendants' assertion that "[p]laintiffs' Motion to Disqualify perfectly exemplifies the harassing tactics the courts seek to avoid" is both legally and factually wrong.  Plaintiffs are entitled to the undivided loyalty of the Greenberg firm, which fiduciary duty the Greenberg firm has knowingly violated.  Importantly, and not surprisingly, <u>all</u>

---

work for the subsidiary of a parent *simultaneous* with his firm's representation in litigation of a party adverse to such parent. The parallels between the situation there and the situation here could not be clearer.

[6]       Rule 1.7 of the Pennsylvania Rules of Professional Conduct is identical to Rule 1.7 of the Illinois Rules of Professional Conduct.

[7]       The <u>Polydoroff</u> court ruled that "[i]t is unethical to represent conflicting interests, except by express consent of all concerned given after full disclosure of the facts…The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed." <u>Id</u>. at 374.

of the cases cited by defendants in their memorandum on this point (at 8-9) involve

disqualification motions on grounds that are markedly different from those here.[8]  Indeed,

defendants have not cited - - nor can they cite - - any case that held that a law firm may

simultaneously represent a client in a litigation that is adverse to another <u>current</u> client.

      A.    **Rule 1.7 Rather Than Rule 1.9 Applies**

Because the Greenberg firm <u>currently</u> represents (a) plaintiff RFR Holding and its

affiliates and (b) Century 21 Department Stores, the applicable statutes governing the Greenberg

firm's ethical responsibilities are (i) Rule 1.7 of the Illinois Rules of Professional Conduct

("IRPC") and Rule 83.51.7 of the Local Rules of the United States District Court for the District

of Illinois (the "Local Rules"), and (ii) New York DR5-105 and 22 NYCRR §1200.24.  Under

these statutes, the Greenberg firm is mandatorily prohibited from representing the defendants in

this action regardless of the relationship of this action to the work that the Greenberg firm

performs for plaintiffs.[9]  This is true whether plaintiffs are considered direct clients of the

---

[8]      Specifically, (i) in <u>Bogosian v. Board of Education of Community Unit School</u>, 95 F. Supp. 2d 874 (N.D. Ill. 2000), the defendant moved to disqualify the plaintiff's attorney on the ground that the attorney might be called to testify as witness; (ii) in <u>Guillen v. City of Chicago</u>, 956 F. Supp. 1416, 1426 (N.D. Ill. 1997), a plaintiff  moved to disqualify the City of Chicago's corporation counsel from representing two city employed paramedics on the ground that the City was also a defendant (and the court noted with approval that <u>International Longshoremen's Association</u> was an example of where disqualification is appropriate);  (iii) in <u>Robin v. Katten, Muchin, Zavis Pearl & Galler</u>, 1986 WL 7079 (N.D. Ill. 1986), the plaintiff moved to disqualify defendant's law firm on the ground that the firm "ought" to be called as witness, (iv) in <u>Panduit Corp. v. All States Plastic Mfg. Co.</u>, 744 F.2d 1564 (Fed. Cir. 1984), a plaintiff moved to disqualify defendant's counsel based on the attorney's prior representation of the plaintiff, (v) in <u>Times Herald Printing Co. v. Dallas Morning News Co.</u>, 1987 WL 20411(N.D. Ill. Nov. 25, 1987), the defendant moved to disqualify the plaintiff's attorney on the ground that the attorney might be called to testify as witness; and (vi) in <u>Freeman v. Chicago Musical Instrument Co.</u>, 689 F.2d 715 (7th Cir. 1982), the plaintiff requested disqualification of defendant's co-counsel on the basis that such co-counsel had previously been associated with a firm that represented the plaintiff in a prior action involving similar matters.

[9]      The Greenberg firm's mischaracterization of plaintiffs as "former" clients is plainly and fundamentally wrong and the <u>undisputed</u> affidavits submitted by plaintiffs establish the direct opposite. Thus, the Greenberg firm is not entitled to rely on the more liberal "substantial relationship" requirements of Rule 1.9 of the IRPC and Local Rule 83.51.9.

Greenberg firm or whether they are considered to be vicarious clients. Under either legal standard, a definite conflict exists.[10]

### B.    Direct Attorney-Client Relationships

RFR Holding, and its affiliates, and Century 21 Department Stores are each ongoing direct clients of the Greenberg firm under applicable law defining the attorney-client relationship. In fact, the Greenberg firm (in the penultimate sentence of its memorandum of law) has readily admitted that it currently represents "Century 21 Department Stores LLC in one open matter." This fundamental admission alone is sufficient to trigger the application of Rule 1.7 rather than 1.9 of the IRPC, despite the Greenberg firm's painstaking attempts to minimize such representation.

Similarly, RFR Holding and its affiliates are direct clients, notwithstanding the Greenberg firm's attempt to disown them. The Greenberg firm's self-serving formalistic argument that RFR Holding is not a client because the Greenberg firm did not list RFR Holding as a client on that firm's "client intake system" or bookkeeping records, does not hold water. Were the Greenberg firm's approach legally accurate, a client's belief that it had an attorney-client relationship with a law firm would be irrelevant and the only thing of relevance would be how the firm decided to characterize the identity of the client on its "intake" form.

First, as noted, it is undisputed that the Greenberg firm sent bills to RFR Holding in connection with the Southbeach Project and such bills listed RFR Holding as the client. Indeed, those bills had all of the Greenberg firm's privileged time records attached which presumably

---

[10]    Once parties such as plaintiffs have shown they are current clients of the firm, the firm has the burden to demonstrate that it satisfied the requirements of Rule 1.7 and DR 5-105 and obtained the necessary consents of its current clients. See, e.g., Cinema 5 Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1386 (2d Cir. 1976) (finding that the adverse representation of a current client is improper per se); Koehring Company v. Manitowoc Company, 418 F.Supp. 1133-1138-39 (E.D. Wisc. 1976) (ruling that the burden is on the law firm to obtain a clear waiver of the conflict). This the Greenberg firm cannot do. Since the Greenberg firm never obtained such consent -- indeed, it asked for such consent which consent was not given (Sultan Mov. Aff. ¶ 5) -- the Greenberg firm has an impermissible conflict.

could not have been disclosed to RFR Holding <u>unless</u> it was considered to be the client. Moreover, although the Greenberg firm's prime "argument" is that none of its bills were paid by RFR Holding, the Seventh Circuit has made clear that "[a] professional relationship is not dependent upon the payment of fees nor, as we have noted, upon the execution of a formal contract [footnotes and citations omitted]."   <u>Westinghouse Electric Corporation v. Kerr-McGee Corporation</u>, 580 F.2d 1311, 1317 (7th Cir. 1978), <u>cert</u>. <u>denied</u>, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978).  <u>See also</u> <u>Metamorfyx, L.L.C. v. Belkin Components</u>, 2002 WL 1308633 (N.D. Ill. 2002).[11]  In <u>Westinghouse</u>, the Seventh Circuit reversed the district court's order denying a defendant's motion to disqualify Kirkland & Ellis ("Kirkland"). The Court of Appeals determined that Kirkland had an attorney-client relationship with the defendant, despite the absence of a traditional retention agreement, when Kirkland represented the American Petroleum Institute ("API"), a lobbying organization of which the defendant was a member, and the defendant submitted information to Kirkland in connection with the firm's work.  580 F.2d at 1313-1314.  The Court of Appeals found that the district court improperly relied on the absence of any retention agreement and the fact that bills were sent to and paid only by API and "erroneously permitted itself to be influenced by the size of the law firm involved."  <u>Id</u>. at 1317-1318.[12]  The court stated that the existence of a "professional relationship. . .  hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice," <u>quoting</u> McCormick on Evidence (2d ed. 1972), s 88, p. 179. Measured against the facts contained in the moving Mangieri Affidavit -- none of which have been denied -- this alone should be the end of the inquiry.

---

[11]    Copies of unpublished cases not previously submitted to the Court are attached as Exhibit 1.

[12]    The Court also ruled that it was Kirkland's duty to advise its multiple clients of actual or potential conflicts and not the other way around.  <u>Id</u>. at 1321.

The law in the Second Circuit is identical. For example, in <u>Rosman v. Shapiro</u>, 653 F.Supp. 1441, 1445-1447 (S.D.N.Y. 1987), the court ruled that a law firm representing a closely held corporation also had an attorney-client relationship with the corporation's two fifty-percent shareholders where the shareholders reasonably believed the firm was acting as their counsel. "[W]here here the corporation is a close corporation consisting of only two shareholders with equal interests in the corporation, it is indeed reasonable for each shareholder to believe that the corporate counsel is in effect his own individual attorney." <u>Id</u>. at 1445.[13] The Court further noted that failing to treat the firm as counsel to the principals would put "form over substance" solely because the principals acted through a corporate entity. <u>Id</u>.

Even if the work that the Greenberg firm is doing for RFR Holding respecting the Southbeach Project and the Miami Herald Property were not dispositive, the Greenberg firm admits that it is <u>currently</u> performing work for RFR Realty, and it does not deny that RFR Realty is 99 percent owned by RFR Holding and that those two closely held companies share the identical control group and the same offices. Similarly, the Greenberg firm admits that it is <u>currently</u> performing work for Century 21 Department Stores and it does not deny that it and its affiliate (which is a 50 percent owner of plaintiff) are family owned closely held companies, which share the same office, principals and decision makers.[14] Thus, there can be no legitimate dispute that RFR Holding and Century 21 Department Stores are current clients of the Greenberg

---

[13]    The court acknowledged that although in the ordinary corporate situation, corporate counsel does not necessarily become counsel for the corporation's shareholders, the situation is different with closely held companies. <u>Id</u>.

[14]    Notably, the Greenberg firm has made a series of misstatements in its brief regarding these issues, none of which has any evidentiary support and all of which are belied by the moving and reply affidavits. Thus, for example, the Greenberg firm has conclusorily stated that (i) different in-house counsel manage the affairs of RFR Holding and RFR Realty (Mem. in Opp. at 14); (ii) RFR Realty (for whom the Greenberg firm concedes it currently performs work) has different management from plaintiff RFR Holding (<u>Id</u>. at 13); and (iii) Century 21 Chicago Department Stores does not have a complete identity of management with the affiliate that is involved in this lawsuit for plaintiff (<u>Id</u>.). The sworn affidavits of Mr. Mangieri and Mr. Sultan make clear that <u>all</u> of these unsupported statements are patently false.

firm.

C.     **Vicarious Attorney-Client Relationship**

Even if this Court were to find that plaintiffs are not direct clients of the Greenberg firm, the plaintiffs should still be considered vicarious clients of the firm. Indeed, a number of courts have found that a "vicarious client" relationship is sufficient to trigger disqualification, regardless of whether a "traditional" attorney-client relationship existed. See, e.g., Colorpix Systems of America v. Broan Mfg. Co., Inc., 131 F. Supp. 2d 331, 336 (D. Conn. 2001). The Colorpix court ruled that examples of vicarious clients include (i) where the matter involving the affiliate will have a financial impact on the traditional client, see, e.g. Stratagem Development Corp. v. Heron Int'l N.V., 756 F.Supp. at 782; (ii) where the corporate parent supervised the subsidiary's litigation, see, e.g., Hartford Accident and Indem. Co. v. RJR Nabisco, Inc., 721 F. Supp. 534, 540 (S.D.N.Y. 1989) (holding that the parent, through its subsidiary, was a client of the law firm in question, because if they were really separate entities there would not have been a need for the parent's general counsel to retain a supervisory role over the subsidiary's litigation); and (iii) where the affiliated companies share an "identity of interest," such as having substantially similar management personnel. Colorpix, supra at 336-37. Accord Board of Managers of Eleventh Street Loftominium Association v. Wabash Loftominium, 376 Ill. App. 185, 196 (1st Dist. 2007) (plaintiffs' attorney's attempts to minimize its attorney-client relationships by focusing on the separate corporate structure and specific assignments of defendants' affiliates was not persuasive "in light of the extensive representation of corporations having a common management group"); Travelers Indemnity Company v. Gerling Global Reinsurance Corp., 2000 WL 1159260 at * 5, 6 (S.D.N.Y. 2000) (finding two corporations to be the same client for conflict purposes, despite their ability to rely on the protections of the corporate veils, where there was considerable overlap within their corporate structures, and noting that "it is the mere

risk of divided loyalty that the Court is concerned with, not only ethical scenarios that can be readily envisioned at this juncture").

Here, as well, this Court should reject the Greenberg's firm's simplistic argument that, because RFR Holding and Century 21 Department Stores conducted their business affairs through separate legal entities, the Greenberg firm was not their attorney. This would simply put form over substance. See, e.g., Rosman; Travelers' Indemnity. All of the elements of a vicarious client relationship are present. RFR Holding and Century 21 Department Stores each have a small control group that regularly consults with the Greenberg firm on its pending matters and expects that the firm is representing them. Indeed, the resolution of the litigation will directly impact the bottom lines of RFR Holding and Century 21 Departments Stores. See Stratagem. Instead of refuting these material facts, the Greenberg firm has baldly alleged that it will not oppose the same representatives with whom it regularly communicates while representing RFR Holding's affiliates and Century 21 Department Stores. (Mem. in Opp. at 14). However, this is untrue[15] and, in any event, irrelevant under Rule 1.7. Equally without support is the Greenberg firm's statement that the likelihood that Mr. Mangieri and Mr. Sultan will be witnesses is remote.[16]

Finally, plaintiffs submit that defendants' reliance on Donnelley Corp. v. Sprint Publishing & Advertising, Inc., 1996 WL 99902 (N.D. Ill. 1996) is misplaced, as the facts in that case could not be more dissimilar than the facts here. Specifically:

---

[15]     See, for example, the unrebutted affidavit of Ezra Sultan swearing that he and Mr. Gindi are the individuals who are dealing with the Greenberg firm with respect to the matters where the firm is representing Century 21 Department Stores; and the Mangieri moving and reply affidavits demonstrating beyond cavil that the Greenberg firm is continuing to communicate with him respecting the Miami Herald Property.

[16]     The purported "basis" for this statement is that this suit centers on defendant's conduct (Mem. in Opp. at 14) , implying that depositions of plaintiffs may be wholly unnecessary. Although defendants' conduct is plainly at issue, given that plaintiffs are seeking tens of millions of dollars in damages in this lawsuit, we assume that defendants will insist on taking plaintiffs' depositions.

- Sprint was a large public company with over 250 subsidiaries. Here, RFR Holding and Century 21 Department Stores are private, closely held companies;

- Sprint and its subsidiary had separate offices in different states. Here, RFR Holding and RFR Realty share the same offices and Century 21 Department Stores shares the same office as its affiliate, GC 730 (which is a single purpose entity formed expressly for the purpose of acting as a 50 percent member of plaintiff Century 21 Chicago);

- In Donnelly, the conflict involved the law firm's past representation of the subsidiary prior to the time Sprint merged with a subsidiary. Here, the structure of plaintiffs and their affiliates remained the same at all times and the Greenberg firm has a current ongoing relationship;

- Sprint and its subsidiary had separate boards of directors. Here, all of the relevant entities on plaintiffs' side are closely held limited liability companies that act through their small handful of principals and not through boards;

- Sprint's general counsel did not actively manage the legal affairs of its subsidiary. Here, Mr. Mangieri does actively supervise the various legal affairs of RFR Holding, and its affiliates, including legal affairs of RFR Realty, and RFR Holding's interest in the Southbeach Project and the Miami Herald Project;

- Sprint and its subsidiary had separate law firms, which is not the case here;

- Protection of confidential client information was less implicated in Donnelly, where management personnel were different people, located in different offices in different states. This is not the case here, where RFR Holding and Century 21 Department Stores, respectively, and their affiliates are each respectively located in a single office and have the same control group; and

- In Donnelly, the law firm had already spent more than 3,000 hours working on the case. Here, plaintiffs advised the Greenberg firm of its conflict as soon as the firm surfaced in this action and plaintiffs filed their motion to disqualify at the inception of the case. Therefore, unlike Donnelly, there is no significant prejudice due to disqualification.

Finally, it bears emphasis that in Donnelly, this Court found that disqualification would not have a deterrent effect because even the most significant conflict system would not have detected the problem. Here, in sharp contrast, the Greenberg firm detected the conflict upon its receipt of the complaint. Indeed, the Greenberg firm's partner, Jay Segal, approached Century 21 Department Stores at that time with a request that it waive the conflict – which request was flatly

denied. Despite the Greenberg firm's actual knowledge of its bright line conflicts, the Greenberg

firm nevertheless barreled forward with its representation of defendants herein and willfully

breached its duty of undivided loyalty to Century 21 Department Stores and RFR Holding.

## CONCLUSION

For the reasons set forth above, as well as in the moving papers and accompanying

affidavits, plaintiffs respectfully request that the Court enter an order disqualifying the

Greenberg firm from acting as counsel to defendants in this action and award to plaintiffs the

fees and expenses incurred in bringing this motion.

Dated: August 22, 2008

                                                                RFR HOLDING LLC
                                                                 CENTURY 21 CHICAGO LLC


                                                                 By: ___/s/ Mark Walfish_____
                                                                 One of their Attorneys

Mark Walfish (Admitted *pro hac vice*)
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

Lazar P. Raynal
Jocelyn D. Francoeur
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois 60606
Telephone: (312) 372-2000

## <u>CERTIFICATE OF SERVICE</u>

I, Mark Walfish, an attorney, certify that on August 22, 2008, I caused a true and complete copy of this **Reply Memorandum of Law** to be served via CM/ECF mail upon:


Howard Kevin Jeruchimowitz
Rita M. Alliss Powers
Greenberg Traurig, L.L.P.
77 West Wacker Drive
Suite 2500
Chicago, IL  60601


And via first-class mail upon:


Hilarie Bass
Greenberg Traurig LLP
1221 Brickell Avenue
Miamia, FL  33131

_____ s/ Mark Walfish _____

# EXHIBIT 1

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1308633 (N.D.Ill.)

Page 1

C Metamorfyx, L.L.C. v. Belkin Components
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
METAMORFYX, L.L.C., Plaintiff,
v.
BELKIN COMPONENTS, Defendant.
**No. 02 C 0771.**

June 14, 2002.

*MEMORANDUM OPINION AND ORDER*

LEFKOW, J.
*\*1 Plaintiff, Metamorfyx, L.L.C. ("Metamorfyx"), has moved to disqualify the law firm of Bryan Cave L.L.C. ("Bryan Cave"), from representing defendant Belkin Components ("Belkin") in the pending patent litigation. For the reasons stated below, the motion is denied.

*PROCEDURAL STANDARD*

Metamorfyx has submitted affidavits in support of its motion, and Belkin has responded in kind with affidavits and documentary evidence. The court infers, then, that the parties expect the court to treat the motion as, in essence, cross motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The court will rely only on the evidence submitted by way of affidavits or documents, and only if it finds there is a dispute of fact that would bear on the outcome will it hold an evidentiary hearing.

*FACTS*

The facts, as proffered by Metamorfyx, are as follows: During the past five years, plaintiff has engaged in litigation and negotiations with various companies including Microsoft Corporation ("Microsoft") and Silitek Corporation ("Silitek"),

concerning infringement of plaintiff's patented ergonomic keyboard technology. One of plaintiff's corporate directors, Robert Granadino ("Robert"), asked his wife, Gloria Granadino ("Gloria"), to seek representation from Bryan Cave regarding these matters. Gloria worked at that time as an administrative assistant for Lynn Thompson ("Thompson") and Leslie Helmer ("Helmer"), both attorneys at Bryan Cave. Around or about March 1997, Gloria approached Thompson about representing Metamorfyx, but Bryan Cave was not retained. At a later time, while plaintiff was completing its negotiations with Microsoft, Helmer, an employment attorney, asked Gloria about the status of plaintiff's negotiations. Gloria told Helmer that the negotiations were confidential and continued with their conversation only after Helmer agreed that she was acting as plaintiff's attorney and that the conversation would be kept confidential, pursuant to attorney-client privilege.

Throughout the remainder of plaintiff's negotiations with Microsoft and with a subsequent licensee, Silitek, Gloria sought Helmer's advice as requested by her husband on whether plaintiff should accept Microsoft's settlement terms. Helmer advised Gloria that plaintiff should accept Microsoft's offer. Robert also requested that Gloria obtain Helmer's advice on other issues that arose with potential licensees, and Gloria sought and received advice which she passed along to her husband. Throughout this time, Gloria believed that the information would be held in confidence and protected by attorney-client privilege. Further, Gloria now believes that the information she provided to Helmer would work to plaintiff's disadvantage in the present litigation.

Belkin's version of the facts is remarkably different: Attorney Helmer attests that she never agreed to represent Metamorfyx, that she did not complete or submit a "conflicts check" memorandum for Gloria, Robert or Metamorfyx, as Bryan Cave requires of all new clients, and that Gloria never asked her for any advice about Metamorfyx's settlements with Microsoft or Silitek or provided her with specific information about the patent or negotiations.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1308633 (N.D.Ill.)

Moreover, Helmer attests that she is an employment attorney, not a patent attorney, that she has no experience in negotiating patent settlements, and that Gloria told her that she and her husband were being represented by a high-powered patent attorney from Aspen, Colorado, in their negotiations with Microsoft.

## DISCUSSION

**\*2** Belkin objects to the affidavits of Robert and Gloria as self-serving. The argument is well taken. *See Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir.2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact."). Although the affidavits attest to one-on-one private conversations which by their nature cannot be corroborated, the absence of supporting evidence such as that Gloria took part in running the business of Metamorfyx,[FN1] that Robert had authority to engage counsel on behalf of Metamorfyx or to dispatch Gloria to do so, that documents were given to Helmer on which she might have based legal advice, or that Metamorfyx was not otherwise represented in the negotiations, belies the credibility of the affidavits to such an extent that they may not be given credit as a matter of law. Thus, Metamorfyx's motion must fail at the outset.

> FN1. Plaintiff argues that Gloria had significant authority at Metamorfyx, but this statement is not supported by any evidence. It is therefore disregarded.

Nevertheless, the court will comment a bit further:

Plaintiff argues that an implied attorney-client relationship existed between Bryan Cave and plaintiff due to Helmer's discussions with Gloria during plaintiff's negotiations with various companies (Mot. at 8), and that under the "substantial relationship test," *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209, 223, 223-34 (N .D. Ill.1975), Helmer's former representation of plaintiff creates a conflict of interest that is imputed to Bryan Cave (Mot. at 10-12). Defendant responds that no implied attorney-client relationship was formed because plaintiff cites no authority that a party can form such a relationship when the wife of one of its directors shares allegedly confidential information with an attorney with whom

she works. (Resp. at p. 6). In reply, plaintiff asserts that because Gloria acted at the behest of a director of plaintiff, an attorney-client relationship was formed.

As a backdrop, the court will quote Magistrate Judge Schenkier of this court, who recently stated in *Commonwealth Ins. Co. v. Stone Container Corp.,* 178 F.Supp.2d 938, 943 (N.D.Ill.2001)

We begin our analysis with the recognition that "[c]lients and the public will not repose confidence 'in lawyers whom they distrust and will not trust law firms that switch sides nimbly." ' *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1269 (7th Cir.1983). "The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration ... that a court may disqualify an attorney for failing to avoid even the appearance of impropriety." *International Business Machines Corp. v. Levin,* 579 F.2d 271, 283 (3d Cir.1978). At the same time, we recognize that motions for disqualification "should be viewed with extreme caution for they can be misused as techniques of harassment." *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982). For this reason, "disqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary." ' *Owen v. Wangerin,* 985 F.2d 312, 317 (7th Cir.1993) (quoting *Schiessle v. Stephens,* 717 F.2d 417-19 (7th Cir.1983)). The moving party "bears a heavy burden of proving facts required for disqualification." *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 794 (2d Cir.1983) (cited with approval in *Guillen v. City of Chicago,* 956 F.Supp. 1416, 1421 (N.D.Ill.1997)).

**\*3** Even where no express contract has been entered into or where no fees are paid, an "implied" attorney-client relationship may be shown if a party submitted confidential information to a lawyer with the reasonable belief that the lawyer was acting as the party's attorney. "The professional relationship ... 'hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." ' *Westinghouse Elec. Corp. v. Kerr-Corp.,* 580 F.2d 1311, 1319 (7th Cir.1978), quoting MCCORMICK ON EVIDENCE § 88, at 179 (2d ed.1972).[FN2] Such relationship "may result because of the nature of the work performed and the circumstances under which confidential

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1308633 (N.D.Ill.)

information is divulged." *Id.* at 1319.

FN2. The court also quoted R. Wise, LEGAL ETHICS 284 (1970), "The deciding factor is what the prospective client thought when he made the disclosure, not what the lawyer thought." *Westinghouse Elec. Corp.,* 580 F.2d at 1320, n. 14.

Citing *Rager v. Boise Cascade Corp.,* No. 88 C 1436, 1988 WL 84724, at *2 (N.D.Ill. Aug. 5, 1988), in which this court (then sitting as a magistrate judge) determined that an individual employed by an entity hired by a corporation was within the corporation's attorney-client privilege, plaintiff argues that Gloria was an agent of plaintiff and thus authorized to enter into an attorney-client relationship for it. In *Rager* the court determined that a corporation could assert the attorney-client privilege regarding conversations with a non-employee who had been engaged to represent the corporation in an unemployment compensation matter, determining that he was acting as "an employee or agent of the corporation," rather than an independent contractor, and that "protecting his communications with [defendant's in-house counsel] is consistent with the purpose of the attorney-client privilege in the corporate context." *Id.* at *3. In reaching that conclusion, the court relied on several principles that create agency: (1) the agent must have power to affect the legal relations of the principal and others; (2) the agent must be a fiduciary who works on behalf of the principal and primarily for his benefit; and (3) the principal has the right to control the conduct of the agent. *Id.* at *4. Plaintiff's reliance on *Rager* is not helpful to it. There is nothing before the court that indicates that Gloria fulfills any of these criteria in relation to Metamorfyx. Because Gloria was a legal stranger to Metamorfyx, she could not possibly have conveyed privileged information to Helmer.

Further, because Gloria is a stranger to Metamorfyx, Metamorfyx cannot rest on the holding in *Westinghouse Electric Corporation.* There, the court disqualified a law firm which had represented the American Petroleum Institute ("API"), a lobbying organization of which three defendants were members, from representing the plaintiff in a later lawsuit. These defendants had previously submitted confidential information to the law firm on behalf of the API and the firm had met with or interviewed

several executives from two of the defendants. The appeals court rejected the district court's view that because the firm had not been an agent of any defendant, it did not have an attorney-client relationship with them.[FN3] The court provided five examples where an attorney-client relationship could be formed where there is no express relationship but a fiduciary obligation or implied professional relationship. These examples included where a prospective client consults with an attorney with the view of retaining the attorney; [FN4] attorneys exchange information concerning their clients, who are co-defendants, and one of those attorneys may use information to the detriment of a co-defendant; an attorney retained by an insurer investigates an insured's claim and the insured cooperates with the attorney pursuant to a cooperation clause in the insurance policy; a law firm hired by an auditor's regional counsel represents plaintiffs suing the auditor; a law firm representing a plaintiff in an action and a corporation that owned 20% of the defendant's outstanding stock. In contrast to these situations where the court concluded that fiduciary obligations arose, here the evidence, even if credited, is simply too thin to demonstrate either that the nature of the work performed and the circumstances under which confidential information (if any) was divulged justifies implying an attorney-client relationship. Because there was no attorney-client relationship, there is no need to address the "substantial relationship" test for whether a conflict of interest exists.

FN3. Although both *Rager* and *Westinghouse Elec. Corp.* speak of agency relationship, they do so in different contexts. In *Westinghouse,* the "agency-principal" discussion concerned whether the lawyer had formerly been in a fiduciary relationship, beyond mere agency, with certain defendants, whereas in *Rager* the question was whether a hired representative was an agent of the corporation.

FN4. While plaintiff mentions that Gloria first approached another attorney about whether this attorney would represent plaintiff, plaintiff's motion for disqualification is not premised on this example.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1308633 (N.D.Ill.)

**\*4** Nevertheless, it is apparent from the submissions that Gloria and Helmer had some conversations about Metamorfyx. To avoid any appearance of impropriety, the court will direct Bryan Cave to file a declaration that Helmer will not communicate any further information that she learned from Gloria to any other person at Bryan Cave associated with the pending litigation (other than what she has disclosed in preparing her affidavits of May 6, 2002 and June 10, 2002).

### CONCLUSION

Wherefore, for the reasons set forth above, the court denies plaintiff's motion to disqualify the law firm Bryan Cave [# 11], finding that no implied attorney-client relationship existed between plaintiff and Leslie Helmer. Bryan Cave is given until July 1, 2002 to file its declaration as set forth above.

N.D.Ill.,2002.
Metamorfyx, L.L.C. v. Belkin Components
Not Reported in F.Supp.2d, 2002 WL 1308633 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1159260 (S.D.N.Y.)

**H**Travelers Indem. Co. v. Gerling Global Reinsurance Corp.
S.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
TRAVELERS INDEMNITY COMPANY, Petitioner,
v.
GERLING GLOBAL REINSURANCE CORP.,
Respondent.
**No. 99 CIV. 4413(LMM).**

Aug. 15, 2000.

MEMORANDUM AND ORDER

MCKENNA, D.J.
*1 Presently before the Court is the motion of Respondent Gerling Global Reinsurance Corp. ("Gerling") to disqualify LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf") from representing Petitioner Travelers Indemnity Company ("Travelers") in this proceeding and the underlying arbitration. For the reasons set forth below, Gerling's motion is granted.

I. BACKGROUND

A. The Gerling Group of Companies

Non-party Gerling Konzern Global Ruckverischerungs AG ("Gerling AG") is a German corporation that is engaged in the business of insurance and reinsurance. (Banfill Aff. ¶ 2). Gerling AG conducts its world-wide business both directly and indirectly through its subsidiaries, which are known collectively as the "Gerling Group." (Kaminsky Aff. ¶ 1).

Gerling and non-party Gerling Global Reinsurance Company of America ("GGRCA") are both subsidiaries of Gerling AG. GGRCA, formerly known as Constitution Reinsurance Corporation, was acquired by Gerling AG in October 1998. (Id. ¶ 3). Together these companies constitute the North American arm of the Gerling Group's property and

casualty reinsurance operations. (Id. ¶ 6).

The primary distinction between these companies is that Gerling's business is limited to "runoff" of certain North American reinsurance business and, therefore, it does not underwrite any new reinsurance business. (Id. ¶ 4). GGRCA, on the other hand, underwrites new business. (Id.). Otherwise, both companies are engaged in similar administration, handling, payment of claims, and other day-to-day activities. (Id.).

While Gerling and GGRCA are separate legal entities, there is substantial overlap in their corporate structures. First, they share common offices in New York City, and the same computer network and systems. (Id. ¶ 5). Additionally, the two companies maintain common human resource and payroll departments and corporate services staff. (Id.; see also Banfill Aff. ¶ 31). Finally, there is significant overlap between senior management positions of Gerling and GGRCA, including the chairman, president, chief operating officer, chief financial officer, and chief actuary. (See Pet'r Decl., Exs. A & B).

B. The Witco Arbitration

Early in the 1980s, Witco Chemical Corp. ("Witco") began reporting environmental claims to Travelers, which had issued primary and umbrella policies to Witco. (Nonna Decl. ¶ 37). The Witco claims eventually grew to include over 140 sites and resulted in declaratory judgment actions in both New York and New Jersey. (Id. ¶¶ 38 & 39). In 1995 Travelers settled the claims. (Id. ¶ 41).

After the settlement, Travelers sought payment from Gerling, which had reinsured certain Witco umbrella policies via facultative certificates. Travelers billed Gerling on a "one occurrence" basis, (id.), considering Witco's company-wide failure to implement adequate waste procedures a "common cause, common origin and single occurrence, of the series of underlying injuries for which Witco sought coverage."(Banfill Aff. ¶ 36, Ex. K). According to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1159260 (S.D.N.Y.)

Travelers, Gerling refused to take any position with respect to the Witco claim. (Nonna Decl. ¶ 43).

**\*2** In September 1996 Travelers commenced arbitration against Gerling to recover what it claimed was Gerling's share of the Witco settlement. (*See* Banfill Decl. ¶ 38). Travelers retained the law firm of Werner & Kennedy; Gerling retained LeBoeuf. Copies of Gerling's files were made available to LeBoeuf attorneys for review. LeBoeuf attorneys reviewed Gerling's files, interviewed Gerling personnel, prepared preliminary memoranda to advise Gerling, prepared submissions to the arbitration panel, conducted and responded to discovery, and prepared and defended Gerling witnesses for their depositions. (*See id.* ¶¶ 40-45). Ultimately, the Witco arbitration was settled and the final award on consent was entered on November 26, 1997.(*Id.* ¶ 44).

C. LeBoeuf's Present Representation of GGRCA

LeBoeuf currently represents GGRCA, Gerling's sister corporation, in at least two active matters. One matter involves the liquidation of Mission Insurance Company in California state court. (Kaminsky Aff. ¶ 8(c)). LeBoeuf represents GGRCA in connection with the distribution of funds to reimburse GGRCA for claim payments. (*Id.*). The other matter involves another California state court action, in which LeBoeuf represents GGRCA in connection with litigation that arose over the arbitration of pollution coverage issues. (*Id.* ¶ 8(a)).

In addition to the two active litigations, GGRCA considers LeBoeuf its "primary outside counsel with respect to reinsurance regulatory advice," (Kaminsky Aff. ¶ 8(b)), which LeBoeuf denies, (Demmerle Decl. ¶ 8).

D. The Underlying Dispute

Through a series of reinsurance agreements, Gerling agreed to reinsure Travelers' general and environmental liability policies issued to TRW, Inc. ("TRW") for underwriting years 1970 through 1977. (*See* Nonna Decl. ¶¶ 14-16). TRW reported hazardous waste claims to Travelers, within Gerling's reinsurance coverage period, for environmental contamination at approximately 60 of its sites located throughout the United States. (*Id.* ¶ 16).

Subsequently, TRW commenced declaratory actions against Travelers in Pennsylvania state and federal courts to ascertain Travelers' obligations under TRW's policy. (*Id.* ¶ 17). TRW and Travelers settled these actions on July 1, 1996 pursuant to a confidential agreement. (*Id.* ¶ 18).

In 1997 Travelers advised Gerling of the TRW settlement and billed Gerling for what Travelers calculated was Gerling's share of the settlement. (*Id.* ¶ 20). Travelers' calculation considered the TRW claim to be a "single occurrence" under the terms of the reinsurance agreement for purposes of the deductible and excess provision. (*Id.* ¶ 23). Gerling objected to Travelers' interpretation, arguing, among other things, that each contaminated TRW site constituted a separate occurrence, thereby requiring Travelers to credit its reinsurance deductible for each occurrence. (*See* Nonna Decl. ¶¶ 21-28).

**\*3** In December 1998, Travelers retained Werner & Kennedy to recover the amount Travelers believed was due under its reinsurance agreements with Gerling. (Foss Decl. ¶ 6). John M. Nonna, a partner at Werner & Kennedy, was lead counsel for Travelers, as he had been in at least twenty other reinsurance disputes, including two disputes with Gerling. (*See id.* ¶¶ 3-4). Through Werner & Kennedy, Travelers demanded arbitration to resolve Gerling's coverage obligation for the TRW settlement.[FN1]

> FN1. TRW is not a party to the arbitration.

In May 1999, while the parties were negotiating the selection of arbitrators, Gerling learned that Werner & Kennedy was dissolving and that Mr. Nonna and several other Werner & Kennedy attorneys were joining LeBoeuf. (Blair Decl. ¶ 6). Shortly thereafter, Gerling's counsel notified Mr. Nonna that he perceived a conflict if Mr. Nonna continued representing Travelers against Gerling, based on LeBoeuf's prior representation of Gerling in the Witco arbitration. (*Id.* ¶ 7). A series of letters were exchanged, wherein the parties disputed the existence of a conflict, and Nonna refused to withdraw as counsel for Travelers. (*Id.* ¶¶ 8-10).

Meanwhile, Travelers petitioned this Court by order to show cause to compel arbitration and to appoint an umpire. The Court stayed Travelers' petition, pending resolution of the instant motion for disqualification.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1159260 (S.D.N.Y.)

Page 3

## II. DISCUSSION

Courts in this circuit have long recognized that resolving disqualification motions requires a fact-specific analysis. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 (2d Cir.1977) ("[I]n deciding questions of professional ethics men of good will often differ in their conclusions."). Indeed, over forty years ago Chief Judge Kaufman aptly observed:

When dealing with ethical principles, ... we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is explored, and the conclusion in a particular case can be reached only after a painstaking analysis of the facts and precise application of precedent.

*United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955).

This oft-quoted admonition has shaped the decisions regarding attorney disqualification in this Circuit, as courts have attempted to resolve the twin tensions underlying any such motion: "a client's right freely to choose his counsel," which "must be balanced against the need to maintain the highest standards of the profession."*Government of India v. Cook Indus., Inc.,* 569 F.2d 737, 739 (2d Cir.1978); *accord Evans v. Artek Sys. Corp.,* 715 F .2d 788, 791 (2d Cir.1983). Thus, the moving party initially bears a heavy burden of demonstrating that a conflict exists. *Government of India,* 569 F.2d at 739,*see also Evans,* 715 F.2d at 794. Once this initial burden is met, however, all doubts must be resolved in favor of disqualification. *See Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 571 (2d Cir.1973)(holding disqualification is necessary where there is "even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.").

*\*4 In Board of Educ. of New York v. Nyquist,* the Second Circuit noted that, with rare exceptions, disqualification is appropriate based on two grounds: (1) where an attorney's conflict of interests among current clients undermines the Court's confidence in the vigor of the attorney's representation of one or more of his clients, or, more commonly, (2) where the attorney is at least potentially in a position to use

privileged information concerning the other side through prior representation. 590 F.2d 1241, 1246 (2d Cir.1979) (citing *Fund of Funds,* 567 F.2d 225,*Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir.1976), and *Emle,* 478 F.2d 562). With respect to the first scenario, an attorney that seeks to simultaneously represent two adverse parties is per se disqualified. *Stratagem Dev. Corp v. Heron Int'l N.V.,* 756 F.Supp. 789, 792 (S.D.N.Y.1991). An attorney faced with the second scenario will be disqualified only if there is a "substantial relationship" between the prior and present representations. *Id.*

Gerling moves for disqualification based on both grounds. First, Gerling argues that LeBoeuf's simultaneous representation of both GGRCA and Travelers is per se improper as it violates LeBoeuf's duty of undivided loyalty, because GGRCA is Gerling's corporate affiliate. Alternatively, Gerling urges for disqualification based on LeBoeuf's prior representation of Gerling in the Witco arbitration, which Gerling argues involved substantially similar issues as those in the present case. Because the Court agrees with respect to Gerling's first argument, the Court holds that LeBoeuf cannot continue to represent Travelers in this case.

### A. Concurrent Representation

Canon 5 of the New York Code of Professional Responsibility mandates an attorney's undivided loyalty to his clients. Thus, concurrent representation of adverse clients is "prima facie improper." *Cinema 5 Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1387 (2d Cir.1976). An attorney who seeks to undertake such adverse representation is per se disqualified, unless he satisfies the "heavy burden" of demonstrating "that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation."*Id.*

LeBoeuf is not presently retained by Gerling; such representation ended with the conclusion of the Witco arbitration. At issue, instead, is whether LeBoeuf's current representation of Gerling's corporate affiliate, GGRCA, while simultaneously representing Travelers against Gerling, violates Canon 5 and, therefore, is per se impermissible.

Gerling urges the Court to follow *Stratagem Dev.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1159260 (S.D.N.Y.)

Page 4

*Corp v. Heron Int'l N.V.*, 756 F.Supp. 789 (S.D.N.Y.1991). In that case, Judge Kram disqualified Epstein Becker & Green ("Epstein Becker") from representing the plaintiff because, while the firm was preparing the suit against the defendant, Heron, it was concurrently representing Heron's subsidiary in an unrelated action. Judge Kram held that the duty of undivided loyalty that Epstein Becker owed to Heron's subsidiary also attached Heron, making the firm's representation of a plaintiff suing Heron per se improper. *Strategem, 756 F.Supp. at 792*. Gerling argues that this reasoning extends to sister corporations, such that LeBoeuf's duty of loyalty to GGRCA extends to Gerling, thereby disqualifying LeBoeuf from representing Travelers in this case.

**5** Travelers argues that under *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir.1981), Gerling is merely a "vicarious" client of LeBoeuf and, therefore, the appropriate test for disqualification is whether the representation of GGRCA is substantially related to the present action. In *Glueck,* a law firm that represented an incorporated trade association sought to represent an individual client against a corporation that was a member the trade association. The Second Circuit held that the per se rule of disqualification was inappropriate because "when an adverse party is only a vicarious client by virtue of membership in an association, the risks against which Canon 5 guards will not inevitably arise."*Id.* at 749.Instead, because the association member seeking disqualification was not a "client[ ] in the traditional sense," the substantial relationship test should be used to determine whether disqualification was appropriate. *Id.*

In essence, the Court disagrees with both parties' arguments. Gerling's reading of *Strategem* is over-broad, and per se disqualification of LeBoeuf is not warranted solely because LeBoeuf also represents GGRCA. An attorney's representation of a corporate client does not automatically disqualify the attorney from taking action against all members of his client's corporate family irrespective of how distant their relations, just as the attorney "that represents the American Bar Association need not decline to represent a client injured by an automobile driven by a member of the ABA."*Glueck*, 653 F.2d at 749. Moreover, Judge Kram's reasoning was largely based on the parent company's whole ownership of its

subsidiary, which is not a consideration in this case because Gerling and GGRCA are only sister corporations. *See Strategem*, 756 F.Supp. at 792 ("[B]ecause the liabilities of a subsidiary corporation directly affect the bottom line of the corporate parent ... [a] fortiori, the duty of undivided loyalty, as set forth in Canon 5, attaches in this case.").

Likewise, with respect to Travelers' argument, the Court notes that "[w]hen *Glueck* was reviewed by the Second Circuit, the court did not establish a bright-line rule with regard to subsidiaries" or, for that matter, sister corporations. *Ives v. Guilford Mills, Inc.,* 3 F.Supp.2d 191, 203 (N.D.N.Y.1998)."Rather, ... it mandated a factual inquiry into the nature of the relationship between the attorney and the party claiming client status."*Id.*

In this action, the nature of the relationship between LeBoeuf and Gerling is predicated upon the relationship between Gerling and GGRCA. It is true that Gerling and GGRCA are separately incorporated entities. Indeed, if Travelers was seeking to impute liability between the two companies, Gerling would no doubt rely on the protection of the corporate veil. However, there is considerable overlap between the two companies, especially within their corporate structures, and this sways the Court to grant Gerling's motion. For example, the companies are engaged in very similar businesses while sharing the same chairman, president, chief operating officer, chief financial officer, and chief actuary. Further, the companies share office space, payroll and human resource departments, and corporate services. They even share the same computer networks and systems, travel agents, mail services, credit card issuers, and annual employee gatherings.

**6** With such overlap, LeBoeuf's representation of GGRCA while concurrently advocating against Gerling raises the specter of divided loyalty. One could imagine an endless number of scenarios. For example, LeBoeuf attorneys will no doubt continue to advise GGRCA management regarding ongoing litigation, while at the same time other LeBoeuf attorneys may be preparing to depose these same individuals, in their capacity as Gerling management, for the prosecution of this case. Speculation aside, it is the mere risk of divided loyalty that the Court is concerned with, not only ethical scenarios that can be readily envisioned at this juncture. The purpose of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1159260 (S.D.N.Y.)

Canon 5 is to protect a client not only from outright and egregious examples of divided loyalty, but also the subtle and indefinable impact that it might have on an attorney's representation.

Yet, none of this should be taken to mean that the Court doubts the ethical standards of LeBoeuf or the sincerity and intentions of its attorneys who have submitted affidavits that urge the Court against disqualification. Their good faith is not at issue. But, where there are doubts as to a lawyer's representation in a given case, the "lawyer's good faith, although essential in all his professional activity, is, nevertheless, an inadequate safeguard when standing alone."*Emle,* 478 F.2d at 571.

B. Successive Representation

Because the Court finds that a conflict exists by virtue of LeBoeuf's representation of GGRCA, it does not rule as to Gerling's motion relating to LeBoeuf's prior representation of Gerling in the Witco arbitration.

III. CONCLUSION

For the foregoing reasons, Gerling's motion to disqualify LeBoeuf in this matter and the underlying arbitration is granted.

SO ORDERED

S.D.N.Y.,2000.
Travelers Indem. Co. v. Gerling Global Reinsurance Corp.
Not Reported in F.Supp.2d, 2000 WL 1159260 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.