**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RFR HOLDING LLC and, | ) | |
| CENTURY 21 CHICAGO, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.    08 CV 1555 |
| v. | ) | |
| | ) | Hon. Wayne R. Andersen |
| PONTE GADEA FLORIDA, INC. and | ) | |
| CHICAGO MICHIGAN, LLC, | ) | Magistrate Judge Cole |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE
TO FILE BRIEF IN EXCESS OF FIFTEEN PAGES, *INSTANTER***

Plaintiffs RFR Holding LLC and Century 21 Chicago, LLC (collectively "Plaintiffs"), by their undersigned attorneys, respectfully request leave of Court to file *instanter* a nineteen-page Memorandum of Law in opposition to the Motion to Dismiss ("Motion") filed by defendants Ponte Gadea Florida, Inc. and Chicago Michigan, LLC (collectively, "Defendants"). A copy of the Memorandum is attached as Exhibit A. In support of this motion, Plaintiffs state as follows:

Plaintiffs request an extension of the page limit so that they may adequately address all of the issues raised by Defendants' Motion. Defendants' Motion seeks to dismiss each of the three claims set forth in Plaintiffs' Amended Complaint, and it seeks to dismiss each claim on multiple grounds. Plaintiffs are aware that this Court disfavors briefs in excess of the fifteen-page limit and have attempted to reduce the length of their opposition brief. Given the Court's intention to rule on Defendants' Motion by mail, however (Docket No. 45), the opposition brief is the only opportunity Plaintiffs will have to present argument in response to Defendants' Motion. As these issues are critical to Plaintiffs' case going forward, Plaintiffs believe that all nineteen pages of its opposition are necessary to respond to Defendants' Motion.

Plaintiffs have consulted with Defendants' counsel, who do not oppose this motion.

WHEREFORE, Plaintiffs respectfully request leave of Court to file its nineteen-page

Memorandum in opposition to Defendants' Motion to Dismiss.

Respectfully submitted,

RFR HOLDING LLC
CENTURY 21 CHICAGO LLC

By:    /s/  Mark Walfish
          One of their Attorneys

Mark Walfish (Admitted *pro hac vice*)
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

Lazar P. Raynal
Jocelyn D. Francoeur
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois  60606
Telephone: (312) 372-2000

<u>**CERTIFICATE OF SERVICE**</u>

   I, Mark Walfish, an attorney, certify that on August 29, 2008, I caused a true and complete copy of **Plaintiffs' Unopposed Motion For Leave To File Brief In Excess of Fifteen Pages** to be served via CM/ECF mail upon:

Howard Kevin Jeruchimowitz
Rita M. Alliss Powers
Greenberg Traurig, L.L.P.
77 West Wacker Drive
Suite 2500
Chicago, IL  60601


   And via first-class mail upon:


Hilarie Bass
Greenberg Traurig LLP
1221 Brickell Avenue
Miamia, FL  33131



           _____ s/ Mark Walfish _____


CHI99 5019321-2.052498.0085

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RFR HOLDING LLC and,<br>CENTURY 21 CHICAGO, LLC | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No.    08 CV 1555 |
| v. | ) | |
| | ) | Hon. Wayne R. Andersen |
| PONTE GADEA FLORIDA, INC. and<br>CHICAGO MICHIGAN, LLC, | ) | |
| | ) | Magistrate Judge Cole |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
12(b)(6) MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Mark Walfish (Admitted *pro hac vice*)
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

Lazar P. Raynal
Jocelyn D. Francoeur
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois  60606
Telephone: (312) 372-2000

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT .............................................................................................................. 2

   I. THE AMENDED COMPLAINT PROPERLY STATES A CLAIM FOR BREACH OF
      THE AGREEMENT ........................................................................................... 2

      A.  The Agreement Is Not Void As A Matter Of Law ..................................... 2

      B.  Defendants' Obligations Remained In Effect At The Time Of Their Actions ........ 7

  II.  THE AMENDED COMPLAINT STATES A CLAIM FOR TORTIOUS
      INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE ................. 9

      A.  Plaintiffs' Tortious Interference Claim Does Not Duplicate Their Contract Claim ... 9

      B.  Defendants' Other Contentions With Respect To The Tortious Interference Claim Are
      Without Merit ................................................................................. 13

  III.  PLAINTIFFS HAVE STATED A CLAIM FOR UNJUST ENRICHMENT ......... 16

CONCLUSION .......................................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allerand, LLC v. 233 E. 18th St. Co.*, 19 A.D.3d 275, 798 N.Y.S.2d 399 (1st Dept. 2005) ____ 11

*Amroc Investments, Inc. v. Deloro*, No. 97 Civ. 2878 TPG, 1999 WL 799642
  (S.D.N.Y. Oct. 7, 1999) _____ 14

*Atkin v. Union Processing Corp.*, 77 A.D.2d 791, 430 N.Y.S.2d 735 (4th Dept. 1980) _____ 6

*Atkin v. Union Processing Corp.*, 90 A.D.2d 332, 457 N.Y.S.2d 152 (4th Dept. 1982),
  *aff'd*, 59 N.Y.2d 919, 453 N.E.2d 522, 466 N.Y.S.2d 293 (1983) _____ 6

*Austin v. Trybus*, 136 A.D.2d 940, 524 N.Y.S.2d 895 (4th Dept. 1988) _____ 6

*Baguer v. Spanish Broadcasting Sys., Inc.*, No. 04-CV-8398 (KMK), 2007 WL 2780390
  (S.D.N.Y. Sept. 20, 2007) _____ 12

*Baker's Aid, A Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*,
  730 F. Supp. 1209 (E.D.N.Y. 1990) _____ 11

*Cardiocall, Inc. v. Serling*, 492 F. Supp.2d 139 (E.D.N.Y. 2007) _____ 10

*Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 647 (7th Cir. 1997) _____ 1

*Charlebois v. Weller Assocs*, 72 N.Y.2d 587, 531 N.E.2d 1288, 535 N.Y.S.2d 356 (1988) ____ 4

*Chen v. Geranium Dev. Corp.*, 243 A.D.2d 708, 663 N.Y.S.2d 288 (2d Dept. 1997) _____ 18

*Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87 Civ. 6294 (MJL),
  1988 WL 52777 (S.D.N.Y. May 18, 1988) _____ 6

*Chicago Messenger Serv., Inc. v. Nextel Comms., Inc.*, No. 01 C 8820,
  2003 WL 22225619 (N.D. Ill. Sept. 24, 2003) _____ 12

*City of New York v. Long Island Airports Limousine Svc. Corp.*, 96 A.D.2d 998, 467 N.Y.S.2d
  93 (3d Dept. 1983), *aff'd*, 62 N.Y.2d 846, 466 N.E.2d 153, 477 N.Y.S.2d 613 (1984) ____ 8

*Clanton v. Smith*, 170 A.D.2d 643, 567 N.Y.S.2d 67 (2d Dept. 1991) _____ 8

*Conant v. Karris*, 165 Ill. App.3d 783, 520 N.E.2d 757 (Ill. App. 1987) _____ 10

*Cook v. Winfrey*, 141 F.3d 322 (7th Cir. 1998) _____ 16

*Daredia v. Gold & Diamond Merch. Group, Inc.*, No. 97 C 8149, 1999 WL 965591
  (N.D. Ill. Sept. 30, 1999) _____ 13

## TABLE OF AUTHORITIES (cont'd)

**Page**

*Design Strategy Corp. v. Knack Systems, LLC*, No. 07 Civ. 0395 (JSR),
2007 WL 4562926 (S.D.N.Y. Dec. 18, 2007) _____ 12

*Diamond Blade Warehouse, Inc. v Paramount Diamond Tools, Inc.*,
420 F.Supp.2d 866 (N.D. Ill. 2006) _____ 12

*Disaster Svcs., Inc. v. ERC Partnership*, 228 Ga.App. 739, 492 S.E.2d 526
(Ga. App. 1997) _____ 14, 15

*DS Courier Services, Inc. v. Seebarran*, 40 A.D.3d 271, 834 N.Y.S.2d 191,
(1st Dept. 2007) _____ 6, 7

*Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008) _____ 16

*East Coast Athletic Club, Inc. v. Chicago Title Ins. Co.*, 39 A.D.3d 461,
833 N.Y.S.2d 585 (2d Dept. 2007) _____ 14

*Fandy Corp. v. Chang*, 272 A.D.2d 369, 707 N.Y.S.2d 361 (2d Dept. 2000) _____ 18

*Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp.2d 439 (E.D.N.Y. 2007) __ 16, 17, 18

*Hi Grade Cleaners, Inc. v. American Permac, Inc.*, 561 F. Supp. 643 (N.D. Ill. 1982) _____ 12

*HPI Health Care Svcs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145,
545 N.E.2d 672 (Ill. 1989) _____ 16

*In re WorldCom, Inc.*, 361 B.R. 697 (Bankr. S.D.N.Y. 2007) _____ 11

*Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc.*, 842 F. Supp. 693
(W.D.N.Y. 1993) _____ 5, 6

*Kimball Assocs. v. Homer Cent. School Dist.*, No. 00-CV-897 (HGM) (GJD),
2000 WL 1720751 (N.D.N.Y. Nov. 9, 2000) _____ 9

*Kinsey v. Cendant Corp*, No. 04 Civ. 0582 (RWS), 2004 WL 2591946
(S.D.N.Y. Nov. 16, 2004) _____ 18

*Korea Life Ins. Co., Ltd. v. Morgan Gaur. Trust Co. of New* York,
269 F.Supp.2d 424 (S.D.N.Y. 2003) _____ 3

*Lazzarino v. Warner Bros. Entertainment, Inc.*, 13 Misc.3d 1230(A), 831 N.Y.S.2d 354,
2006 WL 3069276 (Sup. Ct. N.Y. Co. Oct. 30, 2006) _____ 12

**TABLE OF AUTHORITIES (cont'd)**

**Page**

*Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 603 N.E.2d 246,
589 N.Y.S.2d 396 (1992) _____ 4

*Mathias v. Jacobs*, 167 F. Supp.2d 606 (S.D.N.Y. 2001)_____ 7

*Maxus Leasing Group, Inc. v. Kobelco America, Inc.*, No. 5:04-CV-518 (FJS/DEP),
2007 WL 655779 (N.D.N.Y. Feb. 26, 2007) _____ 12

*Murray Walter, Inc. v. Sarkisian Bros., Inc.*, 107 A.D.2d 173, 486 N.Y.S.2d 396
(3d Dept. 1985) _____ 4

*PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488 (2d Cir 2004) _____ 18

*Quist v. Bd. of Trustees of Comm. College Dist. No. 525,* 259 Ill. App. 3d 814,
629 N.E.2d 807 (Ill. App. 1994) _____ 14

*Reiner v. North Amer. Newspaper Alliance*, 259 N.Y. 250, 181 N.E. 561 (1932)_____ 2, 3

*Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 764 N.E.2d 958, 738 N.Y.S2d. 658
(2001) _____ 8

*Rockefeller Univ. v. Tishman Constr. Corp. of NY*, 240 A.D.2d 341, 659 N.Y.S.2d 460
(1st Dept. 1997) _____ 13

*Septembertide Publishing, B.V. v. Stein and Day*, 884 F.2d 675 (2d Cir. 1989) _____ 8

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgt. Corp.*, No. 97 Civ. 5499 (DNE),
2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) _____ 16

*Spherenomics Global Contact Centers v. vCustomer Corp.*, 427 F. Supp.2d 236,
(E.D.N.Y. 2006) _____ 6, 7

*Subaru Distributors Corp. v. Subaru of America, Inc.*, No. 03 Civ. 9608SCR,
2004 WL 3220120 (S.D.N.Y. June 1, 2004) _____ 14

*Sylmark Holdings Limited v. Silicone Zone Int'l Limited*, 5 Misc.3d 285,
783 N.Y.S.2d 758 (Sup. Ct. N.Y. Co. 2004) _____ 11

*Trans Union LLC v. Credit Research Inc.*, No. 00C3885, 2001 WL 648953
(N.D. Ill. June 4, 2001) _____ 11

*TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.2d 822 (7th Cir. 1998) _____ 18

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**<u>Page</u>**

*U. S. Network Servs., Inc. v. Frontier Comms of the West, Inc.*, 115 F. Supp.2d 353
(W.D.N.Y. 2000) _____ 12

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470,
807 N.E.2d 876, 775 N.Y.S.2d 765 (2004)_____ 8

*Widewaters Prop. Dev. Co. v. Katz,* 38 A.D.2d 1220, 1222, 836 N.Y.S.2d 746
(4th Dept. 2007) _____ 14

*Woodstock Iron Co. v. Richmond & D. Extension Co.*, 129 U.S. 643, 9 S. Ct. 402 (1889) _____ 4

*X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 634 N.E.2d 158,
611 N.Y.S.2d 786, (1994)_____ 4

***Other Authorities***

22 N.Y. Jur.2d Contracts § 196_____ 3

22 N.Y. Jur.2d Contracts § 200_____ 3

22 N.Y. Jur.2d Contracts § 314_____ 13

28 N.Y. Prac. Contract Law § 13:7_____ 5

Restatement (Third) of Unfair Competition, § 41 _____ 10, 11

Plaintiffs RFR Holding LLC and Century 21 Chicago LLC[1] submit this memorandum in opposition to defendants' motion to dismiss the Amended Complaint.

## PRELIMINARY STATEMENT

The Amended Complaint alleges in substance[2] that in November 2007 plaintiffs were having discussions with the Seller, the owner of valuable Property on Michigan Avenue in Chicago, about the possibility of purchasing that Property. At the same time, plaintiffs began to explore the possibility of, among other things, bringing in other investors or third party sources of financing for the Property. In furtherance of these efforts, plaintiff RFR (on behalf of itself and its affiliates, including plaintiff Century 21 Chicago) entered into an Agreement with defendant PGF and its affiliates, pursuant to which plaintiffs agreed to furnish certain non-public information concerning the Property and certain related analyses, projections and other information plaintiffs had developed (collectively defined in the Agreement as "Confidential Information") in exchange for PGF's commitment to keep that information confidential, not to use it other than in connection with a transaction with plaintiffs, and not to discuss the Property directly with the Seller. In reliance on the Agreement and PGF's common law obligations, plaintiffs disclosed the Confidential Information to PGF and arranged for PGF to visit the Property.

PGF voluntarily signed the Agreement and knowingly accepted (and utilized) the Confidential Information. Then, in express contravention of the specific prohibitions contained in the Agreement, defendants (PGF and its affiliate, CM) proceeded to make an end run around plaintiffs -- and, within roughly seven days of visiting the Property, defendants contracted directly with the Seller to purchase it. Now, having derived all of the benefits of the Agreement, and having failed at the time to object to its terms, defendants seek to excuse their flagrant breach by contending that the Agreement was void at inception or expired soon thereafter.

It bears emphasis that the sole purpose of the Agreement was to prevent the very thing that occurred: defendants' contacting the Seller and improperly using the fruits of plaintiffs' efforts to take the opportunity that plaintiffs developed. As shown below, defendants' attempt to justify their retention of the benefits of the Agreement without compensation to plaintiffs is

---

[1] All capitalized terms herein have the meanings set forth in the Amended Complaint.

[2] On this pre-answer motion to dismiss, the allegations of the Amended Complaint must be treated as true. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 647 (7th Cir. 1997).

totally without merit. Defendants' assertions that plaintiffs' separate claims for tortious interference and unjust enrichment should be dismissed for insufficiency are equally unavailing.

## ARGUMENT

## I.  THE AMENDED COMPLAINT PROPERLY STATES A CLAIM FOR BREACH OF THE AGREEMENT

Defendants attack Count I of the Amended Complaint (which seeks damages for breach of the Agreement) on two bases. First, defendants contend that the Agreement is void as a matter of law -- either on the ground that it contemplated plaintiffs' disclosure of information to defendants in violation of the Contract of Sale between plaintiffs and the Seller, or on the ground that it impermissibly restricts competition. Second, defendants contend that their obligations under the Agreement had expired or were otherwise excused by virtue of the termination of that Contract of Sale. Neither of these arguments provides a basis for dismissal of Count I.

### A.  The Agreement Is Not Void As A Matter Of Law

Having signed the Agreement, willingly accepted plaintiffs' Confidential Information, and used that information and plaintiffs' other groundwork to their advantage in order to secure a purchase of the Property which they would not have otherwise known about (and at a $10 million discount from what they would otherwise have paid to plaintiffs), defendants now claim that they should not be held to their corresponding obligations under the Agreement. This follows, defendants claim, either because the Contract of Sale contained a provision that plaintiffs were not to share the Confidential Information, or because the prohibitions contained on the face of the Agreement are void. Both of these arguments are incorrect as a matter of law.

### 1.  The Agreement Is Not Void By Virtue Of Any Alleged Violation Of A Provision Of The Contract Of Sale

Defendants first argue that the Agreement is void, and their obligations under it cannot be enforced, because plaintiffs' performance under the Agreement was in violation of a provision of the Contract of Sale. In support of this claim, defendants baldly assert that under New York law (which governs by virtue of the Agreement's choice of law clause) *any* agreement that entails a breach of a separate contract is unenforceable. (Mov. Br. at 5-6). But New York law says no such thing. Rather, a claim that a contract is unenforceable because it violates another agreement is an *affirmative defense* amounting, essentially, to a claim of illegality. *See Reiner v. North Amer. Newspaper Alliance*, 259 N.Y. 250, 181 N.E. 561 (1932) (affirming lower court's denial

of plaintiff's motion to strike defense that asserted that the contract sued upon was invalid or otherwise unenforceable on the ground that plaintiff entered it in violation of a separate contract).[3]  Importantly, the impact of that defense depends upon facts that cannot be assessed on this motion to dismiss.

In particular, if and when defendants assert this defense in an answer, it will call upon the Court to decide (among other things) whether the Seller -- as the party ostensibly aggrieved by any alleged violation of the Contract of Sale -- expressly or impliedly consented, either before or after the fact, to the conduct that defendants now contend violated that Contract.  If the Court determines that plaintiffs did violate the Contract and such violation was not waived or otherwise consented to by the Seller,[4] it will then have to decide whether, under all of the circumstances, defendants should nevertheless be required to compensate plaintiffs for the benefits defendants received.

Specifically, under New York law, where a party has performed substantially under a contract (as plaintiffs here allege they did), if that contract is later deemed illegal "the public welfare is best served by either compelling restitution or enforcing the other's promise proportionately."  22 N.Y. Jur.2d Contracts § 196 (Exhibit 1); *accord id.* § 200 (Exhibit 2) ("A person cannot repudiate an illegal promise and retain what he or she has received thereunder."); s*ee, e.g., Korea Life Ins. Co., Ltd. v. Morgan Gaur. Trust Co. of New* York, 269 F. Supp. 2d 424, 441 (S.D.N.Y. 2003) ("New York courts will invalidate a contract that is executory, on the theory that where the illegal contract is incomplete, there is still a *locus penitentio,* so that a

---

[3] Defendants erroneously assert that in *Reiner* the court "reject[ed] plaintiff's claim" (Mov. Br. at 5).  The only issue before the court in *Reiner* was whether the affirmative defense asserted by the defendant was "sufficient in law on the face thereof" or should have been stricken as a matter of law at the pleading stage.  *See* 259 N.Y. at 253, 181 N.E. at 562.  The lead opinion held that the defense should not be stricken because "[a]ssuming, as we must, the truth of the allegations contained in the answer, it appears that the conduct of the plaintiff was unconscionable."  *Id.*  As noted in the concurrences, it would, of course, ultimately be up to the defendant to prove those allegations, and up to the trier of fact to determine whether those allegations, under all of the circumstances, truly rendered the plaintiff's conduct "unconscionable."  *See* 259 N.Y. at 257, 181 N.E. at 563 (Pound, C.J., concurring in result) ("Evidence may develop guilty conduct on the party of defendant but we may not assume it"); 259 N.Y. at 258, 181 N.E. at 564 (Crane, J., concurring in result); 259 N.Y. at 262, 181 N.E. at 565 (Lehman, J., concurring in result).

[4] Inasmuch as the Seller derived the advantage of plaintiffs' alleged violation by subsequently entering into a contract with defendants which would not otherwise have occurred, the likelihood that the Seller would be deemed not to have consented is, to put it charitably, exceedingly remote.

disaffirmance of the illegal conduct by the court is appropriate. . . . *When the contract has been executed, however, a New York court will not invalidate it*.") (emphasis added, citation omitted); *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 517, 519 634 N.E.2d 158, 161-162, 611 N.Y.S.2d 786, 789-790 (1994) ("courts are to be guided by the overriding general policy . . . of preventing people from getting other people's property for nothing when they purport to be buying it''; courts should not uphold illegality defenses in contract cases "where doing so would work a substantial forfeiture on one party while unjustly enriching the other") (citations and internal quotations omitted; alteration added in *X.L.O.*); *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 128, 603 N.E.2d 246, 248, 589 N.Y.S.2d 396, 397 (1992) ("as a general rule also, forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as 'a sword for personal gain rather than a shield for the public good.'") (quoting *Charlebois v. Weller Assocs.*, 72 N.Y.2d 587, 595, 531 N.E.2d 1288, 1293, 535 N.Y.S.2d 356, 360 (1988)); *Murray Walter, Inc. v. Sarkisian Bros., Inc.*, 107 A.D.2d 173, 177, 486 N.Y.S.2d 396, 399 (3d Dept. 1985) (fact that one party has already performed "critically affects whether enforcement of another party's contractual obligation will be refused on the ground of illegality").[5]

Plaintiffs here allege that over a period of roughly seven weeks they negotiated certain key terms with the Seller, persuaded the Seller to renegotiate a certain lease in a way that made the Property a more attractive purchase, and developed detailed analyses and projections concerning the Property. (Am. Compl. ¶¶ 21-24, 41, 56). They further allege that, pursuant to the Agreement, they shared these analyses and projections (together with other information) with defendants in reliance on defendants' promise not to use that material to negotiate directly with

---

[5] *Woodstock Iron Co. v. Richmond & D. Extension Co.*, 129 U.S. 643, 9 S. Ct. 402 (1889), which defendants cite on page 6 of their brief, does not change this analysis. In that case, the "contract" in question was one in which the defendant had agreed to pay money and to convey certain property to the plaintiff in exchange for the plaintiff's agreement to locate and construct a railroad by way of a certain town, in violation of the plaintiff's obligation to construct the railroad via the "nearest, cheapest and most suitable route." By doing so, the plaintiff had increased the cost of building the railroad (which was being funded largely by bonds of the railroad company) by $100,000. Recognizing the public's strong interest in the proper and efficient construction of railroads, the Court concluded that the "contract" "was nothing less than the offer of a bribe to the [plaintiff] to be faithless to its engagements, and to do with reference to the business in which it was engaged what would amount to little less than robbery of the employer." 129 U.S. at 655-56, 9 S. Ct. at 406. This analysis has no bearing here, where the Contract of Sale was a purely private matter and the Seller obviously had no problem with plaintiffs' disclosure of information to defendants, as evidenced by the fact that the Seller entered into a contract directly with defendants.

the Seller. (*Id.* ¶¶ 16-20, 34, 41, 50, 56).[6]  Defendants accepted the benefit of plaintiffs'

performance, and after receiving that performance defendants were able, in a span of roughly

seven days or less, to conclude an agreement to purchase the Property directly from the Seller.

(*See, e.g., id.* ¶¶ 29-30).  For its part, the Seller is not complaining that plaintiffs violated a

provision of the Contract of Sale by telling defendants about the Property; to the contrary, the

Seller was apparently perfectly happy to take advantage of the opportunity to sell the Property

directly to defendants.

 Thus, if defendants plead and prove that plaintiffs violated a provision of the Contract of

Sale which was not otherwise excused or waived, the Court will have to determine whether

defendants' obligations under the Agreement should nevertheless be enforced in proportion to

plaintiffs' performance.  This defense is no basis for dismissal.

 **2.  The Agreement Is Not Otherwise Void**

 Defendants' next contention -- that the Agreement is void because its restrictions are

unreasonable (Mov. Br. at 6-7) -- fares no better.  Defendants argue that those restrictions should

not be enforced because (according to defendants) (a) since the Agreement has no termination

date, the restrictions are of "unlimited duration"; and (b) they are "too sweeping."  (Mov. Br. at

7).  Neither of these contentions has merit.[7]

 First, "[w]here a contract has no provision for its termination, courts in New York treat

the contract as being made for a reasonable duration and subject to termination upon reasonable

notice." 28 N.Y. Prac. Contract Law § 13:7 (Exhibit 3); *accord Italian & French Wine Co. of

Buffalo, Inc. v. Negociants U.S.A., Inc.*, 842 F. Supp. 693, 699 (W.D.N.Y. 1993) ("[T]he

'reasonable notice doctrine' is well-established in New York law. . . Even if no definite period of

---

[6] Among the information plaintiffs shared with defendants was the Contract of Sale itself.  Exhibit A to
defendants' motion, which defendants identify as the Contract of Sale, is in fact the copy of the redacted
Contract (with additional markings placed thereon by defendants) that plaintiffs provided to defendants at
defendants' request pursuant to the Agreement.  Importantly, defendants did not repudiate the Agreement
immediately upon their receipt of this document; rather, they continued to accept and encourage
plaintiffs' performance. (*See, e.g.*, Am. Compl. ¶¶ 24, 27, 41-43).  It was only when this lawsuit was
brought that defendants suddenly contended that the Agreement was unenforceable.

[7] Indeed, we note that if defendants' arguments were correct, then the similar provisions in the Contract of
Sale (which are at least as broad and which do not on their face have a termination date) would also be
void.  Yet defendants heavily rely on the text of those provisions, which form the very underpinning for
their separate contention (discussed above) that plaintiffs violated their own obligations under that
Contract.

termination is originally fixed in the contract, such a contract is not terminable at will by either party, but only upon reasonable notice.") (citations omitted); *Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.*, No. 87 Civ. 6294 (MJL), 1988 WL 52777, *2 (S.D.N.Y. May 18, 1988) (Exhibit 4) ("In the absence of an express provision, a contract is terminable after a reasonable duration with reasonable notice."). The absence of an express termination date thus does not, as defendants suggest, make the restriction one of "unlimited duration" that is "per se unreasonable and void." (Mov. Br. at 7). Rather, as a matter of law a *reasonable* duration, followed by a right to terminate upon *reasonable* notice, is presumed. Indeed, defendants essentially concede as much, citing *Austin v. Trybus*, 136 A.D.2d 940, 941, 524 N.Y.S.2d 895, 896 (4th Dept. 1988) -- where the court noted that such "reasonableness is ordinarily a question of fact." (Mov. Br. at 7 n.6).[8]

Second, the restriction is not "too sweeping." It prohibited defendants only from communicating with specified parties (in essence, the Seller and its tenants) concerning a single specified subject (the Property). Such prohibitions are routinely enforced under New York law. *See, e.g.*, *DS Courier Services, Inc. v. Seebarran*, 40 A.D.3d 271, 272, 834 N.Y.S.2d 191, 192 (1st Dept. 2007) (restrictive covenant in agreement between defendant trucker and plaintiff courier service that prohibited defendant "from negotiating directly or indirectly with any of six identified customers of plaintiff for a period of 120 days after termination of defendant's services, voluntary or otherwise" was reasonable on its face); *Spherenomics Global Contact Centers v. vCustomer Corp.*, 427 F. Supp.2d 236, 248-49 (E.D.N.Y. 2006) (agreement that required defendant to refrain from soliciting business directly from a particular client was valid and enforceable).[9]

Indeed, were the rule otherwise, many businesses -- such as real estate brokers, whose very trade depends upon the understanding that the buyers and/or sellers they represent will not

---

[8] Because this is not an action to enjoin a prospective violation of the Agreement, the Court need not here determine what would have been a "reasonable" duration for the Agreement's restrictions.

[9] Defendants assert that under New York law contracts that restrain competition are "generally" void as against public policy, citing *Atkin v. Union Processing Corp.*, 77 A.D.2d 791, 791, 430 N.Y.S.2d 735, 736 (4th Dept. 1980). (*See* Mov. Br. at 6). In *Atkin*, however, the court held that the defendant was *not* entitled to summary judgment dismissing the plaintiff's contract claims because issues of fact existed as to whether or not the contract was unenforceable as the defendant contended. Thereafter, the defendant's arguments -- which were based on contentions that the contract violated the antitrust laws -- were rejected, and the contract was found enforceable. *Atkin v. Union Processing Corp.*, 90 A.D.2d 332, 457 N.Y.S.2d 152 (4th Dept. 1982), *aff'd*, 59 N.Y.2d 919, 453 N.E.2d 522, 466 N.Y.S.2d 293 (1983).

deal directly with their counterparties and thereby cut them out of their commissions -- could not exist. New York law clearly permits and enforces such agreements. *See Spheronomics*, 427 F. Supp.2d at 249.

*Mathias v. Jacobs*, 167 F. Supp.2d 606 (S.D.N.Y. 2001), which defendants cite for their contrary argument, offers them no support. In that case, the restriction at issue prohibited the plaintiff from "having 'any contact whatsoever' with three expansive categories of persons or entities," *without* any limitation as to subject matter. 167 F. Supp.2d at 612. The court found that such a sweeping prohibition bore no relation to what was necessary to prevent the plaintiff from unfairly competing with the defendant's business, and therefore found the restriction unreasonable. *Id.* Here, in sharp contrast, the restriction affects only communications with a specific party concerning a single piece of real property. It is thus directly analogous to the provisions found enforceable in *Spheronomics* and *DS Courier*, and entirely distinguishable from the one found unreasonable in *Mathias*.

### B. Defendants' Obligations Remained In Effect At The Time Of Their Actions

Defendants next argue that, to the extent that the Agreement is not void, at the time defendants dealt directly with the Seller they were no longer bound by the Agreement's prohibition against such conduct. In support of this contention, defendants claim that because the Contract of Sale was terminated effective November 20, 2007, defendants' obligations under the Agreement either expired or were excused from that date forward. Again, defendants' position is without merit.

The Agreement pointedly contains *no* reference to the Contract of Sale. Indeed, it makes no mention at all of any transaction or agreement between plaintiffs and the Seller, or of the status of plaintiffs' interest (if any) in the Property. Rather, it refers only to a "proposed transaction (the 'Proposed Transaction') involving the purchase of, lease of, or an acquisition of an interest or investment in" the Property by defendants, in connection with which defendants have asked plaintiffs to provide them with certain "Confidential Information" concerning the Property. (Agreement (Exhibit B to defendants' moving papers) at 1). Thus, the only "proposed transaction" the Agreement references is one in which *defendants* might acquire an interest in the Property. All the Agreement required *plaintiffs* to do in order to trigger defendants' obligations was disclose "Confidential Information" within the meaning of the Agreement. Plaintiffs unquestionably did so.

7

If defendants had wished to make their obligations contingent on plaintiffs having a present contractual right to purchase the Property, they could easily have done so. Because they did not, such a condition should not be read into the Agreement. *See, e.g., Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961, 738 N.Y.S.2d. 658, 661 (2001) (where an agreement is silent as to a contingency that could reasonably have been foreseen at the time of contracting, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing"); *accord Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 476, 807 N.E.2d 876, 880, 775 N.Y.S.2d 765, 768 (2004) ("judicial insertion of a contract term" is not appropriate, particularly where "[t]he parties could have negotiated and included" a provision dealing with a particular matter but did not do so).[10]

Although we submit that this analysis should end the inquiry, we also note that defendants' argument fails for the separate reason that, as explained above in Point I.A.2, if defendants wished to terminate the Agreement they were required (at a minimum) to give plaintiffs reasonable notice. Had defendants given such notice, plaintiffs would have been entitled (among other things) to insist upon the return or destruction of all information that had been provided to defendants under the Agreement, and "all derivatives thereof." (Agreement at 3, ¶ 5). Defendants not only failed to give any notice of termination; they also continued to

---

[10] Again, the cases defendants cite for their contrary argument do not support their position. In *City of New York v. Long Island Airports Limousine Svc. Corp.*, 96 A.D.2d 998, 467 N.Y.S.2d 93 (3d Dept. 1983), *aff'd*, 62 N.Y.2d 846, 466 N.E.2d 153, 477 N.Y.S.2d 613 (1984), the City had entered into a contract with the defendant pursuant to which the defendant paid the City to secure the City's statutorily-required consent to operate. After the statute was amended to remove the requirement for such consent, the court held that the City could no longer enforce its right to continue to receive payment from the defendant. The amendment of the statute rendered the contract "worthless" to the defendant, and amounted to a failure of consideration that excused the defendant's continued performance. 96 A.D.2d at 999, 467 N.Y.S.2d at 94-95. Here, the benefits defendants received as a result of the Agreement -- including knowledge of the Property's potential availability and plaintiffs' proprietary analyses and projections -- clearly continued to be valuable to defendants; indeed, among other things they helped enable defendants to acquire the Property for $10 million less than they had been willing to pay. (Am. Compl. ¶ 32). *Long Island Airports* is therefore inapposite. The other two cases defendants cite -- *Septembertide Publishing, B.V. v. Stein and Day*, 884 F.2d 675 (2d Cir. 1989) and *Clanton v. Smith*, 170 A.D.2d 643, 567 N.Y.S.2d 67 (2d Dept. 1991) -- stand for the proposition that under New York law a contract can be rescinded only where one party commits a breach so substantial as to defeat the purpose of the contract. Defendants do not here allege that plaintiffs breached the Agreement; indeed, as noted, the Agreement did not on its face require plaintiffs to have a present contractual right to purchase the Property. Accordingly, these cases are similarly of no help to defendants.

accept information from plaintiffs, and other benefits of plaintiffs' performance under the Agreement, *after* the termination of the Contract of Sale. (*See* Am. Compl. ¶¶ 16, 24, 28). Having behaved in this manner, defendants cannot now claim that their own reciprocal obligations had ceased to exist.[11]

## II. THE AMENDED COMPLAINT STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Defendants next challenge Count II of the Amended Complaint, which seeks damages for tortious interference with plaintiffs' prospective economic advantage. Defendants assert that this claim fails because (a) it is allegedly duplicative of plaintiffs' breach of contract claim; (b) defendants were allegedly third party beneficiaries of plaintiffs' "relationship" with the Seller; or (c) plaintiffs have not adequately alleged an expectancy of entering into a business relationship with the Seller. None of these contentions has merit.

### A. Plaintiffs' Tortious Interference Claim Does Not Duplicate Their Contract Claim

Plaintiffs' claim for tortious interference with prospective economic advantage properly alleges a business relationship between themselves and the Seller, defendants' knowledge of that relationship and interference with it, and injury to that relationship. It also properly alleges the other element of such a claim -- that defendants used dishonest, unfair or improper means -- by asserting (among other things) that defendants "misappropriated [p]laintiffs' confidential and proprietary information and misused that information in connection with [d]efendants' efforts to

---

[11] *Kimball Assocs. v. Homer Cent. School Dist.*, No. 00-CV-897 (HGM) (GJD), 2000 WL 1720751 (N.D.N.Y. Nov. 9, 2000) (Exhibit 5), which defendants cite in support of their position that the Agreement "expired" with the termination of the Contract of Sale, is inapposite. In that case, the contract was for certain architectural services to be provided to a school district in two stages. The first stage required the architect to prepare a referendum for voter approval for the project, and the second required the architect to provide certain services for the "*approved*" project. 2000 WL 1720751, *5 (emphasis in original). After two proposed referenda were not approved, the school district fired the plaintiff and retained another architect. The plaintiff sued, claiming that the school district breached the contract by refusing to allow it to prepare a third referendum. The court disagreed, holding that because the second stage of the contract was contingent on approval of the referendum, the contract terminated when the voters rejected the referendum. It also noted that although the contract itself set forth no express duration, it contained a work schedule ending in November 1988 -- a fact that, the court held, "clearly shows the contract to be an agreement with a terminable existence." *Id.* In contrast, here there was no express contingency or timetable, and plaintiffs were continuing to perform under the Agreement because defendants had given them no notice of any termination.

purchase the Property." (Am. Compl. ¶¶ 49, 50-51; *see* Mov. Br. at 12, setting forth the elements of this claim under New York and Illinois law).[12]

Defendants do not dispute that the misappropriation and misuse of plaintiffs' confidential and proprietary information would constitute the dishonest, unfair or improper means necessary to support a claim for tortious interference with prospective economic advantage. *See, e.g., Cardiocall, Inc. v. Serling*, 492 F. Supp.2d 139, 153 (E.D.N.Y. 2007) ("the knowing use of trade secret or other confidential information has been held to be the sort of tortious conduct necessary to state a claim" for tortious interference with prospective economic advantage); *Conant v. Karris*, 165 Ill. App. 3d 783, 791-92, 520 N.E.2d 757, 762-63 (Ill. App. 1987) (claim for tortious interference with prospective economic advantage properly stated where plaintiff alleged that defendants converted confidential information in order to submit a higher offer on property while plaintiff's offer was pending). Rather, defendants contend that plaintiffs' tortious interference claim should be dismissed because, defendants assert, it is premised solely on defendants' breach of the confidentiality obligations imposed by the Agreement. This argument misstates both the facts and the law.

Plaintiffs specifically allege that the circumstances under which they provided confidential information to defendants -- including defendants' assurances that such information would be used only for the purpose of evaluating a transaction with plaintiffs -- gave rise to a duty, *independent* of the Agreement, not to use that information for other purposes. (*See, e.g.,* Am. Compl. ¶¶ 41, 50). Although defendants ask rhetorically in a footnote what circumstances other than the Agreement would have provided plaintiffs with an expectation that the information would be kept confidential (Mov. Br. at 11 n.9), they have made no legal argument challenging plaintiffs' allegation that such a duty arose from defendants' acceptance of this information with knowledge of its confidential nature and plaintiffs' reasonable expectation that defendants would maintain that confidentiality.[13] This express allegation that defendants

---

[12] Defendants do not argue that Illinois law governs any of plaintiffs' claims; rather, they assert only that the Court "can look to Illinois law" because its "standards and results are the same" as those under New York law. (Mov. Br. at 8 n.8). In light of defendants' position, for purposes of this motion we will cite New York and Illinois authority interchangeably. In the event that defendants shift course in the future and assert that the standards or results under New York and Illinois law differ in any material respect, both parties should be afforded the opportunity to brief and argue the relevant choice of law issues in full.

[13] Because defendants have offered no such challenge, we do not brief this principle in full. It is, however, amply supported. *See generally* Restatement (Third) of Unfair Competition, § 41 (Exhibit 6)

breached a duty they owed independently of the Agreement is enough, in itself, to warrant the rejection of defendants' argument that the claims are duplicative.

But wholly apart from this fact, defendants' misappropriation and misuse of plaintiffs' confidential information constituted a tort independent of any breach of the Agreement, *regardless* of whether defendants' duty not to misappropriate the information and material disclosed to them in confidence arose from the Agreement or from other circumstances. *See, e.g., Sylmark Holdings Limited v. Silicone Zone Int'l Limited*, 5 Misc. 3d 285, 295-99, 783 N.Y.S.2d 758, 769-72 (Sup. Ct. N.Y. Co. 2004) (plaintiffs demonstrated likelihood of success on both breach of contract claims and claims for misappropriation of trade secrets, where they submitted "substantial evidence" that defendants "misappropriated [plaintiffs'] trade secret information, in violation of their agreements"); *accord Trans Union LLC v. Credit Research Inc.*, No. 00C3885, 2001 WL 648953, *6 (N.D. Ill. June 4, 2001) (Exhibit 7) (improper use of confidential business information in violation of contractual restrictions can give rise to tort liability for conversion); *Baker's Aid, A Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1212-13 (E.D.N.Y. 1990) (where contract gave plaintiff exclusive right to use specifications, defendant's use of those specifications was both a violation of the contract and an independent tort of conversion). That tort, in turn, constitutes the wrong necessary to support plaintiffs' tortious interference claim.

Defendants base their contrary argument on the general principle that tort claims cannot be based on conduct that constitutes a mere breach of contract. But only two of the cases defendants cite in support of that argument dealt with claims of tortious interference, and each of them is readily distinguishable from the facts present here. In *Allerand, LLC v. 233 E. 18th St. Co.*, 19 A.D.3d 275, 798 N.Y.S.2d 399 (1st Dept. 2005), the court dismissed the plaintiff's tortious interference claim as duplicative of its contract claim because the alleged interference consisted only of a claim that the defendant landlord acted wrongfully by refusing to honor lease terms that permitted the plaintiff tenant to sublet. In *In re WorldCom, Inc.*, 361 B.R. 697, 720 (Bankr. S.D.N.Y. 2007), the court dismissed the plaintiff's tortious interference claim after

---

("A person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret . . . if (a) the person made an express promise of confidentiality prior to the disclosure of the trade secret; *or* (b) . . . (1) the person knew or had reason to know that the disclosure was intended to be in confidence, and (2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality.") (emphasis added).

finding that such claim would not entitle the plaintiff to damages beyond those that had *already* been awarded on its contract claim. Neither of these cases stands for the proposition that a defendant who has a contractual obligation not to interfere with a particular relationship or not to use particular confidential information is immune, simply by virtue of that contract, from a claim for tortious interference. There is no such rule.

Rather, where a defendant is alleged to have misappropriated confidential information or to have violated a contractual obligation not to interfere with the relationship in question, courts routinely permit breach of contract and tortious interference claims to proceed in tandem. *See, e.g., Design Strategy Corp. v. Knack Systems, LLC*, No. 07 Civ. 0395 (JSR), 2007 WL 4562926, *3 (S.D.N.Y. Dec. 18, 2007) (Exhibit 8) (denying summary judgment both on claim for breach of restrictive covenant and on claim for tortious interference based on defendant's conduct in violation of that covenant); *see also Lazzarino v. Warner Bros. Entertainment, Inc.*, 13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276, *11 (Sup. Ct. N.Y. Co. Oct. 30, 2006) (Exhibit 9) (rejecting defendants' argument that tortious interference claim should be dismissed as duplicative of breach of contract claim, even though contract contained express obligation not to interfere with the relationship at issue); *accord Diamond Blade Warehouse, Inc. v Paramount Diamond Tools, Inc.*, 420 F.Supp.2d 866 (N.D. Ill. 2006) (holding that plaintiff stated claims for both tortious interference with prospective economic advantage and breaches of restrictive covenants prohibiting the use of confidential information).

Defendants have cited no case that supports any different result here. Rather, other than *Allerand* and *Worldcom*, defendants cite only cases where courts dismissed claims alleging such purported torts as "tortious breach of contract" (*Baguer v. Spanish Broadcasting Sys., Inc.*, No. 04-CV-8398 (KMK), 2007 WL 2780390, *3-4 (S.D.N.Y. Sept. 20, 2007) (Exhibit 10)); an alleged misrepresentation of intent to perform under a contract (*U. S. Network Servs., Inc. v. Frontier Comms of the West, Inc.*, 115 F. Supp.2d 353 (W.D.N.Y. 2000); *Hi Grade Cleaners, Inc. v. American Permac, Inc.*, 561 F. Supp. 643 (N.D. Ill. 1982)); an allegedly false promise that was also claimed to be a breach of contract (*Chicago Messenger Serv., Inc. v. Nextel Comms, Inc.*, No. 01 C 8820, 2003 WL 22225619 (N.D. Ill. Sept. 24, 2003) (Exhibit 11)); or other "torts" based on breaches of purely contractual duties (*Maxus Leasing Group, Inc. v. Kobelco America, Inc.*, No. 5:04-CV-518 (FJS/DEP), 2007 WL 655779 (N.D.N.Y. Feb. 26, 2007) (Exhibit 12) (plaintiff's fraud and conversion claims were identical to its breach-of-warranty claim); *Daredia*

*v. Gold & Diamond Merch. Group, Inc.*, No. 97 C 8149, 1999 WL 965591, *4 and n.11 (N.D. Ill.
Sept. 30, 1999) (Exhibit 13) (plaintiff's claims for "breach of good faith and fair dealing," "fraud
in the transaction" and "wrongful charge back" were identical to its contract claims); *Rockefeller
Univ. v. Tishman Constr. Corp. of NY*, 240 A.D.2d 341, 659 N.Y.S.2d 460 (1st Dept. 1997)
(causes of action for misrepresentation and fraudulent representation dismissed because they
sought "identical contractual benefit of the bargain recovery")). These cases, like *Allerand* and
*Worldcom*, are entirely inapposite.

　　　As a matter of law, defendants' misappropriation of plaintiffs' confidential information
was both an independent tort and sufficiently wrongful conduct to support a claim of tortious
interference with prospective economic advantage. Accordingly, the Court should reject
defendants' contention that the claim is duplicative of plaintiffs' claim of breach.

### B. Defendants' Other Contentions With Respect To The Tortious Interference Claim Are Without Merit

　　　Defendants next argue that plaintiffs' tortious interference claim should be dismissed
either (a) because defendants were third party beneficiaries of plaintiffs' "relationship" with the
Seller, and therefore cannot have interfered with it; or (b) because plaintiffs have not adequately
alleged an expectation of entering into an agreement with the Seller. These arguments, too, are
without merit.

#### 1. Plaintiffs' Claim Should Not Be Dismissed Based On Defendants' Alleged "Third-Party Beneficiary" Status

　　　Defendants' contention that they were third party beneficiaries of plaintiffs' "relationship"
with the Seller is unsupported in fact or in law. As a threshold matter, defendants do not explain
how they could be third-party beneficiaries of a "relationship," as distinct from a contract. They
cite no case, and we know of none, that could support this novel assertion.

　　　But even if third-party beneficiary status could exist with respect to a "relationship" that
is not contractual, defendants would not meet the criteria for such status. Under New York law
(which defendants concede is identical to Illinois law in all relevant respects), only *intended*
beneficiaries -- not merely incidental ones -- can qualify as third-party beneficiaries. *See
generally* 22 N.Y. Jur.2d Contracts § 314 (Exhibit 14) (a third party who "may derive benefit
from the performance of a contract" but is not an intended beneficiary is merely an incidental
beneficiary and does not have the rights of a third-party beneficiary). Such status does not result

from the mere fact the third party's relationship with one of the contracting parties is impacted by (or even depends upon) the contract. *See, e.g., Amroc Investments, Inc. v. Deloro*, No. 97 Civ. 2878 TPG, 1999 WL 799642 (S.D.N.Y. Oct. 7, 1999) (Exhibit 15) (where plaintiff had entered into an agreement to purchase certain debt and had separately committed to sell that debt to defendant, defendant was not a third-party beneficiary of plaintiff's agreement to purchase the debt, even though it was "clear beyond question" that the parties to that agreement intended that plaintiff would resell the debt); *Subaru Distributors Corp. v. Subaru of America, Inc.*, No. 03 Civ. 9608SCR, 2004 WL 3220120, * 9-10 (S.D.N.Y. June 1, 2004) (Exhibit 16) (sub-distributor, who had contract with distributor covering a portion of the territory assigned to distributor in distributor's contract with manufacturer, was not a third-party beneficiary of distributor's contract with manufacturer). Nor does it arise simply because one or both parties to the contract contemplated related transactions with a third party. *See, e.g., Amroc, supra*; *East Coast Athletic Club, Inc. v. Chicago Title Ins. Co.*, 39 A.D.3d 461, 833 N.Y.S.2d 585 (2d Dept. 2007) (where bank, which loaned money to property owner in exchange for security interest in property, purchased title insurance policy on property in connection with that transaction, property owner was not a third party beneficiary of agreement between bank and title insurance company that required title insurance company to record mortgage).

Defendants have asserted nothing more. Thus, they have not even adequately alleged facts that (if proven) would make them third-party beneficiaries, much less conclusively demonstrated such an entitlement. But defendants cite no case, and we know of none, where a claim for tortious interference was dismissed on this basis under New York (or Illinois) law as against anyone other than a party to the contract (*Widewaters Prop. Dev. Co. v. Katz*, 38 A.D.2d 1220, 1222, 836 N.Y.S.2d 746, 749 (4th Dept. 2007)), an agent or representative of such a party (*Quist v. Bd. of Trustees of Comm. College Dist. No. 525,* 259 Ill. App. 3d 814, 821, 629 N.E.2d 807, 811 (Ill. App. 1994)), or a true third-party beneficiary.[14] As a result, defendants' argument

---

[14] Although defendants cite two Georgia cases and a treatise that suggest that one who does not meet the criteria for a third-party beneficiary might nevertheless be immune from liability for tortious interference (*see* Mov. Br. at 11-12 and n.10), they do not argue that they could enjoy such immunity under New York (or Illinois) law unless they are true third-party beneficiaries. This is not surprising. Under Georgia law, the elements of a claim for tortious interference include a requirement that the defendant's actions be taken both "with the intent to injure" and "without privilege." *See Disaster Svcs., Inc. v. ERC Partnership*, 228 Ga.App. 739, 740, 492 S.E.2d 526, 528 (Ga. App. 1997). "Privilege," in turn, includes "a legitimate relationship of the defendant to the contract", which might include "a direct economic interest . . . not rising to third-party beneficiary status under Georgia contract law." 228 Ga.App. at 741,

that they cannot be liable for tortious interference on the ground that they are not "strangers" to plaintiffs' relationship with the Seller must fail.

## 2. **Plaintiffs Have Adequately Stated A Claim For Tortious Interference**

Defendants next argue that plaintiffs' tortious interference claim must fail because "[p]laintiffs have not alleged a real expectancy of entering into a future business relationship." (Mov. Br. at 12). To make this argument, defendants reduce plaintiffs' allegations to a mere assertion that "after [plaintiffs] terminated the Contract with Seller, they believed the deal was back on track and could be finalized when one tenant's lease was improved." (*Id.*). The Amended Complaint, however, says much more about the basis for plaintiffs' expectancy -- more than enough to satisfy the pleading standards for their tortious interference claim. Specifically, the Amended Complaint alleges that:

- plaintiffs had a contract to purchase the Property (*i.e.,* the Contract of Sale), which came about as a result of a private offer by the Seller, who had approached plaintiffs to inquire about their interest in purchasing the Property (Am. Compl. ¶ 11);

- the Property had not been publicly marketed (*id.*);

- plaintiffs terminated the Contract of Sale on November 20, 2007 solely because certain issues respecting a lease with one of the Seller's tenants had not yet been resolved by this date, which marked the close of the Contract's due diligence period (*id.* ¶¶ 21-23);

- thereafter, plaintiffs and the Seller "continued to work unabated and uninterrupted toward consummating" a sale of the Property to plaintiffs (*id.* ¶ 23);

- evidencing its continued intent to sell the Property to plaintiffs once the lease issues were resolved, on November 28, 2007 the Seller not only advised plaintiffs that it had succeeded in negotiating the lease provision plaintiffs wanted, but also *sought plaintiffs' approval* for the revised lease (*id.* ¶ 25); and

- after plaintiffs granted such approval, plaintiffs (on the one hand) and the Seller (on the other) "confirmed to one another that they were each confident that the sale of the property to [plaintiff] Century 21 Chicago could now be finalized" (*id.* ¶ 26).

This is far more than a mere "belie[f]" that "the deal was back on track." The Seller had

---

492 S.E.2d at 529. In other words, under Georgia law (unlike New York or Illinois law), proof that the defendant did *not* have an economic interest in the contract is an element of the claim for tortious interference.

taken steps to remove the barrier that had prevented the parties from proceeding to close under the original Contract. The Seller had done so in consultation with plaintiffs, in an obvious effort to ensure that plaintiffs would be satisfied with the result and would accordingly be willing to proceed with the purchase. Meanwhile, the Seller was not marketing the Property to anyone else. These allegations are more than sufficient to plead the requisite expectancy. *See, e.g., Six West Retail Acquisition, Inc. v. Sony Theatre Mgt. Corp.*, No. 97 Civ. 5499 (DNE), 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) (Exhibit 17) (allegations that a third party had indicated its willingness to sell its rights and that the plaintiff had "at least arguabl[y] . . . entered into negotiations" to purchase those rights set forth a sufficient expectancy to support a claim for tortious interference with prospective business relations); *accord Cook v. Winfrey*, 141 F.3d 322, 328 (7th Cir. 1998) ("minimal requirements of federal notice pleading" are met where plaintiff alleges a reasonable expectancy of a business relationship, the defendant's knowledge of that expectancy, the defendant's purposeful interference and damages).

## III. PLAINTIFFS HAVE STATED A CLAIM FOR UNJUST ENRICHMENT

Finally, defendants attack plaintiffs' unjust enrichment claim, which is asserted as an alternative to their breach of contract claim (*i.e.,* only in the event that the Agreement is found to be void or otherwise unenforceable, as defendants have urged). Defendants contend that unjust enrichment is "not a viable theory." (Mov. Br. at 13). Under applicable law, however, a claim for unjust enrichment need only allege *either* (a) that a benefit has been conferred upon defendants by a third party as a result of defendants' misconduct or under circumstances otherwise showing that plaintiffs had a better claim to that benefit (*see, e.g., Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 46 (E.D.N.Y. 2008) (unjust enrichment occurs "when and because the acts of the parties *or others* have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another") (emphasis added; citations and internal quotations omitted); *accord HPI Health Care Svcs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill.2d 145, 161-62, 545 N.E.2d 672, 679 (Ill. 1989)); *or* (b) that plaintiffs directly conferred a benefit upon defendants, for which defendants should compensate plaintiffs (*see Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp.2d 439, 454 (E.D.N.Y. 2007) ("Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the

enrichment from the defendant.") (citations and internal quotations omitted)).  Count III of the Amended Complaint states a claim under *both* of these theories of unjust enrichment.

Specifically, plaintiffs allege that by misusing plaintiffs' Confidential Information, defendants "were able to purchase the Property for a purchase price of $350,000,000 -- at least $10,000,000 less than they had offered to pay" plaintiffs.  (Am. Compl. ¶ 56; *see id.* ¶ 57). Defendants, in other words, got the Property for $350,000,000 (a) through wrongful conduct; and/or (b) under circumstances where the opportunity to purchase the Property for that price (and thereafter either sell it to defendants or retain it and profit from its ownership) should have belonged to plaintiffs.  The value of that benefit is, at a minimum, the $10,000,000 more that defendants would have paid for the Property if they had purchased it from plaintiffs.  These allegations amply state a claim for unjust enrichment based on defendants' receipt of a benefit from a third party that more properly belongs to plaintiffs.

In addition, however, plaintiffs have stated a claim for unjust enrichment based on the value of the benefit *they conferred* upon defendants.  That benefit consisted not of "the purchase of the Property itself" (*see* Mov. Br. at 13-14), but rather of the disclosure of the opportunity and the fruits of plaintiffs' negotiating efforts and other due diligence concerning the Property.  (*See* Am. Compl. ¶¶ 56, 58).  Plaintiffs contend that the value of what they furnished to defendants was at least $10,000,000.  Again, these allegations amply state a claim for unjust enrichment.

If the Court finds that the Agreement is void or otherwise unenforceable (as defendants urge), plaintiffs are entitled to compensation based on defendants' unjust enrichment.  *See Gristede's,* 532 F. Supp.2d at 455 (claim for unjust enrichment should be treated "as an alternative to contract, where a contractual relationship has legally failed") (citations and internal quotations omitted).  Indeed, under the precedents discussed above in Point I.A.1, if the Court concludes that the Agreement is unenforceable because plaintiffs violated a provision of the Contract of Sale and that violation was not waived or otherwise excused by the Seller, it should either direct a "proportionate" enforcement of defendants' obligations or award plaintiffs restitution for any benefit conferred on defendants by virtue of plaintiffs' performance.  (*See supra* at 3-5).  Such restitution would include compensation for the value of plaintiffs' work in developing the Property as a viable purchase opportunity, all as detailed in the Amended Complaint.  These same principles -- which recognize that even if a contract is illegal, the law will not tolerate the denial of all relief to one who has performed under it and thereby conferred a

benefit on the other party -- apply *a fortiori* if the Court determines that the Agreement is void or unenforceable for any of the other reasons urged by defendants.

Nor should this claim be dismissed based on defendants' argument that their retention of the benefit of plaintiffs' work would not violate fundamental principles of justice, equity or good conscience. Defendants cite no case, and we know of none, where a claim for unjust enrichment was dismissed on this basis, *at the pleading stage*,[15] in the absence of undisputed facts demonstrating that (a) the plaintiff engaged in misconduct injurious to the *defendant* (*PenneCom B.V. v. Merrill Lynch & Co., Inc.,* 372 F.3d 488, 493 (2d Cir 2004) ("Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is 'directly related to the subject matter in litigation' *and has injured the party attempting to invoke the doctrine*.") (citation omitted)); (b) the plaintiff's loss was caused by the criminal wrongdoing of a third party, and the plaintiff had "knowingly assumed the risk" of such loss by entrusting that third-party wrongdoer with substantial funds without performing a proper investigation (*TRW Title Ins. Co. v. Sec. Union Title Ins. Co.,* 153 F.2d 822, 829 (7th Cir. 1998)); (c) any benefit to the defendant was dubious and was in any event not conferred by the plaintiff (*Kinsey v. Cendant Corp*, No. 04 Civ. 0582 (RWS), 2004 WL 2591946, *18 (S.D.N.Y. Nov. 16, 2004) (Exhibit 18)); or (d) the plaintiff and the defendant had no prior course of dealing at all (*Gristede's Foods*, 532 F. Supp.2d at 454-55). None of the authorities defendants cite can support dismissal of plaintiffs' unjust enrichment claim here. Accordingly, that claim should be permitted to proceed unless and until it is determined that that Agreement is valid and enforceable.

---

[15] *Fandy Corp. v. Chang*, 272 A.D.2d 369, 707 N.Y.S.2d 361 (2d Dept. 2000), cited in the Moving Brief at 15, was an affirmance of a dismissal on summary judgment, not at the pleading stage. The court's opinion does not set forth the facts of the case; it simply states the plaintiff could not recover for unjust enrichment because it was not a "good-faith purchaser for value of the subject property," citing *Chen v. Geranium Dev. Corp.*, 243 A.D.2d 708, 663 N.Y.S.2d 288 (2d Dept. 1997). This citation to *Chen* makes clear that the concept of "good-faith purchaser for value" in *Fandy* related only to the question of whether the plaintiffs could be barred by a prior unrecorded interest -- an issue not relevant here.

## <u>CONCLUSION</u>

For the reasons set forth above, defendants' motion should be denied in its entirety, and each of plaintiffs' claims should be permitted to proceed.


Dated: August 29, 2008                    RFR HOLDING LLC
                                          CENTURY 21 CHICAGO LLC


                                          By:    /s/  Mark Walfish
                                                One of their Attorneys

Mark Walfish (Admitted *pro hac vice*)
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

Lazar P. Raynal
Jocelyn D. Francoeur
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois  60606
Telephone: (312) 372-2000

19

## <u>CERTIFICATE OF SERVICE</u>

I, Mark Walfish, an attorney, certify that on August 29, 2008, I caused a true and complete copy of this **Memorandum of Law in Opposition to Defendants' 12(b)(6) Motion To Dismiss Plaintiffs' Amended Complaint** to be served via CM/ECF mail upon:

Howard Kevin Jeruchimowitz
Rita M. Alliss Powers
Greenberg Traurig, L.L.P.
77 West Wacker Drive
Suite 2500
Chicago, IL  60601


And via first-class mail upon:

Hilarie Bass
Greenberg Traurig LLP
1221 Brickell Avenue
Miamia, FL  33131


$\underline{\hspace{1cm} \text{s/ Mark Walfish} \hspace{1cm}}$

**Exhibit 1**



NYJUR CONTRACTS § 196                                                        Page 1
22 N.Y. Jur. 2d Contracts § 196

New York Jurisprudence, Second Edition
Database updated August 2008

Contracts
Laura Hunter Dietz, J.D., Tracy Bateman Farrell, J.D., John Gebauer, J.D., Alan J.
Jacobs, J.D., Jack K. Levin, J.D., Eric C. Surette, J.D.

V. Illegality
F. Effect of Illegality
1. In General

Topic Summary   Correlation Table   References

§ 196. Effect of performance of contract by one party

West's Key Number Digest

West's Key Number Digest, Contracts  135, 136, 138(1) to 138(7), 140

   Performance by one party to a contract critically affects whether enforcement of
another's party contractual obligation will be refused on the ground of illegality.
While a bargain is wholly executory, there is no serious injustice in denying
enforcement to either party. After either party has performed substantially, the
denial of all remedy would disproportionately penalize him or her; and the public
welfare is best served by either compelling restitution or enforcing the other's
promise proportionately. Thus, once a party seeking such enforcement has
substantially performed his or her obligations, the court should consider the
quality of the illegality, the extent of public harm, the relative guilt of the
parties, and the cruelty of the forfeiture involved in the denial of a remedy.[1]

   The illegality defense to enforcement of a contract is disfavored where it would
work a substantial forfeiture on one party while allowing the other party, who has
already reaped the benefit of the transaction, to avoid the corresponding
obligation, particularly where the two parties are equally culpable with respect to
the illegal conduct.[2]

   [FN1] Murray Walter, Inc. v. Sarkisian Bros., Inc., 107 A.D.2d 173, 486
   N.Y.S.2d 396 (3d Dep't 1985).

   As to the effect of the degree of each party's fault, see §§ 201 to 204.

   As to the effect of a potential forfeiture, see § 195.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN2] Unger v. Leviton, 5 Misc. 3d 925, 787 N.Y.S.2d 625 (Sup 2004).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

NYJUR CONTRACTS § 196

END OF DOCUMENT

**Exhibit 2**



NYJUR CONTRACTS § 200                                                  Page 1
22 N.Y. Jur. 2d Contracts § 200

New York Jurisprudence, Second Edition
Database updated August 2008

Contracts
Laura Hunter Dietz, J.D., Tracy Bateman Farrell, J.D., John Gebauer, J.D., Alan J.
Jacobs, J.D., Jack K. Levin, J.D., Eric C. Surette, J.D.

V. Illegality
F. Effect of Illegality
1. In General

Topic Summary    Correlation Table    References

**§ 200. Waiver or estoppel; repudiation**

**West's Key Number Digest**

West's Key Number Digest, Contracts  138(4)

   Illegal contracts cannot be validated by waiver or estoppel;[1] that is,
questions of estoppel or waiver do not raise triable issues of fact since these
doctrines may not be relied on to enforce a contract which violates public
policy.[2]

   However, it has been said that a party may waive the defense of the illegality
of a contract in which he or she himself or herself participated and affirm the
same insofar as the parties are concerned.[3]

   Parties may also be estopped from attacking the validity of the contract under
certain circumstances. A person who accepted and retained the benefits of a
contract could not allege as a defense to an action upon it that it was void as
against public policy.[4]

   Similarly stated, where a refusal to enforce a contract clause would work a
substantial forfeiture on the plaintiff while permitting the defendants, who are at
least equally culpable, to retain the entire financial benefits of the transaction,
the courts have estopped the assertion of the illegality defense.[5]

   A person cannot repudiate an illegal promise and retain what he or she has
received thereunder.[6]

   [FN1] Levin v. Levin, 253 A.D. 758, 300 N.Y.S. 1042 (2d Dep't 1937); Euclid

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Holding Co. v. Schulte, 153 Misc. 455, 274 N.Y.S. 515 (Mun. Ct. 1934), rev'd on other grounds, 153 Misc. 832, 276 N.Y.S. 533 (App. Term 1934).

[FN2] National Superlease, Inc. v. Reliance Ins. Co. of New York, 126 Misc. 2d 988, 484 N.Y.S.2d 776 (Sup 1985), order aff'd, 123 A.D.2d 608, 507 N.Y.S.2d 16 (2d Dep't 1986).

[FN3] Bonta v. Gridley, 77 A.D. 33, 78 N.Y.S. 961 (4th Dep't 1902); Sheary v. O'Brien, 75 A.D. 121, 77 N.Y.S. 378 (3d Dep't 1902), aff'd, 184 N.Y. 544, 76 N.E. 1108 (1906).

[FN4] Bonta v. Gridley, 77 A.D. 33, 78 N.Y.S. 961 (4th Dep't 1902).

[FN5] Murray Walter, Inc. v. Sarkisian Bros., Inc., 107 A.D.2d 173, 486 N.Y.S.2d 396 (3d Dep't 1985).

[FN6] Medical College Laboratory of City of New York v. New York University, 35 Misc. 80, 71 N.Y.S. 243 (Sup 1901), aff'd, 71 A.D. 617, 76 N.Y.S. 1020 (1st Dep't 1902) and aff'd, 76 A.D. 48, 78 N.Y.S. 673 (1st Dep't 1902), aff'd, 178 N.Y. 153, 70 N.E. 467 (1904).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

NYJUR CONTRACTS § 200

END OF DOCUMENT

**Exhibit 3**



New York Practice Series - New York Contract Law
Database updated March 2008

Glen Banks

Part V. Issues Prior to Completion of Performance
Chapter 13. Termination
A. Unilateral Termination

### § 13:7. Termination upon notice

**West's Key Number Digest**

West's Key Number Digest, Contracts    217, 271

**Legal Encyclopedias**

    N.Y. Jur. 2d, Contracts § 494

    When a contract is not limited as to the time of its duration, it is terminable at the will of either party upon giving reasonable notice.[1] Where a contract does not specify its duration, a court may fairly and reasonably fix the duration in light of surrounding circumstances and the parties' intent.[2] A contract with such an implied duration may generally be terminated after a reasonable duration upon reasonable notice.[3]

    Where a contract has no provision for its termination, courts in New York treat the contract as being made for a reasonable duration and subject to termination upon reasonable notice.[4] The "reasonable notice doctrine" has been stated to be well-established.[5] The U.C.C. requires reasonable notice of termination.[6] Nonetheless, there is authority for the proposition that where the parties' agreement does not contain any provision regarding termination, a requirement that termination be on reasonable notice will not be implied, even if such provision were customary in the type of contract the parties had entered into.[7]

    Where notice of termination is given and the contract expires by its terms prior to the effectiveness of the termination, the contract is deemed to have expired as opposed to having been terminated.[8]

    One party's repudiation of the contract relieves the other party of providing notice in connection with exercising its right to terminate the contract because of the repudiation.[9] If a party gives a defective notice of termination, the receiving party may treat it as a repudiation of the contract.[9.10]

    One court has noted that there is nothing to be gained by construing a notice provision as if it were a common law pleading requirement under which every slip would be fatal because the inquiry should be whether a party's actions in terminating a contract served the general purpose of the contract's pretermination notice provision.[10]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

If a contract states that upon material breach it may be terminated upon written notice, a material breach is a condition precedent to an effective termination.[10.10] When a contract can be terminated upon notice, if, after notice is given, the terminating party breaches the contract, the breach does not affect the termination but may give rise to a claim for breach of contract damages.[10.20]

**Comment:**

Contracts often prescribe how notice under the contract is to be provided. The provision should designate a particular person to whom the notice should be directed and where the notice should be sent. The provision should also require that a copy of the notice be contemporaneously sent to the receiving party's counsel. The contract should specify how the notice will be delivered. If delivery is made by e-mail or fax, a confirmation copy of the notice should be sent by certified mail/return receipt requested or other means that will provide proof of delivery. The party serving the notice should meticulously comply with the provisions of the contract. If the contract is silent on how notice is provided, the party should take action that will allow it to prove it provided the notice, the other party received the notice, and when the receipt occurred.[11]

[FN1] Bailey v. S.S. Stafford, Inc., 178 A.D. 811, 166 N.Y.S. 79 (1st Dep't 1917).

[FN2] Haines v. City of New York, 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 157–58, 364 N.E.2d 820 (1977).

[FN3] Colony Liquor Distributors, Inc. v. Jack Daniel Distillery-Lem Motlow Prop., Inc., 22 A.D.2d 247, 254 N.Y.S.2d 547 (3d Dep't 1964); Copy-Data Systems, Inc. v. Toshiba America, Inc., 755 F.2d 293, 301 (2d Cir. 1985).

[FN4] G. B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc., 47 N.Y.2d 561, 419 N.Y.S.2d 465, 393 N.E.2d 460 (1979); Rogers v. HSN Direct Joint Venture, 1999 WL 595533 (S.D. N.Y. 1999); Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc., 842 F. Supp. 693, 699 (W.D. N.Y. 1993).

[FN5] Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc., 842 F. Supp. 693, 699 (W.D. N.Y. 1993); Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc., 1988 WL 52777 (S.D. N.Y. 1988).

[FN6] N.Y. U.C.C. § 2-309; see § 13:13.

[FN7] Farago Advertising, Inc. v. Hollinger Intern., Inc., 157 F. Supp. 2d 252, 264 (S.D. N.Y. 2001).

[FN8] Mill-Bern Associates, Inc. v. International Business Machines Corp., 64 Fed. Appx. 792 (2d Cir. 2003).

[FN9] Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp., 301 A.D.2d 70, 747 N.Y.S.2d 468 (1st Dep't 2002).

[FN9.10] Smith v. Tenshore Realty, Ltd., 31 A.D.3d 741, 820 N.Y.S.2d 292 (2d Dep't 2006); Velazquez v. Equity LLC, 28 A.D.3d 473, 814 N.Y.S.2d 182 (2d Dep't 2006).

[FN10] Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 925, 2 Fed. R. Evid. Serv. 16 (2d Cir. 1977); Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429, 433 (S.D. N.Y. 1999).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[FN10.10] Bluffs Homeowners' Ass'n, Inc. v. Frador Marketing, Inc., 26 A.D.3d 729, 809 N.Y.S.2d 329 (4th Dep't 2006).

[FN10.20] Automobile Coverage, Inc. v. American Intern. Group, Inc., 42 A.D.3d 405, 839 N.Y.S.2d 916 (1st Dep't 2007).

[FN11] See RBFC One, LLC v. Zeeks, Inc., 367 F. Supp. 2d 604 (S.D. N.Y. 2005) (discussing notice that had not been sent to the proper recipient with no copy to counsel and not in the manner prescribed in the contract).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

NYPRAC-CONT § 13:7

END OF DOCUMENT

**Exhibit 4**

**Westlaw.**

Not Reported in F.Supp.
Not Reported in F.Supp., 1988 WL 52777 (S.D.N.Y.)

Page 1

**C**henoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.
S.D.N.Y.,1988.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
CHENOWETH & FAULKNER, INC., Plaintiff,
v.
METRO MOBILE CTS, INC., Defendant.
**No. 87 CIV. 6294 (MJL).**

May 18, 1988.

Nixon, Hargrave, Devans & Doyle by Frank H. Penski, Vicki L. Safran, New York City, for plaintiff.
Olanoff & Kramer by Edward C. Kramer, Jeffrey S. Olanoff, Steven Tugentman, New York City.

OPINION AND ORDER

LOWE, District Judge.
**\*1** Plaintiff Chenoweth & Faulkner ("C & F") is an advertising and public relations company. Defendant Metro Mobile CTS ("Metro") is a cellular telephone company. This action arises out of the termination of the parties' business relationship. Presently before this Court is Metro's Motion to Dismiss C & F's Second, Fifth, Sixth, Seventh, Eighth and Ninth Causes of Action for failure to state a claim.

FACTS

In early 1984 Metro hired C & F to perform advertising and public relations services. Each media company that C & F arranged to buy advertising space from on behalf of Metro billed C & F. C & F paid the media companies directly, then billed Metro. C & F received a 15% commission from the media companies. C & F also billed Metro for its services at an hourly rate.

C & F submitted annual and monthly schedules to Metro outlining proposed media advertising contracts. One Metro approved these schedules, or made changes to them, C & F performed the necessary services. After these services were performed, and after C & F received invoices from the different media companies, C & F billed Metro.

On January 16, 1987 Metro sent a letter to C & F terminating their relationship effective January 31, 1987. Complaint at ¶ 10. By letter dated January 28, 1987 C & F demanded payment from Metro in the amount of $1,561,179.84. Complaint at ¶ 11. Metro subsequently paid C & F $180,044.03. Complaint at ¶ 12.

DISCUSSION

*Second Cause of Action*

Metro has moved to dismiss C & F's Second Cause of Action for failure to state a claim. In this Cause of Action C & F alleges the existence of an account stated. In its Complaint C & F states:

By accepting C & F's invoices without objection, by making partial payment and by other conduct, Metro Mobile has acknowledged the debt to C & F in the amount of its invoices.

Complaint at ¶ 20.

Under New York law, an account stated is an agreement, express or implied, between the parties to an account based upon prior transactions between them. The agreement is made with respect to the correctness of separate items composing the account and balance due, if any, in favor of one party or the other. *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 719 (S.D.N.Y.1986). It is essentially the same as if a promissory note had been given for the balance. *Interman Industrial Products v. R.S.M. Electron Power,* 37 N.Y.2d 151, 153, 332 N.E.2d 859, 861, 371 N.Y.S.2d 675, 678 (1975).

While silence does not normally constitute agreement to the correctness of an account rendered, the factual situation may be such that in the absence of an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                 Page 2
Not Reported in F.Supp., 1988 WL 52777 (S.D.N.Y.)

objection within a reasonable time after the account is rendered, an implied account stated may be found. *Navimex v. Northern Ice,* 617 F.Supp. 103, 105 (S.D.N.Y.1984) (defendant's failure to object for five months to plaintiff's summary statement of account was unreasonable, and converted statement into account stated); *Interman Industrial Products* at 154, 332 N.E.2d at 861, 371 N.Y.S. at 678-79 (absent express ratification by defendant, even a failure by defendant to object prior to commencement of action will not necessarily constitute implied acquiescence); *see also W.R. Haughton Training Stables v. Miriam Farms,* 118 A.D.2d 639, 499 N.Y.S.2d 792, 793 (1986) (period between summer and late November deemed reasonable time for defendant to object to its obligation to pay amounts billed by plaintiff, and prevented such billings from becoming an account stated).

Partial payment may be considered acknowledgment of the validity of an account rendered, thus converting it into an account stated. *Kramer, Levin, Nessen, Kamin & Frankel* at 720 (two partial payments against outstanding balance, along with nearly three years of silence, amounts to implied acceptance); *Chisholm-Ryder Co. v. Sommer & Sommer,* 70 A.D.2d 429, 431, 421 N.Y.S.2d 455, 457 (1979) (several months of acquiescence and two payments on account during the period of dispute, without questioning the balance, constitute implied agreement as to the whole).

**\*2** C & F submitted media schedules, invoices and aged receivables to Metro. These documents were submitted at different times over the period from July 1986 to February 1987. The Complaint is ambiguous as to whether these documents indicated that the amount due over this period was the same or whether such balances changed over time. It is also unclear from the Complaint which, if any, of these documents C & F intended to render to Metro as the account.

C & F does not allege that Metro explicitly or directly acknowledged any one of the receipts. Hence, absent Metro's assent to any one of these documents as the account stated, this Court can not arbitrarily choose one set of documents as the account rendered. Since the Complaint fails to set forth with sufficient particularity which document submitted by C & F to Metro is the account rendered,

this Court would be unable to determine if the account rendered has been converted into an account stated by Metro's partial payment and/or Metro's silence. C & F has failed to state a claim for an account stated. This Court, therefore, grants Metro's Motion to Dismiss C & F's Second Cause of Action.

*Fifth Cause of Action*

Metro has moved to dismiss C & F's Fifth Cause of Action for failure to state a claim. This Cause of Action alleges breach of an implied contract. In its Complaint C & F states:

The abrupt termination wrecked havoc with the internal operation of C & F as C & F was not afforded an opportunity to effectively manage the necessary reductions in staff and other costs. Accordingly, C & F incurred expenses that adequate notice would have avoided.

Complaint at ¶¶ 33, 34.

When a contract contains express provisions regarding termination, these provisions will be binding upon the parties. In the absence of an express provision, a contract is terminable after a reasonable duration with reasonable notice. *Copy-Data Systems, Inc. v. Toshiba America Inc.,* 755 F.2d 293, 301 (2d Cir.1985). Even if no definite period of termination was originally fixed, the contract is not terminable at will by either party. *Colony Liquor Distributor, Inc. v. Jack Daniels Distillery,* 22 A.D.2d 247, 249, 254 N.Y.S.2d 547, 549 (1964). Rather, if the contract existed for a reasonable duration, then the plaintiff is entitled to reasonable notice of termination. *Id. at 250, 254 N.Y.S.2d at 550.* This reasonable notice doctrine is well established in New York law. *Creative Foods Corp. v. Chef San Francisco,* 92 A.D.2d 462, 458 N.Y.S.2d 917 (1983); *Landow-Luzier Co. v. Grey,* 34 Misc 2d 1061, 232 N.Y.S.2d 247 (1962).

In addition, a plaintiff claiming breach of implied contract must allege facts showing damage. *Calabria v. Associated Hospital Service,* 459 F.Supp. 946, 949 (S.D.N.Y.1978), *aff'd,* 610 F.2d 806 (2d Cir.1979); *Ryan Ready Mixed Concrete Corp. v. Coons,* 25 A.D.2d 530, 530, 267 N.Y.S.2d 627, 630 (1966).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                      Page 3
Not Reported in F.Supp., 1988 WL 52777 (S.D.N.Y.)

**\*3** C & F properly alleges damages because it states that, due to the abrupt contract termination, it incurred expenses that adequate notice would have avoided. Complaint at ¶ 34. We must now decide whether the two week notice of termination given by Metro to C & F was reasonable as a matter of law. Considering the continuing and ongoing business relationship between Metro and C & F for more than two years, and considering the fact that C & F made arrangements with the media on behalf of Metro for periods far in excess of the two weeks' notice of termination given by Metro, this Court holds that the Complaint sufficiently states a claim for breach of implied contract. Therefore, Metro's Motion to Dismiss C & F's Fifth Cause of Action is denied.

*Sixth Cause of Action*

Metro has moved to dismiss C & F's Sixth Cause of Action for failure to state a claim. This Cause of Action alleges tortious interference with contractual relations. In its Complaint C & F states:

Metro Mobile, through its officers and agents, wrongfully, intentionally and maliciously persuaded the Media to breach their agreements with C & F.... The Media would not have breached but for the wrongful conduct of Metro.... Metro Mobile ... caused serious injury to C & F.

Complaint at ¶¶ 39-41.

To withstand a 12(b)(6) motion, a plaintiff bringing a tortious interference with contractual relations claim in New York must show each of the four elements that comprise such a claim: 1) the existence of a valid contract between plaintiff and a third party, 2) defendant's knowledge of such a contract, 3) defendant's intentional procurement of a breach of the contract by the third party, and 4) damages caused by the breach. *Universal City Studios v. Nintendo Co.,* 797 F.2d 70, 75 (2d Cir.1986); *GLM Corp. v. Klein,* 665 F.Supp. 283, 287 (S.D.N.Y.1987); *Printers II, Inc. v. Professional Publishing, Inc.,* 615 F.Supp. 767, 774 (S.D.N.Y.1985), *aff'd,* 784 F.2d 141, 147 (2d Cir.1986); *Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 134 N.E.2d 197, 151 N.Y.S.2d 1 (1956). Additionally, a plaintiff must show that, but for the unlawful actions of the defendant, the contract would have been performed. *GLM Corp.* at 287; *Demalco Ltd. v. Feltner,* 588 F.Supp. 1277, 1280

(S.D.N.Y.1984); *Bryce v. Wilde,* 39 A.D.2d 291, 293, 333 N.Y.S.2d 614, 616,*aff'd,*31 N.Y.2d 882, 292 N.E.2d 320, 340 N.Y.S.2d 185 (1972).

C & F has adequately pleaded all the above-outlined elements except for the third one. On this element, C & F's claims amount to no more than unsubstantiated allegations or assertions that C & F was intentionally and unjustifiably interfered with. *Alvord & Swift v. Steward M. Muller Construction Co.,* 46 N.Y.2d 277, 282, 385 N.E.2d 1238, 1241, 413 N.Y.S.2d 309, 312 (1978). C & F cannot use conclusory language or vague allusions without stating in the Complaint whether or how the third party breached and whether or how Metro procured that breach. *Nordic Bank PLC v. The Trend Group,* 619 F.Supp. 542, 561 (S.D.N.Y.1985); *Robbins v. Ogden, Inc.,* 490 F.Supp. 801, 810 (S.D.N.Y.1980). C & F must allege that the third party relied on Metro and that Metro's motivation was exclusively malicious, as opposed to being based upon *bona fide* economic considerations. *Demalco v. Feltner,* 588 F.Supp. 1277, 1280 (S.D.N.Y.1984); *Strobl v. New York Mercantile Exchange,* 561 F.Supp. 737, 786 (S.D.N.Y.1983); *Sadowy v. Sony Corp. of America,* 496 F.Supp. 1071, 1080 (S.D.N.Y.1980); *Alvord & Swift* at 282, 385 N.E.2d at 1241, 309 N.Y.S.2d at 312.

C & F alleges in a conclusory fashion that Metro "wrongfully, intentionally and maliciously persuaded the media to breach their agreements with C & F and to accept payment directly from Metro." Complaint at ¶ 39. Absent in this bare allegation is any indication that Metro's motivation was exclusively malicious or without other lawful objectives such as economic considerations. In doing so, C & F failed to satisfy the third element of the tortious interference with contractual relations test, Metro's intentional procurement of a breach by the media. We therefore grant Metro's Motion to Dismiss C & F's Sixth Cause of Action.

*Seventh and Ninth Causes of Action*

**\*4** Metro has moved to dismiss C & F's Seventh and Ninth Causes of Action for failure to state a claim. These Causes of Action allege that Metro defamed C & F. In its Complaint C & F states:

Metro Mobile wrongfully questioned the business integrity of C & F [in front of McCaw

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1988 WL 52777 (S.D.N.Y.)

Communications, Inc. ("McCaw"), a client].... with malice, without just cause or excuse, and with wrongful intent, injured C & F's business reputation.... Metro, through its officers and agents, falsely and without legal justification or excuse, stated that it had paid C & F for Magazine Networks, Inc.'s [ ("MNI") a client] bills, ... implying that C & F was not forwarding the payments to MNI.

Complaint at ¶¶ 46, 48, 56.

To withstand a 12(b)(6) motion, a plaintiff bringing a defamation claim must plead in one of two ways. The plaintiff may allege slander *per se.* In such a case the complainant does not have to plead special damages. *Sadowy v. Sony Corporation of America,* 496 F.Supp. 1071 (S.D.N.Y.1980). Rather, the plaintiff must only show that the statements would tend to injure him in his trade, office, occupation, business or profession. *Id.* at 1077; *see also Matherson v. Marchello,* 100 A.D.2d 233, 236, 473 N.Y.S.2d 998, 1001 (1984). If the plaintiff is unable to show slander *per se* then he must plead special damages. *Sadowy* at 1077. In the event that it is necessary to allege special damages, they must be fully and accurately identified with sufficient particularity to identify actual losses. *Sadowy* at 1075; *Matherson* at 1001,473 N.Y.S.2d at 235. The use of round figures or a mere general allegation of losses is insufficient to satisfy the special damages requirement. *Matherson* at 1001,473 N.Y.S.2d at 235. C & F alleges that statements made by officers and agents of Metro to clients of C & F, namely McCaw and MNI were slanderous *per se.*

In determining whether certain statements are actionable as slander *per se,* the weight of authority holds that the complaint must be detailed and informative enough to enable the defendant to respond. *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986); *Herbert v. Lando,* 603 F.Supp. 983, 990 (S.D.N.Y.1985). Furthermore, in drafting a sufficiently detailed and informative slander complaint, defamatory material should be pleaded with substantial accuracy. *Daniel P. Foster, P.C. v. Turner Broadcasting System,* (2d Cir. 1988);846 F.2d 955 *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 297, 445 N.Y.S.2d 156, 159 (1981); *Kelly v. CBS, Inc.,* 59 A.D.2d 686, 686-87, N.Y.S.2d 673, 674 (1977). This requirement insures that defendants are given adequate notice and are able to prepare

responsive pleadings. *Schmidberger* at 46; *Herbert* at 990; *Liquori v. Alexander,* 495 F.Supp. 641, 647 (S.D.N.Y.1980). It is only upon a substantially accurate pleading of the alleged defamatory statements that a court will be able to decide whether the offending words are susceptible to a libelous meaning. *James v. Gannett Co.,* 40 N.Y.2d 415, 420, 353 N.E.2d 834, 837, 386 N.Y.S.2d 871, 874 (1976); *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 136, 155 N.E.2d 853, 854, 182 N.Y.S.2d 1, 3 (1959).

In its Complaint, C & F properly alleges that it was injured by statements made by officers and agents of Metro to clients of C & F. However, C & F fails to identify any particular defamatory words used by Metro. Furthermore, C & F omits which officers and agents of Metro made the alleged statements and whom among their clients actually heard the alleged defamation. Absent such information Metro is unable to adequately defend itself. Hence, C & F has failed to satisfy the substantial accuracy requirement for a slander *per se* claim. This Court therefore grants Metro's Motion to Dismiss C & F's Seventh and Ninth Causes of Action.

*Eighth Cause of Action*

**\*5** Metro has moved to dismiss C & F's Eighth Cause of Action for failure to state a claim. This Cause of Action alleges tortious interference with prospective contractual advantage. In its Complaint C & F states:

C & F had favorably impressed McCaw ... and was being seriously considered by McCaw for a much larger role.... As a direct result of Metro Mobile's conduct, McCaw refuses to deal with C & F ... [and C & F] has lost profits that it would otherwise have obtained.

Complaint at ¶¶ 51-53.

To withstand a 12(b)(6) motion on a tortious interference with prospective contractual advantage claim, a plaintiff must show: 1) defendant's interference with business relations existing between plaintiff and a third party, 2) with the sole purpose of harming plaintiff or by means that are dishonest, unfair or in any other way improper. *PPX Enterprises v. Audiofidelity Enterprises,* 818 F.2d 266, 269 (2d Cir.1987). The plaintiff must also show that the defendant knew about the relationship between the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 5
Not Reported in F.Supp., 1988 WL 52777 (S.D.N.Y.)

plaintiff and the third party. *Id.* at 270. In addition, the plaintiff must set forth special damages with particularity, *Sbrocco v. Pacific Fruit, Inc.,* 565 F.Supp 15, 16 (S.D.N.Y.1983), or allege that the contract would have been completed but for the defendant's conduct, *Bunch v. Artec International,* 559 F.Supp. 961, 962 (S.D.N.Y.1983). If the defendant's interference is intended, even in part, to advance an interest of his own, then the interference will not support a claim of tortious interference with prospective contractual advantage unless the means employed by the defendant include criminal or fraudulent conduct. *PPX Enterprises* at 269.

These criteria have a long history in this district. *See Strapex v. Metaverpa,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985); *Martin Ice Cream v. Chipwich,* 554 F.Supp. 933, 945 (S.D.N.Y.1983); *Robbins* at 811.

C & F attempts to satisfy the requirement of showing that the contract would have been completed but for the defendant's conduct by alleging that "[a]s a direct result of Metro Mobile's conduct, ... C & F has lost profits that it would otherwise have obtained." Complaint at ¶ 53. However, earlier in its Complaint, C & F stated that it was "being seriously considered ... for a larger role" by McCaw. Complaint at ¶ 52. This second assertion falls far short of alleging that C & F had a contract with McCaw that *but for* Metro's actions would have been completed.

Further, even if we assume that Metro's conduct was the reason that C & F did not obtain additional business with McCaw, C & F has failed to satisfy the second prong of the *PPX Enterprises* test. C & F has failed to allege that Metro acted with the sole purpose of harming C & F or by means that were dishonest, unfair or in any other way improper. Hence, C & F has failed to state a cause of action for tortious interference with prospective contractual advantage. We therefore grant Metro's Motion to Dismiss C & F's Eighth Cause of Action.

CONCLUSION

*6 We grant Metro's Motion to Dismiss C & F's Second, Sixth, Seventh, Eighth and Ninth Causes of Action. We deny Metro's Motion to Dismiss C & F's Fifth Cause of Action. We grant C & F leave to file an amended complaint within thirty days from the date this Opinion is filed. The dismissed claims may

only be revived if C & F can and does strictly comply with the requirements outlined herein.

It Is So Ordered.

S.D.N.Y.,1988.
Chenoweth & Faulkner, Inc. v. Metro Mobile CTS, Inc.
Not Reported in F.Supp., 1988 WL 52777 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 5**

# Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

C Kimball Associates, P.A. v. Homer Cent.
School Dist.
N.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
KIMBALL ASSOCIATES, P.A., Plaintiff,
v.
HOMER CENTRAL SCHOOL DISTRICT,
Defendants.
No. 00-CV-897(HGM)(GJD).

Nov. 9, 2000.

Harter, Secrest Law Firm, Rochester, NY, for the
Plaintiff, Jeffrey J. Calabrese, of counsel.
Harris Lindenfeld, Cazenovia, New York, for the
Defendant, of counsel.

*MEMORANDUM DECISION AND ORDER*

MUNSON, Senior J.

### INTRODUCTION

*1 Currently before the court are defendant's motion
to dismiss the complaint and motion for summary
judgment. *See*Dkt. No. 6. These motions were made
in lieu of an answer. Plaintiff opposes these motions
and moves pursuant to Rule 56(f) of the Federal
Rules of Civil Procedure to obtain the discovery that
is necessary to oppose summary judgment. *See*Dkt.
No. 13.For the following reasons, the court grants
defendant's motion to dismiss, and denies defendant's
motion for summary judgment and plaintiff's Rule
56(f) motion for responsive discovery.

### BACKGROUND

Plaintiff, L. Robert Kimball & Associates
("Kimball"), is an architectural firm incorporated in
the State of North Carolina and doing business
principally in the State of Pennsylvania. Defendant,
Homer Central School District ("the District"), is a

New York State municipal corporation located in
Cortland County. Plaintiff brings this cause of action
pursuant to the court's diversity jurisdiction alleging a
breach of contract.[FN1]*See*28 U.S.C. § 1332.
Specifically, Kimball asserts the following five
causes of action: (1) breach of contract; (2) breach of
binding preliminary agreement; (3) breach of binding
preliminary commitment; (4) promissory estoppel;
and (5) unjust enrichment/quantum meruit.

> FN1. According to plaintiff, the parties
> entered into a two stage contract for general
> architectural services.

Defendant moves to dismiss the complaint pursuant
to Rule 12(b)(6) of the Federal Rules of Civil
Procedure claiming the contract expired under its
own terms and that the District fully performed its
contractual obligations. *See*Dkt. No. 6. Although it
has not yet answered, defendant also moves for
summary judgment on the basis that: (1) the contract
is invalid because it was not authorized by the Board
of Education; (2) plaintiff failed to timely file a
Notice of Claim as required by New York State
Education Law § 3813(1); and (3) the applicable
statute of limitations expired before plaintiff
instituted this action. *Id.*

In response, plaintiff seeks a continuance to obtain
discovery specific to the issues presented in
defendant's summary judgment motion. *See*Dkt. No.
13.Kimball asserts that it needs to depose witnesses,
review records, plans, specifications and other
documents relating to the District's capital
improvement project. *Id.* Moreover, plaintiff argues
that the proposed discovery will create issues of
material fact that will prohibit summary dismissal. *Id.*
The court will address these issues *seriatim.*

### FACTS

On July 10, 1996, plaintiff entered into a written
agreement with Harold Ferguson, Superintendent of
the Homer School District, in which it committed to
supply architectural and engineering services for the
District. The agreement states that plaintiff would

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                      Page 2
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

provide two stages of services for the District's 1997 capital improvement program. *See* Compl. Ex. A. Apparently, the District sought to improve its existing facilities and construct several new buildings during the 1997/1998 school year. However, these improvements could not occur without approval of a Bond referendum by the District's voters. Therefore, the agreement includes provisions for Stage 1 (pre-referendum) services and Stage 2 (post-referendum) services.

**\*2** In Stage 1, the agreement states that plaintiff would: (1) survey the District's facilities; (2) develop a construction budget; (3) prepare and present materials for a Bond referendum vote; (4) participate in public information meetings; and (5) participate in a development meeting with the District Administration. In Stage 2, plaintiff agreed to complete Architectural/Engineering services for the approved Bond referendum project. The details of these services were to be outlined in a Standard Agreement between Owner and Architect, AIA B141.

The July 10, 1996, agreement also contains a preliminary outline of the scope of work to be undertaken by the District. Moreover, it describes the services to be rendered at each stage, contains a fee proposal for these stages and a preliminary work schedule. *Id.* In exchange for these services, plaintiff agreed to complete Stage 1 for the lump sum of $15,000 and carry out Stage 2 for 6% of the project cost.

On August 20, 1996, Superintendent Ferguson executed the July 10, 1996, agreement and plaintiff began Stage 1. On June 23, 1997, the parties presented the resultant capital improvement plan for voter approval, but the referendum was defeated. Despite the referendum's failure, the District paid plaintiff the agreed sum of $15,000 and allowed it to undertake a second capital improvement plan for voter referendum. Plaintiff was paid another $15,000 for these services. At this time, the parties also began to negotiate the terms of the Standard Agreement between Owner and Architect, but, on March 3, 1998, the second referendum failed. After this defeat, the District allegedly breached the July 10, 1996, agreement when it would not allow Kimball to produce a third capital improvement plan. Subsequently, defendant hired a new architectural

firm to perform pre-referendum services and produce a third capital improvement plan. The resulting referendum for the amount of $30,000,000 was approved on June 15, 1999.[FN2]

> FN2. Based upon this figure, plaintiff contends that its fee for Stage 2 services would have equaled $1,800,000 and argues that it would have realized 40% or $720,000 in profit. It also states that its Stage 1 services were actually worth $170,466.94 for which $138,787.25 remains unpaid.

*DISCUSSION*

I. *Motion to Dismiss: The Legal Standard*

Federal Rule of Civil Procedure 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted."In analyzing a motion to dismiss, the facts alleged by plaintiff are assumed to be true and must be liberally construed in the light most favorable to him. *See e.g.,Easton v. Sundram,* 947 F.2d 1011, 1014-15 (2d Cir.1991). While a court need not accept mere conclusions of law, it should accept the pleader's description of what happened along with any conclusions that can reasonably be drawn therefrom. *SeeMurray v. City of Milford,* 380 F.2d 468 (2d Cir.1967). Furthermore, when a party makes a Rule 12(b)(6) motion, a court will limit its consideration to the facts asserted on the face of the complaint. *SeeCosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989). A complaint will not be dismissed for failure to state a claim unless it appears, beyond a reasonable doubt, that a plaintiff cannot prove any set of facts entitling him or her to relief. *SeeWanamaker v. Columbian Rope Co.,* 740 F.Supp. 127 (N.D.N.Y.1990). With this standard in mind, the court turns to the sufficiency of plaintiff's claims.

II. *The Contract Claims*

**\*3** It is well settled under New York law that to establish a claim for breach of contract, a plaintiff must prove: (1) that an agreement existed between it and defendant; (2) what the respective obligations of the parties were; (3) that plaintiff performed its obligations; (4) that defendant breached the agreement by failing to perform its obligations; and (5) that plaintiff was damaged by the breach. *SeeEli*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

*Attia Architects v. Safra,* 1996 WL 480721, at *3 (S.D.N.Y. August 23, 1996). In this case, the existence of a contract and plaintiff's performance under the agreement are not disputed issues.[FN3] However, great discord exists between the litigants concerning defendant's contractual obligations and whether it breached the July 10, 1996, agreement.

> FN3. In its motion to dismiss, defendant concedes that a contract exists. Specifically, defendant argues that it fully performed its Stage 1 obligations under the contract and in so doing admits that it contracted with plaintiff. However, defendant does not concede that it agreed to include Stage 2 services in the July 10, 1996, contract.

In its motion to dismiss, defendant contends that it fully performed its obligations under the agreement. Specifically, it argues that its agreement with plaintiff was limited in scope to the development of a capital project plan to be passed in the 1997/1998 school year. Once that academic year ended without a referendum having passed voter muster, defendant believes that the contract terminated and the District was free to seek another architect. To support this assertion, defendant refers, as it should, to the specific language of the contract which includes, *inter alia,* a preliminary schedule for project completion and references to the 1997/1998 school year. While admitting that the contract lacks a specific provision regarding duration, defendant argues that the court should assume that the parties intended to limit their respective obligations for a reasonable time limit. Essentially, defendant contends that no reasonable party would bind itself to a perpetual contractual obligation. For this reason, the District insists that the court must cure the contract's failings, supply the missing ephemeral term and find that the agreement ended once the 1997/1998 academic year passed without an approved referendum.

In response, plaintiff argues that the services performed by the District's new architect and the approved capital improvement project itself are identical to those contemplated in the July 10, 1996, contract. For reasons not clearly articulated, plaintiff believes that the similarities between its two failed referendums and the successful plan substantiate its claims. Yet, despite its professed conviction about the assonant nature of these projects, Kimball also suggests that questions of fact exist concerning whether or not the new project and the new architect's services are identical to those contemplated by the litigants in the July 10, 1996, contract. According to plaintiff, these questions should be explored through discovery and must be resolved at trial.

Plaintiff also contends that defendant, through its motion, raises other factual issues that must be resolved at trial. In particular, plaintiff attacks the idea that the July 10, 1996, contract was limited to the 1997/1998 school year. It claims that the specific academic year is irrelevant to the actual duration of the parties' contractual obligations. Instead, it maintains that the exact nature of the capital program contemplated at the time of contract controls the duration of the parties' obligations. Because it alleges that the approved project was part of the contemplated project, Kimball believes that it is entitled to discovery on this issue.

*4 Furthermore, plaintiff argues that the actual language of the contract does not support the District's interpretation of its temporal limit. Specifically, plaintiff finds it significant that the contract does not contain the terms "school year" or "academic year." It also notes that the contract's only temporal reference is found in the first sentence, where it states that the District would undertake its capital program in 1997/1998. Moreover, plaintiff implies that the contract could not terminate without a specific provision stating that a referendum must pass in the 1997/1998 school year.

Next, plaintiff contends that the District's post-referendum actions belie its argument that the academic year controls the contract's life span. According to Kimball, the District never indicated that it would terminate plaintiff if a referendum did not pass during the 1997/1998 school year. Plaintiff also indicates that it was actually terminated before the end of that academic year. Finally, Kimball argues that whether or not the District should have awarded its capital improvement contract to plaintiff is a question of fact that must be decided by the trier of fact. For these reasons, it maintains that the District's motion to dismiss the complaint must be denied.[FN4]

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

FN4. To the extent that plaintiff's argument is an aspect of his Rule 56(f) motion, the court concludes that additional discovery is not required. The type of project approved on July 15, 1999, is not relevant to resolution of defendant's motion to dismiss.

Essentially, the instant dispute is a matter of contract interpretation. When construing contracts, a trial court's primary objective is to "give effect to the intent of the parties as revealed by the language they chose to use."*Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 103 F.Supp.2d 711, 721 (S.D.N.Y.2000)(quoting*Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)(internal quotation marks omitted)). Therefore, New York law requires a court to first decide whether the contract is ambiguous. *Id.* A contract provision is considered ambiguous

whenever it admits more than one interpretation when viewed objectively by a reasonable intelligent person who examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business.

*Id.* at 722. A provision is not ambiguous if it has a "definite and precise meaning" and there is no danger of misconception or basis for differing opinions. *Id.* If the contract terms are not ambiguous, a court need not investigate extrinsic evidence to determine the parties respective obligations. *Id.* However, if the contract is ambiguous evidence of the parties intent is admissible. *Id.*

Furthermore, New York courts have made it clear that "in searching for the probable intent of the parties, lest form swallow substance, [the court's] goal must be to accord the words of the contract their 'fair and reasonable meaning' " *Sutton v. East River Savings Bank,* 55 N.Y.2d, 555, 450 N.Y.S.2d 460, 463, 435 N.E .2d 1075, 1078 (1982) (citations omitted). In other words, "the aim [of a court] is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations." *Id.* This means that "not merely literal language, but whatever may be reasonably implied therefrom must be taken into account." *Id.* However, "unless there are reservations to the contrary, embraced in the interpretative result

should be 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included." ' *Id.* (quoting*Rowe v. Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 830, 385 N.E.2d 566, 569 (1978)).

**\*5** In this case, the specific question raised by the litigants concerns the intended duration of their agreement. Defendant maintains that the existence of the contract was limited to the 1997/1998 academic year, while plaintiff insists that the nature of the project contemplated in the agreement determines its life span. The court does not fully agree with either party. Instead, it finds that the contract is not ambiguous in any material term and so consideration of any extrinsic evidence, ie., the parties' intent, is unnecessary. Furthermore, review of the contract reveals that the scope of work contemplated by the contract signatories was limited to the District's 1997/1998 capital improvement program. Not only does the contract state that it concerned the "1997 Capital Program", *see* Compl. Ex. A; Dkt. No. 1, but it also establishes a proposed work schedule, which ended in November of 1998. This clearly shows the contract to be an agreement with a terminable existence.

Regardless, the actual duration of the contract and any possible ambiguity that may surround the parties' intent are not material to plaintiff's breach of contract claims. Instead, the appropriate inquiry relates to whether the contract terminated after failure of the first referendum. Once again, the contract's terms plainly show that defendant's obligation to plaintiff ended with the failure of the first referendum. Specifically, the contract is constructed in two parts. In Stage 1, the parties agreed that plaintiff would prepare a referendum for voter approval for a cost of $15,000. In Stage 2, plaintiff agreed to "undertake complete Architectural/Engineering Services for the *approved* Bond Referendum Project ..."*See* Compl. Ex. A (emphasis added). The only reasonable interpretation of this provision is that plaintiff would undertake Stage 2 services if their Stage 1 referendum was approved. Because the first proposed referendum failed, the contract automatically terminated and defendant's obligation to plaintiff ceased.

Furthermore, the District's decision to permit plaintiff to develop a second referendum did not create a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

perpetual obligation to allow Kimball to participate in the project. Moreover, even if the District's actions resurrected the original contract or if it created a new agreement under identical terms, defendant's contractual obligations would again terminate after the second referendum failed. Therefore, the District's contractual obligation to allow plaintiff to further participate in Stage 1, and eventually engage in Stage 2, terminated after the demise of the first and second referendums. Thereafter, defendant was free to retain a new architect without breaching its contract with plaintiff. For these reasons, the court finds that plaintiff's breach of contract claim is deficient and grants defendant's Rule 12(b)(6) motion to dismiss.

### III. Remaining Claims

Although defendant does not address them in its motion, plaintiff asserts four additional causes of action: (1) breach of binding preliminary agreement; (2) breach of binding preliminary commitment; (3) promissory estoppel; and (5) unjust enrichment/quantum meruit. In spite of defendant's disregard of these claims, the court will briefly address each as necessary.

### A. Binding Preliminary Agreement/Commitment Claims

**\*6** Preliminary agreements are manifestations of assent requiring further negotiation or further contracts. See *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996). Normally, these agreements do not create binding obligations, except in rare circumstances where the agreement clearly manifests the intention to be bound. *Id.* There are two types of preliminary agreements: (1) the binding preliminary agreement, and (2) the binding preliminary commitment. See *Gorodensky v. Mitsubishi Pulp Sales, Inc.,* 92 F.Supp.2d 249, 254 (S.D.N.Y.2000). The binding preliminary agreement is created " 'when the parties agree on all points that require negotiation ... but agree to memorialize their agreement in a more formal document." ' *Id.* (quoting *Adjustrite Sys., Inc. v. GAB Business Servs., Inc.,* 145 F.3d 543, 548 (2d Cir.1998)). This agreement is binding because it contemplates the execution of an elaborate contract only as a formality. See *Id.* (citing *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987)). A binding preliminary commitment

is created " 'when the parties agree on certain major terms, but leave other terms open for further negotiation." ' *Id.* (quoting *Adjustrite,* 145 F.3d at 548). Parties to these agreements accept the commitment to negotiate in good faith to reach a final agreement. See *Id.* (quoting *Tribune,* 670 F.Supp. at 498).

In order to ascertain the parties' intent to be bound by a binding preliminary agreement, the court must examine: (1) the language of the agreement; (2) the existence of open terms; (3) whether there has been partial performance; and (4) the necessity of putting the agreement in final form as indicated by the customary form of such transactions. See *Id.* at 254-255. To determine the intent to enter a binding preliminary commitment, the court examines the same four factors plus the context of the negotiations resulting in the commitment. See *Id.*

In the instant case, plaintiff contends that the July 10, 1996, contract is both a preliminary binding agreement and a binding preliminary commitment. In regard to the binding agreement, plaintiff claims that the parties consented to memorialize their agreement in a more formal document, namely the Standard Agreement between Owner and Architect referenced in the Stage 2 provision of the July 10, 1996, contract. Regarding the binding commitment, plaintiff contends that the parties agreed to negotiate the open terms of Stage 2 services.

Despite plaintiff's convictions, the agreement between Kimball and the District is neither a binding preliminary agreement nor a binding preliminary commitment. First, the defendant concedes, and the court agrees, that the parties entered into a contract. Next, the specific language of the contract does not indicate that the parties agree to either formalize their contract terms in a more elaborate document, or negotiate in good faith about open terms. Although the contract states that plaintiff would undertake Stage 2 services for the approved project as outlined in the Standard Agreement between Owner and Architect, it does not contemplate the need to execute an elaborate contract as a mere formality. In fact, there is no indication that the Standard Owner and Architect agreement is anything more than an addendum to the existing contract; the court certainly considers it as such.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

*7 Furthermore, the contract does not clearly indicate the commitment to negotiate in good faith to reach a final agreement. Even if the contract did manifest such a need, further negotiation would only become necessary once the bond referendum project was approved. Since neither of plaintiff's proposed projects were approved, the obligation to negotiate did not materialize. Certainly the conditional nature of this contingency does not absolutely commit defendant to negotiate to reach a final agreement. At most, this indicates the District's intent to finalize plaintiff's duties under the contract, if the appropriate condition materializes.

Because preliminary agreements are not normally binding and the court must avoid trapping parties into unintended contractual obligations, the undersigned finds that these claims are legally deficient. Consequently, plaintiff's binding preliminary agreement and commitment claims are dismissed.

B. *Promissory Estoppel*

A cause of action for promissory estoppel under New York law requires plaintiff to prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury to the relying party as a result of the reliance. *SeeKaye v. Grossman*, 202 F.3d 611, 615 (2d Cir.2000). In this case, plaintiff maintains that its agreement with defendant constitutes a promise to allow Kimball to perform Stage 1 pre-referendum services and Stage 2 post-referendum services. It also claims that it reasonablely relied upon that promise and was subsequently damaged by defendant's breach.

Although the principle of promissory estoppel allows enforcement of a promise even in the absence of an enforceable contract, plaintiff states no claim herein. For the reasons articulated above, the court has found that defendant's commitment to allow plaintiff to conduct both Stage 1 and State 2 services ended when the contract terminated. Specifically, defendant's promises to plaintiff were conditioned upon the passage of a voter referendum within the 1997/1998 academic year. Since this condition did not occur, not only did defendant not breach its contractual obligations but any reliance by plaintiff upon these promises was unjustified.

Moreover, plaintiff's estoppel claim is based upon promises that are consistent with the obligations contemplated in the contract between the parties. The argument that defendant breached its promise to plaintiff is duplicative of its breach of contract claim and so it must be dismissed. *SeeFour Finger Art Factory, Inc., v. Dinicola*, 2000 WL 145466, at *8 (S.D.N.Y. February 9, 2000)(dismissing promissory estoppel claim as duplicative of breach of contract claim). For the reasons stated above, plaintiff's promissory estoppel claims are dismissed.

C. *Unjust Enrichment/Quantum Meruit*

Invoking the doctrines of quantum meruit and unjust enrichment, plaintiff contends that it performed Stage 1 services, which were actually worth $170, 466.94, but received only $31, 679.69 in fees. For this reason, plaintiff alleges that the District was unjustly enriched when it knowingly accepted Stage 1 services without fully compensating Kimball.

*8 Under New York law, "[t]he existence of a valid and enforceable written contract governing a particular subject ... precludes recovery in quasi-contract ..." which includes both quantum meruit and unjust enrichment theories. *SeeValley Juice Ltd. v. Evian Waters of France, Inc.*, 87 F.3d 604 (2d Cir.1996);*see alsoFercus S.R .L. v. Palazzo*, 2000 WL 1118925, at *4 & *5 (S.D.N.Y. August 8, 2000). In this case, plaintiff specifically contracted to perform Stage 1 services for $15,000. Because it performed these services twice, plaintiff was paid $31,679.69.[FN5]Although the actual value of these services far exceeds the amount paid, plaintiff knowingly contracted to provide them for this amount and cannot recover under either quantum meruit or unjust enrichment theories. These claim are dismissed.

> FN5. The contract stated that plaintiff would conduct Stage 1 services for a lump sum of $15,000 and that the District would pay for collateral costs. There is no explanation why plaintiff was paid $1, 679.69 beyond the agreed fee.

IV. *Summary Judgment: Procedural Issues*

Defendant has also moved for summary judgment claiming that: (1) the contract is invalid because it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

was not authorized by the Board of Education; (2) plaintiff failed to timely file a Notice of Claim as required by New York State Education Law § 3813(1); and (3) the applicable statute of limitations expired before institution of this claim. At this juncture, the court notes that defendant makes this motion despite not having answered the complaint. Although it refers to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1, defendant seems unaware that neither rule allows a litigant to move for summary judgment in lieu of answer. Since the court has already granted defendant's motion to dismiss, consideration of the summary judgment motion is not necessary at this juncture.

V. *Motion for Responsive Discovery*

Finally, plaintiff moves pursuant to Rule 56(f) of the Federal Rules of Civil Procedure to obtain the discovery that is necessary to oppose summary judgment. *See* Dkt. No. 13. Because the court has granted defendant's motion to dismiss, the requested discovery is unnecessary and plaintiff's motion is dismissed.

WHEREFORE, for the foregoing reasons, it is hereby

ORDERED, that defendant's Rule 12(b)(6) motion to dismiss the complaint is GRANTED. It is further

ORDERED, that defendant's Rule 56 motion for summary judgment is DENIED. It is further

ORDERED, that plaintiff's Rule 56(f) motion for a continuance to obtain responsive discovery is DENIED. It is further

ORDERED, that the Clerk of the Court serve a copy of this Memorandum Decision and Order upon the parties by regular mail.

N.D.N.Y.,2000.
Kimball Associates, P.A. v. Homer Cent. School Dist.
Not Reported in F.Supp.2d, 2000 WL 1720751 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 6**





Restatement (Third) of Unfair Competition
Current through March 2008

Copyright © 1995-2008 by the American Law Institute

Chapter 4. Appropriation Of Trade Values
Topic 2. Trade Secrets

§ 41. Duty Of Confidence

<u>Link to Case Citations</u>

**A person to whom a trade secret has been disclosed owes a duty of confidence to the owner of the trade secret for purposes of the rule stated in § 40 if:**

> **(a) the person made an express promise of confidentiality prior to the disclosure of the trade secret; or**

> **(b) the trade secret was disclosed to the person under circumstances in which the relationship between the parties to the disclosure or the other facts surrounding the disclosure justify the conclusions that, at the time of the disclosure,**

>> **(1) the person knew or had reason to know that the disclosure was intended to be in confidence, and**

>> **(2) the other party to the disclosure was reasonable in inferring that the person consented to an obligation of confidentiality.**

**Comment:**

*a. Scope.* This Section describes when the recipient of a trade secret disclosure is bound by a duty of confidence. Section 42 treats the special considerations that influence the application of the principles discussed in this Section when the disclosure occurs within an employment relationship.

*b. Confidential disclosures.* A duty of confidence enforceable under the rules stated in § 40 can be created by an express promise of confidentiality made by the recipient of the disclosure. A duty of confidence may also be inferred from the relationship between the parties and the circumstances surrounding the disclosure. However, no duty of confidence will be inferred unless the recipient has notice of the confidential nature of the disclosure. Although no specific form of notice is required, the circumstances must indicate that the recipient knew or had reason to know that the disclosure was intended as confidential. In addition, the circumstances must justify the other party's belief that the recipient has consented to the duty of confidence. Thus, a disclosure to one who has indicated an unwillingness to accept the confidence or who has no opportunity prior to the disclosure to object to the imposition of the confidence will not create an obligation of confidentiality in the recipient.

In some cases the customs of the particular business or industry may be sufficient to indicate to the recipient that a particular disclosure is intended as confidential. The customary expectations surrounding the disclosure of information in noncommercial settings may differ from those arising in connection with disclosures in commercial

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

contexts. The customary expectations regarding the confidentiality of information disclosed within the research facilities of an industrial firm, for example, may differ from those regarding disclosures in a nonprofit research laboratory. Precautions undertaken by the trade secret owner to maintain the secrecy of the information, if known to the recipient, can be evidence that the recipient knew or had reason to know of the owner's expectation of confidentiality. Solicitation of the disclosure by the recipient can also contribute to an inference of confidentiality, particularly if the disclosure is prompted by a misrepresentation or other improper conduct on the part of the recipient. In some cases an express agreement regarding the confidentiality of particular information may be evidence of the parties' expectations regarding the confidentiality of other information not within the scope of the agreement.

If the owner of a trade secret discloses information for a limited purpose that is known to the recipient at the time of the disclosure, the recipient is ordinarily bound by the limitation unless the recipient has indicated an unwillingness to accept the disclosure on such terms. During negotiations with prospective buyers, customers, or licensees, for example, it is sometimes necessary to disclose trade secrets in order to permit the other party to evaluate the merits of the proposed transaction. The law of trade secrets provides the necessary assurance that the limited purpose of such disclosures will be respected.

In the absence of an agreement to the contrary, the sale of a product embodying a trade secret is not ordinarily regarded as a confidential disclosure. The purchaser is thus free to exploit any information acquired through an examination or analysis of the product. However, a transaction such as a lease or a bailment may be more likely to support an inference of confidentiality if the parties understand the transfer to be for a limited purpose. The transfer of a machine embodying trade secrets for the purpose of repair, for example, does not ordinarily authorize the transferee to use or disclose trade secrets learned as a result of the transaction.

Courts frequently recognize an obligation to refrain from the unauthorized use or disclosure of information that is communicated between parties in a so-called "confidential relationship." Certain business relationships such as employer-employee and licensor-licensee are sometimes characterized as "confidential." The fact that the parties are engaged in such an on-going relationship is relevant in determining whether a specific disclosure creates a duty of confidence, but not every disclosure made in the context of a particular relationship is properly treated as confidential. Even within a relationship generally characterized as "confidential," the purpose of the disclosure, the past practice of the parties, the customs of the industry, and the other circumstances of the disclosure remain relevant in determining the recipient's obligations. Thus, although the disclosure to a licensee of a secret formula that is the subject of a license is normally regarded as confidential, a disclosure of other information to a licensee with no indication that the information is confidential may not give rise to a duty of confidence. The special considerations applicable to disclosures within an employment relationship are considered in § 42.

**Illustrations:**

1. A, a manufacturer, develops a new food-processing machine that incorporates innovations eligible for protection as trade secrets. B, an engineering professor at a local university, asks permission from A to inspect the machine. A grants permission without expressing any need or desire for confidentiality. B subsequently uses information acquired during the inspection to design a competing machine. In the absence of evidence establishing that B knew or had reason to know that the inspection was intended by A to be for a limited purpose or was otherwise intended as confidential, B is not subject to liability under the rules stated in § 40.2. A and B are negotiating for the sale of A's soft drink business to B. A discloses the secret formula used to produce the soft drink in order to permit B to assess the value of A's business. B subsequently terminates the negotiations and begins to use the formula. B is subject to liability to A under the rules stated in § 40 since B knew or had reason to know that the disclosure was for the limited purpose of enabling B to evaluate the merits of the proposed transaction.3. The facts being otherwise as stated in Illustration 2, during the negotiations for A's business A also discloses to B plans for a chain of fast-food restaurants that A intends to open after the soft drink business is sold. B subsequently opens several restaurants modeled after those described by A. Since the disclosure was not made for a limited purpose apparent from the nature of the parties' business relationship, B is not subject to liability to A

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

under the rules stated in § 40 unless other evidence establishes that B knew or had reason to know that A intended the disclosure to be confidential and that A was reasonable in believing that B consented to the duty of confidence.

*c. Breach of confidence as a separate tort.* Some courts have recognized liability in tort for the unauthorized disclosure of confidential business information found to be ineligible for protection as a trade secret. In some cases the claim is designated as one for "breach of confidence," while in others it is described as one for "unfair competition." Many of these cases rest on a narrow definition of "trade secret" that excludes non-technical information such as customer identities or information that is not subject to continuous, long-term use. Such information is now subsumed under the broader definition of "trade secret" adopted in § 39. In other cases the imposition of liability for breach of confidence may be justified by interests other than the protection of valuable commercial information, such as the interests that prompt recognition of the general duty of loyalty owed by an employee to an employer, see § 42, Comment b, or the special duties of confidence owed in particular relationships such as attorney and client or doctor and patient. However, in the absence of interests justifying broader duties, the plaintiff should be required to demonstrate that the information qualifies for protection as a trade secret under the rule stated in § 39. The recognition of more extensive rights against the use or disclosure of commercial information can restrict access to knowledge that is properly regarded as part of the public domain. Cf. § 39, Comment f.

*d. Contractual protection of trade secrets.* The owner of a trade secret may seek protection against unauthorized use or disclosure through a contract with the recipient of a disclosure. Such contracts may take several forms, including a promise by the recipient not to compete with the trade secret owner, a general promise to refrain from disclosing or using any confidential information acquired within the context of a particular relationship or transaction, or a promise to refrain from using or disclosing particular information specified in the agreement. Use or disclosure in violation of such agreements can result in liability for breach of contract under the rules stated in the Restatement, Second, of Contracts. However, since such agreements can reduce or eliminate potential competition, they are subject to the traditional rules governing contracts in restraint of trade and are accordingly enforceable only when ancillary to a valid transaction and otherwise reasonable. See Restatement, Second, Contracts §§ 186-188. As a general matter, a restraint is unreasonable if it is greater than necessary to protect the legitimate interests of the promisee or if the promisee's interest in protection is outweighed by the likely harm to the promisor or to the public. Id. § 188, Comment a.

In many jurisdictions a reasonable covenant not to compete is enforceable against the promisor. The rules governing the protection of trade secrets as stated in this Restatement can sometimes be helpful in evaluating the reasonableness of such a covenant. A promise by an employee not to compete with the employer after the termination of the employment or by a seller of a business not to compete with the buyer after the sale may be justified as a reasonable attempt to protect confidential information, provided that the duration and geographic scope of the covenant are appropriately related to the promisee's legitimate interests. When this justification is offered to support the enforcement of a covenant not to compete, the rules governing trade secrets, although not determinative, can be useful in identifying both the legitimate interests served by the covenant and the appropriate limitations on the scope of protection.

The reasonableness of an agreement that merely prohibits the use or disclosure of particular information depends primarily upon whether the information protected by the agreement qualifies as a trade secret. If the information qualifies for protection under the rule stated in § 39, a contract prohibiting its use or disclosure is generally enforceable according to its terms. Although in some cases courts have enforced nondisclosure agreements directed at information found ineligible for protection as a trade secret, many of these decisions merely reflect a more narrow definition of trade secret than that adopted in § 39. However, a nondisclosure agreement that encompasses information that is generally known or in which the promisee has no protectable interest, such as a former employee's promise not to use information that is part of the employee's general skill and training (see § 42, Comment d), may be unenforceable as an unreasonable restraint of trade. Agreements that deny the promisor the right to use information that is in the public domain are ordinarily enforceable only if justified on the basis of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

interests other than the protection of confidential information.

Some courts have indicated that nondisclosure agreements are subject to the same durational and geographic limitations traditionally applied to covenants not to compete. However, a nondisclosure agreement can be reasonable even if the agreement is not limited to a specific geographic area. Once a secret is disclosed, knowledge of the information cannot normally be confined to a particular area. Unauthorized disclosure in any geographic area can therefore result in harm to the trade secret owner. Similarly, unauthorized use in any area may deprive the trade secret owner of potential licensing opportunities. Thus, although the more onerous burden of a covenant not to compete is normally enforceable only if confined within appropriate geographic limits, an absolute prohibition against the use or disclosure of a trade secret is ordinarily justified by the legitimate interests of the trade secret owner. The absence of an express duration on a promise not to use or disclose a trade secret should also not in itself render the agreement unenforceable since in the absence of a clear intention to the contrary a nondisclosure agreement is ordinarily interpreted as imposing an obligation of confidentiality only until the information becomes generally known or readily ascertainable by proper means. However, enforcement of an agreement that is interpreted to prohibit the promisor from using information even after it has entered the public domain cannot be justified by the interest in protecting confidential information, although it may be justified on some other basis. For example, licensing agreements that require the continuation of royalty payments for the use of a trade secret even after the secret becomes generally known are ordinarily enforceable. Such agreements may be justified as a reasonable attempt by the parties to measure the value of the head start obtained by the licensee through the initial disclosure of the trade secret. Similarly, in some circumstances an agreement not to use information that is in the public domain may be justified by a legitimate interest in protecting the reputation or good will of the promisee. The rules stated here do not purport to encompass the full range of justifications that may support the enforcement of an agreement not to use or disclose particular information. These rules may be helpful, however, in determining the appropriate limits on the enforceability of an agreement that the promisee seeks to justify on the basis of interests analogous to those protected under the law of trade secrets.

**Illustrations:**

   4. A engages in a dry-cleaning business in a market with a radius of two miles. A sells the business and a secret process used in the business to B. In the absence of an applicable statute restricting or prohibiting enforcement of covenants not to compete, a promise by A not to engage in the dry-cleaning business is enforceable if the promise is limited to a reasonable time and to a radius of two miles.5. The facts being otherwise as stated in Illustration 4, A also promises not to use or disclose the process, with no stated durational or geographic limitations. The promise is enforceable if interpreted to apply only until the process is no longer secret.6. The facts being otherwise as stated in Illustration 5, B grants to A a license to use the secret process in other markets in return for royalty payments. Subsequently, the process falls into the public domain and others begin to use the process in competition with both A and B. A, although continuing to use the process, refuses to continue the royalty payments. If the agreement is interpreted to require A to continue the royalty payments even after the process is no longer secret, B may continue to enforce the royalty agreement against A.

Reporters' Note

   *Comment a.* Disclosure or use of another's trade secret in breach of a duty of confidence was recognized as a basis of liability in Restatement of Torts § 757(b) (1939). Similar principles are applicable under § 1(2) of the Uniform Trade Secrets Act. See generally Jager, Trade Secrets Law § 5.04[3] [b]; Milgrim on Trade Secrets § 4.03.

   *Comment b.* A duty of confidence can be created by an express or implied-in-fact promise or by operation of law. Kamin v. Kuhnau, 232 Or. 139, 374 P.2d 912 (1962); Aerospace America, Inc. v. Abatement Technologies, Inc., 738 F.Supp. 1061 (E.D.Mich.1990). Even when the parties have entered into an express confidentiality agreement, a tort action under the rules stated in § 40 can be maintained for disclosure or use of the trade secret in violation of the confidence. See § 40, Comment a and the accompanying Reporters' Note.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

A disclosure that occurs in a transaction carried on at arm's length is not ordinarily regarded as confidential absent evidence of a contrary understanding by the parties. Smith v. Snap-On Tools Corp., 833 F.2d 578 (5th Cir.1987); RTE Corp. v. Coatings, Inc., 84 Wis.2d 105, 267 N.W.2d 226 (1978). However, confidentiality may be inferred from the nature of the relationship between the parties, see Roberts v. Sears, Roebuck and Co., 573 F.2d 976 (7th Cir.), cert. denied 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 168 (1978) (submission of an idea by an employee held to be in confidence), or from the customary practices of the industry, see Vantage Point, Inc. v. Parker Brothers, Inc., 529 F.Supp. 1204 (E.D.N.Y.1981), affirmed 697 F.2d 301 (2d Cir.1982).

If the circumstances of the disclosure do not otherwise indicate to the recipient that there is an expectation of confidentiality, the trade secret owner must give notice that the information is to be kept in confidence. See, e.g., Pacific Title, Inc. v. Pioneer National Title Ins. Co., 33 Wash.App. 874, 658 P.2d 684 (1983). The notification must precede the disclosure. See Smith, supra; RTE Corp., supra (manufacturer sought to create a confidential relationship only after the disclosure); Hurst v. Hughes Tool Co., 634 F.2d 895 (5th Cir.), cert. denied 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981) (inventor mentioned the expectation of compensation only after the disclosure). Cf. Bush v. Goldman Sachs & Co., 544 So.2d 873 (Ala.1989) (notification of confidentiality given to one person may not bind others who acquire the information from that person). An obligation of confidentiality will not ordinarily be imposed on a person who had no opportunity to decline the disclosure. See Tele-Count Engineers, Inc. v. Pacific Tel. and Tel. Co., 168 Cal.App.3d 455, 214 Cal.Rptr. 276 (1985); Faris v. Enberg, 97 Cal.App.3d 309, 158 Cal.Rptr. 704 (1979).

For cases discussing solicited disclosures, see Smith, supra (confidentiality may be implied when the recipient actively solicits the disclosure) (dictum); Pachmayr Gun Works, Inc. v. Olin Mathieson Chemical Corp., 502 F.2d 802 (9th Cir.1974) (disclosure held confidential when the defendant induced the disclosure under false pretenses); Crocan Corp. v. Sheller-Globe Corp., 385 F.Supp. 251 (N.D.Ill.1974). On disclosure for a limited purpose, see, e.g., Metallurgical Industries, Inc. v. Fourtek, Inc., 790 F.2d 1195 (5th Cir.1986) (disclosure of an invention to a supplier of machines that would incorporate the innovation held confidential); Nucor Corp. v. Tennessee Forging Steel Service, Inc., 476 F.2d 386 (8th Cir.1973) (submission of building plans to subcontractors for the purpose of preparing bids was a confidential disclosure); Kamin, supra (manufacturer employed to develop inventor's ideas was not entitled to appropriate the ideas for its own use); Tabor v. Hoffman, 118 N.Y. 30, 23 N.E. 12 (1889) (transfer of equipment for purposes of repair).

Disclosures made to enable prospective purchasers or licensees to appraise the value of the business or trade secret are ordinarily held to be confidential. See, e.g., Phillips v. Frey, 20 F.3d 623 (5th Cir.1994) (disclosure during negotiations with a prospective purchaser); Schreyer v. Casco Products Corp., 190 F.2d 921 (2d Cir.1951), cert. denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952) (disclosure during negotiations with a prospective licensee); Heyman v. AR. Winarick, Inc., 325 F.2d 584 (2d Cir.1963) (information disclosed to permit a purchaser to assess the merits of the bargain); Speedry Chemical Products, Inc. v. Carter's Ink Co., 306 F.2d 328 (2d Cir.1962) (valuable information disclosed during licensing negotiations would be confidential) (dictum). Cf. Cloud v. Standard Packaging Corp., 376 F.2d 384 (7th Cir.1967) (disclosure to a prospective supplier held on the facts to be at arm's length and not confidential).

The relationship of licensor-licensee is often characterized as "confidential." See Hyde Corp. v. Huffines, 158 Tex. 566, 314 S.W.2d 763, cert. denied 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958); Default Proof Credit Card System, Inc. v. State Street Bank & Trust Co., 753 F.Supp. 1566 (S.D.Fla.1990). Cf. Aerospace America, supra (no confidential relationship existed between a manufacturer and a distributor in the absence of an express agreement or notice that the disclosure was intended as confidential).

For a case recognizing reverse engineering as a proper means to acquire a trade secret that was embodied in a product purchased from the trade secret owner, see Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441 (11th Cir.1991). For a case holding reverse engineering improper when the product was loaned to the recipient in confidence, see Mineral Deposits Ltd. v. Zigan, 773 P.2d 606 (Colo.App.1988). But see Elle v. Babbitt, 259 Or. 590,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

488 P.2d 440 (1971) (lease of a machine held not to create a confidential relationship) (dictum).

On Illustration 1, see, e.g., Cloud v. Standard Packaging Corp., 376 F.2d 384 (7th Cir.1967). Illustration 2 is suggested by Heyman v. AR. Winarick, Inc., 325 F.2d 584 (2d Cir.1963).

*Comment c.* Some of the decisions that grant relief against a breach of confidence in spite of the absence of a trade secret seek support in Justice Holmes's famous statement in E.I. Du Pont De Nemours Powder Co. v. Masland, 244 U.S. 100, 102, 37 S.Ct. 575, 575, 61 L.Ed. 1016, 1019 (1917): "Whether the plaintiffs have any valuable secret or not the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be." The issue in Masland, however, was whether the defendant could be prohibited from disclosing the alleged trade secret to expert witnesses in preparation for trial. The case does not support the imposition of liability in the absence of evidence that the plaintiff has a protectable interest in the information. See Kubik, Inc. v. Hull, 56 Mich.App. 335, 224 N.W.2d 80 (1974); National Starch Products, Inc. v. Polymer Industries, Inc., 273 App.Div. 732, 79 N.Y.S.2d 357 (1948); Milgrim on Trade Secrets § 1.01[1].

Cases in which a broader definition of "trade secret" might have made consideration of a separate breach of confidence claim unnecessary include, e.g., Lehman v. Dow Jones & Co., 783 F.2d 285 (2d Cir.1986); Saliterman v. Finney, 361 N.W.2d 175 (Minn.App.1985). For cases in which a breach of confidence claim was invoked to enforce a current employee's duty of loyalty to the employer, see Nucor Corp. v. Tennessee Forging Steel Service, Inc., 476 F.2d 386 (8th Cir.1973); Tan-Line Studios, Inc. v. Bradley, 1 U.S.P.Q.2d 2032 (E.D.Pa.1986). Cases suggesting that a generalized breach of confidence claim can be invoked to protect valuable commercial information without regard to its status as a trade secret include Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441 (11th Cir.1991); Self Directed Placement Corp. v. Control Data Corp., 908 F.2d 462 (9th Cir.1990); Tele-Count Engineers, Inc. v. Pacific Tel. and Tel. Co., 168 Cal.App.3d 455, 214 Cal.Rptr. 276 (1985); Boeing Co. v. Sierracin Corp., 108 Wash.2d 38, 738 P.2d 665 (1987) (breach of confidence claim not displaced by the Uniform Trade Secrets Act). The Roboserve case illustrates the danger inherent in imposing liability for breach of confidence without regard to the nature of the protected information. After determining that the defendant was not liable under trade secret law for using information available through an inspection of a machine in the public domain, the court nevertheless suggested the possibility of liability under a breach of confidence theory. Other cases recognize that the policies limiting the scope of trade secret protection are also applicable when the claim is described instead as one for breach of confidence. See Johns-Manville Corp. v. Guardian Industries Corp., 586 F.Supp. 1034 (E.D.Mich.1983), affirmed 770 F.2d 178 (Fed.Cir.1985).

*Comment d.* Agreements that create an unreasonable restraint on trade are unenforceable. Restatement, Second, Contracts § 186 (1979). A covenant not to compete given by an employee to the employer or by the seller of a business to the buyer is an unreasonable restraint of trade if: "(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." Id. § 188(1). Covenants not to compete must be limited in duration and geographic area to a scope that is justified by the legitimate interests of the promisee. Id., Comment e. See, e.g., Central Water Works Supply, Inc. v. Fisher, 240 Ill.App.3d 952, 181 Ill.Dec. 545, 608 N.E.2d 618 (1993) (covenants not to compete given by former employees are evaluated more strictly than covenants ancillary to the sale of a business). Statutes in some jurisdictions further restrict or prohibit the enforcement of covenants not to compete. See Aspelund and Eriksen, Employee Noncompetition Law §§ 9.01-05.

A promise to refrain from the use or disclosure of commercial information is ordinarily unenforceable unless the information is sufficiently secret to justify the restraint. See Rototron Corp. v. Lake Shore Burial Vault Co., 712 F.2d 1214 (7th Cir.1983); Rigging Int'l Maintenance Co. v. Gwin, 128 Cal.App.3d 594, 180 Cal.Rptr. 451 (1982); Thomas v. Best Mfg. Corp., 234 Ga. 787, 218 S.E.2d 68 (1975); American Family Life Assurance Co. v. Tazelaar, 135 Ill.App.3d 1069, 90 Ill.Dec. 789, 482 N.E.2d 1072 (1985); Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass.App.Ct. 254, 400 N.E.2d 1274 (1980); Kaumagraph Co. v. Stampagraph Co., 235 N.Y. 1, 138 N.E. 485 (1923); Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis.2d 202, 267 N.W.2d 242 (1978).

Cases expressing the view that contractual restrictions can protect confidential information that does not technically qualify as a trade secret often rest on a narrower definition of "trade secret" than that adopted in § 39. See, e.g., Modern Controls, Inc. v. Andreadakis, 578 F.2d 1264 (8th Cir.1978); Johns-Manville Corp. v. Guardian Industries Corp., 586 F.Supp. 1034 (E.D.Mich.1983), affirmed 770 F.2d 178 (Fed.Cir.1985); Organic Chemicals, Inc. v. Carroll Products, Inc., 211 U.S.P.Q. 628 (W.D.Mich.1981) (dictum); Continental Group, Inc. v. Kinsley, 422 F.Supp. 838 (D.Conn.1976); Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp., 401 F.Supp. 1102 (E.D.Mich.1975). However, since enforcement turns on the reasonableness of the restraint, the precise definition of a "trade secret" is not necessarily determinative in such cases. Although the existence of an express contract to refrain from the disclosure or use of particular information may justify somewhat broader protection than that available under tort law, see, e.g., Richardson v. Suzuki Motor Co., 868 F.2d 1226 (Fed.Cir.), cert. denied 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); Lear Siegler, Inc. v. Ark-Ell Springs, Inc., 569 F.2d 286 (5th Cir.1978), the public policies that operate to restrict the scope of trade secret protection are also relevant to the enforcement of confidentiality agreements. See, e.g., AMP Inc. v. Fleischhacker, 823 F.2d 1199 (7th Cir.1987); Victor Chemical Works v. Iliff, 299 Ill. 532, 132 N.E. 806 (1921).

Some courts, reviewing nondisclosure agreements under the standards traditionally applied to covenants not to compete, require not only a protectable interest in the information but also both durational and geographic limitations. See Gary Van Zeeland Talent, supra; Disher v. Fulgoni, 124 Ill.App.3d 257, 79 Ill.Dec. 735, 464 N.E.2d 639 (1984) (overruled on this issue by statute in Ill.C.S., ch.765, § 1065/8); State Medical Oxygen & Supply, Inc. v. American Medical Oxygen Co., 240 Mont. 70, 782 P.2d 1272 (1989). Cf. Wesley-Jessen, Inc. v. Armento, 519 F.Supp. 1352 (N.D.Ga.1981) and Durham v. Stand-by Labor, Inc., 230 Ga. 558, 198 S.E.2d 145 (1973), requiring durational but not geographic limitations. But see Nalco Chemical Co. v. Hydro Technologies, Inc., 984 F.2d 801 (7th Cir.1993) and Woven Electronics Corp. v. Advance Group, Inc., 930 F.2d 913 (4th Cir.1991) (durational and geographic limitations are unnecessary in non-disclosure agreements involving trade secrets). Other cases interpret nondisclosure agreements as imposing an obligation of confidentiality only as long as the underlying information remains secret. See Conmar Products Corp. v. Universal Slide Fastener Co., 172 F.2d 150 (2d Cir.1949); Henry Hope X-Ray Products, Inc. v. Marron Carrel, Inc., 674 F.2d 1336 (9th Cir.1982); Dollac Corp. v. Margon Corp., 164 F.Supp. 41 (D.N.J.1958), affirmed 275 F.2d 202 (3d Cir.1960). The cases that require durational and geographic limitations often reflect the concern that broad restrictions on use or disclosure will unfairly inhibit employee mobility. The appropriate inquiry to balance the legitimate interests of the employer and the employee, however, is whether the information is protectable as a trade secret. See, e.g., Amex Distributing Co. v. Mascari, 150 Ariz. 510, 724 P.2d 596 (App.1986); Aspelund and Eriksen, Employee Noncompetition Law § 3.12; Jager, Trade Secret Law § 13.03.

Interests other than confidentiality may also justify the enforcement of contractual restrictions on the use of information. Thus, courts have enforced royalty agreements that extend beyond the public disclosure of the trade secret. See Aronson v. Quick Point Pencil Co., 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979); Warner-Lambert Pharmaceutical Co. v. John J. Reynolds, Inc., 178 F.Supp. 655 (S.D.N.Y.1959), affirmed 280 F.2d 197 (2d Cir.1960); Laff v. John O. Butler Co., 64 Ill.App.3d 603, 21 Ill.Dec. 314, 381 N.E.2d 423 (1978), cert. denied 444 U.S. 844, 100 S.Ct. 88, 62 L.Ed.2d 57 (1979). See also, e.g., Universal Gym Equipment Inc. v. ERWA Exercise Equipment Ltd., 827 F.2d 1542 (Fed.Cir.1987) (agreement prohibiting a licensee from using design features of a publicly marketed product after the termination of the license was perhaps justified to protect the good will of the licensor). A number of cases hold that the interest in protecting established customer relationships can be sufficient to support enforcement of a covenant not to compete. E.g., McRand, Inc. v. Van Beelen, 138 Ill.App.3d 1045, 93 Ill.Dec. 471, 486 N.E.2d 1306 (1985); 4408, Inc. v. Losure, 175 Ind.App. 658, 373 N.E.2d 899 (1978); Eastern Distributing Co. v. Flynn, 222 Kan. 666, 567 P.2d 1371 (1977); North Pacific Lumber Co. v. Moore, 275 Or. 359, 551 P.2d 431 (1976); John G. Bryant Co. v. Sling Testing and Repair, Inc., 471 Pa. 1, 369 A.2d 1164 (1977). See Jager, Trade Secrets Law § 13.05.

Illustration 4 is suggested by Illustrations 1 and 2 to Restatement, Second, Contracts § 188, Comment f.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Research References

1. Digest System Key Numbers



Torts     10(5).

2. A.L.R. Annotations

Employee's duty, in absence of express contract, not to disclose or use in new employment special skills or techniques acquired in earlier employment. 30 ALR3d 631.

Former employee's duty, in absence of express contract, not to solicit former employer's customers or otherwise use his knowledge of customer lists acquired in earlier employment. 28 ALR3d 7.

Implied obligation not to use trade secrets or similar confidential information disclosed during unsuccessful negotiations for sale, license, or the like. 9 ALR3d 665.

Case Citations

Case Citations through June 2007Case Citations through June 2007

Case Citations through June 2007:Case Citations through June 2007:

**S.D.Ind.**1998. Cit. in headnote, quot. in disc., subsec. (b) cit. in disc. Manufacturer/seller of oxygen regulators sued competitor for misappropriation of trade secrets. Denying plaintiff's request for injunctive relief, the court held, in part, that plaintiff did not show a likelihood of succeeding on the merits of its claim, as the information sought to be protected was readily ascertainable through reverse engineering of plaintiff's products, which had been on the market for some time; plaintiff failed to take reasonable steps to protect the confidentiality of the allegedly protected information; and defendant, to whom plaintiff once voluntarily disclosed the information at issue, never consented to keep it confidential. Flotec, Inc. v. Southern Research, Inc., 16 F.Supp.2d 992, 993, 1005–1006, 1006.

**D.N.J.**1998. Cit. and quot. in disc. A freight company acquired rights to computer programs through its affiliation with a Taiwan company. The Taiwan company was previously associated with a New Jersey cargo management company, and it had issued to the New Jersey company and its affiliates a license permitting the companies to make limited use of the software. When the Taiwan company became associated with the freight company, the limited license expired. The freight company sued the New Jersey company and its affiliates for copyright infringement, trade-secret misappropriation, and breach of contract, alleging wrongful use of the software after the license expired. This court denied the New Jersey company's motions for summary judgment, holding, inter alia, that plaintiff stated a viable trade-secret-misappropriation claim. In light of the relationships between the companies, as well as the nexus between these relationships and plaintiff's claim, a reasonable factfinder could hold the New Jersey defendant liable for the acts of its affiliates under general agency law. The nature of defendant's relationships with and control over the affiliates remained a fact issue for the jury. Expediters Intern. v. Direct Line Cargo Management, 995 F.Supp. 468, 481.

**M.D.N.C.**2002. Subsec. (d) quot. in disc. Supplier of aftermarket components and toner for remanufactured laser toner cartridges sued competitor, alleging that defendant tortiously interfered with a nondisclosure agreement signed by one of plaintiff's former employees hired away by defendant. Denying defendant's motion for summary judgment, this court held, inter alia, that plaintiff's interpretation of the agreement as being restricted to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

confidential information presented a genuine issue of material fact as to the scope of the nondisclosure agreement. Static Control Components, Inc. v. Darkprint Imaging, Inc., 200 F.Supp.2d 541, 549.

**Cal.**2003. Com. (d) quot. in ftn. to conc. op. Trade association for motion-picture industry brought suit for injunctive relief against web-site operator's republication of source code for software designed to circumvent the encryption of movies stored on DVDs, alleging that defendant misappropriated trade secrets. The trial court issued a preliminary injunction. The court of appeal reversed. Reversing and remanding, this court held that the preliminary injunction did not violate defendant's free-speech rights under either the state or federal constitution. A concurring opinion argued that plaintiff did not establish a likelihood of prevailing on its trade-secret claim, noting that it was doubtful that the alleged trade secret, which was obtained through reverse engineering, was acquired by improper means. DVD Copy Control Association, Inc. v. Bunner, 31 Cal.4th 864, 901, 4 Cal.Rptr.3d 69, 101, 75 P.3d 1, 28, on remand 116 Cal.App.4th 241, 10 Cal.Rptr.3d 185 (2004).

**Ind.App.**2001. Subsec. (b) cit. in case cit. in disc. Auto-parts manufacturer sued former customer and others for misappropriation of trade secrets and interference with contractual relations. Trial court granted defendants summary judgment. This court affirmed, holding, inter alia, that trial court properly granted summary judgment on the misappropriation claims, because there was no protectible trade secret. Although plaintiff took some measures within its own company and with its own employees to protect the information contained in its shackle machines, it did very little to protect the information from outside sources; therefore, trial court could have found as a matter of law that plaintiff had not taken reasonable steps to maintain the secrecy of its proprietary information. Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp., 759 N.E.2d 239, 247.

**Iowa,** 1999. Quot. in disc. Manufacturer of draft sensor devices sued competitor for tortious interference with contract, civil conspiracy, and misappropriation of trade secrets after two of plaintiff's employees resigned and went into business selling a similar item to defendant. The trial court entered judgment on a jury verdict for plaintiff on the claims for tortious interference and conspiracy. Affirming in part, reversing in part, and remanding, this court held that nondisclosure-confidentiality agreements and invention-assignment provisions executed by employees were reasonable and enforceable; that defendant was liable for tortious interference with these contracts; that plaintiff's recovery on its claim for civil conspiracy was duplicative of the damages awarded for tortious interference; and that defendant was not entitled to a pro tanto credit of a $60,000 settlement agreed to by plaintiff and employees, since the settlement involved claims for trademark and patent infringement and breach of contract. Revere Transducers, Inc. v. Deere & Co., 595 N.W.2d 751, 761.

**Vt.**2002. Subsec. (b)(1) quot. in disc. Manufacturer brought suit for, in part, trade-secret misappropriation against competitor established by former employees. Affirming the trial court's entry of judgment for defendant, this court held, inter alia, that, because plaintiff failed to take steps to put employees on explicit or implicit notice that the information conveyed to them during their employment was to be kept confidential, defendants did not receive the information in confidence, did not breach their duty of confidence to plaintiff, and were not liable for misappropriation. Omega Optical, Inc. v. Chroma Technology Corp., 800 A.2d 1064, 1069.

**Wis.**2006. Cit. in ftn. to diss. op. Former employer sued former employee and his new employer for, in part, misappropriation of trade secrets and related common-law claims, alleging that, after resigning, employee used plaintiff's confidential information, including customer lists and pricing information, to solicit and acquire customers. The trial court granted summary judgment for defendants and the court of appeals affirmed. This court reversed in part and remanded, holding that, while the confidential information did not meet the definition of a trade secret provided in Wisconsin's trade-secret statute derived from the Uniform Trade Secrets Act (UTSA), plaintiff's common-law claims were not precluded by the statute. The dissent argued that plaintiff could not maintain common-law claims for misappropriation of confidential information that did not rise to the level of a trade secret in a UTSA state such as Wisconsin. Burbank Grease Services, LLC v. Sokolowski, 294 Wis.2d 274, 717 N.W.2d 781, 802.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1995)

REST 3d UNCOM § 41

END OF DOCUMENT

**Exhibit 7**

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

Page 1

**H**Trans Union LLC v. Credit Research, Inc.
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
TRANS UNION LLC, Plaintiff,
v.
CREDIT RESEARCH INC., and Credit Bureau of Carmel and Pebble Beach, Inc., Defendants.
CREDIT RESEARCH, INC. and Credit Bureau of Carmel and Pebble Beach, Inc., Counter-plaintiffs,
v.
TRANS UNION LLC, and Acxiom Corporation, Counter-defendants.
**No. 00 C 3885.**

June 4, 2001.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
*1 Defendants Credit Research, Inc. and Credit Bureau of Carmel and Pebble Beach, Inc. (collectively Credit Bureaus) have filed four counterclaims against plaintiff Trans Union LLC and counter-defendant Acxiom Corporation. The complaint FN1 alleges (1) breach of contract; (2) equitable accounting; (3) conversion; and (4) fraud, against each. Trans Union and Acxiom have moved to dismiss the counterclaims under Fed.R.Civ.P. 12(b)(6) and 9(b). For the following reasons, Trans Union's motion is granted in part and denied in part with respect to count 1, and denied as to counts 2, 3 and 4. Acxiom's motion is granted with respect to counts 1 and 4, but denied as to counts 2 and 3.

> FN1. Because these are motions to dismiss counterclaims, the traditional pleading roles are reversed. Although nominally defendants, Credit Bureaus are plaintiffs with respect to the counterclaims and accordingly receive the benefit of all inferences. See *Northern Trust Co. v. Peters, 69 F.3d 123, 129 (7th Cir.1995)*. For simplicity, we will refer to the parties by their nominal titles (*i.e.,* Trans Union is the

plaintiff), but to the counter-complaint as the complaint, and counterclaims as claims. Trans Union's initial complaint is not at issue here.

*BACKGROUND*

All parties are in the credit reporting business. They collect data on individuals and sell it to customers, such as credit issuers. Permissible use of the data is regulated by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.* Trans Union is one of three national players in the industry. Credit Bureaus are local agencies, operating in Santa Cruz, San Benito and Monterey counties in California. Acxiom provides similar data services to the financial industry, such as list management and brokerage. Since 1992, Acxiom has managed all of Trans Union's data processing operations. Trans Union is Acxiom's largest shareholder and has the right to appoint two directors on Acxiom's board.

Since 1986, Credit Bureaus have affiliated with Trans Union, their relationship defined by a service agreement which expires in July 2001. They collect data within their service area and license the data to Trans Union for national distribution. According to the contract, Trans Union then pays them a portion of the revenues attributable to their data. The agreement prescribes specific formulae for different uses of the data. Trans Union provides Credit Bureaus with monthly statements showing the number of names from their service area sold, revenue generated and amount owed. Trans Union has similar arrangements with local agencies all across the country. Its database, known as CRONUS, includes a combination of data licensed from these franchisees and data owned directly by Trans Union.FN2

> FN2. The balance between company-owned and independent franchisees has shifted over time. In 1986, 193 of the 225 bureaus affiliated with CRONUS were independent. Today, Trans Union owns all but eight (cplt.¶ 62).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

Trans Union sells data in several forms, including credit reports and prescreened lists. Trans Union pays Credit Bureaus a prescribed fee for each credit report sold on an individual within their service area. The agreement classifies certain Trans Union customers as "key accounts," and Credit Bureaus receive a lower fee for reports sold to these end-users. Trans Union has the exclusive ability to determine whether a customer meets the agreement's criteria for key account pricing. Prescreened lists are used by customers, such as credit card issuers, who wish to make unsolicited firm credit offers to consumers. Trans Union culls a list of consumers who meet the customer's defined criteria from CRONUS. The resulting list is referred to as "names surviving processing." Trans Union then allocates the revenue from selling the list, according to who contributed the data, and pays franchisees, including Credit Bureaus, a portion of the revenue attributable to each. Because only Trans Union knows how many names were processed and which names survived, it has the exclusive ability to allocate the revenue.

**\*2** Under the contract, defendants were to receive 40 per cent of the prescreened list revenue attributable to their service area. The current dispute involves how the gross revenue figure attributed to each service area is computed. The complaint alleges that the proper formula is: surviving names attributable to Credit Bureaus, divided by total *surviving* names, multiplied by total revenue from the list. It further alleges that Trans Union used the following formula: surviving names attributable to Credit Bureaus, divided by total *processed* names, multiplied by total revenues from the list. The complaint also provides an example which amply demonstrates the significance of this difference:

Assume that a pool of 1,000,000 names, evenly distributed across the United States, are prescreened for an Empirica credit score of greater than 700, producing a list of 100,000 surviving names that is sold for \$.05 per name, or \$5,000. Assume that Credit Bureau contributed 10,000 of the 1,000,000 names in the pool (1%), and 1000 of the 100,000 names surviving processing (also 1%). Credit Bureau should receive \$20 (i.e. 1,000/100,000 x \$5,000 x 40%). But under Trans Union's formula, Credit Bureau would receive only \$2 (i.e. 1,000/1,000,000 x \$5,000 x 40%).

(cplt.¶ 80). In this example, Credit Bureaus receive 10 per cent of the revenue to which they believe they are entitled. This figure will fluctuate, of course, depending on the percentage of total names that survive processing. But the Trans Union formula will always yield a lower number. After reviewing two proposed service agreement amendments incorporating this formula, Credit Bureaus discovered the discrepancy.

## DISCUSSION

When deciding a Rule 12(b)(6) motion we must assume the truth of all well-pleaded factual allegations, making all possible inferences in the non-movant's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994). We will dismiss a claim only if it appears "beyond doubt that the [complainant] can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).Fed.R.Civ.P. 8(a)(2) only requires "a short and plain statement of the claim showing that the pleader is entitled to relief."Generally, "mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss."*Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985). But the complaint must allege facts sufficiently setting forth the essential elements of each cause of action. *Gray v. County of Dane,* 854 F.2d 179, 182 (7th Cir.1988).

### I. *Trans Union's Motion*

#### A. *Equitable Accounting*

Defendants' accounting claim is a logical starting point because it will help develop the facts for the remainder of the case. Credit Bureaus believe Trans Union exploited their data without proper compensation. But the documents tracking what actually happened to their data and how their fees were computed are primarily Trans Union records, to which defendants have no access. An accounting will require Trans Union to document, in detail, all the transactions involving defendants' data. It will reveal how many of defendants' names were used, how many times, in what proportion to the data as a whole and how the fees were computed; this will go a long way towards clarifying whether there were any contractual breaches, false statements or conversion

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

of the data.

*3 To state a claim "the complaint must allege the absence of an adequate remedy at law and one of the following: (1) a breach of fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of mutual accounts which are of a complex nature."*People* ex rel. *Hartigan v. Candy Club,* 501 N.E.2d 188, 190 (Ill.App. 1st Dist.1986). Plaintiff argues that the existence of a breach of contract claim demonstrates an adequate legal remedy and, consequently, precludes any equitable one. We see no reason to prevent defendant from pleading in the alternative. Moreover, contract damages may not fully compensate defendants for the full diminution of their asset's value. Several of the other factors are also present. We have already discussed defendants' need for discovery. The complaint's reliance on information and belief allegations only highlights that most of the determinative facts will come from records within plaintiff's control. There are also allegations of fraud. Further, the accounts in question will likely prove sufficiently complex. *See* *Lorsch v. Gibraltar Mutual Casualty Co.,* 262 N.E.2d 313 (Ill.App. 1st Dist.1970). There are multiple types of products. Names are sold and resold. The fact-finder must calculate a separate revenue allocation for every prescreened list plaintiff sold over fifteen years. Credit Bureaus' share of the revenues had changed over time. And prices vary depending on who the end user is. This could well be "beyond the ken of average jurors."At this point we cannot say with certainty that legal remedies will be adequate or that the accounts are insufficiently complex. The allegations are more than adequate to survive a motion to dismiss.

As we discuss below, there are substantial problems with parts of this complaint. A thorough review of the accounts will likely resolve these pleading problems, clarify the disputed facts and ultimately help the court evaluate the merits of the substantive allegations. Accounting discovery is a sensible first step in sorting out what has actually happened between these parties.

B. *Breach of contract*

Count 1 alleges that Trans Union breached the service agreement in five distinct ways: plaintiff (1)

offered discounted pricing to customers who did not qualify as key accounts; (2) made Credit Bureaus' data available to list brokers, list managers and resellers without payment to defendants; (3) allowed its affiliate Acxiom to improperly use Credit Bureaus' data without compensation; (4) used erroneous formulae in computing payments owed defendants for data included in prescreened lists; and (5) terminated all payments to defendants for use of their data in prescreened lists.

Plaintiff argues that the first three claims are improper because the complaint alleges facts "on information and belief." This is not, as plaintiff contends, fundamentally improper. *See, e.g.,* *PS Promotions, Inc. v. Stern,* 2001 WL 293033 at *3 (N.D.Ill. Mar. 23, 2001). The reason we generally disfavor this form of pleading is Rule 11's requirement that counsel make a reasonable inquiry before filing a complaint. A party may not indulge in a fishing expedition or file a complaint on a rumor or a hunch. *See* *Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 684 (7th Cir.1992). But the federal rules also recognize that sometimes parties will not have access to all the facts until they have had an opportunity for discovery. In such cases, "information and belief" pleading may be permissible. The complaint must demonstrate both that the information is inaccessible and that the pleader has reasonable grounds to suspect those facts. *Id.*

*4 First, Credit Bureaus have alleged that Trans Union offered key account pricing to customers who did not qualify for that discount under the service agreement. Defendants maintain that without access to Trans Union's records they cannot determine whether specific customers qualified as key accounts. Among other requirements, key account customers must request the discount, have compatible technology for automated inquiries and maintain a specified volume of business with Trans Union (cplt.¶ 30). It is unlikely defendants could determine these facts prior to discovery. But defendants have not provided any grounds for their suspicions. The complaint articulates, at great length, a purported scheme by Trans Union to acquire full ownership of its franchisees' data at depressed prices by suppressing cash flows. FCRA disclosure rules prevent plaintiff from understating the number of reports sold. *See* 15 U.S.C. § 1681g. Designating the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

end user as a key account, however, would allow Trans Union to reduce the price per report. Because we have no way to verify key account status, the complaint reasons, they must be using that to cheat us. That is nothing more than speculation. The complaint does not provide any factual basis for these suspicions.[FN3]

> FN3. The complaint specifically identifies three customers so designated who purportedly did not qualify (cplt.¶ 65). But these allegations are also on information and belief, and with no articulated basis.

Second, the complaint alleges that Trans Union sold lists, including defendants' data, to list brokers, list managers and resellers without compensating Credit Bureaus. Defendants cite facts stated in an FTC opinion as the basis for their belief that Trans Union so used their data (cplt.¶ 113). They also allege that Trans Union's agreements with list brokers allow those brokers to use CRONUS data without reporting which names they used to Trans Union or its franchisees. Without such an accounting, there is no way to allocate revenues to the proper franchisees. Defendants found some evidence of this in agreements that list brokers had filed with the SEC (cplt.¶¶ 114, 115). Plaintiff again attacks the complaint's wording, pointing out that it only claims the agreements "appear to" be improper. This is enough at the pleading stage. These agreements, on their face, sufficiently justify defendants' suspicions that their data is being misused to survive a motion to dismiss.

Third, defendants allege that Trans Union gave Acxiom improper access to Credit Bureaus' data. Trans Union contracted Acxiom to do its data processing, so Acxiom necessarily had access to the data, including that licensed from defendants. But the complaint cites several Acxiom statements trumpeting the advantages of its affiliation with Trans Union and its resulting access to Trans Union's data. Moreover, Acxiom is engaged in list brokerage and sells products derived from Trans Union's data.[FN4] If Trans Union permitted Acxiom to use Credit Bureaus' data for its own benefit, and without compensation, that would constitute a breach. Defendants have no way to determine, prior to discovery, if the Trans Union data Acxiom is using includes Credit Bureaus' data, or how Acxiom is

using it. Plaintiff derides the complaint's use of the words "specter" and "prospect." But these are formulations of defendants' suspicions. Defendants properly allege the facts of which they are aware, and adequately claim that Acxiom's statements raise suspicion of a breach.

> FN4. Trans Union's database, as we have already discussed, includes data licensed from defendants.

**\*5** The fifth alleged breach is really two points in the alternative. For many years Trans Union had included Credit Bureaus' data in prescreened lists and paid Credit Bureaus for each usage. Then the payments stopped. Defendants contend that plaintiff is still using their data, without paying for it, or that excluding their data from the lists breaches plaintiff's duty of good faith and fair dealing under the agreement. The former allegation is not properly pled. All the complaint actually alleges is that the payments stopped. The response brief argues "Counter-plaintiffs have no way of knowing whether such data exclusion actually took place, and until TU proves on the merits the Credit Bureau's data actually was excluded, Credit Bureau will continue to claim that TU breached the Service Agreement by terminating such payments" (def. br. at 6). This improperly attempts to shift the burden. It is incumbent upon the pleader to allege a breach. The mere fact that Trans Union has not proven it excluded the data, does not justify an assumption that they are still using it. The complaint neither alleges that Trans Union is still using Credit Bureaus' names, nor states any facts justifying suspicion that they are.

Defendants alternatively argue that Trans Union's reason for excluding their data is to force them to accept less favorable terms, and that this breaches Trans Union's duty of good faith and fair dealing. But their own arguments belie this position. Both parties agree that the contract permits use of defendants' data in prescreened lists, "subject to their mutual consent" (cplt. ¶ 31). Defendants in fact argue emphatically that consent is a condition subsequent and that they have the right to withdraw it at any time. They also acknowledge that Trans Union could unilaterally reduce the percentage of prescreened list revenue paid to Credit Bureaus. Their brief ultimately argues that Credit Bureaus' right to withdraw consent was the reason Trans Union applied the new formula

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

secretly rather than openly reducing the rate. Following defendants' own logic, if use was subject to the parties' mutual consent, Trans Union was not obligated to use the data at all. And plaintiff may stop using it at any time. Doing so does not breach the agreement, and does not evince bad faith. *See Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F.3d 785, 792 (7th Cir.1995).*

Trans Union's motion does not address the fourth alleged breach, that it used the wrong formulae in calculating payments owed defendants. The complaint does adequately allege a discrepancy, so this claim may go forward, along with the second and third claims described above.

*C. Conversion*

To state a claim for conversion the complaint must allege: "(1) unauthorized and wrongful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) a demand for possession." *A.T. Kearney, Inc. v. INCA Int'l, Inc., 477 N.E.2d 1326, 1334 (Ill.App. 1st Dist.1985).* Plaintiff attacks the first, third and fourth elements.

*6 Trans Union was lawfully in possession of Credit Bureaus' data pursuant to the service agreement. But that contract also constrained Trans Union's use of that data. Defendants still owned it, and improper use of confidential business information can constitute a conversion. *See Conant v. Karris, 520 N.E.2d 757, 763 (Ill.App. 1st Dist.1987); FMC Corp. v. Capital Cities/ABC, Inc., 915 F.2d 300, 305 (7th Cir.1990).* The complaint alleges that Trans Union allowed Acxiom to use defendants' data for Acxiom's own benefit. This would exceed the uses permitted under the contract and diminish the data's value, allegedly by several million dollars, to its rightful owners. Permitting a third party to use property that does not belong to you, as if it were your own, is a conversion. As we discussed in the breach of contract analysis, Acxiom's business, its access to Credit Bureaus' data, the products it sells and its own statements sufficiently justify defendants' suspicions for pleading purposes.

As to the third element, the contract only permitted Trans Union to use it "subject to their mutual consent." Credit Bureaus could withdraw their consent at any time and assert their exclusive rights to the data. Defendants retained sufficient rights in the data.

Lastly, although the owner must normally demand its property be returned before filing a conversion claim, Illinois law recognizes an exception to this requirement. If the unauthorized user has already "sold or otherwise disposed of" the property, then a demand would be futile. *See Monroe City Water Coop. v. City of Waterloo, 437 N.E.2d 1237, 1240 (Ill.App. 5th Dist.1982).* The same principle applies in this situation, where defendants claim the damage was already done and irreversible. Once **confidential** information is disclosed, it is no longer **confidential.** Acxiom's use of the data may have already diminished its value enough that a demand would not substantially alleviate the rightful owner's loss. The complaint's allegations in this regard are sufficient to survive a motion to dismiss.

*D. Fraud*

Count 4 alleges that Trans Union committed fraud by misrepresenting the amount owed Credit Bureaus. Under Illinois law the elements of a fraud claim are:

(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.

*Cramer v. Insurance Exchange Agency, 675 N.E.2d 897, 905 (Ill.1996).*[FN5] Plaintiff moves to dismiss on three grounds: a simple breach of contract cannot be fraud; defendants cannot show reliance; and the complaint fails to plead fraud with particularity, as required by Rule 9(b).

> FN5. In challenging plaintiff's citation to *Cramer,* defendants misconstrue the *Erie* principle. *See Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).* They are correct that federal, not state, pleading standards apply. But Illinois law defines the elements

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page 6
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

necessary to state a fraud claim. Fed.R.Civ.P. 9(b) may require fewer facts than the parallel Illinois rule, but it requires that the complaint allege all the elements of fraud, here defined by *Cramer,* with particularity.

**\*7** Plaintiff is correct that failure to advertise a breach does not constitute fraud. *SeeHemenway v. Peabody Coal Co.,* 159 F.3d 255, 261 (7th Cir.1998). The existence of a contract, however, does not absolve fraudulent behavior. If a party makes false statements in an attempt to conceal a breach, that can be fraud. *SeeMutuelle Generale Francaise Vie v. Life Assurance Co.,* 688 F.Supp. 386, 393 (N.D.Ill.1988). Here, defendants allege that Trans Union misrepresented the portion of its revenues attributable to Credit Bureaus' service area, and consequently led defendants to believe they were receiving their correct share of the revenues when in fact they were not. If proven, this could constitute fraud. Because the contract already exists, plaintiff also claims Credit Bureaus cannot show reliance on the purportedly false statements. But this contract contained a condition subsequent. Credit Bureaus could withdraw their consent to use of their data at any time. The false statements allegedly caused defendants to not exercise that right. The complaint's charge that Trans Union misrepresented its prescreened list computations to prevent defendants from withdrawing their consent does state a fraud claim. Credit Bureaus also allege that Trans Union used the 40 per cent prescreened list allocation as leverage in negotiating other terms. If plaintiff knowingly used a false figure to persuade defendants to accept other agreements, that too would demonstrate reliance and constitute a fraud.

Fed.R.Civ.P. 9(b) requires the complaint state the circumstances constituting the fraud with particularity. This means "the who, what, when, where and how: the first paragraph of any newspaper story."*DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). It does not require every last detail defendants intend to introduce at trial. *Mutuelle Generale,* 688 F.Supp. at 393. Particularly where the fraud continued over an extended period, the complaint need not identify every instance of false statements. *Id* . Here, the complaint focuses on the monthly account reports Trans Union submitted to Credit Bureaus. Each one stated the revenue

attributed to Credit Bureaus' service area, and showed the 40 per cent calculation. Defendants maintain that Trans Union intentionally understated the first number, the attributable revenue, by using a formula other than the one outlined in the contract. The complaint identifies who created the reports, what they said, when they were sent, from where they were sent and how the stated number misrepresented the true amount. Several of the documents themselves were appended to the complaint (cplt.exhs. A and B). This is sufficient to state a claim under Rule 9(b). The other statements cited, such as the 1997 and 1999 letters proposing to amend the service agreement, are not themselves fraudulent. But they do provide evidence of motive and intent, and help explain the mechanics of the purported scheme.

## II. *Acxiom's Motion*

### A. *Equitable Accounting*

**\*8** As we noted in our discussion of the parallel allegations against Trans Union, a breach of fiduciary relationship is only one of several possible bases for this claim. *SeeHartigan,* 501 N.E .2d at 190. Counter-defendant was unquestionably in possession of defendants' data. If Acxiom was using that data for its own benefit, Credit Burueas would be entitled to an accounting of any illicit profits. The need for discovery here is identical to the other accounting claim, and the accounts will be equally complex. Again, with respect to adequate legal remedies, defendants may plead in the alternative. Only by allowing this claim to proceed will we be able to determine whether this equitable remedy is appropriate. And the discovery will also develop additional facts necessary to evaluate the merits of the other claims.

### B. *Piercing the Veil*

Acxiom had no direct relationship with Credit Bureaus. As such, the breach of contract and fraud claims do not allege specific wrongdoing by Acxiom itself. Instead, defendants rely on the close relationship between the two companies and attempt to hold Acxiom liable for Trans Union's actions. Defendant argues that Trans Union and Acxiom are so closely intertwined that they are essentially one company, each fully liable for the other's actions. Acxiom correctly characterizes this as an attempt to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                Page 7
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

pierce the corporate veil, [FN6] which is governed by the law of the state where the companies are incorporated. See *Retzler v. Pratt & Whitney Co.*, 723 N.E.2d 345, 354 (Ill.App. 1st Dist.1999). In this case, both Acxiom and Trans Union are Delaware corporations.[FN7]

> **FN6.** This is slightly unorthodox in that defendants are attempting to recover from a subsidiary for the parent's wrongs, rather than the other way around. Because defendants have not sufficiently pled that the companies are indeed alter egos, we express no opinion as to whether such a reverse-piercing is tenable.

> **FN7.** Trans Union is technically a limited liability company, not a corporation, but the corporate form is still defined by Delaware law.

Courts are generally reluctant to ignore the corporate form, and so place a high burden on a party asking us to do so. See *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537 at *4, 15 Del. J. Corp. L. 1030, 1038 (Del. Ch.1989). The alter ego theory is premised on the idea that the corporate entity in question is really a sham, controlled exclusively for the benefit of another, such as a parent company or dominant shareholder. To determine this, courts consider

whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*United States v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del.1988), quoted in *Harco Nat'l*, 1989 WL 110537 at *4. No single factor is essential, but some combination is required, and "an overall element of injustice or unfairness must always be present, as well." *Id.*

The complaint is completely silent about these factors. Defendants make conclusory allegations that Acxiom is an alter ego of Trans Union. All they state in support, however, is that Trans Union is Acxiom's largest shareholder [FN8] and placed two members on its board of directors. This is not enough. "The separate existences of parent and subsidiary will not be set aside merely on a showing of common management of the two entities, nor on a showing that the parent owned all the stock of the subsidiary." *Mabon, Nugent & Co. v. Texas American Energy Corp.*, 1990 WL 44267 at *5, 16 Del. J. Corp. L. 829, 838 (Del. Ch.1990). The complaint alleges nothing about corporate formalities, capitalization, solvency or how there was any facade. Even at the motion to dismiss stage, the complaint must state something in support of its veil-piercing theory beyond conclusions. Credit Bureaus' complaint does not.

> **FN8.** The complaint does not even allege that Trans Union has a controlling share, just the largest one.

**\*9** There is also no injustice to be prevented here. This is not a case of a deep pocket hiding behind a judgment-proof sham entity. The parent itself is the alleged perpetrator. Credit Bureaus have adequate recourse against Trans Union directly-at least they have not pled otherwise. We will not pierce the veil here. Acxiom is only liable for its own actions, not Trans Union's. Acxiom had no contract with defendants, so it could not breach one. Acxiom made no statements to defendants, so it could not have defrauded them.

### C. Conversion

This claim alleges direct wrongdoing on Acxiom's part. Defendants charge that counter-defendant gained access to Credit Unions' confidential business information from Trans Union, used it for Acxiom's own benefit and thereby diminished the information's value to its rightful owner. For the same reasons discussed regarding the conversion claim against Trans Union, the complaint adequately states a conversion claim against Acxiom.

### CONCLUSION

For the foregoing reasons, Acxiom's motion to dismiss is granted with respect to counts 1 and 4, but denied as to counts 2 and 3. Trans Union's motion to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

dismiss is granted with respect to the first and fifth parts of count 1, the breach of contract claim. It is denied as to the second, third and fourth parts of the breach of contract claim, and as to counts 2, 3 and 4.

N.D.Ill.,2001.
Trans Union LLC v. Credit Research, Inc.
Not Reported in F.Supp.2d, 2001 WL 648953 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 8**



Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 4562926 (S.D.N.Y.)

Design Strategy Corp. v. Knack Systems, LLC
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
DESIGN STRATEGY CORPORATION, Plaintiff,
v.
KNACK SYSTEMS, LLC, Defendant.
No. 07 Civ. 0395(JSR).

Dec. 18, 2007.

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.
**\*1** In this litigation between two computer consulting
companies that, *inter alia*, place computer consultant
employees at large businesses, plaintiff Design
Strategy Corporation ("Design") sues defendant
Knack Systems, LLC ("Knack") for breach of
contract, tortious interference with prospective
economic advantage, breach of the implied covenant
of good faith and fair dealing, and unjust enrichment,
while Knack counterclaims for breach of contract and
unjust enrichment. With discovery completed, both
sides have now moved for summary judgment.

The pertinent facts not in genuine dispute are as
follows:

In October 2004, L'Oreal USA Products ("L'Oreal"),
the cosmetics company, began implementing a
software package called SAP, which automates
business processes. Defendant's Rule 56.1 Statement
(Def.56.1") ¶¶ 1-2; Plaintiff's Response to
Defendant's Rule 56.1 Statement ¶¶ 1-2 ("Pl. 56.1
Resp."). In March 2005, G. Janakiraman ("Janki"), a
Vice President of Information Technology at
L'Oreal's office in Cranford, New Jersey, contacted
Design about filling consultant positions on the SAP
project with employees placed by Design. Plaintiff's
Local Civil Rule 56.1 Statement of Undisputed Facts
¶ 8 ("Pl.56.1"); Defendant's Response to Plaintiff's
Rule 56.1 Statement ¶ 8 ("Def 56.1 Resp."); Email
from Janki, Ex. H to Declaration of Jennine
DiSomma in Support of Plaintiff's Motion for Partial
Summary Judgment ("DiSomma Decl."). Around the

same time, a computer consultant employed by
Knack was placed with the L'Oreal SAP project by
two intermediary companies named "B to B
Workforce" and "Accenture." Def. 56.1 ¶ 12; Pl. 56.1
Resp. ¶ 12.

A few months later, Design either contacted or was
contacted by Knack about positions on the SAP
Project. Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10. After
interviewing and verifying the credentials of a Knack
employee named Renuka Kalro, Design presented her
resume to L'Oreal, and L'Oreal accepted her
placement. Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11. In
connection with Kalro's placement, Knack entered
into a written agreement with Design on June 7,
2007. *See* Contractor Agreement (the "Agreement"),
Ex. B to DiSomma Decl. The Agreement contained a
restrictive covenant that stated that "Contractor
[Knack] acknowledges the vital interest of Design in
retaining its business and competitive position within
its industry," and then provided as follows:

Contractor, its employees, shareholders, directors,
officers or representatives, shall refrain, directly or
indirectly, from accepting employment or rendering
services similar to those for which Contractor has
been engaged herein for a period of one year
following the expiration of this Agreement or
completion of the services of the Contractor pursuant
to this Agreement, for the Client of Design or the End
User. Contractor, its employees, shareholders,
directors, officers or representatives, shall not,
directly or indirectly, enter into, or in any manner,
take part in, or lend Contractor's name, counsel or
assistance to any venture, enterprise, business or
endeavor, either as proprietor, principal, investor,
partner, director, officer, consultant, advisor, agent,
independent contractor or in any capacity
whatsoever, for the Client or the End User for a
period of one year following the completion of
services.

**\*2** *Id.* at 1. In July, Knack, through the offices of
intermediaries, placed two more consultants at
L'Oreal: a consultant named Raghu Aluri placed
through Design, and another consultant placed

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                          Page 2
Slip Copy, 2007 WL 4562926 (S.D.N.Y.)

through two other intermediary companies, Global Managed Services and Accenture. Pl. 56.1 ¶ 20; Def. 56.1 Resp. ¶ 20; Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.

In January 2006, another L'Oreal executive named Rich Scuteri, who supervised a different portion of the SAP project than Janki, contacted Rajiv Sharma, Chief Executive Officer of Knack, about hiring consultants directly from Knack to work on the SAP Project. Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18; Declaration of Rajiv Sharma in Support of Defendant's Summary Judgment Motion ¶ 21 ("Sharma Decl."). According to Sharma, Scuteri told him that Scuteri learned of Knack from questioning consultants at L'Oreal as to their employers. Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18; Sharma Decl. ¶ 21. In January L'Oreal hired a consultant who was an employee of Knack directly from Knack itself, and hired another such consultant in February. Def. 56.1 ¶ 17; Pl. 56.1 Resp. ¶ 17.

Around March 2006, Janki learned from Accenture that one of the consultants Accenture had placed with L'Oreal was not an employee of Accenture, but rather of Knack. Def. 56.1 ¶ 20; Pl. 56.1 Resp. ¶ 20. Also in March, Sharma, at Janki's invitation, met with Janki to describe Knack; at no time did either mention Design. Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21. In April 2006, Janki hired a consultant directly from Knack, and subsequently negotiated with Accenture to permit L'Oreal to hire consultants provided by Accenture directly from Knack. Def. 56.1 ¶¶ 22-23; Pl. 56.1 Resp. ¶¶ 22-23. In October 2006, Janki hired directly from Knack one consultant that Accenture had previously placed and two additional consultants. Def. 56.1 ¶¶ 24-26; Pl. 56.1 Resp. ¶¶ 24-26.

The first time Knack discussed Design with L'Oreal was in the summer of 2006, when Janki asked Sharma if L'Oreal could hire directly from Knack its consultants placed by Design; to this Sharma responded that Knack had a contract with Design and could not place those consultants directly with L'Oreal without Design's permission. Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.

As of August 2006, Design ceased paying Knack for the services of Kalro and Aluri. Def. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31. In October 2006, Aluri left Knack's employ. Def. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31. In late 2006, Sharma told Design that Knack could not

afford to keep Kalro at L'Oreal without payment from Design. Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32. In January 2007 Knack informed Janki that by the middle of the month Knack would remove Kalro from working at Design, and in fact Knack removed her on January 15. Def. 56.1 ¶¶ 32-33; Pl. 56.1 Resp. ¶¶ 32-33. At that time, Knack had issued $113,810 in outstanding invoices to Design for the services of Aluri and Kalro Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33.[FN1]

> FN1. Knack recognizes that it received an overpayment from Design for $1,045, and thus calculates that Design owes it $112,765 plus interest. Def. 56.1 ¶ 34; Pl. 56.1 Resp. ¶ 34.

*3 Given this factual background, it is clear that Design's various claims of liability are all premised, directly or indirectly, on Knack's alleged violation of the restrictive covenant in the Agreement between them, which is governed by New York law. "Because covenants not to compete restrain trade, New York courts rigorously examine such covenants before enforcing them."*Baker's Aid v. Hussmann Foodservice Co.,* 730 F.Supp. 1209, 1213 (E.D.N.Y.1990). When parties agree to such covenants as part of ordinary commercial contracts, courts analyze them under a "simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract."*DAR & Assocs., Inc. v. Uniforce Servs., Inc.,* 37 F.Supp.2d 192, 197 (E.D.N.Y.1999). This analysis requires a court to examine (1) whether the party seeking enforcement has demonstrated "a legitimate business interest that warrants ... enforcement," (2) "the reasonableness of the covenant with respect to geographic scope and temporal duration," and (3) "the degree of hardship" that enforcement would inflict upon the party in breach, bearing in mind the degree to which that party "consciously agreed to bear the risk of such hardship when it entered into the contract[ ] with" the party seeking enforcement. *Id.* at 197.

Here, Design has argued, and Knack has not disputed, that the restrictive covenant was reasonable in duration and geographic scope: it applied only for one year and only to relationships with L'Oreal, not with any other companies. Nor has Knack asserted that the covenant imposes undue hardship, or that it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

was the result of anything other than free, arm's-length negotiation. In addition, the contract itself states that Knack acknowledges "the vital interest of Design in retaining its business and competitive position within its industry and that [Design's] payment to [Knack] ... [has] been calculated to include amounts sufficient to constitute adequate consideration for the obligations and commitments made by the Contractor pursuant to his Agreement, including this restrictive covenant."Agreement at 1.

The parties sharply dispute, however, whether the covenant protects a "legitimate business interest" of Design. Legitimate business interests include "prevention of unfair competition." *See Baker's Aid, 730 F.Supp. at 1215;see also DAR & Assocs., 37 F.Supp.2d at 198;BDO Seidman v. Hirshberg, 93 N .Y.2d 382, 392 (1999); Globaldata Mgmt. Corp. v. Pfizer Inc., 814 N.Y.S.2d 561 (Table);*10 Misc.3d 1062(A) (N.Y.Sup.Ct.2005). There would be unfairness here if, in the face of the restrictive covenant, Knack exploited Design's relationship with L'Oreal to obtain its own business, but not otherwise. Specifically, if, as Design claims, Knack obtained some or all of its L'Oreal consulting business proximately as the result of exploiting Design's relationship with L'Oreal, Design would be entitled, under one or another of its contractual or quasi-contractual claims, to damages related to the portion of Knack's business so derived, as well, perhaps, to additional damages on its tortious interference claim. By contrast, Knack would not have liability to Design on any claims if it did not derive any of its L'Oreal business in any material way from its exploitation of Design's relation to L'Oreal, and Knack, instead, would be entitled to recover for any unpaid amounts due from Design on such untainted business (as alleged in Knack's counterclaims).

**\*4** The undisputed facts set forth above, however, do not resolve this causation issue as to any of the business here in dispute, and thus both sides' summary judgment motions must be denied in so far as they relate to liability of any given claim. As for damages, while Knack also seeks summary judgment dismissing Design's requests for consequential damages, punitive damages, and attorney's fees, the Court concludes that those issues are sufficiently intertwined with the unresolved issues of liability as not to be determinable at this stage.

For the foregoing reasons, the parties' pending summary judgment motions are denied in all respects. Counsel are reminded that the trial of this case is firmly scheduled to commence at 9 a.m. on March 3, 2008.

SO ORDERED.

S.D.N.Y.,2007.
Design Strategy Corp. v. Knack Systems, LLC
Slip Copy, 2007 WL 4562926 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 9**

# Westlaw.

13 Misc.3d 1230(A)                                                                                          Page 1
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

**H**Lazzarino v. Warner Bros. Entertainment, Inc.
N.Y.Sup.,2006.
(The decision of the Court is referenced in a table in
the New York Supplement.)
Supreme Court, New York County, New York.
Anthony LAZZARINO, Individually and as
Successor-in-Interest to Windwood/Glen
Productions, Inc.
v.
WARNER BROS. ENTERTAINMENT, INC.,
Warner Bros. Pictures, Inc., Universal Studios, Inc.,
Universal Pictures Company, Inc., Hypnotic, The
Kennedy/Marshall Company, Frank Marshall, Henry
Morrison Douglas Liman, the Estate of Robert
Ludlum, Jeffrey M. Weiner, as Personal
Representative, Marcum & Kliegman, L.L.P., and
Jeffrey M. Weiner, Individually, Defendants.
**No. 602029/05.**

Oct. 30, 2006.

Anthony Lazzarino, pro se.
Mitchell Schuster, Esq., Thomas L. Friedman, Esq.,
Meister Seelig & Fein LLP, New York, Attorneys for
the Ludlum Defendants.
Yvonne Look, Esq., Time Warner Inc., New York,
Attorney for the Warner Bros. Defendants.
Marshall Beil, Esq., McGuire Woods LLP, New
York, Attorney for Defendant Henry Morrison.
Richard Dannay, Esq., Cowan, Liebowitz & Latman,
P.C., New York, Attorney for Universal, Marshall,
Liman Defendants.

BERNARD J. FRIED, J.
*1 Before me is a motion to dismiss (Mot.Seq. No. 1)
and a motion to withdraw as counsel by counsel for
Plaintiff (Mot.Seq. No. 3). For the reasons that
follow, I grant the motion to withdraw as counsel and
grant the motion to dismiss in part.

Plaintiff Anthony Lazzarino, individually and as
successor-in-interest to Windwood/Glen Productions,
Inc., ("Lazzarino") filed this complaint on June 6,
2005 alleging breach of contract and tortious
interference with contract against Defendants Warner

Bros. Entertainment, Inc. and Warner Bros. Pictures,
Inc. (collectively, "Warner"), Universal Studios, Inc.
and Universal Pictures Company, Inc. (collectively,
"Universal"), the Estate of Robert Ludlum, Jeffrey
M. Weiner, Individually and as Personal
Representative, and Marcum & Kleigman, L.L.P.
(collectively, the Ludlum Defendants"), Hypnotic
and Douglas Liman (collectively, the "Liman
Defendants"), Kennedy/Marshall Company and
Frank Marshall, (collectively, the "Marshall
Defendants"), and Henry Morrison ("Morrison").

Universal, Liman, and the Marshall Defendants (the
"non-moving Defendants") filed an Answer. Warner,
Morrison, and the Ludlum Defendants (the "moving
Defendants") moved to dismiss the complaint
pursuant to C.P.L.R. §§ 3211(a)(7), (a)(5), and (a)(1),
based on documentary evidence, failure to state a
claim, and the statute of limitations.[FN1]

> **FN1.** In this memorandum, "Defendants"
> shall refer to the moving Defendants only,
> unless its meaning is otherwise specified.

At the time his complaint was filed, Lazzarino was
represented by the firms Robins, Kaplan, Miller &
Ciresi LLP ("Robins, Kaplan") and Brief Justice
Carmen & Kleiman, LLP ("Brief Justice"). After
being served with the motion to dismiss, these firms
discovered a conflict of interest and were granted
permission to withdraw as counsel for Plaintiff. On
January 9, 2006, Rheingold, Valet, Rheingold,
Shkolnik, & McCartney LLP ("Rheingold") appeared
as counsel for Plaintiff.

Around this time, Lazzarino began to seek to
represent himself. By an Order dated February 28,
2006, I denied Lazzarino's request to file an answer
to the motion to dismiss *pro se*, because he was then
still represented by counsel. Soon afterward,
Lazzarino terminated Rheingold and directed it not to
appear on his behalf. By this time, however,
Rheingold had already prepared a first draft of
opposition papers. At my direction, Rheingold filed
the opposition papers on Lazzarino's behalf on March

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                    Page 2
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

1.[FN2] The moving Defendants filed a timely reply, and oral argument took place on March 23, 2006.

> FN2. I will cite these papers as "Plf.'s Opp'n I."

At oral argument, Simcha Schonfeld, Esq. of Rheingold filed a motion to withdraw as counsel for Plaintiff. I did not grant his motion and required Mr. Schonfeld to appear on Plaintiff's behalf during the argument. I also permitted Lazzarino to speak on his own behalf, since none of the Defendants objected.

Mr. Schonfeld argued that Plaintiff would be significantly prejudiced if he were not permitted to file his own opposition papers, because he would file very different opposition papers than the kind prepared for him by Rheingold. Although I initially denied this request, I eventually granted it, once Lazzarino informed me that he intended to base his opposition to the motion on documents that were not before me. (Trans. at 49-51.) I permitted Lazzarino to submit a supplemental affidavit with the appropriate documents,[FN3] and I permitted the moving Defendants to file a response. (Trans.51-52.)

> FN3. I will cite these papers as "Plf.'s Opp'n II."

**\*2** In addition to this supplemental affidavit, Lazzarino has filed three additional unauthorized submissions on June 7,[FN4] July 18, and August 9, 2006, which the moving Defendants have asked me to disregard. Out of a concern for the equities of the situation, I have reviewed all of Lazzarino's submissions. In the latter two submissions, Lazzarino announced that he had filed a disciplinary complaint against his former Robins, Kaplan attorneys and Warner's attorney and requested a hearing concerning his request for discovery.

> FN4. I will cite these papers as "Plf.'s Opp'n III."

***The Complaint***

A brief introduction to the parties is in order. According to the complaint: Plaintiff Anthony Lazzarino ("Lazzarino") writes and produces screenplays and packages films. The late Robert

Ludlum [FN5] ("Ludlum"), whose estate has been sued, was the author of novels including "The Bourne Identity" (the "book") and "The Bourne Supremacy." Henry Morrison ("Morrison") was Ludlum's literary agent. Jeffrey Weiner ("Weiner") is the managing partner of Marcum and Kliegman LLP, which provided accounting and contract services to Ludlum. Weiner is also the executor and personal representative of Ludlum's estate. Warner and Universal are well-known film production companies. Frank Marshall ("Marshall") was executive producer of the 2002 film, "The Bourne Identity," based on Ludlum's book, and is a principal of the Kennedy/Marshall Company. Douglas Liman ("Liman") is associated with a film production company called Hypnotic. Both Kennedy/Marshall Co. and Hypnotic were co-producers of the film.

> FN5. Ludlum died on March 12, 2001.

The complaint alleges that, in 1980, Lazzarino, Morrison, and a third person named Elliot Blair entered into a joint venture called Windwood/Glen Productions, Inc. ("Windwood") in order to create, present, and commercialize screenplays. In particular, they intended to package and finance a film based on Ludlum's book, based on a screenplay written by Lazzarino. (Compl.¶ 20.) Initially, Lazzarino, Morrison, and Blair were equal shareholders of Windwood.

On behalf of Windwood, Lazzarino wrote a screen treatment of the book and successfully negotiated its sale to Orion Pictures Company ("Orion"), a film producer. (Compl.¶ 23.) On July 24, 1981, Orion entered into four concurrent agreements relating to the book. (the "1981 Orion agreements"). These agreements anticipated that Orion would produce a feature film based on the book using Lazzarino's screen treatment and starring the actor Burt Reynolds. All four agreements, which were executed on the same day, referred to the other concurrently-executed agreements and concerned the same film project.[FN6]

> FN6. The complaint mentions only three of the four agreements executed by Orion relating to the book on July 24, 1981: the Orion-Windwood agreement, the Orion-Ludlum agreement, and a third contract between Orion and a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                                        Page 3
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

development/production company owned by Burt Reynolds, who was thinking of participating in a film based on the book (the "Orion-Reynolds agreement"). (Compl.¶ 28.) The complaint does not mention the fourth July 24, 1981 agreement between Orion and Lazzarino, in which Orion purchased Lazzarino's screen treatment of the book (the "Orion-Lazzarino agreement"). It is clear, however, from the July 24, 1981 agreement between Orion and Windwood, which was submitted by the moving Defendants as an appendix to their Notice of Motion, that all four 1981 Orion agreements were entered into concurrently.

The first was between Orion and Windwood (the "Orion-Windwood agreement"), in which Orion bought "the motion picture and allied rights to The Bourne Identity' [the "film rights"] and Plaintiff Lazzarino's treatment of that book." (Compl.¶ 24.) The Orion-Windwood agreement states that it was executed "[c]oncurrently" with three other agreements: the Orion-Ludlum agreement and those between Orion and Lazzarino and Reynolds's production company, respectively. It also provides in part that:

**\*3** If Orion shall subsequently determine to sell its interest in said feature film project to a third party, [Windwood] shall have the right to match the sales price for which Orion is prepared to sell its interest in the project to said third party, and if [Windwood] should [sic] promptly pay said sales price to Orion, then Orion will promptly convey all of its interest in the project to [Windwood].[FN7]

> [FN7] The Orion-Windwood agreement also provided that if Reynolds withdrew from the project, Windwood would have the option of "plac[ing] the project in turn-around" for six months, after which Orion would regain the film rights. (Orion-Windwood Agt. ¶ 5.) This provision was also reflected in the Orion-Ludlum and Orion-Lazzarino agreement. (Orion-Ludlum Agt. ¶ 3(B); Orion-Lazzarino Agt. ¶ 2(B).) The Windwood shareholders agreed not to exercise these reversionary rights, however, in the 1982 settlement of a lawsuit.

(Orion-Windwood Agt. ¶ 5.) The parties call this provision the "right to match" clause.

The second agreement was between Orion and Ludlum, in which Ludlum sold to Orion "all of the motion picture and allied rights" in the book. (Orion-Ludlum Agt. ¶ 1; *see also* Compl. ¶ 25.) As part of Ludlum's consideration for this agreement, the agreement provides that Orion would make various cash payments to Ludlum; these payments would be dependent on the "[c]oncurrent[ ]" execution of the other 1981 Orion agreements and on various actions taken by Windwood and other parties to the four agreements. (Orion-Ludlum Agt. ¶ 3.) The agreement also notes that it was executed concurrently with a letter agreement dated July 25, 1981 between Orion and Ludlum, which provided that Orion could only make one film from the book (as amended, the "Orion-Ludlum agreement").

These agreements do not define what they mean by "motion picture and allied rights"; for instance, they do not explain whether this term includes the right to make a television mini-series based on the book. But the parties evidently anticipated that Orion would make a feature film. It is not clear from the agreements whether Windwood or Ludlum was the owner of the film rights at the time of the 1981 Orion agreements; both Ludlum and Windwood transferred "motion picture and allied rights" in the book to Orion.

By July 28, 1981, Orion had become the exclusive owner of the film rights, subject to the agreements described above. (Compl.¶ 28.) Under the Orion-Windwood agreement, Windwood had the right to match the sales price if Orion or its successor decided to sell the film rights to a third party.

Soon afterward, a dispute arose among the shareholders of Windwood. Lazzarino filed a lawsuit in September 1981 against Morrison, Blair, Ludlum, and Ludlum's attorney. This lawsuit ended with the execution of a Stipulation of Settlement dated April 27, 1982 (the "1982 settlement"), in which Morrison and Blair resigned from Windwood, leaving Lazzarino as the only remaining shareholder. The 1982 settlement also provided that Morrison and Blair "shall do nothing to interfere or diminish Orions [sic] obligations to [Windwood] and to Lazzarino."(1982 Sett. ¶ 22.) It further provided that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                                   Page 4
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

"[t]he parties agree to perform any and all acts required to be performed to effectuate the terms of this Stipulation Agreement and the agreements with Orion Pictures Corporation."(1982 Sett. ¶ 23.) By "parties," the 1982 settlement included Morrison, Blair, Lazzarino, Ludlum, and Ludlum's then-attorney.[FN8]

> FN8. This language quotes the text of the 1982 settlement, which Lazzarino submitted in support of his complaint. (*See also* Compl. ¶ 31(d).)

*4 In 1982, Warner succeeded to Orion's rights and obligations with respect to the 1981 Orion agreements.[FN9](Compl.¶ 2.)

> FN9. Warner allegedly succeeded to Orion's interests "sometime on or after July 17, 1980."(Compl.¶ 33.)

> The moving Defendants argue that Orion's rights succeeded, not to Warner, but to Warner Bros. Television (WBTV), which they contend was a subsidiary of Defendant Warner Bros. Entertainment Inc., and which is not a defendant in this action. Lazzarino disputes this claim. The moving Defendants' documents do not either explain the relationship between WBTV and Warner or demonstrate that WBTV and not Warner succeeded to Orion's rights under the 1981 Orion agreements. Therefore, for purposes of this motion, I will treat WBTV and Warner as the same entity, pending further discovery.

Neither Orion nor Warner produced a feature film based on the book prior to June 2002, and neither offered to sell Lazzarino the film rights. Around June 14, 2002, Universal released the film, "The Bourne Identity," starring Matt Damon. It was a huge commercial success, grossing over $200 million. Its producers included Ludlum and the Liman and Marshall Defendants. Around July 23, 2004, Universal released a sequel, entitled, "The Bourne Supremacy." Its producers included Marshall, Liman, Weiner, and Morrison, and it was equally successful.

Lazzarino filed this complaint on June 6, 2005,

alleging causes of action for breach of contract and tortious interference with contract. Lazzarino alleges that Warner breached the Orion-Windwood agreement when it "sold to a third party" the film rights without offering Windwood the right to match its price, sometime "prior to June 14, 2002 and after July 17, 1980."[FN10](Compl.¶ 36.) The complaint alleges that the buyer was some combination of the remaining Defendants. (Compl. ¶ 37.) Plaintiff has also alleged that Morrison and Ludlum breached their obligations under the 1982 settlement, in particular by negotiating agreements by which Ludlum obtained and then sold the film rights. (Compl. ¶¶ 1, 3, 46-51; Plf.'s Opp'n I at 10-12.) Lazzarino has alleged that the agreements in 1986 and 1987 between Ludlum and Warner were invalid and demonstrated "fraudulent intent." (Plf.'s Opp'n II at 15, 20.) Lazzarino has alleged that Warner's "fraudulent intent" towards him goes back almost 50 years. (Plf.'s Opp'n II at 3-4.)

> FN10. The contracts allegedly breached by Warner were the Orion-Windwood agreement "and subsequent supplements, amendments and related contracts."(Compl.¶ 2.) I am not aware of any supplements or amendments to the Orion-Windwood agreement. I presume that "the related contracts" means the other three 1981 Orion agreements.

The complaint also alleges that all Defendants (except Warner) tortiously interfered with Plaintiff's rights under the 1981 Orion agreements and the 1982 settlement.[FN11]In particular, Plaintiff alleges that Ludlum intentionally procured breaches of contracts between Lazzarino on the one hand and Morrison and Warner on the other, which "were the actual and proximate cause of damages to Plaintiff Lazzarino commencing on June 14, 2002."(Com pl.¶¶ 59-63.) Plaintiff also alleges that Morrison intentionally procured breaches of contracts between Lazzarino on the one hand and Ludlum and Warner on the other, which "were the actual and proximate cause of damages to Plaintiff Lazzarino, commencing on June 14, 2002."(Compl.¶¶ 53-57.)

> FN11. The complaint also alleges that Defendants tortiously interfered with Lazzarino's "prospective business opportunities, advantages and relationships

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                                      Page 5
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

both independent of and stated in the contracts described."(Compl.¶ 43.)

In his supplemental submissions, Plaintiff has generally alleged collusion and fraudulent concealment by all the Defendants to circumvent Windwood's right to match. (*See generally* Plf.'s Opp'n II at 23, 27; Plf.'s Opp'n III.)

Lazzarino charges that neither of the films based on Ludlum's book could have been made but for these breaches of contract and the alleged tortious interference.

***Motion to Dismiss and Documentary Evidence***

On a motion to dismiss, the facts pleaded in the complaint are presumed to be true and accorded every favorable inference, but "allegations consisting of bare legal conclusions, as well as factual claims inherently incredible or flatly contradicted by documentary evidence are not entitled to such consideration."*Caniglia v. Chicago Tribune-N.Y. News Syndicate,* 204 A.D.2d 233, 233-234 (1st Dept.1994). Dismissal based on documentary evidence under C.P.L.R. §§ 3211(a)(1) is proper when documents relied upon "definitively dispose of [the] plaintiff's claim."*Bronxville Knolls, Inc. v. Webster Town Center Partnership,* 221 A.D.2d 248, 248 (1st Dept.1995).

***5** In addition, "[t]he motion must be denied, if from the pleadings' four corners, factual allegations are discerned which taken together manifest any cause of action cognizable at law."*Richbell Info. Servs, Inc. v. Jupiter Partners, L.P.,* 309 A.D.2d 288, 289 (1st Dep't 2003). In assessing a motion under C.P.L.R. § 3211(a)(7), a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint. *Rovello v. Orofino Realty Co.,* 40 N.Y.2d 633, 635 (1976)."The criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one."*Leon v. Martinez,* 84 N.Y.2d 83, 88 (1994) (internal quotation omitted).

The moving Defendants have attached various documents to their motion to dismiss, and Lazzarino has attached other documents to his supplemental affidavit and subsequent submissions.[FN12]

FN12. I will disregard the affidavit submitted by Morrison except insofar as it supports the Complaint, because I am not permitted to consider affidavits in *support* of a motion to dismiss a complaint.

I will consider the documents submitted by Lazzarino in support of his complaint as relevant to this motion. *See Rovello,* 40 N.Y.2d at 635.These documents include the Orion-Windwood agreement, the Orion-Ludlum agreement, the Orion-Lazzarino agreement, a July 1981 assignment of rights from Ludlum to Orion, the 1982 settlement, and a November 2, 1999 agreement between Ludlum and Universal (the "Universal-Ludlum agreement") which provided that Universal could make a feature film version of the book, as well as two sequels. Lazzarino has also submitted a film advertisement for the "The Bourne Identity," dated June 9, 2002, which lists Defendants Universal, Kennedy/Marshall, Hypnotic, and Liman in its credits.

In addition to some of these documents, the moving Defendants have also asked me to consider additional documents an unexecuted memorandum dated November 20, 1986, an agreement executed on March 12, 1987 between Ludlum and Warner (the "1987 Ludlum agreement"), and an agreement between WBTV and Ludlum executed on May 4, 1999 (the "1999 Ludlum agreement") in support of its motion to dismiss based on documentary evidence.

Because the 1986 document submitted by the moving Defendants is not executed by both parties, I do not consider it reliable documentary evidence and will disregard it.

The 1987 Ludlum agreement is an informal document entitled "Inter-Office Memo" and contains a Warner Bros. logo on the top. It describes itself as an amendment to the Orion-Ludlum agreement. It states that "WB-TV is the successor in interest to ORION's [sic] rights under the [Orion-Ludlum] agreement."It provides that WBTV would have the right to make one motion picture, in the form of a television mini-series, based on the book, and that after its production, "all rights under the [Orion-Ludlum] Agreement shall revert to Ludlum ten (10) years after the end of the applicable network broadcast term."(1987 Ludlum Agt. ¶¶ A, C.) It

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                              Page 6

13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

further provides that, "[i]n the event WB-TV does not produce a Picture, all rights under the [Orion-Ludlum] agreement shall remain vested in WB-TV."(1987 Ludlum Agt. ¶ D.) Finally, it provides that, "[e]xcept as otherwise provided, all the terms and conditions of the Rights Agreement shall remain in full force and effect."(1987 Ludlum Agt. ¶ E.)

**\*6** The 1987 document does not list the parties that agreed to its terms.[FN13] It is signed by Ludlum and "Art" this presumably means "Art Horan," the author of the memo. From the fact that the document repeatedly mentions WBTV and has a Warner Bros. logo at the top, it appears that Art signed his name on behalf of Warner or one of its affiliates. The document does not describe the relationship between WBTV and Warner, Defendants in this action. It also does not explain why WBTV entered into this agreement, when the 1981 Orion agreements had already given Orion's successor "all of the motion picture and allied rights" to the book.

> FN13. *See supra* n. 9.

The 1999 Ludlum agreement looks more like a formal contract. It states that it is an agreement between Ludlum and "Warner Bros. Television Production, a division of Time Warner Entertainment Co., L.P. [ ], successor in interest to Warner Bros. Television ["WBTP"]."[FN14] It represents that, "[t]o the best of Ludlum's knowledge," the "documents through which [WBTP] obtained ... certain rights in [the book]" consist of only the Orion-Ludlum agreement and the 1986 and 1987 Ludlum agreements. The document does not include the other three 1981 Orion agreements in this list.[FN15] It further provides for the termination of WBTP's film rights in Ludlum's book, except for those rights necessary for the distribution of the mini-series. Finally, it states that the parties "represent[ed] and warrant[ed]" that they each "ha[d] the right to enter into this Agreement and to grant the rights herein granted."[FN16] (1999 Ludlum Agt. ¶ 6.)

> FN14. The 1999 Ludlum agreement does not explain the relationship between WBTP and Warner, the Defendants in this lawsuit.

> FN15. Evidently, neither Warner nor Ludlum tried very hard to remember how many previous agreements concerning the

film rights there were. The Orion-Ludlum agreement is a quick read only four pages long with a one-page amendment and states that its consideration included the concurrent execution of the other three 1981 Orion agreements. (*See* Orion-Ludlum Agt. ¶ 3.)

> FN16. The 1999 Ludlum agreement provides that it, as well as the 1987 Ludlum agreement and the 1981 Orion-Ludlum agreement, should be construed under California law. (1999 Ludlum Agt. ¶ 9.) Since none of the parties has relied on California law in its papers concerning this motion, however, I will also apply New York law.

### Plaintiff's Cause of Action for Breach of Contract Against Warner

Plaintiff has alleged broadly that Warner breached the Orion-Windwood agreement "and subsequent supplements, amendments and related contracts."(Com pl.¶¶ 1-2, 46, 49.)In this motion, the moving Defendants have focused on Plaintiff's allegation that Warner breached the Orion-Windwood agreement by selling the film rights to a third party without offering Lazzarino the right to match its price. The moving Defendants argue that the right to match obligation never arose, because Warner never sold the film rights to a third party. According to moving Defendants: WBTV and Ludlum entered into three supplemental agreements with respect to the film rights in 1986, 1987, and 1999, which provided that the film rights sold to Orion in 1981 would revert to Ludlum after WBTV had produced a television mini-series based on the book. WBTV produced such a mini-series, which was broadcast in 1988.[FN17] Afterward, the film rights reverted back to Ludlum, pursuant to the 1986, 1987, and 1999 agreements. A few months after executing the 1999 Warner agreement, in November 1999, Ludlum executed the Universal-Ludlum agreement, in which Universal bought the film rights from Ludlum.

> FN17. Lazzarino has not controverted the moving Defendants' contention that this mini-series was broadcast in 1988, although he appears to maintain that the mini-series

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                               Page 7
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

was produced by Warner, and that WBTV is not a different entity. (Plf.'s Opp'n I at 4; Trans. at 46.)

It is evident from the documents that the 1987 and 1999 Ludlum agreements purport to amend the Orion-Ludlum agreement to allow the film rights to revert to Ludlum after the production of a mini-series based on the book. An evaluation of the moving Defendants' motion to dismiss this cause of action turns on whether the execution of these two agreements breached the 1981 Orion agreements.

*7 This question in turn depends on whether the 1981 Orion agreements are considered part of a single agreement or four separate contracts. On the one hand, if they were part of a single agreement, then Plaintiff has stated a claim that Warner breached the 1981 Orion agreements by entering into the 1987 and 1999 Ludlum agreements without the consent of all the parties. *See* Richard A. Lord, 11 *Williston on Contracts* § 33:24 (4th ed., West 2006) (where "one agreement is made wholly or partly in consideration of the simultaneous agreement to enter into another, the transactions are necessarily bound together"). On the face of the 1981 Orion agreements, it appears that the consideration for the Orion-Ludlum agreement included the concurrent execution of the other 1981 Orion agreements including the Orion-Windwood agreement, containing the right to match. A contract may not be altered without the consent of all the parties to that contract. *Bier Pension Plan Trust v. Estate of Schneierson,* 74 N.Y.2d 312, 315 (1989). If, on the other hand, these agreements are four separate contracts, then Ludlum would be a third party to the Orion-Windwood agreement, and Plaintiff would have a claim that Warner breached the right to match provision by entering into the 1987 and 1999 Ludlum agreements.[FN18]

> FN18. The moving Defendants contend that, even if the 1987 and 1999 Ludlum agreements could be interpreted as a sale from Warner to Ludlum, such a sale is not a transfer to a "third party," as required by the right to match provision, because Ludlum was not a third party to the Orion-Windwood agreement. At the same time, they maintain that Ludlum and Morrison were not parties to the Orion-Windwood agreement and therefore cannot have

breached it. The moving Defendants cannot have it both ways: If Ludlum was not a party to the Orion-Windwood agreement, he cannot avoid being considered a third party for purposes of the right to match provision.

In either case, I cannot determine, as a matter of law on a motion to dismiss based on documentary evidence, that Plaintiff has not stated a claim for breach of contract against Warner.

***Plaintiff's Cause of Action for Breach of Contract Against Morrison and Ludlum***

Plaintiff alleges that, by entering into agreements to reacquire the film rights from Warner and to sell them to Universal, Ludlum breached his obligation under the 1982 Settlement to "perform any and all acts required to be performed to effectuate" the 1982 Settlement and the 1981 Orion agreements.[FN19] (1982 Sett. ¶ 23.) By means of this conduct, Plaintiff alleges that Ludlum tried to circumvent Windwood's right to match. Plaintiff also maintains that, by negotiating these agreements, Morrison breached the same obligation and also breached his obligation to "do nothing to interfere or diminish" Orion's obligations to Windwood and Lazzarino. (1982 Sett. ¶ 22.)

> FN19. Plaintiff has not alleged that Ludlum breached the right to match provision or another provision of the 1981 Orion agreements. (Plf.'s Opp'n I at 10.)

The documentary evidence indicates that Ludlum entered into such agreements with Warner in 1987 and 1999 and an agreement with Universal in 1999. Morrison does not dispute that he was involved in negotiating the 1999 Ludlum agreement and the Universal-Ludlum agreement. (Morrison Aff. ¶¶ 9, 11.) It would appear that these agreements and the subsequent production of the 2002 film destroyed the practical value of Windwood's right to match under the Orion-Windwood agreement. Therefore, I conclude that Plaintiff has stated a claim for breach of contract against Ludlum and Morrison based on their alleged breaches of the 1982 settlement.

***Plaintiff's Argument Regarding Breach of Covenant of Good Faith and Fair Dealing***

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                                                          Page 8
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
Unreported Disposition

**\*8** In his opposition papers and at oral argument, Plaintiff suggested that Warner breached an implied covenant of good faith and fair dealing in the 1981 Orion agreements by failing to object or notify Windwood when Ludlum attempted to "s[ell] its rights out from under it" by selling the film rights to Universal in November 1999.[FN20] (Plf.'s Opp'n I at 9; Trans. at 41-42.) Plaintiff has alleged that Warner was aware of Ludlum's plan to sell the film rights to Universal when it reaffirmed the 1987 Ludlum agreement in May 1999; its awareness of Ludlum's plan is implied by the fact that Warner executed the 1999 Ludlum agreement just six months before Ludlum sold the film rights to Universal.

> FN20."Implied in every contract is a covenant of good faith and fair dealing, which is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."*Jaffe v. Paramount Communications, Inc.,* 222 A.D.2d 17, 22-23 (1st Dept.1996) (citations omitted). A claim for a breach of a covenant of good faith and fair dealing cannot be duplicative of the party's breach of contract claim. *Cerberus Intl., Ltd. v. BancTec, Inc.,* 16 AD3d 126, 127 (1st Dept.2005).

This argument, however, was not made in the complaint and is therefore not before me. Plaintiff has not sought leave to amend his complaint to add a cause of action for breach of an implied covenant of good faith and fair dealing. Out of consideration of his *pro se* status, however, I will grant him leave to file an amended complaint, in accordance with this memorandum, within 30 days of this decision. If Defendants move to dismiss this cause of action in the amended complaint, I will address this issue then.

### Statute of Limitations Defense to Breach of Contract Cause of Action

Defendants contend, however, that the breach of contract cause of action against Warner must be dismissed against the moving Defendants because it was untimely filed.

Statutes of limitations have been an essential part of

the Anglo-American legal system for centuries. They "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."*Order of Railroad Telegraphers v. Railway Express Agency,* 321 U .S. 342, 348-49 (1944) (Holmes, J.). Statutes of limitations encourage the prompt prosecution of claims and ensure that questions of fact will be decided on the basis of fresh evidence, thereby increasing the likelihood that both courts and juries will resolve factual issues fairly and accurately. Jorge L. Carro & Joseph V. Hatala, *Recovered Memories, Extended Statutes of Limitations & Discovery Exceptions in Childhood Sexual Abuse Cases: Have We Gone Too Far?,* 23 Pepp. L.Rev. 1239, 1252 (1996). Statutes of limitations are not "arbitrary obstacles to the vindication of just claims."*Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 452-53 (7th Cir.1990), *cert. denied,*501 U.S. 1261 (1991). Rather, "[t]hey protect important social interests in certainty, accuracy, and repose."*Id.* at 453.

The New York legislature has decided that causes of action for breach of contract are subject to a six-year statute of limitations. C.P.L.R. § 213(2). A breach of contract cause of action accrues at the time of the breach, even if no damage occurs until later. *Ely-Cruikshank Co., Inc. v. Bank of Montreal,* 81 N.Y.2d 399, 402-03 (1993) (refusing to postpone running of statute of limitations for contract action where plaintiff was allegedly unaware of the breach at the time it occurred).

**\*9** The statute of limitations on Plaintiff's breach of contract cause of action against Warner began to run when Ludlum allegedly entered into the last agreement with Warner on May 4, 1999. Therefore, the six-year statute of limitations on this cause of action expired on May 4, 2005.

Plaintiff contends, however, that the moving Defendants should be equitably estopped from pleading the statute of limitations because they deliberately "concealed" from him the existence of the 1987 and 1999 Ludlum agreements until this motion to dismiss was filed. (Plf.'s Opp'n I at 15-16.)

Under the doctrine of equitable estoppel, a defendant may be estopped to plead the statute of limitations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                                                                 Page 9
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

where a plaintiff "was induced by fraud, misrepresentations or deception to refrain from filing a timely action."*Simcuski v. Saeli,* 44 N.Y.2d 442, 448-49 (1978). In order to qualify for equitable estoppel, a plaintiff must establish that the action was brought within a reasonable time after the facts giving rise to the estoppel ceased to be operational. *Id.* at 450.The reasonableness of the plaintiff's delay is a question of fact that will "necessarily depend on all the relevant circumstances."*Id.*

For instance, in *Harkin v. Culleton,* 156 A.D.2d 19 (1st Dept.1990), the plaintiff filed his complaint alleging medical malpractice just 2 1/2 months after the statute of limitations expired, 6 1/2 months after learning about the alleged malpractice. *Id.* at 23-24.The Court reversed the trial court's grant of summary judgment dismissing the medical malpractice cause of action as untimely filed, concluding that the plaintiff had alleged fraudulent concealment by his physician and had acted diligently after discovering the alleged malpractice.

Here, in contrast to *Harkin,* there has been no discovery. Plaintiff has alleged that even the 1987 and 1999 Ludlum agreements only came to his attention for the first time as part of this motion to dismiss. Based on the documentary evidence submitted on this motion, it is evident that Ludlum and Morrison had personal knowledge of the Orion-Windwood agreement and its terms. One might therefore infer that the moving Defendants were aware of the right to match when they executed the 1987 and 1999 Ludlum agreements. Yet the 1999 Ludlum agreement fails to list the Orion-Windwood agreement among the documents through which, "[t]o the best of Ludlum's knowledge," Warner obtained "certain rights in [the book]."

Plaintiff has alleged that the moving Defendants deliberately "concealed" from him the existence of the 1987 and 1999 Ludlum agreements until this motion to dismiss was filed, and he has alleged that they had "fraudulent intent." (Plf.'s Opp'n I at 15-16; Plf.'s Opp'n II at 3-4, 27.) Although Plaintiff has not alleged specific misrepresentations or acts of concealment by the moving Defendants since the execution of the 1987 and 1999 Ludlum agreements, it would be "almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge"

of the moving Defendants. *Jered Contracting Corp. v. New York City Transit Authority,* 22 N.Y.2d 187, 194 (1968). I conclude that, under the circumstances, it would be unreasonable to expect Plaintiff to state the circumstances of the alleged fraudulent misrepresentations or concealment in detail without permitting him fact discovery. *Cf. Banner Industries, Inc. v. Schwartz,* 181 A.D.2d 479, 480 (1st Dept.1992).

*10 Although there is no fixed amount of time that constitutes an unreasonable delay in bringing a cause of action after the estoppel ceases to be operational, it has been suggested that a delay close to the length of the statute of limitations would be unreasonable. *Simcuski,* 44 N.Y.2d at 449.For instance, in *Kermen v. Brower,* 16 AD3d 156, 157 (1st Dept.2005), the Court affirmed a grant of summary judgment dismissing the plaintiff's medical malpractice claim, which was subject to a 2 1/2-year statute of limitations, on the (alternative) ground that the plaintiff filed suit two years and three months after learning of her misdiagnosis.[FN21]

> FN21.*Kermen* does not state how much time had passed since the expiration of the statute of limitations.

*Kermen* is distinguishable on at least two grounds. First, in *Kermen,* the additional delay was just three months short of the length of the applicable statute of limitations. In contrast, here the estoppel ceased to be operational in June 2002, when the film was released. Plaintiff filed suit three years later three years short of the statute of limitations on a breach of contract claim and only one month after the expiration of the original statute of limitations. Second, in *Kermen,* the Court had the benefit of a factual record, from which it could have concluded that there was no factual issue preventing summary judgment as to whether the plaintiff's delay was reasonable. Here, there has been no discovery, and Plaintiff has not had a chance to develop a factual record.

The Court of Appeals has indicated that it would be premature to decide whether a plaintiff met her due diligence obligation without allowing the plaintiff to develop a factual record. In *Simcuski,* the Court refused to dismiss a medical malpractice claim based on the (then) applicable three-year statute of limitations, where the plaintiff had filed her

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                      Page 10
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

complaint 5 1/2 years after the events occurred and 1 1/2 years after she discovered the injury. The Court refused to decide whether the plaintiff met her obligation of due diligence as a matter of law on a motion to dismiss. *Simcuski,* 44 N.Y.2d at 451.

According to documents submitted by Lazzarino, film advertisements for "The Bourne Identity" appeared at least as early as June 9, 2002. The advertisements listed Defendants Universal, Kennedy/Marshall, Hypnotic, and Liman in the film credits. At least by this time, Plaintiff knew that he had not been offered a right to match under the Orion-Windwood agreement. Plaintiff filed this lawsuit about three years later on June 6, 2005 just one month after the statute of limitations expired.

Under the circumstances, I cannot conclude as a matter of law that the reasonable time for bringing this cause of action for breach of contract had expired when Plaintiff filed his complaint.

### Plaintiff's Causes of Action for Tortious Interference

Plaintiff has alleged that Ludlum intentionally procured breaches of contracts between Lazzarino on the one hand and Morrison and Warner on the other, which "were the actual and proximate cause of damages to Plaintiff Lazzarino commencing on June 14, 2002."(Compl.¶¶ 59-63.) Plaintiff has also alleged that Morrison intentionally procured breaches of contracts between Lazzarino on the one hand and Ludlum and Warner on the other, which "were the actual and proximate cause of damages to Plaintiff Lazzarino, commencing on June 14, 2002."[FN22](Compl.¶¶ 53-57.) The moving Defendants contend that these causes of action must be dismissed under C.P.L.R. § 3211(a)(5) and (7) because Plaintiff has not alleged the requisite elements or specific facts in support of them, because the tortious interference claim against Morrison duplicates the breach of contract claim against him, and because they are untimely filed.

FN22. The moving Defendants are incorrect in stating that "[t]he complaint does not specify when defendants allegedly tortiously interfered with the 1981 Orion-[Windwood] Agreement or when damages first accrued."(Defs' Opening Memo. of Law at

25.)

**\*11** Tortious interference with contractual relations consists of four elements: (1) the existence of a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to the plaintiff. *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94 (1993)."Since damage is an essential element of the tort, the claim is not enforceable until damages are sustained."*Id.* For instance, in *Kronos,* the Court denied a motion to dismiss the plaintiff's claim for tortious interference with contract based on a statute of limitations, holding that the statute did not accrue until four years after the contract was allegedly breached, when the plaintiff first allegedly suffered injury, according to the complaint. *Id.* at 94-95.

Plaintiff has alleged that Ludlum intentionally procured a breach of the Orion-Windwood agreement when he executed the agreements with Warner and the Universal-Ludlum agreement, and that this conduct caused his damages. If fact discovery reveals that the 1981 Orion agreements were not a single agreement, then Ludlum was not a party to the Orion-Windwood agreement, but he certainly knew of it. I conclude that Plaintiff has stated a cause of action for tortious interference against Ludlum.

Plaintiff has also alleged that Morrison intentionally procured a breach of the 1981 Orion agreements when he negotiated the one or more of the agreements between Warner and Ludlum and the Universal-Ludlum agreement, and that this conduct caused his damages. Morrison certainly was aware of the 1981 Warner agreements, but he may not have been a party once he gave up his share in Windwood in 1982. I conclude that Plaintiff has stated a cause of action for tortious interference with contract against Morrison.

The moving Defendants argue, however, that the tortious interference with contract claim against Morrison restates the breach of contract claim against him based on his obligation in the 1982 settlement agreement not to "interfere [with] or diminish" Orion's obligations to Windwood. (1982 Sett. ¶ 22.) The cases cited by the moving Defendants in support of this argument, however, do not involve two

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

13 Misc.3d 1230(A)                                                                                    Page 11
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)
**Unreported Disposition**

separate contracts. As far as I can tell, they are cases in which the plaintiff alleged that the defendant both breached and tortiously interfered with a single contract, to which they were both parties. *See Allerand, LLC v. 233 East 18th Street Co.,* 19 AD3d 275 (1st Dept.2005) (dismissing claim that landlord tortiously interfered with lease in action by renter to enforce lease terms); *JHH Pictures, Inc. v. Rawkus Entertainment LLC,* 291 A.D.2d 356 (1st Dept.2002) (dismissing tortious interference claim based on same contract to produce an album that was the basis of plaintiff's breach of contract claim). Here, in contrast, the subject of the tortious interference claim is the 1981 Orion agreements, to which Morrison is allegedly not a party. I decline to decide, based on the pleadings, whether a breach of Morrison's obligations under paragraph 22 of the 1982 Settlement would be duplicative of Plaintiff's tortious interference claim.

**\*12** Finally, the statute of limitations on the tortious interference causes of action is three years. It began to run when Plaintiff first suffered damages. *Kronos,* 81 N.Y.2d at 94.According to the complaint, Plaintiff first suffered damages on June 14, 2002. Consequently, Plaintiff's causes of action for tortious interference with contract against Morrison and the Ludlum Defendants are timely.

### Allegations Against Former Lawyers and Defendants' Lawyers

Lazzarino has also alleged that his former law firm, Robins, Kaplan, has colluded with Defendants and their attorneys against his interests in this action.[FN23]He claims, among other things, that Robins, Kaplan prepared a complaint designed to fall under Defendants' planned defenses, failed to attach key documents to his complaint, and did not give him a copy of the Answer filed by the non-moving Defendants. I conclude, however, that these alleged actions cannot have prejudiced him, because I permitted Lazzarino to file a supplemental affidavit attaching whatever documents he deemed relevant, and Lazzarino obtained a copy of the Answer soon after the oral argument.

> FN23. Lazzarino did not make these accusations against Rheingold.

Lazzarino also alleges that these attorneys and Defendants fabricated or distorted agreements and

documents to deprive Windwood of its rights under the 1981 Orion-Windwood agreement. He has asked me to order discovery prior to deciding this motion to dismiss, so that he can substantiate these allegations. I interpret this request as a request for me to convert the motion to dismiss into a motion for summary judgment, pursuant to C.P.L.R. § 3211(c). I do not find a basis for doing so; none of these attorneys are Defendants in this action, and the complaint does not allege a cause of action for malpractice or fraud.

Accordingly it is

ORDERED that the motion to dismiss (Mot.Seq. No. 1) is DENIED in accordance with the above memorandum decision; and it is further

ORDERED that Rheingold's motion to withdraw as counsel for Plaintiff (Mot.Seq. No. 3) is GRANTED; and it is further

ORDERED that, within 30 days of this decision, Plaintiff may file an amended complaint to add a cause of action for breach of an implied covenant of good faith and fair dealing, as discussed in this memorandum; and it is further

ORDERED that the parties shall appear for a preliminary conference before this Court at 10:00 a.m. on December 18, 2006, at which a discovery schedule will be ordered; and it is further

ORDERED that if Lazzarino chooses to proceed with new counsel, a notice of appearance shall be filed promptly.

N.Y.Sup.,2006.
Lazzarino v. Warner Bros. Entertainment, Inc.
13 Misc.3d 1230(A), 831 N.Y.S.2d 354, 2006 WL 3069276 (N.Y.Sup.), 2006 N.Y. Slip Op. 52070(U)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 10**

# Westlaw.

Slip Copy                                                                                                  Page 1
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)

C Baguer v. Spanish Broadcasting System, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Michael BAGUER, Plaintiff,
v.
SPANISH BROADCASTING SYSTEM, INC.,
Defendant.
**No. 04-CV-8393 (KMK).**

Sept. 20, 2007.

Jerry S. Goldman, Esq., Gina MarieMac Neill, Esq.,
Jerry S. Goldman and Associates, P.C., New York,
NY, for Plaintiff.
William Charles Zifchak, Esq., Neil Stuart Kaufman,
Esq., Margo Ferrandino, Esq., Kaye Scholer, LLP,
New York, NY, for Defendant.

*OPINION AND ORDER*

KENNETH M. KARAS, District Judge.
**\*1** Plaintiff Michael Baguer brings this action to
recover money allegedly owed to him by his former
employer, Spanish Broadcasting System, Inc.
("SBS"). The First Amended Complaint, which
contains thirteen causes of action, alleges that SBS
breached its employment contract with Plaintiff,
discriminated against him on the basis of age, race,
and national origin, and violated New York labor
laws by failing to pay commissions and benefits due
to Plaintiff. The First Amended Complaint also
contains several contract and quasi-contract claims,
including claims based on quantum meruit, tortious
breach of contract, promissory estoppel, and violation
of the implied covenant of good faith and fair
dealing. With this Motion, SBS moves to dismiss the
ninth (tortious breach of contract), tenth (promissory
estoppel), and thirteenth (good faith and fair dealing)
causes of action. For the reasons stated herein, the
Motion is granted in part and denied in part.

*I. Background*

The Court will accept the following facts as true for
the purposes of this Motion. Plaintiff is a fifty-five-
year-old, Cuban-born, naturalized American citizen.
(Am.Compl.¶ 15.) SBS owns and operates
approximately fifty radio stations, including two that
are based in New York City. (*Id.* ¶ 14.)In January of
1996, Plaintiff was hired by SBS as an at-will
employee to serve as an Account Executive, where
his duties included building and maintaining
relationships with advertising clients for SBS's two
New York radio stations.(*Id.* ¶ 16.)Plaintiff allegedly
performed well as an Account Executive, and by
January 2003 Plaintiff was responsible for accounts
worth approximately $1.1 million. (*Id.* ¶ 17.)

Plaintiff alleges that, despite his strong performance,
SBS "determined that it wanted to use younger and
more 'Anglo' sales persons to directly interface with
the more important accounts."(*Id.* ¶ 21.)Allegedly as
a result of this decision, beginning in 2003 SBS
changed its policies such that individual account
executives were permitted to sell to only one New
York radio station, as opposed to both New York
stations under the previous policy. (*Id.* ¶ 22.)In
implementing this policy change, SBS promised that
all account executives would receive equal treatment
and, in particular, that Plaintiff would be provided
with additional accounts in compensation for any
accounts that he lost during the transition process.
(*Id.*) However, despite SBS's promises, Plaintiff was
not provided with accounts of similar value to those
he lost, and ultimately Plaintiff received replacement
accounts valued at only approximately $350,000. (*Id.*
¶ 23.)Because Plaintiff's compensation was based in
large part on commissions tied to the value of his
accounts, his annual compensation declined by
approximately $45,000 as a result of the policy
change. (*Id.* ¶ 26.)

On July 18, 2003, SBS fired Plaintiff and allegedly
replaced him with a younger, American-born, non-
Hispanic employee, who was less qualified than
Plaintiff. (*Id.* ¶ 28.)At the time of Plaintiff's
termination, SBS allegedly owed Plaintiff
approximately $50,000 in commissions for the
advertising that he had already sold to his clients. (*Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

¶ 30.)SBS has allegedly refused to pay this amount. (*Id.* ¶ 31.)As a result of SBS's actions, Plaintiff seeks compensatory and punitive damages.

## II. Discussion

### A. Standard of Review

**\*2** SBS claims that general causes of action fail to state a claim. *See*Fed.R.Civ.P. 12(b)(6). The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."*Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original). In *Bell Atlantic, id.* at 1964-69, the Supreme Court also abandoned reliance on the oft-cited line from *Conley v. Gibson* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]"355 U.S. 41, 45-46 (1957). As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."*Bell Atl.,* 127 S.Ct. at 1968 (alteration in original). Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level ... [,]"*id.* at 1965, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint [,]"*id.* at 1969.A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."*Id.* at 1974.If it "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed."*Id.; see also* Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.").

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint via reference. *See* Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir.1996) (citation omitted). The Court will accept as true Plaintiff's allegations, and draw all reasonable inferences in Plaintiff's favor. *See* Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993); Blimpie Int'l, Inc. v. Blimpie of the Keys, 371 F.Supp.2d 469, 470-71 (S.D.N.Y.2005). At this stage, the Court is not concerned with weighing the evidence which would be presented at trial. *See* Chosun Int'l Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 327 (2d Cir.2005).

### B. Plaintiff's Ninth Cause of Action

#### 1. Tortious Breach of Contract

**\*3** In his ninth cause of action, Plaintiff seeks to recover compensatory and punitive damages for what the First Amended Complaint labels "Tortious Breach of Contract." (Am.Compl.¶¶ 95-103.) Specifically, Plaintiff alleges that SBS terminated Plaintiff's employment for "improper motives" and that "the breach of contract was so intended and planned ... as to cease to be a mere breach of contract and become, in association with the attendant circumstances, a tortuous [sic] and wrongful act or omission."(*Id.* ¶ 100.)In short, the First Amended Complaint alleges that SBS's breach of contract was so malicious as to constitute a tort.

Under New York law, absent a breach of a legal duty independent of the contract itself, a plaintiff has no cause of action in tort for a breach of contract. *See* Orlando v. Novurania of Am., Inc., 162 F.Supp.2d 220, 224 (S.D.N.Y.2001) ("[A] breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y.1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."). Moreover, allegations of improper motives alone will not convert a simple breach of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

contract into a tortious act. *See Merrin Jewelry Co. v. St. Paul Fire & Marine Ins. Co.,* 301 F.Supp. 479, 481 (S.D .N.Y.1969)* ( "[A] claim in tort does not lie on allegations of conspiracy of a party to a contract to break it, and his consequent failure to carry out the contract, in pursuance of the conspiracy, without more."); *Burlew v. Am. Mut. Ins. Co.,* 471 N.Y.S.2d 908, 912 (App.Div.1984)* ("The allegations in the complaint of malice, wantonness and grossly negligent conduct and the conclusory claims in the affidavit, which are obviously made to buttress the suit for punitive damages, cannot convert the action from one in contract to one in tort."(citation omitted)).

Plaintiff does not dispute that a cause of action in tort may not be sustained unless a defendant has violated an independent legal duty. (Pl.'s Mem. of Law in Opp'n to the Def.'s Mot. to Dismiss 8 ("Pl.'s Mem.").) However, Plaintiff argues that SBS in fact violated such an independent duty when it engaged in discriminatory employment practices in contravention of federal, state, and city law. (*Id.* at 8-9 (identifying the independent legal duty as the "federal, state, and city constitutional protections, laws, rules and regulations barring the invidious discriminatory practices which the defendant allegedly engaged in").) This argument, however, reads New York tort law too broadly. To sustain an independent action in tort, Plaintiff must establish not merely that SBS violated *some* independent legal duty; rather, Plaintiff must establish that SBS violated a duty owed to Plaintiff *in tort. See N.Y. Univ. v. Continental Ins. Co.,* 662 N.E.2d 763, 770 (N.Y.1995) (noting that the "tort" cause of action was "duplicative of the first cause of action for breach of contract" because "the use of familiar tort language in the pleading does not change the cause of action to a tort claim in the absence of an underlying *tort duty....*" (emphasis added)). Thus, a "defendant may be liable in tort when it has breached *a duty of reasonable care* distinct from its contractual obligations, or when it has engaged in *tortious conduct* separate and apart from its failure to fulfill its contractual obligations." *Id.* at 767 (emphases added).

*4 Here, the alleged violations of federal, state, and city anti-discrimination laws are not torts under New York law. *See Rivera v. Heyman,* 157 F.3d 101, 105 (2d Cir.1998) (noting that "discrimination claims

under the [New York] Human Rights Laws" are not tort claims); *Treanor v. Metro. Transp. Auth.,* 414 F.Supp.2d 297, 303 (S.D.N.Y.2005) ("New York cases reason [ ] that a discrimination claim is not a tort because it is 'a new statutory cause of action which was not cognizable at common law.' " (quoting *Picciano v. Nassau Co. Civil Serv. Comm'n,* 736 N.Y.S.2d 55, 60 (App.Div.2001))); *Bauman v. Garfinkle,* 652 N.Y.S.2d 32, 33 (App.Div.1997) ("The Federal court claims for breach of contract and discrimination are not in tort."); *Lane-Weber v. Plainedge Union Free Sch. Dist.,* 624 N.Y.S.2d 185, 186 (App.Div.1995) ("[A]n action brought pursuant to [New York's employment discrimination statute] is not a tort claim."). Therefore, Plaintiff's reliance on SBS's alleged violation of federal, state, and city anti-discrimination laws cannot constitute the "independent legal duty" necessary to sustain his cause of action for tortious breach of contract.

Moreover, Defendant's alleged breach of contract implicates no other independent tort duty. In determining whether a cause of action in tort may be sustained, courts applying New York law look, *inter alia,* to the type of injury allegedly caused by a defendant's actions and to the type of damages sought. *See, e.g., Sommer v. Fed. Signal Corp.,* 593 N.E.2d 1365, 1369 (N.Y.1992) ( "In disentangling tort and contract claims, we have also considered the nature of the injury, the manner in which the injury occurred and the resulting harm."(citation omitted)); *Bellevue S. Assocs. v. HRH Constr. Corp.,* 579 N.E.2d 195, 200 (N.Y.1991) (considering the injury and the damages sought in determining whether a claim is actionable in tort). Where, as here, "plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory."[FN1]*Sommer,* 593 N.E.2d at 1369 (citations omitted); *see also Bellevue,* 579 N.E.2d at 200 (finding no cause of action in tort where the "injury ... was not personal injury or property damage" but "simply a case of economic disappointment"). Moreover, the New York Court of Appeals has unequivocally held that there is no independent cause of action in tort for wrongful discharge of an employee. *See Murphy v. Am. Home Prods. Corp.,* 448 N.E.2d 86, 87 (N.Y.1983) ("This court has not and does not now recognize a cause of action in tort for abusive or wrongful discharge of an employee; such recognition must await action of the Legislature.").

FN1. With this cause of action, Plaintiff admittedly seeks no compensation for personal injury or property damage, but instead claims to have suffered contract-related "economic damages ... including ... back pay, back benefits, future earnings and future benefits."(Am.Compl.¶ 102.)

Accordingly, because Plaintiff is unable to identify any legal duty in tort that SBS violated when it discharged Plaintiff and because, absent such a violation, "[t]here is no such thing as a tortious breach of contract under New York law,"*Onanuga v. Pfizer, Inc.*, No. 03 Civ. 5405, 2003 WL 22670842, at *3 (S.D.N.Y. Nov. 7, 2003), the Court will dismiss Plaintiff's ninth cause of action for failure to state a claim upon which relief can be granted.

### 2. Plaintiff's Request to Amend

*5 As an alternative, Plaintiff seeks leave to amend his sixth cause of action, for ordinary breach of contract, to include a claim for punitive damages. (Pl.'s Mem. 11-12.) Under New York law, to obtain punitive damages in an action for breach of contract: "(1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of [an] egregious nature ...; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally."*N.Y. Univ.*, 662 N.E.2d at 767 (citations omitted); *accord Carvel Corp. v. Noonan*, 350 F.3d 6, 24 (2d Cir.2003). As noted, Plaintiff has not pled facts sufficient to establish that SBS's conduct with respect to the alleged breach of contract was "actionable as an independent tort," and thus Plaintiff fails to meet even the first prong of this test. Plaintiff also has failed to allege that SBS's conduct was directed at the public generally (and has not suggested in his brief that he could make such an allegation), and therefore his punitive damages amendment fails on this ground as well. Furthermore, although Plaintiff declares in his opposition brief that SBS's alleged discriminatory actions were "tortuous [sic] in nature," he does not identify any additional facts that might be included in a second amended complaint that would support this position. Accordingly, as Plaintiff has provided no reason to suggest that his proposed amendment would withstand a renewed motion to dismiss, the Court finds it unnecessary to further delay this litigation with an additional amended complaint. *See Hall v. United Techs., Corp.*, 872 F.Supp. 1094, 1100 (D.Conn.1995) ("The decision whether to grant leave to amend is within the court's sound discretion ....").

### C. Plaintiff's Tenth Cause of Action

#### 1. Promissory Estoppel

Plaintiff's tenth cause of action is based in promissory estoppel. Plaintiff alleges that SBS promised to pay Plaintiff commissions and benefits and to reassign and reallocate advertising accounts to Plaintiff. (Am.Compl.¶¶ 106-07.) Plaintiff further claims that he "reasonably relied upon [these promises], by staying" at his employment with SBS (Pl.'s Mem. 16), and that consequently he "suffered substantial economic damages" when SBS reneged on these promises and terminated Plaintiff "based upon a discriminatory basis." (Am.Compl.¶¶ 106-11.) As a result, Plaintiff seeks both compensatory and punitive damages.

" 'A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance.' " *Fontana v. Potter*, No. 01 Civ. 7002, 2005 WL 2039194, at *6 (E.D.N.Y. Aug. 24, 2005) (quoting *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir.2000)); *accord Rogers v. Town of Islip*, 646 N.Y.S.2d 158, 158 (App.Div.1996). However, several courts within the Second Circuit have held that "New York does not recognize promissory estoppel as a valid cause of action in the employment context." *Fontana*, 2005 WL 2039194, at *7 (quotations omitted); *see also Weinberg v. Mizuho Capital Mkts. Corp.*, No. 03 Civ. 2612, 2003 WL 22462022, at *7 (S.D.N.Y. Oct. 30, 2003) ("New York does not recognize promissory estoppel as a valid cause of action when raised in the employment context." (quotations omitted)); *Deutsch v. Kroll Assoc.*, No. 02 Civ. 2892, 2003 WL 22203740, at *3 (S.D.N.Y. Sept. 23, 2003) ("New York law, which here governs, does not recognize promissory estoppel in the employment context."); *Miller v. Citicorp*, No. 95 Civ. 9728, 1997 WL 96569, at *10 (S.D.N.Y. Mar. 4, 1997) ("New York does not recognize promissory estoppel as a valid cause of action in the employment context.").

**\*6** While this Court is aware of no New York State case that has similarly adopted a categorical rejection of promissory estoppel in the employment context, several New York courts have held that changing, or failing to change, one's employment is insufficient to establish the injury requisite to a promissory estoppel claim, "unless the plaintiff's rights under the previous situation, or missed opportunity, were so valuable that injury of unconscionable proportions would flow from the failure to enforce the oral contract ."*Cunnison v. Richardson Greenshields Sec.,* 485 N.Y.S.2d 272, 276 (App.Div.1985) ("[I]t has been consistently held that a change of job or residence, by itself, is insufficient to trigger invocation of the promissory estoppel doctrine."); *see also Stillman v. Townsend,* No. 05 Civ. 6612, 2006 WL 2067035, at \*5 (S.D.N.Y. July 26, 2006) ("It is well-settled that change of job or residence, by itself, is insufficient to trigger invocation of the promissory estoppel doctrine."(quotations omitted)); *Dalton v. Union Bank of Switz.,* 520 N.Y.S.2d 764, 766 (App.Div.1987) ("[A] change of job, even with increased emoluments and advanced status, is not sufficient to call promissory estoppel into play."(quotations omitted)); *Swerdloff v. Mobil Oil Corp.,* 427 N.Y.S.2d 266, 270 (App.Div.1980) ("A change of job or residence (and, a fortiori, the failure to make such change), by itself, is not sufficient to call promissory estoppel into play ...."). Such a rule is consistent with New York's restrictive approach to promissory estoppel, which reserves the doctrine only "for a limited class of cases based on unusual circumstances."*Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.,* 452 N.Y.S.2d 590, 593 (App.Div.1982); *accord Miller,* 1997 WL 96569, at \*10 (citing *Tribune Printing* ).

Here, the only injury that Plaintiff claims to have suffered as a result of his reliance on SBS's alleged promises was his failure to "leave the employer and seek a better deal elsewhere."(*See* Pl.'s Mem. 16.) But as discussed above, even assuming, contrary to the clear weight of the authority in this district, that promissory estoppel is applicable in the employment context, Plaintiff's failure to change his employment is insufficient to trigger promissory estoppel under New York law without a further claim that the missed opportunity caused injury of "unconscionable proportions ." Plaintiff makes no such claim here, and therefore, without more, Plaintiff cannot survive

SBS's motion to dismiss his promissory estoppel claim.

Perhaps recognizing this, Plaintiff points the Court to cases that he interprets as using "a classic promissory estoppel analysis to describe how a plaintiff might sustain a claim for severance in the absence of a written promise."(Pl.'s Mem. 13.) The earliest of these cases is *Smith v. N.Y. State Elec. & Gas Corp.,* 548 N.Y .S.2d 117 (App.Div.1989). In *Smith,* the Third Department held that, to survive summary judgment on a claim for severance payments, "plaintiff was required to come forward with evidence of (1) a regular practice by defendant to make severance payments, and (2) his reliance on that practice in accepting or continuing his employment."*Id.* at 118 (citations omitted). The *Smith* analysis was again applied to claims for severance payments in *Deutsch,* 2003 WL 22203740, at \*3-4, and in *Hirschfeld v. Institutional Investor, Inc.,* 617 N.Y.S.2d 11, 12 (App.Div.1994). In Plaintiff's view, *"Smith, Hirschfeld,* and *Deutsch* stand for the proposition that, while an employer may terminate [an employee] 'at will,' an employer may not deny the employee the wages and other benefits to which he was entitled for the term of his employment, and the existence and amount of those benefits may be determined, where necessary, by reference to the doctrine of promissory estoppel."(Pl.'s Mem. 14.)

**\*7** Contrary to Plaintiff's claims, however, *Smith* and its progeny are not promissory estoppel cases. Although the test set forth in *Smith* lists "reliance" as one of its two factors, it differs from the well-established three-prong promissory estoppel test used in New York, as it requires neither a clear and unambiguous promise nor an injury stemming from reliance on that promise. *See Kaye,* 202 F.3d at 615 (listing the "three elements" of a promissory estoppel claim under New York law). This distinction is perhaps clearest in the cases that address both promissory estoppel claims and other claims under *Smith.*For example, in *Deutsch* and *Graff v. Enodis Corp.,* No. 02 Civ. 5922, 2003 WL 1702026 (S.D.N.Y. Mar. 28, 2003), the courts treated as separate the plaintiffs' promissory estoppel claims and their claims based on *Smith,* rejecting the plaintiffs' *Smith* claims only after independently rejecting distinct promissory estoppel claims as inapplicable in the employment context. *See Deutsch,*

2003 WL 22203740, at *3-4; Graff, 2003 WL 1702026, at *2-3. Moreover, in Smith itself, the court characterized the test that it set forth as one for breach of contract, not promissory estoppel. 548 N.Y.S.2d at 118 ("[T]he contract which plaintiff claims defendant breached was not supported by consideration and is, accordingly, unenforceable as a matter of law."(citations omitted)); see also Hirschfeld, 617 N.Y.S.2d at 12 (summarily applying Smith analysis). In fact, the Court is aware of no case that applies the Smith analysis to a promissory estoppel claim, rather than to a claim for breach of contract. Accordingly, Plaintiff's reliance on Smith to establish that promissory estoppel is applicable in the employment context fails.

Instead of an alternative analysis by which to assess promissory estoppel claims, New York courts apply the test set forth in Smith only to employees' claims for severance payments and only when such claims are based upon a regular practice by their employers to issue such payments. See, e.g., Deutsch, 2003 WL 22203740, at *3-4 (applying Smith test to "Deutsch's severance claims" based on "breach of an oral contract"); Graff, 2003 WL 1702026, at *3 (applying Smith to plaintiff's "claim for severance pay"); Hirschfeld, 617 N.Y.S.2d at 12 (applying test to "plaintiff's claim for severance benefits"). Thus, even if the Amended Complaint were to satisfy the Smith test, Plaintiff would be eligible only to receive severance payments, not the "back pay, back benefits, future earnings and future benefits" (Am.Compl.¶ 111) that he seeks with his tenth cause of action. Furthermore, because Plaintiff has not pled "a regular practice by [SBS] to make severance payments,"Smith, 548 N.Y.S.2d at 118, his claim fails even under Smith. Accordingly, Plaintiff's tenth cause of action fails to state a claim upon which relief can be granted.

### 2. Plaintiff's Request to Amend

**\*8** As with his ninth cause of action, Plaintiff again seeks leave to amend his Complaint in the event the Court dismisses Count Ten. (Pl.'s Mem. 17-18.) But, here too, Plaintiff has provided no reason to believe that an amendment would cure the defects found in this count. Plaintiff's promissory estoppel claim fails because he does not plead an injury that is cognizable under New York's limited promissory estoppel doctrine. A curative amendment would therefore

need to plead an "injury of unconscionable proportions." Cunnison, 485 N.Y.S.2d at 276. Plaintiff's proposed amendment-that he "relied on the defendant's statements and ... 'reasonably expected' that the accounts would be properly reallocated" (Pl.'s Mem. 18)-does not plead an unconscionable injury and therefore does not save this cause of action. Accordingly, Plaintiff's request to amend his tenth cause of action is denied.

### D. Plaintiff's Thirteenth Cause of Action

With his thirteenth cause of action, Plaintiff alleges that SBS breached its implied duty of good faith and fair dealing under the employment contract when it failed to pay him commissions for the sales that he executed prior to his termination, and when it unfairly reallocated his accounts. (Am.Compl.¶ 128.) "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance."511 W. 232nd Owners Corp v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y.2002) (citations omitted). This covenant is breached "when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."O'Neill v. Warburg, Pincus & Co., 833 N .Y.S.2d 461, 463 (App.Div.2007) (internal quotations and citations omitted); accord Jaffe v. Paramount Commc'ns Inc., 644 N.Y.S.2d 43, 47 (App.Div.1996). To prevail on such a claim, a plaintiff must establish that the defendant violated an implied term "apart from the terms of the contract" itself.Brooks v. Key Trust Co. Nat'l Assoc., 809 N.Y.S.2d 270, 272 (App.Div.2006) (internal quotations omitted). If the alleged violation cannot be distinguished from the explicit contractual obligations, then the claim is "properly dismissed as duplicative" of the underlying contract claim. Id.

Addressing the implied covenant of good faith and fair dealing, the New York Court of Appeals has held repeatedly that " '[n]o obligation can be implied ... which would be inconsistent with other terms of the contractual relationship.' " Horn v. N.Y. Times, 790 N.E.2d 753, 756 (N.Y.2003) (quoting Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y.1983)). Accordingly, a "defendant does not breach its duty of good faith and fair dealing by exercising its rights under the contract[ ] ...." DCMR v. Trident Precision Mfg., 317 F.Supp.2d 220, 226 (W.D.N.Y.2004)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 7
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)

(internal quotations omitted). In the context of an at-will employment contract, this means that "it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination." *Murphy,* 448 N.E.2d at 91.

**\*9** Consistent with this policy, the New York Court of Appeals has regularly declined to alter at-will employment relationships through the imposition of implied contractual terms. *See Horn,* 790 N.E.2d at 759 ("The only exceptions to the employment-at-will rule ever adopted by this Court have involved very specific substitutes for a written employment contract .... We have consistently declined to ... recognize a covenant of good faith and fair dealing to imply terms grounded in a conception of public policy into employment contracts ...."). *But see Wieder v. Skala,* 609 N.E.2d 105, 109 (N.Y.1992) (applying covenant of good faith and fair dealing in the limited circumstances where the "unique characteristics of the legal profession ... make the relationship of an associate to a law firm employment intrinsically different from that of ... financial managers to ... corporate employers ...."). For example, the Court of Appeals has rejected claims of implied contractual terms where a plaintiff was discharged for "refus[ing] to participate in certain illegal activities," *Sabetay v. Sterling Drug, Inc.,* 506 N.E.2d 919, 920 (N.Y.1987), where a plaintiff was discharged as the result of age discrimination, *see Murphy,* 448 N.E.2d at 87, and where a plaintiff was discharged so that defendant corporation could avoid paying a higher stock buy-back price for shares of its securities, *see Gallagher v. Lambert,* 549 N.E.2d 136, 136 (N.Y.1989).

*Gallagher* is particularly relevant here. In *Gallagher,* the plaintiff alleged that "defendants fired him for the sole purpose of recapturing his shares at an unfairly low price and redistributing them among themselves." 549 N.E.2d at 140 (Kaye, J., dissenting). The plaintiff did not seek compensation for his improper termination; rather, he sought "the higher repurchase price" that he would have been entitled to under his employment contract had he been fired on January 31, 1985, instead of on January 10, 1985. *Id.* at 136. The trial court denied summary judgment on the grounds that "factual issues were raised relating to defendants' motive in firing plaintiff." *Id.* at 137. The Court of Appeals, however, refused to consider defendants' motive for the firing. Noting that

the plaintiff was "at all times an employee at will," *id.* at 136, the Court of Appeals rejected plaintiff's claim, reasoning that any other holding would "frustrate" the employer's "unfettered discretion to fire plaintiff at any time." *Id.* at 138.

Thus, there is a clear line of cases in New York upholding a strict reading of an employer's right to terminate an at-will employee, even for allegedly "improper" motives. In the Southern District, however, this line of precedent is complicated by the Second Circuit's twenty-two-year-old holding in *Wakefield v. N. Telecom, Inc.,* 769 F.2d 109 (2d Cir.1985). In *Wakefield,* which preceded the New York Court of Appeals' decision in *Gallagher,* the plaintiff salesman claimed that the defendant breached the implied covenant of good faith in the employment contract when the defendant discharged him "in order to avoid paying him commissions on sales that were completed but for formalities." *Id.* at 112. The *Wakefield* court, applying New York law as it stood in 1985, held that plaintiff would prevail on his implied contract claim if he could prove that defendant's "desire to avoid paying him commissions that were virtually certain to become vested was a substantial motivating factor in the decision to discharge him." *Id.* at 114. However, if "the discharge was otherwise motivated, he [would] not recover on the good faith theory." *Id.* The court reached this conclusion despite a provision in the employment contract explicitly stating that no incentive compensation would be paid unless plaintiff were employed "on the date the incentive compensation is to be paid pursuant to the [contract]." *Id.* at 111.

**\*10** Because *Wakefield* preceded *Gallagher,* it is unclear whether *Wakefield* remains good law. A few courts in this District have tried to reconcile the two decisions, reaching varying conclusions. *Compare Plantier v. Cordiant plc,* No. 97 Civ. 8696, 1998 WL 661474, at \*3 (S.D.N.Y. Sept. 24, 1998) (distinguishing *Wakefield* from *Gallagher*), *and Knudsen v. Quebecor Printing (U.S.A.) Inc.,* 792 F.Supp. 234, 239 (S.D.N.Y.1992) (distinguishing *Wakefield* from *Gallagher,* and holding that *Wakefield* is still good law), *with Butler v. Cadbury Beverages, Inc.,* No. 3:97-CV-2241, 1999 WL 464527, at \*4 n. 2 (D. Conn. June 30, 1999) ("[N]ot[ing] that the validity of *Wakefield*... has been called into question."), *and Collins & Aikman Floor Coverings Corp. v. Froehlich,* 736 F.Supp. 480, 486

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(S.D.N.Y.1990) (reading *Gallagher* to mean that "[r]eliance upon *Wakefield* turned out to be in error under New York law").

In distinguishing *Wakefield* from *Gallagher,* the *Plantier* and *Knudsen* courts found that when the plaintiff in *Gallagher* was terminated, he had not yet earned the higher stock price that he sought; whereas, according to their reading, the plaintiff in *Wakefield* had already earned his sales commission by the time that he was dismissed from his employment. *See Plantier,* 1998 WL 661474, at \*3;*Knudsen, 792 F.Supp. at 239*. In the view of this Court, however, this distinction fails to take into account a key fact in *Wakefield:* namely, that at the time of his termination, the plaintiff in *Wakefield* was not yet contractually entitled to his sales commission. Instead, pursuant to an express provision in his employment contract, his commissions did not vest until the date that they were scheduled to be paid: "In order to receive incentive compensation under this Plan, the participant must be a[n] ... employee on the date the incentive compensation is to be paid pursuant to the Plan."*Wakefield, 769 F.2d at 111*. Faced with this contract provision, the *Wakefield* court permitted recovery not because the plaintiff had already earned his commissions, but because defendant's *motives* in firing plaintiff were improper. *Id.* at 113.The *Wakefield* court's focus on the employer's motives is confirmed by its explicit holding that the plaintiff would not be permitted to recover under the covenant of good faith and fair dealing if a jury determined that he was fired for an innocuous reason-or, indeed, even for a "mistaken or arbitrary" reason-rather than in an attempt to avoid payment of the sales commissions. *Id.* Yet, it is precisely the consideration of the employer's motives that later was rejected by the New York Court of Appeals in *Gallagher.See Gallagher, 549 N.E.2d at 137* (reversing district court's holding that summary judgment was inappropriate because "factual issues were raised relating to defendants' motive in firing plaintiff"). Given these seemingly incompatible holdings, it may be that "[r]eliance upon *Wakefield* turned out to be in error under New York law."*Collins & Aikman, 736 F.Supp. at 486*.

\*11 This does not end the inquiry, however. For even if *Wakefield* does not survive the Court of Appeals' decision in *Gallagher,* the present case differs from *Gallagher* with respect to a key issue. Like

*Wakefield, Gallagher* involved an express contractual provision which limited the employee's ability to receive certain compensation in the event of his termination. Here, however, no such provision governs the employment contract. This difference is clearly material, as under New York law, an implied contractual term cannot conflict with an express term. *See Horn, 790 N.E.2d at 756* ("No obligation can be implied ... which would be inconsistent with other terms of the contractual relationship."). Indeed, in *Gallagher,* the court focused on the express provision in the contract, reasoning that a rule that strictly applied express contractual terms better enabled the parties to define their rights through contract. *See549 N.E .2d at 138* ("[Ignoring an express term] would frustrate the agreement and would be disruptive of the settled principles governing like agreements where parties contract between themselves in advance so that there may be reliance, predictability and definitiveness between themselves on such matters."). Here, because Plaintiff's employment contract contains no provision conditioning his ability to collect commissions on his employment status at a certain date, his claim will not be dismissed on this ground.

Moreover, Defendant gains no cover from the fact that Plaintiff was an "at-will" employee. This is not a claim for wrongful termination; rather, Plaintiff claims that SBS implicitly violated the employment contract when it failed to pay him commissions for the sales that he executed before termination by SBS. The implied term sought by Plaintiff-that his commissions vested at the point that he made the relevant sales-is entirely compatible with at-will employment, just as a salaried at-will employee who is fired before being paid may be compensated for the work done since his last paycheck. *See Sipkin v. MLB Advance Media,* 808 N.Y.S.2d 920, 920 (App.Div.2005) (per curiam) (finding that at-will employee was entitled to "earned" compensation, even though he had been terminated prior to receiving payment). Moreover, because Plaintiff's compensation largely consisted of these incentive-based commissions, failure to honor the implied term sought by Plaintiff would "deprive [Plaintiff] of the right to receive the benefits under the[ ] [employment] agreement."*O'Neill, 833 N.Y.S.2d at 463* (quotations omitted). Accordingly, the Court will not dismiss Plaintiff's claim for commissions based on the implied covenant of good faith and fair dealing.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

However, the second part of Plaintiff's good faith and fair dealing claim, which is premised on SBS's reallocation of Plaintiff's accounts, fails to state a claim upon which relief can be granted. Unlike Plaintiff's claim for commissions earned, on this issue, Plaintiff's at-will employment status is a bar to recovery. Under the employment contract, SBS had the authority to terminate Plaintiff's employment at any time and for any reason. Possessed of this greater power to terminate the contract, SBS also had the authority to reallocate Plaintiff's accounts. *See Danzig v. Dikman,* 434 N.Y.S.2d 217, 219 (App.Div.1980) ("The power to modify [a contract] is implicit from the power to terminate, in that the effect of a modification is the production of a new contract."). As such, an implied term prohibiting SBS from reallocating Plaintiff's accounts would be "inconsistent with other terms of the contractual relationship," *Horn,* 790 N.E.2d at 756, namely, the at-will employment provision. Moreover, even absent Plaintiff's at-will employment status, Plaintiff has failed to establish that reallocation of his accounts "would deprive [him] of the right to receive the benefits under [the employment] agreement." *O'Neill,* 833 N.Y.S.2d at 463. Assuming that Plaintiff was fully compensated for the advertising revenue that he generated-or, to the extent that he was not, he seeks redress elsewhere in his Complaint-SBS's alleged reallocation of Plaintiff's accounts does not "prevent performance of the contract or to withhold its benefits [Plaintiff's compensation] from the plaintiff." *Aventine Inv. Mgmt., Inc. v. Can. Imperial Bank of Commerce,* 697 N.Y.S.2d 128, 130 (App.Div.1999). The Court therefore will not imply a contract term prohibiting the reallocation of Plaintiff's accounts and SBS's Motion to Dismiss this aspect of Plaintiff's thirteenth cause of action is granted. [FN2]

> FN2. Plaintiff also alleges that the reallocation of his accounts was "carried out in contravention of the agreements and understandings reached with plaintiff and in contravention of the representations made by the defendant."(Am.Compl.¶ 79.) To the extent that Plaintiff claims that the account reallocation violated such express agreements, he has preserved that claim in his breach of contract cause of action, which is not challenged in this Motion to Dismiss.

*III. Conclusion*

**\*12** For the reasons stated herein, SBS's Motion to Dismiss Plaintiff's ninth and tenth causes of action is granted. SBS's Motion to Dismiss Plaintiff's thirteenth cause of action is granted with respect to the reallocation of Plaintiff's accounts and denied with respect to Plaintiff's claim for commissions. The Clerk of the Court is directed to terminate the Motion (Docket Nos. 8, 17).

SO ORDERED.

S.D.N.Y.,2007.
Baguer v. Spanish Broadcasting System, Inc.
Slip Copy, 2007 WL 2780390 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 11**

# Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

**H**Chicago Messenger Service, Inc. v. Nextel
Communications, Inc.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
CHICAGO MESSENGER SERVICE, INC. and
Veterans Messenger Service, Inc., Plaintiffs,
v.
NEXTEL COMMUNICATIONS, INC. and Nextel
West Corp. Defendants.
**No. 01 C 8820.**

Sept. 24, 2003.

Daniel John Voelker, William Nicholas Howard,
Robert J. Hall, Freeborn & Peters, Chicago, IL, for
Plaintiffs/Counter-defendants.
Frederic R. Klein, Deborah Rzasnicki Hogan,
Matthew H. Metcalf, Goldberg, Kohn, Bell, Black,
Rosenbloom & Moritz, Ltd., Chicago, IL, for
Counter-claimant.

OPINION AND ORDER

NORGLE, J.
**\*1** Before the court is Defendants Nextel
Communications, Inc. and Nextel West Corp.'s
Motion for Summary Judgment as to Plaintiffs
Chicago Messenger Service, Inc. and Veterans
Messenger Service, Inc.'s Amended Complaint. Also
before the court is Defendant Nextel West's Motion
for Summary Judgment as to its Amended
Counterclaim. For the following reasons, Defendants'
Motion for Summary Judgment as to Plaintiffs'
Amended Complaint is granted, and Nextel West's
Motion for Summary Judgment as to its Amended
Counterclaim is granted in part and denied in part.

## I. BACKGROUND [FN1]

> FN1. The court takes the facts from the
> parties' Local Rule 56.1 statements and
> accompanying briefs. Disputed facts are
> noted in the text.

Plaintiffs, Chicago Messenger Service, Inc. and
Veterans Messenger Service, Inc. (collectively
"Messengers"), bring this diversity suit against
Defendants, Nextel Communications, Inc. and Nextel
West Corp. (collectively "Nextel"). Messengers are
Illinois corporations in the business of providing
messenger delivery services. Messengers employ
numerous couriers and maintain communication with
its staff of couriers by way of wireless
communication equipment. Nextel are Delaware
corporations in the business of providing wireless
communications equipment and services .[FN2]Nextel
provides a wireless communications system, which
Messengers utilized at all times relevant to the
present dispute.

> FN2. Nextel Communications has its
> principal place of business in Virginia, and
> Nextel West has its principal place of
> business in Michigan. Jurisdiction is proper
> under 28 U.S.C. § 1332, as the parties are
> diverse and the amount in controversy
> exceeds $75,000, exclusive of interests and
> costs.

In the fall of 1997, Messengers' General Manager,
Milt Buzil ("Buzil") was responsible for finding a
wireless communications provider. On or about
November 10, 1997, Buzil initially entered into
negotiations with Robert Picchietti ("Picchietti"), a
Nextel employee, which resulted in a written
agreement to purchase wireless communications
equipment and services from Nextel. Shortly
thereafter, Buzil was contacted by an independent
dealer of Nextel equipment and services, Scott
Lambert ("Lambert") of Radco Communications.
Lambert offered Buzil a better price for Nextel
equipment. On or about November 12, 1997, Buzil
sent a letter to Picchietti rescinding the November 10,
1997 written agreement. Also on or about November
12, 1997, Lambert and Buzil executed written
Subscriber Agreements for Nextel equipment and
wireless services (more on Lambert to come later).
Over the next three years, Messengers entered into
numerous similar Subscriber Agreements as it

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

purchased additional wireless equipment to be used on Nextel's wireless system. The Subscriber Agreements were standard form contracts, which Nextel provided to dealers of Nextel equipment and services.

The Subscriber Agreements executed by Messengers expressly noted that by signing, the customer signified that he had read, understood, agreed to and accepted the terms and conditions stated on the face and reverse of the Subscriber Agreements. The Subscriber Agreements between Messengers and Nextel included the following pertinent provisions, or provisions substantively similar thereto:

6. RATES, CHARGES AND PAYMENT-Company shall issue invoices for Service. Monthly Access charges shall be invoiced in advance. Airtime and long distance charges shall be invoiced in arrears. Customer is responsible to pay Company, on a timely basis, for charges for Service as set forth in the front of this Agreement, and any modifications thereto....

**\*2** 13. COMPLETE AGREEMENT / SEVERABILITY / WAIVER-This Agreement sets forth all of the agreements between the parties concerning the Service and Purchase of the Equipment, and there are no oral or written agreements between them other than as set forth in this Agreement. No amendment or addition to this Agreement shall be binding upon Company unless it is in writing and signed by both parties. Company shall not be bound by the terms and conditions in Customer's purchase order or elsewhere, unless expressly agreed to in writing. This Agreement becomes effective when accepted by the Company....

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

Under the parties' agreements, the Monthly Access charge was a fixed monthly fee of $38.25 for all wireless telephones that were assigned to Messengers' accounts. Messengers knew that Monthly Access charges were billed one month in advance, and that in the event Nextel was informed to deactivate a phone during a month, the following month Messengers would receive a prorated credit against the amount it had paid in advance for that phone. Reasons to deactivate a wireless telephone would be if a phone was lost, stolen, damaged, or simply unused and placed in inventory.

Responsibility for managing the wireless telephones was assigned to Messengers' Communications Department. Messengers' Vice President, Paul Pitaro ("Pitaro"), supervised the Communications Department. Other employees of the Communications Department, including Juanita Krmaschek ("Krmaschek") and Jessie Portillo ("Portillo"), issued wireless telephones to Messengers' staff of couriers and maintained related internal documentation. While aware that notifying Nextel that a wireless telephone had to be deactivated would stop that phone from incurring the Monthly Access charge, the Communications Department would not routinely do so. Messengers do not dispute that the contracts between the parties regarding wireless service were written contracts governed by the terms and conditions stated in the Subscriber Agreements; however, Messengers contend that there was also an oral agreement, which was reiterated on several occasions, that Messengers would only be charged Monthly Access charges for wireless telephones that were actually used. Messengers refer to this oral agreement as the "no usage, no access charge" term.

Messengers received detailed monthly bills from Nextel for every month that the parties' three-year relationship existed. Messengers' bookkeeper, Haydee Romo, generally reviewed the Nextel bills every month, and then presented the bills to Messengers' owner and President, William Factor ("Factor"), for payment.

The controversy giving rise to the present case began in March 2001, when Lambert contacted Messengers in regard to Messengers' Nextel bills. Lambert, this time in a capacity as auditor, offered to review Messengers' Nextel bills. After Lambert's audit, Messengers believed that Nextel was improperly charging Monthly Access charges for some wireless telephones that Messengers were not using, contrary to the "no usage, no access charge" term that Messengers allege was orally communicated on numerous occasions. Based on Lambert's audit, Messengers stopped paying Nextel's bills.

**\*3** Messengers contacted Nextel and requested that its accounts be credited for unused wireless telephones that were assessed the Monthly Access

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

charge. The parties engaged in numerous attempts to rectify the billing dispute. During the course of the dispute, Messengers allege that Nextel employees, Michael Beltrano ("Beltrano") and Randall Burns ("Burns"), told Messengers not to pay the bills until the issue was resolved.

Ultimately, in October 2001, Nextel demanded that Messengers pay the full amounts reflected as owed in Nextel's bill, or Messengers' wireless service would be discontinued. On November 6, 2001, Messengers delivered a check to Nextel in the amount of $123,287.50, representing the amounts that Messengers did not dispute. On November 13, 2001, Factor contacted Burns and requested another meeting to resolve the billing dispute; however, Burns refused and stated that wireless service would be discontinued if the full amounts reflected as owed were not paid by November 16, 2001. On November 15, 2001, Messengers paid an additional $33,000 to Nextel, in exchange for Nextel's agreement to continue Messengers' wireless service through November 27, 2001.

On November 15, 2001, Messengers also filed a complaint in Illinois state court seeking an injunction to prevent Nextel from terminating wireless service to Messengers, and Nextel removed the case to this court that very day. After removal of the case, the parties continued their efforts to resolve the dispute; however, those efforts proved unsuccessful and Nextel terminated Messengers' wireless service on November 28, 2001. As a result of the termination of Messengers' wireless service, Nextel filed a motion to dismiss the complaint as moot and also filed a counterclaim seeking payment of the balance alleged to be due, plus late fees and attorney fees and costs. The parties then entered an agreed order granting Messengers time to file an amended complaint. Messengers proceeded to file a three count amended complaint alleging breach of contract, common law fraud, and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. The gist of all three counts is that Nextel made an oral promise not to charge Messengers the Monthly Access charges for wireless telephones that were not actually used, and that Nextel has not fulfilled that promise.

Nextel has filed a motion for summary judgment, which is fully briefed and ready for ruling.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Seventh Circuit has indicated that cases involving contract interpretation are "particularly well-suited to disposition on summary judgment."*Neuma, Inc. v. AMP, Inc.,* 259 F.3d 539, 542 (7th Cir.2000).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party has the initial burden to prove that no genuine issue of material fact exists. *SeeMatsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial. *SeeCelotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**\*4** The non-moving party cannot rest on the pleadings alone, but must identify specific facts that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. *SeeMurphy v. ITT Technical Services, Inc.,* 176 F.3d 934, 936 (7th Cir.1999); *seealso*Fed.R.Civ.P. 56(e)."Conclusory allegations alone cannot defeat a motion for summary judgment."*See Thomas v. Christ Hosp. and Medical Center,* 328 F.3d 890, 893-94 (7th Cir.2003) (citing *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 888-89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Local Rule 56.1 requires both the moving and non-moving parties to submit a statement of material facts, including "specific references to the affidavits, parts of the record, and other supporting materials relied upon."Local Rule 56.1(a)(3); Local Rule 56.1(b)(3)(B). Evidence submitted at summary judgment must ultimately be admissible at trial under the Federal Rules of Evidence. *SeeWoods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir.2000). Specifically, hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial. *SeeEisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). Thus, all facts not properly supported by the record evidence must be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

disregarded. *Brasic v. Heinemunn's, Inc.*, 121 F.3d 281, 284 (7th Cir.1997).[FN3]

> FN3. Along with Nextel's Amended Reply Memorandum in Support of its Motion for Summary Judgment, Nextel also filed a Motion to Strike Messengers' Amended Local Rule 56.1 Counter-Statement of Material Facts. In light of this court's standard of decision to be applied in a motion for summary judgment, Nextel's Motion to Strike is disregarded as moot.

The court views the record evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *See*Fed.R.Civ.P. 56(c). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make a "choice of inferences." *See*Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir.1996). The choice between reasonable inferences from facts is a jury function. *See*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III. DISCUSSION

In cases where a federal district court's jurisdiction is based upon diversity jurisdiction, the court must use the substantive law of the state in which it sits. *See*Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (indicating "the proper function of the ... federal court is to ascertain what the state law is, not what it ought to be"); *see also*Land v. Yamaha Motor Corp., 272 F.3d 514, 516 (7th Cir.2001)."Rules of contract interpretation are treated as substantive."*Dawn Equipment Co. v. Micro-Trak Systems, Inc.*, 186 F.3d 981, 986 (7th Cir.1999) (citing *Bourke v. Dun & Bradstreet*, 159 F.3d 1032, 1036 (7th Cir.1998))."As a court sitting in diversity, we attempt to predict how the [Illinois] Supreme Court would decide the issues presented here."*Id.* (citing *Allen v. Transamerica Ins. Co.*, 128 F.3d 462, 466 (7th Cir.1997)).

#### A. Breach of Contract

*1. Effect of Integration Clause on Admissibility of Parol Evidence*

Count III of Messengers' Amended Complaint alleges breach of contract. The parties present the court with an issue involving the parol evidence rule. Illinois courts have embraced the parol evidence rule in its more conservative approach, which has been termed the "four corners" rule. *See e.g.*,*Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 236 Ill.Dec. 8, 706 N.E.2d 882, 884 (Ill.1999) (rejecting application of the "extrinsic ambiguity" doctrine, and reiterating "four corners" rule as the proper method for contract interpretation). Under Illinois Supreme Court case law, the "four corners" rule provides: " 'An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.' " *Id.* (citing *Western Illinois Oil Co. v. Thompson*, 26 Ill.2d 287, 186 N.E.2d 285, 291 (Ill.1962)). In applying the "four corners" rule, Illinois courts look to the language of the contract alone in order to determine whether an ambiguity exists. *See*id.If an ambiguity exists, parol evidence may be introduced. *See*id.(discussing the determination of whether an ambiguity exists in a written contract so as to require admission of parol evidence).

**\*5** The importance of an integration clause in the parties' written contract takes on great significance under this "four corners" rule. As stated by the Illinois Supreme Court, "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence."*Id .* at 885.Thus, under Illinois law, the presence of an integration clause is evidence that the parties have executed a fully integrated contract, to be interpreted solely within the four corners of that contract, and which cannot be altered by extrinsic evidence.

In this case, it is undisputed that the parties' written agreements all contained integration clauses, which provided:

13. COMPLETE AGREEMENT / SEVERABILITY / WAIVER - This Agreement sets forth all of the agreements between the parties concerning the Service and Purchase of the Equipment, and there are no oral or written agreements between them other

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                            Page 5
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

than as set forth in this Agreement. No amendment or addition to this Agreement shall be binding upon Company unless it is in writing and signed by both parties. Company shall not be bound by the terms and conditions in Customer's purchase order or elsewhere, unless expressly agreed to in writing....

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

The presence of such an integration clause "is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement."*Air Safety,* 236 Ill.Dec. 8, 706 N.E.2d at 886. Prior to the final execution of each written Subscriber Agreement, Messengers were free to contract as they saw fit. The Subscriber Agreements themselves contemplate that the parties may add or delete terms and conditions to the parties' written agreement before execution. In fact, Messengers took advantage of this opportunity in some of the contracts that the parties executed. By way of example, on the front of one such Subscriber Agreement the following additional contract terms appear:

Payment Terms. Net 30 days after completion of installation of equipment 1% discount if paid within 10 days of completion of installations To be installed first week of December (by December 5th)

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H. By this handwritten amendment, the parties added a payment term and a delivery term. Thus, Messengers could have easily added the alleged "no usage, no access charge" term to the front of each and every Subscriber Agreement that they executed. However, Messengers failed to do so. The parol evidence rule precludes Messengers from now arguing that the alleged "no usage, no access charge" term, which appears nowhere in the Subscriber Agreements, is a term of the parties' written agreements.

This court recently wrote on the mischief that such claims bring to the stability and certainty of written contracts. *SeeDavis v. G N Mortgage Corp.,* 244 F.Supp.2d 950, 960-61 (N.D.Ill.2003) ("Claims seeking to add to, modify, or contradict a written agreement ... work mischief with the law of contracts and the attendant stability that the law of contracts

brings to a myriad of transactions."). The following quote from the Seventh Circuit is also instructive on this issue:

**\*6** Memory plays tricks. Acting in the best of faith, people may "remember" things that never occurred but now serve their interests. Or they may remember events with a change of emphasis or nuance that makes a substantial difference to meaning.... A statement such as "[no usage, no airtime charges]" may be recalled years later as "[no usage, no access charges]." Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing, and promoting the primacy of the written word....

*Rissman v. Rissman,* 213 F.3d 381, 384 (7th Cir.2000).

## 2. Existence of Ambiguity in Contract Language

Messengers offer an additional argument in support of its breach of contract claim. Messengers contend that the language of the Subscriber Agreements is ambiguous, as the Subscriber Agreements do not address the issue of whether the Monthly Access charge will be applied to unused wireless telephones. In response, Nextel contends that the language of the Subscriber Agreements is unambiguous, as the Subscriber Agreements require payment of a fixed Monthly Access charge for each wireless telephone, and that such obligation is not conditioned in any way.

In Illinois, a court "must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent."*Quake Construction, Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990, 994 (Ill.1990). Again this is done under the traditional "four corners" rule. *SeeAir Safety,* 236 Ill.Dec. 8, 706 N.E.2d at 884. An ambiguity is present only if "the language of the contract is susceptible to more than one meaning."*Id.*"If no ambiguity exists in the writing, the parties' intent must be derived ... as a matter of law, solely from the writing itself."*Id.* As aptly stated by the Illinois Supreme Court: "The court must take the contract as made by the parties. It cannot make a new contract for them or add anything to its provisions."*Ortman v. Kane,* 389 Ill. 613, 60

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

N.E.2d 93, 98 (1945).

On the front of each Subscriber Agreement, the parties indicated how many wireless telephones would be purchased and subscribed to Nextel's system, and the Monthly Access charge for each wireless telephone. It is undisputed that this Monthly Access charge was $38.25 per each wireless telephone. The back of each Subscriber Agreement provided how the Monthly Access charge would be billed, stating: "Monthly Access charges shall be invoiced in advance."*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I. Within the Subscriber Agreements, this statement is not conditioned in any manner. Thus, there is no ambiguity, and the parties' written agreements provide that every wireless telephone that Messengers subscribed to Nextel's system was to be billed the Monthly Access charge. What Messengers claim to be ambiguous contract language is simply its own belief imposed onto the unambiguous text of the parties' written Subscriber Agreements. *Compare Air Line Pilots Ass'n., Intern. v. Midwest Exp. Airlines, Inc.,* 279 F.3d 553, 556 (7th Cir.2002) (stating: "the party challenging the literal meaning must present *objective* evidence, not just his say-so, that the contract does not mean what it says") (emphasis in original). Messengers must present more than its interpretation of the language of the contract; it must demonstrate that the language is truly ambiguous - meaning susceptible to more than one meaning - which it has not done. "Any particular interpretation that only the plaintiff may have envisioned at the time a contract is executed is immaterial."*Eichengreen v. Rollins, Inc.,* 325 Ill.App.3d 517, 259 Ill.Dec. 89, 757 N.E.2d 952, 958 (Ill.App.Ct.2001).

**\*7** Applying the traditional contract interpretation principles of the "four corners" rule, as provided by the Illinois Supreme Court, Messengers may not introduce parol evidence of the alleged "no usage, no access charge" term. The parties' agreement is to be found solely within the Subscriber Agreements. Therefore, since Messengers cannot establish its breach of contract claim against Nextel, Nextel is entitled to judgment as a matter of law. *See Celotex,* 477 U.S. at 322.

B. Common Law Fraud and Illinois Consumer Fraud and Deceptive Practice Act

Counts I and II of Messengers' Amended Complaint allege common law fraud and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, respectively. Both claims allege that Nextel charged Messengers the Monthly Access fees for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term. In short, both of these fraud claims are simply a repackaged version of Messengers' breach of contract claim.

*1. Promissory Fraud*

Under Illinois law, the elements of the tort of fraudulent misrepresentation are: "(1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) made to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance."*Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co.,* 114 Ill.2d 278, 102 Ill.Dec. 306, 499 N.E.2d 1319, 1323 (Ill.1986)."In addition, the reliance upon the misrepresentation must have been justified, i.e., the other party had a right to rely upon the statement."*Id.*

Unlike most states, Illinois generally does not provide a remedy for fraudulent promises. *See* Michael J. Polelle, *An Illinois Choice: fossil Law or an Action for Promissory Fraud?,*32 DePaul L.Rev. 565, 569-70 (1983). The basis for this general prohibition is that the misrepresentation must be based on present or preexisting facts, and thus, statements of future intent generally cannot be the basis for a claim of promissory fraud. *See HPI Healthcare Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 682 (Ill.1989). This general prohibition is tempered by one exception, "where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud."*Steinberg v. Chicago Medical School,* 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634, 641 (Ill.1977); *see also Roda v. Berko,* 401 Ill. 335, 81 N.E.2d 912, 915 (Ill.1948) (recognizing the general prohibition against claims for promissory fraud, but stating that "where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud and thereby cheat and defraud another of his

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

Page 7

property, equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed"). Commentators have noted that this "scheme to defraud" exception has not been elucidated, and has resulted in confusion and inconsistent application among Illinois courts. *See* Roger L. Price and Mark L. Johnson, *Understanding the "Scheme To Defraud" Exception to Promissory Fraud in Illinois,* 90 Ill. B.J. 536, 536 (2002) ("The [scheme to defraud] exception has generated a confusing body of case law ...."); *seealsoDesnick v. American Broadcasting Cos., Inc.,* 44 F.3d 1345, 1354 (7th Cir.1995) ("The distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge.").

**8** Messengers' claim can be disposed of without this court having to enter the bramble bush that is the "scheme to defraud" exception. Messengers allege that Nextel charged the Monthly Access fees for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term, and buried these charges in voluminous invoices as part of a scheme to defraud.

Messengers provide no admissible evidence for the alleged "no use, no access charge" term. Messengers simply state: "It was [Messengers'] understanding, based on the representations made by Nextel during negotiations, and throughout the relationship, that Nextel would not charge [Messengers] for wireless telephones which were unusable, replaced, unused or otherwise not in service." *See* Pls.' Amended Local Rule 56.1 Counter-Statement of Additional Uncontested Facts, ¶ 96. The record citations to support ¶ 96 are devoid of any evidence to support this statement. Messengers fail to indicate when "throughout the relationship" these statements were made. The statements that Messengers proffer as having been made by Nextel where made by Lambert, the independent dealer of Nextel equipment and services. However, the record contains no affidavit or deposition testimony from Lambert. Further, Messengers offer no evidence that Lambert was an agent of Nextel, or that Nextel had any knowledge of Lambert's statements, so as to bring Lambert's statements within <u>Federal Rule of Evidence 801</u>. With such deficiencies, the alleged statements are nothing more than hearsay, which is

inadmissible and an improper method of defending a motion for summary judgment. *SeeEisenstadt,* 113 F.3d at 742. In short, Messengers simply concludes that the statements were made by Nextel; however, such conclusory allegations are insufficient to create a genuine issue of material fact. *SeeThomas,* 328 F.3d at 894 (reiterating that "Rule 56(e) of the Federal Rules of Civil Procedure specifically prohibits a party from relying upon his allegations to contest entry of summary judgment").

Additionally, Messengers must establish that its reliance on the statements was justified. *Charles Hester Enterprises,* 102 Ill.Dec. 306, 499 N.E.2d at 1323, which it cannot do. As this "no usage, no access charge" term was not in the parties' written contracts, and in fact contradictory to the unambiguous text of the Subscriber Agreements, any such reliance could not be justified. Further, assuming *arguendo* that admissible evidence supported the alleged "no usage, no access charge" term, the record evidence belies Messengers' argument that they relied on that term. In order to avoid the Monthly Access charges, it was Messengers' responsibility to call and request that a wireless telephone be deactivated. The following deposition testimony shows that Messengers knew of this obligation:

Q. What does the messenger companies do when a phone is lost?

A. I know what they're supposed to do. They're supposed to call the company and stop the service because they can't use it for phones.

**9** Q. When you say, "they're supposed to call the company and stop the service," you mean they're supposed to call Nextel to stop the service, correct?

A. I believe so, but you have to check that out with the communications department. I don't know what their procedure is.

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Exh. A, Buzil Dep. pg. 94. When the supervisor of Messengers' Communications Department was asked about this obligation, the following deposition testimony was elicited:
Q. Whose responsibility was it to deactivate phones that weren't being used?

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

A. .... [I]t would be the responsibility of Juanita [Krmaschek] or Jessie [Portillo] to call in and tell Nextel that we lost a radio; it has to be deactivated.

*Seeid.,* Exh. D, Pitaro Dep. pg. 63. This evidence shows that Messengers were aware of their obligation to contact Nextel and request deactivation to avoid being billed the Monthly Access charge.

In short, Messengers cannot satisfy the elements required for a claim based on promissory fraud. As Messengers bear the burden of proving each element of its fraud claim at trial, which it has shown it cannot, summary judgment is appropriate. *SeeCelotex,* 477 U.S. at 322.

*2. Illinois Consumer Fraud and Deceptive Business Practices Act*

The elements for a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") are: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception."*Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151, 160 (Ill.2002). In contrast to a claim of common law fraud, a "[p]laintiff's reliance is not an element of statutory consumer fraud."*Connick v. Suzuki Motor Co., Ltd.,* 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (1996) (citation omitted).

"The Consumer Fraud Act defines 'unfair or deceptive acts or practices' to include the use or employment of any 'deception, fraud, false pretense, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." ' *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.,* 186 Ill.2d 472, 239 Ill.Dec. 12, 713 N.E.2d 543, 552 (Ill.1999) (citing 815 Ill. Comp. Stat. 505/2).

As with the promissory fraud claim, Messengers allege that Nextel charged the Monthly Access charges for wireless telephones that were not used,

contrary to the alleged oral "no usage, no access charge" term, and buried these charges in voluminous invoices as part of a scheme to defraud. Messengers argue that this qualifies as "deceptive conduct" under the Consumer Fraud Act. *See*815 Ill. Comp. Stat. 505/2 (2003). Messengers argue that they present more than a simple breach of contract case, arguing that Nextel made the false representations intending for Messengers to rely on those statements and continue to purchase Nextel equipment and services. However, this argument suffers from the same shortcomings that plagued the promissory fraud claim. Messengers offer no admissible evidence of any statements made by Nextel, and simply provide conclusory allegations, the type which summary judgment seeks to avoid. *SeeThomas,* 328 F.3d at 742. The allegedly "deceptive conduct" is nothing more than an allegedly false promise not to charge monthly access fees for wireless telephones that were not being used by Messengers.

**\*10** Further, the court cannot accept the argument that Nextel's invoices were deceptive. Nextel simply billed Messengers in accordance with the terms of the Subscriber Agreements. Again, Messengers were responsible for requesting that any unused wireless telephones be deactivated, which they failed to routinely do. Messengers cannot turn their own shortcomings into a cause of action against Nextel. Nextel's actions, reflected in the detailed invoices sent to Messengers, were consistent with the parties' written agreements.

Illinois case law interpreting claims for violations of the Consumer Fraud Act (as well as claims for promissory fraud) make clear that the general bar against such claims is to prevent every breach of contract claim from giving rise to a duplicative tort claim. *SeeZankle v. Queen Anne Landscaping,* 311 Ill.App.3d 308, 244 Ill.Dec. 100, 724 N.E.2d 988, 992-93 (Ill.App.Ct.2000) (stating that "it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy"). Thus, Illinois law is true to the distinction between contract claims and tort claims. To the extent that Messengers' allegations are, at their core, a claim for breach of contract, then relief is not warranted when simply repackaged as fraud-based claims.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

*C. Nextel West's Counterclaim*

In its counterclaim, Nextel West seeks to have Messengers pay all charges invoiced, as well as late fees, attorney fees and costs, as provided in the parties' written agreements. The Subscriber Agreements provided:

7. NONPAYMENT/BREACH-A late payment charge of 1.5% (or the maximum interest rate permitted by law) per month, may be applied to Customer's account if monthly invoices are not paid by the due date. The late payment charge is applied to the total unpaid balance due and outstanding.... If Company obtains the services of a collection or repossession agency or an attorney to assist Company in remedying Customer's breach of this Agreement, including but not limited to the nonpayment for charges hereunder, Customer shall be liable for this expense....

*See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

Based on this court's analysis, it is clear that Messengers have breached the unambiguous terms of the parties' Subscriber Agreements by failing to pay Nextel for wireless telephone service, and are liable to Nextel as to the counterclaim. However, the court cannot determine the amount that Messengers are liable for with any degree of certainty.

In their Amended Counterclaim, Nextel West states the amount of charges owed by Messengers as $139,319.64. *See* Defs.' Am. Counterclaim, ¶ 26. However, in their motion for summary judgment, Nextel West states the amount of charges owed as $128,729.54. *See* Defs.' Mot. for Summ. J., pg. 16. Nextel West explains this disparity by indicating that certain valid credits were not applied to Messengers' accounts, and with these credits the amount owed is then $128, 729.54.

**\*11** Messengers offer numerous arguments in opposition to Nextel's motion for summary judgment as to the counterclaim. First, Messengers contend that no outstanding balance exists, as Nextel breached the "no usage, no access charge" term of the parties' agreements; however, this claim has been rejected. Second, Messengers dispute that their outstanding balance is $139,319.64, as they contend that this

amount does not take into account substantial credits that Nextel admittedly owes to Messengers. In support of the argument that Nextel owes substantial credits, Messengers point to the depositions of two Nextel employees who concede that errors did occur with regard to the billing of Messengers' account. *See* Defs.' Local Rule 56.1 Statements of Uncontested Facts, Exh. K, Burns Dep., pg. 75 (indicating that some errors had been made with regard to Messengers' invoices); Exh. J, Black Dep., pg. 129 (same). Beyond these admissions that errors were made with regard to the billing of Messengers' account, there is no further evidence detailing what credits were given and what credits, if any, remain. Based on the dearth of information in the record concerning the credits which Messengers have received, or may still be entitled to, the court cannot determine the amounts due to Nextel for wireless service with any degree of certainty.

Furthermore, the exact amount of Messengers' liability for late fees is also uncertain based on representations made by Nextel employees indicating that Messengers did not have to pay the charges until the billing dispute was resolved. After Messengers stopped paying Nextel's invoices, the parties engaged in extensive discussions and negotiations to resolve this dispute. During the course of those negotiations, Messengers state that employees of Nextel, Beltrano and Burns, repeatedly instructed Messengers not to make any further payments until the dispute had been resolved. Since the dispute is not resolved, as evidenced by this lawsuit, and construing the facts in the light most favorable to Messengers, it is not clear that late fees should be calculated from November 28, 2001, the date of the service termination, as argued by Nextel.

In short, while Messengers are liable to Nextel West for breaching the Subscriber Agreements by failing to make payments, the exact amount of damages cannot be determined on the current record.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment as to Plaintiffs' Amended Complaint is granted, and Nextel West's Motion for Summary Judgment as to its Amended Counterclaim is granted in part and denied in part.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22225619 (N.D.Ill.)

IT IS SO ORDERED.

N.D.Ill.,2003.
Chicago Messenger Service, Inc. v. Nextel
Communications, Inc.
Not Reported in F.Supp.2d, 2003 WL 22225619
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 12**

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

Page 1

Maxus Leasing Group, Inc. v. Kobelco America, Inc.
N.D.N.Y.,2007.

United States District Court,N.D. New York.
MAXUS LEASING GROUP, INC., Plaintiff,
v.
KOBELCO AMERICA, INC.; Kobelco Construction
Machinery America LLC; Brownell Steel Inc.; Allan
J. Bentkofsky, Chapter 7 Trustee for Syracuse
Equipment Leasing Co., Inc.; Wells Fargo Equipment
Finance, Inc.; and Syracuse Equipment Leasing Co.,
Inc., Defendants.
No. 5:04-CV-518 (FJS/DEP).

Feb. 26, 2007.

Green & Seifter, Attorneys, PLLC, Robert K. Weiler,
Esq., Kimberly M. Zimmer, Esq., of counsel,
Syracuse, NY, for Plaintiff.
Bleakley Platt & Schmidt, LLP, Thomas G. Bailey,
Jr., Esq., White Plains, NY, Hiscock & Barclay LLP,
J. Eric Charlton, Esq., John P. Langan, Esq., of
counsel, Syracuse, NY, for Defendants Kobelco
America, Inc. and Kobelco Construction Machinery
America LLC.
Whiteman Osterman & Hanna LLP, John J. Henry,
Esq., Albany, NY, for Defendants Brownell Steel,
Inc.; Wells Fargo Equipment Finance, Inc.; and
Syracuse Equipment Leasing Co.

## MEMORANDUM-DECISION AND ORDER

SCULLIN, Senior Judge.

## I. INTRODUCTION

*1 On May 10, 2004, Plaintiff Maxus Leasing Group,
Inc. ("Maxus") filed its complaint alleging seven
causes of action: (1) conversion against Defendant
Wells Fargo Equipment Finance, Inc. ("Wells
Fargo"); (2) recovery of chattel against Defendants
Wells Fargo and Brownell Steel, Inc. ("Brownell");

(3) breach of warranty of title against Defendants
Kobelco America, Inc. and Kobelco Construction
Machinery America LLC (collectively referred to as
"Kobelco"); (4) fraud against Defendant Kobelco; (5)
conspiracy against Defendant Kobelco; (6) unjust
enrichment against Defendant Kobelco; and (7)
conversion against Defendant Kobelco.

Currently before the Court are Defendants Wells
Fargo and Brownell's motion for summary judgment,
Defendant Kobelco's motion for summary judgment,
and Plaintiff Maxus' cross-motion for summary
judgment as to all claims.

## II. BACKGROUND

The present dispute arises from a series of
transactions involving two Kobelco cranes. In
October 2000, Defendant Kobelco sold and delivered
two Model CK 1000 crawler cranes to Defendant
Syracuse Equipment Leasing Co., Inc. ("SELC") for
$588,920.18 per crane.[FN1] [FN2]

> FN1. The cranes had serial numbers
> GD0201061 ("61 crane") and GD0201063
> ("63 crane").

> FN2. It is unclear how much Defendant
> SELC actually paid Defendant Kobelco on
> the cranes. An internal Kobelco
> memorandum suggests that nothing was
> paid on these cranes. See Affidavit of
> Kimberly M. Zimmer, sworn to Oct. 18,
> 2005, at Exhibit "K."

On approximately May 10, 2001, Defendant
Kobelco, claiming difficulty collecting payments
from SELC, entered into another transaction
regarding the same cranes. In this transaction,
Plaintiff Maxus remitted $715,000 per crane to
Defendant Kobelco. Defendant Kobelco applied
Plaintiff Maxus' $1,430,000 payment to Defendant
SELC's account, crediting entries for the two cranes
and another piece of equipment.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

By late 2001 and early 2002, Defendant SELC's financial situation was deteriorating, and it defaulted on all of its obligations concerning the two cranes. Defendant SELC filed for bankruptcy on April 22, 2002.[FN3]

> FN3. Although SELC and its Chapter 7 Trustee are named Defendants, Plaintiff Maxus seeks no recovery from either.

The nature of the transaction entered into between Defendant Kobelco and Plaintiff Maxus in May 2001 is the crux of this dispute. Plaintiff Maxus claims that it did not have knowledge of Defendant Kobelco's prior sale of the cranes to Defendant SELC and that it intended to purchase the cranes new from Defendant Kobelco in order that they could then lease them to Defendant SELC.

Defendant Kobelco sees the May 2001 transaction differently. Defendant Kobelco claims that it told Plaintiff Maxus that it had already sold the cranes to Defendant SELC and that Plaintiff Maxus, as a result of some business arrangement with Defendant SELC, had agreed to re-finance the cranes for Defendant SELC.

### III. DISCUSSION

#### A. Summary judgment standard

A district court will grant summary judgment when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). In reviewing the pleadings, affidavits, depositions, and admissions on file, the court must " 'resolve all ambiguities and draw all inferences in favor of the non-moving party.' " Chan v. Gantner, 464 F.3d 289, 292 (2d Cir.2006) (quotation omitted).

#### B. Standing

*2 As an initial matter, with respect to Plaintiff Maxus' claims for conversion and recovery of chattel (Causes of Action 1 and 2), Defendants Kobelco, Wells Fargo, and Brownell contend that Plaintiff Maxus lacks standing to bring this action.

To complete the May 2001 transaction with

Defendant Kobelco, Plaintiff Maxus needed to obtain financing from third parties. Therefore, Plaintiff Maxus obtained a "bridge loan" from First Merit Bank for $715,000 and assigned its security interest in the 61 crane as collateral. That crane was later reassigned to Plaintiff Maxus in March 2002.[FN4]

> FN4.See Affidavit of Anthony Granata, sworn to Oct. 17, 2005, at ¶ 4.

Under New York law, assignment of a security interest passes all rights and interests to the assignee, including the right to seek delinquent payments or recover collateral. See Rockland Lease Funding Corp., Inc. v. Waste Mgmt. of N.Y., Inc., 245 A.D.2d 779, 779 (3d Dep't 1997) (citations omitted). A complete assignment, without qualification, cuts off the assignor's rights. See In re Stralem, 303 A.D.2d 120, 122-23 (2d Dep't 2003) (quotation and other citations omitted). Therefore, the assignor is no longer a real party in interest and lacks standing. See James McKinney & Son, Inc. v. Lake Placid 1980 Olympic Games, Inc., 61 N.Y.2d 836, 838 (1984). However, a reassignment back to the assignor restores standing. Cf. Walsh v. Woarms, 109 A.D. 166, 168 (2d Dep't 1905).

Since the 61 crane was reassigned to Plaintiff Maxus in March 2002, the Court concludes that Maxus is a real party in interest with standing as to that crane.[FN5]

> FN5. Defendant Kobelco also contends that Plaintiff Maxus suffered no injury concerning the 63 crane and, therefore, lacks standing to pursue its causes of action concerning that crane.
>
> Following Defendant SELC's default, Plaintiff Maxus recovered the 63 crane and leased it to third parties, receiving approximately $140,000 in payments; and, on March 22, 2005, Plaintiff Maxus sold the 63 crane for $323,000.
>
> However, as the facts are currently presented, the Court cannot conclude that Plaintiff Maxus suffered no actual or threatened injury concerning the 63 crane. See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

(1982) (quotation omitted). Although the situation is unclear, it appears likely that Plaintiff Maxus suffered a loss of control over the crane and incurred costs in recovering and selling the crane. In addition, Plaintiff Maxus did not recover the full May 2001 "purchase price" of $715,000 for the crane because the subsequent lease and sale transactions netted only $463,000. Therefore, at this time, the Court rejects Defendant Kobelco's contention that Plaintiff Maxus suffered no injury concerning the 63 crane.

**C. Plaintiff Maxus' conversion claim against Defendant Wells Fargo and recovery of chattel claim against Defendants Wells Fargo and Brownell**

Plaintiff Maxus argues that, because it had a superior security interest in the 61 crane, Defendant Wells Fargo wrongfully repossessed the crane and sold it to Defendant Brownell.

In the time between the two transactions at issue in this case. Defendant SELC obtained a $2,540,000 loan from Defendant Wells Fargo on November 22, 2000. As collateral, Defendant SELC pledged the 61 crane and other equipment. Therefore, on November 22, 2000, Defendant Wells Fargo filed a UCC-1 financing statement attempting to designate the crane and other items as collateral. However, Defendant Wells Fargo omitted a zero in its filing, so that the serial number for the 61 crane incorrectly read GD02-0161 rather than the correct serial number GD0201061.

Following the May 2001 transaction between Plaintiff Maxus and Defendant Kobelco, and without conducting a UCC search, Plaintiff Maxus also attempted to create a security interest in the 61 crane. On May 29, 2001, Plaintiff Maxus filed a UCC-1 financing statement listing the 61 and 63 cranes along with their correct serial numbers.

As noted above, Defendant SELC defaulted on all obligations regarding the cranes including its loan obligations to Defendant Wells Fargo and its lease obligations to Plaintiff Maxus. In March 2002, Defendant Wells Fargo repossessed the 61 crane and

sold it to Defendant Brownell for $480,000 net.

**\*3** In order to be valid as a properly recorded security interest, a UCC financing statement must provide a description of the collateral that "reasonably identifies what is described." N.Y. U.C.C. §§ 9-504, 9-108. Collateral is reasonably identified if its identity is "objectively determinable." N.Y. U.C.C. § 9-108(b)(6). Even with minor errors, a financing statement is effective unless the errors make it "seriously misleading." N.Y. U.C.C. § 9-506(a) and cmt. 2; *see also In re Bennett Funding Group*, 255 B.R. 616, 636 (N.D.N.Y.2000) (holding that a financing statement's description must allow distinction between the collateral and other, similar goods that the debtor owns) (quotation omitted); *John Deere Co. of Baltimore, Inc. v. William C. Pahl Constr. Co., Inc.*, 34 A.D.2d 85, 88 (4th Dep't 1970) (holding that a UCC filing is meant to provide mere inquiry notice to serve as starting point for further investigation).

The weight of authority supports the validity of a financing statement with a "one digit" error.[FN6] *See* N.Y. U.C.C. § 9-108 cmt. 2 (rejecting a serial number test); *In re Sarex Corp.*, 509 F.2d 689, 691 (2d Cir.1975) (same); *In re Esquire Produce Co.*, No. 66-B-1052, 1968 WL 9183 (Bankr.E.D.N.Y. Feb. 27, 1968) (finding a one digit typographical error "harmless"); *Marine Midland Bank, N.A. v. Smith Boys, Inc.*, 129 Misc.2d 37, 40 (N.Y.Sup.Ct.1985) (rejecting a serial number test) (citations omitted).

> FN6. White & Summers include an analogous example in their treatise, stating that a description of a "1998 Mack Truck with serial number AB7777" would be adequate even if the serial number actually read "AB7888" because it is objectively determinable that the debtor owned only one such truck and the parties intended to create a security interest therein. 4 *White & Summers* UCC § 3103(b) (5th ed.2006) (citations omitted).

Here, Defendant Wells Fargo filed a UCC financing statement on November 22, 2000, describing the collateral as "One (1) New 2000 Kobelco Crane, Model CK 1000, s/n GD02-0161" and including an extensive list of the crane's attachments. *See*

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

Affidavit of John J. Henry, sworn to Sept. 8, 2005, at Exhibit "Q." As stated, the actual serial number of the 61 crane was GD0201061. [FN7]

> FN7. The Court notes that Plaintiff Maxus made similar serial number errors while renting the 63 crane following SELC's default.

The completeness of the financing statement's description and the totality of the circumstances in this case lead the Court to conclude that the one-digit error was not seriously misleading. Defendant Wells Fargo's financing statement contained the proper debtor along with an accurate description of the year, make, and model of the crane. It also had an extensive list of attachments associated with the 61 crane. A UCC search would have provided inquiry notice regarding Defendant Wells Fargo's security interest in a new 2000 Kobelco Model CK 1000 crane owned by Defendant SELC with an extensive list of attachments and a very similar serial number. The Court finds that this information provided at least a starting point for further investigation and provided enough information to distinguish this collateral from other similar equipment. [FN8] Moreover, pursuant to N.Y. U.C.C. § 9-617(a) and (b), Defendant Wells Fargo's transfer of the 61 crane to Defendant Brownell precludes any claim of Plaintiff Maxus against Defendant Brownell.

> FN8. The cases that Plaintiff Maxus cites are readily distinguishable. In *John Deere Co., Inc. v. Richards,* the serial numbers used "[were] not even close," and the accompanying collateral description was inaccurate. 136 Misc.2d 923, 924 (N.Y.Sup.Ct.1987). Although *In re Aragon Indus., Inc.* states that parties who use serial numbers in multiple item transactions run the risk of subjecting their security interest to attack, that case "was not simply a question of the number being off a digit or being otherwise garbled;" rather, serial numbers were completely omitted. No. 73-263-BK-CF-Y, 1973 WL 21377 (Bankr.S.D.Fla. Nov. 21, 1973). Similarly, *In re The Bennett Funding Group* involved "comparatively extreme example[s]," some of which were "incomprehensible and provide[d] no way ... to ascertain the

identity" of the collateral. 255 B.R. at 636 n. 16. Furthermore, the court explicitly limited its holding to use of the serial number test only when "there is no other way to identify a piece of collateral" and then as part of a multi-factor inquiry. *Id.* at 636-37.

Accordingly, the Court **GRANTS** Defendants Wells Fargo and Brownell's motion for summary judgment on Plaintiff Maxus' conversion and recovery of chattel claims relating to the 61 crane (Causes of Action 1 and 2); and the Court further **DENIES** Plaintiff Maxus' cross-motion for summary judgment on these claims.

**D. Breach of warranty**

*4 Plaintiff Maxus asserts that Defendant Kobelco breached warranties of title pursuant to UCC § 2-312 by entering a contract for sale in May 2001 without having the cranes' titles free of security interests, liens, and encumbrances.

A contract for sale contains a warranty that "the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge."N.Y. U.C.C. § 2-312(1)(b). However, an exception exists in "circumstances which give the buyer reason to know that the person selling does not claim title in himself...."N.Y. U.C .C. § 2-312(2). The official comments clarify that the exception applies to sales by sheriffs, executors, foreclosing lienors, and similarly situated persons, such that the character of the transaction is "immediately apparent" as being outside the ordinary commercial course. N.Y. U.C.C. § 2-312 cmt. 5.

Notwithstanding the parties' arguments about the exception's applicability, the threshold issue is whether a contract for sale was formed between the parties. Without a contract for sale, no warranty under § 2-312 could attach. This matter is disputed, and the parties offer widely divergent factual allegations, supported by employee depositions. [FN9] [FN10]

> FN9. The following key facts are in dispute: (1) Plaintiff Maxus alleges that it received a list of equipment prior to the transaction with a cover sheet indicating that the cranes

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

were new; (2) three former employees of Defendant Kobelco assert that they notified Plaintiff Maxus that the cranes had already been delivered to Defendant SELC; and (3) Defendant Kobelco claims that Maxus' employees directed it to "fix" invoices that showed a previous sale of the cranes to Defendant SELC by inserting Plaintiff Maxus' name as buyer for the purpose of enabling Maxus to obtain financing.

FN10. Even if the contract's existence were not disputed, the applicability of the "reason to know" exception is a question of fact that cannot be decided on summary judgment. *See, e.g., Jones v. Linebaugh,* 34 Mich.App. 305, 310 (Mich.Ct.App.1971) (citations omitted). The Second Circuit has stated that, in UCC matters, out-of-state precedents are " 'more than mere persuasive authority.' " *In re Lou Levy & Sons Fashions, Inc.,* 988 F.2d 311, 316 n. 5 (2d Cir.1993) (quotation omitted).

Accordingly, the Court **DENIES** both Defendant Kobelco's motion and Plaintiff Maxus' cross-motion for summary judgment on Plaintiff Maxus' breach-of-warranty cause of action (Cause of Action 3).

**E. Tort Claims**

*1. Fraud and Conversion*

It is a well-settled matter of New York law that a tort cause of action does not lie where it is duplicative of a claim sounding in contract: the plaintiff must assert that the defendant breached a duty independent of the claimed contract. *See, e.g., Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19-20 (2d Cir.1996) (citations omitted).[FN11] Thus, the addition of a scienter allegation alone is generally insufficient to transform a contract cause of action into an actionable tort. *See Bibeau v. Ward,* 228 A.D.2d 943, 943-44 (3d Dep't 1996) (citation omitted). When "the identical contractual benefit of the bargain recovery is sought," the tort action is barred as duplicative. *Rockefeller Univ. v. Tishman Constr. Corp. of N.Y.,* 240 A.D.2d 341, 342 (1st Dep't 1997).

FN11.*See also Grappo v. Alitalia Linee*

*Aeree Italiane,* 56 F.3d 427, 434 (2d Cir.1995) (citations omitted); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389 (1987) (citations omitted); *Merzon v. Lefkowitz,* 289 A.D.2d 142, 143 (1st Dep't 2001) (citation omitted); *Interstate Adjusters, Inc. v. First Fidelity Bank, N.A.,* 251 A.D.2d 232, 234 (1 st Dep't 1998) (quotation omitted); *Stella Flour & Feed Corp. v. Nat'l City Bank of N.Y.,* 285 A.D. 182, 187 (1st Dep't 1954) (citations omitted).

In this case, all allegations in the fraud, conversion, and breach-of-warranty causes of action are identical, except for an additional allegation of scienter. Moreover, Plaintiff Maxus seeks to recover the identical contractual benefit of the bargain or "purchase price" in each cause of action and alleges no independent facts to support tort liability.[FN12][FN13] Therefore, the Court finds that Plaintiff Maxus' fraud and conversion claims are duplicative of its breach-of-warranty claim.

FN12. Plaintiff Maxus' reliance on Rule 8(e) of the Federal Rules of Civil Procedure and *Henry v. Daytop Village, Inc.,* 42 F.3d 89, 95 (2d Cir.1994), for the proposition that it can plead alternative causes of action, is misplaced. These authorities address pleading potentially inconsistent causes of action, but precedent indicates that these tort causes of action cannot coexist at all with a seemingly consistent contract claim based on identical allegations.

FN13. Furthermore, the Court recognizes the inherent logic of the rule barring duplicative tort and contract actions. On one hand, if Plaintiff Maxus proves the existence of a contract, it will recover contract-based damages for any breach. On the other hand, if no contract of sale existed, Defendant Kobelco could not have defrauded Plaintiff Maxus because it did not attempt to sell already-sold cranes. Also, if no contract existed, Defendant Kobelco could not have committed conversion because Plaintiff Maxus had no superior right to the cranes.

Accordingly, the Court **GRANTS** Defendant

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

Kobelco's motion for summary judgment on Plaintiff Maxus' fraud and conversion claims (Causes of Action 4 and 7).

### 2. Conspiracy

*5 There is no substantive tort of conspiracy in New York. *See Stuart v. Tomasino,* 148 A.D.2d 370, 372 (1st Dep't 1989) (citations omitted). An allegation of conspiracy is "permitted only to connect the actions of separate defendants with an otherwise actionable tort...."*Id.*(citation omitted); *see also Alexander & Alexander of N.Y., Inc. v. Fritzen,* 68 N.Y.2d 968, 969 (1986) (citations omitted). Therefore, conspiracy to commit fraud is not an independent cause of action. *See Alexander,* 68 N.Y.2d at 969 (quotation and other citations omitted); *MBF Clearing Corp. v. Shine,* 212 A.D.2d 478, 479 (1 st Dep't 1995) (quotation and other citation omitted). Moreover, once the underlying fraud cause of action is dismissed, "the charge of conspiracy to effectuate [it] adds nothing and must also fall."*Block v. Chassin,* 36 A.D.2d 703, 703 (1st Dep't 1971) (citation omitted).

In this case, Plaintiff Maxus alleges that a conspiracy to defraud existed between Defendant Kobelco and Defendant SELC.[FN14]However, it asserts this cause of action against Defendant Kobelco only and does not use it to connect separate defendants to the alleged fraud. In addition, since the Court has already granted summary judgment on the fraud cause of action to Defendant Kobelco, the conspiracy claim "must also fall." *Id.*

> FN14. The Court notes that, because Plaintiff Maxus would be a party to any contract that might have existed, it is barred from asserting a cause of action for conspiracy to breach a contract. *See North Shore Bottling Co., Inc. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 179 (1968) (quotation and other citations omitted).

Accordingly, the Court **GRANTS** Defendant Kobelco's motion for summary judgment on Plaintiff Maxus' conspiracy claim (Cause of Action 5).

### F. Unjust enrichment and money had and received

Unjust enrichment is based on implied or quasi-contract.[FN15]*See Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir.1982) (citation omitted). The plaintiff is required to "establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution."*Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000) (citation omitted). A restitution remedy is available whether the defendant engaged in wrongdoing or merely obtained the plaintiff's money by mistake. *See Citipostal, Inc. v. Unistar Leasing,* 283 A.D.2d 916, 919 (4th Dep't 2001) (citations omitted).

> FN15. The causes of action for unjust enrichment and money had and received are identical. *See In re Estate of Witbeck,* 245 A.D.2d 848, 850 (3d Dep't 1997).

Since this form of relief is quasi-contractual, "[i]t applies in situations where no legal contract exists."*Indyk,* 694 F.2d at 57. Therefore, the existence of an enforceable contract generally precludes recovery on this theory. *See Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537, 2003 WL 23018888, *17 (S.D.N.Y. Dec. 22, 2003)* (quotation omitted).

In this case, due to the quasi-contractual nature of this cause of action, there is a threshold issue regarding the existence of a contract. As noted above, this issue is disputed. If a contract were formed between Plaintiff Maxus and Defendant Kobelco, then quasi-contractual relief would be precluded. However, if no contract existed, a remedy may be afforded if the facts show that it would be unjust for Kobelco to keep the "purchase" money that Maxus remitted for the 61 crane. *See Indyk,* 694 F.2d at 57 (quotation omitted). Therefore, the Court cannot rule at this time as a matter of law, but must await a jury's determination as to whether there is a contract cause of action.

*6 Accordingly, the Court **DENIES** both Defendant Kobelco's motion and Plaintiff Maxus' cross-motion for summary judgment on Plaintiff Maxus' unjust enrichment and money had and received claim (Cause of Action 6).

### IV. CONCLUSION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

Accordingly, after reviewing the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants Wells Fargo and Brownell's motion for summary judgment is **GRANTED** and Plaintiff Maxus' cross-motion for summary judgment is **DENIED** on Plaintiff Maxus' conversion and recovery-of-chattel claims concerning the 61 crane (**Causes of Action 1 and 2**); and the Court further

**ORDERS** that Defendant Kobelco's motion for summary judgment is **GRANTED** and Plaintiff Maxus' cross-motion for summary judgment is **DENIED** on Plaintiff Maxus' fraud, conspiracy, and conversion claims (**Causes of Action 4, 5, and 7**); and the Court further

**ORDERS** that both Defendant Kobelco's motion and Plaintiff Maxus' cross-motion for summary judgment are **DENIED** on Plaintiff Maxus' breach-of-warranty and unjust enrichment claims (**Causes of Action 3 and 6**); [FN16] and the Court further

> FN16. Accordingly, two matters remain for trial: (1) Plaintiff Maxus' breach of warranty of title claim against Defendant Kobelco (**Cause of Action 3**); and (2) Plaintiff Maxus' unjust enrichment and money had and received claim against Defendant Kobelco (**Cause of Action 6**).

**ORDERS** that Plaintiff Maxus' counsel is to initiate a telephone conference with the Court and opposing counsel for the one remaining Defendant, Defendant Kobelco, using a professional conferencing service on March 6, 2007 at 9:45a.m. to set a trial date for this action.

**IT IS SO ORDERED.**

N.D.N.Y.,2007.
Maxus Leasing Group, Inc. v. Kobelco America, Inc.
Not Reported in F.Supp.2d, 2007 WL 655779 (N.D.N.Y.), 63 UCC Rep.Serv.2d 140

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 13**



C Daredia v. Gold & Diamond Merchants Group, Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
Shabbudin ("Sam") DAREDIA, Individually and as Representative for Carats and Karats, Inc.; Gheilam ("George") Meghani, Individually and as Representative for General Management Group; Mr. & Mrs. Syed Aly, Individually and as Representative for Elegance Jewelry, Arlan Jirani, Individually and as Representative for J.C. Sons Jewelers, and Nooraii Jirani, Individually and as Representative for Karat Gold, Plaintiffs,
v.
GOLD & DIAMOND MERCHANTS GROUP, INC. and Avondale Federal Savings Bank, Defendants.
No. 97 C 8149.

Sept. 30, 1999.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, J.
**\*1** Plaintiffs Shabbudin Daredia ("Daredia"), individually and as representative for Carats and Karats, Inc. ("Carats & Karats"), Gheilam Meghani ("Meghani"), individually and as representative for General Management Group ("GMG"), and Mr. and Mrs. Syed Aly, individually and as representative for Elegance Jewelry ("Elegance Jewelry") (collectively, "Plaintiffs"), have brought this action against Defendants Gold and Diamond Merchants Group, Inc. ("Gold and Diamond") and Avondale Federal Savings Bank ("Avondale"),[FN1] alleging numerous claims, all which essentially revolve around the parties' contract dispute. The contracts involved in this case were part of a credit card loan program run by Avondale and entered into by various jewelry merchants, including Plaintiffs. Plaintiffs allege, *inter alia,* that Avondale breached the contracts with them by wrongfully charging back transactions to Plaintiffs' accounts.

FN1. Since this case has been filed, the following parties have been voluntarily dismissed from the action: Plaintiffs Arlan Jirani, J.C. Sons Jewelers, Noorali Jirani and Karat Gold and Defendant Gold and Diamond.

In addition, Avondale has filed (1) a Counterclaim against Plaintiffs seeking, *inter alia,* "chargeback" amounts for alleged violations of the contracts, and (2) a Third-Party Complaint against Shirazuddin Jiwani ("Jiwani") (Count I) and Ashraf Riayyani [FN2] (Count II), based on each of their personal guarantees of two of the contracts with Avondale.

FN2. This claim seeks judgment against Ashraf Raiyyani, the president of Hamida, Inc. based on her guaranty of the Hamida, Inc. indebtedness. Avondale explains that this claims was brought as a third-party claim because Avondale was unaware that the plaintiff identified as "Mrs. Syed Aly" was in fact Ashraf Riayyani ("Riayyani"). (*See* Avondale Mem. at 18, n. 25.)

Avondale now moves for summary judgment on (1) all causes of action in Plaintiffs' Complaint, (2) Counts I, II, V, VIII and IX of Avondale's Counterclaim,[FN3] and (3) Count II of Avondale's Third-Party Complaint. For the reasons set forth below, the Court grants in part and denies in part Avondale's summary judgment motion on Plaintiffs' Complaint and denies Avondale's motion for its summary judgment on Counts I, II, V, VIII and IX of its Counterclaim and Count II of its Third-Party Complaint.

FN3. Avondale says that it will not pursue Counts III, IV, VI, VII and X of the Counterclaim in the event that summary judgment is entered in its favor on the counts which are the subject of this motion. The remaining portions of the Counterclaim- Counts XI, XII, XIII, XIV and XV- constitute claims asserted against the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

plaintiffs who have not answered the Counterclaim and who have since voluntarily dismissed their claims against Avondale. Avondale says that it will later move for a default judgment against those parties. (*See* Avondale Mem. at 18, n. 25.)

### BACKGROUND[FN4]

FN4. Plaintiffs argue that the affidavit of Tina Perez ("Perez"), which Avondale relies on in support of a number of its material facts, should be stricken as improper. (*See* Pls. Resp. at 2-6.) Specifically, Plaintiffs argues that Perez does not have personal knowledge to testify as to some of her statements and that her deposition testimony contradicts other statements. Rule 56(e) of the Federal Rules of Civil Procedure requires that any affidavit submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."Perez testifies that she is the vice-president of Avondale, that she has been part of the Credit Card Program department since its inception and that she has personal knowledge of the facts set forth in the affidavit. Thus, this Court finds her competent to testify to matters concerning the operation of the Credit Card Program. In addition, the Court has reviewed Perez's affidavit and has not found any relevant portion of the affidavit to be in violation of Rule 56(e).

Unless otherwise noted, the following facts are undisputed. Daredia is the president and one of two shareholders of Carats & Karats. Meghani is the president and one of two shareholders of GMG. Riayyani is the president and a shareholder of Hamida, Inc., of which Elegance Jewelry is the trade name. The Individual Plaintiffs are residents of Texas, and the Corporate Plaintiffs- Carats & Karats, GMG, and Elegance Jewelry-are Texas corporations with their principal places of business in Texas. Avondale is a federal savings bank with its principal place of business in Chicago, Illinois.

In June 1996, through the execution of standard form "Merchant Agreements," Avondale began entering into contracts with various jewelry merchants in connection with a Private Label Credit Card Program ("Credit Card Program" or the "Program") started in conjunction with Gold and Diamond, a jewelry wholesaler having contractual relationships with small jewelry merchants. Under the Credit Card Program, Avondale was to act as a merchant processing bank for credit card transactions initiated by customers of jewelry merchants at the merchants' place of business. These customers would complete an application and provide two forms of identification, and the jewelry merchant would transmit the information to Avondale through a credit card computer terminal. Avondale then would conduct a credit check on each applicant, and within a few minutes, would either approve or reject the applicant for credit. Approved applicants would receive a credit limit and could, at that point, complete the purchase; approved applicants would also receive a private label credit card on which to make subsequent purchases. Avondale would then bill the merchant's customer on a monthly basis for the amount of the purchase. Avondale received a discount percentage from the retailer at the time the charge was made and would also charge interest on the customer's charge account.

**\*2** Jewelry merchants participating in the Credit Card Program were required to sign a Merchant Agreement and the principals of the jewelry retailers signed a Payment and Performance Guaranty Agreement ("Guaranty Agreement"), guaranteeing the payment of sums due and owing under the Merchant Agreement. Among other things, the Merchant Agreement contained certain provisions which entitled Avondale to charge back the sale amount to the merchant where the transaction violated certain warranties set forth in the Agreement. (*See* Avondale 12(M) Exs. E, H, and L at ¶¶ 5-6.)

Carats & Karats, GMG, and Elegance Jewelry all participated in the Credit Card Program and processed jewelry purchase credit transactions through Avondale. It is undisputed that each of the Corporate Plaintiffs executed the signature page of a Merchant Agreement with Avondale in or about June 1996, but there is some disagreement as to whether they each saw and/or received a full copy of this

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

Agreement. (*See* Pls. 12(N) ¶¶ 7-16.) In addition, Daredia, Meghani, Raiyyani each executed a Guaranty Agreement in June 1996, securing the debts of Carats & Karats, GMG and Elegance Jewelry, respectively.[FN5]

> **FN5.** Riayyani contends that at the time she signed the Guaranty Agreement on June 3, 1996, she only saw the last page; she did not ask to see or review the other pages of the document. (Avondale 12(M) ¶ 16.)

During 1996, the volume of business generated from the Credit Card Program, both in terms of jewelry merchants and the number of credit cards, greatly exceeded Avondale's original estimates. After only six months of operation, there were over 370 merchants participating in the program from all over the country. By December 1996, Avondale had suffered significant losses in the Credit Card Program as a result of unauthorized transactions and delinquencies in credit card accounts opened by jewelry merchant customers. Avondale charged back several of Plaintiffs' accounts in cases where, according to Avondale, an original loan application was not submitted, a customer disputed the account for defective merchandise, or the accounts were found to be fraudulent at the point of sale. Plaintiffs contend that Avondale was not entitled to make such chargebacks under the Agreement and specifically deny that they failed to submit any original loan applications.[FN6]

> **FN6.** Plaintiffs have submitted evidence, by way of deposition testimony, that the merchants had mechanisms in place to mail the applications each week to Avondale, that they did, in fact, mail all original applications and that, when originally notified that certain applications had not been received, they resent the applications, in some instances more than once. (*See, e.g.,* Pls. 12(N) at ¶¶ 47, 52; Avondale 12(M) Ex. F at 106; Ex. I at 63-65, Ex. M at 56-57.)

In February 1997, Avondale decided that various changes needed to be made to the Program. Representatives of Avondale, with Gold and Diamond, organized a meeting of jeweler merchants at a jewelry convention in Las Vegas in early February 1997. At that meeting, Avondale informed

the attendees, *inter alia,* of problems that it was experiencing with the Program and that it might be increasing the percentage of sales owed to Avondale.[FN7]

> **FN7.** Plaintiffs assert that at this Las Vegas meeting, Avondale referred to Pakistani jewelers as "crooks," (*see, e.g.,* Pls. 12(N) ¶ 61, Avondale 12(M), Ex. M. pp. 41-54)-an assertion Avondale disputes (*see* Avondale 12(N)(3) ¶ 16).

On February 5, 1997, Avondale sent notices to all jewelry merchants who were then participating in the Credit Card Program, notifying them of changes to the Merchant Agreement. These changes included changes in the discount percentages payable by merchants for credit card transactions and changes in the termination provisions. For example, instead of the 90-day notice of termination previously required, Avondale could now cancel the program at any time and for any reason, upon giving written notice to the jewelry merchant. (Avondale 12(M) ¶ 21, Ex. O.) Each of the Corporate Plaintiffs received copies of Avondale's notice. Plaintiffs all processed credit card transactions after receipt of this notice from Avondale.

**\*3** According to Avondale, the changes to the Credit Card Program initiated in February 1997 did not lessen the continuing losses accruing from the Programs; as a result, in May 1997, Avondale decided to terminate the Credit Card Program. The termination of the Program took place in stages, and the first notices of termination were sent to all jewelry merchants in Texas and Oklahoma. Carats & Karats, GMG, and Elegance Jewelry each received their respective notices of termination of the Credit Card Program on or about Friday, May 2, 1997, informing them that the Program was no longer in effect as of Monday, May 5, 1997. Plaintiffs complain that this termination came at an inopportune time-just six days before Mothers' Day-and that Mothers' Day Sales were hurt because merchants were unable to sell their merchandise on credit to the credit card holders in the Program.

All other jewelry merchants in the Credit Card Program were terminated during the summer of 1997, and the Program was completely shut down by the end of August 1997. Thereafter, Plaintiffs filed the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

present action.[FN8]

> FN8. This action was originally filed in
> Texas state court and was later removed to
> the United States District Court for the
> Southern District of Texas on diversity
> jurisdiction grounds. It ultimately was
> transferred to this Court based on the fact
> that the Merchant Agreements contain a
> mandatory forum and jurisdiction selection
> clause requiring that any suit arising from
> the contract be filed in Chicago and be
> governed by Illinois law.

Plaintiffs' Complaint alleges, among other things, that beginning in March 1997, Avondale began to make large and numerous chargebacks to Plaintiffs' accounts and that "when Plaintiffs began to complain and make demand for proper documentation of the forgery complaints, Avondale, without notice or warning, shut down the computer terminals ... and refused to honor any purchases by any cardholders."(Compl.¶ 13.) Plaintiffs further allege that "Plaintiffs' respective businesses have suffered a severe loss in sales" as a result of Avondale's actions (*id.* at ¶ 14), and claim that Avondale breached the terms of the Merchant Agreement in that the "chargebacks to Plaintiffs' accounts were unauthorized,"(*id.* at 4). In addition to their breach of contract claim, Plaintiffs also assert the following host of claims: conspiracy, fraud, disparate discriminatory treatment based on nationality (Pakistani), deceptive trade practices, unconscionability and misrepresentation regarding contract terms, breach of duty of good faith and fair dealing, wrongful chargeback, fraud in the transaction, negligence and gross negligence, and conversion.

Avondale's Counterclaim and Third-Party Complaint allege that several accounts from each of the Corporate Plaintiffs failed to meet the requirements under the Merchant Agreements for jewelry purchases. As a result, Avondale alleges that it was entitled to, and did, charge back Plaintiffs for such breaches. Avondale seeks to recover from the Corporate Plaintiffs the chargebacks amounts remaining on their account or to recover payment on the Individual Plaintiffs' Guarantees for the alleged amounts due and owing from their corporations.

*DISCUSSION*

I. *Standards for Summary Judgment*

Summary judgment is appropriate where the pleadings, answers to interrogatories, affidavits, and other materials show that there exists "no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists only if there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."*Id.* at 249.When considering a motion for summary judgment, a court must view the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the non-movant. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991).

II. *Plaintiffs' Complaint*

A. *The Individual Plaintiffs*

**\*4** Before reaching the merits of Plaintiffs' claims, the Court first addresses Avondale's contention that the four Individual Plaintiffs should be dismissed from the action because there is "no discernable basis upon which the individual plaintiffs possess a claim against Avondale."(Avondale Mem. at 6.) Avondale asserts that, with the exception of the disparate treatment claim, all of the other causes of action in Plaintiffs' Complaint relate to the Merchant Agreements and to the operation of the Credit Card Program. Because the Merchant Agreements were executed by Carats & Karats, GMG and Hamida, Inc./ Elegance Jewelry-Texas Corporations-Avondale argues that the Individual Plaintiffs have no basis to seek damages.

"As a general principle, a corporate shareholder does not have an individual right of action against third persons for damages to the shareholder resulting indirectly from injury to the corporation."*Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989). There are certain exceptions to this general rule, "such as where a special contractual duty exists between the wrongdoer and shareholder or where the shareholder

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

suffers an injury separate and distinct from that suffered by other shareholders."*Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985).

Plaintiffs offer two reasons why the Individual Plaintiffs have claims in this case: (1) because the Individuals Plaintiffs signed Guarantees of the corporate debt to Avondale, if any, and have a right to defend against Avondale's Counterclaims against them, and (2) because each Individual Plaintiff has "lost assets, goodwill, good business reputation and customers."(Pls. Resp. at 7, ¶ 22.) Neither reason is sufficient, however. First, the Complaint does not assert any cause of action based on the Guaranty Agreements, nor have any facts supporting such a cause of action been set forth by Plaintiffs in their 12(N) Statement.[FN9]Second, although Plaintiffs argue in their response brief that injuries have been alleged which "have a direct impact on the business reputation and good will built over a long period of time by the individual plaintiffs, (Pls. Resp. at 25), such damages have not been set forth in any pleading thus far. The injuries alleged here are solely to the corporations who entered into the Merchant Agreements and, as such, are the only parties authorized to vindicate their respective rights.

> FN9. In fact, one of the Individual Plaintiffs-Syed Ayed-did not even execute a Guaranty Agreement. As best the Court can determine, his sole relationship to the action is that he is the husband of Raiyyani-the owner and president of Hamida, Inc.

B. *Breach of Contract Claims*

At the heart of this action is Plaintiffs' claim that Avondale has breached the Merchant Agreement by wrongfully charging back various transactions to Plaintiffs' respective accounts. Plaintiffs, however, have unnecessarily muddied the waters by including a hodgepodge of other claims in their Complaint which are intertwined with the breach of contract issue. These claims must be dismissed because they are either impermissible tort claims [FN10] or claims which are duplicative of the breach of contract claim.[FN11]

> FN10. The economic loss doctrine prohibits recoveries in tort which are also recoverable

in contract. See*Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 435 N.E.2d 443 (1982)*see*also*Getto v. Village of Palos Park,* 1998 WL 801987, at *1 (N.D.Ill. Nov. 12, 1998) (same). Because Plaintiffs' relationship with Avondale is contractual, Plaintiffs' "negligence and gross negligence" claim (Compl.¶ K) and conversion claim (Compl.¶ G) are dismissed. Furthermore, as for the conversion claim, because Plaintiffs "seek only a certain amount of money rather than a specifically identifiable fund or account," Plaintiffs cannot state a claim for conversion. See*Horbach v. Kaczmarek,* 934 F.Supp. 981, 986 (N.D.Ill.1996); *see*also*Sutherland v. O'Malley,* 882 F.2d 1196, 1200 (7th Cir.1989).

> FN11. The duplicative contract claims include: (1) "wrongful charge back"; (2) "breach of good faith and fair dealing"; and (3) "fraud in the transaction." The wrongful charge back claim contains identical allegations as Plaintiffs' breach of contract claim and is wholly unnecessary. (Compl.¶ I.) As for Plaintiffs' claim that Avondale "failed to act in good faith and failed to deal fairly with Plaintiffs"(*id.* at ¶ H), the proper place for such an argument is within a breach of contract claim, not standing alone as its own claim. See*Echo, Inc. v. Baxter Health Care Corp.,* 121 F.3d 1099, 1106 (7th Cir.1997); *see*also*Cobb-Alvarez v. Union Pac. Corp.,* 962 F.Supp. 1049, 1054 (N.D.Ill.1997) ("Illinois does not recognize a breach of good faith and fair dealing cause of action, apart from a breach a contract claim."). Finally, Plaintiffs' claim that Avondale breached the Merchant Agreement by not properly documenting Plaintiffs' customers' complaints of forgery (Compl.¶ J), is really just another way of claiming that Avondale wrongfully charged back their accounts; it is not an independent cause of action. In any event, because Plaintiffs have failed to demonstrate that any of the chargebacks here were "fraudulent," this claim is dismissed.

**5** The contract dispute here essentially revolves around the interpretation of two paragraphs in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

Merchant Agreement. Specifically, Plaintiffs claim that Avondale breached the terms of the Merchant Agreement in that the chargebacks it made to Plaintiffs' accounts were not authorized by the merchants' representations and warranties set forth in the contract. (*See* Cmpl. ¶¶ B, I.) [FN11] Avondale disagrees, asserting that Plaintiffs' interpretation of the contract "makes no sense." (Avondale Reply at 13.)

> FN11. In addition, Plaintiffs assert (in their response brief only) that the Merchant Agreements constitute contracts of adhesion because Plaintiffs "did not freely choose the terms of the agreement. Either they signed it or they did not have an outlet for selling their merchandise."(Pls. Resp. at 16.) Such an argument is meritless. Each of the Plaintiffs testified that they accept MasterCard, Visa and American Express from their customers (Avondale 12(M) Ex. F at 15-17; Ex. I at 12-13; Ex. M at 15-16), and the customers could have certainly paid with cash or by check.

In *Taracorp, Inc. v. NL Industries, Inc.,* 73 F.3d 738 (7th Cir.1996), the Seventh Circuit explained how contracts are to be interpreted under Illinois law: [FN12]

> FN12. Illinois law applies to the claims here by virtue of Plaintiffs' contractual agreement to that effect. (*See* Merchant Agreements, at ¶ 10.)

"The starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over."....If the plain language of the contract is ambiguous, then "the court must go on to declare [the contract's] meaning."....If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide.... However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a fact-finder must be called upon to determine the intent of the parties. *Id.* at 743 (citing *Lumpkin v. Envirodyne Indus.,* 933 F.2d 449, 456 (7th Cir.1991)). Illinois requires that contracts be interpreted as a whole, in a way that gives effect to all terms, in the light of their ordinary and natural meanings. *LaSalle National Trust, N.A. v.*

*ECM Motor Co.,* 76 F.3d 140, 144 (7th Cir.1996) (citations omitted).

Under Illinois law, a contract is intrinsically ambiguous if "its language is reasonably and fairly susceptible to more than one meaning."*CSX Transp. v. Chicago & North W. Transp. Co.,* 62 F.3d 185, 189 (7th Cir.1995). However, the contractual language "is not ambiguous simply because the parties disagree upon its meaning ... nor is it ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends."*Foxfield Realty, Inc. v. Kubala,* 287 Ill.App.3d 519, 678 N.E.2d 1060, 1063 (2d Dist.1997) (citations omitted); *seealsoMatter of Envirodyne Indus., Inc.,* 29 F.3d 301, 304 (7th Cir.1994).

With these general statements of law in mind, the Court turns to the paragraphs of the Merchant Agreement at issue. Paragraph 5 of the Agreement sets forth the following warranties:

5. *Representations and Warranties.*Merchant represents and warrants that (a) each transaction submitted to Bank complies with the terms of this Agreement, any policies and procedures of Bank with respect to the Program and applicable laws, rules and regulations, including these representations and warranties, ... (e) each account and transaction results from a bona fide sale of merchant in its ordinary course of business at its place of business ..., (f) the establishment of the account and each transaction is valid and legally enforceable and is not subject to any claim or defense whatsoever ... (g) the cardholder does not dispute the sale transaction or the delivery for quality of the merchandise or services and has no claim or defense to payment, (h) no information has been altered or is fraudulent....

*6 (Merchant Agreement, ¶ 5.) Paragraph 6 of the Merchant Agreement provides that:
In the event of any breach of any term, condition, convenant, representation or warranty in the Agreement ... or any transaction is subject to claim or defense or other dispute, then Merchant shall upon demand repurchase any transaction or account so affected.... Bank may charge Merchant's account for any such claims or losses....

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

(*Id.* at ¶ 6.)

Avondale has charged back Plaintiffs' accounts for several purchases that it asserts failed to "meet the requirements of the Agreement" because (1) "Plaintiffs failed to submit the original loan application," (2) "the customer disputed the accounts for defective merchandise" or (3) "the accounts were found to be fraudulent at the point of sale."(Countercl.¶ 5.) Plaintiffs primarily take issue with respect to the last two of these three reasons, and thus, the Court addresses them first. Specifically, Plaintiffs argue that the warranties regarding fraudulent transactions made in paragraph five of the Agreement only apply to fraudulent acts by the *merchants* and should not be read as extending to any transactions instituted by a merchants' customers. (Pls. Resp. at 13-14.) Plaintiffs further maintain that the warranty section is vague and ambiguous and that the only reasonable interpretation is that the merchants are not responsible for the acts of a third party. (*Id.*) On the other hand, Avondale argues that because it was the jewelry merchants themselves who would be handling the applications for credit and participating in the point of sale transaction, "the Merchant Agreement was drafted so as to place the responsibility for the legitimacy of transactions and customer satisfaction on the individual jewelry merchants."(Avondale Mem. at 14.) According to Avondale, "[i]t is not the establishment of the fact of a fraudulent transaction or the legitimacy of a customer dispute which gave Avondale the right to charge back the merchant; rather it is the *existence* of such a claim or dispute which constitutes the breach of the representation and warranty."(*Id.*) (emphasis in original.)

The Court first notes that it does not find the relevant provisions of the Merchant Agreement to be "intrinsically ambiguous ." *SeeCSX Transp., 62 F.3d at 189.* Rather, as to the question of whether Avondale was entitled to chargeback Plaintiffs for customer dissatisfaction and/or fraudulent transactions, the Court finds that the clear and express language of the warranty provisions to be susceptible to only one reasonable interpretation- the one suggested by Avondale. In paragraph 5, subsections (f), (g) and (h) of the Merchant Agreement, the merchant warrants that "(f) the establishment of the account and each transaction is valid and legally enforceable and not subject to any

claim or defense whatsoever," that (g) "the cardholder does not dispute the transaction or the delivery or quality of the merchandise or service and has no claim or defense to payment," and that (h) no information has been altered or is fraudulent." (Merchant Agreement ¶ 5.) Paragraph six then authorizes Avondale to charge back merchants for breach of the warranties and representations set forth in the Agreement. (*Id.* at ¶ 6.) It is clear to this Court that, pursuant to the unambiguous language of paragraphs five and six, the merchants have agreed to essentially indemnify Avondale for any transaction that a customer disputes, for any reason. While it is possible that Plaintiffs may not have understood the full extent of these warranties, there is no question as to what the provisions in dispute plainly provide.

*7 However, in addition to the chargebacks for customer disputes and/or fraudulent transactions, Avondale has also charged back Plaintiffs' accounts based on its claim that Plaintiffs failed to submit all original credit card applications from Plaintiffs. (*See* Countercl. ¶ 5.) Plaintiffs contend, and have offered deposition testimony in support of their contention, that they did not fail to submit any original applications to Avondale. (*See, e.g.,* Avondale 12(M) Ex. F at 106; Ex. I at 63-65, Ex. M at 56-57.) Plaintiffs suggest instead that Avondale was unprepared for the tremendous amount of applications that it received and that it had an imperfect system for imputing the receipt of the applications. (Pls. Resp. at 14.)

This Court finds that there is sufficient evidence in the record to create a genuine issue of material fact as to whether Plaintiffs actually sent the original credit card applications in question to Avondale, and consequently, whether Avondale's chargebacks to Plaintiffs' accounts based on "the missing applications" was proper. Because it cannot be determined from the evidence here which chargebacks were based on fraudulent transactions and/or customer disputes and which were based on "the missing applications," summary judgment must be denied on Plaintiffs' breach of contract claim. (*See* Compl. ¶ B.) [FN10]

> FN10. Parenthetically, although none of the breach of contract claims specifically include a claim of improper termination, because Plaintiffs seem to suggest such a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

claim in their brief and in several attached depositions, the Court addresses this issue briefly. All Plaintiffs admit to receiving Avondale's February 5, 1997 letter notifying them that the second sentence of Section 9 of the Merchant Agreement was to be changed to the following:

> Bank may terminate this Agreement at any time for any
>
> reason upon the giving of written notice to Merchants, ... (Avondale 12(M) Ex. O.) It is also undisputed that all Plaintiffs processed transactions after receipt of the notice. (*Id.* ¶¶ 21-22.)Given the fact that each Plaintiff further admits to having received their respective notices of termination on May 2, 1997, just prior to the termination of the Program on May 5, 1997, the Court finds that there was no improper termination of the Merchant Agreements.

## C. *Conspiracy Claim*

Plaintiffs' Complaint alleges a cause of action for conspiracy between Avondale and Gold and Diamond consisting of a "plan or scheme for the unlawful purpose of taking over Plaintiffs' business enterprise."(Compl.¶ 15(A)).

In Illinois "[c]ivil conspiracy consists of a combination of two or more persons for the purpose of accomplishing by some concerned action either an unlawful purpose or a lawful purpose by unlawful means."*Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62, 645 N.E.2d 888, 894 (1995). To state a cause of action for conspiracy, a plaintiff must allege not only that one of the conspirators committed an overt act in furtherance of the conspiracy, but also that such act was tortious or unlawful in character. *Id.* at 894.

Here, Plaintiffs do not identify a specific tortuous act in furtherance of the conspiracy in their Complaint, but suggest in their response brief that the tortuous act was "the way Avondale went about terminating the merchants accounts."(Pls. Resp. at 10-11.) Specifically, Plaintiffs complain that the February 7, 1997 notice changed the terms of the Merchants Agreements from requiring a 90-day notice of

termination to requiring no notice at all and that Avondale then, almost exactly 90-days later, terminated the Program with no notice, just before Mother's Day sales. (*Id.*) Plaintiffs seem to argue in their response brief that the alleged conspiracy was a scheme to permit Gold and Diamond to sell Mother's Day inventory to Plaintiffs before the Credit Card Program was terminated. (*Id.*)

However, while Plaintiffs are undoubtedly unhappy with the situation they found themselves in when the Program was terminated, they have offered no evidence that such actions by Avondale were tortuous or unlawful. As a result, there is no evidence in the record to support a conspiracy, and Avondale is entitled to summary judgment on this claim.

## D. *Formation of the Contract Issues*

**\*8** Plaintiffs' Complaint also asserts two claims which raise issues relating to the formation of the contract at issue here. (*See* Compl. ¶¶ C and G.) Specifically, Plaintiffs allege that Defendants "procured the Merchant Agreement by fraudulent representations"(*id.* ¶ C)-(although they do not identify what these representations were), and "that [Avondale] "purposefully and with malice misrepresented the length of the Merchants Agreements Plaintiffs were asked to sign."(*id.* at ¶ G). Plaintiffs have not produced evidence supporting either claim, and summary judgment is granted as to both of these claims.

## E. *Deceptive Business Practices Act*

Plaintiffs allege in their Complaint that Defendants have engaged in false, misleading or deceptive acts that violate the Texas Deceptive Trade Practices Act § 17.46. (Compl.¶ F.) However, because Illinois law governs their business relationship, Plaintiffs re-characterize this claim in their response brief as arising under the Illinois Consumer Fraud and Deceptive Business Practices Act, 825 ILCS 505/101-505 (the "Act"). The elements under the Act are: (1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception; and (3) that the deception have occurred in the course of conduct involving trade or commerce. *Siegel v. The Levy Org. Dev. Co.,* 153 Ill.2d 534, 542, 607 N.E.2d 194, 198 (1992).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

Plaintiffs have not and cannot establish a claim under this Act. First, Plaintiffs have not shown that Avondale engaged in any deceptive acts or practices. Second, the Corporate Defendants do not qualify as "consumers" under the Act. *See Doherty v. Kahn, 289 Ill.App.3d 563-64, 682 N.E.2d 163, 176-77 (Ill.App.Ct.1997)*. "[W]here a dispute involves two businesses that are not consumers, the proper test is 'whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns.'" *Id.* at 564 (citation omitted). *See also Empire Home Servs. Inc. v. Carpet Amer., Inc.*, 274 Ill.App.3d 666, 669, 653 N.E.2d 852, 854 (Ill.App.Ct.1995). The Credit Card Program in this case was not offered generally to consumers but only to specified jewelry merchants and then only in connection with a detailed contractual relationship. The Act does not apply to the Corporate Plaintiffs here and, thus, the deceptive trade practices claim is dismissed.

F. *"Disparate Treatment" Claim*

Finally, in Section E of the Complaint, Plaintiffs allege that "Defendants purposefully singled them out because of their nationality (Pakistani) and terminated their agreements for that reason."(Compl.¶ E.) The record is void of evidence supporting such an allegation.

At best, Plaintiffs have created a genuine issue of material fact as to whether Avondale harbored any racial animus toward Pakistani merchants. (*See* Pls. 12(N) ¶ 61, Avondale 12(M), Ex. M at 41-54.) However, there is absolutely no evidence that Plaintiffs' Merchant Agreements were terminated because of the nationality of the jewelry merchants. Instead, Perez testified that the changes to the Merchant Agreement and the final termination of the Credit Card Program were actions taken by Avondale that affected *all* merchants in the Program; nationality was irrelevant. (*See* Avondale 12(M), Ex. D at ¶ 13.) Plaintiffs have produced no evidence which contradicts Perez' statements concerning how and in what manner the Credit Card Programs was changed and ultimately terminated. Accordingly, Plaintiffs' "disparate treatment" claim fails.

III. *Avondale's Counterclaim and Third-Party Complaint*

*9 Avondale also seeks summary judgment in its favor on Counts I, II, V, VII and IX of its Counterclaim and Count II of its Third-Party Complaint. All of these claims seek recovery from the Corporate Plaintiffs for the alleged deficits remaining in their accounts after the termination of the Credit Card Program or seek payment on the Individual Plaintiffs' Guarantees for the alleged amounts due and owing from their respective corporations. As the Court has found that there is a genuine issue of material fact as to which chargebacks, if any, were authorized by the Merchant Agreement, summary judgment is also precluded on these counts of Avondale's Counterclaim and Third-Party Complaint.

*CONCLUSION*

At the end of the day, there remains a genuine issue of material fact regarding which of Avondale's chargebacks to Plaintiffs' accounts were authorized under the terms of the Merchant Agreement, and which were not, as discussed *supra* in Section II.B. Accordingly, the Court grants Avondale's motion for summary judgment as to all claims in the Complaint other than this breach of contract claim. The Court denies Avondale's motion for summary judgment on Counts I, II, V, VIII and IX of its Counterclaim and Count II of its Third-Party Complaint.

N.D.Ill.,1999.
Daredia v. Gold & Diamond Merchants Group, Inc.
Not Reported in F.Supp.2d, 1999 WL 965591 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 14**



NYJUR CONTRACTS § 314                                                    Page 1
22 N.Y. Jur. 2d Contracts § 314


New York Jurisprudence, Second Edition
Database updated August 2008

Contracts
Laura Hunter Dietz, J.D., Tracy Bateman Farrell, J.D., John Gebauer, J.D., Alan J.
Jacobs, J.D., Jack K. Levin, J.D., Eric C. Surette, J.D.

VII. Third-Party Beneficiaries

Topic Summary   Correlation Table   References

**§ 314. Basis or rationale of rule—Insufficiency of incidental or indirect benefit**

**West's Key Number Digest**

West's Key Number Digest, Contracts  185 to 187

For a person to enforce a contract as a third-party beneficiary, the benefit
must be one which is not merely incidental.[1]

The benefit must be immediate in such a sense and to such a degree as to
indicate the assumption of a duty to make reparation if the benefit is lost.[2]

Absent such intent, the third party is merely an incidental beneficiary with no
right to enforce the contract.[3]

An incidental beneficiary is a third party who may derive benefit from the
performance of a contract though he or she is neither the promisee nor the one to
whom performance is to be rendered.[4]

**Illustration:**

Transactions between an anesthesiologist and his malpractice insurer did not show
any intent to benefit the hospital's insurer, and the hospital's insurer was not a
third-party beneficiary of an agreement between the anesthesiologist and his
malpractice insurer to provide insurance for a nurse anesthesiologist.[5]

Neither precedent nor reason warrants the extension of the application of the
third-party-beneficiary doctrine from the named beneficiary to creditors of the
designated beneficiary.[6]

In instances where the relevant contract makes clear that a third party will be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

retained to assist in the performance by the promisee, such third parties are not intended beneficiaries of the main contract.[7]

**CUMULATIVE SUPPLEMENT**

**Cases:**

Individual, who had executed property lease with sign company, was not an intended third-party beneficiary under commercial general liability (CGL) policy which was issued to company; there was no suggestion of an intent to extend direct coverage to individual, and at best, individual was merely an incidental beneficiary, not an intended third-party beneficiary. Kassis v. Ohio Cas. Ins. Co., 51 A.D.3d 1366, 856 N.Y.S.2d 797 (4th Dep't 2008).

Condominium owner was incidental beneficiary of real estate developer's contracts with general contractor, architect, mechanical engineer and structural engineer, rather than intended beneficiary of contracts, and thus owner could not bring negligence or breach of contract claims against contractor, architect, mechanical engineer and structural engineer. Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. Partnership, 50 A.D.3d 503, 858 N.Y.S.2d 109 (1st Dep't 2008).

**[END OF SUPPLEMENT]**

[FN1] Sears, Roebuck and Co. v. Zurich North America Ins. Co., 17 A.D.3d 663, 794 N.Y.S.2d 110 (2d Dep't 2005); Braten v. Bankers Trust Co., 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983) (plaintiffs were at best incidental beneficiaries and hence had no right of action); ComJet Aviation Management LLC v. Aviation Investors Holdings Ltd., 303 A.D.2d 272, 758 N.Y.S.2d 607 (1st Dep't 2003); Amherst Magnetic Imaging Associates, P.C. v. Community Blue, 286 A.D.2d 896, 730 N.Y.S.2d 639 (4th Dep't 2001); Dubroff v. Evergreen Bank, Nat. Ass'n, 265 A.D.2d 644, 696 N.Y.S.2d 560 (3d Dep't 1999); Binghamton Masonic Temple Inc. v. City of Binghamton, 213 A.D.2d 742, 623 N.Y.S.2d 357 (3d Dep't 1995); Artwear, Inc. v. Hughes, 202 A.D.2d 76, 615 N.Y.S.2d 689 (1st Dep't 1994).

[FN2] Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985); Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983); Associated Flour Haulers & Warehousemen v. Hoffman, 282 N.Y. 173, 26 N.E.2d 7 (1940).

[FN3] Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985); Braten v. Bankers Trust Co., 60 N.Y.2d 155, 468 N.Y.S.2d 861, 456 N.E.2d 802 (1983); Castorino v. Unifast Bldg. Products Corp., 161 A.D.2d 421, 555 N.Y.S.2d 350 (1st Dep't 1990); Miner v. DSN Dealer Service Network, 151 A.D.2d 928, 543 N.Y.S.2d 201 (3d Dep't 1989); Einhorn v. Seeley, 136 A.D.2d 122, 525 N.Y.S.2d 212 (1st Dep't 1988).

[FN4] Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp., 76 A.D.2d 68, 430 N.Y.S.2d 179 (4th Dep't 1980).

[FN5] Benedictine Hosp. v. Hospital Underwriters Mut. Ins. Co., 103 A.D.2d 553, 481 N.Y.S.2d 813 (3d Dep't 1984).

[FN6] Zweig v. Metropolitan Life Ins. Co., 73 Misc. 2d 93, 340 N.Y.S.2d 817 (N.Y. City Civ. Ct. 1972).

[FN7] Artwear, Inc. v. Hughes, 202 A.D.2d 76, 615 N.Y.S.2d 689 (1st Dep't 1994) (tee-shirt manufacturer was not third-party beneficiary of contract between artist's estate and licensee, even where tee-shirt manufacturer was a sublicensee of licensee); Oursler v. Women's Interart Center, Inc., 170 A.D.2d 407, 566 N.Y.S.2d 295 (1st Dep't 1991) (artists held to be mere incidental beneficiaries of contract between not-for-profit corporation and National Endowment for the Arts, even though latter awarded grant to not-for-profit corporation to support artists' project); Alicea v. City of New York, 145 A.D.2d 315, 534 N.Y.S.2d 983 (1st Dep't 1988) (employees of company hired to maintain city's parking meters were not third-party beneficiaries of employer's contract with city).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

NYJUR CONTRACTS § 314

END OF DOCUMENT

**Exhibit 15**

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 799642 (S.D.N.Y.)

Page 1

Amroc Investments, Inc. v. Deloro
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
AMROC INVESTMENTS, INC., Plaintiff,
v.
Andre DELORO, Defendant and Counterclaim
Plaintiff,
v.
CREDIT COMMUNAL DE BELGIQUE, Additional
Defendant on Counterclaims.
**No. 97 CIV. 2878 TPG.**

Oct. 7, 1999.

OPINION

GRIESA, D.J.
**\*1** This action originated with a claim by Amroc against Deloro for a commission. Amroc, a company located in New York, alleges that it arranged for Deloro, a citizen of France, to purchase a large amount of Eurotunnel debt (of a face amount equal to $60 million) and that Deloro agreed to pay Amroc a commission of about $600,000. The complaint alleges that Deloro refused without justification to close on the purchase, but is nevertheless obligated to pay the commission.

Deloro filed his answer, denying liability, and counterclaiming against Amroc. Deloro joined as "Additional Defendant on Counterclaims" a Belgian bank, Credit Communal De Belgique ("CCB"). CCB is actually a third-party defendant, and the counterclaims against CCB constitute a third-party complaint and are denominated as such. Deloro alleges that CCB contracted to sell the Eurotunnel debt to Deloro and breached that contract. Deloro also alleges that Amroc was a party to the contract and participated in the breach. Deloro further claims that CCB and Amroc breached an implied covenant of good faith and fair dealing.

CCB moves for summary judgment dismissing the third-party complaint. CCB also moves for sanctions against Deloro and against Deloro's current counsel,

Gleason & Koatz, and John P. Gleason of that firm.

The motion for summary judgment is granted. The motion for sanctions is denied.

*Facts*

The following facts are conclusively established on the present record.

As of July 1996 CCB was a participant in a lending consortium holding Eurotunnel debt. CCB decided that it wished to sell at least some of the debt. After certain other attempts, CCB decided to try to sell the debt through Amroc. CCB entered into an "Agreement in Principle" with Amroc dated July 22, 1996. The agreement provided:

This letter sets forth the agreement in principle of Amroc Investments, Inc., as agent ("Buyer") to buy from Credit Communal de Belgique (the "Seller") and the Seller to sell to Buyer a 100% assignment in all right, title and interest in its claim against Eurotunnel Finance Limited And France-Manche S.A. ("Debtor") in the principal outstanding amount of approximately ....

The sentence concluded by stating the face amount of the debt in Belgian francs, French francs and Eurodollars. It is agreed that the U.S. dollar equivalent was about $60 million. The Agreement in Principle went on to state:
It is understood that a binding agreement of the purchase and sale agreement will result from the execution of a subparticipation agreement (the "Definitive Agreement") which is mutually acceptable to both the Seller and the Buyer. If or when permitted by the terms of the Credit Agreement the Seller and the Buyer shall use their best effort to elevate the subparticipation to a direct assignment. The Definitive Agreement will provide that the proceeds payable to Seller by Buyer will be 40% (the "Purchase Rate") multiplied by the principal amount outstanding of ....

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 799642 (S.D.N.Y.)

**\*2** The sentence concluded by stating the face amount of the debt, using the same figures set forth earlier in the agreement. One further provision of the agreement should be noted.

By signing this agreement, the Seller agrees to cease any discussions with other prospective purchasers and decline any offers related to the sale or transfer of the Claim until August 9, 1996 the last date by which this transaction will close, or any later date which is mutually acceptable to both parties.

The parties to the Agreement in Principle were CCB and Amroc. Deloro was not a party to that agreement nor was Deloro referred to therein.

It is clear beyond question that the purpose of the Agreement in Principle was not to have Amroc be the ultimate purchaser of the Eurotunnel debt, despite the fact that Amroc is named as "Buyer." The actual purpose was to give Amroc a period of time, in which it had the exclusive right to find an ultimate buyer.

Amroc was in touch with Deloro on the subject of his purchasing Eurotunnel debt. Amroc submitted to Deloro a document entitled "Confirmation," dated July 23, 1996. Amroc asked Deloro to sign the Confirmation, indicating that he "accepted and agreed." Deloro did so. The document confirmed Deloro's "purchase of the below-referenced claim." It went on to recite that the "Debtor/Borrower" on the claim was the Eurotunnel entity, and gave the amount of the debt being purchased as the same amount listed in the Agreement in Principle. The seller was named as CCB. The purchase price was given as "40%," obviously referring to 40% of the principal amount, as had been described in the Agreement in Principle. Amroc was to receive a commission of 1% of the principal amount. The Confirmation also stated:

The Fronting Bank's fee will be 0.5% if used.

The Confirmation was signed by Amroc and Deloro. CCB was not a party to the Confirmation.

The transactions contemplated by the July 22 and 23 documents were not consummated. There was no sale of Eurotunnel debt by CCB to Deloro through Amroc or otherwise. The "subparticipation agreement" referred to in the Agreement in Principle was never reached.

The concept of a "subparticipation agreement" requires explanation. Owners of Eurotunnel debt had an obligation to make additional loans under certain conditions. They could not sell their debt except under conditions which ensured that the buyer would honor proper requests for additional loans. A so-called "fronting bank," as referred to in the Confirmation, is a bank which can be placed between the buyer and seller in order to provide the necessary assurance about responding to calls for additional loans.

One of the problems which prevented the consummation of the sale of CCB's Eurotunnel debt to Deloro was a disagreement as to whether a fronting bank was required, and, if so, what bank this would be.

*Discussion*

There is a dispute between CCB and Deloro as to which law should apply, with CCB arguing for Belgian law and Deloro arguing for New York law. But under either law the critical question is whether Deloro had a contract with CCB obligating CCB to sell Deloro the Eurotunnel debt. The question receives the same answer under either law, and that answer is in the negative.

**\*3** The only contract made by CCB was the Agreement in Principle of July 22, 1996. But this was with Amroc, not with Deloro. CCB has submitted expert opinion that, under Belgian law, Amroc was acting as a "commissionaire." This is someone who commits himself to purchase property in his own name, making a contract between himself and the seller. Then he sells the property to an ultimate purchaser, who pays him a fee. This concept would appear to mean that the contractual obligation of CCB, whatever it was, ran solely to Amroc.

But the problem goes deeper. Under the July 22 Agreement in Principle, there simply was not a final, binding contract for the sale of Eurotunnel debt by CCB to anyone. There could not be such a contract without the necessary subparticipation agreement. The ultimate purchaser needed to be identified and that ultimate purchaser, or an intermediary such as a "fronting bank," needed to be of a quality who could honor requests for further advances. But the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 799642 (S.D.N.Y.)

Page 3

Agreement in Principle did not identify such an ultimate purchaser, or a fronting bank, or contain a definition of participation rights and obligations. The purpose of the Agreement in Principle was to allow Amroc to find an ultimate purchaser. Of course, Amroc found Deloro and executed the July 23 Confirmation with him. But the Confirmation was not a contract between Deloro and CCB, nor did it purport to contain a full set of the terms which would be applicable to Deloro as an ultimate purchaser.

The court has considered whether CCB might be liable to Deloro on the July 22 document on the theory that Deloro was an undisclosed principle. Without attempting to discuss the rules relating to such a theory, it is simply necessary to reiterate that the July 22 Agreement in Principle did not contain the essential terms of an arrangement for the sale of the debt to Deloro. Nor did it constitute a final binding contract with Amroc permitting Amroc to resell to Deloro.

The court has considered whether Deloro might be a third party beneficiary of the July 22 Agreement in Principle. But CCB did not, and could not, in the July 22 document provide for the sale of the debt to an unidentified third party.

The record conclusively demonstrates, beyond any triable issue of fact, that CCB is not liable to Deloro for breach of contract. As to the claim for breach of an implied covenant of good faith and fair dealing, there is no basis for liability on such a claim.

Regarding CCB's motion for sanctions, although the court rules that CCB is entitled to succeed on the merits, this is not a case for sanctions.

### Conclusion

CCB's motion for summary judgment dismissing the third-party complaint is granted, and that complaint is dismissed. CCB's motion for sanctions is denied.

SO ORDERED.

S.D.N.Y.,1999.
Amroc Investments, Inc. v. Deloro
Not Reported in F.Supp.2d, 1999 WL 799642 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 16**

# Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

**H**Subaru Distributors Corp. v. Suraru of America, Inc.

S.D.N.Y.,2004.

Only the Westlaw citation is currently available.

United States District Court,S.D. New York.

SUBARU DISTRIBUTORS CORP., Plaintiff,

v.

SUBARU OF AMERICA, INC., Fuji Heavy Industries Ltd., General Motors Corporation, Saab Automobile AB, and Saab Cars USA, Inc., Defendants.

**No. 03 Civ. 9608SCR.**

June 1, 2004.

AMENDED DECISION AND ORDER

ROBINSON, J.

**\*1** Subaru Distributors Corp. ("SDC") brings this action to prevent defendants from implementing an alleged "re-badging plan" in which cars known as the Saab 9-2, made from the plans originally used for various Subaru Impreza Wagons and related parts and accessories, which have undergone cosmetic changes and bear the Saab mark, would be sold to Saab dealers in SDC's exclusive territory.

More specifically, the Complaint alleges that the Saab 9-2 will be manufactured in two versions, one based on the Subaru Impreza WRX Wagon and the other the Subaru Impreza Sport Wagon. SDC asserts that the "Re-Badged Impreza Wagons are simply Subaru Impreza Sport Wagons with a 'face lift,' consisting of minor cosmetic changes to the front end and rear-end of the vehicles, minor interior modifications and the substitution of the Saab mark for the Subaru mark."Complaint, ¶ 4.

Three contracts are at issue. The 1969 Fuji-SOA Agreement gives SOA the exclusive right to distribute Subaru vehicles, parts and accessories in the 360 and 1000 Series. (It appears that this contract has been modified to permit distribution of current models of Subaru brand vehicles, parts, and accessories.) The 1975 SOA-SDC Distribution Agreement, when read with the 1990 Memorandum of Understanding, gives SDC the right to be the exclusive distributor within its territory of (a) Subaru vehicles distributed by SOA, or (b) non-Subaru vehicles generally offered by SOA to Subaru brand dealers.

In essence, SDC claims in this lawsuit that the defendants are doing an "end run" around certain contractual obligations that give SDC exclusive rights. SDC asserts that simply calling vehicles, parts and accessories something other than "Subaru" does not put them outside the contractual obligations. It seeks, among other things, "preliminary and permanent injunctions (a) enjoining the sale of the Re-Badged Impreza Wagons and any other re-badged Subaru vehicles in SDC's exclusive Territory through authorized Saab dealers or otherwise, and (b) enjoining the sale of parts and accessories related to Re-Badged Impreza Wagons and Subaru Impreza Wagons or parts and accessories related to any other re-badged Subaru vehicles in SDC's exclusive Territory through authorized Saab dealer or otherwise."Complaint, ¶ 122.

SDC has named Subaru of America, Fuji Heavy Industries, Ltd., General Motors Corporation, Saab Automobile AB, and Saab Cars ISA, Inc. as defendants. Each has moved to dismiss this lawsuit. The various defendants make various arguments in support of their motions, but all contend that that the vehicles, parts and accessories at issue are not Subaru vehicles, parts and accessories, and all maintain that SDC cannot state a claim for the right to distribute these items or prevent the defendants from transacting in them.

The following contractual analysis will show that the alleged "re-badged" vehicles are not "Subaru vehicles" within the meaning of the Distributor Agreement or "Subaru Brand Vehicles" within the meaning of the Memorandum of Understanding. For the reasons stated below, the various motions to dismiss are hereby granted.

I. Background

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

Page 2

A. The parties

1. Plaintiff

**\*2** SDC is a New York corporation with its principle place of business in Orangeburg, New York. It is the exclusive distributor of Subaru vehicles, parts, and accessories" in New York State and northern New Jersey (the "Territory").

2. Defendants

General Motors ("GM") is a worldwide manufacturer and marketer of passenger cars, various other vehicles, and their related parts and accessories. It is organized under the laws of Delaware; its headquarters exist in Detroit.

Saab Automobile AB is a wholly-owned foreign subsidiary of GM that is organized and existing under the laws of Sweden, with its headquarters in Trollhattan, Sweden.

Saab USA is a wholly-owned subsidiary of Saab Automobile and is the exclusive importer of Saab brand vehicles in the United States, which it distributes through a network of more than 200 Saab dealerships nationwide. It is a Connecticut organization with its headquarters in Norcross, Georgia.

Fuji Heavy Industries, Ltd. ("Fuji") is a corporation organized under the laws of Japan, having its principal place of business in Tokyo, Japan.[FN1] It is a global transport equipment manufacturer engaged in the development and manufacture of Subaru vehicles, parts, and accessories. In late 1999, GM acquired an approximate 20% equity stake in Fuji. In early 2000,

GM and Fuji publicly announced that they had entered into a technical alliance, the terms of which were not publicly disclosed. In April 2003, Saab Automobile AB and GM publicized their intent to receive a new vehicle-the Saab 9-2-that would be produced by Fuji.

> FN1. Fuji challenges its participation in this lawsuit, arguing that service on it was improper. As there are other basis for the holding by the Court, the issue of proper service is not reached.

Subaru of America ("SOA") is the sole United States importer and distributor of Subaru brand vehicles, parts and accessories. SOA is a New Jersey corporation with its principal place of business in Cherry Hill, New Jersey. When the Fuji-SOA Agreement was executed in 1969, SOA was entirely independent and its stock was traded on public markets. In 1976, Fuji acquired a controlling interest in SOA; by August 1990, Fuji had acquired 100% of SOA's stock. SOA is now fully owned by Fuji.

In the past, SOA distributed the Subaru brand entirely through independent wholesale dealers, such as SDC. Today, however, SOA has two distinct channels of distribution. In most areas of the country, SOA sells Subaru brand vehicles directly to Subaru retail dealers. In the northeast, however, SOA sells Subaru brand vehicles to the two remaining independent wholesale dealers: SDC, which has the exclusive right to distribute Subaru vehicles in New York and northern New Jersey, and Subaru of New England, Inc. ("SNE"), the distributor for New England.

Chart of corporate relationships

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

Page 3

## Chart of corporate relationships



B. The Contracts in Dispute

2. The Fuji-SOA Agreement

In January 1969, when Fuji and SOA were entirely independent companies negotiating at arms length, they entered into an agreement (the "Fuji-SOA Agreement") whereby Fuji appointed SOA its exclusive importer and distributor of Subaru vehicles, parts and accessories in the United States. The Fuji-SOA Agreement reads as follows:

**\*3** Fuji hereby grants to [SOA] an exclusive right to purchase from Fuji any or all of the Products and distribute and resell them within the Territory subject to the restrictions hereinafter provided for.

[SOA] shall be the exclusive distributor for the Territory, which shall mean that Fuji shall not sell to any other person or company in the Territory.

Fuji-SOA Agreement, Article 2. The "Territory" is defined in Article 1, ¶ 2 as "the fifty (50) states of the United States of America ..." The term "Products" is defined to mean:
such motor vehicles manufactured by Fuji as enumerated below [the Subaru 360 series and the Subaru 1000 series] and their successor models of the same series, hereinafter referred to as Motor Vehicles, and spare parts and accessories ...

*Id.,* Article 1, ¶ 1. Article 11, ¶ 1 directs SOA to

appoint qualified sub-distributors and dealers as is reasonably necessary to achieve an efficient sales network in the United States. Article 14 states that the Fuji-SOA Agreement is perpetual. It remains in full force and effect. Complaint, ¶ 34.

3. The Distributor Agreement

In January 1975, SOA entered into a Distributor Agreement with SDC (the "Distributor Agreement"). At the time this agreement was made, SOA was an independent public company. The recitals to the Distributor Agreement stated:

[SOA] is a party to an agreement with Fuji ... under the terms of which [SOA] is the sole distributor for the Subaru vehicles (hereinafter referred to as "Car") and all the spare parts and accessories for the Car (which together with the Car are hereinafter referred to as "SA Products") in the fifty states of the United States ...

Distributor Agreement, preamble. Article 1 grants SDC the right to distribute SA Products in its Territory, which encompasses New York and northern New Jersey. Article 2 forbids SOA from granting any other wholesale distributorship or selling directly to any retail dealer in SDC's Territory. The Distribution Agreement requires SOA to "sell and deliver SA Products to [SDC] for resale and assist [SDC] in its operations relating to the resale of, and service for, SA Products."Distribution Agreement, Article 4. The Distributor Agreement grants perpetual distribution rights to SDC.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

Distribution Agreement, Article 12, ¶ 1.[FN2]

FN2. On its face, the Distributor Agreement is governed by the law of Pennsylvania. Distribution Agreement, Article 15, ¶ 12. This is where SOA was originally incorporated prior to its re-incorporation as a New Jersey corporation in 1976, after Fuji acquired a controlling interest. New York conflict of law rules may render Pennsylvania's connection to the claims in this action too remote to uphold the Distributor Agreement's choice of law designation. *See* *Cargill, Inc. v. Charles Kowsky Res. Inc.,* 949 F.2d 51, 55 (2d Cir.1991). For purposes of the present motion, the laws of Pennsylvania, New York and New Jersey (the three states whose laws arguably may govern) are virtually identical. I have used primarily Second Circuit and New York law in analyzing these motions. In this Order, choice of law issues are addressed as needed.

4. The Memorandum of Understanding ("MOU")

In 1990, SOA and SDC negotiated an amendment to the Distributor Agreement that redefined what products would be distributed by SDC. Complaint, ¶¶ 47, 48. This amendment, titled the Memorandum of Understanding ("MOU"), provided:

1. (a) The terms "Subaru vehicles" and "Car", as used in the [Distributor Agreement], include all vehicles that Fuji ... manufactures, assembles or produces and that, in any such case, are distributed in the continental United States ... by SOA ...

i) under the brand name Subaru, or

ii) under any other brand name, if such other brand name vehicles are generally offered to Subaru brand dealers either under the Subaru Dealership Agreement (by amendment or otherwise), or under a separate franchise agreement that does not contain separate facilities requirements.

**\*4** MOU, ¶ 1(a).

5. Judge McMahon's findings

In 1998, SDC filed a lawsuit in this court seeking interpretation of the Distributor Agreement and the MOU and enforcement of various state and federal laws. Following a two week trial, Judge McMahon issued a written opinion, which included the following findings:

By a document titled 'Memorandum of Understanding' and dated September 14, 1990 ... embodying SDC's essential proposal, SOA agreed to sell to SDC, and authorized SDC to distribute to its authorized Subaru dealers, not only SIA vehicles but all Subaru brand vehicles and non-Subaru-brand vehicles distributed by SOA, whether manufactured by Fuji ... or any other manufacturer or source, through authorized retail Subaru dealers.

... the MOU expanded the term "Cars" to cover cars that did not carry the Subaru brand name, as long as they were distributed through Subaru channels via SOA.

*Subaru Distrib. Corp. v. Subaru of Am., Inc.,* No. 98 CIV 5566, 2002 WL 413808, \*6 (S.D.N.Y. March 18, 2002). Thus, under Judge McMahon's ruling, the MOU materially expanded the Distributor Agreement and gave SDC the right to distribute Subaru vehicles manufactured by Fuji that are distributed in the continental United States by SOA under the Subaru brand name, as well as non-Subaru brand vehicles that are generally offered to other Subaru brand dealerships across the country by SOA.

II. Legal Standards

A. Legal Standard for a Motion to Dismiss

Under Rule 12(b)(6), a motion to dismiss should be granted "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). While the Court must assume the truth of factual allegations contained in the complaint, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *Mason v. American Tobacco Co.,* 346 F.3d 36, 39 (2d Cir.2003).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                 Page 5
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

B. Construction of Contracts

The "sound rule" in the construction of contracts is that "where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language ... and enforced according to its terms."*R/S Assoc. v. N.Y. Job Devel. Auth.,* 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240 (2002)."If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself."*Torres v. Walker,* 356 F.3d 238, 245 (2d Cir.2004). A party cannot create an ambiguity in an otherwise plain agreement merely by urging different interpretations in litigation. *Id.;seealsoBethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957) (a court should not "strain[ ] contract language beyond its reasonable and ordinary meaning").

III. SOA's Motion to Dismiss

SOA is only named in Claim 1 of the Complaint, which alleges that SOA breached the Distributor Agreement by acquiescing in the sale of vehicles, parts, and accessories of alleged Re-Badged Impreza Wagons to GM or one or both of the Saab defendants, and/or by failing to enforce its exclusivity rights under the Fuji-SOA Agreement to prevent such sales. Although the Complaint only alleges violations of the Distributor Agreement, the Court cannot consider those allegations without taking into account the modifications and definitions of its key terms in the MOU.

A. The MOU does not give SDC rights regarding the Saab 9-2

**5** In its Motion to Dismiss, SOA contends that the MOU unambiguously denies SDC the right to control distribution of the Saab 9-2; that the Saab 9-2 is not a Subaru vehicle under the Distributor Agreement; and that Judge McMahon's rulings establish that the sale of the Saab 9-2 does not violate the MOU or the Distributor Agreement. I agree.

SOA dismisses the plaintiff's claim that the Saab 9-2 vehicles are actually re-badged Subaru vehicles as a conclusory allegation, and contends that since the

Saab 9-2 is a Saab brand vehicle (and not a Subaru), which will be distributed only by Saab to Saab dealers (and not by SOA or offered to Subaru brand dealers), the creation and marketing of the Saab 9-2 does not violate the terms of the various contracts outlined above. It asserts that because SDC concedes that the alleged "re-branded" cars will not be sold under the Subaru brand name and will not be distributed by SOA, SDC should be collaterally estopped from asserting its breach of contract claim.

In support of its Motion, SOA submits a sworn statement by SDC's Chairman, Robert Butler, which was made in the context of the litigation before Judge McMahon. According to Chairman Butler,

[By the MOU], SOA granted SDC the new right to distribute Subaru vehicles manufactured by Subaru-Isuzu Automotive, Inc. ("SIA") in Lafayette, Indiana, and further expanded SDC's distribution rights to include *not only SIA vehicles, but all Subaru brand vehicles and all non-Subaru brand vehicles distributed by SOA,* irrespective of manufacturer or source.

Herschman Aff., Ex. F, Witness Statement of Robert T. Butler, ¶ 80 (emphasis added). SOA also presents a statement from SDC's President and Chief Operating Officer, David Sammons:

The basic point [of the MOU] was that we wanted an expansion of what might be included in the distributor agreement, because our belief was that if SOA would take the position with respect to Subaru cars built by a company owned by Fuji, majority owned by Fuji, if SOA would take the position that SDC was not entitled to those cars, even though they were Subaru's, then we certainly understood that perhaps in the future, if ever SOA might or Fuji might market a Hyundai and put a Subaru brand name on it, that SOA would take the position that we were not entitled to the car, either. So we wanted that issue covered and others.

Herschman Aff., Ex. G, Transcript of the trial before Judge McMahon on December 3, 2001, at 202. In response to a question by his counsel, Sammons added that:

Simply, the same concept, that if SOA sold a nonSubaru [sic] brand vehicle, then being a distributor for SOA, we believed we should get the car.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

Page 6

*Id.*, at 203, 161 N.Y.S.2d 90, 141 N.E.2d 590.

In its Complaint, SDC acknowledges that "[b]y its terms, the MOU expressly acknowledged that the terms of the Distributor Agreement granting product exclusivity to SDC included ... all Subaru brand vehicles distributed by SOA ... and non-Subaru brand vehicles from any source that are distributed by SOA."Complaint, ¶ 48. It is notable that this explanation of the Distributor Agreement does not include the key fact that vehicles sold under other brand names are only included in the contract "if such other brand names are generally offered to Subaru brand dealers."MOU, ¶ 1(a)(ii). SDC does not argue in its Opposition that the vehicles at issue fall into the category of non-Subaru brand vehicles under ¶ 1(a)(ii) of the MOU, presumably because they will not be generally offered to Subaru retail dealers, as is required by that paragraph. Opposition, 31.

*6 SDC does claim, however, that the Saab 9-2s are "Subaru brand vehicles" within the meaning of the MOU. Opposition, 31. It argues that the genealogy of the MOU shows that that document was meant to explain what was "included" within the phrase "Subaru vehicles," and "was not intended to limit[ ] the meaning of the phrase 'Subaru vehicles,' as used in the Distributor Agreement, in any manner whatsoever."*Id.* SDC contends that "since SOA is presently distributing the Subaru Impreza Wagons under the Subaru brand name and the Re-Badged Impreza Wagons are the same as the Subaru Impreza Wagons, the Re-Badged Impreza Wagons are also 'Subaru brand vehicles' within the meaning of the MOU."*Id.* SDC is incorrect in its assertion.

First, the statement that the Saab 9-2s "are the same as Subaru Impreza Wagons" is directly at odds with SDC's acknowledgment in paragraphs 42 and 97 of the Complaint that physical modifications will be made to the alleged "Re-Badged Impreza Wagons." Even if no physical modifications were made, however, the name change would bring the vehicles outside the purview of the MOU. This is because SDC's assertion that the Saab 9-2s are "Subaru brand vehicles" ignores the plain meaning of the phrase "Subaru brand vehicles." The MOU states, after all, that "The terms 'Subaru vehicles' and 'Car' as used in the [Distributor Agreement], include all vehicles ... under the brand name Subaru ..." MOU, ¶ 1(a)(1).

Standard reference books confirm the obvious meaning of key terms. *Merriam Webster's Collegiate Dictionary, Eleventh Ed.* (2003) defines "brand" as "a class of good identified by name as the product of a single firm or manufacturer."The synonyms for "brand" that are found in the *Merriam Webster's Collegiate Thesaurus* (2003) are "brand name, logo, logotype, trademark." Thus, to be a "Subaru Vehicle" under all but the most tortured reading of ¶ 1(a)(i) of the MOU (or, for that matter, the Distribution Agreement) the vehicle in question must bear the Subaru mark. The Saab 9-2s do not.

In claiming that Saab 9-2s are Subarus, SDC is seeking to ignore the express terms of the MOU and rewrite the contract to allow SDC to achieve via litigation rights that it did not gain in the 1990 contract negotiations. *SeeRefinemet International Company v. Eastbourne, N.V.*, 815 F.Supp. 738, 742 (S.D.Y.Y.1993), *aff'd*25 F.3d 105 (2d Cir.1994) ("That condition was bargained for at arm's length by sophisticated businessmen, and the Court may not, for [Plaintiff's] benefit, remake or ignore it."). While the MOU does show an expansion of what is included in the Distribution Agreement, there is nothing in the MOU that implies SDC has any rights concerning vehicles, parts or accessories that are sold under the Saab brand name, to Saab brand dealers, and that are not offered by SOA to Subaru brand dealers.

If SDC's assertion that "Subaru Brand Vehicles" includes the Saab 9-2 were taken as true, it would render ¶ 1(a)(ii) of the MOU meaningless. *SeeHelmsley-Spear, Inc. v. New York Blood Center, Inc.*, 257 A.D.2d 64, 69, 687 N.Y.S.2d 353 (N.Y.App. Div., 1 Dep't, 1999) (courts should "avoid an interpretation that effectively renders meaningless a part of the contract"); *Robbet 366 LLC v. Tobais*, 309 A.D.2d 602, 603, 766 N.Y.S.2d 834 (N.Y.App. Div., 1 Dep't, 2003) ("a contract should be interpreted to give full meaning and effect to all of its provisions").

*7 The case of *John Keenan Company, Inc. v. Norrell Corporation*,2001 U.S. Dist. Lexis 10473 (E.D.La. July 19, 2001) is instructive. There, plaintiff claimed that the defendant had violated its exclusive agreement, which provided that neither the defendant nor its parent or affiliates would "operate or license another person or persons to operate under the trade

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

names 'Norrell', 'Norrell Services' or 'Norrell Temporary Services', or any derivative thereof, any similar type business to that which is conducted by [Keenan] within the protected area."*Id.* at *11. As a result of a merger with one of its competitors, the defendant began competing with the plaintiff in the plaintiff's exclusive territory, although defendant was not doing so under one of the listed brand names. *Id.* The Court found that even though the defendant's locations were engaged in a similar type business, the defendant did not violate the contract because these locations were not using the brand names listed in the exclusivity provision. *Id.,* at *20-*21.The Court wrote that plaintiff's contract interpretation "would render meaningless" that portion of the licensing agreement exclusive to particular brand names, and held that the licensing agreement unambiguously limited plaintiff's exclusivity to temporary services businesses operated under the specific trade names.*Id.* In the present case, SDC's proposed interpretation of the MOU would render certain provisions of the contract meaningless and improperly expand other provisions beyond the plain meaning of their terms. Such a construction is untenable.

**B. The Distributor Agreement does not give SDC rights regarding the Saab 9-2**

In the Distributor Agreement, the term "Car" is defined as "Subaru vehicles." Distribution Agreement, preamble. "SA Products" are defined as "all the spare parts and accessories for the Car, together with the Car."*Id.* SDC argues that the term "Subaru vehicles" is not limited to Subaru *brand* vehicles because Article 6(2) of the Distributor Agreement "requires" SDC to use the word Subaru and other trademarks used by Fuji or SOA in connection with the promotion and sale of new Subaru vehicles, parts and accessories and services pursuant to the Distributor Agreement. Opposition, 29. It contends that, reading the contract holistically, "there is nothing to support SOA's assertion that the term 'Subaru vehicles' is limited to 'Subaru brand vehicles' " because "[a]ll indicia of Subaru brand identification were considered by SOA to be separate and distinct from the physical products included in the concepts of 'Subaru vehicles' and 'SA Products.' "*Id.*

SDC is incorrect in its assessment of the import of

Article 6(2). Article 6(2) permits SDC's use of the "the word 'Subaru' or any other trademark or trade name now or at any time hereafter used or claimed by [Fuji] or by [SOA] ... (a) in connection with the promotion and sale of new SA Products and service for SA Products pursuant to this Agreement and (b) only in such manner and for such purposes incident to such promotion, sale and service as [SOA] may specify from time to time."Distributor Agreement, Article 6, ¶ 2. This provision allows SDC to use SOA's intellectual property, such as trade names like Subaru Outback and Subaru Baja and related advertising slogans, in connection with its promotion and sale of Subaru vehicles. It does not give SDC any rights to Saab brand vehicles. Nor does it imply that Subaru brand identification is something separate and distinct from SA Products-indeed, this Article is designed to keep the brand identification tightly limited only to those products. It does not nullify the definition of "SA Products" or "Subaru vehicles" given elsewhere in the contract.

**8** *Keenan* supports the fact that Article 6(2) gives SDC no rights regarding the Saab 9-2. There, the plaintiff argued that because the defendant had the right to adopt new trademarks, the plaintiff's exclusive must extend to similar businesses operated under the new mark. The court, however, rejected that contention. It wrote:

Keenan argues that Section 4 of the License Agreement, which allows Norrell to change or modify the Norrell system, including the adoption of new trade names, is relevant to Keenan's territorial exclusivity rights. Keenan believes, without citation to any authority, that by requiring Keenan to accept and use any changes made by the franchisor, Norrell Services, Inc. or its assignee, [the franchisor] is required to make such changes to the Noorell system since it has merged and to offer Keenan opportunities with any new or different system. This argument has no merit and this provision is not relevant to territorial exclusivity.

*Keenan,*2001 U.S. Dist. LEXIS, at *18, n. 3. As in *Keenan,* Article 6(2) has no relevance to SDC's claims of territorial exclusivity.

**C. SOA's Motion to Dismiss is Granted**

In its Complaint, SDC alleges that the Saab 9-2s are

Not Reported in F.Supp.2d                                                           Page 8
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

either "Subaru brand vehicles" within the meaning of the MOU or "Subaru vehicles" within the meaning of the Distributor Agreement, or both. Unfortunately for SDC, clear contractual language does not support this allegation. The contracts do not provide SDC with any rights to sell Saab 9-2 vehicles, parts and accessories, or to stop others from selling them.

SDC claims that SOA's acquiescence to the sale of the Saab 9-2s to GM or one or both of the Saab Defendants for resale violates SDC's product exclusivity rights under the Distributor Agreement. This claim must fail. Cars that bear the Saab brand name and are not distributed by SOA to Subaru brand dealers fall outside both the Distribution Agreement and the MOU. There can be no evidence that the product exclusivity clauses in the Distribution Agreement (either standing alone or modified by the MOU) have been breached by production and distribution of the Saab 9-2, as Plaintiff does not claim that the Saab 9-2 vehicles will be distributed by SOA, sold under the brand name Subaru, or generally offered to Subaru brand dealers. SDC therefore fails to present the possibility of any evidence supporting its breach of contract claim.

The analysis for parts and accessories for the Saab 9-2 mirrors that of the vehicle itself: if they are not given the Subaru brand name, and are not distributed by SOA to Subaru brand dealers-and there is no evidence that they are either of these things-they fall outside the purview of the governing contracts.

As there are no facts that have been alleged or can be proved consistent with SDC's allegations against SOA, SOA's motion to dismiss is granted. Claim 1 of the Complaint is dismissed.

IV. Fuji, GM, and the Saab Defendants' Motions to Dismiss

*9 As there has been no breach of contract by SOA, other claims related to the alleged breach of contract must also fail. I will address each of SDC's claims in turn.

A. Fuji's Motion to Dismiss the Second Claim is Granted

In its second claim, SDC asserts that Fuji is

responsible for SOA's alleged breach of the Distributor Agreement under a theory of piercing the corporate veil. A two part showing is required to pierce a corporate veil: first, that the corporate parent exercised complete domination over the subsidiary corporation, and second, that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil. *American Fuel Corp. v. Utah Energy Dev.,* 122 F.3d 130, 134 (2d Cir.1997); *Morris v. New York State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 603 N.Y.S.2d 807, 623 N.E.2d 1157, 1160-61 (1993).[FN3] We need not reach the issue of domination, because no fraud or wrong has been committed. As explained above, the Distributor Agreement is not breached by the production and sale of the Saab 9-2. Fuji's motion to dismiss the second claim is granted.

> FN3. Fuji maintains that New Jersey law should govern because SOA is incorporated in New Jersey. As the law in New Jersey is virtually identical to that of New York, I apply New York law here.

B. Fuji's Motion to Dismiss the Third Claim is Granted

SDC's third claim, brought against Fuji, is for tortious interference with the Distributor Agreement. SDC alleges that Fuji induced and directed SOA to breach the Distributor Agreement by causing SOA to fail to prevent Fuji from selling the Saab 9-2 to GM or the Saab Defendants for resale within SDC's exclusive territory. "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996); *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993). Actual breach of a contract is necessary to sustain a claim for tortious interference. *D'Andrea v. Rafla-Demetrious,* 146 F.3d 64, 1998 U.S.App. LEXIS 29436 at *4 (2d Cir.1998). This claim must fail because, as noted above, no claim for breach of the Distributor Agreement or the MOU has been stated. Fuji's motion to dismiss the third claim is granted.

C. Fuji's Motion to Dismiss the Fourth Claim is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

Granted

In its fourth claim, SDC asserts that it is a third-party beneficiary of the Fuji-SOA Agreement and, as such, is entitled to sue Fuji to enforce the Agreement. In essence, SDC's claim is that Fuji overrid SOA's right to prevent Fuji's sale of the Saab 9-2 vehicles and supporting parts, and that in so doing, Fuji breached SOA's rights under Article 2, ¶ 1 of the Fuji-SOA Agreement. SDC claims that it is an intended beneficiary of the Fuji-SOA Agreement, even though that Agreement was signed six years before SDC entered into the Distributor Agreement with SOA and twenty-one years before the MOA was enacted. Fuji, naturally, disagrees.<u>FN4</u>

> FN4. Fuji also argues that Japanese law should govern the Fuji-SOA Agreement because it is the choice of law selected by the parties in the agreement, and it bears a substantial relationship to the parties since Fuji is a Japanese corporation. SDC contends that New York law should govern. Given that there are other basis for dismissal of this claim, however, the Court does not reach the issue of choice of law.

"Although a party need not be specifically mentioned in the contract before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement."*Newman & Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 663 (2d Cir.1996)*(quoting *In re Gulf Oil/Cities Tender Offer Litig., 725 F.Supp. 712, 733 (S.D.N.Y.1989))*."Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract."*In re Gulf Oil/Cities Tender Offer Litig., 725 F.Supp. at 733.* New York law concerning who is an intended, as opposed to incidental, beneficiary stems directly from the Restatement (Second) of Contracts § 302. *Levin v. Tiber Holding Corp., 277 F.3d 243, 248 (2d Cir.2002).*

**\*10** Under New York law, a third party is an intended (as opposed to incidental) beneficiary of a contract if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to

pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Id.* (quoting directly from the <u>Restatement (Second) of Contracts, § 302</u> and also citing to *<u>Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208, 211-12 (1985)</u>*).

Clearly, the issue at hand does not fall into subsection (a), as the Fuji-SOA Agreement does not concern the payment of money, but the exclusive distributorship of cars. The question, then, is whether the Fuji-SOA Agreement and the two contracts between SDC and SOA are intended to create a situation whereby SDC is an intended beneficiary under subsection (b).

Comment a to <u>§ 302</u> defines a "promisee" as the person to whom a promise is addressed, and a "beneficiary" as the person who will benefit from the claimed promise. It defines an "intended beneficiary" as one who acquires a right by virtue of the promise, and an "incidental beneficiary" as one who does not.Restatement (Second) of Contracts, § 302, Comment a. As explained above, SDC claims that it is an intended beneficiary under the Fuji-SOA Agreement, which is a promise made by Fuji to promisee SOA.

Illustration 19 to <u>§ 302</u> shows that SDC is not an intended beneficiary. It reads:

A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building.

<u>Restatement (Second) of Contracts, § 302</u>, Illustration 19. The layered contract structure discussed in this Illustration is mirrored here. A(SOA) contracts with C (Fuji) to be the exclusive distributor in the United States of Subaru vehicles. B(SDC) then contracts with A(SOA) to be a sub-distributor in the United States. C (Fuji) is an incidental beneficiary of B's (SDC's) promise, and B (SDC) is an incidental beneficiary of C's (Fuji's) promise. In this case, neither has rights to enforce contracts that they are not party to.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

The New York Court of Appeals has held that a third party has a right to enforce a contract if "no one other than the third party can recover if the promisor breaches the contract or that the *language of the contract* otherwise clearly evidences an intent to permit enforcement by the third party as by fixing the rate or price at which the third party can obtain services or goods even though there was no duty of the promisee to the third party."*Fourth Ocean Putnam Corp.,* 495 N.Y.S.2d 1, 485 N.E.2d at 212 (emphasis added) (citations omitted); *seealsoAkcess Pac. Group LLC v. Winstar Communs. Inc.,* 67 F.Supp.2d 394, 399 (S.D.N.Y.1999); *MLB Contracting Corp., v. King World Prod. Inc.,* 98 F.Supp.2d 492, 496 (S.D.N.Y.2000). SDC cannot be considered a third party beneficiary under this formulation of the third-party beneficiary rule. It is certainly not true that no one other than SDC can recover if Fuji breaches the contract, as SOA clearly holds this right. Furthermore, the language of the Fuji-SOA Agreement does not clearly evidence an intent to permit enforcement by third party; nor does it fix the rate or price at which SDC can obtain Subaru vehicles or in any other way create any specific rights that SDC may enforce.

**\*11** The Fuji-SOA Agreement clearly provides that only the contracting parties have rights and responsibilities under the Agreement; only the contracting parties, therefore, have the right to enforce the other's obligations under the Agreement. The contract states that the "purpose of this Agreement is to set forth the functions and responsibilities of the parties hereto regarding the sale by Fuji to [SOA] and distribution and resale by [SOA] of such Products in such Territory as hereinafter defined."Fuji-SOA Agreement, preamble.

Furthermore, the Fuji-SOA Agreement provides that "[SOA] shall not be at liberty to assign or sublicense the whole or any part of this Agreement in any way, unless [SOA] obtains Fuji's specific consent in writing and in advance. This paragraph, however, shall not be construed to prevent [SOA] from appointing as many sub-distributors and dealers as [SOA] deems desirable."*Id.,* Article 3, ¶ 3. This clause shows that the parties did not intend any third party, including plaintiff, to have rights under the Agreement. Indeed, it shows that third parties may only be involved in the sale of vehicles covered by

the Fuji-SOA Agreement to the extent that SOA "deems desirable." While it is clear that the Fuji-SOA Agreement made provisions for SOA to appoint sub-distributorships and dealers in the United States, *Id.,seealso* Article 11, ¶ 1, it did not explicitly or implicitly provide that any of these sub-distributorships or dealers have the right to enforce the Fuji-SOA Agreement between the two signators.

SDC is not an intended beneficiary of the Fuji-SOA Agreement and therefore lacks standing to make this claim. Fuji's motion to dismiss the fourth claim is granted.

**D. GM and the Saab Defendants' Motion to Dismiss the Fifth Claim is Granted**

The fifth claim asserts that GM and the Saab Defendants have tortiously interfered with SDC's exclusivity rights under the Distributor Agreement, as well as SOA's rights to exclusivity under the Fuji-SOA Agreement. As explained above, actual breach of contract is necessary to sustain a claim for tortious interference with contract. *D'Andrea v. Rafla-Demetrious,* 146 F.3d at 64, 1998 U.S.App. LEXIS 29436 at \*4, \*6. GM and the Saab Defendants' Motion to Dismiss the Fifth Claim is therefore granted.

**E. Fuji and GM and the Saab Defendants' Motions to Dismiss the Sixth Claim are Granted**

The sixth claim is against all defendants except SOA. It alleges that they conspired to tortiously induce SOA's breach of the Distributor Agreement. Under New York law, there is no independent cause of action for civil conspiracy.*Frank v. DaimlerChrysler Corp.,* 292 A.D.2d 118, 741 N.Y.S.2d 9, 17 (N.Y.App. Div., 1st Dep't., 2002); *Linden v. Lloyd's Plannign Service, Inc.,* 299 A.D.2d 217, 750 N.Y.S.2d 20, 21 (N.Y.App. Div. 1st Dep't., 2002)("since plaintiff has no viable underlying claim for fraud or any other tort, her civil conspiracy claim was properly dismissed.")."Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."*Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102, 103 (1986). Because there is no actionable tort here, the allegation of conspiracy must also fail. The motions to dismiss the sixth claim are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

granted.

V. Conclusion

**\*12** As motions to dismiss each and every claim made by plaintiff have been granted, this case is dismissed.

It is so ordered.

S.D.N.Y.,2004.
Subaru Distributors Corp. v. Suraru of America, Inc.
Not Reported in F.Supp.2d, 2004 WL 3220120 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 17**

# Westlaw.

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

P United States District Court, S.D. New York.
SIX WEST RETAIL ACQUISITION, INC., Plaintiff,
v.
SONY THEATRE MANAGEMENT CORP.; Loews
Theatre Management Corp.; Talent Booking
Agency, Inc.; Loews Fine Arts Cinemas, Inc.; Sony
Pictures Entertainment Corp.;
Sony Electronics Corp.; Sony Corp.; James Loeks;
Barrie Lawson Loeks; Travis
Reid; Seymour H. Smith; and Thomas Brueggemann,
Defendants.
**No. 97 CIV. 5499(DNE).**

March 9, 2000.

David N. Edelstein, District Judge.

OPINION & ORDER
**\*1** In this action, Plaintiff alleges that Defendants
breached various written and oral contracts existing
between the parties regarding Defendants'
management of three movie theatres that Plaintiff
owned, breached fiduciary duties arising therefrom,
tortiously interfered with Plaintiff's prospective
business relations, and violated antitrust laws through
the operation of Plaintiff's theatres and Defendants'
participation in the film industry. Presently before
this Court is Defendants' motion to dismiss the
amended complaint pursuant to Federal Rule of Civil
Procedure ("Rule") 12(b)(6).

At the heart of Plaintiff's claims is its alleged
inability to compete for more profitable films to
exhibit at its theatres. In the spirit of such Hollywood
epics as *Gone With the Wind, Ben Hur, The Ten
Commandments,* and *Braveheart,* this Court sets forth
the following detailed opinion after fully
contemplating all the complex and significant
principles of law that the amended complaint
implicates. [FN1]

> FN1. "You're gonna need a bigger boat."
> Jaws (Universal 1975).

Background
This matter reaches this Court framed as a Rule
12(b)(6) motion. Accordingly, the facts recited herein
are drawn predominantly from Plaintiff's amended
complaint.

I. Parties

Plaintiff Six West Retail Acquisition, Inc. ("Six
West" or "Plaintiff"), formerly Solow Theatre
Corporation, is a New York corporation with its
principal place of business in New York, New York.
*See* Amended Compl. at ¶¶ 6, 34. Six West is the
lessee and controller of: (1) the New York Twin (the
"Twin"), a 1000-seat, two-screen movie theater
located at 265 East 66th Street in New York City, (2)
the Paris Theatre (the "Paris"), a 575-seat movie
theatre located at 4 West 58th Street in New York
City, and (3) the premises located at 6 West 57th
Street in New York City, formerly the Festival
Theatre (the "Festival"). *See id.* at ¶¶ 4, 6. Sheldon H.
Solow ("Solow"), a New York City real estate
developer, is the owner, the sole shareholder, and an
officer of Plaintiff. *See id.* at ¶¶ 4, 6.

Defendant Loews Theatre Management Corporation
("Loews" or "Loews Theatres"), also known at
various times as Sony Theatre Management
Corporation ("Sony" or "Sony Theatres"), is a
Delaware corporation with its principal place of
business in New York, New York. Defendant Sony,
also known at various times as Loews, is a Delaware
corporation with its principal place of business in
New York, New York. *See id.* at ¶ 7. [FN2]
Defendant Talent Booking Agency Inc. ("TBA") is a
New York corporation with its principal place of
business in New York, New York. *See id.* at ¶ 9.
TBA, originally a Loews Corporation subsidiary, is
an affiliate of Sony Theatres and its predecessors-in-
interest. *See id.* at ¶¶ 9, 34. Defendant Loews Fine
Arts Cinemas, Inc. ("Loews Fine Arts") is a New
York Corporation with its principal place of business
in New York, New York. *See id.* at ¶ 10. Loews Fine
Arts is a subsidiary of Sony Theatres through which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

Sony Theatres conducted business with the Paris and the Festival. *See id.* As used herein, the term "Sony" includes Defendants Sony Theatres, Loews Theatres, TBA, and Loews Fine Arts, all of which are allegedly the same entity or closely affiliated entities.

> FN2. In December 1986, through a series of stock purchases, Tri-Star Pictures, Inc. ("Tri-Star") acquired Loews Theatres. *See* Memorandum in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Defendants' Mem.") at 7. In 1987, Tri-Star acquired Columbia Pictures Entertainment, Inc. and was renamed Columbia Pictures Entertainment, Inc. ("Columbia"). *See id.* Finally, in 1989, Columbia, through a series of transactions with Sony Corporation, became Sony Pictures Entertainment, Inc. *See id.* On July 29, 1994, Sony informed Six West that Loews had changed its name to Sony. *See* Amended Compl. at ¶ 42.

**\*2** Defendant Sony Pictures Entertainment Corporation ("Sony Pictures"), a Delaware corporation, is the parent [FN3] company of Sony Theatres. *See id.* at ¶ 11. Sony Pictures engages in the production and distribution of motion pictures, as well as the exhibition of movies through, among other companies, its subsidiary Sony Theatres. *See id.* Defendant Sony Electronics Corporation ("Sony Electronics"), a New York corporation, is the parent company of Sony Pictures. *See id.* at ¶ 12. Defendant Sony Corporation, a Japanese corporation, is the ultimate parent company of Sony Electronics and the other Sony Defendants. *See id.* at ¶ 13. [FN4]

> FN3. "No. I am your father." The Empire Strikes Back (20th Century Fox 1980). "Mother--what's the phrase? Isn't quite herself today." Psycho (Paramount 1960).

> FN4. This Court will hereinafter refer to Sony Pictures, Sony Electronics, and Sony Corporation collectively as the "Sony Corporate Entities."

Defendants James Loeks and Barrie Lawson Loeks ("Barrie Loeks"), formerly co-Chairpersons of Sony Theatres, are residents of Rye, New York. *See id.* at ¶¶ 14-15. Defendant Travis Reid, a resident of Saddle River, New Jersey, is President of Sony Theatres and

TBA. *See id.* at ¶ 16. Defendant Thomas Brueggmann, a resident of New York, New York, is Vice President of Sony Theatres. *See id.* at ¶ 17. Defendant Seymour H. Smith, a resident of New York State, is the Executive Vice President of Sony Theatres and TBA. *See id.* at ¶ 18. [FN5]

> FN5. This Court will hereinafter refer to these corporate officers of Sony as the "Individual Defendants."

II. Facts

In this case, Plaintiff asserts both federal antitrust law and state law claims. The events and claims underlying this lawsuit arise from Defendants' operation of the three motion picture theatres that Plaintiff controlled and Defendants' alleged violations of the agreements with Plaintiff to run those theatres. Plaintiff describes in the amended complaint the details of the relationship between Plaintiff and Defendants regarding the management of Plaintiff's theatres. Plaintiff also contends that

> [i]n operating plaintiff's theatres, Sony began to elevate its own interests over those of the plaintiff's theatres, in using plaintiff's theatres to curry favor with movie distributors purely for Sony's own advantage and to benefit Sony's own theatre operations. Sony's conduct has blatantly violated its contractual and fiduciary obligations to plaintiff. *Id.* at ¶ 50.

Thus, it is important to examine the nature of the agreements between the parties and in what manner Plaintiff claims Defendants violated those understandings. Moreover, it is necessary to highlight Plaintiff's other allegations of Defendants' anti-competitive behavior.

A. Events Concerning the New York Twin

During the 1970s, Solow, who built the Twin, developed a close personal relationship with Bernard Myerson ("Myerson"), a senior executive of Loews Theatres. [FN6] *See id.* at ¶ 33. On December 13, 1978, Solow Theatre Corporation, Plaintiff's predecessor-in-interest, entered into an agreement with TBA regarding the management and operation of the Twin (the "Twin Agreement"). *See id.* at ¶ 34. The Twin Agreement expired on December 31, 1993, *see* Twin Agreement at § 2.01, but on July 14, 1992,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

Sony exercised an option to extend the duration of the agreement from January 1, 1994 to December 31, 2003. *See* Amended Compl. at ¶ 42.

> FN6. "I think this is the beginning of a beautiful friendship." Casablanca (Warner Brothers 1942).

**\*3** Under the provisions of the Twin Agreement, Plaintiff was to receive sixty percent (60%) and the operator of the Twin was to receive forty percent (40%) of net theatre income after the deduction of expenses. *See* Twin Agreement at § 4.02. The Twin Agreement also provided:
[TBA] agrees to operate the [Twin] as [a] prestige theatre[ ] showing neighborhood first-run motion pictures, [FN7] if available consistent with sound business practice, and in no event dissimilar to other Loews Theatres in the greater New York Metropolitan area.

> FN7. When a film is released in a given locality it will have one or more "runs" at various movie theatres. "The critical run for a film is its first run. If a film's first run is not successful, it may have no ... subsequent runs." Amended Compl. at ¶ 30.

Twin Agreement at § 7.01. [FN8] Furthermore, under the terms of a Lease Agreement and a Four Party Agreement, TBA and Loews were committed to

> FN8. Under the terms of a Lease Agreement and a Four Party Agreement that Solow, Solow Theatre Corporation, TBA, and Loews executed on December 13, 1978, contemporaneously with the Twin Agreement, TBA and Loews agreed to the same. *See* Amended Compl. at ¶ 41; Affidavit of Rachel S. Fleishman ("Fleishman Aff.") at Ex. B.

keep in the [Twin] and maintain in good condition and working order ... all ... projection equipment, sound equipment, ticket booth equipment, screens, drapery tracks, draperies, drapery motors, masking motors, carpeting, seats, aisle lights, lighting fixtures, concession equipment, lobby and lounge furniture and attraction signs and any other trade fixtures, equipment, decorations and furnishings, as shall be necessary or desirable for the efficient operation of the [Twin] as [a] first class motion picture theatre[ ].
Amended Compl. at ¶ 41.

Still, the Twin Agreement also acknowledged that TBA had the obligation and exclusive right to book movies for exhibition at the Twin. The Twin Agreement stated:
[Six West] acknowledges that [TBA] has not made and does not make any representation or warranty to [Six West] as to the manner of booking pictures for the [Twin], the clearance of motion pictures to be exhibited at the [Twin], the prices to be paid or charged for admission thereto, or whether pictures of a particular producer or distributor will be exhibited at the [Twin], all of which is specifically reserved to the sole discretion of [TBA].
Twin Agreement at § 7.01. The Twin Agreement also expressly noted that Plaintiff was aware that TBA's corporate affiliates, including Loews Theatres, operated several other movie theatres in Manhattan and declared that nothing in the Twin Agreement
shall be deemed to prohibit or in any way impair the right of Loews Corporation, Loew's Theatres, Inc. or any of their subsidiaries (a) to acquire other motion picture theatres which may be competitive with [the Twin]; or (b) to operate its existing motion picture theatres in any way which in its sole judgment it shall determine.
*Id.* at § 7.02.

Because the Twin Agreement also prohibited Loews from assigning its interest in the Twin Agreement to an entity unaffiliated with Loews absent Plaintiff's consent, on July 3, 1985, in contemplation of Sony's predecessor-in-interest's acquisition of Loews, Loews and Solow entered into an agreement providing for Plaintiff's consent in exchange for specific covenants ("Consent and Covenant"). *See* Amended Compl. at ¶¶ 36-37; *see also* Fleishman Aff. at Ex. B. The parties have referred to the Twin Agreement and the Consent and Covenant collectively as the "Amended Twin Agreement." *See* Amended Compl. at ¶ 38; Fleishman Aff. at ¶ 3.

**\*4** The Consent and Covenant underscored the special relationship between Solow and Myerson, [FN9] expressly conditioning Plaintiff's consent on Myerson's position as the "Chief Executive Officer of [TBA] ... in charge of programming motion pictures for and the operation of the ... Twin," and affording

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                              Page 4
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

Solow an opportunity to disapprove of any successor to Myerson. [FN10] Fleishman Aff. at Ex. B. Moreover, while the Consent and Covenant extended the rights of §§ 7.01 and 7.02 of the Twin Agreement to any successor to TBA by merger, the Consent and Covenant also stated that

> FN9. "You are my best friend. You're my only friend." The Frisco Kid (Warner Brothers 1979).

> FN10. "Strange, isn't it? Each man's life touches so many other lives--and when he isn't around he leaves an awful hole, doesn't he? ... You see, George, you really had a wonderful life." It's a Wonderful Life (RKO 1946).

> [i]n the event a successor to Bernard Myerson is agreed upon, the Operator shall exhibit at the Loews New York Twin only first run motion pictures (or reissues distributed on a first run basis) of the type, quality and character equal to or better than motion pictures exhibited at the other theatres operated under the "Loews" name and situated on the east side of Manhattan ....

Fleishman Aff. at Ex. B. Plaintiff asserts that this promise was "the core consideration for Solow's consent to the transfer of Loews' management of the Twin" from Myerson. Amended Compl. at ¶ 38.

Plaintiff claims, however, that Defendants did not fulfill this obligation to play only first run films of equal or better quality than the movies [FN11] shown at Defendants' other East Side theatres. Additionally, Plaintiff contends that Defendants violated the Amended Twin Agreement by booking poorly performing movies at the Twin, exhibiting movies at the Twin for a protracted period, and failing to maintain the physical condition of the Twin. *See id.* at ¶¶ 68-74. The amended complaint alleges a litany of specific violations.

> FN11. "I don't go to the movies much--if you've seen one, you've seen them all." Singin' in the Rain (Metro-Goldwyn-Mayer 1951).

First, Sony allegedly showed quality first run movies at its own East Side theatres, *see id.* at ¶ 68, while "saddl[ing] [the Twin] with ... a long list of

undesireable [FN12] movies." *Id.* at ¶ 71. According to Plaintiff, throughout 1995, Sony booked several allegedly unprofitable and sub-standard movies at the Twin, including *Disclosure* and *I.Q.* in late January and early February 1995; *Tommy Boy* in April 1995; *My Family* and *Panther* in May 1995; *Free Willy 2* in July 1995; and *Copycat* and *It Takes Two* in December 1995. *See id.* at ¶¶ 68, 71. Between, August and November 1996, a similar pattern occurred when Sony exhibited the popular films *A Time to Kill* and *The First Wives Club* at the Sony Tower East theatre, while it booked a string of less profitable movies at the Twin, including *Eraser, Harriet the Spy,* and *Joe's Apartment* in August 1996; *Grace of My Heart, She's the One, Infinity,* and *Giant* in September and October 1996; and *Dear God* in November 1996. *See id.* at ¶¶ 70-71. In May and June 1997, Sony booked *Night Falls on Manhattan* at the Sony Tower East theatre, while showing the sub-par movies *Father's Day* and *Brassed Off* at the Twin. *See id.* at ¶ 70. Furthermore, while Sony showed *Emma* at the Sony Lincoln Square theatre and the Cineplex Odeon ("Cineplex") Beekman theatre [FN13] for a ten-week run, it booked in the Twin "a series of utter failures ... all of which failed to earn any profit whatever for the New York Twin," including *Harriet the Spy; Joe's Apartment; Eraser; Cold Comfort Farm,* a second-run film; *A Very Brady Sequel; Grace of My Heart;* and *Infinity. Id.* at ¶ 69.

> FN12. Mrs. Robinson: "Do you find me undesireable?"
> Ben Braddock: "Oh, no. I think you're the most attractive of my parents' friends." The Graduate (United Artists 1967).

> FN13. Showing *Emma,* an allegedly popular film, at Cineplex's Beekman theatre benefitted Cineplex, Sony's future merger partner. Pursuant to the merger settlement permitting consummation of the merger, *see infra* part IV., Cineplex divested itself of the Beekman.

*5 Second, Plaintiff asserts that Sony exhibited films at the Twin for an extended period of time, causing box office receipts to decline. *See id.* at ¶ 72. For example, Sony booked the initially profitable *Face Off* at the Twin for twelve weeks in 1997, including a six week stint at both Twin theatres, despite sharply declining gross receipts. *See id.* Moreover, during the

Not Reported in F.Supp.2d                                                                                 Page 5
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

last three weeks of its Twin run, Sony did not show *Face Off* at any of its own theatres. *See id.*

Third, Plaintiff contends that Sony habitually " 'cherry-picked' hit movies by opening them at theatres where it receives 100 percent of the profits and then, after several weeks, moving them to the Twin (where Sony gets only 40 percent of the profits) when their revenue-generating potential has declined." *Id.*

Fourth, Sony allegedly has not operated the Twin theatres "as prestige theatres," as required under the Amended Twin Agreement. Twin Agreement at § 7.01. In particular, Plaintiff argues that "Sony has failed to provide the Twin with modern equipment such as digital sound capacity and allowed the physical condition of the Twin to deteriorate markedly." *Id.* at ¶ 73. Plaintiff also claims that Sony has obstructed Plaintiff's efforts "to undertake basic and necessary repairs and refurbishment of the New York Twin." *Id.*

B. Events Concerning the Paris Theatre [FN14]

> FN14. "We'll always have Paris." Casablanca (Warner Brothers 1942).

In 1990, Solow, on behalf of Six West, began to operate the Paris Theatre, allegedly one of the country's most prestigious theatres and one recognized as a top premiere venue. *See id.* at ¶¶ 43, 51. Shortly thereafter, Sony commenced management of the Paris for Plaintiff pursuant to a financial arrangement similar to that for the Twin. *See id.* at ¶ 43. After the payment of all operating expenses, Plaintiff received the first $200,000 of net income each year and the parties divided the remainder, sixty percent (60%) for Plaintiff and forty percent (40%) for Sony. *See id.*

The amended complaint does not define the responsibilities of the parties or the parameters of the working relationship between them regarding the Paris. While the parties did exchange drafts of written management agreements over the course of several years, none were ever signed. Still, Plaintiff contends that the parties effectively acted pursuant to two letter agreements--an October 1, 1993 proposal [FN15] that Solow presented and a May 18, 1994 proposal that Loews Fine Arts offered. *See id.* at ¶ 44.

> FN15. "I'll make him an offer he can't refuse." The Godfather (Paramount 1972).

Plaintiff asserts that these two proposals "contain provisions that are largely compatible," *id.,* and refers to them as the "Paris Agreement." *Id.* at ¶ 45. Plaintiff also maintains that "[b]efore the breaches by Sony, the parties conducted themselves in accordance with those mutual understandings." *Id.* at ¶ 44. This Court, however, recognizes certain key differences between the two proposals. [FN16]

> FN16. In considering a motion to dismiss, a court may look at documents incorporated in the complaint by reference. *See Kramer v.. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

While Solow's letter states, "Operator shall manage and operate the Theatre in accordance with the same standards as it manages and operates other Loews Theatres in the City of New York," Fleishman Aff. at Ex. C, the Loews Fine Arts letter reads, "Operator shall manage and operate the Theatre *substantially* in accordance with the same standards that it manages and operates other Loews Theatres in the Borough of Manhattan." *Id.* at Ex. D (emphasis added). Furthermore, while both proposals agree that "Operator shall be deemed to be acting in a fiduciary capacity for the benefit of Owner," *id.* at Exs. C, D, the Loews Fine Arts letter qualifies that acknowledgment by adding the words "subject to the provisions of Paragraph 7 hereof." *Id.* at Ex. D. Paragraph 7 of the Loews Fine Arts letter provides:

> *6 Owner has been advised and acknowledges that Operator and its affiliates are involved in, and may increase involvement in, numerous aspects of the motion picture industry, including the production and distribution of motion picture films for exhibition in motion picture theatres and the ownership, operation or management of other motion picture theatres. Owner has been advised that Columbia Pictures, Tri-Star Pictures, Sony Picture Classics and Triumph Releasing Corporation are affiliates of Operator. Owner has been further advised that Operator now operates [other theatres], and that affiliates of Operator contemplate the opening of a 12-auditoria theatre plus an IMAX Theatre at Lincoln Square at 67th Street and Broadway in Manhattan in November

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

1994. Owner recognizes that these operations may result in actual or potential conflicts of interest, and conflicts of interest shall not in and of itself [sic] constitute a basis for any claim by Owner against Operator or any of its affiliates.
*Id.*

Thus, even considering the two letter agreements, the details of the arrangement between Plaintiff and Sony regarding the Paris are still unknown. Nevertheless, despite discrepancies between the two letters and the amended complaint's lack of detail regarding the terms under which Sony managed the Paris, Sony unquestionably did indeed operate the Paris beginning in 1990, acting as Plaintiff's agent and, thereby, Plaintiff's fiduciary in some capacity. In fact, "upon its takeover of the Paris in 1990, and before the letter agreements were drafted, Loews Theatres publicly announced its agreement to operate the Paris and professed its commitment[ ] to maintaining the 'upscale nature' and traditional policies of the Paris," which included a longstanding policy of exclusive bookings. Amended Compl. at ¶¶ 44, 66. Moreover, in April 1996, in a discussion with Plaintiff, Defendant Barrie Loeks emphasized the importance of sustaining the prestige of the Paris and of exclusive bookings to preserve the theatre's stature, assuring Plaintiff that "before a film [would be] booked for the [Paris] Theatre, [Sony would] have a written agreement with the distributor that the film [would] run exclusively at the Paris." *Id.* at ¶ 59.

Plaintiff asserts that Defendants violated the arrangement regarding the Paris Theatre and the aforementioned guarantees that Defendants made to Plaintiff by premiering movies at the Paris, affording the benefit of the Paris's prestige to those movies and their distributors, and then refusing to continue to show those films at the Paris or Plaintiff's other theatres; exhibiting movies at the Paris for a protracted period; and ignoring prior guarantees to continue the Paris's history of exclusive bookings while diverting successful films to its Lincoln Square theatre for exclusive and non-exclusive runs. *See id.* at ¶¶ 51-67. Plaintiff specifically alleges a long list of violations.

First, Plaintiff maintains that "Sony abused the special reputation and quality of the Paris Theatre, premiering top quality films there for minimal fees and then failing to exhibit those films at any of plaintiff's theatres ... curry[ing] favor with certain distributors, with no benefit to plaintiff." *Id.* at ¶ 51. Plaintiff insists, however, that Sony did show those films at its own theatres. For example, Sony arranged for the premiere of *Emma,* produced by the distributor Miramax, at the Paris in April 1996, benefitting Miramax and strengthening Sony's relationship with Miramax. *See id.* at ¶ 52. Thereafter, *Emma* did not play at any of Plaintiff's theatres but rather at the Sony Lincoln Square theatre and the theatre formerly known as the Cineplex Beekman. *See id.* Sony also helped plan the premiere of *The First Wives Club,* a popular and successful Paramount production, at the Paris in September 1996, enhancing Sony's relationship with Paramount while conferring no benefit onto Plaintiff. *See id.* at ¶ 53. *The First Wives Club* then played at, among other theatres, the Sony Tower East, but not at the Paris. *See id.* Further, Sony arranged these premieres without Plaintiff's consent, allegedly in violation of the Paris Agreement, which required Plaintiff's consent for such showings. *See id.* at ¶ 54. [FN17]

> FN17. The two letter agreements of October 1, 1993 and May 18, 1994 both contain the provision: "Operator shall not enter into any so-called '4-wall deals' without the prior approval of Owner." *See* Fleishman Aff. at Exs. C, D. A movie premiere is "a form of 'four wall deal' in which the theatre is rented out at a set price for a set period of time." *See* Amended Compl. at ¶ 54.

*7 Second, Plaintiff alleges that "Sony ... failed to book appropriate films for the Paris, in violation of its contractual and fiduciary obligations, and often extended for an unreasonable duration the exhibition of under-performing motion pictures." *Id.* at ¶ 58. Furthermore, Plaintiff agrees that while "Sony[ ] refus[ed] to exhibit suitable, high quality motion pictures at the Paris for an extended period," *id.* at ¶ 51, "Sony exhibited a number of motion pictures on an exclusive basis at its own Lincoln Square facility." *Id.* at ¶ 58. For instance, in July 1996, when Sony informed Plaintiff that it would be unable to exhibit *The Garden of the Finzi-Continis* at the Paris until 1997 "because of difficulty in getting the materials from Italy," *id.* at ¶ 61, Sony continued to show *Purple Noon,* "an underperformer," for a prolonged run at the Paris. *Id.* at ¶ 62. Sony claimed that it would be unable to obtain an alternative to book at

the Paris until *Surviving Picasso* would open in late September 1996. *See id.* Plaintiff later learned that during the extended run of *Purple Noon*, Sony could have booked *The Spitfire Grill* exclusively at the Paris. *See id.* [FN18] Also in 1996, after reneging on its representation to Plaintiff to exhibit *The English Patient* for an exclusive run at the Paris, Sony continued to show the four hour long *Hamlet* at the Paris "for an inordinately long run." *Id.* at ¶ 65.

> FN18. Columbia, a close affiliate of Sony, distributed *The Spitfire Grill. See id.*

Third, despite guarantees from Defendant Barrie Loeks to continue the tradition of exclusive bookings at the Paris, Sony, allegedly in an effort to promote its own relations with distributors, "attempted to bully plaintiff into departing from the Paris Theatre's traditional exclusive booking policy." *Id.* at ¶¶ 60, 66. In June 1996, Defendant Thomas Brueggmann informed Solow that Sony was negotiating to exhibit several movies at the Paris on a non-exclusive basis. *See id.* at ¶ 60. Additionally, in a letter dated August 15, 1996, Defendant Travis Reid "expressly threatened that Sony would book the movies *Hamlet, Surviving Picasso* and *The English Patient* at the Sony Lincoln Square theatre instead of the Paris Theatre unless plaintiff accepted downtown showings of those movies in a departure from the Paris Theatre's longstanding exclusivity policy." *Id.* at ¶ 66.

Fourth, Plaintiff alleges that while claiming an inability to locate films for exclusive showings at the Paris, Sony repeatedly diverted the exhibition of quality films from the Paris to its own theatres, including the Sony Lincoln Square theatre. Plaintiff speculates that "[b]ecause Sony made such an extraordinarily large investment in the Sony Lincoln Square theatre complex, it was willing to breach its obligations to plaintiff in order to advance Lincoln Square's competitive position." *Id.* at ¶ 64. For example, in 1996, when Sony did not fulfill its commitment to book *The English Patient* exclusively at the Paris, it instead played *The English Patient* at the Sony Lincoln Square complex. *See id .* at ¶ 65. Moreover, when Sony failed to inform Plaintiff of the availability of *The Spitfire Grill* to replace *Purple Moon* at the Paris, Sony opened *The Spitfire Grill* for an exclusive run at the Sony Lincoln Square theatre. *See id.* at ¶ 62.

*8 Finally, before Sony unilaterally terminated its operation of the Paris in 1997, Plaintiff requested that Sony continue to manage the Paris for another month and to continue to show *Anna Karenina* ("Anna") at the Paris. *See id.* at ¶ 67. Plaintiff asserts that "Sony refused to do so unless plaintiff agreed to release Sony from all potential claims arising from its management of the Paris." *Id.* Plaintiff claims that when it rebuffed Sony's condition, "Sony intentionally induced the distributor Warner Brothers ... to decide not to continue to exhibit *Anna* at the Paris Theatre, as previously arranged, and instead to move it to the Sony Tower East theatre in February 1997." *Id.* Ultimately, Sony's alleged attempts to decrease or even eliminate competition for its theatres, especially the Sony Lincoln Square complex, were successful when Plaintiff's failure to obtain quality films to book at the Paris purportedly forced Plaintiff to close the Paris for a lengthy period. *See id.* at ¶ 64. [FN19]

> FN19. The amended complaint does not state when or for how long Plaintiff closed the Paris.

C. Events Concerning the Festival Theatre

At the time Sony assumed operation of the Paris, it also publicly announced its management of the Festival. *See id.* at ¶ 47. Plaintiff and Sony acted "on the same terms that governed the Paris, except that Plaintiff received no priority payment of net income (the 'Festival Agreement')." *See id.*

The amended complaint is devoid of specific details governing the Festival Agreement. According to Plaintiff, however, it was the understanding of the parties that Sony was Plaintiff's agent and undertook fiduciary obligations pursuant to that relationship. *See id.* Additionally, the amended complaint states that "[i]n negotiating to manage the Festival Theatre, Sony represented that it could make more money than the previous operator of the theatre and that it would improve the physical condition and quality of films shown at the Festival." *Id.* at ¶ 48. [FN20] Plaintiff argues that notwithstanding these assurances, "Sony grossly mismanaged the Festival Theatre and allowed its profitability and physical appearance to deteriorate dramatically." *Id.* at ¶ 75.

> FN20. The amended complaint does not,

Not Reported in F.Supp.2d                                                        Page 8
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

however, mention the profitability of or describe the appearance of the Festival prior to Sony's assumption of management.

First, Plaintiff alleges that "the Festival was being used as a 'dumping ground' for inferior film product," causing the theatre's reputation to deteriorate. *Id.* at ¶ 77. Thus, while the Festival was profitable during the last six months of 1990, the initial period of Sony's management, the Festival lost money from 1991 until 1994, when it closed permanently. *See id.* at ¶ 75. In fact, "the Festival's annual gross receipts from ticket sales under Sony's management were only about one-half or less than the amounts recorded in 1989, the last full year prior to Sony's takeover." *Id.*

Second, Plaintiff claims "Sony incurred unnecessary expenses in operating the Festival," by overstaffing the Festival after attendance decreased, without justification for the increase in personnel. *Id.* at ¶ 76. "Indeed, in 1992 and 1993, employee salaries and benefits alone substantially exceeded gross box office revenues." *Id.*

**\*9** Third, Plaintiff states that Sony permitted the physical condition of the theatre to fall into utter disrepair. *See id.* at ¶¶ 76-77. The Festival became so unsuitable and squalid that on December 26, 1993, the *New York Times* quoted a movie industry executive who said the following about the Festival: "It's a pig sty. Every other seat is broken. It smells like rat poison. It looks like Dresden." *Id.* at ¶ 77. Ultimately, in 1994, Plaintiff closed the Festival, citing Sony's inept management, Sony's estimates of the expenditures necessary to refurbish and upgrade the Festival--of which Plaintiff was responsible for sixty percent pursuant to the Festival Agreement--and the Festival's declining reputation. *See id.* at ¶¶ 75, 77.

In sum, Plaintiff maintains that
> Sony's actions in showing second-run movies, poorly performing movies and insisting on overlong runs, combined with Sony's intentional neglect of the theatre[s'] equipment and physical condition, have seriously impaired the image of [Plaintiff's three theatres]. Sony's improper film choices and failure to maintain [Plaintiffs' theatres] violate the [agreements between Plaintiff and Sony], Sony's implied duty of good faith and fair dealing and Sony's fiduciary duties. Sony intended

these violations to advance its own business interests and monopolistic and anti-competitive objectives, all to the detriment of plaintiff.
*Id.* at ¶ 74.

D. Other Allegations Demonstrating Sony's Anti-competitive Behavior

To substantiate the claim that Sony advanced its own business interests over Plaintiff's, the amended complaint also describes several other actions that Defendants undertook. In 1995, when Sony claimed to be having trouble booking an appropriate movie for exhibition at the Paris, Solow asked Defendant Brueggemann to research the possibility of leasing *Belle de Jour*, ("Belle"), a classic 1967 film. *See id.* at ¶ 55. After making some inquiries, Defendant Brueggemann informed Solow that the owner of the rights to *Belle* would consider only selling the rights, not leasing. *See id.* at ¶ 56. Solow then directed Defendant Brueggemann to determine the cost of the rights to facilitate Plaintiff's purchase of the movie. *See id.* Plaintiff contends that "[r]ather than pursuing Mr. Solow's request as agent for plaintiff, Mr. Brueggemann suggested the concept to Miramax, which subsequently bought and re-released *Belle de Jour* [at the Paris] with great success." *Id.* at ¶ 57. An advertisement in *Variety* stated that in its first week at the Paris, *Belle* grossed over $100,000, at that time, "history's highest grossing foreign language film on a single screen." *Id.* Plaintiff argues that Defendants Brueggemann and Sony thereby intended "to curry favor with Miramax [and] effectively deprive[ ] plaintiff of a substantial business opportunity." *Id.*

Additionally, Plaintiff alleges that Sony engaged in a series of block-booking agreements with distributors, limiting the availability of motion pictures to independent theatre owners and reducing competition. *See id.* at ¶ 78. Block-booking, a per se violation of the antitrust laws, is an illegal practice [FN21] through which film distributors condition the license or sale of their movies on the acceptance of unwanted or inferior films. *See United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 156 (1948). [FN22] Plaintiff claims that Sony's correspondence with Plaintiff, answering Plaintiff's dissatisfaction about the films Sony exhibited at Plaintiff's theatres, demonstrates Sony's "pattern of blatantly anticompetitive conduct." Amended Compl. at ¶ 78.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

FN21. "Damn it all, why is everything we're good at illegal?" Butch Cassidy and the Sundance Kid (20th Century Fox 1969).

FN22. For a brief general history of the *Paramount* case see *United States v. Loew's Inc.,* 705 F.Supp. 878, 880-81 (S.D.N.Y.1988). In particular, this Court notes that the Supreme Court found the *Paramount* defendants, eight studios that owned production, distribution, and exhibition facilities and dominated and controlled the movie industry, guilty of restraining and monopolizing the distribution and exhibition of films in violation of §§ 1 and 2 of the Sherman Act. *Id.* at 880 (citations omitted). A series of consent judgments followed, prohibiting the *Paramount* defendants, most significantly:
From licensing any features for exhibition upon any run in any theatre in any other manner than that each license shall be offered and taken *theatre by theatre,* solely upon the merits and without discrimination in favor of affiliated theatres, circuit theatres or others.
*Id.* at 881 (citation omitted)(emphasis added).

*10 In a January 16, 1996 letter to Solow explaining why Sony made no effort to obtain *Sense and Sensibility,* a Sony Pictures' release, to play at the Twin, Defendant Reid wrote,
if we were to decide to attempt to change our relationships on the east side of New York this business does not work in such a way that we would only play *Sense and Sensibility,* but that we would become obligated to play a full portion of the Sony Pictures release schedule.
*Id.* at ¶ 80. In an August 15, 1996 letter to Solow, Defendant Reid stated that it is
necessary to form relationships in order to be booked properly on a long term basis. Our relationships on the East side are with Paramount, Warner Brothers and Gramercy. *Harriet the Spy* (Paramount) was released by the same company that has this year given the Twin *Mission Impossible* and *Primal Fear* .... Similarly, *Joe's Apartment* (Warner Brothers) was released by the same company that gave us *Heat* and *Eraser* ....
*Id.* at ¶ 79 (alterations in original). On September 19,

1996, Defendant Reid sent another letter to Solow that detailed the booking practices that at least some distributors desire to have with exhibitors, writing: "In order for distributors to be certain of proper placement in this zone [the East Side of Manhattan], they make long term relationships with one or two of these exhibitors who agree to participate in the liquidation of all their product, not just high profile films ...." *Id.* at ¶ 81. Plaintiff asserts that these letters "constitute an admission of block-booking agreements between Sony and [various] distributors," *id.* at ¶ 79, that "makes it unreasonably difficult for an independent theatre owner to compete for high quality motion pictures." *Id.* at ¶ 81.

Plaintiff further asserts that Sony resented Plaintiff's discontent with Sony's booking arrangements at Plaintiff's theatres. Plaintiff alleges that Defendant Reid "adopted a peremptory, adversarial and threatening tone in communicating with plaintiff." *Id.* at ¶ 83. For example, in an October 7, 1996 letter to Plaintiff, Defendant Reid wrote "The Management Agreement for the New York Twin does not require Sony Theatres to discuss individual bookings with you, and it is not my intention to do so." *Id.* [FN23] Furthermore, in late 1996, when Plaintiff indicated that it may terminate Sony as manager of Plaintiff's theatres, Defendant Reid "threatened that he and the other defendants would make every effort to influence distributors not to deliver quality films to plaintiff's theatres." *Id.* at ¶ 84. Plaintiff asserts that Sony was motivated by the many millions of dollars that it expended to build the Lincoln Square complex, [FN24] maintaining that "eliminating competition by precipitating the demise" of Plaintiff's theatres was a "strong incentive to ensure Lincoln Square's success." *Id.* at ¶ 85.

FN23. "Frankly, my dear, I don't give a damn." Gone with the Wind (Selznick-Metro-Goldwyn-Mayer 1939).

FN24. "If you build it, he will come." Field of Dreams (Universal 1989).

Finally, shortly before Plaintiff filed its amended complaint, Sony announced an intention "to merge its operations--which include the largest movie theatre chain in Manhattan--with the Cineplex Odeon chain--Manhattan's second largest theatre operator." *Id.* at ¶ 3. On September 30, 1997, Loews and Cineplex

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 10
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

entered into a merger agreement, making Cineplex a wholly owned subsidiary of Loews and creating the company Loews Cineplex Entertainment Corporation ("LCE"). *See* Proposed Final Judgment and Competitive Impact Statement, 98- CIV-2716, 63 Fed.Reg. 25071, 25076 (May 6, 1998). The parties finally consummated the merger pursuant to a settlement requiring the divestiture of various Loews and Cineplex movie theatres in Manhattan and Chicago. *See id.* Plaintiff alleges that the merger between Sony and Cineplex demonstrates Sony's monopolistic intent and violates the antitrust laws. *See* Amended Compl. at ¶¶ 3, 127-131.

III. Procedural History

*11 On July 24, 1997, Plaintiff commenced the instant litigation by filing a complaint. Thereafter, on October 14, 1997, this Court held a pretrial conference [FN25] at which this Court granted Plaintiff permission to amend its complaint to add a Clayton Act § 7 claim. On December 4, 1997, Plaintiff filed an amended complaint asserting seven federal and state claims against Defendants: (1) breach of contract; (2) breach of fiduciary duty; (3) tortious interference with prospective business relations; (4) unjust enrichment; (5) block-booking agreements in restraint of trade in violation of § 1 of the Sherman Act (" § 1"), 15 U.S.C. § 1; (6) attempted monopolization in violation of § 2 of the Sherman Act (" § 2"), 15 U.S.C. § 2; and (7) merger violations of § 7 of the Clayton Act (" § 7"), 15 U.S.C. § 18. *See id.* at ¶¶ 86-131.

> FN25. "Why don't you come up sometime, see me? Come up, I'll tell your fortune." She Done Him Wrong (Paramount 1933).

On January 8, 1998, Defendants filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6). Submissions from both parties followed. This Court agreed to table the motion to dismiss while the parties attempted to narrow the scope of the claims to be tried while simultaneously pursuing discovery. Based on correspondence from the parties in February 1999, however, this Court concluded that the parties were unable to consensually narrow the issues or to amicably complete discovery. *See* Letter from David Boies, attorney for Plaintiff, to Judge David N. Edelstein of 2/1/99; Letter from Ira S. Sacks, attorney for Defendants, to Judge David N.

Edelstein of 2/8/99 ("Sacks Letter"). At that point, this Court determined that it was necessary to consider the motion to dismiss. Then, on March 8, 1999, Defendants brought a motion requesting that this Court take judicial notice of certain adjudicative facts that occurred after Defendants briefed the motion to dismiss. *See infra* part IV. Submissions from both parties followed.

Discussion

This Court now [FN26] turns to the claims Plaintiff raises in the amended complaint. Before resolving these issues, this Court will first set forth the legal standards that govern the instant Opinion and Order.

> FN26. "What we need right now is a stupid, futile gesture on someone's part" National Lampoon's Animal House (Universal 1978).

IV. Relevant Standards

The appropriate legal standards for purposes of this Opinion and Order [FN27] are those that control: (1) a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), and (2) a party's request that a court take judicial notice of supplemental material pursuant to Federal Rule of Evidence 201(b) ("Rule of Evid. 201(b)").

> FN27. "You're out of order. You're out of order. The whole trial is out of order." And Justice For All (Columbia 1979).

A. Motion to Dismiss

In evaluating whether a complaint will withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, a court must assume the truth [FN28] of a plaintiff's "well-pleaded allegations." *Albright v. Oliver,* 510 U.S. 266, 268 (1994); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991). The court also must read the complaint generously and draw reasonable inferences in favor of the pleader. *See LaBounty,* 933 F.2d at 123. A court's function is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *accord Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 124 (2d Cir.1991). "The issue is

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
(Cite as: 2000 WL 264295 (S.D.N.Y.))

not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). Thus, a court will not dismiss a complaint unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to the relief requested. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991).

> FN28. "You can't handle the truth." A Few Good Men (Columbia 1992).

**\*12** In the context of an antitrust complaint, the standard is even more rigorous. The Supreme Court has stated that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of the Rex Hosp.,* 425 U.S. 738, 746 (1976)(quoting *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473 (1962)). This Court, therefore, will not dismiss any of the antitrust charges in the amended complaint that include "a short plain statement of the claim," Rule 8(a)(2), that "adequately ... define[s] the relevant product market, ... allege[s] antitrust injury, [and] ... allege[s] conduct in violation of the antitrust laws." *Re-Alco Indus., Inc. v. National Center for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993).

When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein. *See Fed.R.Civ.P.* 12(b)(6); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991); *Kramer,* 937 F.2d at 773. "[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer,* 937 F.2d at 773; *accord Kopec v. Coughlin III,* 922 F.2d 152, 155-56 (2d Cir.1991); *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). If a court wishes to consider material outside the pleadings, it must convert the motion to dismiss into one for summary judgment under Rule 56. *See Kramer,* 937 F.2d at 773; *Kopec,* 922 F.2d at 155-56; *Fonte,* 848 F.2d at 25.

**B. Judicial Notice**

Defendants petition this Court to look beyond the amended complaint to consider certain relevant facts that occurred after its filing. On April 16, 1998, the United States, the State of New York, and the State of Illinois filed a civil antitrust action in the United States District Court for the Southern District of New York against Loews, Cineplex, Sony Corporation America, and J.E. Seagram Corporation alleging that the merger, then pending, of Loews and Cineplex would violate § 7 of the Clayton Act. Defendants ask this Court [FN29] to take judicial notice that on that same date, April 16, 1998, the parties to that action entered into a settlement requiring Loews and Cineplex to divest themselves of a total of fourteen movie theatres in Manhattan--one Loews theatre and thirteen Cineplex theatres. *See* Memorandum in Supp. of Defs.' Request that the Court take Judicial Notice of Certain Adjudicative Facts ("Defendants' Judicial Notice Mem."); *see also* Proposed Final Judgment and Competitive Impact Statement ("Stipulation and Order"), 98-CIV-2716, 63 Fed.Reg. 25071, 25076 (May 6, 1998). In particular, Defendants want this Court to recognize that the Stipulation and Order explained that "[t]he divested theatres constitute[d] slightly more in box office revenue in Manhattan ... than the [merged entity, LCE] ... acquir[ed] in [the Manhattan] market and, as a result ... reduce[d] the [merged entity's] share back to (or actually slightly less than) pre-merger levels ...." Defendants' Judicial Notice Mem. at 2 (quoting Stipulation and Order at 25078). "Stated differently, as a result of the Stipulation and Order requiring Loews and Cineplex to divest a total of fourteen (14) first-run theatres in Manhattan, LCE operates the same number of theatres as Loews alone operated prior to the merger." Reply Br. in Supp. of Defs. Request that the Court Take Judicial Notice of Certain Adjudicative Facts at 2.

> FN29. "[T]here's only one question you should ask yourself: 'Do I feel lucky?' Well, do you, punk?" Dirty Harry (Warner Brothers 1971).

**\*13** "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."

*International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir.1998) (citation and internal quotations omitted); *see also Kramer,* 937 F.2d at 774 (stating that documents filed with the SEC "are relevant not to prove the truth of their contents but only to determine what the documents stated"). Thus, this Court may recognize that the Government and the States of New York and Illinois did bring a civil antitrust suit against Defendant Loews with regard to its merger with Cineplex. This Court may also notice that the parties entered into a Stipulation and Order directing Loews and Cineplex to dispossess certain theatres. It would be improper, however, for this Court to accept as true any of the statements, allegations, or agreements contained in the Stipulation and Order that do not comply with the standard set forth in Rule of Evid. 201(b).

Rule of Evid. 201(b) permits a court to take judicial notice of facts "not subject to reasonable dispute." Fed.R.Evid. 201(b). Such facts must either be "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* The Second Circuit stated that "[f]acts adjudicated in a prior case do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source." *International Star Class,* 146 F.3d at 70 (citation omitted). Here, Defendants effectively want this Court to acknowledge that as a result of compliance with the Stipulation and Order the size of Loews' share of the movie exhibition market in Manhattan remains unchanged since the merger. This Court may not glean this information from the Stipulation and Order because to do so would be to rely on facts decided in a prior case.

Nevertheless, in support of this request, Defendants submitted copies of the April 2, 1998 and April 3, 1998 *New York Times* advertisement for Loews Theatres showing that Loews operated ten theatres in Manhattan. *See* Affidavit of Ira S. Sacks in Supp. of Defs.' Request that the Court take Judicial Notice of Certain Adjudicative Facts at Exs. A, B. Defendants also offered an excerpt from the March 18, 1999 *New York Times,* confirming that the merged entity, LCE, managed the same number of theatres after the divestiture. *See id.* at Ex. C. By relying on the

citations from the *New York Times,* "whose accuracy cannot reasonably be questioned," Fed.R.Evid. 201(b), this Court can accept that Loews, now known as LCE, operates the same number of theatres that it did prior to the merger. [FN30]

> FN30. Although Defendants failed to comply with this Court's Individual Rules requiring that they seek a pre-motion conference before submitting their motion or asking this Court for special permission to file such a motion, *see* Individual Rules of Judge David N. Edelstein 2.A., it would be remiss for this Court to reject the motion in view of the significance of the facts detailed therein. It would be futile and illogical for this Court to analyze the individual pre-merger market share of movie theatres that Loews possessed in Manhattan and speculate as to its potential market share if merged with Cineplex, disregarding that Loews and Cineplex have already actually merged into LCE.

V. Federal Law Claims

**\*14** Principles of supplemental jurisdiction allow this Court to analyze the sufficiency of both Plaintiff's federal and state claims. *See* 28 U.S.C. § 1367(a). This Court has original jurisdiction over Plaintiff's antitrust claims and may exercise jurisdiction over Plaintiff's state claims as they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Id.* Because 28 U.S.C. § 1367 also directs that a court may decline to exercise jurisdiction over state law claims if the court has dismissed all federal claims, this Court will first examine the adequacy of Plaintiff's federal antitrust claims.

A. Sherman Act § 1 Claims: Agreements in Restraint of Trade

Plaintiff frames its § 1 claim as a block-booking claim against Defendants. After carefully reviewing and sorting through the amended complaint, this Court finds that Plaintiff's § 1 claim, though somewhat mixed up and imprecise, may stand either as a block-booking claim against Defendant Sony Pictures and the other Sony Corporate Entities or as

an illegal relationship licensing claim against all of the Sony Defendants. Discovery, therefore, may proceed on both claims.

1. Block-booking

In the landmark case *United States v. Paramount Pictures, Inc.,* the Supreme Court defined block-booking as "the practice of licensing, or offering for license, one feature or group of features on condition that the exhibitor will also license another feature or group of features released by the distributors during a given period ." *334 U.S. at 156.* As such, block-booking is a type of tying arrangement, *see Fields Prods., Inc. v. United Artists Corp.,* 318 F. Supp 87, 88 (S.D.N.Y.1969); *aff'd* 432 F.2d 1010 (2d Cir.1970), which is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5 (1958). Block-booking violates § 1 because distributors force theatres to accept films that they do not desire and, thereby, prevent other exhibitors from access to those movies, while at the same time depriving competing distributors of an opportunity to license their own movies to the coerced theatres. *Fields,* 318 F.Supp. at 88. The Supreme Court held that block-booking is inimical to the antitrust laws because it "prevents competitors from bidding for single features on their individual merits." *Paramount,* 334 U.S. at 156-57. As recently as 1989, the Second Circuit found that block-booking is one of the most common practices used within the film industry to frustrate competition. *See United States v. Twentieth Century Fox Film Corp.,* 882 F.2d 656, 658 (2d Cir.1989).

Because block-booking involves a distributor compelling a theatre to accept movies that it does not want, actual coercion "is an indispensable element" of a block-booking violation. *Unijax, Inc. v. Champion Int'l, Inc.,* 683 F.2d 678, 685 (2d Cir.1982); *accord American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 446 F.2d 1131, 1137 (2d Cir.1971). The Supreme Court stated that

**\*15** the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984); *accord United States v. Loew's Inc.,* 371 U.S. 38, 45 (1962)(quoting *Northern Pac.,* 356 U.S. at 6)("The standard of illegality is that the seller must have 'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product ....'").

Defendants correctly emphasize that because coercion is a critical element of a tying claim, a defendant must have sufficient economic power in the market for a product to be able to coerce buyers into purchasing the product. *See* Defendants' Mem. at 13. Only a film distributor, who possesses the copyright to a movie, has the ability to coerce an exhibitor to accept an unwanted film along with a desired one and, thereby, satisfy the coercion element of a tying agreement. Block-booking, therefore, is a wrong that distributors perpetrate upon exhibitors. Thus, Plaintiff's block-booking claim cannot stand against any of the exhibitor Defendants, which are not copyright holders and do not possess the economic power over copyrighted motion pictures necessary to coerce a buyer to take undesired films. [FN31]

> FN31. The exhibitor Defendants include: Sony, Loews, TBA, Loews Fine Arts, James Loeks, Barrie Loeks, Travis Reid, Thomas Brueggemann, and Seymour H. Smith.

Still, although Plaintiff may not bring a block-booking claim against any of the exhibitor Defendants, Plaintiff has set forth sufficient allegations in the amended complaint alleging block-booking against Sony Pictures and the other Sony Corporate Entities to survive Defendants' Rule 12(b)(6) motion. Plaintiff specifically relies on letters it received from Defendant Reid, addressing Plaintiff's criticisms about Sony's booking practices at Plaintiff's theatres. *See* Amended Compl. at ¶¶ 79-80. Indeed, this Court finds that those letters present adequate facts indicating that the Sony Corporate Entities engaged in block-booking practices that adversely affected Plaintiff.

In a September 19, 1996 letter to Solow, Defendant Reid explained that distributors expect [FN32] to establish "long term relationships with ... exhibitors who agree to participate in the liquidation of all their product, not just high profile films." *Id.* at ¶ 81.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

Ostensibly, Reid's letter stated that if an exhibitor hopes to receive any suitable movies at all for a theatre, it is customary within the film industry for the exhibitor to agree to show all of a distributor's product, both the desired movies as well as the packaged ones. Defendant Reid's letter of January 16, 1996, responding to Solow's inquiry about possible exhibition of *Sense and Sensibility* at the Twin, confirmed that Sony Pictures adheres to the practice of expecting to liquidate its entire product with one exhibitor. *See id.* at ¶ 80. In that letter, Reid stated that a change in Sony's East Side booking methods to play *Sense and Sensibility* at the Twin would have "obligated [Sony] to play a full portion of the Sony Pictures release schedule." *Id* . at ¶ 80. This statement suggests that short of agreeing to exhibit all of Sony Pictures' films, Solow, or Sony as Solow's agent, could have done nothing to convince Sony Pictures to award the rights to show *Sense and Sensibility* to the Twin.

> FN32. James Bond: "Do you expect me to talk?" Goldfinger: "No Mr. Bond, I expect you to die."
> Goldfinger (GB United Artists 1961).

**\*16** Distributors' expectations that an exhibitor will play a full schedule of their films and will comply with such a demand put a premium on the size of a theatre chain's circuit of theatres and eliminate the opportunity for a small, independent theatre owner, such as Plaintiff, to bid for films individually and obtain quality movies. *See Paramount,* 334 U.S. at 154. Plaintiff contends that, on the whole, it received only poorly performing movies and that it was unable to procure more desirable films because of the actions of Sony Pictures and the other Sony Corporate Entities.

Thus, this Court finds that the amended complaint includes adequate facts to support the allegation that the Sony Corporate Entities engaged in block-booking to the detriment of Plaintiff in violation of § 1. At this point in the litigation, the facts suggest that Plaintiff's difficulty in acquiring more profitable movies may be attributed to its unwillingness or its inability to accept all of Sony Pictures' films. Still, because block-booking is traditionally a claim that exhibitors bring against distributors, Plaintiff may assert such a claim only against the Sony Corporate Entities.

### 2. Illegal Relationship Licensing

While this Court finds that Plaintiff has included sufficient factual allegations in the amended complaint to support a block-booking claim against the Sony Corporate Entities, such a claim cannot stand against any of the exhibitor Defendants because Plaintiff properly may assert a block-booking claim only against a distributor. Defendant Sony suggests that a block-booking claim likewise may not stand against them because "there is no claim that the [Sony] defendants were coerced into buying packages of films," and any relationships that they established with distributors were voluntary. In their submissions to this Court, Defendants confirmed that they "in fact desire the product that Plaintiff claims they are being forced to accept." Sacks Letter at 3; *see also* Defendants' Mem. at 15.

Indeed, some of Plaintiff's statements in the amended complaint identify Sony's booking arrangements as voluntary. According to the amended complaint:

> Sony *has entered into agreements* with certain motion picture distributors concerning the block-booking of motion pictures being distributed by those distributors.
> Pursuant to those block-booking arrangements, Sony *agrees to "liquidate" or exhibit* in its theatres all of the motion picture product of a distributor. In order to obtain high quality motion pictures, Sony *agrees to also exhibit* the lesser motion pictures.

Amended Compl. at ¶¶ 112-113 (emphasis added). These paragraphs do not assert that anyone coerced Defendant Sony to accept unwanted films, nor do they allege that Defendant Sony forced anyone to provide it with packages of films. Rather, these paragraphs indicate that Defendant Sony voluntarily engaged in relationships with distributors to exhibit all of a distributor's product and, thereby, guarantee a ready supply of films to play in their theatres.

**\*17** These statements, therefore, are, surprisingly, somewhat contradictory to Plaintiff's block-booking claim. Nevertheless, ironically, despite the inconsistent allegations, Plaintiff unknowingly asserts an alternative theory of a § 1 violation against the exhibitor Defendants. Although Plaintiff's block-booking claim against the exhibitor Defendants must fail, Plaintiff has included sufficient facts in the amended complaint to sustain a § 1 illegal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 15
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

relationship licensing claim against all of the Sony Defendants. Thus, although Plaintiff has mislabeled its § 1 claim against Defendant Sony, this Court will analyze Plaintiff's allegations in light of the prevailing case law.

This Court recognizes the complexity of this issue and realizes that it must balance the interests of Defendants' autonomy in establishing their own booking relationships with the importance of having a fair and free economy and ensuring that those relationships do not violate the antitrust laws. To support their contention that distributors and exhibitors may have booking relationships with each other that do not violate the antitrust laws, Defendants cite the Supreme Court, which held that group-booking relationships that do not involve coercion can be legal. The Court stated:

> We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted.

*Paramount,* 334 U.S. at 159. Moreover, Defendants also attempt to rely on a 1988 Department of Justice report ("Report") that thoroughly analyzed the history of the *Paramount* case and discussed various film-booking arrangements. *See* Defendants' Mem. at 15 n.6; Fleishman Aff. at Ex. E. The Report identified relationship licensing as "a distributor's selection of a preferred exhibitor in whose theatre the distributor would like to play all or almost all of its pictures." Fleishman Aff. at Ex. E. at 39. The Report went on to explain that

> the distributor makes an initial on-the-merits selection of the exhibitor's theatre to play its films, and thereafter for an indeterminate period the distributor offers its films to the exhibitor and the exhibitor plays them.... In the Antitrust Division's view, the theatre-by-theatre injunction [that the *Paramount* case established] does not prohibit this type of relationship licensing.

*Id.* at Ex. E at 40. Moreover "so long as a competing exhibitor [is] not foreclosed from having his theatre considered on its merits for the licensing of one or more pictures in that group," the Report found that relationship licensing does not violate the antitrust laws. *Id.* at Ex E. at 42. In fact, the Report suggested that "relationship licensing may assure a small operator a ready supply of pictures to play." *Id.* at Ex. E. at 43. Thus, Defendants assert that because they

voluntarily accepted any group-bookings that distributors offered to them, Plaintiff fails to include adequate allegations of the bedrock principle of a tying violation: coercion. *See* Defendants' Mem. at 15; Reply Mem. in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Reply Mem.") at 2-3. Therefore, Defendants argue that this Court should dismiss Plaintiff's block-booking claim. *See* Defendants' Mem. at 15; Reply Mem. at 2-3.

**\*18** Defendants' reliance on the Supreme Court decision and the Report, however, is misplaced and disingenuous because it ignores the underlying rationale driving the Supreme Court's decision in *Paramount* and its establishment of the theatre-by-theatre injunction. The Court's primary consideration in the *Paramount* case was to prevent the stifling of competition by ensuring that all exhibitors have fair access to motion pictures. When discussing certain kinds [FN33] of licensing relationships, the Court recognized that some licensing arrangements are unlawful restraints of trade because they

> FN33. "You see in this world there's two kinds of people my friend-- those with loaded guns and those who dig. You dig!" The Good, the Bad, and the Ugly (United Artists 1966).

eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit [of theatres]. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators.

*Paramount,* 334 U.S. at 154; *see Loew's,* 370 U.S. at 880 (citing this explanation as the crux of the rationale in *Paramount* ).

Thus, if distributors and exhibitors engaged in relationship licensing in such a manner as to hinder other exhibitors' ability to acquire quality movies, then such relationship licensing would violate § 1. Moreover, the Report actually propounds such a position on relationship licensing. Defendants were selective in their citation of the Report. While the Report indicated that relationship licensing may be legal under the antitrust laws, it also stated:

> The foregoing discussion should not be read to suggest, however, that in all cases relationship

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

licensing is lawful. Where, for example, such licensing involves circuit dealing, favoritism toward affiliates, preferential contract terms, or rejection out-of-hand of competing exhibitors' offers without any "on-the-merits" determination, the mere fact that relationship licensing is also involved will not immunize that conduct. Thus, we will review on its merits each complaint that the theatre-by-theatre injunction has been violated to determine whether in a relationship licensing situation any of the prohibited conduct discussed above is present.
Fleishman Aff. at Ex. E. at 50-51. [FN34] Accordingly, in considering Plaintiff's allegations against Defendants, this Court must be mindful of the Supreme Court's concern that some booking relationships may have the effect of excluding exhibitors, especially small, independent exhibitors, from fair access to films.

> FN34. Both the Supreme Court decision and the Report suggest that any illegality in relationship licenses would generally be caused by a distributor at the expense of exhibitors, particularly small, independent exhibitors. The Supreme Court, however, also noted that "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *Paramount,* 334 U.S. at 161. Thus, because relationship licensing is consensual between the participating distributors and exhibitors, it follows that a court may also hold exhibitors liable for any illegality.

Here, the amended complaint recites sufficient allegations suggesting that Defendants have engaged in illegal relationship licensing, "elevat[ing] [their] own interests over those of the plaintiff's theatres, in using plaintiff's theatres to curry favor with movie distributors purely for Sony's own advantage and to benefit Sony's own theatre operations." Amended Compl. at ¶ 50. First, Defendant Sony effectively guaranteed distributors a venue for their films despite any declining box-office receipts, by either exhibiting movies at Plaintiff's theatres for extended runs, or moving films to Plaintiff's theatres from Sony's theatres once those movies became less profitable. *See id.* at ¶¶ 51, 58, 61-62, 65, 72. For instance, regardless of sharply decreasing profitability, in 1996, Sony showed *Hamlet* at the Paris for an

allegedly unreasonably long run, and in 1997, Sony booked *Face Off* at the Twin for a three-month period. *See id.* at 65, 72.

*19 Second, Defendant Sony arranged for the premieres of several films at the Paris, affording distributors the benefit of the Paris's special reputation as an elite premiere venue, but thereafter exhibited those films at its own theatres, where it received 100 percent of the profits. *See id.* at ¶¶ 51-53. For example, after helping Miramax plan the premiere of *Emma* at the Paris in April 1996, Sony transferred *Emma* to its Lincoln Square theatre and to a Cineplex theatre. *See id.* at ¶ 52.

Third, purportedly in an effort to foster its own relationships with distributors by offering them more than one venue to exhibit their films, Sony executives allegedly attempted to harass Plaintiff into deviating from its long-time exclusive booking practice at the Paris. Plaintiff recounts that in June 1996, Defendant Brueggemann notified Solow that Sony was discussing with distributors the exhibition of films at the Paris on a non-exclusive basis. *See id.* at ¶ 60. Plaintiff also cites an August 15, 1996 letter from Defendant Reid, warning that unless Plaintiff agreed to abandon its exclusive booking policy, Sony would refuse to book certain films at the Paris. *See id.* at ¶ 66.

Fourth, Plaintiff includes allegations in the amended complaint that Sony elevated its own business interests over Plaintiff's. In 1995, Solow asked Defendant Brueggemann to inquire about the possibility of leasing and exhibiting *Belle* at the Paris. *See id.* at ¶ 55. Plaintiff asserts that, with the intent of strengthening Sony's ties to Miramax, Brueggemann instead proposed the idea to Miramax, which thereafter bought and exhibited *Belle* at the Paris, thereby favoring Miramax and depriving Plaintiff of a lucrative business opportunity. *See id.* at ¶ 57.

Fifth, the amended complaint demonstrates that Sony is in a propitious position to accept all of a distributor's product, because, as manager of Plaintiff's theatres, Sony is able to keep all the heralded films for its own theatres, where it receives all the profits, while "dump[ing] the refuse of its ... deals" in Plaintiff's theatres, *id.* at ¶ 117, where it may keep only forty percent of net income after expenses. *See id.* at ¶ 40. Plaintiff enumerates a long

Not Reported in F.Supp.2d                                                     Page 17
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

list of underperforming films that Sony booked at the Twin while Sony played more popular and productive pictures at its own theatres. *See id.* at ¶¶ 68-71; *see also id.* at ¶¶ 58, 77 (alleging that Sony "failed to book appropriate films at the Paris" and "used [the Festival] as a 'dumping ground' "). Plaintiff also points to a statement from Defendant Reid, acknowledging the acceptance of sub-standard pictures as a method of "form[ing] relationships [with distributors] in order to be booked properly on a long term basis." *Id.* at ¶ 79.

Finally, considering these allegations, this Court is concerned that Defendants will use the benefits of their merger, which brought together top distributors and exhibitors, *see infra* part V.B., to secure a competitive dominance within the film industry, by favoring affiliates and freezing out small exhibitors from access to movies. This Court's wariness is heightened by such evidence as Defendant Reid's June 1996 threat that Defendants "would make every effort to influence distributors not to deliver quality films to plaintiff's theatres," if Plaintiff terminated Sony as manager of Plaintiff's theatres. *Id.* at ¶ 84.

*20 Plaintiff states that "[a]s a result of the foregoing agreements in restraint of trade, plaintiff is damaged because its ability to compete as an independent theatre owner is effectively undermined." *Id.* at ¶ 117. All of the actions that Plaintiff cites in support of its claim promote relations between Defendants and other distributors and help ensure that Defendants will have a supply of quality films from which to choose and a competitive advantage over other exhibitors. Plaintiff asserts that it "did not benefit from Defendants' anti-competitive arrangements and was repeatedly damaged by those arrangements." *Id.* Accordingly, Plaintiff sets forth enough facts to uphold a claim for illegal relationship licensing against Defendants.

At this stage, Plaintiff must now proceed in a more astute manner, delineating more cogently the exact nature of its § 1 claims against the proper Sony Defendants and their underlying bases. The lack of precision in Plaintiff's amended complaint was disconcerting to this Court. It was unclear whether Plaintiff's § 1 claim alleged block-booking, illegal relationship licensing, or both. *See* Rule 8(e)(2)("A party may set forth two or more statements of a claim ... alternately or hypothetically, either in one count ...

or in separate counts .... A party may also state as many separate claims ... as the party has regardless of consistency ...."). Plaintiff conflates a block-booking claim against Defendants, which requires an element of coercion, with allegations that Sony agreed to engage in the block-booking relationships. Emphasizing that their booking relationships with distributors were voluntary, Defendants correctly point out that a block-booking claim against them cannot stand because Plaintiff fails to demonstrate coercion. Still, Defendants arguments do not exonerate them from any antitrust violations. Defendants cannot have it both ways because even voluntary relationships may violate § 1.

Defendants' motion to dismiss Plaintiff's § 1 claim is, therefore, denied. Defendants had the burden of demonstrating to this Court that Plaintiff's amended complaint presented no interpretation of facts that could support a § 1 claim. Defendants have failed to sustain their burden. Defendant Reid's January 16, 1996 letter suggests that Sony felt forced "to play a full portion of Sony Pictures release schedule." Amended Compl. at ¶ 80. If, as this letter appears to indicate, Sony Pictures did employ coercion against Sony, Plaintiff's managing agent, then Plaintiff may proceed with a block-booking claim, a per se violation of § 1, solely against the Sony Corporate Entities. If, however, as Defendants argue, Reid's letter is merely an overstatement and Defendants' booking relationships are completely voluntary, then the block-booking claim must fail and there is no per se violation of § 1. Instead, Plaintiff should move forward on an illegal relationship licensing claim against Defendants. At that point, this Court will be in a position to review the individual merits of this case to determine whether Plaintiff asserts a satisfactory illegal relationship licensing violation.

*21 Either way, the amended complaint contains enough facts to support a § 1 claim against Defendants. Further discovery may enlighten both the parties and this Court as to which construction of a § 1 claim is more feasible. Accordingly, despite the imprecise and ambiguous nature of the amended complaint, Plaintiff presents an actionable § 1 claim either as a block-booking claim against the Sony Corporate Entities or as an illegal relationship licensing claim against all of the Sony Defendants.

B. Clayton Act § 7 Claims: Merger

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

Page 18

Plaintiff claims that the merger that Defendants entered into with Cineplex to form LCE violates § 7. *See* Amended Compl. at ¶¶ 127-131. Plaintiff contends that it will be unable to compete as an independent theatre operator because "[t]he merger will dramatically enhance Sony's market power in relevant markets." [FN35] *Id.* at ¶ 129. Specifically, Plaintiff argues that the merger effectuates intimate affiliations between exhibitors, Sony and Cineplex, and distributors, Sony Pictures and Universal Pictures, which, in turn, "will impede plaintiff's ability to obtain quality motion pictures." *Id.* at ¶ 130.

> FN35. Identifying the appropriate market-- product and geographic--is a "necessary predicate" to an analysis of the probable effects that a merger will have on competition. *Brown Shoe v. United States,* 370 U.S. 294, 324, 335 (1962). Here, this Court finds that the product market is the film exhibition market, and the relevant geographic market is Manhattan. *See id.* at 336 ("Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one."). In addition, it should be noted that the Upper East Side of Manhattan is "the most important market because of the concentration of nationally influential film critics and news media." *Loew's,* 705 F.Supp. at 887-88 (citation omitted).

Section 7 prohibits mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The Supreme Court remarked that § 7 creates a "relatively expansive definition of antitrust liability." *California v. American Stores Co.,* 495 U.S. 271, 284 (1990). Additionally, as § 7 aims to catch a threat to competition in its incipiency, the Supreme Court held that § 7 is concerned with probabilities, not certainties, and, therefore, "[m]ergers with a *probable* anticompetitive effect [are] ... proscribed by [§ 7]." *Brown Shoe,* 370 U.S. at 323 (emphasis added); *accord Fruehauf Corp. v. Federal Trade Commission,* 603 F.2d 345, 351 (2d Cir.1979). Nevertheless, the Second Circuit emphasized that " 'mere possibility' will not suffice," and, rather, a reasonable probability of substantial impairment of competition must exist. *Fruehauf,* 603 F.2d at 351.

Accordingly, to have standing, under § 7, to challenge the LCE merger, Plaintiff must offer a sufficient factual basis demonstrating that the merger threatens Plaintiff with probable antitrust injury. *See American Stores,* 495 U.S. at 281-82; *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 105, 122; *Consolidated Gold Fields PLC v. Minorco, S.A.* 871 F.2d 252, 254 (2d Cir.1989); *R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 103 (2d Cir.1989); *see also Remington Prods., Inc. v. North Am. Philips, Corp.,* 755 F.Supp. 52, 55 (D.Conn.1991)("[O]ne seeking equitable relief [to demonstrate a violation of § 7] need only show 'threatened' loss or damage.").

Moreover, the Supreme Court has held that a [p]laintiff[ ] must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [a] defendant['s] acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."
**\*22** *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)(quoting *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 125 (1969)). The Supreme Court explained that injury, although casually related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti- competitive aspect of the practice under scrutiny, "since '[it] is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition."
*Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990)(quoting *Cargill,* 479 U.S. at 109-10 (quoting *Brunswick,* 429 U.S. at 488))(alterations in original).

The issue before this Court, therefore, is whether the amended complaint has alleged adequate facts to show that the LCE merger threatens Plaintiff with the kind of injury Congress targeted in enacting the antitrust laws. This Court finds that the amended complaint has sustained this burden. Here, Plaintiff alleges that the merger causes antitrust injury by restraining Plaintiff's access to quality motion pictures and, effectively, depriving Plaintiff of its ability to compete for first-run films. [FN36] *See*

Not Reported in F.Supp.2d                                                                            Page 19
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

Amended Compl. at ¶ 130. The amended complaint presents facts demonstrating Defendants' anti-competitive actions designed to limit Plaintiff's ability to obtain select movies. *See id.* at ¶¶ 51-53, 58, 68-71, 77; *see supra* part V.A.2. Plaintiff maintains that the merger will enhance Defendants' ability to divert more profitable films away from Plaintiff's theatres. *See* Amended Compl. at ¶¶ 129-30. The Second Circuit has found the claim that a merger prevents a plaintiff from competing in the relevant market sufficient under § 7. *See Bigelow, 867 F.2d at 108, 111.*

> FN36. "See you don't understand. I could have had class. I coulda been a contender." On the Waterfront (Columbia 1954).

This Court must, therefore, determine if the merger affords LCE the power to limit its competitors' ability to compete. When a court evaluates the effects of a merger, "the starting point is [the merged entity's] post-acquisition market share." *Id.* at 107 (citing *Brown Shoe,* 370 U.S. at 343). The Supreme Court stated that "market share ... is one of the most important factors to be considered when determining the probable effects of the combination on ... competition in the relevant market." *Brown Shoe,* 370 U.S. at 343.

Thus, the size of the merged company in relation to the size of its competitors is a primary consideration. *See United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 363 (1963)(noting that the size of a merger can make the merger "inherently suspect in light of Congress' design in § 7 to prevent undue concentration"); *see also Brunswick,* 429 U.S. at 487 ("If the acquisition here were unlawful, it is because they brought a 'deep pocket' parent into a market of 'pygmies.' "). Indeed, the legislative history of the 1950 amendments to § 7 indicates that a merger may be perceived as substantially lessening competition or tending to create a monopoly if, *inter alia,* "the relative size of the acquiring corporation ha[s] increased to such a point that its advantage over competitors threaten[s] to be 'decisive'." H.R.Rep. No. 1191, 81st Cong., 1st Sess., ("H.R.1191") at 8 (1949), *quoted in Brown Shoe,* 370 U.S. at 321 n.36; *see Brown Shoe* 370 U.S. at 315 ("The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic

concentration in the American economy."). The Supreme Court understood this rationale for the amendments as an "intense congressional concern with [market] concentration [that in certain cases] warrants dispensing ... with elaborate proof of market structure, market behavior, or probable anticompetitive effects." *Philadelphia Nat'l Bank,* 374 U.S. at 363.

**\*23** Moreover, the Court emphatically agreed with Congress's concern, stating:

> [W]e think that a merger that produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Id.* (citing *United States v. Koppers Co.,* 202 F.Supp. 437 (W.D.Pa.1962)). Here, this Court is presented with both a horizontal merger [FN37] and, more significantly, a vertical merger. [FN38] *See* H.R. 1191 at 11; *Brown Shoe,* 370 U.S. at 317 (noting that § 7 applies to both horizontal and vertical mergers).

> FN37. "An economic arrangement between companies performing similar functions in the production or sale of comparable goods or services is characterized as 'horizontal.' " *Brown Shoe,* 370 U.S. at 334. The LCE merger horizontally consolidated the distributor Sony Pictures with the distributor Universal Pictures and the exhibitor Sony with the exhibitor Cinepelex.

> FN38. "Economic arrangements between companies standing in a supplier-customer relationship are characterized as 'vertical' " *Brown Shoe,* 270 U.S. at 323. The LCE merger vertically consolidated the distributors Sony Pictures and Universal Pictures with the exhibitors Sony and Cineplex.

Defendants observe that this Court must consider the size of Defendants' post-merger market share when weighing the probable effects on competition. Therefore, in view of the Stipulation and Order that required Sony and Cineplex to divest themselves of a total of fourteen theatres before merging, Defendants

Not Reported in F.Supp.2d                                                                              Page 20
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

urge this Court to dismiss Plaintiff's § 7 claim. *See* Defendants' Judicial Notice Mem. at 1-2; *see also* Sacks Letter at 3 ("Plaintiff's merger claim is moot because DOJ has already cleared the merger between LTM Holdings, Inc. and Cineplex and in so doing, DOJ required them to divest certain theatre assets in both Manhattan and Chicago."). This Court recognizes that as a result of the divestiture, the merged entity LCE operates the same number of New York theatres that Sony managed prior to the merger. *See supra* part IV. Nevertheless, this Court finds this fact alone insufficient to support the motion to dismiss.

First, [FN39] it must be noted that "[t]he Department of Justice at times countenances a higher level of anti-competitive behavior than do the courts," and, therefore, it is the responsibility of this Court to undertake its own evaluation of the merger in light of the allegations in the amended complaint. *Loew's,* 705 F.Supp. at 891; *see also id.* at 879 ("The Attorney General's concessions to the court regarding what might be widespread anti-competitive behavior in this industry left open a number of crucial questions that the court felt needed to be answered ...."); John M. Garon, *Media & Monopoly in the Information Age: Slowing the Convergence at the Marketplace of Ideas,* 17 Cardozo Arts & Ent. L.J. 491, 621 n.563 (1999)("Despite regular review by the Department of Justice ... illegal trade practice [within the film industry] continue[s] to occur.")" Second, the Stipulation and Order itself states:

> FN39. "Who's on first, What's on Second, I Don't Know is on third ...." The Naughty Nineties (Universal 1945).

Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against defendants.

**\*24** Stipulation and Order at 20. Accordingly, the settlement that Sony, Cineplex, the Government, and the States of New York and Illinois entered to complete the merger does not govern Plaintiff's § 7 claim.

Additionally, at this point, the parties have not

presented this Court an adequate factual foundation upon which to evaluate the actual effects of the horizontal merger. For example, while this Court notices that LCE possesses the same number of theatres in Manhattan that Sony ran prior to the merger, this fact does not necessarily diminish Defendants' market share in Manhattan. This Court has no information regarding the nature of the divested theatres, i.e., their age, their condition, or whether they are single or multi-screen theatres. Perhaps, while controlling the same number of theatres in Manhattan, LCE now has twice as many screens; perhaps the divestiture merely has delayed LCE's dominance over the competition. This Court is also interested in the effect the merger has had on exhibition prices. [FN40] Therefore, further discovery is necessary to address this Court's concerns.

> FN40. This Court is wary that the merger may facilitate escalating and prohibitively expensive ticket-prices. On February 28, 1999, the *New York Times* reported the recent increase of LCE ticket prices to $9.50, the highest in the nation. *See* Robert D. McFadden, *Appearing Finally in Theaters: The $9.50 Movie,* N.Y. Times, February 28, 1999. Granted, the increase may have had no connection at all to the merger, as in recent years, increases in ticket prices have been a regular occurrence in Manhattan. A March 19, 1999 *New York Times* article reported that "[i]n the last five years, movie ticket prices in the city have gone up by 27 percent, more than twice as fast as the cost of living." Clyde Haberman, *Moviegoers Vs. Theaters: Food Fight!,* N.Y. Times, March 19, 1999, at B1.
> The present jump to $9.50, however, occurred despite assurances from a Cineplex executive, at the time of the merger, guaranteeing that the merger would not cause an increase in ticket prices. *See id.* ("I can guarantee you that ticket prices will not increase as a result of this merger."). This Court also notes that Manhattan, in addition to having the dubious distinction of charging the most expensive movie-ticket prices, offers a paucity of matinee theatre prices at its movie theatres.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 21
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

More alarming to this Court, though, is the vertical unification that the LCE merger caused between powerful distributors and exhibitors. The Supreme Court warned that an important factor for a court to consider when assaying the legality of a merger is "the trend toward concentration in the industry." _Brown Shoe,_ 370 U.S. at 332. Indeed, one court has noted that the film industry "is a concentrated industry in which there has been a recent trend toward vertical integration which appears significant." _Loew's,_ 705 F.Supp. at 885.

Accordingly, this Court must be vigilant in assessing the effects of the prominent vertical integration in this case, as Defendants are both exhibitors and distributors and the merger places them within the same company. Defendants represent a unique entity. To understand the precise structure of this entity, this Court must consider Defendants in their entirety. To do otherwise would be shortsighted. Defendants are indeed the sum of all their parts, and they cannot evade scrutiny by partitioning themselves. Pieces of a puzzle viewed separately form unintelligible, irregular shapes, but considered together reveal a discernible image.   [FN41]   Thus, to allow fragmentation to provide an escape from responsibility would be to deal in illusion. This Court sees right through the cellophane fence that Defendants attempt to hide behind.

> FN41. "I guess Rosebud is just a piece in a jigsaw puzzle." Citizen Kane (RKO 1941).

In this case, the LCE merger vertically integrated elite exhibitors and distributors, concentrating those entities together to create a film industry powerhouse. [FN42] Prior to the merger between Sony and Cineplex, Sony was the largest motion picture exhibitor in Manhattan and one of the largest in the United States; Sony Pictures was the largest film distributor in the world and was also closely affiliated with Columbia Pictures; Cineplex was the second largest movie exhibitor in Manhattan and the fourth largest exhibitor in the United States; and Universal Studios, the distributor with a controlling interest in Cineplex, was also one of the six largest national film distributors. _See_ Amended Compl. at ¶¶ 1, 3; Plaintiff's Mem. in Opp'n to Defs.' Mot. to Dismiss ("Plaintiff's Mem.") at 1-2. Thus, regardless of the divestiture of theatres resulting in LCE's possession of the same total number of theatres within

Manhattan that Sony had before consummating the merger, the merger still combined two dominant Manhattan movie exhibitors with extensive connections to powerful film distributors. _See_ H.R. 1191 at 8 (suggesting that § 7 can be violated if "buyers and sellers in the relevant market had established relationships depriving their rivals of a fair opportunity to compete"), _quoted in Brown Shoe,_ 370 U.S. at 321 n.36.

> FN42. "Ladies and gentlemen, look at Kong, the eighth wonder of the world." King Kong (RKO 1933).

**\*25** A vertical merger, however, does not automatically have an anti-competitive effect. _See Fruehauf,_ 603 F.2d at 351.

> As the Supreme Court recognized in _Brown Shoe_ ... the foutainhead of § 7 analysis of vertical mergers, the competitive significance of a vertical merger results primarily from the degree, if any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms, (2) by foreclosing competitors of the selling firm ... from access to the market or a substantial portion of it, or (3) by forcing actual or potential competitors to enter or continue in the market only on a vertically integrated basis because of advantages unrelated to economies attributable solely to integration.... The ultimate objective, however, is to determine whether and how the particular merger in issue may lessen competition, i.e., what its anticompetitive effect on the market, if any, is likely to be.

_Id._ at 352 (citing _Brown Shoe,_ 370 U.S. at 328). Thus, in assessing the competitive results of the vertical merger that exists in this case, this Court must primarily concern itself with the possibility of market foreclosure, the exact antitrust injury that Plaintiff alleges.

In view of this high standard, this Court is amazed at Defendants' flat and unsupported denial of Plaintiff's allegation that the merger will permit LCE to obtain more quality films than Sony and Cineplex were able to acquire separately. _See_ Defendants' Mem. at 20-21. Defendants adamantly assert that "[t]he notion is illogical," insisting that distributors, who have the market power to offer films, decide where to place

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

their films and what exhibitor bids to accept. *Id.* In so claiming, Defendants seek to circumvent the instruction of the district court in *Paramount* that "defendants must be viewed collectively rather than independently as to the power which they exercise [ ] over the market by their theatre holdings." *Paramount,* 85 F.Supp. at 894 (citing *American Tobacco Co. v. United States,* 328 U.S. 781 (1946)).

Analyzing the vertical merger, particularly in the context of the motion picture industry, *see Brown Shoe,* 370 U.S. at 321-22, this Court notes that in *Loew's,* where a producer/distributor requested that the court consider modifying the antitrust consent judgment, the court warned of the danger that when distributors and exhibitors merge, the merged entities may predominantly or exclusively deal only with one another. 705 F.Supp. at 886. The Court in *Loew's* recognized the real potential for foreclosure of access to theatre space for competing distributors and of access to film product for competing exhibitors that may result if the vertically integrated company attempts to keep everything "in house ." [FN43] *See id.* at 887, 888.

> FN43. "There's no place like home!" The Wizard of Oz (Metro-Goldwyn-Mayer 1939). "E.T. phone home." E.T. the Extra-Terrestrial (Universal 1982).

Here, Plaintiff alleges that LCE will exploit its new commanding position in the film industry and the relevant market to acquire advantageous booking relationships that will stifle competition from independent exhibitors such as Plaintiff. This Court looks askance at the booking relationships that the merger facilitates because of "the likelihood that foreclosure of access to film product or exhibition space might be caused by the ... acquisition." *Loew's,* 705 F.Supp. at 885. Plaintiff alleges that prior to the merger, Defendants already engaged in activity that frustrated Plaintiff's ability to obtain films for exhibition. *See* Amended Compl. at ¶¶ 51-53, 58, 68-71, 77; *see supra* part V.A.2. The merger presents Defendants with an opportunity and an avenue through which they can further thwart Plaintiff's and other exhibitors' access to movies. A decision by LCE's distributors and exhibitors to restrict availability to their films and to their theatre space could potentially harm competition. This Court is, therefore, worried that "the market presence of the

new vertically integrated company [may be] great enough that the potential anti-competitive effects become a significant concern." *Loew's,* 705 F.Supp. at 886 (citing *Brown Shoe,* 370 U.S. at 328-29).

**\*26** Thus, both parties now have the opportunity to present further facts supporting their positions, thereby enabling this Court to make a determination about the effects of the LCE merger on competition on a more fully developed record. First, this Court is aware that "[w]hile market share data alone does not create an irrebutable presumption of illegality, such a presumption can be overcome only by evidence that the market share data gives an 'inaccurate account of the acquisition['s] probable effects on competition." ' *Bigelow,* 867 F.2d at 108 (quoting *United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 120 (1975)(internal citations omitted). Discovery will offer Defendants a chance to present evidence to this Court refuting this presumption.

Second, a more detailed record is indispensable to a court assessing the legality of a merger. In *Brown Shoe,* the Supreme Court stated that examining "the very nature and purpose of a [merger]" is an extremely important factor in assessing its legality. *Brown Shoe,* 370 U.S. at 329. Discovery on the § 7 claim will afford Defendants an opportunity to present evidence that the merger was motivated by a legitimate business purpose. *See, e.g., Loew's,* 705 F.Supp. at 884-85 (discussing several legitimate business purposes that motivated a producer/distributor to acquire a movie exhibition company). Additionally, in *Cargill,* the Supreme Court referred to evidence that the plaintiff presented at trial to help define the threatened loss, 479 U.S. at 114, and in *Bigelow* the Second Circuit suggested that a full trial on the merits may be necessary to appropriately assess market share data, market foreclosure, and the decrease of competition. 867 F.2d at 111. This Court, likewise, awaits more detailed submissions from both parties before making determinations about potential foreclosure.

Based on the alleged facts available to this Court at this time, however, there is certainly an adequate basis to recognize a reasonable probability that the LCE merger will lessen competition. Plaintiff "is entitled to the benefit of all reasonable inferences that follow from the alleged deliberate acquisition by merger of substantial monopoly power in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[Manhattan movie market] and to a presumption that ... [LCE will] be likely to eliminate competition in that market by, inter alia, reducing [Plaintiff's] access to [quality films]," a sufficient antitrust injury. _Bigelow, 867 F.2d at 111._

One court in this Circuit has stated that the film industry "has shown a proclivity for anti-competitive behavior when given the opportunity" and noted "evidence of a climate of non-compliance with this court's consent judgments." _Loew's,_ 705 F.Supp. at 885. Considering Plaintiff's allegations, which this court must accept as true, that Defendants have attempted to achieve a competitive advantage over Plaintiff and other exhibitors and that Defendants have already successfully effected the closure of the Festival permanently and the Paris temporarily, _see_ Amended Compl. at ¶ 121, this Court cannot, at this time, assume that Defendants, in their new position as part of LCE, will be on their best behavior. Accordingly, this Court will not dismiss Plaintiff's § 7 claim.

**C. Sherman Act § 2 Claims: Attempted Monopolization**

**\*27** Plaintiff asserts that Defendants' conduct constitutes an attempted monopolization in violation of § 2. _See id._ at ¶¶ 119-126. Plaintiff maintains that Defendants have manifested an intent to monopolize the motion picture exhibition market in Manhattan and have "engaged in predatory conduct, including threats of a concerted refusal to deal and actual diversion of motion picture product," all aimed at effectuating their plan to eliminate competition from other exhibitors such as Plaintiff. _Id._ at ¶ 121. Allegedly, Defendants' actions have already been successful, "forcing the temporary closure of the Paris Theatre, dramatically damaging business at the New York Twin, and precipitating the economic decision to close the Festival Theatre." _Id._ In addition, Plaintiff claims that the merger creates too high of a concentration of exhibition theatres and corporate affiliations with distributors, affording Defendants "the power [to] effectively deprive independent theatre owners such as plaintiff of quality motion pictures, as well as to raise prices to consumers virtually at will." _Id._ at ¶ 126.

Section 2 makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine

or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. [FN44] To establish a claim for attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." _Spectrum Sports, Inc. v. McQuillan,_ 506 U.S. 447, 456 (1993). The amended complaint sets forth an adequate claim against Defendants for attempted monopolization.

> FN44. "[G]reed, for the lack of a better word, is good. Greed is right. Greed works." Wall Street (20th Century Fox 1987).

Plaintiff has supplied this Court with ample allegations of Defendants' anti-competitive acts. _See supra_ parts V.A., V.B. In view of the litany of alleged anti-competitive acts that Plaintiff included in the amended complaint, Defendants' argument that Plaintiff "has not alleged any predatory conduct by the defendants" confounds this Court. Defendants' Mem. at 21. The amended complaint contains an extensive depiction of actions through which Defendants purportedly attempted to divert profitable movies away from Plaintiff's theatres and to diminish competition. _See_ Amended Compl. at ¶¶ 51-85. Plaintiff maintains that Defendants' conduct successfully prevents it from having access to quality films and from effectively competing within the Manhattan exhibition market.

This Court also finds ample evidence demonstrating Defendants' specific intent for attempted monopolization. First, the Second Circuit has held that a court may infer specific intent from a defendant's conduct. _See Tops Markets, Inc. v. Quality Markets, Inc.,_ 142 F.3d 90, 101 (2d Cir.1998)(citing _Northeastern Tel. Co. v. American Tel. Co.,_ 651 F.2d 76, 85 (2d Cir.1981)); _Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council,_ 857 F.2d 55, 74 (2d Cir.1988). Considering the laundry list of anti-competitive acts that Plaintiff asserts in its amended complaint, this Court finds it more than likely that Defendants possessed specific intent to destroy competition. Second, the Second Circuit stated that defendants' intent "can be derived from their words." _Tops Markets,_ 142 F.3d at 101. Here, Plaintiff alleges that Defendant Reid, a Sony

Not Reported in F.Supp.2d                                                                 Page 24
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
(Cite as: 2000 WL 264295 (S.D.N.Y.))

official, "adopted a peremptory, adversarial and threatening tone in communicating with plaintiff." Amended Compl. at ¶ 83. Specifically, Plaintiff complains that Defendant Reid "threatened that he and the other defendants would make every effort to influence distributors not to deliver quality films to plaintiff's theatres." *Id.* at ¶ 84. This Court, therefore, accepts as sufficient Plaintiff's allegations that Defendants intended to monopolize the Manhattan market, as evidenced by the words of one of their own officials.

**\*28** Defendants, however, argue that Defendant Reid's threat of encouraging diversion of product away from Plaintiff was in response to Plaintiff's intimation that it might terminate Sony as manager of Plaintiff's theatres, an act that never [FN45] occurred. *See* Defendants' Mem. at 22. Citing case law from the Eighth and Ninth Circuits, Defendants contend that "allegations ... of conditional 'threats' (with an unfulfilled condition) fail to sufficiently allege that defendants engaged in predatory or anticompetitive conduct." *Id.* (citing *Conoco Inc. v. Inman Oil Co.,* 774 F.2d 895, 905 (8th Cir.1985); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir.1971)). Defendants' argument is both tenuous and erroneous.

> FN45. "Call your mother and tell her you will never be a lawyer." The Paper Chase (20th Century Fox 1973).

First, based on the other allegations in the amended complaint, it appears to this Court that Defendants may have not only engaged in threats but actually followed through with the predatory actions of which Reid threatened. This Court also finds it just as reasonable to speculate that Defendant Reid's threat was motivated by Defendants' own realization that without Plaintiff's theatres, Defendants would be without an outlet to dump the sub-standard films that they received from distributors. Thus, a fair reading of Reid's threat can be understood to indicate that, regardless of whether Plaintiff ultimately fired Sony as manager of its theatres, Defendants were interested in reducing competition from Plaintiff.

Second, in support of their proposition that words are not enough to demonstrate specific intent, Defendants cite to other Circuits, ignoring the view of this Circuit in *Tops Market,* 142 F.3d at 101. Not only are the opinions of other Circuits not binding

upon this Court, but they certainly must be rejected when the law of this Circuit expresses a contrary view. *See Newsweek, Inc. v. United States Postal Serv.,* 663 F.2d 1186, 1196 (2d Cir.1981)("At the outset, it is well settled that the decisions of one Circuit Court of Appeals are not binding upon another Circuit."); *Christ the King Regional High Sch. v. Culvert,* 644 F.Supp. 1490, 1496 (S.D.N .Y.1986), *aff'd,* 815 F.2d 219 (2d Cir.1987)(emphasizing that contrary views or criticisms from other Circuits do not authorize a district court to reject the opinion of the Second Circuit). Defendants do not even attempt to distinguish the facts of our case from those in the Second Circuit's decision.

Third, even under the rationales of the Eighth and Ninth Circuits, Defendants' contention fails. Both the Eight and Ninth Circuit's opinions hold that a court must reject the implication of specific intent from statements only when corroborating evidence of anti-competitive conduct does not exist. *See Conoco,* 774 F.2d at 905 (stating that "isolated statements by a single ... official ... are insufficient to prove ... intent to monopolize in the absence of corroborating conduct"); *Dahl,* 448 F.2d at 19 (finding that "a manifestation of intent ... in the absence of evidence of unfair, anti-competitive or predatory conduct, is not enough to establish a violation of § 2"). In this case, this Court finds ample corroborating allegations to help substantiate Defendant Reid's threats.

**\*29** Finally, Plaintiffs allege sufficient facts to establish the real probability that Defendants possess the requisite power to achieve monopolization. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports,* 506 U.S. at 456; *accord AD/SAT v. Associated Press,* No. 96-7304, 1999 WL 415326, at *8 (2d Cir. June 23, 1999)(stating that for an attempted monopolization claim, defendant's market share is the principal sign of a dangerous probability of success); *Tops Markets,* 142 F.3d at 100 ("Critical to deciding the dangerous probability prong of plaintiff's attempted monopolization claim is defendant's economic power in the relevant market."). This Court has already examined, at length, Plaintiff's allegations regarding Defendants' market presence and has determined that

Not Reported in F.Supp.2d                                                                                  Page 25
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

there are enough facts upon which to posit that the LCE merger enables Defendants to destroy competition. *See supra* part V.B.

Sony Pictures, as a distributor, is now intimately connected with two major movie chains to license the rights of its films, while Sony, as exhibitors, has established concrete relationships with top film distributors from whom they can obtain a ready supply of movies to exhibit. The awesome vertical integration that the merger created affords Defendants extensive power within the film industry to gain a major competitive advantage over rival distributors and exhibitors. Such market power, coupled with Defendants' alleged exclusionary conduct and intent to control the market, leads this Court to the conclusion that a dangerous probability of achieving monopolization also exists. *See Paramount,* 334 U.S. at 174 (stating that "a vertically integrated enterprise ... will constitute monopoly which, though unexercised, violates the Sherman Act provided a power to exclude competition is coupled with a purpose or intent to do so."); *Volvo,* 857 F.2d at 74 (holding that when a court is faced with "both exclusionary conduct and the existence of monopoly power ... a dangerous probability of success, may be inferred."). Accordingly, this Court finds that the amended complaint satisfactorily alleges that, by their words and actions, Defendants have demonstrated a specific intent to create a monopoly with a dangerous probability of success.

VI. State Claims

Having found that Plaintiff has set forth sufficient factual allegations in the amended complaint to support its federal law claims against Defendants, for purposes of judicial economy, convenience, and fairness, this Court chooses to exercise supplemental jurisdiction over Plaintiff's state claims. *See City of Chicago v. International College of Surgeons,* 522 U.S. 156, 173 (1997)(citing *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)).

A. Tortious Interference with Prospective Business Relations [FN46]

> FN46. This tort has also been referred to as interference with economic advantage, prospective advantage, business relations, or pre-contractual relations. *See Martin Ice*

*Cream, Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y.1983).

*\*30* Plaintiff alleges that Defendants unlawfully interfered with Plaintiff's prospective contractual relationships. *See* Amended Compl. at ¶¶ 101-104. Specifically, Plaintiff argues that

> defendants' actions in inducing film distributors not to provide quality films to plaintiff and in preventing plaintiff from pursuing the substantial business opportunity associated with plaintiff's concept of acquiring the rights to and reissuing the film *Belle de Jour* ... ha[ve] interfered with and continue[ ] to interfere with plaintiff's prospective business relations in the field of motion picture exhibition.

*Id.* at ¶¶ 102-03. To sustain its claim for tortious interference with prospective economic advantage, Plaintiff must satisfy an extremely high pleading standard. Plaintiff's allegations must include elements "more demanding than those for interference with [the] performance of an existing contract." *Fine v. Doernberg & Co., Inc.,* 610 N.Y.S.2d 566, 567 (App. Div.2d Dep't 1994) (citation omitted)(alteration in original). Under New York law, to succeed on the claim, Plaintiff must show "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994) (citation omitted); *accord PPX Enters. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 269 (2d Cir.1987). This Court finds that Plaintiff has set forth a satisfactory claim to warrant further discovery on this issue.

To establish a successful claim, Plaintiff " 'must specify some particular, existing business relationship through which plaintiff would have done business but for the allegedly tortious behavior." ' *Minnesota Mining and Mfg. Co. v. Graham-Field, Inc.,* No. 96 Civ. 3839, 1997 WL 166497, at \*7 (S.D.N.Y. April 9, 1997)(quoting *Kramer v. Pollock-Krasner Found.,* 890 F.Supp. 250, 258 (S.D.N.Y.1995)); *see also Envirosource, Inc. v. Horsehead Resource Dev. Co .,* No. 95 Civ. 5106, 1996 WL 363091, at \*14 (S.D.N.Y. July 1, 1996)(quoting *McGill v. Parker,* 582 N.Y.S.2d 91, 95 (App. Div. 1st Dep't 1992))("A 'general allegation of interference with customers without any sufficiently

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                          Page 26
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

particular allegation of interference with a specific contract or business relationship' will not withstand a motion to dismiss."). Because of the nature of this tort, it is axiomatic that the selected business relationships need not have amounted to an actual contract. *See Volvo,* 857 F.2d at 74.

Despite the high burden of proof that Plaintiff will ultimately need to satisfy for the claim, at this point in the action, Rule 8(a) requires only that Plaintiff allege "a short and concise statement, detailed only to the extent necessary to enable defendant[s] to respond." *Geisler,* 616 F.2d at 640 (citing Fed.R.Civ.P. 8). The amended complaint "complies with this standard because it identifies the prospective business relationships as being with [owners of movie rights and distributors of films], such that it does not appear 'beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." ' *SLM, Inc. v. Shelbud Prods. Corp.,* No. 92 Civ. 3073, 193 WL 127969, at *5 (S.D.N.Y. April 20, 1993) (quoting *Conley,* 335 U.S. at 45-46).

***31** In any event, Plaintiff has already identified in the amended complaint certain pre-contractual relationships with which Defendants interfered. For example, at ¶¶ 55-57 of the amended complaint, Plaintiff recites the steps it took to attempt to re-release *Belle. See* Amended Compl. Specifically, Solow enlisted Defendant Brueggemann, its agent, to investigate the possibility of leasing the film. *See id.* at ¶ 55. After some inquiries, Defendant Brueggemann informed Solow that the owners of the rights to *Belle* were interested only in selling. *See id.* at ¶ 56 Solow then instructed Brueggemann to pursue purchasing the movie. *See id.* Plaintiff asserts that instead, Brueggemann presented the idea of buying *Belle* to Miramax, which, thereafter, purchased and re-released the picture with great success. *See id.* at ¶ 57.

Based on these facts, it is at least arguable that Plaintiff had entered into negotiations with the owners of the rights to *Belle.* "Interference with a plaintiff's business relations with a third party can be found if the plaintiff had a 'reasonable expectancy of a contract' with the third party, which can result from 'mere negotiations." ' *Strapex Corp. v. Metaverpa N.V.,* 607 F.Supp. 1047, 1050 (S.D.N.Y.1985)(quoting *Morse v. Swank, Inc.,* 459

F.Supp. 660, 667 (S.D.N.Y.1978)). Here, the owners of *Belle* were certainly inclined to sell the rights to the film, as evidenced by their sale to Miramax. At this point, therefore, it is reasonable to infer that but for Defendant Brueggemann's interference, Plaintiff would have been able to acquire the rights to *Belle* and would have realized the substantial profits that Miramax enjoyed in its place.

Additionally, at ¶ 67 of the amended complaint, Plaintiff states that "Sony intentionally induced the distributor Warner Pictures ... to decide not to continue to exhibit *Anna Karenina* at the Paris Theatre, as previously arranged, and instead to move it to the Sony Tower East theatre." Amended Compl. Considering that *Anna* had already been playing at the Paris, any interruption with the exhibition of *Anna* that Defendants caused would be interference with an existing business relationship. At this juncture in the litigation, it is tenable that but for Defendants' interference Plaintiff could have negotiated to continue to show *Anna* at the Paris and realize greater profits. [FN47]

> FN47. It is also possible that Plaintiff once again has mislabeled its certain claim against Defendants. Plaintiff contends that Defendants interfered with the exhibition of *Anna* at the Paris "as previously arranged," suggesting there was already an agreement between Plaintiff and Warner for the showing of *Anna.* If so, Defendants' purported interference would be not with a prospective contractual relationship but, rather, with an established contractual relation, implicating an entirely different tort. *See Martin Ice Cream,* 554 F.Supp. at 945. This Court directs Plaintiff to be more precise with regard to this matter in its future submissions.

Furthermore, Plaintiff has sufficiently alleged the element of the tort requiring that Defendants "acted with the sole purpose of harming the plaintiff *or* used dishonest, unfair, or improper means." *Purgess,* 33 F.3d at 141 (emphasis added). It is well settled that a defendant's "status as a competitor ... may excuse him from the consequences of interference with prospective contractual relationships, where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful

restraint of trade is effected, and the means employed are not wrongful." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191 (1980); *see also PPX,* 818 F.2d at 269 ("If defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct."); *Imtrac Indus., Inc. v. Glassexport Co. Ltd.,* No. 90 Civ. 6058, 1996 WL 39294, at *11 (S.D.N.Y. Feb. 1, 1996)("[I]n the context of tortious interference with prospective business relations, self-interest can operate to nullify the claim itself.").

**\*32** Here, however, Defendants are not only Plaintiff's competitors in the movie exhibition business. More significantly, with regard to the prospective business relations at issue, Defendants were also Plaintiff's agent. Thus, Defendants owed Plaintiff a fiduciary duty and were, thereby, required to act in Plaintiff's best interests. It, therefore, would be a violation of fiduciary duty for Defendants to divert a lucrative business opportunity, such as the re-release of *Belle,* away from Plaintiff or to encourage a distributor not to continue the exhibition of its film at Plaintiff's theatre.

Additionally, Defendants' alleged competitor status would protect them only if "no unlawful restraint of trade [were] effected" by their conduct. *Guard-Life,* 50 N.Y.2d at 191; *accord Martin Ice Cream,* 554 F.Supp. at 946 (holding that actions that unreasonably restrain trade or attempts to monopolize trade "would constitute improper means"). Accordingly, "if [Plaintiff] is able to prove ... antitrust violations ... it will also be able to prove improper means." *Martin Ice Cream,* 554 F.Supp. at 946. In this case, Plaintiff has already offered a factual basis for antitrust claims against Defendants. This Court, therefore, finds that the facts adequately set forth allegations demonstrating that Defendants tortiously interfered with Plaintiff's pre-contractual relations while employing dishonest, unfair, and improper tactics. Plaintiff may use discovery to identify the specific relations at issue and gather further information to support its claim. [FN48]

> FN48. This Court, however, cautions Plaintiff to be thorough in its research and to offer only specific contractual relations that realistically could be used to establish a claim for tortious interference. In its

opposition memorandum to this Court, Plaintiff suggests that Defendants' failure to disclose to Plaintiff the availability of *The Spitfire Grill,* a Columbia film, for exhibition at the Paris could be a viable business relationship with which Defendants interfered. *See* Plaintiff's Mem. at 30 (citing Amended Compl. at ¶ 62).

Arguing that this allegation supports a claim for tortious interference with a prospective economic advantage is extremely tenuous. If, as Plaintiff states, Defendants never informed Plaintiff of the opportunity to exhibit *The Spitfire Grill,* then Plaintiff is effectively asking this Court to find tortious interference with a future economic advantage of which Plaintiff was not even aware. *See Minnesota Mining,* 1997 WL 166497, at \* 7 (requiring a plaintiff to identify "some particular, existing business relationship"). The law was not intended to protect a party from such a contorted interpretation of the tort.

**B. Breach of Fiduciary Duty**

Plaintiff asserts that Defendants breached their fiduciary duties as Plaintiff's agent with respect to the operation and management of Plaintiff's theatres. *See* Amended Compl. at ¶¶ 95-100. For these alleged breaches of fiduciary duty, Plaintiff seeks an unspecified amount of damages and punitive damages of at least $100 million. *See id.* at ¶ 99. Defendants respond that an exculpatory clause in the Twin Agreement expressly states that Plaintiff is prevented from bringing an action for damages based on breaches of fiduciary duty. The Twin Agreement discusses Sony's fiduciary obligation to Plaintiff and provides that Plaintiff's "sole remedy for any violation of [Sony's] obligations under this Section shall be to terminate this Agreement and [Plaintiff] shall not assert any claim for damages for any such violation." Twin Agreement at § 5.09.

While courts generally recognize exculpatory clauses, Defendants blatantly disregard well-settled case law holding that contractual terms exempting a party from liability for harm caused intentionally or willfully are wholly unenforceable. The New York Court of Appeals stated:

[A]n exculpatory agreement, no matter how flat

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts. More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing.

*33 *Kalisch-Jarcho, Inc. v. City of New York,* 58 N.Y.2d 377, 384-85 (1983) (citations omitted); *see also McNally Wellman Co. v. New York State Elec. & Gas,* 63 F.3d 1188, 1198 (2d Cir.1995); *Petrocelli Elec. Co., Inc. v. Crow Constr. Co.,* No. 93 Civ. 8387, 1999 WL 791683, at *6 (S.D.N.Y. October 5, 1999); *Federal Ins. Co. v. Honeywell, Inc.,* 641 F.Supp. 1560, 1562 (S.D.N.Y.1986); *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.,* 600 N.Y.S.2d 212, 215 (App. Div. 1st Dep't 1993); *Great N. Assocs., Inc. v. Continental Casualty Co.,* 596 N.Y.S.2d 938, 940 (App. Div.3d Dep't 1993). This public policy is so central to adjudicating contractual relationships that even if the parties to an exculpatory clause contemplated that the violating conduct would be incorporated within the purview of the exempting language, the clause would still be unenforceable. *See Kalisch-Jarcho,* 58 N.Y.2d at 385; *Great N. Assocs.,* 596 N.Y.S.2d at 940. Here, Plaintiff argues that Defendants "intentionally, willfully, and maliciously" acted to destroy Plaintiff's ability to compete in the movie industry and maintains that it will be able to prove [FN49] such grossly negligent conduct through discovery. If Plaintiff can indeed support such claims, this Court will not permit Defendants to evade monetary liability for their purported breaches of fiduciary duty by relying on the unenforceable exculpatory clause contained in § 5.09 of the Twin Agreement.

> FN49. "I just wanna prove somethin'--I ain't no bum from the neighborhood. It don't matter if I lose ... don't matter if he opens my head .... The only thing I wanna do is go the distance. That's all." Rocky (United Artists 1976).

VII. Allegations against the Sony Corporate Entities and the Individual Defendants

In addition to alleging claims against Sony, Plaintiff brings its claims against the Sony Corporate Entities

and the Individual Defendants. Defendants argue that Plaintiff has not identified sufficient allegations to sustain any of its claims against either the Sony Corporate Entities or the Individual Defendants. This Court, however, finds that Defendants' objections ultimately go to Plaintiff's future burden of proving its claims rather than to its present burden of pleading. Accordingly, this Court refuses to dismiss any of the claims against these defendants.

A. Sony Corporate Entities

Plaintiff alleges that the Sony Corporate Entities own, dominate, and control Sony and "condoned, and benefitted from the violations alleged [in the amended complaint]." *Id.* at ¶ 21. With respect to the asserted violations, Plaintiff contends that "all of the defendant corporations effectively operated as a single ... entity." *Id.* Specifically, Plaintiff states that at the opening of the Lincoln Square theatre, the President and CEO of Defendant Sony Electronics gave a speech in which he commended the former Chairman and CEO of Defendant Sony Pictures for having "the vision [FN50] to create the concept" for the Lincoln Square theatres. *Id.* Additionally, Plaintiff claims that it wrote to all of the Sony Defendants regarding their conduct toward Plaintiff's theatres and maintains that the Sony Defendants collectively refused to rectify the situation. *See id.* In that regard, Plaintiff asserts:

> FN50. "Don't you eyeball me boy! Use your peripheral vision." Officer and a Gentleman (Paramount 1982).

*34 Officers of Sony Theatres consulted with officers of Sony Pictures concerning defendants' conduct in relation to plaintiff, as reflected by the practice of Sony Theatres officers in providing officers of Sony Pictures with copies of correspondence addressing the matters alleged [in the amended complaint]. Officers of Sony [Electronics] and Sony Corporation received and responded to correspondence concerning these disputes, ratifying the violations by the other defendants. For example, after receiving a September 11, 1996 letter from Solow writing on behalf of plaintiff concerning the situation, Nobuyuki Idei, President of Sony Corporation, instructed Ted Kawai, Deputy President of Sony [Electronics], to investigate and respond to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 29
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

plaintiff's concerns. Officers of Sony [Electronics], Sony Pictures and Sony Theatres thereafter coordinated their responses .... At each stage of this process, Mr. Kawai of Sony [Electronics] reported to Mr. Idei of Sony Corporation and consulted closely with officers of Sony Pictures and Sony Theatres.
*Id.* at ¶ 22.

Defendants would like this Court to find that the Sony Corporate Entities had no role in exhibiting movies at Plaintiff's theatres and, therefore, Plaintiff cannot support any of its claims against them. Defendants argue that the Sony Corporate Entities' contacts with Defendant Sony involved nothing more than general consultation between parent corporations and their subsidiary, acceptable conduct that does not implicate the antitrust laws. *See Reisner v. General Motors Corp., 511 F.Supp. 1167, 1173 (S.D.N.Y.1981)*("A parent corporation and its subsidiary must be able to consult on some matters of company policy without violating the antitrust laws absent a demonstration of anticompetitive motivation.") (citation omitted), *aff'd, 671 F.2d 91 (2d Cir.1982)*. This Court, however, forcefully rejects Defendants' suggestion that the facts Plaintiff alleged against the Sony Corporate Entities demonstrate only nominal consultation.

The purported control that Plaintiff attributes to the Sony Corporate Entities helps validate Plaintiff's contention that the Sony Corporate Entities dominated and controlled Sony's actions with respect to Sony's operation of Plaintiff's theatres. From Plaintiff's allegations, it is reasonable for this Court to find that Sony's allegedly improper actions toward Plaintiff were taken pursuant to directions it received from its parent organizations, the Sony Corporate Entities. [FN51] First, Plaintiff asserts that the President of Sony Corporation, Sony's ultimate parent company, instructed the Deputy President of Sony Electronics, the immediate parent company of Sony Pictures, "to investigate and respond to plaintiff's concerns," and that the Deputy President of Sony Electronics, thereafter, "consulted closely with officers of Sony Pictures and Sony Theatres" and continuously reported back to the President of Sony Corporation. Amended Compl. at ¶ 22. The allegations suggest a top-down coordinated effort on behalf on the entire Sony corporation against Plaintiff. Such an effort, if proven, would constitute

extensive involvement, going beyond simple consultation and into the realm of "anti-competitive motivation." *See Reisner, 511 F.Supp. at 1173; see also Baratta v. Kozlowski, 464 N.Y.S.2d 803, 805 (App.Div..2d Dep't 1983)*(dismissing claims against parent company because "complaint fail[ed] to allege that it exercised complete domination and control over the subsidiary"). Second, if the Sony Corporate Entities are truly as uninvolved with film exhibition as Defendants would want this Court to find, it is curious that at the opening of the Lincoln Square theatres, which presumably Defendant Sony operates as exhibitors, the President and CEO of Sony Electronics praised the former Chairman and CEO of Sony Pictures for his insight to develop the complex. *See* Amended Comp. at ¶ 21. [FN52] Third, this Court has already noted that the Sony Corporate Entities are proper defendants with regard to Plaintiff's § 1 block-booking claim. *See supra* part V.A.1. Thus, this Court considers the factual allegations more than sufficient to allow Plaintiff to go forward with its claims against the Sony Corporate Entities.

FN51. Indeed, the Supreme Court has recognized the "unity of purpose or a common design" that exists between parents and subsidiaries of the same company, finding that parent and subsidiary companies are not legally capable of conspiring with one another under § 1. *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 753 (1984)*. The Court stated:
The coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise .... A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate, and their general corporate objectives are guided or determined not by two separate corporate consciousnesses, but one. With or without a formal "agreement," the subsidiary acts for the parent's benefit. If the parent and the subsidiary "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests ....
*Id.*

FN52. It is also interesting that a senior

Not Reported in F.Supp.2d                                                                    Page 30
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
(Cite as: 2000 WL 264295 (S.D.N.Y.))

officer of Sony Pictures provided the initial motivation behind the construction of the Lincoln Square complex. In the context of this case, such influence on behalf of Sony Pictures, a distributor, can be understood as a desire for Sony Pictures to have a large, ready outlet for its films.

**B. Individual Defendants**

**\*35** Plaintiff asserts that the Individual Defendants have "with malice toward plaintiff, personally engaged and participated in the antitrust, contract, tort and fiduciary violations described [in the amended complaint] and have controlled, directed, authorized and ratified the violations committed by Sony." Amended Compl. at ¶ 19. Pursuant to this alleged involvement, Plaintiff argues that this Court should hold the Individual Defendants personally liable for Plaintiff's injuries. *See id.* Defendants, however, maintain that the amended complaint fails to include adequate facts to sustain either the federal or state claims against them. *See* Defendants' Mem. at 28-30; Reply Mem. at 15-22.

This Court finds that Plaintiff has satisfactorily plead antitrust allegations against the Individual Defendants. A corporate officer or director can be held personally liable for damages arising from an antitrust violation where he or she participated in the unlawful acts, or where he or she acquiesced or ratified the actions of other officers or agents of the corporation who violated the antitrust laws. *Hoffman Motors Corp. v. Alfa Romeo*, 244 F.Supp. 70, 82 (S.D.N.Y.1965); *Cott Beverage Corp. v. Canada Dry Ginger Ale, Inc.*, 146 F.Supp. 300, 301-02 (S.D.N.Y.1956). Accordingly, the extent to which the Individual Defendants were involved with the alleged antitrust violations is an important fact for this Court to consider. *See Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.*, 994 F.Supp. 133, 142 (E.D.N.Y.1998); *New York v. Cedar Park Concrete Corp.*, 665 F.Supp. 238, 247 (S.D.N.Y.1987). Here, Plaintiff argues that this Court should hold the Individual Defendants, all of whom are major employees, personally liable for the purported antitrust violations because of the influence they exerted in effectuating Sony's corporate policy. This Court finds that such an allegation meets the pleading requirement of Rule 8(a).

With regard to the state claims, this Court dismisses Plaintiff's contract claim against the Individual Defendants. Under New York law, "a corporate officer cannot be held liable for a corporation's breach of contract claims." *Komatsu Invs., Ltd. v. Greater China Corp.*, No. 96 Civ. 3833, 1997 WL 16667, at \*2 (S.D.N.Y. Jan. 17, 1997); *accord Hudson Venture Partners, L.P. v. Patriot Aviation Group, Inc.*, No. 98 Civ. 4132, 1999 WL 76803, at \*6 (S.D.N.Y. Feb. 17, 1999); *Cruz v. Nynex Info. Resources*, 2000 WL 150864, at \*6 (N.Y.App. Div. 1st Dep't Feb. 10, 2000). Even if a corporate individual's actions caused a breach of a corporation's contractual obligations, such conduct does not render the individual personally liable. *See Cruz*, 2000 WL 150864 at \*6.

Indeed, Plaintiff effectively concedes this point. In its opposition memorandum to this Court, Plaintiff attempts to clarify its position, explaining that it "seeks to hold the individual defendants liable in tort for their direct participation in the antitrust violations, the breach of fiduciary duties owed to Plaintiff, and the tortious interference with Plaintiff's business relationships ... recogniz[ing] the distinction between officers' liability on their corporation's contracts, and their liability for their own torts, even those committed in the course of their employment." Plaintiff's Mem. at 37 (citing *Komatsu*, 1997 WL 16667, at \*2).

**\*36** Plaintiff, thereby, has indicated its intention to assert against the Individual Defendants only those state claims that lie in tort. Because a court may ordinarily hold an individual corporate officer personally liable for participation in the commission of a tort, even one arising out of his or her duties for the corporation, *see Lopresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir.1997); *Komatsu*, 1997 WL 16667, at \*2; *National Survival Game, Inc. v. Skirmish, U.S.A., Inc.*, 603 F.Supp. 339, 341 (S.D.N.Y.1985); *Key Bank of N.Y. v. Grossi*, 642 N.Y.S.2d 403, 404 (App. Div.3d Dep't 1996), this Court permits Plaintiff to go forward against the Individual Defendants with the claims for breach of fiduciary duty [FN53] and tortious interference with prospective business relations. Alleging that the Individual Defendants have personally participated in and exercised dominion and control over the tort and fiduciary violations described in the amended complaint is a short, plain statement of the claims that satisfies Rule

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                   Page 31
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

8(a).

> FN53. Defendants argue that the amended complaint never identifies facts from which this Court can conclude that a fiduciary relationship had been established between Plaintiff and the Individual Defendants. *See* Defendants' Mem. at 29; Reply Mem. at 20. Such a contention is meritless. Besides § 5.09 of the Twin Agreement, which establishes, in writing, a fiduciary relationship between Sony's executives and Plaintiff, the Individual Defendants owed fiduciary duties to Plaintiff by the very fact that they served as Plaintiff's agents in the operation of its theatres.

Thus, Plaintiff's assertions against the Individual Defendants provide grounds for Plaintiff to proceed with discovery to identify particular instances where the Individual Defendants actively participated in the antitrust and tort violations. [FN54] Indeed, Plaintiff has already specified certain actions by the Individual Defendants that raise the specter of antitrust and tort violations against Plaintiff. *See, e.g.,* Amended Compl. at ¶¶ 55-57, 59, 66, 79-81, 83-84.

> FN54. To bolster their contention that this Court should dismiss the antitrust claims against the Individual Defendants, Defendants cite *Brown v. Donco Enters., Inc.* 783 F.2d 644 (6th Cir.1986), a Sixth Circuit case that states:
> Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends. To support a determination of liability under this standard, the evidence must demonstrate that a defendant exerted his influence so as to shape corporate intentions. *Id.* at 646. First, the Sixth Circuit case is not binding here. *See Newsweek,* 663 F.2d at 1196. Second, even the Sixth Circuit acknowledged the paucity of support for the above proposition, stating "[a]t the outset, the court recognizes that the conduct proscribed by the antitrust laws is often difficult to distinguish 'from the gray zone of socially acceptable and economically justifiable business conduct," ' and citing

only "one court," from the Northern District of California, in a 1979 decision. *Id.* In addition to the lack of precedential value that the Sixth Circuit case has for this Court, this Court finds that, in any event, Plaintiff has complied with the Sixth Circuit standard for purposes of withstanding a motion to dismiss.

### Conclusion

Granting a motion to dismiss is a blunt weapon and a drastic remedy that a court should employ only after careful consideration of all the salient issues leads to the conclusion that no interpretation of facts could support a plaintiff's claims. Sustaining a motion to dismiss is particularly difficult for a defendant in a case involving antitrust claims, where a court's wariness of dismissal is heightened. This Court has pored over the allegations in the amended complaint and the parties' submissions in view of the relevant case law. This Court finds that Plaintiff has sufficiently alleged in its amended complaint its federal and state claims against all of the Defendants with the exception of Plaintiff's contract claim against the Individual Defendants. Therefore, this Court refuses to dismiss the amended complaint at this juncture in the litigation. The parties should proceed with discovery on the remaining issues. [FN55] Accordingly,

> FN55. "May the force be with you." Star Wars (20th Century Fox 1977).

IT IS HEREBY ORDERED THAT Defendants' Motion to Dismiss is GRANTED with regard to Plaintiff's breach of contract claim against the Individual Defendants. [FN56]

> FN56. In the amended complaint, Plaintiff alleges breaches of the Twin Agreement, the Paris Agreement, and the Festival Agreement. *See* Amended Compl. at ¶¶ 86-94. This Court directs Plaintiff in its future submissions related to its contract claims against Defendants to detail the arrangements governing the Paris and Festival contracts, as the amended complaint fails to delineate the specifics of either.

IT IS FURTHER ORDERED THAT Defendants' Motion to Dismiss is DENIED in all other respects.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 32
Not Reported in F.Supp.2d, 2000 WL 264295 (S.D.N.Y.), 2000-1 Trade Cases P 72,823
**(Cite as: 2000 WL 264295 (S.D.N.Y.))**

THE END. MM

 SO ORDERED.

Not Reported in F.Supp.2d, 2000 WL 264295
(S.D.N.Y.), 2000-1 Trade Cases P 72,823

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Exhibit 18**

# Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

**H**Kinsey v. Cendant Corp.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
Douglas KINSEY, Plaintiff,
v.
CENDANT CORPORATION, Fairfield Resorts Inc.,
and FFD Development Company, L.L.C.,
Defendants.
**No. 04 Civ.0582(RWS).**

Nov. 16, 2004.

King, Pagano & Harrison, New York, NY, By: Jeffrey W. Pagano, IRA M. Saxe, for Plaintiff, of counsel.
Skadden, Arps, Slate, Meagher & Flom, New York, NY, By: Samuel Kadet, Timothy K. Giordano, for Defendants, of counsel.

*OPINION*

SWEET, J.
**\*1** Defendants Cendant Corporation ("Cendant"), Fairfield Resorts, Inc. ("Fairfield"), and FFD Development Company, L.L.C. ("FFD") (collectively, the "Defendants") have moved pursuant to Rules 12(b)(6) and 9(b), Federal Rules of Civil Procedure, and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4, to dismiss claims 1, 3, 4, 5, 7 (to the extent based on gross negligence) and 8 in the amended complaint (the "Amended Complaint") of plaintiff Douglas Kinsey ("Kinsey"). For the reasons set forth below, the motion is granted and Kinsey is granted leave to move to file a second amended complaint.

*The Parties*

Kinsey is a resident of Georgia and a former employee of both Fairfield and FFD. (*See* Am. Compl. at ¶¶ 2, 9, 29.) Kinsey resigned from Fairfield in or about May 2003. (*See* Am. Compl. at ¶ 65.)

Fairfield is a Delaware corporation with its principal place of business in Florida and was at one time purported to be the largest vacation ownership company in the world. (*See* Am. Compl. at ¶¶ 4, 9.)

Cendant is a Delaware Corporation with its principal place of business in New York and is the parent company of Fairfield, having acquired it in April 2001. (*See* Am. Compl. at ¶¶ 3, 17.) Cendant is primarily a travel and real estate company with world-wide operations. (*See* Am. Compl. at ¶ 18; *seealso* Excerpts from Cendant's Form 10-K, filed Mar. 29, 2001, attached as Exhibit B to the Declaration of Samuel Kadet, dated May 10, 2004 ("Kadet Decl."), at 4.)

FFD, a Delaware corporation with its principal place of business in Florida, was formed in connection with Cendant's acquisition of Fairfield in April 2001. (*See* Am. Compl. at ¶¶ 5, 17.)

*Prior Proceedings*

Kinsey commenced this action on January 26, 2004. In his initial complaint (the "Original Complaint") against Fairfield, FFD, Cendant and the Cendant Corporation Employee Stock Purchase Plan (collectively, the "Initial Defendants"), Kinsey alleged claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001*etseq.,* as well as common law claims and violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. (*See* Original Compl. at ¶¶ 48-143.)

The Initial Defendants moved to dismiss the Original Complaint on March 26, 2004, including the purported ERISA claims and the claim for securities fraud. Kinsey then filed the Amended Complaint on April 23, 2004, alleging securities fraud in Count 1, breach of contract in Count 2, breach of fiduciary duty in Count 3, breach of the implied duty of good faith and fair dealing in Count 4, fraud and deceit in Count 5, negligent misrepresentation in Count 6,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

negligence in Count 7, unjust enrichment in Count 8, and failure to pay wages in Count 9, as well as seeking a declaratory judgment in Count 10.

**\*2** The Defendants thereafter moved to dismiss Counts 1, 3, 4, 5, and 8 of the Amended Complaint in their entirety and Count 7 in part.[FN1] The motion was heard and marked fully submitted on June 16, 2004.

> FN1. As set forth in a letter from the Defendants' counsel to the Court following the filing of both the Amended Complaint and the Defendants' motion to dismiss the Amended Complaint, "[i]n light of these events, the parties believe and agree that there is no need for the argument on the Initial Motion to Dismiss...." (Letter of Samuel Kadet to the Court, dated May 14, 2004, at 1.) Accordingly, the Initial Defendants' motion to dismiss the Original Complaint, filed on March 26, 2004, is deemed moot.

*The Facts*

The following factual background is drawn primarily from the allegations of the Amended Complaint and from documents referenced in and integral to the Amended Complaint, including, *interalia,* the Fairfield Communities, Inc.1997 Stock Option Plan (the "Plan") and the related option agreement between Kinsey and Fairfield (the "Option Agreement"), as well as public documents filed with the Securities and Exchange Commission (the "SEC").*See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991)* (stating that "when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents"); *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.,* No. 99 Civ. 8556(JGK), *2000 WL 1277303, at \*3 (S.D.N.Y. Sept.8, 2000)* (holding that where a complaint contains allegations that the defendants breached a contract, the complaint "incorporates by reference the allegedly breached contract and the Court may consider the terms of that contract on a motion to dismiss") (citing *Allworld Communications Network, L.L.C. v. MCI Worldcom, Inc.,* No. 99 Civ.

4256(DC), 2000 WL 1013956, at \*2 n. 1 (S.D.N.Y. July 24, 2000), *appeal dismissed,98 Fed. Appx. 72 (2d Cir.2004); Cary Oil Co. v. MG Refining & Mktg., Inc., 90 F.Supp.2d 401, 407 n. 19 (S.D.N.Y.2000)).* The factual allegations are accepted as true for the purposes of this motion, *see Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.2002),* and do not constitute findings of fact by the Court.

In or about 1981, Kinsey commenced employment with Fairfield. He subsequently left employment with Fairfield in or around 1989 and commenced employment with Fairfield again in or around 1995. (*See* Am. Compl. at ¶¶ 9, 10.) In or about Fall 1996, Kinsey rose to the position of Vice President of Acquisitions for Fairfield. (*See* Am. Compl. at ¶ 10.)

In March 1997, Fairfield established the Plan (*see* Am. Compl. ¶ 11), which authorized the Fairfield Board of Directors (the "Fairfield Board") or its compensation committee to make discretionary awards to employees of options to purchase shares of Fairfield common stock. (*See* Plan, Kadet Decl., Exh. C, at 2.) Under the Plan, any award of options would specify the required period of continuous employment and any other conditions to be satisfied before the awarded options would become exercisable. (*See* Plan, Kadet Decl., Exh. C, at 3.) The award could also provide for, or be amended to provide for, the earlier exercise of options in the event of a change in control of Fairfield. (*See* Plan, Kadet Decl., Exh. C, at 3.)

**\*3** Under the Plan, each award of options was to be evidenced by a stock option agreement executed on behalf of Fairfield and delivered to the recipient employee. (*See* Plan, Kadet Decl., Exh. C, at 3.) The Fairfield Board (or the compensation committee) was authorized, without the consent of the recipient employee, to "amend any agreement evidencing a Stock Option granted under the Plan, or otherwise take action, to accelerate the time or times at which the Stock Option granted under the Plan, [and] to extend the expiration date of the Stock Option...." (Plan, Kadet Decl., Exh. C, at 4.) The Fairfield Board or any duly authorized committee also could amend the Plan or terminate it at any time. (*See* Plan, Kadet Decl., Exh. C, at 5.)

On May 22, 1997, Kinsey was granted certain stock options (the "Awarded Options"), pursuant to which

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

he had the right to purchase 10,000 shares of Fairfield common stock at $30.00 per share. (*See* Am. Compl. at ¶ 12.) As contemplated by the Plan, the terms and conditions of this grant were set forth in the Option Agreement, an agreement entered into by Kinsey on or about June 5, 1997 and executed effective as of May 22, 1997. (*See* Am. Compl. at ¶ 14; *seegenerally* Option Agreement, Kadet Decl., Exh. D.)

According to the Option Agreement, the Awarded Options were to vest (*i.e.,* become exercisable) at a rate of 25% on each of the second, third, fourth and fifth anniversaries of the date of the award, provided that Kinsey remained in continuous employment with Fairfield from the award date until each such vesting date. (*See* Am. Compl. at ¶ 12.) So long as Kinsey remained employed by Fairfield, he could exercise any of the Awarded Options that had vested up to ten years after the May 22, 1997 award date. (*See* Am. Compl. at ¶ 12.)

On the other hand if Kinsey ceased to be an employee of Fairfield for any reason other than death or discharge for cause (or resignation in anticipation of discharge for cause), the Option Agreement provided that Kinsey could exercise his vested Awarded Options only during the ninety calendar days following such termination, but in no event after the otherwise applicable ten-year expiration date. (*See* Option Agreement, Kadet Decl., Exh. D, at 2.) The Option Agreement further provided that any subsequent amendment to the Plan would be deemed an amendment to the Option Agreement, subject only to the requirement that no amendment would adversely affect Kinsey's rights thereunder without his consent. (*See* Option Agreement, Kadet Decl., Exh. D, at 3.)

Following this grant, Fairfield announced two stock splits, a 3-for-2 split effective July 15, 1997, and a 2-for-1 split effective January 30, 1998. In connection with each stock split, the Plan was amended appropriately. (*See* Am. Compl. at ¶¶ 15, 16.) Neither of the amendments changed the time within which Kinsey was entitled to exercise the Awarded Options. (*See* Am. Compl. at ¶¶ 15, 16.)

*4 In April 2001, Cendant acquired Fairfield pursuant to a merger (the "Merger") and assumed the outstanding and unexercised options issued pursuant to the Plan. (*See* Am. Compl. at ¶ 17, 30.) As a result, in conjunction with the Merger, all such options, including Kinsey's, automatically became fully vested and were converted to options to purchase shares of Cendant common stock. (*See* Am. Compl. at ¶¶ 30, 31.) Under the applicable conversion factor, the Awarded Options became fully-vested options to purchase 33,918 shares of Cendant common stock at a "strike" price of $8.85 per share. (*See* Am. Compl. at ¶¶ 31, 32.)

As of December 31, 2000, the last full fiscal year before Cendant acquired Fairfield, there were approximately 917 million shares of Cendant common stock, and 187 million options to purchase shares of such stock, outstanding. (*See* Excerpts, Kadet Decl., Exh. B, at F-8, F-30.)

Kinsey received notice of the conversion of Fairfield stock options in a Statement of Stock Option Award, which explained that the newly-converted options remained subject to the terms and conditions set forth in the Plan and Option Agreement. (*See* Am. Compl. at ¶ 32.) As stated in a notice accompanying the Statement of Stock Option Award, "[t]his means that the original expiration date of [the] options will continue to apply, as well as the terms and conditions applicable to [the] options upon your separation from employment with Cendant and/or Fairfield."(Notice, Kadet Decl., Exh. E, at 1.)

In or around April 2001, Kinsey, who had been employed by Fairfield, became an employee of FFD. FFD was formed in connection with the Cendant acquisition of Fairfield. (*See* Am. Compl. at ¶¶ 17, 29.) In or about June 2001, Cendant sent a notice to Kinsey informing him that his stock options would expire on or about June 30, 2001. (*See* Am. Compl. at ¶ 36.)

On or about July 3, 2001, the Defendants informed Kinsey that the notice that his stock options would expire on June 30, 2001 was sent to Kinsey in error. The Defendants informed Kinsey that the Plan had been amended to provide that employment at FFD would "count" as continued employment at Fairfield and thus would not trigger the Plan's 90-day post-termination period after which all unexercised options would expire. (*See* Am. Compl. at ¶ 37.) According to Kinsey, on or about July 3, 2001 he was informed by a FFD officer, Greg Bendlin

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

("Bendlin"), in an e-mail that his unexercised options had not expired. (*See* Am. Compl. at ¶ 37.) On or about August 14, 2001, Bendlin informed Kinsey that his stock options would not expire until the later of one year after the Merger (*i.e* ., April 2, 2002) or the ten-year term set forth in the Option Agreement (May 21, 2007). (*See* Am. Compl. at ¶ 39.)

Kinsey accepted employment with Fairfield again in or around October 2001, assuming the position of Senior Vice President of Real Estate Acquisitions. (*See* Am. Compl. at ¶¶ 40, 46, 47.)

**\*5** On or about April 3, 2003 a Cendant officer informed Kinsey that the Cendant stock options converted from the Awarded Options had actually expired in April 2002, on the first anniversary of the Merger. (*See* Am. Compl. at ¶ 55.) Kinsey resigned from Fairfield in or about May 2003, shortly after a dispute arose concerning the expiration of his stock options. (*See* Am. Compl. at ¶ 65.) According to Kinsey, at all relevant times, the amount that would have been realized by Kinsey had the stock options at issue been exercised exceeded $100,000. (*See* Am. Compl. at ¶ 67.)

*The Rule 12(b)(6) Standard*

In considering a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor,"*Chambers, 282 F.3d at 152* (citing *Gregory v. Daly, 243 F.3d 687, 691 (2d Cir.2001)*), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir.1994).*"The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.1995)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)*). In other words, " 'the office of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 176 (2d Cir.2004)* (quoting *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir.1980)*). Dismissal is only

appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan, 235 F.3d 80, 83 (2d Cir.2000); accordEternity Global Master Fund, 375 F.3d at 176-77.*

*Choice of Law*

As to Kinsey's state law claims, a court must apply the choice-of-law rules prevailing in the state in which the court sits. *See,e.g.,Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Krauss v. Manhattan Life Ins. Co., 643 F.2d 98, 100 (2d Cir.1981)*. In this case, New York's choice-of-law principles are applied, according to which the governing law with respect to Kinsey's state-law claims is that " 'of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." ' *Tartaglia v. Paul Revere Life Ins. Co., 948 F.Supp. 325, 326 (S.D.N.Y.1996)* (quoting *Babcock v. Jackson, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (N.Y.1963)*). Under New York's choice-of-law principles, "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir.2002)* (quoting *Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 419-20 (2d Cir.2001)* (citing *In re Allstate Ins. Co., 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (N.Y.1993)*)).

**\*6** Kinsey has alleged in the Amended Complaint that "a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District."(Am. Compl. at ¶ 8.) While Kinsey has cited to both Georgia and New York law in his opposition papers with respect to his claim for breach of the implied duty of good faith and fair dealing, noting slight variations between the two bodies of law, he has otherwise relied on case law from New York with respect to his state law claims and has expressly asserted that his claim for breach of a fiduciary duty must stand "under any applicable state law...." (Pl. Opp. Mem. at 2.)

For their part, the Defendants note in their moving papers that the Option Agreement provides that it is to be governed by Arkansas law except as to matters

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

of corporate law, which are to be governed by Delaware law (*see* Option Agreement, Kadet Decl., Exh. D, at 3), although they cite to no Arkansas law with respect to Kinsey's claim for breach of the implied duty of good faith and fair dealing arising out of the Option Agreement. The Defendants otherwise assert that the conduct alleged in the Amended Complaint at least arguably occurred either in Florida, Georgia or New York, but that "no conflict issue for purposes of this motion" is perceived. (Defs. Mem. at 21-22 n.7.)

Since "implied consent to use a forum's law is sufficient to establish choice of law, *Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton,* 888 F.2d 239, 242 (2d Cir.1989), and, with the exception of the fiduciary duty claim, the parties have relied, at least in part, upon New York law and have noted no relevant conflicts with the law of the other potentially applicable jurisdictions, New York law will be applied here except as otherwise noted.

*Discussion*

I. *The Defendants' Motion Is Granted*

A. *The Securities Fraud Claim Is Dismissed*

Count 1 of the Amended Complaint alleges that the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j and the regulations promulgated thereunder. (*See* Am. Compl. at ¶¶ 75-87.) Kinsey alleges, *interalia,* that the Defendants intentionally and knowingly failed to disclose material facts and made false statements of fact, knowing them to be false, in relation to the time period within which Kinsey had to exercise his stock options. (*See* Am. Compl. at ¶ 78.)

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must plead that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury."*Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks omitted); *accordLawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003). A claim under Section 10(b) sounds in fraud and must therefore meet the pleading requirements of Rule

9(b), Fed.R.Civ.P. *See,e .g.,In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.), *cert. denied sub nomScholastic Corp. v. Truncellito,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001). Such a claim must also satisfy the requirements of the PSLRA, 15 U.S.C. §§ 78u-4(b)(1) and 78u-4(b)(2).

**\*7** The Defendants argue that Count 1 fails because Kinsey did not "purchase" the Awarded Options within the meaning of Section 10(b) and that, even if he had, none of the purported misrepresentations occurred "in connection with" that award of options. The Defendants further argue that Count 1 does not comply with the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P., and of the PSLRA.

1. *Kinsey Did Not "Purchase" the Awarded Options or the Converted Cendant Stock Options*

Kinsey does not dispute the Defendants' contention that his receipt of the Awarded Options in 1997 fails to qualify as a "purchase" for Exchange Act purposes. Instead, Kinsey argues that he purchased the Cendant stock options converted from the Awarded Options in April 2001 when he accepted employment with FFD and that he purchased the converted Cendant stock options again when he subsequently returned to work for Fairfield in October 2001. Kinsey contends that he accepted the employment offered to him in both instances based in part on the Defendants' representations to him concerning the period within which he could exercise his stock options.[FN2]

> FN2. Kinsey has alleged that, over the course of the negotiations leading to his October 2001 decision to return to Fairfield, the Defendants "also provided [Kinsey] with options in 50,000 shares of Cendant stock if he rejoined Fairfield."(Am. Compl. at ¶ 41.) These additional 50,000 shares of Cendant stock are not referenced in Count 1 of the Amended Complaint, which cites only the Awarded Options and the "converted Cendant stock options" (Am. Compl. at ¶ 77) as the relevant "securities" within the meaning of 15 U.S.C. §§ 77b(a)(1) and 78c(a)(10). (*See* Am. Compl. at ¶¶ 77-78.) Accordingly, these additional non-converted Cendant stock options are not relevant here and the discussion of Kinsey's stock options

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

refers only to the Awarded Options and the Cendant stock options to which the Awarded Options were converted.

As the Defendants acknowledge in their moving papers, if an individual receives an award of grant stock options (or stock) in exchange for accepting employment, then, under the Second Circuit's decision in *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555 (2d Cir.1985), that individual might be found to have made a "purchase" for Exchange Act purposes. *SeeYoder,* 751 F.2d at 558-61 (holding that stock offered as an inducement to accept employment qualifies as a "purchase" of securities under the Exchange Act); *seealsoLawrence,* 325 F.3d at 152-53 (collecting cases demonstrating that standing to sue under Section 10(b) is limited to actual purchasers and sellers of a security or to plaintiffs with a contractual right to purchase or sell a security). Even construing the allegations of the Amended Complaint as true, no such "purchase" occurred here.

As an initial matter, Kinsey has alleged in the Amended Complaint that all options under the Plan, including his Awarded Options, were automatically converted to options to purchase Cendant common stock upon Cendant's acquisition of Fairfield. (*See* Am. Compl. at ¶ 30 ("Under the Agreement and Plan of Merger between Cendant and Fairfield, Cendant assumed the outstanding and unexercised options under the 1997 Stock Option Plan, including [Kinsey's] options."), ¶ 31 ("As a result of Cendant's acquisition of Fairfield, all options to purchase stock under the 1997 Stock Option Plan became options to purchase Cendant common stock."); *seealso* Am. Compl. at ¶ 77 (referring to "[t]he converted Cendant stock options issued to [Kinsey] as a result of the negotiations in connection with Cendant's acquisition of Fairfield").) Thus, according to the Amended Complaint, Kinsey received the converted options as a result of the Merger and not as the result of any employment decision in April 2001.[FN3]

> FN3. Although the exchange or conversion of securities in connection with a merger may constitute a purchase for purposes of a Section 10(b) claim where the plaintiff shareholder has alleged that he or she was deceived into approving the merger, *see,e.g.,S.E .C. v. Nat'l Secs., Inc.,* 393 U.S.

457, 467 (1969), no such allegations are present here, and the conversion of the Awarded Options therefore does not constitute an investment decision or "purchase."

**\*8** To the extent that the Amended Complaint suggests an inconsistent allegation, *i.e.,* that Kinsey was somehow different from the other Plan participants or that the Awarded Options were not automatically converted and vested upon the Merger (*see,e.g.,* Am. Compl. at ¶ 24 (explaining that "[d]uring the course of [the April 2001] negotiations, Fairfield, FFD and Cendant management advised [Kinsey] that in the event that he chose to become employed by Cendant through FFD, his Fairfield stock options would be converted to Cendant stock options"), ¶ 77 (alleging that Kinsey "acquired the converted Cendant stock options as a result of individualized negotiations in connection with his decision to accept employment with Cendant through FFD and his decision to remain with Cendant through employment with Fairfield")), such a contradictory allegation does not undermine the conclusion just reached. *See,e.g.,In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 405-06 (S.D.N.Y.2001) (explaining that "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely" or (collecting cases).

Second, the allegations of the Amended Complaint do not suggest that Kinsey "purchased" the converted stock options in April 2001 and October 2001 within the meaning of Section 10(b) and the applicable case law. *Yoder* and the other cases on which Kinsey relies are inapposite, as they stand for the proposition that a plaintiff who received stock options in exchange for and as in inducement for accepting employment has standing as a "purchaser." *See,e.g.,Yoder,* 751 F.2d at 558-61;*Dubin v. E.F. Hutton Group, Inc.,* 695 F.Supp. 138, 145 (S.D.N.Y.1988) (explaining that the plaintiff, in accepting the defendant's job offer, had exchanged "something of tangible value-he changed his way of life and his job-in return for the stock and stock options available through the Plan" and concluding that the plaintiff qualified as a "purchaser" of a security); *Collins v. Rukin,* 342 F.Supp. 1282, 1287-

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

89 (D.Mass.1972) (determining that the plaintiff, who had agreed, in accepting employment with the defendant, that he should receive certain stock options, qualified as a purchaser of securities). Unlike the plaintiffs in *Yoder,Dubin,* and *Collins,* Kinsey does not allege that he received the converted stock options in exchange for or as an inducement for acceptance of employment either in April 2001 or in October of that same year. Rather, Kinsey is alleged to have received the Awarded Options in May 1997 (*see* Am. Compl. at ¶ 12), which Awarded Options were converted to Cendant stock options upon the Merger. (*See* Am. Compl. at ¶¶ 30-31). Even taking as true the allegations that Kinsey was induced to accept employment with FFD in April 2001 and with Fairfield in October 2001 based, in part, on the Defendants' representations and omissions concerning the relevant period in which he could exercise the converted stock options (*see* Am. Compl. at ¶¶ 24, 29, 45, 46) these allegations are insufficient to establish that Kinsey was a "purchaser" of securities on either occasion, as no purchase or sale of the converted stock options occurred. To conclude otherwise would lead to the untenable result that a purchase or sale could be said to have occurred upon any misrepresentation concerning a security *already* purchased or sold. Consequently, Kinsey's securities fraud claim must be dismissed.[FN4]

> **FN4.** As the allegations of the Amended Complaint fail to establish that a "purchase" of the converted stock options occurred in either April 2001 or October 2001, the Defendants' alternate argument that any alleged misrepresentations did not occur "in connection with" those purchases need not be reached.

### 2. *The Securities Fraud Claim Is Not Pled With Sufficient Particularity*

**\*9** Count 1 fails for the additional reason that it has not been pled with sufficient particularity, as required by both Rule 9(b), Fed.R.Civ.P., and the PSLRA. *See,e.g.,Novak v. Kasaks,* 216 F.3d 300, 306-07 (2d Cir.2000) (setting forth the heightened pleading standards of the PSLRA that must be met by a plaintiff who alleges securities fraud under Section 10(b) and Rule 10b-5); *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994) (stating that "[s]ecurities fraud allegations under § 10(b) and Rule

10b-5 are subject to the pleading requirements of Rule 9(b)").

To satisfy Rule 9(b), a complaint setting forth a claim pursuant to Section 10(b) and Rule 10b-5 "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ' *Shields,* 25 F.3d at 1128 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)); *accordStevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir.1999). To plead a material misrepresentation or omission under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Amended Complaint does not include sufficiently particular allegations concerning the majority of misrepresentations and omissions cited by Kinsey. There are no allegations, for instance, concerning when and where the "individualized negotiations" between Kinsey and the Defendants leading to Kinsey's decisions to accept employment with FFD in April 2001 and with Fairfield in October 2001 took place, nor does the Amended Complaint indicate who participated in those negotiations, the identity of the speaker of the alleged representations made to Kinsey during those negotiations, or when the representations themselves were made. (*See* Am. Compl. at ¶¶ 23-29, 40-46, 77). Similarly, Kinsey has failed to identify when Cendant's writing or writings concerning the conversion of the Awarded Options to Cendant stock options were issued. (*See* Am. Compl. at ¶ 32.) Although the details of statements concerning the exercise period for Kinsey's stock options purportedly made by Bendlin, an FFD officer, in e-mails on or about July 3, 2001 and August 14, 2001 (*see* Am. Compl. at ¶¶ 37, 39) are pled with adequate particularity, these allegations would only potentially salvage Kinsey's claim if he were a "purchaser" of converted Cendant stock options in October 2001 (*i.e.,* following the issuance of the e-mails), which, for the reasons stated above, he was not, and if he had adequately pled scienter, which, for the reasons stated below, he has not.

Not Reported in F.Supp.2d                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

**\*10** Moreover, Kinsey has not refuted the Defendants' argument that the Amended Complaint, which is replete with references to the Defendants' purported actions and omissions, fails to satisfy the basic requirement that "[w]here multiple defendants are involved, the complaint is required to describe specifically each defendant's alleged participation in the fraud."*Spira v. Curtin,* No. 97 Civ. 2637(TPG), 2001 WL 611386, at \*3 (S.D.N.Y. June 5, 2001); *seealsoDouble Alpha, Inc. v. Mako Partners, L.P.,* No. 99 Civ. 11541(DC), 2000 WL 1036034, at \*3 (S.D.N.Y. July 27, 2000) (dismissing Section 10(b) claims where the complaint did not distinguish among the multiple defendants and "alleg[e] specific acts of wrongdoing as to each one of them"); *In re Blech Secs. Litig.,* 928 F.Supp. 1279, 1294 (S.D.N.Y.1996) (dismissing Section 10(b) and other claims for failure to satisfy Rule 9(b), since "Rule 9(b) is not satisfied by a complaint in which 'defendants are clumped together in vague allegations'") (quoting *Three Crown Ltd. P'ship v. Caxton Corp.,* 817 F.Supp. 1033, 1040 (S.D.N.Y.1993)). Kinsey's cursory allegation that the Defendants shared common ownership and common officers and/or directors at all relevant times following the Merger (*see* Am. Compl. at ¶ 35) and his argument that all of the Defendants were " 'one' " with respect to the wrongdoing alleged in the Amended Complaint (Pl. Opp. Mem. at 13) do not excuse his failure to differentiate among the Defendants or otherwise exempt his pleadings from the requirements of Rule 9(b).*See,e.g.,Filler v. Hanvit Bank,* Nos. 01 Civ. 9510(MGC) & 02 Civ. 8251(MGC), 2003 WL 22110773, at \*3 (S.D.N .Y. Sept. 12, 2003) (dismissing fraud claims against related corporate entities for lack of specificity where "[t]he complaints are full of conclusory allegations that the Korean entity acted through [its] parent [and] assume that these two corporations constitute a single entity [without] any explanation of why these distinct corporations should be regarded as one"); *Kolbeck v. LIT America, Inc.,* 923 F.Supp. 557, 570 (S.D.N.Y.1996) (explaining that "[b]road allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b)") (citing *Landy v. Mitchell Petroleum Tech. Corp.,* 734 F.Supp. 608, 620-21 (S.D.N.Y.1990)), *aff'd,*152 F.3d 918 (2d Cir.1998).

Kinsey has also failed to plead scienter adequately. In order to plead scienter under the PSLRA, "plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' as required by the language of the Act itself."*Novak,* 216 F.3d at 311 (quoting 15 U.S.C. § 78u-4(b)(2)). In order to satisfy this requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."*Rombach v. Chang,* 355 F.3d 164, 176 (2d Cir.2004) (quoting *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir.2000)). Pursuant to Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). Notwithstanding the generosity of this standard, the Second Circuit has long recognized that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito,* 47 F.3d at 52 (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)).

**\*11** Kinsey argues that the Defendants had both motive and opportunity to commit the fraud alleged. In support of his argument, he points to allegations in the Amended Complaint concerning Cendant's "questionable accounting practices" (Am. Compl. at ¶ 20) at or around the time of the Merger and Cendant's "scheme to understate its liabilities for off balance sheet entities and its employee stock options."(Am. Compl. at ¶ 21). It is alleged that Cendant announced in or about August 2002 that it would end its practice of refusing to report employee stock options as expenses as of January 2003 and reduce its issuance of employee stock options in the future. (*See* Am. Compl. at ¶¶ 48-49.) It is further alleged that at or around that same time Cendant's shareholders determined that Cendant's president should no longer have the right to a mandatory grant of stock options and that Cendant "took these actions in response to the business scandals and securities fraud lawsuits that it was facing."(Am. Compl. at ¶ 53.) Kinsey argues that motive may be inferred from the timing of the August 2002 announcement and the decision by Cendant's shareholders, both made after Kinsey was told that he had until May 2007 to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                       Page 9
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

exercise his converted stock options and before Kinsey was informed that his options had expired. (*See* Am. Compl. at ¶¶ 37-39, 55; *seealso* Am. Compl. at ¶ 82 (alleging that the Defendants "had the motive to commit fraud because Cendant decided to drastically curtail its grant of stock options, including those to its own President, and therefore determined that it would not allow [Kinsey] to enjoy a right no longer available to its own President").)

Kinsey's allegations of general wrongdoing and the reduction in the *award* of employee stock options have no discernible bearing on any motive that the Defendants may have had to misrepresent to Kinsey the relevant *exercise* period for his converted stock options. This is particularly so in light of the timing of the August 2002 announcement and the shareholder decision, both of which came well after the summer of 2001, when the only misleading statements alleged with sufficient particularity purportedly occurred. Moreover, even accepting Kinsey's cursory allegation of the Defendants' "scheme" to mislead the public with regard to Cendant's accounting for awards of stock options as true, there are no allegations in the Amended Complaint suggesting how the purported misrepresentations to Kinsey concerning the exercise period for his Awarded Options, later the converted stock options, could have furthered that scheme.

Kinsey's conclusory allegation that the Defendants-including certain unidentified "directors and officers"-had the motive to commit fraud "because they were then able to realize, or believed themselves able to realize, concrete and personal benefits from the false statements and/or the wrongful disclosures ..., specifically in relation to reducing the liability that it faced in connection with the securities fraud and other lawsuits that it faced and in its struggle to remove the public taint of financial scandal that had fallen upon Cendant and to increase the value of their own stock options" (Am. Compl. at ¶ 83) fares little better. Even adopting, *arguendo,* the somewhat strained assumption that the benefits alleged were sufficiently concrete, *seegenerallyChill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996) (explaining that motive entails " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged'") (quoting *Shields,* 25 F.3d at 1130), there is no suggestion offered by Kinsey as to how the Defendants, by purportedly

misleading Kinsey concerning the exercise period for his Awarded Options, might have realized any of the generalized benefits alleged. As the Defendants observe, the notion that Kinsey's exercise of his 33,918 Awarded Options would have anything more than a *deminimis* effect on another shareholder's, much less the Defendants', holdings of Cendant common stock-of which there were nearly one billion shares outstanding as of December 21, 2000-is implausible and no allegations to the contrary have been offered.

**\*12** Kinsey has also contended that the factual allegations in the Amended Complaint adequately plead scienter because they set forth strong circumstantial evidence of recklessness. "To qualify as reckless conduct, defendants' conduct must have been 'highly unreasonable' and 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." ' *Scholastic,* 252 F.3d at 76 (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir.1978)) (alteration in original). Thus, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *Id.* Where, however, a "plaintiff has failed to demonstrate that defendants had a motive to defraud ..., he must produce a stronger inference of recklessness." *Kalnit v. Eichler,* 264 F.3d 131, 143 (2d Cir.2001); *seealsoChill,* 101 F.3d at 270 (noting that there is a "significant burden on the plaintiff in stating a fraud claim based on recklessness"). Kinsey fails to demonstrate how the allegations in the Amended Complaint in any way support such a "stronger inference ."

In opposition to the Defendants' motion, Kinsey has recited various alleged misrepresentations and then proffered the conclusions that "[t]hese representations were profoundly false" (Pl. Opp. Mem. at 17) and that recklessness has been established because the Defendants allegedly made misrepresentations "on no less than seven occasions."(*Id.*). Even assuming that these representations-the majority of which, as stated above, have not been pled with sufficient

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                                Page 10
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

particularity-were false, or repeatedly made, such falsity or repetition does not demonstrate that the representations were made knowingly or recklessly.

Kinsey argues that knowledge may be inferred because on or about April 3, 2003, two years after the alleged misrepresentations, an officer of Cendant, Richard Meisner ("Meisner"), allegedly informed him that "the Board of Directors had determined" that all Fairfield options became fully vested at the time of the Merger in April 2001 and that for Fairfield employees (like Kinsey) who became employed by FFD, the applicable option agreements "was amended" to provide that those employees had one year (rather than three months) from the date of the Merger to exercise their options. (*See* Am. Compl. at ¶ 55.) Thus, according to Kinsey, at the time of the challenged representations in 2001, it had already been decided by the Board of Directors that Kinsey would be unable to exercise his stock options through 2007.

First, the Amended Complaint does not make clear at what point the unspecified Defendant's Board of Directors allegedly made the determination to which Kinsey refers or when and by whom the amendment referenced was made. Kinsey alleges merely that the Board of Directors "had determined that all Fairfield options became fully vested at the time of the Cendant-Fairfield acquisition in April 2001" and that "Meisner's e-mail also stated that if a Fairfield employee had been transferred to FFD, that employee's option was amended to provide an extended post-termination exercise period which ended on or about April 2002...." (Am. Compl. at ¶ 55.) Just when the unidentified Board of Directors is alleged to have reached its determination is not clear, as the clause "at the time of the Cendant-Fairfield acquisition in April 2001" could apply logically to the moment at which the options were fully vested or to the moment at which the determination was made. Further, there is no indication that the amendment to which Kinsey refers was effectuated simultaneous with the determination of the Board of Directors, or by whom that amendment was made.

*13 Even adopting Kinsey's construction of his own allegation, *i.e.,* that the determination of the Board of Directors was made as of the time of the Merger and that the amendment was made by that same Board at the same time, this allegation is not enough to ascribe

scienter to the Defendants. With regard to recklessness,

It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement.

*In re Apple Computer, Inc. Sec. Litig.,* 243 F.Supp.2d 1012, 1023 (N.D.Cal.2002) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435-36 (9th Cir.1995)); *see also Southland Sec. Corp. v. Inspire Ins. Solutions Inc.,* 365 F.3d 353, 366 (5th Cir.2004) ("For purposes of determining whether a statement by a corporation was made by it with the requisite 10(b) scienter" one must "look to the state of mind of the individual corporate official or officials who make or issue the statement" at issue.); *First Equity Corp. of Fla. v. Standard & Poor's Corp.,* 690 F.Supp. 256, 260 (S.D.N.Y.1988) ("A corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual."), *aff'd,* 869 F.2d 175 (2d Cir.1989). The sole allegations of misleading statements set forth with particularity here concern the e-mails purportedly sent by Bendlin in the summer of 2001. Kinsey does not argue, nor does the Amended Complaint offer particularized facts from which to conclude, that Bendlin acted knowingly or recklessly when he made the representations at issue. Accordingly, no inference of recklessness may be drawn here, much less the "stronger inference" required.[FN5]

> FN5. Kinsey's scienter allegations also fail for the independent reason that none of them differentiates between Cendant, FFD and Fairfield. *See, e.g., Smith v. Circuit City Stores, Inc.,* 286 F.Supp.2d 707, 716 (E.D.Va.2003) ("Plaintiff's scienter allegations fail for the independent reason[ ] that ... [they] lump Defendants together....").

Even drawing all reasonable inferences in Kinsey's favor and assuming, *arguendo,* that Kinsey was a "purchaser" of the Awarded Options in April 2001

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

and October 2001, Count 1 of the Amended Complaint nonetheless must be dismissed, as Kinsey's claim has not been pled with the particularity required by both Rule 9(b), Fed.R.Civ.P., and the PSLRA.

### B. *The Breach Of Fiduciary Duty Claim Is Dismissed*

Count 3 alleges a common law claim of breach of fiduciary duty. Specifically, Kinsey alleges that, "[b]ased upon the business and personal relations developed since in or about 1981 between Plaintiff and various officers, directors and executives of Defendants Fairfield, FFD and Cendant, Plaintiff reposed his trust and confidence in their integrity and fidelity," and, "[a]s a result, a fiduciary relationship developed between Plaintiff and various officers, directors and executives...." (Am. Compl. at ¶¶ 96, 97.) According to Kinsey, this fiduciary relationship created in the Defendants "a duty to refrain from making a false statement of material fact to him in relation to such business and employment decisions" and "a duty to provide him with accurate information in connection with representations of material fact...." (Am. Compl. at ¶¶ 98, 99.) The Defendants contend that Count 3 should be dismissed because Kinsey has not pled sufficient facts to establish that a fiduciary relationship ever existed between him and any of the Defendants.

**\*14** The law, whether that of New York or of Georgia,[FN6] will not imply a fiduciary relationship based merely on Kinsey's status as an employee. See,e.g.,Lind v. Vanguard Offset Printers, Inc. ., 857 F.Supp. 1060, 1067 (S.D.N.Y.1994) (dismissing a breach of fiduciary duty claim where the purported fiduciary relationship was based on the plaintiff's status as an employee, since "under New York law, an employer-employee relationship is not fiduciary in nature") (citing Van Brunt v. Rauschenberg, 799 F.Supp. 1467, 1474 (S.D.N.Y.1992); Ingle v. Glamore Motor Sales, Inc., 140 A.D.2d 493, 494, 528 N.Y.S.2d 602, 604 (2d Dept.1988), aff'd,73 N.Y.2d 183, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989)); Atlanta Mkt. Ctr. Mgmt. Co. v. McLane, 269 Ga. 604, 607, 503 S.E.2d 278, 281-82 (Ga.1998) ("The employee-employer relationship is not one from which the law will necessarily imply fiduciary obligations; however, the facts of a particular case may establish the existence of a confidential relationship between an employer and an employee

concerning a particular transaction, thereby placing upon the parties the fiduciary obligations associated with a principal-agent relationship."). Thus, without additional factual allegations, Kinsey's breach of fiduciary duty claim fails as a matter of law. SeeMadera v. Metro. Life Ins. Co., No. 99 Civ. 4005(MBM), 2002 WL 1453827, at \*8 (S.D.N.Y. July 3, 2002) (dismissing a claim that depended on the existence of a fiduciary relationship between an employer and an employee because under New York law "[t]he employer-employee relationship is not fiduciary in nature, and plaintiff alleges no further facts from which to infer that such a relationship existed") (citation omitted); ServiceMaster Co. v. Martin, 252 Ga.App. 751, 758, 556 S.E.2d 517, 524 (Ga.Ct.App.2001) (holding that a breach of fiduciary duty claim was properly dismissed where the plaintiff was merely an employee and there were no well-pled facts indicating that a confidential relationship existed, since the law will not imply a fiduciary relationship).

> FN6. Kinsey has cited to authority from both jurisdictions in opposing the Defendants' motion to dismiss Count 3. As the result reached here would be the same under either New York or Georgia law, it need not be determined which jurisdiction's law applies.

Kinsey's assertions that a fiduciary duty developed based upon the "business and personal relations" between Kinsey and certain unidentified officers, directors and executives of the Defendants (Am. Compl. at ¶ 96) or that the Defendants had superior information in respect to the Awarded Options are not sufficient allegations of fact to demonstrate the existence of a fiduciary relationship. See,e.g.,ServiceMaster, 252 Ga.App. at 758, 556 S.E.2d at 524 (stating that "conclusory statements" of a confidential relationship are an insufficient basis upon which to infer that an employer-employee relationship is fiduciary in nature); Freedman v. Pearlman, 271 A.D.2d 301, 305, 706 N.Y.S.2d 405, 409 (N.Y.App. Div. 1st Dep't 2000) (concluding that allegations that an employee trusted his employer to treat him fairly "do[ ] not give rise to a fiduciary duty"); seealsoOnanuga v. Pfizer, Inc., No. 03 Civ. 5405(CM), 2003 WL 22670842, at \*3 (S.D.N.Y. Nov.7, 2003) (holding that a claim depending on the existence of a special relationship must be dismissed where the plaintiff has not pled facts from which to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                  Page 12
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

infer that a fiduciary relationship existed). Nor does the purported length of Kinsey's employment relationship with some of the Defendants suffice to establish a fiduciary relationship here. *See id.*("Plaintiff's allegation that her husband was a life-long employee of Pfizer does not plead any special relationship ."); *Ellis v. Provident Life & Acc. Ins. Co.,* 3 F.Supp.2d 399, 402, 411 (S.D.N.Y.1998) (concluding that no fiduciary relationship existed between the plaintiff and his employer of approximately 24 years), *aff'd,* 172 F.3d 37 (2d Cir.1999).

*15 As the allegations of the Amended Complaint are insufficient to establish the existence of a fiduciary relationship between Kinsey and the Defendants, Count 3 must be dismissed.

C. *The Claim For Breach Of Implied Duty Of Good Fair And Fair Dealing Is Dismissed*

In Count 4 of the Amended Complaint Kinsey alleges that "[b]y virtue of the contractual and fiduciary relationship" between Kinsey and each of the Defendants, each of the Defendants owed Kinsey an implied duty of good faith and fair dealing. (Am. Compl. at ¶¶ 104-106.) The Defendants breached this implied duty, according to Kinsey, "by, without limitation. failing to act in a fair and good faith manner in relation to their representation of material facts, and their omission of material facts, to [Kinsey] in relation to the significant business and employment decisions that he faced."(Am. Compl. at ¶ 107.) For the reasons just set forth, the Amended Complaint contains no factual allegations giving rise to a fiduciary relationship, leaving only the contractual relationship among the parties as the basis for Kinsey's claim.

Although Count 4 does not specify from which contract arises the implied duty allegedly breached by the Defendants, Kinsey has argued in opposition to the Defendants' motion that both the Plan and Option Agreement give rise to the duty at issue. Thus, according to Kinsey, the Plan provides that the Compensation Committee or the Board may, without Kinsey's consent, amend any stock option agreement granted under the Plan with respect to the time or times within which the stock options must be exercised. The Option Agreement states that,

Any amendment to the Plan shall be deemed to be an amendment to this Agreement to the extent that the amendment is applicable hereto; *provided, however,* that no amendment shall adversely affect the rights of the Participant hereunder without the Participant's consent.

(Option Agreement, Kadet Decl., Exh. D, at 3.) Kinsey argues that these provisions imply that the exercise period could not be modified without an amendment to the Plan and Kinsey's consent, and that, as a result of these provisions, it was incumbent upon the Defendants to notify Kinsey if and when they chose to change the expiration date of the exercise period and to refrain from misrepresenting that expiration date to him.

Under the law of New York, a covenant of good faith and fair dealing is implied with respect to every contract. *See* *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763, 769 (N.Y.1995). This covenant is breached when a party "acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Jaffe v. Paramount Communications Inc.,* 222 A.D.2d 17, 22-23, 644 N.Y.S.2d 43, 47 (N.Y.App. Div. 1st Dep't 1996). Where a claim for breach of the covenant of good faith and fair dealing is duplicative of a claim for breach of contract, the claim for breach of the covenant of good faith and fair dealing is properly dismissed. *See* *Engelhard Corp. v. Research Corp.,* 268 A.D.2d 358, 358-59, 702 N.Y.S.2d 255, 256 (N.Y.App. Div. 1st Dep't 2000) (holding that a claim for breach of the implied covenant of good faith and fair dealing was properly dismissed as duplicative of a breach of contract claim).

*16 Kinsey has failed to allege facts that would support a claim for breach of the covenant of good faith and fair dealing as distinct from a claim for breach of express contract. The crux of Kinsey's allegations is that the Defendants did not act in good faith under the Option Agreement when they purportedly shortened the expiration date of the Awarded Options without providing notice to Kinsey and obtaining his consent. Whether, as Kinsey argues, the Defendants "actually clandestinely amended the Plan or the [Option] Agreement without informing [Kinsey], or just plain refused to abide by

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

their terms" (Pl. Surreply Mem. at 4), the conduct alleged relates to the Defendants' purported breach of express provisions of the subject agreements rather than any separate and independent grounds for Kinsey's claim of breach of the covenant of good faith and fair dealing. Accordingly, Kinsey's claim of breach of the implied covenant of good faith and fair dealing is dismissed. *See, e.g., ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 243-44 (S.D.N.Y.1997) ( "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.") (internal quotation marks omitted).

### D. *The Fraud And Deceit Claim Is Dismissed*

In Count 5 of the Amended Complaint Kinsey alleges that Fairfield represented to him that the options provided to him did not expire until May 22, 2007, ten years from the date of the grant. (*See* Am. Compl. at ¶ 111.) Kinsey further alleges, upon information and belief, that "at the time of the above-mentioned representation by Defendant Fairfield regarding [Kinsey's] rights in relation to his stock options, Defendant Fairfield knew that [Kinsey] would not be allowed to exercise his stock options up to and including May 21, 2007."(Am. Compl. at ¶ 112.) The Defendants are also alleged to have represented to Kinsey that "his newly-converted Cendant stock options remained subject to the terms of the 1997 Stock Option Plan" and to have intentionally failed to disclose to Kinsey, "until well after one year following Cendant's acquisition of Fairfield, of their position that [Kinsey's] stock options expired one year after that acquisition."(Am. Compl. at ¶¶ 113-114.) Kinsey alleges that "[t]hese omissions were material to [Kinsey's] business and employment decisions," and he assertedly relied upon the Defendants' "promises, representations and omissions" as the Defendants allegedly intended that he would. (Am. Compl. at ¶¶ 115-116.) As a result of the alleged conduct, Kinsey alleges that he has sustained economic and other injuries. (*See* Am. Compl. at ¶ 119.)

The Defendants argue that Count 5 must be dismissed because Kinsey has failed to allege fraud with the particularity required by Rule 9(b), Fed.R.Civ.P. Specifically, the Defendants contend

that Kinsey has only provided conclusory allegations that the supposedly fraudulent acts were committed knowingly, intentionally or recklessly, and that such allegations are insufficient.

**\*17** As set forth above, although Rule 9(b) provides that the requisite state of mind may be "averred generally," Fed.R.Civ.P. 9(b), Rule 9(b) is not "a 'license to base claims of fraud on speculation and conclusory allegations.' " *Acito,* 47 F.3d at 52 (quoting *Wexner,* 902 F.2d at 172). Thus, a conclusory allegation of knowledge or intent without a sufficient motive theory or allegations of fact constituting strong circumstance evidence of conscious misbehavior is insufficient to withstand a motion to dismiss. *Seeid.* at 53.

As previously discussed, there are no allegations in the Amended Complaint suggesting why the Defendants would have been motivated to defraud Kinsey or that the purported misinformation that Kinsey received concerning the expiration date for the exercise of the Awarded Options was the result of anything more than negligence or mistake. In particular, even accepting as true the allegations in the Amended Complaint concerning Cendant's accounting practices (*see* Am. Compl. at ¶ 20), its purported desire "to mislead the public regarding the value of the company" at or around the time of the Merger (Am. Compl. at ¶ 20), and its announcement in or about August 2002 that it planned to reduce the issuance of employee stock options (*see* Am. Compl. at ¶ 49), these allegations are not relevant to, nor sufficient to establish, any purported motive to defraud Kinsey with respect to the expiration date for exercise of his stock options. *See,e.g.,Kalnit,* 264 F.3d at 139 ("Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.") (internal quotations omitted). Nor are the Amended Complaint's allegations of false statements and misrepresentations adequate to "establish conscious behavior and recklessness[s]" on the part of the Defendants, as Kinsey suggests. (Pl. Opp. Mem. at 17.) Accordingly, Count 5 must be dismissed, as Kinsey has failed to plead scienter with sufficient particularity.

### E. *The Gross Negligence Claim Is Dismissed*

Count 7 sets forth a claim for negligence. According

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

to the Amended Complaint, the Defendants had a duty to administer stock options in a reasonable manner and to inform participants and beneficiaries of any information impacting the rights of those participants and beneficiaries under the Plan. (*See* Am. Compl. at ¶ 135.) Kinsey alleges that the Defendants breached their duty by failing to advise him "on a timely basis of their position that his rights to exercise his stock options ended within one year of the Cendant[ ] acquisition of Fairfield."(Am. Compl. at ¶ 136.) In addition, the Defendants are alleged to have acted "recklessly and/or with a conscious disregard of [Kinsey's] rights by failing to ascertain the facts available to them in relation to such representations," which conduct, according to Kinsey, amounts to gross negligence. (Am. Compl. at ¶ 138.) The Defendants do not challenge Kinsey's negligence claim itself but argue that Kinsey has failed to state a claim for gross negligence.

\*18 Kinsey concedes that to state a claim for gross negligence, as opposed to ordinary negligence, the facts alleged must demonstrate "the want of even scant care,"*Hong Kong Exp. Credit Ins. Corp. v. Dun & Bradstreet,* 414 F.Supp. 153, 160 (S.D.N.Y.1975), and the purported misconduct must "smack[ ] of intentional wrongdoing." *Tevdorachvili v. Chase Manhattan Bank,* 103 F.Supp.2d 632, 644 (E.D.N.Y.2000) (quoting *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.,* 81 N.Y.2d 821, 824, 595 N.Y.S.2d 381, 383, 611 N.E.2d 282, 284 (N.Y.1993)) (internal quotation marks omitted). Kinsey's allegations demonstrate only that the Defendants purportedly made representations to Kinsey regarding the exercise period for his stock options and then completely contradicted those representations almost two years later. No factual allegations in the Amended Complaint show why this supposed transmission of misinformation alone establishes the want of scant care, or suggest that the Defendants' purported failure to provide accurate information to Kinsey "smacks" of intentional wrongdoing. Thus, while Kinsey may adequately have pled a claim for ordinary negligence, the Amended Complaint does not state a claim for gross negligence. *See,e.g.,Sutton Park Dev. Corp. Trading Co. v. Guerin & Guerin Agency Inc.,* 297 A.D.2d 430, 431, 745 N.Y.S.2d 622, 624 (N.Y.App. Div.3d Dep't 2002) (concluding that a properly pled claim for ordinary negligence did not support a claim for gross negligence where the complaint lacked factual allegations demonstrating that the purported negligence was of an aggravated character that evinced a reckless disregard of plaintiff's rights or smacked of intentional wrongdoing). The claim of gross negligence included in Count 7 is therefore dismissed.

*F. The Unjust Enrichment Claim Is Dismissed*

In Count 8 of the Amended Complaint, Kinsey alleges that the Defendants were unjustly enriched at his expense insofar as they are alleged, by "acting in concert and conspiracy with each other" and "as agents for each other," to have "made material misrepresentations and failed to disclose material information within their knowledge regarding the time period by which [Kinsey] had to exercise his stock options."[FN7](Am. Compl. at ¶ 142.)

> FN7. As set forth above, *seesupra* note 2, the only relevant stock options are those converted from the Awarded Options. Although Kinsey has alleged that he received additional Cendant stock options in October 2001 (*see* Am. Compl. at ¶ 41), he has not alleged what exercise period applies or applied to those additional stock options or suggested that any of the Defendants' representations might be related to the exercise of those additional stock options. Accordingly, the analysis of Count 8 does not concern the additional stock options provided to Kinsey in October 2001.

The Defendants argue that for Kinsey to sustain his claim of unjust enrichment he must identify a benefit that he conferred on the Defendants such that it would be inequitable for them to retain the conferred benefit without paying for it. *See,e.g.,Smith v. Chase Manhattan Bank, USA, N.A.,* 293 A.D.2d 598, 600, 741 N.Y.S.2d 100, 102 (N.Y.App. Div.2d Dep't 2002). In opposition, Kinsey asserts that the Defendants benefitted from their purported misconduct because the Awarded Options became part of the pool of authorized Cendant stock that Defendants either sold or may sell on the open market.[FN8]However, as this so-called benefit is a result of the purported misconduct rather than a benefit that Kinsey conferred on the Defendants, his claim for unjust enrichment is dismissed. *Seeid.*[FN9]

> FN8. Kinsey does not explain how FFD or Fairfield could be said to possess or have the

ability to sell shares of Cendant common stock that otherwise would have been issued to Kinsey had he timely exercised his stock options.

FN9. The single case cited by Kinsey, _Paramount Film Distrib. Corp. v. State of New York,_ 30 N.Y.2d 415, 334 N.Y.S.2d 388, 285 N.E.2d 695 (N.Y.1972), is not to the contrary. There, unlike here, the plaintiff sought to recover a purported benefit that it had actually conferred on the defendant (_i.e.,_ the payment of motion picture license fees)._See_ _Paramount Film Distrib.,_ 30 N.Y.2d at 416, 334 N.Y.S.2d at 389, 285 N.E.2d at 695.

II. _Leave To Move to Eile A Second Amended Complaint Is Granted_

**\*19** Rule 15(a) only permits an amendment of a pleading "once as a matter of course," provided no responsive pleading has been served. Fed.R.Civ.P. 15(a). "Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party...." _Id._ Kinsey used his sole opportunity to amend as of right when, instead of responding to the initial motion to dismiss, he filed the Amended Complaint. He, nevertheless, "reserves his right" to amend the Amended Complaint in his papers submitted in opposition to the Defendants' motion. (Pl. Opp. Mem. at 4.)

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Thus, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead ." _Cortec Indus.,_ 949 F.2d at 48 (citing _Ronzani v. Sanofi S.A .,_ 899 F.2d 195, 198 (2d Cir.1990); _Devaney v. Chester,_ 813 F.2d 566, 569 (2d Cir.1987); _Pross v. Katz,_ 784 F.2d 455, 459-60 (2d Cir.1986)). In view of certain of the grounds for dismissal set forth above, the discretion of the Court is invoked and leave is granted to move to amend the Amended Complaint.

_Conclusion_

For the reasons set forth above, Counts 1, 3, 4, 5, and 8 of the Amended Complaint are dismissed in their entirety and Count 7 is dismissed in part. Leave to move to file a second amended complaint within

thirty (30) days of the entry of this opinion and order is granted.

It is so ordered.

S.D.N.Y.,2004.
Kinsey v. Cendant Corp.
Not Reported in F.Supp.2d, 2004 WL 2591946 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,045

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.