IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RFR HOLDING LLC and, ) <br> CENTURY 21 CHICAGO, LLC ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> PONTE GADEA FLORIDA, INC. and ) <br> CHICAGO MICHIGAN, LLC, ) <br> ) <br> Defendants. ) | No.   08 CV 1555 <br><br> Hon. Wayne R. Andersen <br><br> Magistrate Judge Cole |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO FILE A SURREPLY

Plaintiffs submit this opposition to defendants' motion for leave to file a surreply (the "Surreply Application") in further opposition to plaintiffs' motion for an order disqualifying Greenberg Traurig, LLP (the "Greenberg firm") from representing defendants in this action. In opposition to the surreply application, plaintiffs state as follows:

1. Plaintiffs' moving papers consisted of two affidavits from plaintiffs' principals, with exhibits thereto, which in total aggregated 77 pages, and a 12 page memorandum of law. Defendants requested, and plaintiffs did not oppose, a briefing schedule pursuant to which defendants had over <u>six weeks</u> to respond to plaintiffs' motion to disqualify. In opposition to such motion, defendants submitted four separate affidavits which, with exhibits, totaled 125 pages. In addition, defendants submitted a 16 page memorandum of law. Despite having had adequate time to respond and despite the length of its written opposition, defendants have now filed the Surreply Application seeking additional time and space to present new arguments and evidence. However, as detailed below, defendants have failed to come forward with the compelling showing necessary to justify a surreply. Indeed, given the record on the motion

before this Court and the adequacy of time and opportunity which defendants already have had, plaintiffs respectfully submit that the Court should deny defendants' Surreply Application.

2. Specifically, in the face of defendants' lengthy submission in opposition to the motion to disqualify, plaintiffs' reply contained nothing which could be characterized as "new." Indeed, plaintiffs' <u>entire</u> submission consisted of (i) a single affidavit comprised of a <u>total</u> of two pages (with a single exhibit attached thereto); and (ii) a reply memorandum of law.  Both the affidavit and the memorandum of law were designed primarily (a) to point out the numerous facts which defendants had failed to rebut in their opposition (indeed, the first six pages of plaintiffs' reply were devoted to absolutely nothing else); and (b) to discuss the statutory rules and case law that defendants had relied upon and how such authorities were distinguishable and inconsistent with controlling legal principles.  In other words, <u>plaintiffs submitted virtually nothing new on reply and certainly nothing was submitted which would justify permitting defendants to place new evidentiary material before the Court</u>.

3. Without any specifics, and without having attached their proposed surreply brief to their surreply application, defendants conclusorily contend that they should be allowed to submit a surreply.  In support, defendants contend that plaintiffs have somehow raised "new facts" and submitted "new evidence" in reply. They also conclusorily state that plaintiffs have "misstated facts" and that defendants should be "allowed to address these matters in a surreply."  Not only do defendants fail to point to a single example, but it bears repeating that the <u>sole</u> evidence submitted by plaintiffs on reply was a two page affidavit with a single exhibit, generated by the Greenberg firm after the moving papers were filed, which was simply another example of what was set forth in plaintiffs' moving papers. Especially given defendants' failure to identify any <u>new</u> facts submitted -- which, we submit, they cannot do -- we respectfully submit that

defendants are improperly using this as an opportunity to submit additional evidentiary materials before the Court which they could have done, and should have done, in their opposition to the disqualification motion

4. In a similar vein, defendants state that plaintiffs "relied on several new cases throughout their Reply Brief." Once again, however, the Reply Brief merely responded to defendants' arguments and the decisional and statutory law relied upon by defendants, and demonstrated that the authorities cited by them did not accurately state the law. Moreover, the fact that plaintiffs "relied on several new cases" in their reply memorandum of law hardly gives license to a litigant to submit surreply papers on a motion. Thus, we respectfully submit that defendants' motion should be denied in its entirety. See, e.g., United States of America v. One 2005 Rolls Royce Phantom, No. 07 C 2870, 2008 U.S. Dist. Lexis 1477, *2 n.1 (N.D. Ill. Jan. 8, 2008) ("I am denying the opportunity to sur-reply because the reply doesn't raise any issues that weren't already addressed"); Dependable Cartage and Transportation Company v. Sovereign Oil Company, No. 84 C 4949, 1985 U.S. Dist. Lexis 15454, *17 n.7 (N.D. Ill. 1985) ("Apparently realizing, albeit too late, that its brief was inadequate, [plaintiff] now seeks another opportunity to do what it should have done in the first place. . . Nor did the moving defendants raise new matters in their reply briefs which would require a response. . . [Plaintiff's] motion for leave to file a sur-reply brief, therefore, is denied").[1]

5. Finally, defendants contend that plaintiffs have "added additional legal arguments concerning 'direct attorney-client relationships' and 'vicarious attorney-client relationships.'" However, plaintiffs simply explained in their reply brief that the authorities relied upon by defendants were off the mark because of these principles which defendants purposely ignored.

---

[1] Copies of these cases are attached hereto as Exhibit A.

324147-2-W                                        3

This, too, provides no "justification," let alone demonstrates the compelling need to submit a surreply brief on the motion.

6. In short, we respectfully submit that defendants' Surreply Application should be denied in its entirety. Alternatively, in the event any portion of defendants' Application is granted, plaintiffs request that the Court limit defendants to submitting a brief addressing the so-called "new" legal authorities contained in plaintiffs' reply memorandum. In no event should defendants be given leave to submit new evidentiary material, given the fact that the sole affidavit submitted by plaintiffs on reply was a scant two pages long and contained virtually nothing which could be characterized as new.

WHEREFORE, plaintiffs respectfully request that the relief requested by defendants should be denied.

Dated:  September 4, 2008                    Respectfully submitted,

                                             RFR HOLDING LLC
                                             CENTURY 21 CHICAGO LLC


                                             By:   /s/  Mark Walfish
                                             One of their Attorneys


Mark Walfish (Admitted *pro hac vice*)
KATSKY KORINS LLP
605 Third Avenue
New York, New York 10158-0038
(212) 953-6000

Lazar P. Raynal
Jocelyn D. Francoeur
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois  60606
Telephone: (312) 372-2000

324147-2-W                                   4

## CERTIFICATE OF SERVICE

I, Mark Walfish, an attorney, certify that on September 4, 2008, I caused a true and complete copy of **Plaintiffs' Opposition to Defendants' Motion For Leave to File a Surreply** to be served via CM/ECF mail upon:

Howard Kevin Jeruchimowitz
Rita M. Alliss Powers
Greenberg Traurig, L.L.P.
77 West Wacker Drive
Suite 2500
Chicago, IL  60601

And via first-class mail upon:

Hilarie Bass
Greenberg Traurig LLP
1221 Brickell Avenue
Miamia, FL  33131

                                            s/ Mark Walfish

CHI99 5024459-1.052498.0085

# EXHIBIT A

LEXSEE


Cited
As of: Sep 04, 2008

**UNITED STATES OF AMERICA, Plaintiff, v. ONE 2005 ROLLS ROYCE PHANTOM, Defendant.**

**No. 07 C 2870**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2008 U.S. Dist. LEXIS 1477**

**January 8, 2008, Decided
January 8, 2008, Filed**

**CORE TERMS:** notice, forfeiture, claimant's, untimely, currency, Supplemental Rules, forfeiture proceedings, purchase price, wholly owned subsidiary, prejudiced, instanter, verified, maritime, leave to file, file a claim, forfeiture action, date of notice, potential claimant, strict compliance, discretion to strike, standing to contest, late filing, lienholder, unverified, admiralty, ownership, seizure, rem, security interest

**COUNSEL:** [*1] For United States Of America, Plaintiff: AUSA, James Michael Kuhn, United States Attorney's Office (NDIL), Chicago, IL.

For Robert Brunt, Genesis Investment Group, Inc., Claimants: Michael J McDermott, LEAD ATTORNEY, Law Offices of Michael James McDermott, Chicago, IL.

For Luxury Motors Gold Coast, Luxury Motors Gold Coast d/b/a/ Bentley Gold Coast, Claimant: Clive D. Kamins, LEAD ATTORNEY, Bronson & Kahn LLC, Chicago, IL.

For JPMorgan Chase Bank NA, Claimant: Richard L. Hirsh, Richard L. Hirsh & Associates, Lisle, IL.

**JUDGES:** James B. Zagel, United States District Judge.

**OPINION BY:** James B. Zagel

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Before me is the United States' motion to strike JP Morgan's untimely filed claim to defendant vehicle. For the reasons stated below, the motion to strike is denied. JP Morgan's claim to the vehicle is ordered properly filed and the case shall proceed accordingly.[1]

> 1  JP Morgan's motion for leave to file its claim and answer instanter was presented to the court on October 9, 2007. I granted Plaintiff 28 days to file its objection to that motion. However, due to a docketing error, the motion to file instanter was granted and Plaintiff was ordered to answer by November 6, 2007. Because of [*2] the error, the United States has instead styled its brief as a motion to strike, to which JP Morgan has responded and the United States replied. Ordinarily JP Morgan would have the final word on its motion, but I am denying the opportunity to sur-reply because the reply doesn't raise any new issues that weren't already addressed in JP Morgan's filings.

**I. Background**

This is an in rem forfeiture action pursuant to 18 U.S.C §§ 981(a)(1)(C) and 981(a)(1)(A) for the forfeiture of one 2005 Rolls Royce Phantom. In November 2006, the United States initiated the administrative forfeiture of the 2005 Rolls Royce Phantom, which, according to the complaint is property which was derived from proceeds traceable to a violation of bank fraud, in violation of 18 U.S.C. § 1344, and property involved in monetary transactions in criminally derived property in excess of $ 10,000, in violation of 18 U.S.C. §§ 1345 and

1355(e). On November 17, 2006, the United States obtained a seizure warrant for the defendant vehicle, and on November 20, 2006, the vehicle was seized by agents from the Internal Revenue Service. On January 19, 2007, notice of the seizure and administrative forfeiture was sent to all persons [*3] known to have an interest in the vehicle, including JP Morgan Chase Bank in Phoenix, Arizona.

As the complaint indicates, the 2005 Rolls Royce Phantom was purchased at Luxury Motors Gold Coast Inc., d/b/a Bentley Gold Coast, Inc., which took back a purchase money security interest in the vehicle. The assignee of that security interest was JP Morgan Chase Bank, in the amount of $ 142,013.48. [2] That purchase occurred on October 12, 2006.

> 2  The total purchase price of the 2005 Rolls Royce Phantom was $ 270,000. The purchaser, Robert Brunt, an individual alleged to be involved in a scheme to defraud mortgage companies and others including financial institutions, traded-in his 2004 Rolls Royce and paid $ 10,000 cash to provide the total purchase price.

On February 28, 2007, Chase Auto Finance filed a claim with the IRS. That claim was verified by Rita Houp, Vice-President of Chase Auto Finance. The administrative claim was accompanied by two business cards identifying contact persons for Chase Auto Finance, one for Jim West and one for Rita Houp. Another employee of Chase Auto Finance, Terra Quinton, contacted the United States Attorney's Office prior to its initiation of civil forfeiture. [*4] Ms. Quinton requested that all notices concerning the defendant vehicle should be directed to her.

On May 22, 2007 judicial forfeiture proceedings began when the Unites States filed its civil forfeiture complaint. No notice of the proceedings was sent to JP Morgan Chase Bank. Instead, notice was sent to Rita Houp, Jim West, and Terra Quinton, three persons from Chase Auto Finance Corp., a wholly owned subsidiary of JP Morgan Chase Bank, who had identified themselves as individuals connected with the matter and appropriate for service. The notice provided that claims must be filed within 35 days of the date of notice, or July 5, 2007. Notice was also published in the Chicago Tribune on June 4, 2007, as required by Supplemental Rule G(4)(a)(iii)(B). [3] That rule allows for claims to be filed within 30 days of final publication.

> 3  The Supplemental Rules for Certain Admiralty and Maritime Claims specifically apply to "the procedure in statutory condemnation proceedings analogous to maritime actions in in rem, whether within the admiralty and maritime jurisdiction or not." Fed.R.Civ.P., Supp. Rule A. The Supplemental Rules appy to civil forfeiture actions under 21 U.S.C. § 881. *United States v. U.S. Currency, in amount of $103,387.27*, 863 F.2d 555, 558 n.4 (7th Cir. 1988) (citing *United States v. United States Currency in Amount of $2,857.00*, 754 F.2d 208, 210 n.2 (7th Cir. 1985)).

On September 30, 2007, [*5] JP Morgan Chase Bank filed a motion for leave to file its claim and answer instanter, owing its untimely filing to the fact that notice was sent to Chase Auto Finance Corp., a wholly owned subsidiary of JP Morgan Chase Bank, but not to JP Morgan Chase Bank, the record lienholder. JP Morgan Chase Bank admits that the notice may have been technically sufficient pursuant to Supplemental Rule G(4)(b)(iii), which allows for notice "by means reasonably calculated to reach the potential claimant," but argues that the notice process employed by the United States injected "an element of delay" into the process. JP Morgan Chase Bank further argues that it is a lienholder and "innocent owner" under 18 U.S.C. § 983(d), and that the United States will not be prejudiced by allowing it to file its claim to the defendant vehicle, which is attached to its motion.

The United States argues that I should not excuse JP Morgan Chase Bank's untimely filing, which if counting [*6] from the date of notice was more than 80 days overdue. The United States stresses that its direct service on the three persons specifically self-identified for receipt of notice compels adherence to the July 5, 2007 due date.

## II. Analysis

The Unites States argues that I should insist on strict compliance with Rule G(5), but the cases it cites are distinguishable from the facts presented here. *United States v. Commodity Account No. 549 54930*, 219 F.3d 595, 598 (7th Cir. 2000) (claimant's claim was both unverified and *two years* outside the twenty-day window allotted to file, and claimant was convicted in Norway of criminal fraud allegedly related to the moneys he later sought to claim in the U.S.); *United States v. $ 38,570 U.S. Currency*, 950 F.2d 1108 (5th Cir. 1992) (claimant and his attorney were each directly served notice of forfeiture); *United States v. Lots 5, 6, & 7, N. Corder Place*, 43 F.3d 388, 391 (8th Cir. 1994) (in addition to lacking required verification, claims did not specify in which properties the named claimants had an interest, and, furthermore, the motion to strike claims was deemed "unresisted" because claimants failed to amend their claims when [*7] given the opportunity to do so).

Although strict compliance with the filing requirements of the Supplemental Rules is typically required, it

has been held an abuse of discretion to strike a claim for failure to comply. *U.S. Currency, in the Amount of $ 103,387.27,* 863 F.2d at 563; *but see United States v. Beechcraft Queen Airplane,* 789 F.2d 627, 630 (8th Cir. 1986) (district court did not abuse its discretion in striking answer that was not preceded by verified claim); *United States v. 218 Panther Street,* 745 F.Supp. 118, 120 (E.D.N.Y. 1990) (claimant lacks standing to contest forfeiture because he did not timely file claim and answer); *United States v. RR 2,* 959 F.2d 101, 104 (8th Cir. 1992) (no abuse of discretion to strike unverified claims).

Forfeiture is a harsh but effective civil penalty, especially in a case such as this one where the defendant vehicle had a purchase price of $ 270,000 and the claimant has an interest in that vehicle in the amount of $ 142,013.48. However, even where the United States has a solid forfeiture case, a claimant who has standing to contest the forfeiture should be given the opportunity to do so. *See U.S. Currency in the Amount of $ 103,387.27,* 863 F.2d at 561. [*8] In this case, JP Morgan's claim in the civil forfeiture proceeding is clear, and the legitimacy of that claim was noted in the complaint where the United States alleged the defendant vehicle was financed with a loan from JP Morgan. *See United States v. Amiel,* 995 F.2d 367, 371 (2d Cir. 1993) ("Only those with legitimate possessory interests have standing to challenge forfeitures."); *see also $ 38,570 U.S. Currency,* 950 F.2d at 1113 (claimant need not supplement claim with evidence of ownership where government admitted relationship to currency in its complaint).

Ultimately, I am persuaded by the Seventh Circuit's reasoning in *U.S. Currency in the Amount of $ 103,387.27,* in which the court pointed to several factors which have guided district courts in exercising their discretion in forfeiture claims. 863 F.2d at 561. The same two factors are relevant here: (1) whether the claimant has advised the court and the government of its interest in the defendant - here the 2005 Rolls Royce Phantom, and (2) whether the government would be prejudiced by allowing the late filing. Like in *U.S. Currency in the Amount of $ 103,387.27,* in this case the government and the court were placed on notice [*9] of JP Morgan's interest in the property. The government concedes that service on the wholly owned subsidiary Chase Auto Finance was sufficient service on JP Morgan the parent company, and the government's own exhibit (Exhibit C) shows that Chase Auto Finance had intentions to file a claim in the defendant interest as of February 28, 2007, when Chase Auto Finance filed a claim with the IRS. This was well before the filing deadline came and went here. Additionally, the United States details JP Morgan's interest in the vehicle, including the amount and date of the loan secured, in its verified complaint. Thus, there is no dispute as to the ownership interest, and the court was on notice of this interest as of May 22, 2007.

Admittedly, JP Morgan's reasons for its late filing are feeble, but courts have extended the time to file a claim despite the claimant's failure to offer *any* reasons supporting failure to file where the government failed to specifically show how it would be prejudiced by a late filing. *See United Sates v. One (1) 1979 Mercedes 450SE,* 651 F.Supp. 351 (S.D.Fla. 1987). The government has not stated any prejudice it may face as a result of the untimely filing, and under [*10] the circumstances here, none can be found. The purpose of time limits in forfeiture proceedings is to force potential claimants to come forward as soon as possible after the proceedings have begun so that all interested parties can be heard and the dispute can be resolved expeditiously. *United States v. 1982 Yukon Delta Houseboat,* 774 F.2d 1432, 1436 (9th Cir. 1985). Because that purpose is not thwarted here, where the government and the court knew, by the time of the filing of the complaint, of JP Morgan's interest in the vehicle, the government's motion to strike JP Morgan's claim is denied.

/s/ James B. Zagel

James B. Zagel

United States District Judge

DATE: January 8, 2008

LEXSEE


Cited
As of: Sep 04, 2008

**DEPENDABLE CARTAGE AND TRANSPORTATION COMPANY, INC., Plaintiff, v. SOVEREIGN OIL COMPANY, et al., Defendants**

**No. 84 C 4949**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

**1985 U.S. Dist. LEXIS 15454**

**September 30, 1985**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff freight carrier filed suit against defendants, the shipper and the shipper's customers, alleging that they were jointly and severally liable under the Interstate Commerce Act (Act), 49 U.S.C.S. § 10101 et seq., for unpaid freight charges. The carrier also alleged that the shipper was guilty of racketeering, common law fraud, and breach of a fiduciary relationship. Four of the shipper's customers filed motions for summary judgment.

**OVERVIEW:** The carrier and the shipper agreed to a freight rate substantially less than the rate and tariff than the carrier had on file with the Interstate Commerce Commission, in violation of the Act. The carrier and shipper agreed that the shipper would correct the rate differential later through stock or by having the freight bills audited. The carrier transported the shipper's goods to its customers and the freight charges were negotiated with and billed exclusively to the shipper. The shipper's customers had no notice that they might be liable for any portion of the freight charges. The court held that: (1) the carrier contracted with the shipper and was estopped from recovery against the shipper's customers; (2) the carrier's allegations did not justify recourse against the shipper's customers under the Act; (3) the carrier failed to allege any agreement, facts, or conduct to substantiate its contention that the shipper's customers were jointly and severally liable with the shipper for payment of the unpaid freight charges; and (4) the carrier could demand payment from the shipper.

**OUTCOME:** The court granted the summary judgment motions filed by four of the shipper's customers in a suit by the carrier for unpaid freight charges.

**CORE TERMS:** carrier, consignee, freight charges, shipper, interstate commerce, summary judgment, transportation, freight, prepaid, shipment, tariff, contractually, estopped, delivery, estoppel, interstate, contracted, bills of lading, tariff rate, contractual, consignor, unpaid, leave to file, negotiated, surreply, interstate carrier, freight bills, common carrier, undercharge, commodities

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN1]To prevail on a motion for summary judgment, a party has the burden of establishing that there is no genuine issue of material fact. Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. The existence of a factual dispute, however, only precludes summary judgment if the disputed fact is outcome determinative. A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. Absent a material issue of fact, the question becomes whether defendants are entitled to summary judgment as a matter of law.

*Transportation Law > Carrier Duties & Liabilities > Rates & Tariffs*

[HN2]Interstate carriers are estopped to recover Interstate Commerce Commission-regulated freight charges from consignees who accept delivery of goods in reliance upon the carrier's representation that freight has been prepaid by the party, the consignor, that sent the property.

*Transportation Law > Carrier Duties & Liabilities > Rates & Tariffs*

[HN3]The carrier is presumed to know the law and understand that the rate charged can lawfully be only the one fixed by the tariff.

*Torts > Transportation Torts > General Overview*
*Transportation Law > Carrier Duties & Liabilities > Rates & Tariffs*
*Transportation Law > Commercial Vehicles > Rates & Tariffs*

[HN4]Under the Interstate Commerce Act (Act), a shipper and carrier retain the right to enter into a contract allocating responsibility for freight charges. Allocation of responsibility for payment of the freight is not discriminatory as long as someone is liable for the applicable freight. Thus, carriers may not proceed against consignees for freight charges they have contracted to collect from shippers. A carrier will be debarred from recovering from a consignee when the policy of the Act is not violated. The rights and duties created by the Act are for the public rather than for the enrichment of the carrier.

**COUNSEL:** [*1] Richard L. Lucas, Richard L. Lucas & Associates, Addison, IL, for Plaintiff.

Bruce Spitzer, Gorham, Metge, Bowman & Hourigan, Chicago, IL; Elaine K. B. Siegel, Sonnenschein Carlin Nath & Rosenthal, Chicago, IL; Harry C. Goplerud, Keck, Mahin & Cate, Chicago, IL; Cleta Glen, Chicago, IL; Irwin D. Rozner, Chicago, IL; Steven B. Teplinsky, Latham & Watkins, Chicago, IL, for Defendants.

**OPINION BY:** ROVNER

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Dependable Cartage and Transportation Company, Inc. ("Dependable") filed a complaint against numerous defendants [1] alleging that defendant Sovereign Oil is liable under the Interstate Commerce Act for freight charges which were incurred between May, 1981 and July, 1982. Additionally, Dependable alleges that Sovereign Oil is guilty of racketeeering, common law fraud, and breach of a fiduciary relationship. Finally, Dependable alleges in its complaint that all other defendants are jointly and severally liable with Sovereign Oil under the Interstate Commerce Act, 49 U.S.C. §§ 10101, *et seq.*, for the freight charges which were incurred between May, 1981 and July, 1982.

> 1   Defendants include Sovereign Oil Company ("Sovereign Oil"), Sovereign Chemical and Petroleum Products, Inc., Renuzit-Sovereign Oil, Zayre Corporation ("Zayre"), K-Mart Corporation ("K-Mart"), Mid-Ohio Automotive (now known as Nationwise, Inc.) ("Mid-Ohio), Silco Oil Co., Inc. ("Silco"), Motor Oils Refining Technology Company, Rubbermaid, Inc., Atlas Coatings, Ltd., Westville Oil Company, Steego Auto Parts, R.A.L. Auto Parts, Chicago & Northwestern Railroad Co., Louisville Bear Safety Service! Inc., Farmer Jacks Supermarket, Cooper Lewis, Inc., Automotive Color & Supply, Conoco, Inc., Spartan Stores, and Lloyds Shopping Center.

[*2] On May 10, 1985, defendants Zayre, K-Mart, Silco, and Mid-Ohio filed motions pursuant to Fed. R. Civ. P. ("Rule") 56 for summary judgment on Counts VII, VIII, IX, and XI of Dependable's second amended complaint. [2]

> 2   [HN1]To prevail on a motion for summary judgment! a party has the burden of establishing that there is no genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222 (7th Cir. 1984). Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Hermes v. Hein,* 742 F.2d 350 (7th Cir. 1984). The existence of a factual dispute, however, only precludes summary judgment if the disputed fact is outcome determinative. *Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir. 1984). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *Korf,* 726 F.2d at 1226, *quoting* Admiral 677 F.2d 1301, 1306 (9th Cir. 1982).

Dependable does not dispute the facts set forth in defendants' motions for summary judgment. Absent a material issue of fact, the question becomes whether defendants [*3] are entitled to summary judgment as a matter of law. For the following reasons, summary judgment is granted in favor of Zayre, K-Mart, Silco, and Mid-Ohio Automotive, and against Dependable.

*Facts*

Dependable is an Illinois corporation with its principal place of business in Cook County, Illinois. Dependable is duly certified by the Interstate Commerce Commission ("I.C.C.") as a motor common carrier of goods in interstate commerce. In accordance with the Interstate Commerce Act, Dependable has placed on file with the I.C.C. the rates and tariffs that it will charge for the transportation of commodities as an interstate carrier. Pursuant to the provisions of the Interstate Commerce Act, 49 U.S.C. §§ 10741, 10744, and 10761, Dependable is required to charge these rates and tariffs to all customers who contract with it as an interstate carrier.

At various times between May, 1981 and July, 1982, Dependable transported commodities in interstate commerce for defendant Sovereign Oil. These commodities were transported to various states and delivered to Sovereign Oil's customers, including Zayre, K-Mart, Silco-Oil, and Mid-Ohio. Prior to shipment, Dependable and Sovereign Oil, in admitted [*4] violation of the Interstate Commerce Act, negotiated the freight rate and tariff to be charged. Dependable and Sovereign Oil agreed to a rate substantially less than that on file with the Interstate Commerce Commission. They agreed that Sovereign Oil would correct the rate differential at a later date through stock or by having the freight bills audited.

In accordance with the agreement, Dependable transported Sovereign Oil's goods in interstate commerce to Sovereign Oil's consignees, defendants Zayre, K-Mart, Silco-Oil, and Mid-Ohio, as well as to numerous other distributors and retailers. It was understood and agreed by Sovereign Oil and its consignees that all sales made by Sovereign Oil were on a prepaid basis. The sales agreements between Sovereign Oil and these customers provided that all goods would be delivered to the consignees and Sovereign Oil alone would be responsible for the cost of transportation. Pursuant to this understanding, all products sold by Sovereign Oil were shipped freight prepaid, and the carrier, Dependable, was to bill Sovereign Oil for all freight charges.

Sovereign Oil loaded and prepared the trailers for transportation and then issued the bills of [*5] lading for the shipments. The bills of lading used by Sovereign Oil in connection with the transportation of goods to the consignees were either preprinted with the notation "Freight Prepaid," "Prepaid," or a similar notation. Dependable billed all freight charges to Sovereign Oil, and Sovereign Oil paid all freight bills as invoiced.

During the years 1981 and 1982, Sovereign Oil's accounts with respect to sales made to the defendant consignees in this suit were paid in full. In addition, when each consignee paid Sovereign Oil for goods sold, each payment included all freight charges.

I. The Carrier Is Estopped To Recover

*Unpaid Freight Charges From Consignees*

The Seventh Circuit has explicitly held that [HN2]interstate carriers are estopped to recover I.C.C. -- regulated freight charges from consignees who accept delivery of goods in reliance upon the carrier's representation that freight has been prepaid by the party (the consignor) that sent the property. *Consolidated Freight Ways Corp. v. Admiral Corp.*, 442 F.2d 56 (7th Cir. 1971). This Court is, of course, bound by the holding of the Seventh Circuit in *Consolidated Freightways*, and thus applies its principles to [*6] this case.

In *Consolidated Freightways*, a carrier that had been unable to recover unpaid freight charges from the consignor brought an action to recover the charges from the consignee (Admiral). The consignee, which had accepted delivery of the shipments and reimbursed the consignor for the "prepaid" freight charges in reliance upon the carrier's representations that freight had been fully prepaid, argued that the carrier was estopped to proceed against it. The Seventh Circuit agreed, stating:

> Admiral accepted delivery of the shipments upon [the carrier's] representation and promptly paid [the shipper] for the freight charges. These representations thus deprived Admiral of its ability to protect itself from possible double liability by paying the freight charges itself directly to the carrier upon acceptance of the shipment. Having indicated upon delivery that payment was sought and received from [the shipper], [the carrier] invited Admiral to discharge its obligations under its agreement with [the shipper]. Equity will not ignore [the carrier's] participation in securing Admiral's detrimental reliance in supposedly reimbursing [the shipper] for freight bills [*7] already paid.

*Id.* at 59.

Case law from other jurisdictions also supports the use of estoppel to prohibit recovery from these consignees.[3]

> 3 *Consolidated Freightways Corp. v. Eddy*, 266 Or. 385, 513 P.2d 1161 (1973) (en banc) (a carrier may be estopped to collect from a consignee when the carrier has represented that the freight

charges were prepaid by the shipper, and the consignee, in reliance on that representation, accepted shipment); *Checker Van Lines v. Siltek International, Ltd.,* 169 N.J. Super. 102, 404 A.2d 333 (1979) (carrier estopped from demanding the payment by a consignee of unpaid freight charges).

Here too, permitting Dependable to recover from these consignees would deprive them of their ability to protect themselves from accepting delivery of products which they had purchased at prices that were negotiated to include all freight charges and other costs of delivery. The evidence is uncontroverted that Dependable presented to these consignees bills of lading marked "Freight Prepaid," "Prepaid," or with a similar notation. Dependable negotiated exclusively with Sovereign Oil for the applicable freight charges. Moreover, Dependable billed Sovereign [*8] Oil and *only* Sovereign Oil for all freight charges. There is no indication from the evidence and facts before the Court that Dependable put these consignees on notice before filing suit that they might be liable for any portion of the transportation costs. Allowing Dependable to recover from these consignees would only serve to reward Dependable's unlawful and inequitable conduct. [4]

> 4   Dependable contends that the defendant consignees have an alternative remedy because if they are found liable, the consignees could sue Sovereign Oil to recover. This argument is irrelevant to the defendant consignees' present motion for summary judgment. If a party should not be included in a suit, that party should be granted summary judgment dismissing it as a matter of law.

Dependable contends that estoppel does not apply based on the naked proposition that courts in general have refused to apply estoppel even where there was intentional fraud, illegal credit, or "prepaid" type bills of lading, and have refused to relieve a consignee of paying the tariff rate. Dependable's contention that contractual defenses, estoppel, and other equitable defenses never apply in tariff undercharge cases [*9] has no basis in law. Indeed, Dependable fails to cite a single federal court decision that supports its contention. Each case cited by Dependable concerns the primary contractual liability of a shipper to a carrier and is thus inapposite to this case. [5]

> 5   *Siegal v. Converters Transportation, Inc.,* 714 F.2d 213 (2d Cir. 1983) (carrier who contractually undercharged shipper could later recover additional freight charges and the Act); *Missouri Pacific Railroad Co. v. Rutledge Oil Co.,* 669 F.2d 557 (8th Cir. 1982) (carrier allowed to recover unpaid demurrage charges even though it had assured shipper that no demurrage charge would be assessed); *Consolidated Freightways Corp. of Delaware v. Terry Truct, Inc.,* 612 F.2d 465 (9th Cir. 1980), *cert. denied,* 447 U.S. 907 (1980) (shipper held liable for freight charges even though carrier knowingly misquoted them prior to shipment); *Aero Trucking, Inc. v. Regal Tube Co.,* 594 F.2d 619 (7th Cir. 1979) (a shipper could not rely on carrier's manager's erroneous statement that no detention charges would be assessed; applicable tariffs were incorporated by law into the contract between shipper and carrier); *Consolidated Freightways Corp. of Delaware v. Forty-Eight Insulations, Inc.,* 501 F.2d 1400 (7th Cir. 1974) (carrier was allowed to recover additional freight charges from a shipper even though it had mistakenly misquoted the applicable rate prior to shipment); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.,* 430 F.2d 334 (1st Cir. 1970), *cert. denied,* 400 U.S. 964 (1970) (a shipper who had contracted with a carrier for rates lower than those published by the carrier was held liable for the difference); *Farrell Lines, Inc. v. American Motorists Insurance Co.,* 572 F. Supp. 939 (S.D.N.Y. 1983), *aff'd,* 728 F.2d 147 (2d Cir. 1982) (dealt with liability of the party to whom the carrier actually looked for payment; as long as someone is liable for the full amount of the freight, public interest is protected and statute is satisfied).

[*10] Dependable contends next that because Sovereign Oil rather than Dependable prepared all of the bills of lading and invoices, the doctrine of estoppel cannot be invoked. This argument is also without merit. Indeed, it merely emphasizes that Dependable intended to and did look to Sovereign Oil for reimbursement of the freight charges.

Third, Dependable argues that defendant Zayre "is not free of 'unclean hands'." In support of this argument, Dependable provides excerpts from the deposition taken of its own representative, Stienmann. These excerpts refer to a meeting at which representatives from Dependable, Sovereign Oil, and Zayre were present. The testimony given by Dependable's representative is that Zayre was to pay Sovereign Oil for the freight charges and Sovereign Oil would be primarily liable to Dependable for transportation costs. Moreover, it indicates that the arrangement between Sovereign Oil and Dependable was a completely separate matter. This evidence does not support the argument that Zayre engaged in illegal conduct; nor does it indicate that Zayre was ever contractually liable for the freight charges.

Finally, Dependable argues that it did not intentionally undercharge [*11] the shipper, Sovereign Oil, for freight. The question of Dependable's intent in imposing freight charges on Sovereign Oil is, however, irrelevant to the determination of whether to apply the doctrine of estoppel against Dependable. Dependable openly admits that it conducted its business with Sovereign Oil illegally by extending credit. [HN3]"The carrier must be presumed to know the law and to have understood that the rate charged could lawfully be only the one fixed by the tariff." *Aero Trucking, Inc. v. Regal Tube Co., 594 F.2d 619, 621 (7th Cir. 1979)*, *quoting Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink*, 250 U.S. at 577, 581 (1919). Implicit in Dependable's presumptive knowledge of the law is its knowledge of its contractual liability. Dependable contracted with Sovereign Oil for payment, and thus should demand any additional charges only from Sovereign Oil. Dependable is estopped to recover against the defendant consignees.

## II. The Interstate Commerce Act Provides

### *No Basis for Recovery Against Consignees*

The Interstate Commerce Act, *49 U.S.C. §§ 10101, et seq.*, establishes a regulatory scheme to prohibit unjust, discriminatory transportation [*12] practices, such as kickbacks or rebates. It requires common carriers to publish freight rates in tariffs filed with the I.C.C. The carrier must then determine freight charges in accordance with the published tariff rates. The objective of the Interstate Commerce Act is "to curb prejudicial or preferential discrimination among shippers by interstate motor carriers." *Consolidated Freightways Corp. v. Admiral Corp., 442 F.2d 56, 61 (7th Cir. 1971)*.

Dependable's second amended complaint is premised upon an alleged contract between Dependable and Sovereign Oil providing that Dependable would transport products to the consignees on behalf of Sovereign Oil, which would be liable for the freight charges. Dependable, a licensed motor carrier in interstate commerce, published its tariff rates with the I.C.C. Dependable, however, negotiated and billed Sovereign Oil lower rates for its shipments than those on file with the I.C.C. Rates on file are fixed by law.

[HN4]Under the Interstate Commerce Act, a shipper and carrier retain the right to enter into a contract allocating responsibility for freight charges. *Louisville & N.R. Co. v. Central Iron & Coal Co., 265 U.S. 59, 65-66 (1924)*. Allocation [*13] of responsibility for payment of the freight is not discriminatory as long as someone is liable for the applicable freight. *Farrell Lines, Inc. v. Titan Industrial Corp., 306 F. Supp. 1348, 1349* (S.D.N.Y.), *aff'd, 419 F.2d 835 (2d Cir. 1969)*, *cert. denied, 397 U.S. 1042 (1970)*. Thus, carriers may not proceed against consignees for freight charges they have contracted to collect from shipppers.

On the facts in this case, liability for freight charges must be determined through the principles of contract law, not under the Interstate Commerce Act. Dependable's allegations do not justify recourse against the defendant consignees under the Interstate Commerce Act for amounts contractually due from Sovereign Oil.

Dependable has alleged that Sovereign Oil, not the consignees, was initially responsible for transportation charges. Dependable has failed to allege any agreement, facts, or conduct to substantiate its contention that these consignees are now "jointly and severally liable" for payment. Absent any contractual obligation on the part of the consignees, the "joint and several liability" which Dependable would have this Court impose on the consignees would have to [*14] arise solely from the Interstate Commerce Act itself.

Dependable relies on the case of *Southern Pacific Transportation Co. v. Commercial Metals Co., 456 U.S. 336 (1982)*, to support its contention that the consignees are liable at law. The Court in *Southern Pacific, supra, 456 U.S. at 343-44*, stated, "it is perhaps appropriate to note that a carrier has not only the right but also the duty to recover its proper charges for services performed . . . to achieve uniformity in freight transportation charges, and thereby eliminate the discrimination and favoritism . . . ." [6] Moreover, Dependable cites in its brief in opposition to the motion for summary judgment, the case of *Western Transportation Company v. Wilson & Co., 682 F.2d 1227 (7th Cir. 1982)*, for the proposition that

> No contract of the carrier could reduce the amount legally payable; or release from liability *a shipper who had assumed an obligation to pay the charges.* Nor could any act or omission of the carrier (except the running of the statute of limitations) estop or preclude it from enforcing payment of the full amount *by a person liable therefor.*

*682 F.2d at 1229* (emphasis added). [*15]

6  13 C.J.S. Carriers § 393.

This Court agrees. A carrier has a duty under the Interstate Commerce Act to recover all freight charges for services it has performed. Implicit in the ruling of both the Supreme Court and the Seventh Circuit, however, is the availability of a contract defense. Dependable can sue and has sued the shipper, Sovereign Oil, with whom it contracted for freight charges. Neither Dependable's al-

legations nor its reliance on *Southern Pacific*, however, furnish a basis for proceeding against the defendant consignees to recover amounts that Dependable failed to collect from the party who was contractually liable for payment, Sovereign Oil.

Although it is true that where a common carrier charges and collects a rate lower than its tariff rates, it is the carrier's duty to use every lawful method to collect the difference, this Court too discerns "nothing in the language or policies of [the Act] to suggest that Congress intended to impose absolute liability upon a consignee for freight charges." *Consolidated Freightways, supra,* 442 F.2d at 61. The purpose of the Act was to prevent unjust discrimination among shippers by interstate motor carriers. [*16] Congress did not intend to provide statutory insurance for all carriers transporting goods in interstate commerce from the legal consequences of their otherwise negligent or inequitable conduct. *Consolidated Freightways, supra,* 442 F.2d at 59.

The law is well settled that a carrier will be debarred from recovering from a consignee when the policy of the Act is not violated. *In re Penn-Dixie Steel Corp.*, 6Bank. L. Rep. 817 at 820 (B.C. S.D.N.Y. 1980), *aff'd*, 10Bank. L. Rep. 878 (B.C. S.D.N.Y. 1981). "The rights and duties created by the Act are for the public rather than for the enrichment of the carrier." *In re Penn-Dixie Steel Corp., supra*, 6 B.R. at 821-22.

As the Seventh Circuit observed in *New York Central Railway Co. v. Trans-American Petroleum Corp.,* 108 F.2d 994 (7th Cir. 1939), "plaintiff's theory would place at the disposal of the carrier a means of practicing rather than preventing discrimination." The Seventh Circuit also succinctly stated in *Consolidated Freightways*:

> Congress was concerned with eliminating rate and credit discrimination in the collection of the lawful charges from the party otherwise liable, whether it be the consignor, [*17] consignee, or another shipper with a beneficial interest in the goods shipped. The statute is not primarily addressed to establishing or locating liability for payment of freight charges. No attempt was made to specify from whom payment should be collected under ordinary circumstances.

442 F.2d at 61.

In this case, the only real issue relates to who is to be responsible for payment, and thus discrimination is not involved. *In re Penn-Dixie Steel, supra*, 6 B.R. at 820-21. So long as payment of the full tariff charges may be demanded from some party, the anti-discrimination policy of the Interstate Commerce Act is satisfied. *Consolidated Freightways, supra,* 442 F.2d at 62. Dependable can demand payment from Sovereign Oil, the party with whom it originally contracted for payment.

The goal of the Interstate Commerce Act cannot be furthered by permitting carriers to contractually undercharge shippers and then extract all additional freight charges from unsuspecting consignees. The purpose of the Act is effectuated by demanding payment from the party contractually liable for any and all transportation costs, in this case, the shipper, Sovereign Oil. [7]

> 7 After the briefing on the motions for summary judgment was completed, plaintiff Dependable requested leave to file a surreply brief. The Local Rules of the United States District for the Northern District of Illinois clearly allow a party opposing a motion for summary judgment one opportunity to respond by filing a brief not exceeding 15 pages, unless leave of court is obtained to exceed that page limit. Dependable filed a responsive brief opposiong [sic] the motions for summary judgment consisting of only 6 pages. Apparently realizing, albeit too late, that its brief was inadequate, Dependable now seeks another opportunity to do what it should have done in the first place. In accordance with the Local Rules of this District, Dependable has had an adequate opportunity to present its arguments. Moreover, Dependable gives no indication of what it is that it seeks to add. Dependable does not contend in its motion for leave to file a surreply that additional law will be cited. Nor did the moving defendants raise new matters in their reply briefs which would require a response. The sole support for Dependable's request for additional briefing is that "plaintiff does have something to say and would like an opportunity to respond." This Court will not condone conduct which both prolongs the resolution of this case and unecessarily increases the attorneys' fees which all parties must bear. Dependable's motion for leave to file a surreply brief, therefore, is denied.

[*18] *Conclusion*

Because there are no genuine issues of material fact, this Court grants summary judgment as a matter of law in favor of defendants Zayre, K-Mart, Silco Oil Company, Inc. and Mid-Ohio Automotive on Counts VII, VIII, IX, and XI, and against plaintiff, Dependable Cartage and Transportation, Inc. These defendants are dismissed from those Counts. Moreover, Dependable's motion for leave to file a surreply brief on the defendants'

motions for summary judgment is denied. All parties will bear their own costs on these motions. It is so ordered.